# Exhibit D

## <u>Notice of Authorities</u>

Pursuant to this Court's Discovery procedures, the parties respectfully include herewith their respective listing of authorities followed by highlighted copies of these authorities.

<u>Authorities relied upon by Plaintiff Miami Slice Pizza, LLC</u>

*PODS Enterprises, Inc. v. U-Haul International, Inc.*, 2014 WL 12628663, at *2 (M.D. Fla. June 27, 2013)

*Peace United, Ltd. v. 1906 Collins, LLC*, No. 17-cv-21881-JEM, 2022 WL 2290528 (S.D. Fla. June 24, 2022)

*ITT Corp. v. Xylem Group, LLC*, 963 F.Supp.2d 1309, 1330-32 (N.D. Ga. 2013)

*First Quality Tissue, LLC v. Irving Consumer Products Limited,* 2022 WL 958089, at *15-17 (D. Del. Mar. 30, 2022)

<u>Authorities relied upon by Defendant Carnival Corporation</u>

Following Plaintiff's authorities, beginning at page 50 of Exhibit D.

2014 WL 12628663
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

PODS ENTERPRISES, INC., Plaintiff,
v.
U–HAUL INTERNATIONAL, INC.,
Defendant.

Case No. 8:12–cv–01479–T–27MAP
|
Signed 06/27/2014

**Attorneys and Law Firms**

Charles E. Cantine, Jason M. Sobel, Joseph Diamante, Vivian Luo, Stroock & Stroock & Lavan, LLP, New York, NY, Jeffrey S. Bucholtz, King & Spalding, LLP, Washington, DC, Jonathan B. Sbar, Raul Valles, Jr., Robert L. Rocke, Rocke, McLean & Sbar, PA, Tampa, FL, for Plaintiff.

Leo R. Beus, Beus Gilbert, PLLC, Phoenix, AZ, R. Charles Henn, Jr., William H. Brewster, Kilpatrick Townsend & Stockton, LLP, Atlanta, GA, Seth P. Waxman, WilmerHale, LLP, Washington, DC, Dennis L. Wilson, Kilpatrick Townsend & Stockton, LLP, Beverly Hills, CA, William P. Cassidy, Jr., Johnson & Cassidy, P.A., Tampa, FL, for Defendant.

## ORDER

JAMES D. WHITTEMORE, United States District Judge

**\*1 BEFORE THE COURT** is U–Haul International Inc.'s Motion to Exclude the Expert Testimony of Walter Bratic (Dkt. 153), which Plaintiff opposes (Dkt. 201). Upon consideration, the motion (Dkt. 153) is DENIED.

Plaintiff PODS Enterprises, Inc. engaged Walter Bratic to render an opinion as to the damages to which PEI is entitled as a result of U–Haul's alleged infringement of PEI's trademarks. Dkts. 156–21, 156–22. Bratic opines as to the amount of damages to which PEI is entitled in several categories, including profits, a reasonably royalty, corrective advertising, and avoided costs. U–Haul moves to exclude his opinions as unreliable under *Dauberi v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579(1993).

*Profits*

U–Haul first argues that Bratic's opinion concerning profits should be excluded because he fails to establish what portion of U–Haul's profits was attributable to, or caused by, U–Haul's allegedly infringing use of PEI's marks on its website. This argument is unpersuasive.

The Lanham Act provides that a successful plaintiff in a trademark infringement action may recover (1) the defendant's profits; (2) any damages sustained by the plaintiff; and (3) the cost of the action. 15 U.S.C. § 1117; *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986). Courts have "considerable discretion" in fashioning an award of the defendant's profits, which is to be guided by principles of equity. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir. 1983). Section 1117 also provides for the adjustment of any profits award if it is inadequate or excessive. *Id.* "[N]o hard and fast rules dictate the form or quantum of relief" for a Lanham Act violation. *Id.* at 1495 n. 11.

A plaintiff need not demonstrate actual damages in order to obtain an accounting for profits. *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988). An accounting for profits is appropriate where (1) the defendant's conduct is a deliberate and willful violation; (2) the infringer is unjustly enriched; or (3) the sanction is necessary for future deterrence. *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990). To prove the quantum of profits that should be awarded, a plaintiff need only "prove the infringer's sales." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987). "The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales." *Id.* Shifting the burden to the defendant to prove costs and deductions from total sales has been the law of the land since *Mishawaka Rubber & Woolen Manufacturing. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942).

U–Haul's argument that PEI must demonstrate the portion of U–Haul's profits attributable to the infringing use of the mark on its website is contradicted by the burden-shifting framework of *Mishawaka. See id.* at 206

("If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher."). Even if Bratic was required to set forth a profits calculation based on causation, he has arguably done so, and U–Haul does not argue that the calculation is unreliable or that it would not be helpful to the jury. *See* Dkt. 156–21 ¶ 68 ("Based on the application of these apportionment factors, I have preliminarily determined that U–Haul generated between \$64.1 and \$92.7 million in U–Box sales *associated with its infringement* of the PODS Marks ....") (emphasis added); *see generally id.* ¶¶ 63–68. Given the broad discretion accorded to the district court in fashioning a profits award, Bratic's profits opinion is admissible. *Mason*, 710 F.2d at 1495. U–Haul's remaining arguments go to the weight of Bratic's profits opinion and may be addressed on cross-examination.[1]

### Reasonable Royalty

**\*2** U–Haul next contests Bratic's calculation of a reasonable royalty. The Eleventh Circuit has consistently approved a reasonable royalty as a measure of damages in trademark infringement cases. *ITT Corp. v. Xylem Grp., LLC*, 963 F. Supp. 2d 1309, 1329–30 (N.D. Ga. 2013) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519–20 (11th Cir. 1990); *Ramada Inns*, 804 F.2d at 1565; *Boston. Prof'l Hockey Ass 'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 76 (5th Cir.1979)).[2] The *Georgia–Pacific* methodology for hypothesizing a licensing arrangement and arriving at a reasonable royalty is well-established, and U–Haul does not contest its use. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009); *Ga.–Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Rather, U–Haul contends that Bratic's application of the *Georgia–Pacific* framework is "so flawed as to render his opinion inadmissible." Dkt. 153 at 11.

U–Haul first argues that the reasonable royalty opinion must be excluded because his calculation includes all gross revenues from the sale of U–Box products. The Court disagrees. *See* Dkt. 156–22 ¶ 147. U–Haul's second argument that Bratic fails to explain his use of comparable licenses is similarly incorrect. Bratic extensively discusses his use of comparable licenses and licensing fees. *See id.* ¶¶ 123–128, 140–142. U–Haul's final argument that Bratic's opinion should be excluded because it is based on the unreasonable inference that U–Haul infringed PEI's marks is nothing more than a merits, and is likewise unpersuasive. Bratic's reasonable royalty opinion uses a well-accepted methodology and is reasoned and discussed at length. It is reliable and will be helpful to the jury in determining a reasonable royalty.

### Corrective Advertising and Avoided Costs

U–Haul contends that Bratic's opinions as to corrective advertising and avoided costs should be excluded because he simply incorporates Dr. Russell Winer's calculations. This argument fails. *See* Fed. R. Evid. 702 *committee notes* (2000) ("The term 'data' is intended to encompass the reliable opinions of other experts."). Trademark infringement damages are cumulative, and Bratic was retained to render an opinion as to the entire picture of damages, which he has done by incorporating the reliable opinion of Dr. Winer. *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994).

Accordingly, U–Haul International Inc.'s Motion to Exclude the Expert Testimony of Walter Bratic (Dkt. 153) is **DENIED.**

**DONE AND ORDERED** this 27th day of June, 2014.

### All Citations

Not Reported in Fed. Supp., 2014 WL 12628663

---

Footnotes

1    U–Haul's extensive reliance on *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, 2006 WL 1663357 (N.D. Ga. June 14, 2006), is unavailing. The expert's opinion in that case was excluded because he relied on facts excluded from evidence and included damages for multiple claims that had been dismissed. *Id* at \*5.

2    In *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent

**PODS Enterprises, Inc. v. U–Haul International, Inc., Not Reported in Fed. Supp. (2014)**

2014 WL 12628663

all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Peace United, Ltd. v. 1906 Collins, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2290528

2022 WL 2290528
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

PEACE UNITED, LTD., Plaintiff,
v.
1906 COLLINS, LLC and Mathieu Massa,
Defendants,

Case Number:
17-21881-CIV-MARTINEZ-BECERRA
|
Signed 06/24/2022

**Attorneys and Law Firms**

Anthony Vicken Narula, AXS Law Group, PLLC, Wynwood, FL, Jeffrey W. Gutchess, Joshua Shore, Rossana Arteaga-Gomez, Joanna Niworowski, AXS Law Group, Miami, FL, for Plaintiff.

Alan J. Perlman, Catherine Fran Hoffman, Vijay Gibran Brijbasi, Dickinson Wright PLLC, Ft. Lauderdale, FL, James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL, for Defendant 1906 Collins LLC.

Catherine Fran Hoffman, Dickinson Wright PLLC, Ft. Lauderdale, FL, James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL, for Defendant Mathieu Masssa.

## ORDER ON MOTION TO STRIKE JURY DEMAND

JOSE E. MARTINEZ, UNITED STATES DISTRICT JUDGE

**\*1 THIS MATTER** comes before the Court on Defendants 1906 Collins, LLC and Mathieu Massa's Motion to Strike Jury Trial Demand. (ECF No. 278). Defendants argue Plaintiff Peace United Ltd. does not have the right to a jury trial because Peace is only entitled to equitable relief on its trademark infringement and unfair competition claims. (*Id.* at 2). In response, Peace asserts that it is entitled to recover both actual damages in the form of a reasonable royalty and the equitable disgorgement of profits. (ECF No. 297).

A plaintiff is entitled to a jury trial under the Seventh Amendment of the U.S. Constitution or pursuant to a federal statute. *See* Fed. R. Civ. P. 38. The Seventh Amendment of the U.S. Constitution provides for jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Supreme Court has established a two-part test to determine whether a plaintiff is entitled to a jury trial: (1) whether the action "is 'analogous' to a claim that would have been brought in the English law courts at common law" or "if the claims sounded in equity or admiralty"; and (2) whether the remedy sought is legal or equitable in nature. *See Tull v. United States*, 481 U.S. 412, 417–18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1352 (11th Cir. 2019). To be entitled to a jury trial, the plaintiff must assert a common law claim and be entitled to a legal remedy. *See Hard Candy*, 921 F.3d at 1352– 53. Applying the test here, the first prong is "indeterminate" "because when the Seventh Amendment was ratified trademark rights had 'been long recognized by the common law and the chancery courts of England.' " *Id.* at 1355. Thus, Peace's right to a jury trial turns on the second prong, the nature of the remedy, which is the "[m]ore important" consideration. *See Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).

Both equitable and legal remedies are available under the Lanham Act. *See* 15 U.S.C. § 1117(a). Here, Peace asserts that it is entitled to both the disgorgement of profits from Defendants' alleged misuse of Peace's trademarks and actual damages in the form of reasonable royalty fees. (*See* Resp. at 5, ECF No. 297). Disgorgement of profits is an equitable remedy, *Waldrop v. S. Co. Servs.*, 24 F.3d 152, 157 (11th Cir. 1994), while actual damages are a legal remedy, *see Hard Candy*, 921 F.3d at 1358. To support its claim for actual damages, Peace points to the licensing agreement between its predecessor-in-interest and 1906 Collins, which Peace asserts entitles it to a royalty payment. (TAC ¶ 10, ECF No. 340). "The use of lost royalties to determine the actual damages incurred by a victim of trademark misuse is well established by this court." *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519–20 (11th Cir. 1990); *see also Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks."). With these principles in mind, the Court finds

Peace United, Ltd. v. 1906 Collins, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2290528

that the licensing agreement provides adequate support for Peace's claim for actual damages and, corresponding, to Peace's right to a trial by jury.

**\*2** Defendant argues that allowing Peace to recover for disgorgement and actual damages would amount to a double recovery. But "if a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, *including all issues common to both claims*, remain intact." *Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (emphasis added); *see also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ("The necessary prerequisite to maintain a suit for an equitable [remedy] ... is ... the absence of an adequate remedy at law."); *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*, No. 16-cv-452, 2017 WL 6945340 at *5, 2017 U.S. Dist. LEXIS 222711 at *11 (S.D. Ala. Aug. 18, 2017) (recognizing that the "recovery of lost royalties by a victim of trademark infringement is the preferred award of damages"). As to Defendants' argument that Peace has not presented evidence of actual damages, the royalties

purportedly owed to Peace under the licensing agreement can provide the jury with adequate information to calculate damages. *See N. Atl. Operating Co. v. Hammad Enters.*, No. 19-60200, 2020 WL 1286180, at *——, 2020 U.S. Dist. LEXIS 50182, at *8 (S.D. Fla. Jan. 15, 2020); *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 8404330, at *7 (S.D. Fla. Nov. 20, 2017).

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Strike the Jury Demand, (ECF No. 278), is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of June, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2290528

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

KeyCite Yellow Flag - Negative Treatment
Distinguished by Alaskasland.Com, LLC v. Cross, Alaska, September 25, 2015

963 F.Supp.2d 1309
United States District Court, N.D. Georgia, Atlanta Division.

ITT CORPORATION and Xylem, Inc., Plaintiffs/Counterclaim Defendants,
v.
XYLEM GROUP, LLC, Defendant/Counterclaim Plaintiff.

No. 1:11–cv–03669–WSD
|
Aug. 5, 2013.

**Synopsis**
**Background:** Global high-technology engineering and manufacturing organization, whose water technology subsidiary used the trade name "Xylem" filed state court suit against owner of "Xylem" trademark used in Georgia in conjunction with bathroom furniture and fixtures, seeking declaration of non-infringement. Defendant counterclaimed for trade name and trademark infringement and unfair competition under Lanham Act, Georgia state law, and New York state law, and removed. Both sides moved for partial summary judgment and to exclude expert testimony.

**Holdings:** The District Court, William S. Duffey., Jr., J., held that:

[1] "Xylem" mark was at least suggestive;

[2] "Xylem" trade name was substantially similar to "Xylem" trademark;

[3] there was an overlap of advertising between the trademark and trade name;

[4] actual consumer confusion existed; but

[5] genuine issue of material fact as to whether, in balancing factors, a likelihood of confusion existed between the trademark and the competing trade name precluded summary judgment on claims of infringement

and unfair competition;

[6] global parent company would be liable for contributory trademark infringement should its subsidiary be found to have infringed trademark; and

[7] genuine issue of material fact as to whether trademark owner suffered actual damages due to lost sales precluded summary judgment on issue of damages.

Ordered accordingly.

West Headnotes (40)

[1]     **Trademarks**⚖️Trade names in general

Both trade names and trademarks are protected under the Lanham Act. Lanham Act, §§ 32, 43(a), 15 U.S.C.A. §§ 1114, 1125(a).

[2]     **Trademarks**⚖️Infringement

A trade name may infringe on a registered trademark, in violation of Lanham Act, if the two are similar enough to cause consumer confusion. Lanham Act, § 32, 15 U.S.C.A. § 1114.

1 Case that cites this headnote

[3]     **Trademarks**⚖️Infringement

To prove infringement under Lanham Act, the holder of a registered trademark must show: (1) that the infringer used the mark in commerce, without the trademark holder's consent, and (2) that the use was likely to cause confusion. Lanham Act, § 32, 15 U.S.C.A. § 1114.

3 Cases that cite this headnote

**[4]     Trademarks** Nature or type of mark; distinctiveness and strength

Once a mark has been registered for five years with the Patent & Trademark Office and becomes incontestable, its validity is presumed and cannot then be challenged on the ground that it is merely descriptive. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[5]     Trademarks** Factors considered in general

To determine whether customer confusion is likely to occur, for purposes of trademark infringement under Lanham Act, court considers: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. Lanham Act, § 32, 15 U.S.C.A. § 1114.

3 Cases that cite this headnote

**[6]     Trademarks** Actual confusion
**Trademarks** Nature of Marks

Of the seven factors used to determine whether customer confusion is likely to occur, for purposes of trademark infringement claim under Lanham Act, the type of mark and the evidence of actual confusion are the most important. Lanham Act, § 32, 15 U.S.C.A. § 1114.

7 Cases that cite this headnote

**[7]     Trademarks** Similarity; likelihood of confusion

The likelihood of confusion, for purposes of establishing trademark infringement in violation of Lanham Act, is a question of fact. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[8]     Trademarks** Factors considered in general

Determining whether a likelihood of confusion exists for purposes of trademark infringement under Lanham Act entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the overall balance. Lanham Act, § 32, 15 U.S.C.A. § 1114.

2 Cases that cite this headnote

**[9]     Trademarks** Generic terms or marks

Whether a name is generic, for purposes of trademark infringement under Lanham Act, depends on the use of the term, not the term itself. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[10]     Trademarks** Generic terms or marks

The generic use of a word may not be registered as a trademark. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[11]     Trademarks** Levels or categories of distinctiveness in general; strength of marks in general

Both the descriptiveness of the mark and the extent of third-party use should be considered when analyzing the strength of a particular trademark. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[12]    Trademarks**⬦Suggestive terms or marks

For purposes of trademark infringement under Lanham Act, "Xylem" mark used in conjunction with bathroom furniture and fixtures was at least suggestive, because it took a leap of the imagination to connect the plant tissue "xylem" to the owner's products, even though the two shared a water-transport function. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[13]    Trademarks**⬦Examination and comparison; construction as entirety
**Trademarks**⬦Appearance, sound, and meaning

For purposes of trademark infringement under Lanham Act, "Xylem" trade name, used by water technology subsidiary of global high-technology engineering and manufacturing organization, was substantially similar to "Xylem" trademark used in conjunction with Georgia owner's bathroom furniture and fixtures; appearance, sound, and totality of impression were the same, even though captioned words used underneath the name was different, and overall impression of the two was so similar that a customer not familiar with the distinction would likely attribute both to the same source. Lanham Act, § 32, 15 U.S.C.A. § 1114.

4 Cases that cite this headnote

**[14]    Trademarks**⬦Trade channels; sales,

advertising, and marketing

The similarity of advertising factor used to determine whether customer confusion is likely to occur, for purposes of trademark infringement under Lanham Act, looks to each party's method of advertising. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[15]    Trademarks**⬦Trade channels; sales, advertising, and marketing

Even though Georgia owner of "Xylem" trademark used in conjunction with bathroom furniture and fixtures spent roughly $46,000 on marketing and public relations in one-year period, while owner of allegedly infringing trade name "Xylem" spent $15 million in two quarters in rebranding and marketing its water technology subsidiary, there was overlap in advertising, even if small, for purposes of determining whether likelihood of confusion existed, for purposes of trademark infringement under Lanham Act. Lanham Act, § 32, 15 U.S.C.A. § 1114.

**[16]    Trademarks**⬦Actual confusion

Actual consumer confusion existed between "Xylem" trade name, used by water technology subsidiary of global high-technology engineering and manufacturing organization, and "Xylem" trademark used in conjunction with Georgia owner's bathroom furniture and fixtures, for purposes of trademark infringement under Lanham Act, where there had been over 100 instances of consumers' misdirected checks, phone calls, faxes, and emails coming from people who ought not to have been confused, including customers and others with whom Georgia owner had conducted its business. Lanham Act, § 32, 15 U.S.C.A. § 1114.

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

**[17]   Summary Judgment** ⚬ Trademarks
**Trademarks** ⚬ Similarity; likelihood of
confusion

Genuine issue of material fact as to whether a
likelihood of confusion existed between
"Xylem" trade name, used by water technology
subsidiary of global high-technology
engineering and manufacturing organization and
"Xylem" trademark used in conjunction with
Georgia owner's bathroom furniture and fixtures
precluded summary judgment on claims of
trademark infringement and unfair competition
under Lanham Act. Lanham Act, § 32, 15
U.S.C.A. § 1114.

1 Case that cites this headnote

**[18]   Trademarks** ⚬ Contributory liability

To be liable for contributory trademark
infringement, a defendant must have
intentionally induced another to infringe a
trademark. Lanham Act, § 32, 15 U.S.C.A. §
1114.

2 Cases that cite this headnote

**[19]   Trademarks** ⚬ Contributory liability

Any liability for contributory infringement will
necessarily depend upon whether or not the
contributing party intended to participate in the
infringement or actually knew about the
infringing activities. Lanham Act, § 32, 15
U.S.C.A. § 1114.

1 Case that cites this headnote

**[20]   Trademarks** ⚬ Contributory liability

Parent company would be liable for contributory
trademark infringement, under Lanham Act,
should its subsidiary be found to have infringed
another's trademark through use of trade name
"Xylem", where parent and its management
knew that the "Xylem" trademark had been
registered by another in the United States, parent
was warned by its outside counsel that it was
unlikely that it could successfully register the
name in the country because of its prior
registration, and despite the warning, parent
chose to name its subsidiary using the trade
name and then embarked on its business
activities which involved overlapping
customers. Lanham Act, § 32, 15 U.S.C.A. §
1114.

1 Case that cites this headnote

**[21]   Trademarks** ⚬ Unfair competition

To prevail on a claim for federal unfair
competition under Lanham Act, movant must
show: (1) that it had enforceable trademark
rights in the mark or name, and (2) that
respondent made unauthorized use of the mark
or name such that consumers were likely to
confuse the two. Lanham Act, § 43(a), 15
U.S.C.A. § 1125(a).

**[22]   Trademarks** ⚬ Necessity of registration

Registration of a service mark or trademark is a
prerequisite for relief under Georgia trademark
statute. West's Ga.Code Ann. § 10–1–450.

1 Case that cites this headnote

**[23]   Trademarks** ⚬ Similarity Between Marks;
Likelihood of Confusion

Trademark infringement claims under Georgia

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

trademark statute adopt the same likelihood of confusion analysis as federal trademark-infringement claims under the Lanham Act. Lanham Act, § 32, 15 U.S.C.A. § 1114; West's Ga.Code Ann. § 10–1–450.

6 Cases that cite this headnote

[24]   **Trademarks**—Unfair competition

Georgia unfair-competition claims involve the same dispositive questions as trademark-infringement claims under the Lanham Act. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a); West's Ga.Code Ann. § 23–2–55.

2 Cases that cite this headnote

[25]   **Antitrust and Trade Regulation**—Confusion
**Trademarks**—Similarity Between Marks; Likelihood of Confusion

Whether confusion occurs under Georgia Deceptive Trade Practices Act requires the same likelihood of confusion analysis found in trademark-infringement claims under the Lanham Act. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a); West's Ga.Code Ann. § 10–1–372.

3 Cases that cite this headnote

[26]   **Trademarks**—Damages
**Trademarks**—Measure and amount

Lanham Act damages for trademark infringement and unfair competition may be awarded even when they are not susceptible to precise calculations. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[27]   **Trademarks**—Measure and amount

District court has wide discretion in determining a just amount of recovery for trademark infringement. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[28]   **Trademarks**—Elements of Damages
**Trademarks**—Corrective advertising
**Trademarks**—Good will

Under Lanham Act, damages sustained by a trademark holder include all elements of injury to its business proximately resulting from infringer's wrongful acts such as the costs of corrective advertising or injury to business reputation or goodwill. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[29]   **Trademarks**—Loss of profits or royalties

Trial court may use a reasonable royalty as a measure of damages for trademark infringement under Lanham Act. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

3 Cases that cite this headnote

[30]   **Summary Judgment**—Trademarks
**Trademarks**—Infringement in general
**Trademarks**—Unfair competition in general

Genuine issue of material fact as to whether owner of "Xylem" trademark used in conjunction with Georgia owner's bathroom furniture and fixtures suffered actual damages due to lost sales as a result of global high-technology engineering and manufacturing organization's subsidiary's use of "Xylem" trade name precluded summary judgment on issue of

damages for claims of trademark infringement and unfair competition under Lanham Act. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**[31]    Trademarks**  Loss of profits or royalties

The "reasonable royalty theory" is a method used to estimate hypothetical royalty amounts in the absence of an established royalty in trademark infringement suits. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**[32]    Trademarks**  Loss of profits or royalties

The Eleventh Circuit uses the reasonable royalty theory as a measure of damages in trademark infringement cases. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

3 Cases that cite this headnote

**[33]    Trademarks**  Loss of profits or royalties

The reasonable royalty theory, used to estimate hypothetical royalty amounts in the absence of an established royalty in trademark infringement suits under Lanham Act, applies even in a case that does not involve a holdover license or when a license was not previously granted to a third party. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**[34]    Evidence**  Daubert and Frye tests as to reliability in general

In assessing reliability of expert testimony, a deciding court may look to: (1) whether expert's

methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. Fed.Rules Evid.Rule 703, 28 U.S.C.A.

**[35]    Evidence**  Damages

Expert testimony of trademark owner's certified public accountant (CPA) as to reasonable royalty to which owner was entitled under Lanham Act was sufficiently reliable, and thus, admissible in trademark infringement suit; although assumptions on which expert's opinion was based could be subject to criticism, alleged defects went to weight, rather than admissibility of opinion, since it was for the trier of fact to determine credibility and persuasiveness of opinion offered. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a); Fed.Rules Evid.Rules 702, 703, 28 U.S.C.A.

**[36]    Evidence**  Damages

Expert testimony as to a reasonable royalty that would have resulted from a hypothetical negotiation between competing parties using the same trademark and trade name was relevant to jury's determination of what a reasonable royalty would have been, and thus admissible in trademark infringement suit for purposes of establishing damages; expert had based opinion on an actual licensing agreement between alleged infringer and a third-party, and any alleged defects in the analysis affected weight of opinion, rather than its admissibility. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a); Fed.Rules Evid.Rules 702, 703, 28 U.S.C.A.

**[37]** **Evidence**🔑Tendency to mislead or confuse in general; prejudicial effect in general

Although the relative strength of a trademark position was a subject matter on which proposed expert witness was qualified to testify, based on his experience at the United States Patent and Trademark Office, his opinion as to the valuation of a hypothetical coexistence agreement between competing users of "Xylem" trademark and trade names, and the basis for it, was not admissible in trademark infringement suit, on issue of damages, since it would not be helpful to the trier of fact and would tend to mislead the jury. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a); Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[38]** **Summary Judgment**🔑Trademarks

Issue of punitive damages under either the Lanham Act or Georgia state trademark statute was premature, given genuine issues of material fact as to whether trademark infringement or unfair competition had actually occurred. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**[39]** **Patents**🔑In general; utility

US Patent 3,183,362. Cited.

**[40]** **Trademarks**🔑Alphabetical listing

XYLEM.

**Attorneys and Law Firms**

**\*1313** Emmet T. Flood, Robert J. Shaughnessy, Sarah F. Teich, Williams & Connolly, LLP, Washington, DC, Ellen Claire Carothers, King & Spalding, LLP, Gregory Scott Brow, McKenna Long & Aldridge, LLP, Atlanta, GA, for Plaintiffs/Counterclaim Defendants.

Gerard F. Dunne, Joseph A. Dunne, Law Office of Gerard F. Dunne, P.C., New York, NY, Christina M. Baugh, Stephen Thomas La Briola, Fellows La Briola, **\*1314** LLP, Atlanta, GA, for Defendant/Counterclaim Plaintiff.

Emmet T. Flood, Robert J. Shaughnessy, Sarah F. Teich, Williams & Connolly, LLP, Washington, DC, Gregory Scott Brow, McKenna Long & Aldridge, LLP, Ellen Claire Carothers, Atlanta, GA, for Plaintiffs/Counterclaim Defendants.

Gerard F. Dunne, Joseph A. Dunne, Law Office of Gerard F. Dunne, P.C., New York, NY, Christina M. Baugh, Stephen Thomas La Briola, Fellows La Briola, LLP, Atlanta, GA, for Defendant/Counterclaim Plaintiff.

*OPINION AND ORDER*

WILLIAM S. DUFFEY., JR., District Judge.

This matter is before the Court on (1) Defendant's Motion for Partial Summary Judgment [78], (2) Defendant's Motion to Exclude Testimony of Michael B. Mazis, Ph.D. [76], (3) Plaintiffs' Motion for Partial Summary Judgment as to Damages [70], (4) Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69], (5) Defendant's Motion to Exclude Testimony of Robert N. Yerman [75] and (6) Defendant's Motion to Exclude Certain Testimony of Philip G. Hampton, II [77].

**I. BACKGROUND**

A. *The parties*

Plaintiff ITT Corp. ("ITT") is a "global multi-industry high-technology engineering and manufacturing organization with operations in more than sixty countries" which provides products and services in the "global defense and security; water technology; and highly engineered industrial products" markets. [1, ¶ 2].

Plaintiff Xylem, Inc. is an ITT subsidiary that was created and spun off in 2011 to own and operate ITT's water-technology business. [*Id.* ¶ 3; 184–1, ¶ 4]. Xylem, Inc. is an S & P 500 company with annual revenue of approximately $3.8 billion, over 60% of which derives from operations outside the United States. [171, ¶ 5; 184–1, ¶ 5]. Xylem, Inc. sells to wholesale plumbing distributors and retail chain stores including Ferguson and Home Depot. [78–2, ¶¶ 130–36; 173, ¶¶ 130–36]. As part of its rebranding and marketing process, Xylem, Inc. spent $15 million in the third quarter of 2011 and the first quarter of 2012. [230–3, at 33; 230–1, at 13].

Defendant Xylem Group, LLC, ("XG" or "Defendant") is a Georgia limited liability company in the business of designing and selling bathroom furniture and fixtures. [13, ¶ 4]. Its products include vanities, sinks, faucets and fittings. XG has fourteen (14) employees and had sales revenue of $8,075,836.53 in 2011. XG pays to be listed in plumbing trade publications, attends tradeshows and spent roughly $46,000 on marketing and public relations in 2011. [78–2, ¶¶ 1–3, 18–20, 22; 173, ¶¶ 1–3, 18–20, 22]. XG's total equity was valued at approximately $3 million in 2009. (June Weinstein Dep., 171:22–172:16).

XG sells to wholesale plumbing distributors, including 39 distributors who also purchase from Xylem, Inc. (the "Overlapping Customers"). In particular, XG sells to Ferguson, which operates showrooms in common buildings with separate sections for commercial and residential products and customers.[1] [78–2, ¶¶ 130–35; 173, ¶¶ 130–35]. From November 1, 2011, through July 31, 2012, XG's sales to the Overlapping Customers totaled $1,454,456.00, approximately 24.01% of XG's 2011 revenue on an annualized basis. **1315** [78–2, ¶ 136; 173, ¶ 136] [171, ¶¶ 155–56; 184–1, ¶¶ 155–56]. Home Depot and Ferguson accounted for approximately 76% of XG's sales to the Overlapping Customers. [171, ¶ 152; 184–1, ¶ 152].

Sales to the Overlapping Customers constitute only a small portion of Xylem, Inc.'s sales in the United States. From November 1, 2011, through July 31, 2012, Xylem, Inc.'s sales to the Overlapping Customers totaled $8,280,116.32, approximately 1.4% of its United States sales for that period. [78–2, ¶ 137; 173, ¶ 137] [171, ¶

170; 184–1, ¶ 170].

XG first began using the name "Xylem" in interstate commerce in 2005. On December 12, 2006, XG obtained Registration No. 3,183,362 from the United States Patent and Trademark Office for the XYLEM mark. In November 2011, XG obtained four registrations for the XYLEM mark in the State of Georgia. [78–2, ¶¶ 4–10]. Plaintiffs do not dispute the validity of XG's trademark registrations. [173, ¶¶ 4–10].

B. *The Xylem dispute*

On January 12, 2011, ITT announced its intention to separate itself into three separate publicly-traded companies: a manufacturing company, a water-technology company, and a defense and security company. [78–2, ¶ 23; 173, ¶ 23].

In March 2011, ITT hired Lippincott, a brand consulting company, to consult with ITT regarding the naming of its water-technology company. Lippincott recommended seventeen possible trade names and trademarks. ITT's executives narrowed the proposed names to seven, including "XYLEM." ITT had Baker & McKenzie, an international law firm which served as ITT's outside trademark counsel, conduct a worldwide trademark search for each of the seven marks it intended to consider to identify any legal issues associated with any of the seven proposed names. [78–2, ¶¶ 25, 27–31; 173, ¶¶ 25, 27–31].

On May 26, 2011, Baker & McKenzie presented ITT's executives with its trademark search results and provided its opinion regarding the registrability of each of the seven marks in the countries where ITT's water-technology company expected to do business. (Hampton Report ¶ 16; Gardner Report at 3–4). Baker & McKenzie reported that there may be "high difficulty" in obtaining trademark protections for the "Xylem" mark in the United States because the "XYLEM" mark was owned by XG for use in the United States, and that the mark was for a water-technology business similar to ITT's business. (Hampton Report ¶¶ 18–19; Gardner Report at 3–4).

A few days later, on June 2, 2011, Lippincott presented to ITT's executives a "summary of full legal, linguistic and URL evaluations" along with information from the Baker & McKenzie report (the "June 2nd Lippincott Report"). (Hampton Report ¶ 20).

On July 14, 2011, after discussions with ITT's executives and its counsel, and after ITT's review of the June 2nd Lippincott Report, ITT announced its new water-technology company would be named Xylem, Inc. (Hampton Report ¶ 21); [78–2, ¶ 100; 173, ¶ 100].

On July 20, 2011, XG sent a cease-and-desist letter to ITT alleging that its use of "Xylem" would infringe on XG's registered XYLEM mark. XG also objected to ITT's use of the new Xylem mark for its new water-technology company. (Gardner Report at 5); [78–2, ¶ 106; 173, ¶ 106].

On October 26, 2011, Plaintiffs filed their Complaint [1] seeking a declaratory judgment that their use of the Xylem name and mark does not infringe on XG's registrations, **\*1316** or otherwise violate XG's rights in the Xylem name and mark. [1, at 8].

On December 12, 2011, XG filed its Answer and Counterclaim [13]. In its counterclaim, XG alleges that ITT and Xylem, Inc. engaged in tradename and trademark infringement and unfair competition and had diluted XG's tradename and trademarks. XG's claims were asserted under the Lanham Act, Georgia state law and New York state law. [13, ¶¶ 73–87]. On September 23, 2012, XG filed its Amended Counterclaim [67]. XG removed its dilution claim and New York state-law claims in its Amended Counterclaim. XG, in its Amended Counterclaim, seeks injunctive relief, damages, attorney's fees and costs, prejudgment interest and punitive damages. [67, at 13–15].

On October 1, 2012, XG filed its Motion for Partial Summary Judgment on the issue of infringement [78]. In support of its motion, XG presents evidence that Plaintiffs' use of the Xylem name and mark has infringed the Xylem registrations. XG alleged, among other evidence, that Plaintiffs' use of "Xylem" caused actual customer confusion in the United States. For example, between November 2011 and September 2012, XG received (i) at least 58 checks intended for Xylem, Inc., (ii) at least 38 phone calls regarding Xylem, Inc.'s products, and (iii) 23 emails and faxes intended for Xylem, Inc. In the same period, Xylem, Inc. received at least 8 checks intended for XG. [78–2, ¶¶ 138–164]. Plaintiffs do not dispute that these instances of actual confusion occurred, but contend they are *de minimis.* [173, ¶¶ 138–164; 172, at 11–14].

Plaintiffs also present survey evidence from Mazis purporting to show there was little likelihood of customer confusion regarding its use of the Xylem name and mark. [170–8]. XG moves to exclude Mazis's expert opinion on the ground that it is not reliable, including because the surveyed population was not representative of the relevant market. [76, at 1–2; 177, at 6–8].

XG also seeks payment of a reasonable royalty, and in doing so, presents the expert opinion of Robert A. Hutchins, CPA. Hutchins opines that a reasonable royalty based on a hypothetical licensing agreement between XG and Plaintiffs would have resulted in a minimum royalty amount to XG of $45 million. [230–3, at 34]. Plaintiffs offered the rebutting expert opinion of Robert N. Yerman. Yerman opines that a hypothetical licensing agreement would have resulted in a royalty worth no more than $3.3 million plus a control premium, which he claims is equivalent to the approximate value of XG's total equity. [218–1, at 14] The parties moved to exclude each other's expert opinions on damages [69] [75].

In a separate expert opinion supporting Plaintiffs' valuation of a reasonable royalty between XG and the Plaintiffs, Philip G. Hampton, II opines that the value of a licensing agreement between XG and Plaintiffs "would have been significantly less than $250,000" because ITT had paid Novedades Agricolas, a Spanish company, only $250,000 to avoid a conflict with what Hampton considers to be a "stronger" mark than the mark at issue in this litigation. [77–2, at 10–11]. XG moves to exclude that portion of Hampton's expert opinion [77].

On October 1, 2012, Plaintiffs filed their Motion for Partial Summary Judgment against XG on the issue of damages [70]. Plaintiffs allege that "XG cannot recover damages for lost sales," that they "cannot recover damages measured by a reasonable royalty", and that "there is no legal basis for punitive damages." [70–1 at 5–16]. XG opposes the motion and estimates that its lost sales in November 2011 and December 2011 were at least $93,790.85. [145–2, ¶¶ 1–2].

**\*1317 II. DISCUSSION**

A. *Legal Standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't,* 193 F.3d 1241, 1246 (11th Cir.1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1282 (11th Cir.1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." *Id.* at 1282.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." *Garczynski v. Bradshaw,* 573 F.3d 1158, 1165 (11th Cir.2009) (quoting *Scott v. Harris,* 550 U.S. 372, 381 n. 8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury...." *Graham,* 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog,* 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B. *Xylem Group, LLC's Motion for Partial Summary Judgment on Liability for Infringement [78]*
XG requests the Court to find as a matter of law that Plaintiffs have (1) infringed Xylem Group's trademark pursuant to 15 U.S.C. § 1114 and O.C.G.A. § 10–1–450, (2) engaged in unfair competition pursuant to 15 U.S.C. § 1125 and O.C.G.A. § 23–2–55, and (3) violated the Georgia Deceptive Trade Practices Act pursuant to O.C.G.A. § 10–1–372(a)(2)-(3). Xylem Group also seeks an injunction preventing Xylem, Inc.'s further use of the Xylem mark within the United States. [78, at 2].

[1] [2] Plaintiffs oppose the motion, arguing that "there are many genuine issues of material fact as to liability." [172, at 3]. First, Plaintiffs argue that "XG's trade name and

mark are weak," entitling XG to "only a narrow scope of protection."[2] [ *1318 *Id.* at 4–6]. Second, Plaintiffs argue that XG's and Xylem, Inc.'s marks are "distinguishable." [*Id.* at 8]. Third, Plaintiffs argue that XG's and Xylem, Inc.'s products are "significantly different" while their consumer overlap is "insignificant." [*Id.* at 8, 11]. Fourth, Plaintiffs claim that the confusion between XG's and Xylem, Inc.'s use of the Xylem name and mark is *de minimis* and insufficient to support that Plaintiffs engaged in tradename or trademark infringement. [*Id.* at 1, 12, 19].

1. *Trademark infringement under the Lanham Act,* 15 U.S.C. § 1114

[3] [4] To prove infringement under 15 U.S.C. § 1114 of the Lanham Act,[3] the holder of a registered trademark must show (1) that the infringer used the mark in commerce, without the trademark holder's consent, and (2) that the use was likely to cause confusion. *Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC,* 605 F.3d 931, 934 (11th Cir.2010). The parties do not dispute that XG held a registered trademark in the United States and do not dispute that Plaintiffs used the Xylem name and mark in commerce despite having received a cease-and-desist letter from XG. [173, ¶¶ 33–58, 86–95, 106]. Once a mark has been registered for five years with the Patent & Trademark Office and "become 'incontestable,' its validity is presumed.... [I]ts validity cannot [then] be challenged on the grounds [sic] that it is merely descriptive." *Dieter v. B & H Indus.,* 880 F.2d 322, 328 (11th Cir.1989); *Frehling Enters. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1336 (11th Cir.1999) (citing *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.,* 177 F.3d 1204, 1208 (11th Cir.1999)). Whether Plaintiffs' use of the Xylem name and mark infringes XG's trademark depends on whether the use is likely to cause confusion.

*1319 [5] [6] Seven factors apply in this circuit to determine whether customer confusion is likely to occur under the Lanham Act.[4] The factors are (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media, (6) defendant's intent, and (7) actual confusion. Of the seven factors, the type of mark and the evidence of actual confusion are the most important. *Caliber,* 605 F.3d at 935 (citing *Frehling,* 192 F.3d 1330 at 1335); *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.1985); *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC,* 685 F.Supp.2d 1360, 1377 (N.D.Ga.2010). "[N]o single factor is dispositive, but greater weight is given to the type of mark and

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

evidence of actual confusion." *Dieter,* 880 F.2d at 326.

[7] [8] "The likelihood of confusion is a question of fact." *Welding Services, Inc. v. Forman,* 509 F.3d 1351, 1361 (11th Cir.2007). To award summary judgment in a case where these factors are required to be weighed, the Court must consider the evidence in a light most favorable to the non-moving party and must conclude that no reasonable jury could reach a contrary result. See *Caliber,* 605 F.3d at 935. Determining whether a likelihood of confusion exists "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.' " *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.,* 508 F.3d 641, 649 (11th Cir.2007). "[T]he district court must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate fact decision." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.,* 716 F.2d 833, 840 n. 17 (11th Cir.1983). Even in a case where the "type of mark and evidence of actual confusion are the most weighty of considerations," and the seven likelihood-of-confusion factors "typically inform a court's determination of the likelihood of confusion," a court must still "take into account the unique facts of each case." *Custom,* 508 F.3d at 650 (internal quotation marks omitted) (citing *Hi–Tech Pharms., Inc. v. Herbal Health Prods., Inc.,* 132 Fed.Appx. 348, 350 (11th Cir.2005)). That is because "each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case.... The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* at 650 (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991)) (internal quotation marks omitted).

With this analytical framework, the Court evaluates the seven likelihood-of-confusion factors.

i. Type of mark

[9] [10] "There are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary. The stronger the mark, the greater the scope of protection accorded it." *Caliber,* 605 F.3d at 938 (quoting *Aronowitz v. Health–Chem Corp.,* 513 F.3d 1229, 1240 (11th Cir.2008)). "An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent, [e.g., Kodak]. A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product, [e.g., Penguin Refrigerators]. A descriptive

**\*1320** mark identifies a characteristic or quality of the service or product, [e.g., Vision Center]." *Id.* at 939 (alteration in original) (quoting *Welding Servs. v. Forman,* 509 F.3d 1351, 1357–58 (11th Cir.2007)). A generic name refers to "a particular genus or class of which an individual article or service is but a member." It is the "term by which the product or service itself is commonly known" and "depicts the product or service as a whole, rather than any particular feature, quality, or characteristic of the whole." *Welding,* 509 F.3d at 1358 (citations omitted) (internal quotation marks omitted). Whether a name is generic depends on the use of the term, not the term itself. "A word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap." *Id.* at 1358 (quoting *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir.1980)). The "generic use of a word may not be registered as a trademark." *Id.* (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)).

Important in gauging the strength of a mark is "the degree to which third parties make use of the mark." The less third parties use the mark, "the stronger it is, and the more protection it deserves." *Frehling,* 192 F.3d at 1336 (citing *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 974–75 (11th Cir.1983)).

XG argues that its registered XYLEM mark is "at least suggestive, if not arbitrary" because the mark has become incontestable, and because "Xylem is a real word referring to a type of tissue in plants that moves water from the roots to the leaves." XG acknowledges that its products-vanities, sinks and faucets-"are part of the process of moving water from its source to the end user," but argues that the characteristics of the products "require an effort of the imagination by the consumer to be understood," supporting that it is at least suggestive. [78–1, at 4–5].

Plaintiffs generally argue that XG's trademark is "weak." Plaintiffs acknowledge that XG's XYLEM mark "is the subject of a now-incontestable registration" and that registration "creates a presumption of strength." Plaintiffs argue, however, that XG's trademark enjoys only "conceptual strength" rather than "commercial strength." Plaintiffs cite third-party use by Kohler Company, which "has been using XYLEM for three years as a trademark for floor tile," as support for their argument that XG's XYLEM mark's commercial strength is "abysmal at best." [172, at 5–6]. Plaintiffs did not respond to XG's argument that its XYLEM mark is "at least suggestive" and requires "an effort of the imagination by the consumer" to connect the products to the trademark.[5]

[11] [12] The Court finds that the XYLEM mark is at least suggestive, because it takes a leap of the imagination to connect the plant tissue "xylem" to XG's products, even though the two share a water-transport function.[6] In evaluating this factor, the Court determines that the type of the mark weighs significantly in favor of XG.

### ii. Similarity of mark

Similarity of mark is determined by "the overall impression created by the marks, *1321 including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *Caliber,* 605 F.3d at 939 (quoting *E. Remy Martin & Co. v. Shaw–Ross Intl. Imps., Inc.,* 756 F.2d 1525, 1531 (11th Cir.1985)).

XG argues that the words of the marks, the sound, and the "dominant focus" of the marks are "identical." [78–1, at 5–6]. Plaintiffs do not contest the similarity of the words contained in the marks but argue that "the graphic rendering[s]" of the marks are "distinguishable." They argue that Xylem, Inc.'s mark always appears in conjunction with its product-line names, e.g., Goulds or Bell & Gossett, and that the mark is only used by itself when in reference to Xylem, Inc. as a corporate entity. [171, ¶¶ 184–85; 172, at 7–8].

[13] The Court finds, after considering their appearance, sound and the totality of impression, that the marks used by Xylem, Inc. and XG are substantially similar. Both marks prominently contain the word "Xylem." Even though the smaller, captioned words underneath "Xylem" are different in the two marks, the overall impression of the two is so similar that a customer not familiar with the distinction would likely attribute both marks to the same source. See [78–2, ¶ 11; 171, ¶¶ 184, 193]. The use of product-line names in conjunction with "Xylem" in Xylem, Inc.'s mark does not discredit the overall impression that both are Xylem products. This factor also weighs in favor of XG.

### iii. Similarity of products

Whether there is a similarity of products requires the "determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between

the products of the respective parties." *Caliber,* 605 F.3d at 939–40 (quoting *Frehling,* 192 F.3d at 1338). In our circuit, the test is "not whether the goods could be distinguished, as they could be by any [consumer], but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Frehling,* 192 F.3d at 1338.

XG argues that "it is reasonable for a consumer to believe that some of Xylem, Inc.'s goods would be produced by a manufacturer of vanities, sinks, faucets, and fittings" because Xylem, Inc. produces "circulator pumps," "valves" and "products relating to the treatment of water and wastewater." [78–1, at 7].

Plaintiffs argue that the products are not similar because Xylem, Inc. produces "highly engineered" products whereas XG produces "bathroom vanities, sinks, faucets, and fittings." [172, at 8–9].

The Court finds that the distinction between "highly engineered" and bathroom products is a distinction of the products. The proper test is whether consumers could attribute the products to a single source. *Frehling,* 192 F.3d at 1338. The two companies make some subset of products that are functionally similar. Even though Xylem, Inc. specializes in highly engineered and industrial products and XG specializes in home bathroom products, the functional similarity of some of the products could mislead consumers into attributing both types of these subset products to a single source. These are, however, differences in a large portion of the products manufactured by XG and Xylem, Inc., making it unclear in which party's favor the similarity-of-products factor weighs.

### iv. Similarity of retail outlets and customers

The similarity of the parties' retail outlets and customers "takes into consideration where, how, and to whom the parties' products are sold." *Caliber,* 605 F.3d at 940 (quoting *Frehling,* 192 F.3d at 1339). *1322 XG argues that both XG and Xylem, Inc. "sell to at least 39 of the same wholesale plumbing distributors," and the volume of sales to the Overlapping Customers is significant. [78–1, at 10]. Xylem, Inc. argues that the extent of the overlap is "insignificant" because "the majority of the overlap involves just two large, nationwide entities." [172, 13].

The Court finds that there is overlap to some degree, of retail outlets and regular retail customers. Plaintiffs concede the existence of sales overlap but argue that it is

not significant. This factor, like the previous one, cannot conclusively be found to weigh in favor of any of the parties.

### v. Similarity of advertising media

[14] The "similarity of advertising" factor "looks to each party's method of advertising." *Caliber,* 605 F.3d at 940. XG argues that "both parties have appeared in [certain] trade journals ... [and] other magazines, participate[d] in trade shows, [maintained] a web presence, and distribute[d] small promotional products." [78–1, at 11–12]. Plaintiffs argue that "XG's president and majority owner [has] admit[ted]" that "XG does not advertise and never has" at a deposition. They argue further that XG began advertising "at nominal cost" to "bolster [XG]'s position in this litigation." [172, at 14–15].

[15] The record shows that XG spent roughly $46,000 on marketing and public relations in 2011, and that Plaintiffs spent $15 million in two quarters in rebranding and marketing. The evidence is consistent with both parties' contentions that there is overlap in advertising, even if small. See [171, ¶¶ 22, 129–39; 184–1, ¶¶ 22, 129–39]. The Court concludes that this factor weighs slightly in favor of XG.

### vi. Intent of the allegedly infringing party

The intent factor looks to whether the allegedly infringing party "adopted a plaintiff's mark with the intention of deriving a benefit from the [trademark holder's] business reputation." *Caliber,* 605 F.3d at 940. While the record shows that Plaintiffs knew of XG's trademark and the possibility of infringement prior to their decision to adopt and use the new Xylem mark, the Court cannot find that Plaintiffs intended, to any material degree, to derive a benefit from XG's business reputation. From the third quarter of 2011 to the first quarter of 2012, Plaintiffs spent $15 million in rebranding and marketing to promote Xylem, Inc.'s brand after it was established as a separate subsidiary. [230–3, at 33; 230–1, at 13]. These marketing expenses exceed, and are nearly double, XG's entire U.S. sales revenue in 2011. [78–2, ¶ 3; 173, ¶ 3]. The Court finds that Plaintiffs intended, albeit to some slight degree, to benefit from XG's reputation and goodwill by confusing XG customers and inducing them to buy Xylem, Inc.'s products. The Court concludes that this factor slightly favors XG.

### vii. Actual confusion

Actual consumer confusion is "the best evidence" of likelihood of confusion. "All potential consumers of the relevant product or service, including middlemen, can inform the inquiry, and the ultimate consumers deserve special attention." *Caliber,* 605 F.3d at 936–37 (citations omitted). The rule courts usually apply is that infringement occurs when "there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent' buyers." *John H. Harland Co.,* 711 F.2d at 979 n. 22 (quoting 2 McCarthy, *supra,* § 23:27, at 87–88 (1973)). "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight." **\*1323** *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir.1982) (citations omitted). "There is no absolute scale as to how many instances of actual confusion establish the existence of [actual confusion]." *Caliber,* 605 F.3d at 937 (internal quotation marks omitted) (quoting *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1543 (11th Cir.1986)). "While the [Eleventh Circuit has] no hard-and-fast rule, under [its] standard the quantum of evidence needed to show actual confusion is relatively small." *Id.* at 937–38 (internal quotation marks omitted) (quoting *Jellibeans,* 716 F.2d at 845); *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971); *see Safeway,* 675 F.2d at 1167 (finding that two instances of actual confusion were sufficient evidence of actual confusion).

The Court finds that a level of actual confusion of customers resulted from Xylem, Inc.'s adoption of the Xylem name and its use of its Xylem mark. XG documented at least 127 instances in which actual confusion occurred: XG received (i) 58 checks intended for Xylem, Inc., (ii) 38 phone calls regarding Xylem, Inc.'s products, and (iii) 23 emails and faxes intended for Xylem; Xylem, Inc., on the other hand, received 8 checks intended for XG. [78–2, ¶¶ 138–164]. Plaintiffs do not dispute that these instances of confusion occurred. [173, ¶¶ 138–164]. Plaintiffs argue, instead, that the actual confusion is *de minimis* and the confusion that occurred is insufficient to support a "likelihood of confusion" in a trademark-infringement analysis. See [172, at 11–14].

[16] In our circuit, "very little proof of actual confusion would be necessary to prove the likelihood of confusion." *World,* 438 F.2d at 489; *see Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, at 46 (5th Cir.1975) (confusion by four

individuals held to be significant evidence of actual confusion. In Safeway, the Court considered the "kinds of issues confused and degree of confusion" involved and the weight to be given to the actual confusion shown. *Safeway,* 675 F.2d at 1167. The Safeway court concluded that where the incidents of actual confusion were small, and a supplier and a customer were confused, the confusion was deemed significant because customers and suppliers are the type of people who ought not to be confused. *Id.* at 1167. Here, XG has documented over 100 instances of actual confusion resulting from misdirected checks, phone calls, faxes and emails. They come from people who ought not to have been confused, including customers and others with whom Defendant conducts its business. The Court finds that this actual confusion among the people weighs in XG's favor.[7]

viii. Weighing of the seven factors of "likelihood of confusion"

[17]  The Court, having considered each of the seven factors, now considers the overall balance of them. *Custom,* 508 F.3d at 649. It does so based on the undisputed facts of this case. The Court finds that while the factors may tip in favor of XG on whether Xylem, Inc.'s use of the Xylem name and mark created confusion, including actual confusion, the facts here are unique in that the market and product overlap is limited, and the marketing activity disparate. While XG appears, based on its registration and an analysis of the seven factors, to have a stronger factual and legal argument in favor of "likelihood of confusion," in viewing the evidence in the light most favorable to Plaintiffs, the Court cannot find that no reasonable juror would find there is no confusion created by Xylem, Inc.'s use of the Xylem name and **\*1324** mark. The issue of infringement is required to be decided by a jury.[8]

2. *Whether ITT Corp. may be held liable for Xylem, Inc.'s alleged use of the Xylem name and mark*

[18] [19]  It is well-established that "liability for trademark infringement can extend beyond those entities that actually perform the acts of infringement." *Mini Maid Services Co. v. Maid Brigade Systems, Inc.,* 967 F.2d 1516, 1522 (11th Cir.1992) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)); *see Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231 (11th Cir.2007) (finding a distributor liable for trademark infringement committed by merchant distributees); *Bauer Lamp Co., Inc. v. Shaffer,* 941 F.2d 1165 (11th Cir.1991) (finding contributory infringement where manufacturing is done by a third party). "To be liable for contributory trademark infringement, a defendant must have intentionally induced another to infringe a trademark." *Suntree Technologies, Inc. v. Ecosense International, Inc.,* 693 F.3d 1338, 1345 (11th Cir.2012) (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:18 at 25–54 (4th ed.2012)). "Any liability for contributory infringement will necessarily depend upon whether or not the contributing party intended to participate in the infringement or actually knew about the infringing activities." *Suntree,* 693 F.3d at 1345 (quoting *Mini,* 967 F.2d at 1522).

[20]  The Court next decides whether ITT may be held liable for Xylem, Inc.'s use of the Xylem name and mark. The record here shows that ITT and its management knew that the XYLEM mark had been registered by XG as XG's trademark in the United States. ITT was warned by its outside counsel, Baker & Mackenzie LLP, that it was unlikely that ITT could successfully register the Xylem name in the United States because of XG's prior registration. Despite these warnings, ITT chose to name its subsidiary Xylem, Inc. and allowed Xylem, Inc. to embark on its business activities, including the sale of Xylem, Inc.'s products, which bear the Xylem mark, to the Overlapping Customers. [173, ¶¶ 33–58, 86–95]. Even if ITT believed that ITT was legally allowed to use the Xylem name and mark, it did so knowing of XG's registration. [173, ¶¶ 86–87]. If Xylem, Inc. is found to have infringed on XG's trademark rights, ITT would be liable for contributory infringement. *See Suntree,* 693 F.3d at 1345; *see Mini,* 967 F.2d at 1522.

3. *Unfair Competition under federal law,* 15 U.S.C. § 1125

[21]  To prevail on a claim for federal unfair competition under 15 U.S.C. § 1125(a),[9] a movant must show (1) that the movant had enforceable trademark rights in the mark or name, and (2) that the respondent made unauthorized use of **\*1325** the mark or name such that consumers were likely to confuse the two. *Custom,* 508 F.3d at 647 (quoting *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 358 (11th Cir.1997)); *Crystal Entm't & Filmworks, Inc. v. Jurado,* 643 F.3d 1313, 1320 (11th Cir.2011).

XG registered its XYLEM mark under the Lanham Act

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

and has enforceable rights in the mark and the Xylem name. *See Jellibeans,* 716 F.2d at 835 (enjoining the use of "Lollipops" as a trade name because it infringes on the "Jellibeans" service mark); *Citibank, N.A. v. Citibanc Grp., Inc.,* 724 F.2d 1540 (11th Cir.1984) (enjoining the use of "Citibanc" as a trade name and mark because they infringe on Citibank's trade name and mark). The first prong of the 15 U.S.C. § 1125(a) analysis is therefore satisfied.

The "likelihood of confusion" analysis under 15 U.S.C. § 1125(a) is the same as that under 15 U.S.C. § 1114. *See Custom,* 508 F.3d at 648; *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484, 1488 (11th Cir.1987).

Because the Court finds that a "likelihood of confusion" under 15 U.S.C. § 1125(a) is in genuine dispute and required to be decided at trial, summary judgment of XG's claim for unfair competition under the Lanham Act is required to be denied.

### 4. *Trademark infringement under Georgia law, O.C.G.A. § 10–1–450*

[22] Registration of a service mark or trademark is a prerequisite for relief under O.C.G.A. § 10–1–450.[10] **\*1326** *Diedrich v. Miller & Meier & Assocs., Architects & Planners, Inc.,* 254 Ga. 734, 334 S.E.2d 308, 311 (1985).

[23] Trademark-infringement claims under O.C.G.A. § 10–1–450 adopt the same "likelihood of confusion" analysis as federal trademark-infringement claims under the Lanham Act. *See Ackerman Security Systems, Inc. v. Design Security Systems, Inc.,* 201 Ga.App. 805, 412 S.E.2d 588, 589 (1991).

XG has registered its trademark in the State of Georgia, and the fact is not disputed by Plaintiffs. [78–2 ¶¶ 7–10; 173 ¶¶ 7–10]. Because the Court finds that whether there is a likelihood of confusion is required to be determined at trial, summary judgment on XG's trademark-infringement claim under Georgia law also is required to be denied.

### 5. *Unfair Competition under Georgia law, O.C.G.A. § 23–2–55*

[24] Georgia unfair-competition claims under O.C.G.A. §

23–2–55[11] involve the same dispositive questions as trademark-infringement claims under the Lanham Act. *Caliber,* 605 F.3d at 935 n. 16. "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Suntree,* 693 F.3d at 1345 (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n. 4 (11th Cir.2001)). Relief under O.C.G.A. § 23–2–55 "depends upon a showing of intent to deceive. However, this intent may be presumed if encroachment is done with knowledge of the prior right." *Giant Mart Corp. v. Giant Disc. Foods, Inc.,* 247 Ga. 775, 279 S.E.2d 683, 685 (1981).

The record shows that Plaintiffs adopted the Xylem name and mark with full knowledge of XG's registered trademark in the United States and continued with their use despite having received a cease-and-desist letter from XG. [173, ¶¶ 33–58, 86–95, 106]. Because the Court finds that a "likelihood of confusion" is in genuine dispute and required to be decided at trial, summary judgment of XG's claim under O.C.G.A. § 23–2–55 also is required to be denied.

### 6. *Georgia Deceptive Trade Practices Act pursuant to O.C.G.A. § 10–1–372(a)(2)-(3)*

To obtain relief under Georgia Deceptive Trade Practices Act, O.C.G.A. § 10–1–372,[12] the movant is "not required to show that [it] suffered monetary damages or that the [respondent] intended to cause confusion or misunderstanding to the public." *Eckles v. Atlanta Tech. Grp., Inc.,* 267 Ga. 801, 485 S.E.2d 22, 24 (1997). Relief also "would not be dependent upon [the movant's] registration of [its] trade **\*1327** name." What the movant needs to establish is "that the use of a name causes confusion to others [who are] using reasonable care." *Id.* at 24 (quoting *Future Prof'ls, Inc. v. Darby,* 266 Ga. 690, 470 S.E.2d 644, 646 (1996)); *Giant,* 279 S.E.2d at 686–87.

[25] Whether confusion occurs under Georgia Deceptive Trade Practices Act, O.C.G.A. § 10–1–372, requires the same "likelihood of confusion" analysis found in trademark-infringement claims under the Lanham Act. *See Ackerman Sec. Sys., Inc. v. Design Sec. Sys., Inc.,* 201 Ga.App. 805, 412 S.E.2d 588, 589 (1991); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 265 (5th Cir.1980).

Because the Court finds that a "likelihood of confusion" is in genuine dispute and required to be decided at trial, summary judgment of XG's claim under O.C.G.A. §

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

10–1–372 also is required to be denied.[13]

C. *Plaintiffs' Motion for Partial Summary Judgment on Damages [70]*

ITT and Xylem, Inc. move for partial summary judgment on the issue of damages. Plaintiffs argue that, as a prerequisite to a recovery for trademark infringement, XG must prove that it is entitled to recover the infringer's profits attributable to the infringement, any damage sustained by the trademark owner and the cost of the action. *See Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1564 (11th Cir.1986). Plaintiffs allege that XG seeks "damages for lost sale" and "damages measured by a reasonable royalty," which, according to Plaintiffs, are not proper recoveries for an alleged trademark infringement as a matter of law. Plaintiffs argue that they are thus entitled, as a matter of law, to summary judgment on damages XG alleges. To the extent XG is entitled to recover based on a reasonable royalty, Plaintiffs alternatively allege that XG cannot prove the amount of the royalty claimed because the opinion offered by XG's expert, Hutchins, is inadmissible. Plaintiffs further allege that "there is no legal basis for punitive damages." [70–1, at 4–5, 13, 15].

Plaintiffs claim that the "only theory of damages that XG ... advance[s] is based on a reasonable royalty." [70–1, at 5]. Plaintiffs argue that the "reasonable royalty" damage theory, while common in patent cases, "has been atypical" in cases for trademark infringement. *A & H Sportswear v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 208 (3rd Cir.1999) (en banc). **1328** Plaintiffs argue further that the "reasonable royalty" theory has been used in trademark cases only where a royalty is based on a license previously granted and typically where the licenses were held over beyond the license term. In these cases, the damages are capable of being measured by the established royalty rates in the licenses. In cases where there was not a prior licensing agreement, Plaintiffs argue that a reasonable royalty may be used as a basis for damage awards only if the trademark owner had licensed its trademark to one or more third parties. In those cases, the third-party license provides a basis for awarding profits for the infringement. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947 (7th Cir.1992).

Plaintiffs claim, without pointing to any binding authority in this circuit, that a reasonable royalty may not be used as a measure of damage award because it is not possible to determine the amount of a reasonable royalty with "reasonable certainty." [70–1, at 8]. Fundamental to

Plaintiffs' theory is that a trademark owner who refuses to license its trademark may never recover damages based on royalty rates that are not established.

XG claims that a reasonable royalty is a valid and permissible basis for awarding damages under the Lanham Act. It offers an expert opinion on what a reasonable royalty would have been between XG and the Plaintiffs. XG also claims it presented evidence of actual damages in the amount of $93,790.85 apart from its reasonable-royalty theory.

1. *Legal Standard*

[26] [27] [28] [29] Damages for trademark infringement under the Lanham Act may include (1) the infringing party's profits, (2) any damage sustained by the trademark holder and (3) the cost of the action. 15 U.S.C. § 1117(a)[14]; *Aronowitz,* 513 F.3d at 1241; *Ramada,* 804 F.2d at 1564. "Lanham Act damages may be awarded even when they are not susceptible to precise calculations," and the district courts have "wide discretion in determining a just amount of recovery for trademark infringement." *Aronowitz,* 513 F.3d at 1241 (quoting *Ramada,* 804 F.2d at 1564–65). Damages sustained by the trademark holder include "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts such as the costs of corrective advertising or injury to business reputation or goodwill." **1329** *Id.* at 1241 (citation omitted) (internal quotation marks omitted). The trial court may also use a reasonable royalty as a measure of damages. *Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1519–20 (11th Cir.1990); *Ramada,* 804 F.2d at 1565.

2. *Whether Defendant may recover damages for lost sales*

[30] Damages for trademark infringement under the Lanham Act may include any damage actually sustained by the trademark holder. 15 U.S.C. § 1117(a); *Aronowitz,* 513 F.3d at 1241; *Ramada,* 804 F.2d at 1564. Plaintiff argues that "there is no evidentiary basis for such damages" because XG "cannot show any decline in its sales or foregone sales that were caused by the alleged infringement." [70–1, at 5]. Those claims are not supported by the record. The record evidence here is that XG lost sales in November 2011 and December 2011 in an amount that XG estimates to be $93,790.85. [145–2, ¶¶ 1–2]. The Court cannot conclude that no reasonable juror

would find that actual damages were incurred by XG as a result of lost sales in this amount, and there is a genuine issue of material fact whether XG suffered actual damages due to lost sales. For this reason alone, Plaintiffs' Motion for Partial Summary Judgment as to Damages is required to be denied.

### 3. *Whether Defendant may recover a reasonable royalty*

The more interesting and significant issue in this case is whether XG can claim and recover damages based on a reasonable royalty.

Plaintiffs do not contest that the Eleventh Circuit has relied on a "reasonable royalty" theory to determine damages under the Lanham Act. See [70–1, at 5–6]. Plaintiffs argue, however, that a "reasonable royalty" theory of damages is available only when the royalty amount is "sensible, non-speculative, and grounded in commercial reality," requiring "use of the mark by persons other than the owner [to] ... demonstrate[ ] market value." [70–1, at 6]. Plaintiffs claim that those conditions are not met here because the royalty claimed in this case is too speculative and is based only on a hypothetical royalty rate that cannot be verified based on an established, historical royalty rate. See [70–1, at 8–10]. The Court disagrees.

[31]  The Supreme Court, in *Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915), discussed when a reasonable royalty may be used as a basis for a damage award resulting from patent infringement. In *Dowagiac,* a monopolist inventor refused to license an improvement on grain-drills to third parties and, to maintain its monopoly, sued other manufacturers who copied the inventor's design. The Supreme Court, recognizing that "there was no established royalty," held that "the only measure of damages" in those cases of infringement was "such sum as under all the circumstances, would have been a reasonable royalty for the defendant to have paid." 235 U.S. at 648–49, 35 S.Ct. 221. The "reasonable royalty" theory has, from its inception, been a method to estimate hypothetical royalty amounts in the absence of an established royalty. The Supreme Court, in *Sheldon v. Metro–Goldwyn Pictures Corp.,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), extended the "reasonable royalty" theory of damages to copyright cases. In *Sheldon,* the Supreme Court noted that "what is required is not mathematical exactness but only a reasonable approximation," and that "the testimony of those who are informed by observation and experience may be not only

helpful but ... indispensable." 309 U.S. at 408, 60 S.Ct. 681.

[32]  The methodology for hypothesizing a licensing arrangement and arriving **\*1330** at a reasonable royalty is well-established. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324–25 (Fed.Cir.2009); *Ga.–Pac. Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970); *Am. Tel. & Tel. Co. v. Radio Audion Co.,* 5 F.2d 535, 536 (D.Del.1925). The Eleventh Circuit has consistently used a reasonable royalty as a measure of damages in trademark-infringement cases. *See Howard,* 892 F.2d at 1519–20; *Ramada,* 804 F.2d at 1565; *Bos. Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg.,* 597 F.2d 71, 76 (5th Cir.1979).

[33]  Our circuit has not considered whether a prior license is required to determine a reasonable royalty as the basis for an award of trademark-infringement damages. The Court has critically considered the history of the "reasonable royalty" theory and its purpose in determining whether the theory can apply in a case that does not involve a holdover license or where a license was not previously granted to a third party. The Court concludes that it may.

A careful reading of *Dowagiac* and *Sheldon* compel the conclusion that the "reasonable royalty" theory of damages is a viable, if not necessary, measure of protecting the property rights afforded a trademark holder under the Lanham Act. In *Dowagiac,* the Supreme Court evaluated the royalties due to the holder of intellectual property rights—a patent—which were infringed by a defendant. The Supreme Court found that the patent holder was entitled to use the profits obtained by the infringer as a result of the infringement. *Dowagiac,* 235 U.S. at 646, 35 S.Ct. 221. In discussing the reasons for allowing the patent holder a recovery for the infringement, the Supreme Court held that "the result to be accomplished is a rational separation of the net profits so that neither party may have what rightfully belongs to the other, and it is important that the accounting be so conducted as to secure this result, if it be reasonably possible." *Id.* at 647, 35 S.Ct. 221. The Supreme Court stated "it may well be that mathematical exactness [is] not possible," noting that "degree of accuracy is not required but only reasonable approximation, which usually may be attained through the testimony of experts and persons informed by observation and experience. Testimony of this character is generally helpful and at times indispensable." *Id.* The Supreme Court, recognizing that a patent right was a form of property and that the "infringement was a tortious taking," ruled that "the normal measure of damages was the value of what was

taken." *Id.* at 648, 35 S.Ct. 221. Because the patent holder had elected not to license its patent, it was "permissible [for the plaintiff] to show the value [of its intellectual property rights] by proving what would have been a reasonable royalty." *Id.*

In *Sheldon,* the Supreme Court addressed the same issue in a case involving infringement of another type of intellectual property—copyrights. Justice Hughes presented the case question as follows: "The questions presented are whether, in computing an award of profits against an infringer of a copyright, there may be an apportionment so as to give to the owner of the copyright only that part of the profits found to be attributable to the use of the copyrighted material as distinguished from what the infringer himself has supplied, and, if so, whether the evidence affords a proper basis for the apportionment decreed in this case." *Sheldon,* 309 U.S. at 396, 60 S.Ct. 681. Adopting the reasoning of *Dowagiac,* the *Sheldon* court held that the damages may be measured by the value of the intellectual property taken. *Id.* at 408–09, 60 S.Ct. 681.

Plaintiffs here try to distinguish the reasoning of these cases and argue that their **\*1331** reasoning does not apply to a third kind of intellectual property—trademarks. Their argument is unpersuasive and would lead to the illogical result that the value added to a product by an infringed trademark could not be recovered. This result is unreasonable because it would deny to the holder of this type of intellectual property a recovery while allowing the infringer to unwarrantedly capitalize on its infringing conduct.[15]

The reasoning and rationale in *Dowagiac* and *Sheldon* apply in this trademark case. If XG can prove infringement, XG argues it may seek damages based on the value of the infringed trademark. Plaintiffs ultimately concede that a reasonable royalty is a viable measure of damages in trademark-infringement cases, but seek to limit it to the narrow set of cases where a plaintiff can point to an established royalty based on an actual license agreement. Plaintiffs' narrow interpretation is not consistent with the Supreme Court's reasoning in *Dowagiac* and *Sheldon* or with the generally accepted use of a reasonable royalty for damage calculations. Accordingly, the Court finds that Plaintiffs' Motion for Partial Summary Judgment as to Damages is denied. The Court now turns to whether XG's and Plaintiffs' expert opinions on the value of a reasonable royalty are admissible in this case.

i. Motions to Exclude Expert Opinions on the Proper Amount of a Reasonable Royalty

a. Legal Standard

Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact. *See* Fed.R.Evid. 703; *Club Car, Inc. v. Club Car (Que.) Imp., Inc.,* 362 F.3d 775, 780 (11th Cir.2004); *Quiet Tech. DC–8 v. Hurel–Dubois UK, Ltd.,* 326 F.3d 1333, 1340–41 (11th Cir.2003); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[34] In assessing reliability, a deciding court may look to (1) whether the expert's methodology has been tested or is capable of being tested, (2) whether the technique has been subjected to peer review and publication, (3) the known and potential error rate of the methodology, and (4) whether the technique has been generally accepted in the proper scientific community. *McDowell v. Brown,* 392 F.3d, 1283, 1298 (11th Cir.2004); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *see Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. "A district court has considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *McDowell,* 392 F.3d at 1299 (internal quotation marks omitted) (citation omitted); *Kumho,* 526 U.S. at 151–152, 119 S.Ct. 1167.

Expert testimony will assist the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *U.S. v. Frazier,* 387 F.3d 1244, 1262 (11th Cir.2004). "This condition goes primarily to relevance." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. Expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier,* 387 F.3d at 1262–63.

**\*1332** Expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403 of the Federal Rules of Evidence when "the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury." *Frazier,* 387 F.3d at 1263; Fed.R.Evid. 403.

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

b. Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69]

Plaintiffs move to exclude Robert A. Hutchins's expert opinion on the reasonable royalty XG is entitled to based on Plaintiffs' alleged infringement. Plaintiffs offer three arguments why Hutchins's testimony is "unreliable and unhelpful to the trier of fact." [69, at 1].

First, Plaintiffs argue that the comparable transactions Hutchins used to derive the range of reasonable royalty amounts are not comparable to a hypothetical licensing of XG's trademark. [230–1, at 4, 9–13]. Hutchins, acknowledging there are no "comparable licensing transactions" to be used as a basis for a royalty calculation, arrived at his estimates by using three separate transactions in which ITT acquired another company's trademark through a merger and acquisition. [230–3, at 16–17]. Hutchins then "reverse engineer [ed]" a range of "implied royalty rates" for a hypothetical licensing of XG's trademark to Plaintiffs, assuming that the hypothetical transaction would be comparable to ITT's previous acquisitions of three other trademarks. [*Id.* at 18–19]. Hutchins acknowledges that the "companies acquired by [Plaintiffs] had significantly larger revenue bases and had been in existence for longer periods of time relative to [XG]," and "[Plaintiffs] would be undertaking the cost and risk of developing and building the Xylem name on a global scale." [*Id.* at 20]. As a result, Hutchins adopted the lower-end of his range of estimates and adjusted the royalty rate downward to reach a conservative estimate. He calculated the range of royalty rates to be "between 0.63 and 1.50 percent" and ultimately "set the maximum rate for the hypothetical negotiations at 0.60 percent." [*Id.* at 33].

Second, Plaintiffs argue that to the extent Hutchins accounted for the incomparability of the trademarks by adopting a lower-end estimate of a reasonable royalty (and then discounting the royalty rate further), the adjustment was insufficient. [230–1, at 21]. "[L]ike estimating the weight of a fourth grader by weighing a group of NFL linemen," Plaintiffs argue, "the complete lack of comparability between the subject and the reference group is scarcely resolved by selecting a value a bit below the weight of the lightest lineman." [*Id.* at 21]. Plaintiffs essentially claim the range of royalty rate selected was too random.

[35] Third, Plaintiffs argue that Hutchins used false assumptions to arrive at a minimum royalty amount that was too high. [230–1, at 13–14]. Hutchins set a minimum value of XG's trademark by looking at how much Plaintiffs had spent on "rebranding and marketing" the Xylem brand. [230–3, at 33]. Plaintiffs argue that

Hutchins unreasonably chose October rather than July as the ending month of the rebranding effort, causing the minimum royalty amount to be inflated. [230–1, at 13–14].

The Court has considered the opinion offered by Hutchins in light of the incomparability of data, the downward adjustment of estimates and the unreasonable use of negotiation dates alleged by the Plaintiffs. The Court has performed the analysis set out in Rule 702 of the Federal Rules of Evidence and the reliability analysis set out in *Daubert* and *Kumho*. Plaintiffs do not challenge Hutchins's qualification or the methodology of comparable analysis. They also do not argue that his **\*1333** comparable analysis is not generally accepted in the accounting community in which Hutchins operates. Plaintiffs' argument is that the opinion is not sufficiently reliable. Although the Court recognizes that the assumptions on which Hutchins's opinion is based can be subject to criticism, it is for the trier of fact to determine the credibility and persuasiveness of Hutchins's opinion, and then to determine whether XG has met its burden of proof for damages. That is, the defects alleged by Plaintiffs affect the weight of Hutchins's opinion rather than its admissibility. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; *Quiet,* 326 F.3d at 1341. Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty is denied.

c. Defendant's Motion to Exclude Testimony of Robert N. Yerman [75]

XG moves to exclude Robert N. Yerman's expert opinion on the reasonable royalty that would have resulted from a hypothetical negotiation between the parties. XG bases its motion on two grounds.

First, XG argues that Yerman's estimate lacks reliability because Yerman "starts with an accepted methodology" but "reaches an unsubstantiated conclusion that cannot be tested or duplicated through peer review." XG argues that Yerman "never identifies why" the negotiated amount "would be no more than $400,000" after he started with "monetary values ranging from approximately $284,000 to $3.3 million." [75–1, at 3, 8]. An examination of Yerman's report reveals that he based his number on XG's total equity value and an actual licensing agreement ITT entered into with Novedades Agricolas, a Spanish company, regarding the Xilema trademark. [218–1, at 14, 29].

[36] Second, XG argues that Yerman's estimate "will not

assist the trier of fact" because what he did to arrive at the estimate is "no different than what the jury will be asked to do." XG essentially argues that Yerman offered no expert insight and formed his estimate as any layman would. [75–1, at 8–9]. Expert testimony will assist the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262. The requirement "goes primarily to relevance." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. Yerman's estimate was based on an actual licensing agreement between ITT and Novedades Agricolas. His estimate was proffered to rebut Hutchins's estimate relied upon by XG, and it is relevant to the jury's determination of what a reasonable royalty would have been between Plaintiffs and XG. XG does not challenge Yerman's analytical method. XG argues only that Yerman's conclusions are not subject to verifiable testing and have not been subject to peer review. The arguments are unpersuasive. It is for the trier of fact to determine, after considering the opinion and other evidence, what amount of damages should result in recovery. The defects alleged by XG affect the weight of Yerman's opinion rather than its admissibility. *See Quiet,* 326 F.3d at 1341; *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. XG's Motion to Exclude Testimony of Robert N. Yerman is denied.

d. Defendant's Motion to Exclude Certain Testimony of Philip G. Hampton, II [77]

XG next moves to strike a paragraph of Philip G. Hampton, II's expert opinion on the valuation of a hypothetical coexistence agreement[16] between Plaintiffs and XG. **\*1334** XG argues that "ITT has not met its burden in qualifying Hampton as an expert in the realm of coexistence agreement valuations" because Hampton's expertise related solely to the trademark registration process as a result of his former role as an Assistant Commissioner for Trademarks at the United States Patent and Trademark Office. [77–1, at 2; 77–2, at 2].

An examination of Hampton's report shows that he is not testifying to the absolute value of a hypothetical coexistence agreement between Plaintiffs and XG. Hampton instead opines on the relative value of a coexistence agreement in light of another existing coexistence agreement between ITT and Novedades Agricolas, which he understood to have had a value of "about $250,000." Based on his determination that "Novedades had (and has) a much stronger trademark position vis-a-vis a Xylem trademark than Xylem Group," Hampton concludes that XG's hypothetical coexistence agreement, if based on Novedades Agricolas's

coexistence agreement, would have been valued at an amount "significantly less than $250,000." [77–2, at 10–11].

[37] The relative strength of a trademark position is a subject-matter on which Hampton is qualified to testify based on his experience at the United States Patent and Trademark Office. The Court, however, having considered the opinion and the basis for it, determines that it would not be helpful to the trier of fact and would tend to mislead the jury. See Fed.R.Evid. 403. XG's Motion to Exclude Certain Testimony of Philip G. Hampton, II is granted.

4. *Whether Defendant may recover punitive damages*

[38] Plaintiffs argue that XG is not entitled to punitive damages under Georgia state law. To the extent Plaintiff argues that XG is not entitled to punitive damages under the Lanham Act, the issue is premature. The Court "may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages" under 15 U.S.C. § 1117(a). Such a discretionary award "may not be punitive, and must be based on a showing of actual harm." *Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1183 (11th Cir.1994).

If Plaintiffs argue that XG is not entitled to punitive damages under Georgia state law, O.C.G.A. § 51–12–5[17], the motion is granted. Section 51–12–5(b) specifically provides that "[t]his Code section shall apply only to causes of action for torts arising before July 1, 1987." In any event, this issue is required to be decided only if there is an award of damages in this action for trademark infringement.

D. *Appropriateness of Injunctive Relief*

**III. CONCLUSION**
Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment [78] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Testimony of Michael B. Mazis, Ph.D. [76] is

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

**DENIED WITHOUT PREJUDICE.**

**\*1335 IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment as to Damages [70] is **GRANTED IN PART AND DENIED IN PART.** It is **GRANTED** with respect to Defendant's counterclaim for punitive damages under Georgia law. It is **DENIED** with respect to all other claims.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Testimony of Robert N. Yerman [75] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Certain Testimony of Philip G. Hampton, II [77] is **GRANTED.**

**All Citations**

963 F.Supp.2d 1309

Footnotes

1    XG argues any customer can enter either of these sections and thus there is consumer overlap in XG's and Xylem, Inc.'s products. [78–2, ¶ ¶ 133–34; 78–1, at 10–11].

2    To the extent Plaintiffs argue that consumer confusion is over the Xylem trade name rather than the XYLEM trademark, the Court notes that both are protected under the Lanham Act, albeit under different sections. 15 U.S.C. § 1114 covers infringement of a federally registered trademark, while 15 U.S.C. § 1125(a) more broadly covers "any word, term, name, symbol, or device" that "is likely to cause confusion." *See Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.1985). Because XG asserts claims under both sections of the Lanham Act, the Court will address them separately. The Court notes further that a trade name may infringe on a registered trademark if the two are similar enough to cause consumer confusion. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 835 (11th Cir.1983); *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1542 (11th Cir.1984). Plaintiffs' reliance on *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1163 (11th Cir.1982) for the proposition that "[t]rade names ... are not protected by the Lanham Act" is a legal error. *See Am. Television & Commc'ns v. American Commc'ns & Television, Inc.,* 810 F.2d 1546, 1548 n. 1 (11th Cir.1987) (noting but not overturning *Safeway's* legal error on whether the Lanham Act protects trade names). The analysis of "likelihood of confusion" is the same under both sections of the Lanham Act. *Suntree Techs., Inc. v. Ecosense Int'l, Inc.,* 693 F.3d 1338, 1345 (11th Cir.2012); *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n. 4 (11th Cir.2001).

3    Section 1114 provides, in pertinent part:

   Any person who shall, without the consent of the registrant-

   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

   (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

   shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

   15 U.S.C. § 1114(1).

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

4       The Court is aware that various circuits have adopted different factors for the likelihood-of-confusion analysis. See 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:19 (4th ed.2013). The seven factors discussed below are the well-established factors in the Eleventh Circuit.

5       Plaintiffs do not argue the mark is generic or descriptive.

6       That "Xylem" has been used by third parties must be weighed against the non-descriptiveness of the mark. *John H. Harland Co., 711 F.2d at 975* (explaining that both the descriptiveness of the mark and the extent of third-party use "should be considered when analyzing the strength of a particular trademark"). The third-party use in this case does not erode the strength of the mark as found by the Court.

7       What is not known is whether the actual confusion involving the products and sales merchants could be viewed as actual confusion where XG and Xylem, Inc. products sales are made using different sales outlets and to different customers.

8       Plaintiffs submitted the affidavit of Michael B. Mazis to support their argument that there is an absence of a likelihood of confusion and that XG's motion for partial summary judgment should be denied. The Court already has determined based on its analysis of the seven factors that the issue of infringement is required to be decided by a jury. As a result, it is not necessary now to decide whether Mazis's opinion is admissible. XG's motion to exclude is denied but without prejudice to allow it to be filed as a motion *in limine* under the Court's Local Rules.

9       Section 1125 provides, in pertinent parts:

        (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

        (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

        (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

        shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

        15 U.S.C. § 1125(a). The statute authorizes injunctive relief, as follows:

        Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

        *Id.* § 1125(c)(1).

10    Section 10–1–450 provides, in pertinent part:

[A]ny person who shall:

(1) Use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trademark or service mark registered under this part in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or

(2) Reproduce, counterfeit, copy, or colorably imitate any such trademark or service mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale or other distribution in this state of such goods or services;

shall be liable to a civil action by the owner of such registered trademark or service mark for liquidated damages in the amount of $10,000.00, if such act has been committed with knowledge that the trademark or service mark has been registered under this part and such act has been committed without previously obtaining the consent of the owner thereof....

O.C.G.A. § 10–1–450.

11    Section 23–2–55 provides: "Any attempt to encroach upon the business of a trader or other person by the use of similar trademarks, names, or devices, with the intention of deceiving and misleading the public, is a fraud for which equity will grant relief." O.C.G.A. § 23–2–55.

12    Section 10–1–372 provides, in pertinent part:

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; [or] ...

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

O.C.G.A. § 10–1–372(a)–(b).

13    Because the Court has determined that Plaintiffs' liability for Defendant's counterclaims is required to be decided at trial, the Court does not reach Defendant's request for injunctive relief. The Court notes that the granting of an injunction is not automatic upon a showing of infringement. "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). A movant seeking a permanent injunction "must satisfy a four-factor test before a court may grant such relief." The movant must demonstrate: (1) that it has suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and (4) that the public interest would not be disserved by a permanent injunction. Id. at 391, 126 S.Ct. 1837; Remy Martin, 756 F.2d at 1530 n. 13; Buchanan v. U.S. Postal Serv., 508 F.2d 259, 266 (5th Cir.1975); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir.2008) ("Although eBay dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that eBay's holding necessarily extends to the grant of preliminary

ITT Corp. v. Xylem Group, LLC, 963 F.Supp.2d 1309 (2013)

injunctions under the Lanham Act."). The Court will determine whether to grant injunctive relief if XG prevails on its infringement claim at trial.

14    Section 1117(a) provides:

    When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

    15 U.S.C. § 1117(a).

15    Plaintiffs have cited several district court opinions declining to find that a royalty in those cases allowed a recovery for the infringed party. The Court understands that it will in any given case have to determine whether the royalty claimed is a proper basis for a damage award. The Court here responds to, and rejects, the Plaintiffs' overarching argument that a reasonable royalty is not an allowable damage theory.

16    A trademark coexistence agreement is an agreement made by two parties to use a similar trademark for marketing purposes without interfering in each other's enterprises. Agreements of this nature are often made when parties only require a regional use of their trademarks, and when one party's use of a trademark will not harm another party's business.

17    XG bases its punitive-damage claim on O.C.G.A. §§ 10–1–373(c), 51–12–5. (Am. Countercl. [67] at 15). O.C.G.A. § 10–1–373(c) provides only that "[t]he relief provided in this Code section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state."

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

2022 WL 958089
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

FIRST QUALITY TISSUE, LLC, Plaintiff,
v.

IRVING CONSUMER PRODUCTS
LIMITED and Irving Consumer Products,
Inc., Defendants.

Civil Action No. 19-428-RGA
|
Signed 03/30/2022

**Attorneys and Law Firms**

Joseph B. Warden, Warren Keith Mabey, Jr., Nitika Gupta Fiorella, Fish & Richardson P.C., Wilmington, DE., Attorneys for Plaintiff.

John G. Day, Andrew C. Mayo, Ashby & Geddes, Wilmington, DE; Maximilian A. Grant, Matthew J. Moore, Inge A. Osman, Rebecca L. Rabenstein, Jeremiah A. Egger, Latham & Watkins LLP, Washington, D.C.; Charles A. Sanders, David W. Rowe, Paul Weinand, Latham & Watkins LLP, Boston, MA., Attorneys for Defendants.

MEMORANDUM OPINION

ANDREWS, UNITED STATES DISTRICT JUDGE:

*1 Before me are Plaintiff's motion to exclude expert testimony (D.I. 194) and Defendants' motion for summary judgment and to exclude expert testimony (D.I. 196). The motions have been fully briefed (D.I. 195, 197, 206, 210, 220, 222) and I heard oral argument on select issues on January 19, 2022 (D.I. 281). Following oral argument, I issued a Supplemental Order on Claim Construction (D.I. 275), and the parties submitted letters of additional legal authority (D.I. 276, 277) and additional briefing on the issues (D.I. 282, 286, 288). I have considered the parties' arguments and briefing.

## I. BACKGROUND

Plaintiff First Quality ("FQ") brings this action alleging that Irving's accused bath tissue product infringes ten claims of three of FQ's patents: claims 1 and 3 of U.S. Patent No. 9,506,203 ("the '203 patent"), claims 1, 3, 4, and 8 of U.S. Patent No. 9,580,872 ("the '872 patent"), and claims 4, 10, 12 and 13 of U.S. Patent No. 9,725,853 ("the '853 patent") (collectively, "the Asserted Patents" and "the Asserted Claims"). (D.I. 1 ¶ 22; D.I. 197 at 1). The Asserted Patents share essentially the same specification[1] and are directed toward novel "through air dried" tissues. (*See* D.I. 1-1, 1-2, 1-3).

Claim 1 of the '203 patent discloses, "A through air dried tissue comprising an outer surface having an Average Peak to Valley Waviness of 140 microns or less and a Waviness Uniformity of 27 microns or less, the tissue having a bulk softness of less than 10TS7." (D.I. 1-1 at 12).

Claim 3 of the '203 patent is a dependent claim of claim 1, disclosing, "A multi-ply sheet comprising two or more plies, at least one of the two or more plies comprising the tissue of claim 1." (*Id.*).

Claim 1 of the '872 patent discloses, "A through air dried tissue comprising an outer surface having an Average Peak to Valley Waviness of 140 microns or less, a Waviness Uniformity of 27 microns or less, an Average Primary Amplitude of 50 microns or less and an Amplitude Uniformity of 8 microns or less." (D.I. 1-2 at 11-12).

Claim 3 of the '872 patent is a dependent claim of unasserted dependent claim 2, disclosing, "The tissue of claim 2, further comprising an interior layer." (*Id.* at 12). Claim 2 of the '872 patent is a dependent claim of claim 1, disclosing, "The tissue of claim 1, wherein the tissue includes first and second exterior layers." (*Id.*).

Claim 4 of the '872 patent is a dependent claim of claim 1, disclosing, "The tissue of claim 1, wherein the tissue has a bulk softness of less than 10TS7." (*Id.*).

Claim 8 of the '872 patent is a dependent claim of claim 1, disclosing, "A multi-ply sheet comprising two or more plies, at least one of the two or more plies comprising the tissue of claim 1." (*Id.*).

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

Claim 4 of the '853 patent discloses, "A through air dried tissue having a bulk softness of less than 10TS7 and comprising an outer surface having an Average Peak to Valley Waviness of 140 microns or less." (D.I. 1-3 at 12).

**\*2** Claim 10 of the '853 patent is a dependent claim of unasserted independent claim 8, disclosing, "The two-ply, through air dried tissue of claim 8, wherein the outer surface has an Average Peak to Valley Waviness of 135 microns or less." (*Id.*). Claim 8 of the '853 patent discloses:

> A two-ply, through air dried tissue comprising an outer surface having an Average Peak to Valley Waviness of 140 microns or less, a Waviness Uniformity of 27 microns or less, an Average Primary Amplitude of 50 microns or less and an Amplitude Uniformity of 8 microns or less.

(*Id.*).

Claim 12 of the '853 patent is a dependent claim of unasserted independent claim 8, disclosing, "The two-ply, through air dried tissue of claim 8, wherein the tissue has

a softness of at least 90." (*Id.*).

Claim 13 of the '853 patent is a dependent claim of unasserted independent claim 8, disclosing, "the two-ply, through air dried tissue of claim 8, wherein the tissue has a caliper of less than 650 microns." (*Id.*).

Irving seeks summary judgment "that all asserted claims are invalid for indefiniteness, lack of written description, or both." (D.I 197 at 1). Irving also moves to exclude testimony from FQ's technical expert, Dr. Runge, and damages expert, Dr. Maness. (*Id.* at 2).

FQ moves to exclude testimony from Irving's technical experts, Dr. Keller and Mr. Kavalew, and damages expert, Mr. Malackowski. (D.I. 195 at 1).

I issued claim constructions (D.I. 85, 275) for the following terms that are relevant to the issues before me now:

| Term | Construction |
|---|---|
| "Average Peak to Valley Waviness" | Average peak height plus average valley depth (both taken as positive values) relative to the meanline, as computed and measured according to the procedure of the '203 Patent at 9:31-57 [ and corresponding disclosure of the other Asserted Patents]. |
| "Average Primary Amplitude" | Average distance between each roughness profile point and the meanline, as compared and measured according to the procedure of the '203 Patent at 9:31-57 [ and corresponding disclosure of the other Asserted Patents]. |
| "an outer surface" | the surface of the outer side of the through air dried tissue |

## II. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." *Fed. R. Civ. P. 56(c)(1)*. The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams, 891 F.2d at 461*.

*3 When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp., 477 U.S.* *at 322*.

### B. Expert Testimony

*Federal Rule of Evidence 702* sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid. 702*.

The Third Circuit has explained:

> *Rule 702* embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under *Rule 702* requires a determination as to its scientific validity." Finally, *Rule 702* requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "*Rule 702*'s 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (cleaned up).[2]

## III. DISCUSSION

### A. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Where "different approaches to measurement are involved" in the indefiniteness inquiry, "the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 630 (Fed. Cir. 2015).

**\*4** Indefiniteness is a question of law that may depend on subsidiary factual findings based on intrinsic evidence, *i.e.*, "the patent claims and specifications, along with the patent's prosecution history," and extrinsic evidence, "for example, to understand the meaning of a term in the relevant art at the relevant time." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1339-40 (Fed. Cir. 2015). "Regardless of whether a subsidiary factual finding plays a small or large role in the ultimate conclusion about the meaning of the patent term, the ultimate question of construction will remain a legal question." *Id.* at 1340 (cleaned up). "[D]efiniteness ... is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003).

Invalidity must be proven by clear and convincing evidence. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Thus, "[t]he burden of proving invalidity on summary judgment is high." *Schumer v. Lab. Comput. Sys.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002).

Each of the Asserted Claims requires an Average Peak to Valley Waviness ("Wc") of either "140 or less" or "135 or less."[3] I construed "Average Peak to Valley Waviness"

to require measurement according to the procedures described in the Asserted Patents' Specification ("the Protocol"). (D.I. 85; D.I. 1-1 at 9:31-57).

Irving argues the Asserted Claims are invalid for indefiniteness "because there are multiple ways to measure [the claimed surface characteristics], and the specification does not provide any guidance as to which way to use." (D.I. 197 at 10). Specifically, Irving argues the patents do not describe (1) "where to perform the twenty scans required to measure Wc and Pa on embossed tissue," (2) "how to account for embossing when measuring Wc and Pa," (3) "how many samples to test, and (4) which software version to use for the required calculations," and that all of these decisions "can materially impact whether an embossed tissue satisfies the claims." (*Id.*). FQ argues Irving cannot carry its burden on indefiniteness because a POSA "would understand that the patents describe one way, not multiple ways, to determine the claimed roughness parameters." (D.I. 210 at 4).

I find that Irving has not met its burden of showing there are no genuine issues of material fact with respect to indefiniteness. For Irving to prevail on its theory of indefiniteness at the summary judgment stage, it must show it is undisputed that "there [are] competing existing methodologies that reach[ ] different results, and the patent failed to describe which of the multiple methods to use." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1377 (Fed. Cir. 2017). Irving has not done that, because whether a POSA would find there are "competing existing methodologies" on how to conduct the Wc testing described in the Protocol is a disputed factual issue. Further, insofar as there may be multiple legitimate ways to approach some aspects of the Wc testing, whether these "competing methodologies" reach different results is also a disputed factual issue.

As an initial matter, Irving's indefiniteness arguments relating to number of samples and software version, arguments (3) and (4), respectively, are unconvincing. Irving's argument that the Specification is ambiguous as to how many samples to test has no merit. For the reasons I articulated in my Supplemental Order on Claim Construction, the Protocol clearly contemplates testing and averaging 200 total samples. (*See* D.I. 275 at 4-5). Irving's argument that a POSA would not know which version of the OmniSurf software to use to conduct the testing also fails. Dr. Runge and Dr. Brown state that a POSA would know to use the version of the software that was current as of the filing date of the patent, which shows Irving's claim that a POSA would not know which software version to use is factually disputed. (D.I. 199-1

Ex. 2 ¶ 462-64 (Runge) (information regarding the version of the software available at the time the patents were filed "is readily available, and a [POSA] would have sought out that information and used the same software version used by First Quality in the patents."); D.I. 212-1 Ex. B ¶ 27 (Brown) (a POSA "would understand that they should use the same version of software as the inventors.")).

**\*5** Irving's remaining indefiniteness arguments relate to (1) the Protocol's lack of guidance as to where the tissue should be scanned and (2) how a POSA should "account for embossing" during testing. I find that, as to the first, it is factually disputed that a POSA would not know generally where the tissue should be scanned and, further, it is factually disputed that any variation in where a POSA chooses to scan, so long as a POSA performs the scanning in an unbiased manner, would materially alter the results of the testing. As to the second, I find that it is factually disputed that a POSA would not know "how to account for embossing" during testing and, further, it is factually disputed that, so long as a POSA performs the scanning in an unbiased manner, the presence or absence of embossing would materially alter the results of the testing.

**1. Location of Scanning**

Irving argues, "the patents and their prosecution histories do not disclose (1) where to perform [the scans described in the Protocol], (2) whether the sample is physically moved between scans to test different lines, and, (3) if the sample is moved between scans, how to position those scans relative to each other," and that "all of these choices can materially affect whether Wc, Pa, and their uniformities for a given tissue fall[ ] within the claims because the POSA can choose whether to perform scans over embossing, not over embossing, or some combination thereof." (D.I. 197 at 13).

While the Protocol does not expressly address these questions, I find that testimony from Dr. Runge and Dr. Brown shows there is a factual dispute as to whether a POSA would nevertheless know the answers based on what is disclosed in the Protocol and standard industry practices. *See Presidio*, 875 F.3d at 1376 ("Under our post-*Nautilus* cases, a claim is not indefinite if a person of skill in the art would know how to utilize a standard measurement method ... to make the necessary measurement. A patent need not explicitly include information that is already well known in the art."). I also find that the experts' testimony regarding fundamental best practices for achieving non-biased results shows there is a factual dispute as to whether, due to embossing, a POSA's decision about where to perform the scans would materially affect the results of the testing.

I find that a factfinder could conclude based on the testimony of Dr. Runge and Dr. Brown that a POSA would know (1) to test in a generally central area of the tissue, (2) to avoid scanning over the same line, and (3) to keep the positioning of the scans consistent from sample to sample. With these assumptions in place, a factfinder could then conclude that the spacing between scans would be immaterial to the outcome, because a POSA would know not to intentionally seek out or avoid embossed areas, as doing so would bias the results.

First, Irving's claim that a POSA would not know where to perform the scans described in the Protocol is factually disputed. Dr. Runge explains in his report that a POSA would know to run the tests "in a generally common center region of the samples" because "when a bath tissue sheet ... is mounted on the Mahr test fixture approximately perf to perf, the center region of the sheet largely lines up with the test fixture's target region" and a POSA "would not be motivated to deviate from this general central region." (D.I. 199-2 ¶ 18 (Runge)). Dr. Runge supports his opinion by explaining, "A person of ordinary skill would [ ] understand a central region to be the most sensible region to test because edge effects are mitigated in this region." (*Id.* at 20).

Dr. Runge's testimony is further supported by Dr. Brown's opinion, "I understand from Dr. Runge that testing of a center region of a sheet is standard in the tissue industry, which is also consistent with general metrology practices." (D.I. 212-1 Ex. C ¶ 14 (Brown)). Dr. Brown explains, "Observations of a center region are less likely to include surface artifacts caused by outside influences (e.g., effects near the edges of each sheet where the perforation or roll cutting may have altered the surface properties)." (*Id.*).

**\*6** Second, Irving's claim that a POSA would not know whether the sample should be moved between scans to avoid scanning over the same line is factually disputed. Dr. Runge explains that, because "the stylus tip of a contact profilometer will necessarily ... deform the tissue surface as it runs over the surface," "it would be apparent to a skilled artisan that repeat testing over the same line should be avoided to achieve the aims of the testing described in the patents." (D.I. 213-1 Ex. B ¶ 454 (Runge)). Dr. Brown agrees, "Given the clear goal of the testing and the lack of any instruction expressly stating to the contrary, the clear direction to the person of skill in

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

the art would be that the twenty scans should all be performed in the CD [cross machine] direction over twenty different traces." (D.I. 212-1 Ex. B ¶ 25 (Brown)).

**2. Accounting for Embossing**

living's claim that a POSA would not know what to do to "account for" embossing is factually disputed. Dr. Runge and Dr. Brown's testimony suggest a POSA would understand that, because scanning should be performed "in a generally consistent, center region of each tissue sheet tested," the precise spacing between scans is immaterial to the results and nothing special should be done to "account for" embossing on tissues. (D.I. 212-1 Ex. C ¶ 23 (Brown)). As Dr. Runge explains, a POSA would "recognize by default that the testing region should not be changed from sheet to sheet, as that would require modifying the test setup from sheet to sheet, which would, for example, introduce potential error." (D.I. 199-1 Ex. 3 ¶ 20 (Runge)). Because a POSA would know that the testing locations should remain consistent across samples, a POSA would understand that nothing should be done to "account for" embossing, because "by testing a generally consistent/common region throughout, the scans will cross embossment an appropriate proportion of time over 10 sheets, as a matter of course." (*Id.* at 19). Dr. Brown agrees, "Over 10 tissue samples, the amount of embossing that appears in such measurements regions will be appropriately representative of the proportion of the tissue surface that has embossing. This is an unbiased, appropriate approach to understanding surface topographies...." (D.I. 212-1 Ex. C ¶ 23 (Brown)).

The testimony of Dr. Runge and Dr. Brown shows that a factfinder could conclude that, so long as a POSA uses "a common, consistent region for scans across multiple samples," which "avoids unintentional biasing of results," and neither intentionally seeks out nor avoids embossing, the exact spacing between scans would not materially impact the outcome of the testing. (D.I. 212-1 Ex. C ¶ 14). As Dr. Brown explains, "The patents explain that two hundred 30 mm scans should be performed across ten representative samples.... This generates a tremendous amount of data. In my experience, and as would be understood by a [POSA], that sample size renders further guidance as to *exactly* where to perform the scans unnecessary." (D.I. 212-1 Ex. B. ¶22).

Irving argues, "Dr. Keller's unrebutted testing establishes that embossing can materially affect measurement of the claimed Wc and Pa values." (D.I. 197). Dr. Keller's "unrebutted" testing, however, merely showed that

scanning exclusively over embossed regions of the tissue produces materially different results than scanning exclusively over non-embossed regions. (D.I. 197 at 12; D.I. 198 ¶¶ 45-46, 50 (Keller)) (FQ's tissue met the claim limitations "when the scans did not run over embossing, whereas when the scans ran over embossing the values of the parameters did not fall within the claimed [ranges].")).

Dr. Runge and Dr. Brown agree that a POSA would not interpret the Protocol to allow for scanning exclusively over embossed regions or exclusively over non-embossed regions, as doing so would bias the results. Dr. Runge states that scanning in a consistent region of the tissue "without regard to embossment is the standard and most reasonable approach for a [POSA] to take because it is an unbiased approach – it takes the emboss pattern as it comes and it does not attempt to artificially bias the testing towards or away from emboss patterns." (D.I. 199-1 Ex. 3 ¶20). He further states that a POSA "would not, as Dr. Keller does, specifically seek to conduct each and every test on only embossments or only on non-embossed portions of the samples. Nor would the [POSA] otherwise seek to bias the results as Dr. Keller suggests through gerrymandered testing." (*Id.* ¶ 445). Dr. Brown states, "Dr. Keller's suggestion that a [POSA] would choose to perform all of the scans in a specific way so as to skew the representativeness of the data is antithetical to standard scientific [principles] and, depending on the context, general [principles] of scientific honesty and ethics." (D.I. 212-1 Ex. B ¶ 23). Therefore, whether embossing materially affects a tissue's Pa and Wc measurements when a POSA does nothing to "account for" such embossing is factually disputed.

**\*7** Irving cites to deposition testimony by Mr. Miller, Dr. Sealey, and Ms. Massey expressing differing opinions on whether embossments should be avoided during testing. (*See* D.I. 197 at 16). Their testimony goes to the weight of FQ's argument, but it does not alter my conclusion that the question of whether a POSA would know, based on the Protocol and standard measurement practices, not to do anything to specially "account for" embossing is factually disputed. Because I find that the experts' opinions and supporting reasoning are sufficient evidence such that a reasonable factfinder could conclude that a POSA would know to test embossed tissue just as she would non-embossed tissue, Irving has not met its burden of proving indefiniteness at the summary judgment stage. *See Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 860 (W.D.N.C. 2016) (holding "Defendants have failed to prove indefiniteness by clear and convincing evidence" where there are outstanding factual questions "as to what one skilled in the art would have understood by looking at the

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....
2022 WL 958089

patent.").


### 3. Conclusion

For these reasons, Irving's motion for summary judgment that the Asserted Claims are invalid for indefiniteness is DENIED.


### B. Written Description

The written description requirement of 35 U.S.C. § 112 requires that a patent contain a description of the invention that "clearly allow[s] persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (cleaned up). "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* The written description inquiry is a question of fact. Thus, "determining whether a patent complies with the written description requirement will necessarily vary depending on the context. Specifically, the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* (cleaned up).

"Compliance with the written description requirement ... is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). "A party must prove invalidity for lack of written description by clear and convincing evidence." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).

Irving argues the Asserted Claims are invalid for lack of written description because (1) the patents do not disclose any tissue having both the claimed Wc and Pa characteristics and the other claimed properties (D.I. 197 at 22-25), (2) the patents do not disclose tissues having Wc and Pa values throughout the claimed broad ranges of Wc and Pa (*id.* at 25-26), and (3) the patents fail to disclose a tissue having Wc and Pa in the claimed ranges based on an average of 200 samples, as required by the claims (D.I. 282 at 1-3). FQ responds that Irving's written description arguments are predicated on an incorrect

understanding of what the law requires. (D.I. 210 at 18). "The Federal Circuit has made clear that '[a] claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language.' " (*Id.* (quoting *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005))).

For the following reasons, I find Irving has not met its burden of showing there are no genuine factual disputes material to the sufficiency of the Asserted Claims' written description. I address each of Irving's arguments in turn.


### 1. Wc/Pa and Softness Properties

Irving argues six[4] of the Asserted Claims are invalid for lack of written description, because they require a combination of Wc and one of three other softness-related properties, but "Example 5 is the only disclosed example of a tissue having Wc and Pa within the claimed ranges, and [ ] the patents do not disclose the bulk softness, hand-feel softness, or caliper of Example 5." (D.I. 197 at 22). Thus, Irving argues, these claims are invalid because the Specification would not " 'clearly allow [a POSA] to recognize that [the inventors] invented what is claimed,' i.e., tissue having the claimed combination of properties." (*Id.* at 22 (quoting *Ariad*, 598 F.3d at 1351)). FQ responds, "that all claimed properties of the Example 5 tissue are not specifically disclosed [is] neither here nor there, under *Ariad* and other established law," because "the specification, *as a whole*, does disclose that the inventors possessed their invention." (D.I. 210 at 20).

**\*8** I agree with FQ that *Ariad* does not require disclosure of a specific example embodying all of the claim limitations. As *Ariad* itself expressly states, the Federal Circuit has "made clear that the written description requirement does not demand either examples or an actual reduction to practice ...." *Ariad*, 598 F.3d at 1352. To satisfy the written description requirement, all that is required is a showing that a POSA would understand, based on what is disclosed within the four corners of the specification, that the inventors were in possession of what they claimed.

I find that Dr. Runge's testimony about what a POSA would understand from the Specification's disclosures relating to the tissue's softness properties and surface profile properties is sufficient to show there is a genuine dispute of material fact as to the adequacy of the Asserted Patents' written description. (*See* D.I. 213-1 Ex. B ¶¶ 476-80). Dr. Runge explains that a POSA would

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

understand that the inventors were in possession of the claimed tissue based on the Specification's detailed explanation of how the inventors achieved each of the claimed properties. (*Id.*). Dr. Runge notes that the Specification describes "how to adjust various levers to adjust each of the claimed properties," "describes in detail the impact of various softener/debonder applications to the disclosed examples [1-4]," explains that two plies of the tissue of Example 1 were combined to create Example 5, and discusses "the relationship between the softness properties discussed in examples 1-4 with the surface profile properties of example 5." (*Id.* ¶¶ 478-79).

A factfinder could reasonably conclude, based on Dr. Runge's testimony, that a POSA would understand from the Specification that the inventor was in possession of a tissue with all of the claimed properties.

## 2. Ranges

Irving argues the Asserted Claims are invalid for lack of written description because the written description does not support the broad ranges for the Wc and Pa values. The specification provides "just a single data point within each of the claimed ranges ... toward the upper end of the claimed ranges," and, "There is no description of a tissue having Wc or Pa, e.g., in the middle of the claimed ranges, let alone toward their lower ends." (D.I. 197 at 25-26). FQ responds that Irving is wrong to "focus on Example 5 in isolation, and eschew the rest of the patents' disclosure." (D.I. 210 at 22). FQ points to Dr. Runge's testimony about "how the inventors were able adjust various aspects of the tissue making process to achieve a TAD tissue with characteristics throughout the claimed range(s) for each" to support its argument that "the *totality* of the specification teaches the full scope of the claims." (*Id.* at 23).

I agree with FQ that Dr. Runge's testimony shows there is a genuine dispute of material fact as to whether the Asserted Patents' written description is sufficient. As the Federal Circuit explained in *Scripps*:

> Open-ended claims are not inherently improper; as for all claims their appropriateness depends on the particular facts of the invention, the disclosure, and the prior art. They may be supported if there is an inherent, albeit not precisely known, [lower] limit and the specification enables one of skill in the art to approach that limit.

*Scripps Clinic & Research Found v. Genentech, Inc.*, 927 F.2d 1565, 1572 (Fed. Cir. 1991), *overruled on other*

*grounds by Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009) ("[P]rocess terms limit product-by-process claims. To the extent that *Scripps Clinic* is inconsistent with this rule, this court hereby expressly overrules *Scripps Clinic*.").[5]

**\*9** Here, Dr. Runge's testimony shows both that the claimed Wc and Pa ranges have an inherent lower limit and that the Specification would enable a POSA to approach that limit. Dr. Runge explains, "No actual real world tissue surface has a Pa or Wc—or more colloquially, "smoothness"—of zero microns. All real world surfaces, including tissue, have a practical lower limit defining their smoothness which is certainly not zero microns." (D.I. 213-1 Ex. B ¶ 473). Moreover, in Dr. Runge's opinion, "contrary to Dr. Keller's assertion, the specification does indeed explain how to adjust various aspects of the tissue making process to achieve a TAD tissue over differing surface profiles less than the claimed upper limit(s) for each." (*Id.* ¶ 471). Thus, a factfinder could reasonably conclude from Dr. Runge's testimony that a POSA would understand the inventors were in possession of tissue products with surface properties throughout the claimed ranges. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) (upholding jury's verdict that patents were not invalid for lack of written description because "jury was free to credit" testimony that "a [POSA] would recognize" claimed open-ended range had an inherent upper limit and a POSA "would be fully enabled to practice the invention based on the specification's disclosure" "in reaching its conclusion that the invention was adequately described ...").

## 3. Number of Samples

Finally, Irving argues that the Asserted Claims are invalid for lack of written description because the Specification's "failure to disclose any tissue having Wc within the claimed range 'obtained by averaging 200 scans from ten samples' confirms that there was no 'possession' of any Wc based on 200 scans from 10 samples...." (D.I. 282 at 2). Irving's argument, however, improperly relies on extrinsic evidence to show that the Wc values reported in the Specification were not derived from 200 samples. *See id.*; *Ariad*, 598 F.3d at 1351 (holding written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art"). Lack of written description cannot be proven by the sort of extrinsic evidence Irving offers here. In any event, even if it were clear from the four corners of the Specification that the Wc and Pa data disclosed in

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

Example 5 was derived from fewer than 200 samples, such a disclosure would still be sufficient to satisfy *Ariad*'s baseline requirement of "a constructive reduction to practice that in a definite way identifies the claimed invention ...." *Id.* at 1352.

**4. Conclusion**

For the reasons stated above, Irving's motion for summary judgment that the Asserted Claims are invalid for lack of written description is DENIED.

**C. Copying Opinions**

Irving argues Dr. Runge's and Dr. Maness's opinions that Irving copied FQ's products should be excluded because (1) copying is a factual issue that is equally within the competence of jurors to decide, (2) copying opinions improperly address living's "intent, motive or state of mind," and (3) the copying opinions are not grounded in reliable scientific evidence "because FQ's experts perform no analysis to identify any specific way in which Irving allegedly copied something FQ had done." (D.I. 197 at 27-28). FQ responds that Dr. Runge's[6] "copying opinions" "are not chiefly about copying," but rather "the main thrust of those opinions are 'on Irving's practices in developing its Sam's Club Member's Mark bath tissue.' " (D.I. 210 at 27 (quoting D.I. 213-1 Ex. A ¶ 76)).

First, I agree with Irving that copying is a factual issue that is within the competence of the jurors to decide. I disagree, however, with living's characterization of Dr. Runge's "copying" testimony as "not grounded in reliable scientific evidence." (D.I. 197 at 28). Indeed, it appears that some of the factual evidence on which a jury would rely in reaching such a conclusion would benefit from an expert's explanation. For example, Dr. Runge relies on his expertise in the field of tissue research and development to opine on the significance of "Irving's stated goal of matching First Quality's levels on temporary wet strength," as the level of temporary wet strength "is a very specific aspect of tissue production" that "will also have a significant impact on the properties of the final product." (D.I. 199-1 Ex. 1 ¶ 78). Dr. Runge also relies on his expertise to opine, "Irving [ ] had a significantly inferior product as compared to First Quality's product" in June 2014, and the difference in softness between Irving and FQ's respective tissue products at that time was "significant, and overcoming

such a difference in softness would be a product development challenge." (*Id.* ¶ 79).

**\*10** Second, the parties agree that expert opinions on intent, motive, or state of mind are impermissible. FQ maintains, "Dr. Runge does not intend to opine on [intent, motive, or state of mind] and First Quality agrees that no expert should be allowed to." (D.I. 210 at 30). The parties' disagreement centers on whether individual excerpts from Dr. Runge's report are instances of expert opinion on intent, motive, or state of mind, or simply repetitions of Irving's own "stated intent" from their internal documents. (*Id.* ("[M]any of Irving's documents state an intent.")). I agree with FQ that at least some of the excerpts it identifies contain improper opinions on intent, motive, or state of mind. Nevertheless, these disputes are best resolved through objections at trial. I therefore decline to parse through Dr. Runge's report and rule individually (and without any context) on which opinions refer to intent and which do not. FQ is on notice of Irving's objections (and that there is merit to some of them) and would be well advised to limit the scope of Dr. Runge's testimony accordingly.

For the above reasons, I agree with FQ that "Dr. Runge's incidental and sporadic references to intent and 'copying' ... may be remedied without resorting to Irving's proposed wholesale exclusion of opinions." (*Id.* at 31). Therefore, I will DENY Irving's motion to exclude Dr. Runge's "copying" opinions with the following qualification. Neither Dr. Runge nor Dr. Maness may testify at trial that Irving copied FQ. The parties are correct that this is a factual conclusion that is within the province of the jury to decide. Dr. Runge may, however, offer opinions on the limited set of underlying factual circumstances from which copying could be inferred and which require expert explanation, including possibly industry standards for tissue product development and the significance of various individual tissue properties to the development process. FQ should err on the side of caution in determining which portions of Dr. Runge's "copying" testimony to offer on the basis that they "provide technical and industry context for Irving's documents which would not be apparent to a lay jury." (*Id.* at 28).

**D. Dr. Maness's Damages Opinion**

Irving argues Dr. Maness's damages opinion should be excluded, because he (1) does not exclude any non-infringing products from his royalty base; (2) improperly "applies a rule of thumb" in setting his proposed royalty rate to Irving's lowest annual profit

margin for sales of its accused tissue; (3) "effectively disgorges Irving's profits," despite not opining on lost profits; (4) does not apportion any value to unpatented features of the accused tissue; and (5) "bases his reasonable royalty in part on his legally erroneous opinion that Irving's paper towel sales to Sam's Club are convoyed sales." (D.I. 197 at 31). I address each of Irving's arguments, some of which are frivolous, in turn.

### 1. Non-infringing products

Irving argues Dr. Maness's damages opinion should be excluded because his reasonable royalty calculation does not account for a percentage of tissue product that would not literally infringe the Asserted Claims, despite evidence that some of Irving's accused tissue "has Wc and Pa falling outside all asserted claims." (D.I. 197 at 32-33). FQ responds that Dr. Maness's calculations are proper "because, at a hypothetical negotiation, the parties' intent and expectation would be for [all] sales to be infringing," and, "to the extent there are any *de minimis* out-of-spec products that are non-infringing, sales of those products were only possible because of Irving's infringement." (D.I. 210 at 31-32).

FQ contends that any tissue product that satisfies Sam's Club's technical specifications infringes the Asserted Claims. (*See id.* at 32-33). In other words, FQ argues that if any of Irving's accused product does not infringe, it is only because it is "off-spec." (*Id.*; D.I. 213-1 Ex. A (Runge Opening Report) ¶ 60 ("The only products I am aware of that satisfy Sam's Club's specifications ... are products that practice the claims of the Asserted Patents."), Ex. C (Runge Reply Report) ¶ 43 ("[T]he several individual, historical samples of Irving's Sam's Club Member's Mark bath tissue that were tested to be low quality for TS7 and TSA handfeel softness were clearly off-spec.")).

**\*11** Irving replies, "[T]here is no evidence of what fraction [of the accused tissue] indisputably does not infringe or that such product is 'out-of-spec.' " (D.I. 220 at 17). Although FQ's position that non-infringing tissue is also necessarily "off-spec" is factually disputed, I find that Dr. Runge has a sound basis for this opinion and Dr. Maness's reliance on such an assumption in his damages calculation does not run afoul of *Daubert*. (*See* D.I. 213-1 Ex. C ¶¶ 38-43 ("Irving's documents show that there have been a number of instances where Irving produced tissue below its specification's targets and acceptance limits for TSA softness.")).

I agree with FQ that the law does not require a showing that "damages in all circumstances be limited to specific instances of infringement proven with direct evidence." (D.I. 210 at 33 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009))). I find that at the hypothetical negotiation, the assumption of the parties would be that all the accused tissue would have the same properties. (*See* D.I. 213-1 Ex. C ¶ 40 ("[O]ff-spec samples should not be determinative of the representative properties of a product, and generally would not be used in such a way in industry.")). Thus, if the parties assume any of the tissue infringed, which would be a given at the hypothetical negotiation, they would assume essentially all the tissue infringed. I find Dr. Maness's opinion that even if some out-of-spec bath tissue did not literally infringe, "neither party would desire the cost and nuisance of auditing every production batch sold to Sam's Club to determine if each roll was within the asserted claims" to be sound. (D.I. 199-1 Ex. 14 ¶ 61). Therefore, Dr. Maness did not err in failing to account for off-spec non-infringing tissue in his reasonable royalty calculation.

### 2. "Rule of Thumb"

Irving frivolously argues Dr. Maness impermissibly applied a "rule of thumb" by selecting a proposed royalty rate equivalent to Irving's lowest annual profit margin on accused bathroom tissue sales. (D.I. 197 at 33). I disagree.

The Federal Circuit has rejected rules of thumb for "being insufficiently grounded in the specific facts of the case." *Virnetx, Inc. v. Cisco Systems, Inc.*, 161 F.3d 1308, 1331-32 (Fed. Cir. 2014). Here, I find that Dr. Maness appropriately tied his selected royalty rate to facts specific to the case at hand. Dr. Maness explains the selected royalty rate is "based on Irving's actual profit margin from accused sales throughout the infringement period as well as the profits expected at the time of the 2016 hypothetical negotiation," in addition to the "bargaining power of the two parties given [ ] case-specific facts," such as the lack of a non-infringing alternative, and "the reality that Irving's cost of forgoing a license would be walking away from all the profit associated with the Sam's Club opportunity ...." (*See, e.g., D.I.* 199-1 Ex. 14 ¶¶ 27). Therefore, Dr. Maness did not rely on an impermissible "rule of thumb" in arriving at his selected royalty rate.

### 3. "Disgorgement"

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

Irving argues Dr. Maness's use of a royalty rate equivalent to Irving's lowest annual profit margin is an improper attempt to "reimburse FQ for lost profits by disgorging Irving's profits." (D.I. 197 at 35). This argument is frivolous too.

FQ is correct when it says that Dr. Maness's opinion does not identify and does not seek to recover FQ's lost profits. (D.I. 210 at 36). Nor does Dr. Maness's opinion seek to "disgorge" Irving of its profits. Dr. Maness merely and, appropriately, considers Irving's profits from sales of the accused tissue, *i.e.*, "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity," as one factor in determining a reasonable royalty rate. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Irving's arguments relating to lost profits and disgorgement are baseless.

### 4. Apportionment

**\*12** Amidst the dross, Irving has one golden nugget.

Irving argues, "By refusing to apportion any value to unpatented aspects of the accused bathroom tissue, Dr. Maness violated '[t]he essential requirement [ ] that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.' " (D.I. 197 at 36 (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). FQ responds, "because bathroom tissue is not a multi component product, apportionment, per se, is not actually required." (D.I. 210 at 37). FQ further argues that because "the *only* way Irving was able to sell Member's Mark bath tissue was by matching First Quality's patent-practicing products," "the Patents at Issue are the drivers of demand for the only customer who bought the accused product [Sam's Club]," and therefore it was appropriate for Dr. Maness to apportion 100% of the value of the accused products to the patented technology. (*Id.* at 37-38). I am not convinced by FQ's argument.

FQ is incorrect that apportionment is not required because bathroom tissue is not a multi-component product. The law on apportionment is clear. "A patentee is only entitled to a reasonable royalty attributable to the infringing features. The patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

FQ's reliance on *AstraZeneca* is also inapt. There, the Court found the novel subcoating "was substantially responsible for the value of the product" because it made it commercially viable for the first time; here, there is no dispute that bathroom tissue has long been commercially viable without FQ's patented technology. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339-40 (Fed. Cir. 2015). Irving's tissue product has both patented and unpatented features that contribute value and drive demand for the product. Therefore, apportionment is required, and I agree with Irving that "100% apportionment is no apportionment at all." (D.I. 220 at 19).

I implied at oral argument that I did not believe Dr. Maness properly apportioned in his report and intended to strike any of his analysis that flowed from that failure. (D.I. 281 at 139:3-140:8). For the reasons stated above, I formally do that now by GRANTING Irving's motion to exclude the portions of Dr. Maness's original report that rely on his incorrect "apportionment" method.

Dr. Maness has filed a supplemental expert report to address the apportionment issue. Irving has filed a brief (D.I. 295) objecting to the alternative method of apportionment Dr. Maness employs in his supplemental report. I will treat Irving's renewed objection as a new motion and address it separately.

### 5. "Convoyed Sales"

Irving argues, "The final legal error requiring exclusion of Dr. Maness's damages opinion is that he treats Irving's paper towel sales to Sam's Club as convoyed sales in arriving at his proposed royalty," despite the paper towel sales not being "convoyed sales as a matter of law because *paper towels* and the accused *bathroom tissue* undisputedly lack a functional relationship." (D.I. 197 at 38). FQ responds that Dr. Maness does not use the paper towel sales in either his royalty base or royalty rate calculations and instead "notes only that because the parties would recognize that securing Sam's Club bath tissue business could help Irving secure its paper towel business, Irving's maximum willingness to pay would have been even greater than its 12.6% profit margin at the time of the hypothetical negotiation ... and, therefore, Dr. Maness's 7.5% rate is conservative." (D.I. 210 at 40).

**\*13** I find that, because Dr. Maness does not seek any lost profits for the paper towel sales, his consideration of the paper towel sales as part of his overall damages opinion is appropriate. *Georgia-Pacific* factor 6 expressly allows for

2022 WL 958089

the consideration of "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia-Pacific*, 318 F. Supp. at 1120.

## 6. Conclusion

For the reasons stated above, the portion of Irving's motion to exclude Dr. Maness's damages opinion that I did not address at oral argument is DENIED.

## E. Dr. Keller's Opinions

FQ seeks to exclude portions of Dr. Keller's opinions. Specifically, FQ argues Dr. Keller's proposed testimony (1) "advocat[es] and us[es] an improper claim construction of 'an outer surface,' " (2) discusses "optical" and "non-contact" profilometry, "which is irrelevant to this case," and (3) includes "rubber-stamping attorney argument, predicated on materials he admitted to never reviewing." (D.I. 195 at 1). I review each of these arguments in turn.

## 1. "Outer Surface"

FQ contends, "Dr. Keller argues ... that the 'outer surface having' the claimed roughness parameters must be somehow either 'representative' of the entire outer surface of the tissue or be more than a 'mere portion' of the entire outer surface." (*Id.* at 3). FQ argues that this amounts to "a new claim requirement" which is "improper because it is contrary both to the plain meaning of the claims and the Court's constructions of 'Average Primary Amplitude' and 'Average Peak to Valley Waviness.' " (*Id.*). For the reasons explained in my Supplemental Order on Claim Construction (D.I. 275), I disagree.

I construed "an outer surface" to mean "the surface of the outer side of the through air dried tissue," explaining, "when the inventors discuss improvements to the tissue's 'surface profile,' they are referring to the surface profile of the tissue as a whole." (*Id.* at 2-3). The portions of Dr. Keller's opinions to which FQ objects, where he opines that infringement testing should be conducted to generate

measurements that "are representative of the outer surface" and "not a mere portion of that outer surface" are compatible with this construction of "an outer surface." (D.I. 195 at 5-6; *see, e.g.*, D.I. 200-1 ¶ 36 (Keller Rebuttal) ("[T]he 'outer surface' that is claimed is not a mere portion of that outer surface"); *Id.* ¶ 40 (POSA would understand FQ's testing "is not representative of the outer surface.")).

For these reasons, FQ's motion to exclude Dr. Keller's opinions on the claimed "outer surface" is DENIED.

## 2. Optical Profilometry

FQ moves to exclude Dr. Keller's discussion of "optical" or "non-contact" profilometry because it is "both entirely irrelevant to the case and highly likely to confuse the trier of fact." (D.I. 195 at 12). FQ argues that, because the Asserted Claims require that Wc and Pa be measured using contact profilometry, Dr. Keller's "confounding discussion of non-contact, optical profilometry methods and the respective benefits of optical profilometry over contact profilometry throughout his reports is an impermissible end run around the Court's claim construction." (*Id.*). Irving responds that Dr. Keller's comparison of contact profilometry to non-contact profilometry is relevant to damages, specifically " 'the nature of the invention' and its relative lack of 'utility,' which are 'important considerations in the hypothetical negotiation.' " (D.I. 206 at 15 (quoting *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015))). Irving further argues that FQ's framing of Dr. Keller's opinions as "an impermissible end run around the Court's claim construction" is incorrect, because Dr. Keller relies solely on contact profilometry measurements to opine on non-infringement. (D.I. 206 at 15).

**\*14** Because I agree with Irving that (1) Dr. Keller has not relied on non-contact profilometry to opine on whether the accused product meets the claim limitations (D.I. 200-1 (Keller Rebuttal) ¶¶ 44-48; D.I. 200-2 (Keller Reply) ¶¶ 104-06), (2) Dr. Keller's discussion of the deficiencies of the contact profilometry technique required by the claims may be relevant to damages (D.I. 200-17 at 22, 48), and (3) Dr. Keller's non-contact profilometry images may help the jury visualize what embossing and the surface characteristics that are the subject of the claim limitations look like at the micron scale (D.I. 200-6 ¶¶ 79-83), I do not see a reason to exclude Dr. Keller's testimony relating to optical profilometry at this time. FQ's motion to exclude Dr.

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

Keller's testimony relating to optical profilometry is DENIED without prejudice to objections at trial based on the rules of evidence.

### 3. Dr. Keller's Other Opinions

FQ argues that Dr. Keller's remaining opinions are "attorney argument, created and written by Irving's lawyers, and merely rubber-stamped by Dr. Keller sight-unseen" and should therefore be excluded because "they are not predicated on reliable scientific investigation ...." (D.I. 195 at 16-17). FQ points to (1) Dr. Keller's admission in his deposition that "he reviewed, at most, only isolated lines identified by Irving's attorneys and no other portion of" transcripts from certain fact witnesses' depositions that he cited in his report (*id.* at 18; D.I. 200-7 (Keller Opening) ¶¶ 76, 117, 118, 132, 135, 136, 165, 178); (2) paragraph 132 of Dr. Keller's opening report discussing various fact witnesses' testimony on how contact profilometry scans should be spaced relative to each other, portions of which appear verbatim in a motion filed by Irving in October 2020, before Dr. Keller had access to the cited materials (D.I. 195 at 18-19; D.I. 200-7 ¶ 132; D.I. 200-9 at 2); and (3) Dr. Keller's "extensive[ ]" reliance on Mr. Kavalew's contemporaneously filed report, despite admitting at his deposition that he had not seen Mr. Kavalew's report prior to submitting his own report (D.I. 195 at 20).

Irving responds, "FQ's rhetoric ignores that Dr. Keller's opinions are well-supported by technical evidence and that he had very substantial involvement in his reports." Irving points to Dr. Keller's response to living's questioning about whether there were portions of his report he did not write: "The technical component is entirely mine. My findings are mine. I wrote those. And the legal team I'm working with typed out the table of contents, inserted the patent['s claims]." (D.I. 206 at 18; D.I. 200-8 at 166:3-167:4).

I agree with Irving that the deficiencies identified by FQ in Dr. Keller's reports are not serious enough to require blanket exclusion of Dr. Keller's opinions. *In re Asbestos Products Liability Litigation (no. VI)*, 714 F. Supp. 2d 535, 542 (E.D. Pa. May 24, 2010) ("When a Rule 26(a)(2)(B) challenge is raised, the proper focus of the court's inquiry is whether the expert witness offered substantial input into what was put into the report.") (cleaned up). The examples FQ points to involve subjects that are ancillary to Dr. Keller's primary invalidity and non-infringement opinions. Irving has shown that Dr. Keller had "substantial involvement" in what was

included in his reports and was responsible for the reports' technical analyses and conclusions, which comprise the core of his testimony. (*See, e.g.*, D.I. 206 at 19 (citing evidence from the record to show "Dr. Keller's opinions are well-supported by technical evidence, including technical literature, patents, tissue images, testing, and measurements that the parties produced.")).

FQ's concerns with Dr. Keller's report can be fairly addressed through cross-examination. For these reasons, FQ's motion to exclude Dr. Keller's opinions is DENIED.

### F. Mr. Kavalew's Opinions

As I implied at oral argument (D.I. 281 at 105:22-106:3), I do not think there are any *Daubert* issues with Mr. Kavalew's opinions.

**\*15** Irving relies on physical samples of tissues manufactured before the priority date of the Asserted Claims as prior art in its invalidity case. living's technical expert, Mr. Kavalew, performed testing on these prior art tissue samples to show they met the requirements of the Asserted Claims. FQ argues this testing by Mr. Kavalew should be excluded for three reasons: (1) "living's present-day test results on the physical samples do not reliably reflect the properties of the tissue at the time they were prior art," (2) "Mr. Kavalew relies on testing and evaluation on the alleged prior art samples performed by Irving employee Ida Lamanna, but during fact discovery Irving asserted privilege over Ms. Lamanna's evaluation of those very same samples," and (3) "[M]any of the test results are inherently unreliable because Mr. Kavalew is unable to confirm the correctness or accuracy of them," "many of the measurements were inconsistently reported in Mr. Kavalew's report," and, "While Irving served a 'corrected' report from its attorneys after the close of expert discovery, there is no basis for the 'corrections.' " (D.I. 195 at 21). I am not persuaded by any of FQ's arguments.

First, I find that the question of whether the prior art samples had the same properties at the time of testing as they had prior to the priority date is a factual question on which both parties should be allowed to opine. Mr. Kavalew testified that the packaging was unopened prior to testing, had no expiration or "use by" dates, and that he personally inspected the samples and found they showed no signs of degradation. (D.I. 207-1 Ex. 20 ¶¶ 145, 146, 187, 206, 225; D.I. 200-5 ¶¶ 32-33). Mr. Kavalew also tested two properties of the tissues, caliper and tensile, that would have been likely to change over time if

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

degradation had occurred and found both were within the target range for all samples. (D.I. 200-5 ¶¶ 85-89, 104-09, 160-65, 178-83, 284-89, 294-99, 345-50, 354-50, 354-57).

Second, as to the argument that FQ suffered some prejudice from its inability to depose Ms. Lamanna prior to Irving waiving its work product privilege, I resolved that at oral argument. (D.I. 281 at 134:7-139:2).

Finally, the errors in Mr. Kavalew's original report were typographical and have been corrected. FQ is in possession of all the data from the testing and is free to cross examine Mr. Kavalew about that data and any remaining inconsistencies in his results at trial.

For these reasons, FQ's motion to exclude Mr. Kavalew's testimony about the results of his testing on the prior art tissues is DENIED.

### G. Mr. Malackowski's Opinions

#### 1. P&G Settlement Agreement

The Federal Circuit has "recognized that licenses may be presented to the jury to help the jury decide an appropriate royalty award." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). Because licenses "are almost never perfectly analogous to the infringement action," reasonable royalty opinions "relying on licenses must account for [ ] distinguishing facts when invoking them to value the patented invention." *Ericsson*, 773 F.3d at 1227. "[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *Wordtech Sys., Inc. v. Integrated Networks Sol'ns, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (cleaned up).

While the Federal Circuit "has often excluded licenses that are technologically or economically non-comparable," it "has also held, however, that the issue of comparability is often one of sufficiency of the evidence, not admissibility." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373-74 (Fed. Cir. 2020). Nevertheless, "a patentee [can] not rely on license agreements that [are] radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Uniloc*, 632 F.3d at 1316 (cleaned up).

FQ seeks to exclude Mr. Malackowski's opinions relying on a "Settlement and Patent License Agreement" entered into between Proctor & Gamble and Irving (the "P&G-Irving Agreement") in March 2012. FQ argues, "Neither Irving nor Mr. Malackowski have come close to showing that the [P&G-Irving Agreement] is comparable to the hypothetical license" because neither Irving nor Mr. Malackowski have identified even the most rudimentary facts necessary to evaluate comparability of the [P&G-Irving Agreement]." (D.I. 195 at 27-28). FQ argues the "unknowns regarding that agreement include at least the following": (1) "What dispute the settlement resolved," (2) "what Irving product(s) the settlement covered," (3) "how many sales or how much revenue Irving made or expected to make from the licensed product," (4) "whether Irving ever actually used or intended to use the licensed technology in any product," (5) "whether the licensed technology is capable of being used in bathroom tissue products," and (6) "any identification whatsoever of the circumstances that led to the settlement." (*Id.* at 28). Irving responds, "Mr. Malackowski at least has shown 'baseline comparability' to support admissibility, and FQ's challenge to 'the degree of comparability is a factual issue best addressed through cross examination.' " (D.I. 206 at 32 (quoting *Bio-Rad*, 967 F.3d at 1373-74)).

**\*16** The P&G-Irving Agreement resolved two disputes, one relating to living's diaper products (the "Diaper Dispute"), and one relating to Irving's tissue products (the "Tissue Dispute"). (D.I. 200-17 at 40). Mr. Malackowski notes, "the disputes between the parties were 'amicably resolved' without any lawsuit being filed in court." (*Id.*). The Diaper Dispute arose from a disagreement over royalty obligations due under a previous patent license agreement from 2003 (the "2003 Diaper License"). (*Id.* at 40-41). The P&G-Irving Agreement included a "release," under which the parties agreed that no further payments would be required under the 2003 Diaper License. (*Id.* at 41).

The P&G-Irving Agreement granted Irving "a fully paid up, irrevocable, royalty-free, and worldwide license for all past manufacture, use, offering for sale, sale, or importation of any products within the claims of the licensed tissue patents." (*Id.* at 41). Mr. Malackowski opines, "With respect to the licensed products, the P&G-Irving Agreement can cover both [bathroom tissue] and paper towels." (*Id.* at 43). Neither Mr. Malackowski nor Irvine, however, has identified any specific Irving

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

product covered by the Agreement. Accordingly, the amount of revenue Irving has made or expected to make from the licensed technology is unknown.

Mr. Malackowski performed an in-depth assessment of the comparability of the P&G-Irving Agreement to the hypothetical negotiation. He begins by comparing the timing, noting the Agreement occurred "approximately 4.5 years prior to the hypothetical negotiation in November 2016," but that there were "no notable differences in the bath tissue market during this period as the market was stable, growing at a rate of less than 1% per year." (*Id.* at 41). Mr. Malackowski then compares the relationships between the respective parties, noting "the competitive relationship between the licensor and licensees in [the] P&G-Irving Agreement is sufficiently similar to the relationship of the hypothetical negotiators," because, although P&G and Irving would not compete "at the retailer level for private label [bathroom tissue] supplier status," they would "still compete with each other at the consumer level." (*Id.* at 41).

Mr. Malackowski then turns to comparing the licensed technologies, noting the P&G-Irving Agreement "included rights to nine patents and patent applications," including four issued U.S. patents. (*Id.*). He summarizes the technology claimed in the four issued patents, and relies on discussions with Mr. Kavalew, one of Irving's technical experts, to conclude, "the licensed P&G patents are similar to the asserted patents in that they both disclose certain parameters relating to tissues." (*Id.* at 41-42). In comparing the licensed technologies, Mr. Malackowski notes, "the testing and parameters contained in the licensed P&G patents are measurements that are commonly assessed in the industry in contrast to the Patents-in-Suit which disclose uncommon testing protocols and parameters," and the licensed P&G patents disclose properties such as "enhanced softness without sacrificing strength, bulk, and/or absorbency" and "improved absorbency," as opposed to the Asserted Patents which "cover a totally flat sheet of tissue with a zero Average Peak to Valley Waviness, Primary Amplitude, and uniformity values." (*Id.* at 42). For these reasons, Mr. Malackowski concludes, "Given the above, Mr. Kavalew noted that the P&G licensed patents are relatively more valuable than the Patents-in-Suit," and therefore, "All else being equal, this would indicate that the reasonable royalty from the hypothetical negotiations would be lower than the royalty rate agreed to in the P&G-Irving Agreement." (*Id.* at 42-43).

**\*17** Mr. Malackowski notes that because "Irving also received a release regarding certain P&G patents related to living's diaper products," "the reasonable royalty from

the hypothetical negotiations would be lower than the royalty agreed to in the P&G-Irving Agreement." (*Id.* at 43).

He concludes, "the licensed products under the P&G-Irving Agreement and the hypothetical negotiations are sufficiently comparable," because "the P&G-Irving Agreement can cover both [bathroom tissue] and paper towels." (*Id.*). Finally, Mr. Malackowski compares the terms of the P&G-Irving Agreement and the hypothetical license, finding they both would be "long-term license[s]" which "would indicate a similar royalty rate in this matter." (*Id.*).

I find that Mr. Malackowski has made a sufficient showing of the technological comparability of the P&G-Irving Agreement to the hypothetical negotiation. I also find that Mr. Malackowski's analysis of the parties' competitive relationships and the relative value of the inventions disclosed in the licensed patents as compared to the Asserted Patents is sufficient to make a showing of the "baseline [economic] comparability" required by the Federal Circuit. *See Bio-Rad*, 967 F.3d at 1373-74.

The thoroughness of Mr. Malackowski's comparability analysis far exceeds the "loose, vague allegations of technological comparability" that led to the exclusion of the damages expert's opinion in *M2M Sol'ns LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 677-78 (D. Del. 2016). Additionally, unlike in *M2M, id.* at 678, where the damages expert "virtually ignore[d] the fact that [the] two licenses resulted from litigation settlements, providing a drastically different backdrop than the hypothetical negotiation involving two willing licensors," here, Mr. Malackowski expressly notes that no lawsuits were filed in the disputes giving rise to the P&G-Irving Agreement. (D.I. 200-17 at 40).

The other two cases FQ relies on in its argument for exclusion, *Plexxikon* and *Sprint*, are similarly inapt. In *Plexxikon*, the defendant failed to show "that the technology [was] comparable" and the Court took issue with "the litigation-focused circumstances of the negotiations of the licenses." *Plexxikon Inc. v. Novartis Pharms. Corp.*, 2021 WL 97544, at \*7 (N.D. Cal. Jan. 12, 2021). Here, the P&G-Irving Agreement did not arise out of litigation and Mr. Malackowski has made a sufficient showing of technological comparability. In *Sprint*, the licenses were excluded "most importantly" because "three out of the four licenses resulted from litigation settlements with non-practicing entities, who most likely were in drastically different bargaining positions than Sprint would have been in at the time of the hypothetical negotiation." *Sprint Commc'ns Co. v. Comcast IP*

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

*Holdings, LLC*, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015). By contrast, the P&G-Irving Agreement did not involve a non-practicing entity, and Mr. Malackowski expressly noted the similarities and differences between the competitive relationships of the respective parties in that Agreement and the present hypothetical negotiation. Finally, unlike in *Sprint*, where the licenses were "not sufficiently comparable to the hypothetical licenses" and "to the extent the lack of comparability could be accounted for, [the expert did] not attempt[ ] to do so," here, Mr. Malackowski has performed a sufficient comparability analysis.

*18 While the lack of information about the specific products covered by the agreement and living's actual or expected revenues from those products is a deficiency in Irving's showing of economic comparability, I find that these omissions go to the weight of Mr. Malackowski's opinion and can be sufficiently addressed through cross-examination. Thus, I find they are not severe enough deficiencies to require exclusion, especially as "the degree of comparability of the license agreements is a factual issue best addressed by cross examination and not by exclusion." *Bio-Rad*, 967 F.3d at 1374.

For these reasons, FQ's motion to exclude Mr. Malackowski's discussion of the P&G-Irving Agreement is DENIED.

**2. GP-Irving Embossing License**

Mr. Malackowski also relies on a license agreement (the "GP Emboss License") entered into between Georgia-Pacific Consumer Products LP ("GP") and Irving, in which GP licensed Irving a non-exclusive, limited license to an embossing pattern used on Irving's accused product. (D.I. 200-17 at 43). FQ argues this portion of Mr. Malackowski's opinion should be excluded, as "[t]he GP Emboss License is not even a patent license. It is a license only to a particular pattern." (D.I. 195 at 34). I agree. A license to an embossing pattern has effectively no bearing on the value of the Asserted Patents, which claim physical properties of a tissue product.

Mr. Malackowski's argument that the "the value of the Patents-in-Suit ... can be correlated to the value of utilizing certain embossing patterns," because "whether a tissue falls within the scope of the asserted claims may depend on the embossing pattern used" is unpersuasive. (D.I. 200-17 at 45). While whether a tissue falls within the scope of the Asserted Claims may depend on the

percentage of the tissue surface that is covered by embossment (although even that is disputed), the purely aesthetic formation of the embossment, which is the "technology" covered by the GP Emboss License, is entirely unrelated to the technology covered by the Asserted Patents.

FQ's motion to exclude Mr. Malackowski's testimony relating to the GP Emboss License is GRANTED.

**3. Non-Infringing Alternative**

FQ argues that Mr. Malackowski's opinion "that Irving could have avoided infringement by using a denser embossing pattern on its Member's Mark bathroom tissue and, therefore, that the maximum amount Irving would agree to pay at a hypothetical negotiation is the cost of changing that embossing pattern" should be excluded because "there are no facts from which a jury could reasonably conclude that Mr. Malackowski's proposed [non-infringing] alternative would be acceptable." (D.I. 195 at 35). Irving responds that it "will be able to present ample evidence from which a jury could conclude that the non-infringing alternative – bathroom tissue with a denser emboss pattern – would have been acceptable to Sam's Club." (D.I. 206 at 36).

I agree with Irving that whether a denser embossing pattern would have been acceptable to Sam's Club is a factually contested point, and therefore decline to decide this factual issue in FQ's favor before trial. Irving points to evidence that (1) unrebutted testing shows living's bathroom tissue made using the same base sheet and a denser emboss pattern that it supplies to Wegmans, a different tissue seller, does not infringe (D.I. 200-1 ¶¶ 90-95), (2) unrebutted testing shows other commercially available bathroom tissue products with denser emboss patterns do not infringe (*id.* ¶¶ 96-104), and (3) Sam's Club selected a different emboss pattern for the paper towels Irving supplies to Sam's Club than the emboss pattern for the paper towels FQ supplies to Sam's Club. (D.I. 200-17 at 39-40).

*19 I find that this evidence belies FQ's claim that "there are no facts from which a jury could reasonably conclude" Sam's Club would find Mr. Malackowski's non-infringing alternative acceptable. For these reasons, FQ's motion to exclude Mr. Malackowski's testimony relating to a non-infringing alternative is DENIED.

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

## IV. CONCLUSION

For the reasons stated above, Irving's motion for Summary Judgment of invalidity on the basis of indefiniteness and lack of written description is DENIED. Irving's motion to exclude FQ's experts' "copying" opinions is DENIED. Irving's motion to exclude Dr. Maness's damages opinion is DENIED except as to apportionment, which is GRANTED, but with leave to file a supplemental report.

FQ's motion to exclude Dr. Keller's opinions is DENIED. FQ's motion to exclude Mr. Kavalew's opinions is DENIED. FQ's motion to exclude Mr. Malackowski's damages opinion relating to the P&G-Irving Agreement is DENIED. FQ's motion to exclude Mr. Malackowski's damages opinion relating to the GP-Irving Embossing License is GRANTED. FQ's motion to exclude Mr. Malackowski's opinions on a non-infringing alternative is DENIED.

An appropriate order will issue.

## All Citations

Not Reported in Fed. Supp., 2022 WL 958089

### Footnotes

1   Thus, I cite only to one of them, the '203 patent's (hereinafter, "the Specification").

2   The Court wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

3   Some of the Asserted Claims also require values for other surface roughness characteristics, including Waviness Uniformity, Average Primary Amplitude ("Pa"), and Amplitude Uniformity. Because Wc is the only surface roughness characteristic referenced by all the Asserted Claims, the parties' indefiniteness arguments and my analysis focus on Wc.

4   Irving states, "Six asserted claims require a combination of (a) Wc (and in many asserted claims Pa) and (b) one of three other tissue properties." (D.I. 197 at 22). Irving, however, only specifically identifies five claims ("claims 1 and 3 of the '203 patent, claim 4 of the '872 patent, and claims 12 and 13 of the '853 patent") that disclose softness properties in addition to Wc, and are therefore invalid. (Id.). I assume Irving intended to identify claim 4 of the '853 patent as well, which discloses, "A through air dried tissue having a bulk softness of less than 10TS7 and comprising an outer surface having an Average Peak to Valley Waviness of 140 microns or less." (D.I. 1-3 at 12).

5   While Scripps was decided prior to the Federal Circuit's clarification in Ariad that written description and enablement are distinct requirements of § 112, Irving has not cited a single post-Ariad example of a court invalidating a claim for lack of written description based on the claims' disclosure of an open-ended range.

Lipocine does not help Irving. (See D.I. 277). There, the claims were directed to methods of administering a drug "to obtain certain designated pharmacokinetic ('PK') results." Lipocine Inc. v. Clarus Therapeutics, Inc., 541 F. Supp.3d 435, 439 (D. Del. June 1, 2021). There, the Court found the two "Composition Examples" in the specification, disclosing formulations containing 15% and 18% API that satisfied the functional PK claims, were insufficient to show possession of formulations throughout the entire claimed API concentration range (14-35%) that would likewise satisfy the functional PK claims. Id. at 458-59 ("The Composition Examples that satisfy the limitations of the [functional PK claims] are ... not representative of the entire claimed genus."). In Lipocine, mere disclosure of how to achieve API concentrations throughout the claimed range without representative examples and accompanying PK results would have been insufficient to satisfy the written description requirement because the claims also contained functional limitations. Id. at 458 ("[T]he species that are shown to be operative are not representative of the entire claimed genus.") (emphasis added). Here, by contrast, all the limitations of the Asserted Claims are structural – they describe surface and softness properties of a tissue – as opposed to functional. Thus, disclosure of examples spanning the entire claimed range of each property is unnecessary where the inventors have disclosed how to achieve values throughout the claimed range

First Quality Tissue, LLC v. Irving Consumer Products Limited, Not Reported in Fed....

2022 WL 958089

of each property, as Dr. Runge testifies they have done here.

*Eiselstein* and *Wertheim*, the two other cases Irving cites in support of its "range" written description argument, are also inapt. (*See* D.I. 277). The Federal Circuit's conclusion in *Eiselstein* that the Board did not clearly err in finding a grandparent application claiming 45-55% nickel "did not provide an adequate written description of the invention comprising 50-60% nickel" is irrelevant. *Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir. 1995). Here, the question is different, whether an example near one end of a claimed range in combination with a description of how to achieve values throughout the claimed range can provide an adequate written description of that range. *Eiselstein*'s conclusion that an earlier claimed range does not show possession of a later-claimed and different range does not help Irving. *Wertheim*, where the Court found that an earlier claimed range of 25-60% solids content did not provide an adequate written description of a later claimed range of "at least 35%" solids content, is inapposite for the same reason. *Application of Wertheim*, 541 F.2d 257, 263-64 (C.C.P.A. 1976).

6    Because Dr. Maness's copying opinions rely on Dr. Runge's opinions, I will focus my analysis on Dr. Runge's opinions. (*See* D.I. 199-1 Ex. 13 ¶¶ 37, 43-44, 61 (Maness Op.); Ex. 14 ¶¶ 39-40 (Maness Reply)). It is hard to imagine that there would be any legitimate reason to have Dr. Maness, an economist, rely upon or repeat any admissible "copying" testimony.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:23-cv-21347**

**MIAMI SLICE PIZZA, LLC**,

        Plaintiff/Counter-Defendant,

    v.

**CARNIVAL CORPORATION**,

        Defendant/Counter-Plaintiff.

**DEFENDANT'S LIST OF CITATIONS FOR DISCOVERY HEARING (EXHIBIT D)**

Defendant/Counter-Plaintiff Carnival Corporation ("Carnival"), by and through undersigned counsel, respectfully submits the following list of citations for those authorities upon which Carnival intends to rely at the December 13, 2023 discovery hearing in this matter, as part of Exhibit D to the required Notice of Hearing.

1) J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION §30:85 (5ᵗʰ ed. 2023) ("Usually, when the courts have awarded a royalty for past acts of infringement, it was for **continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on** . . . . In the absence of a prior licensing agreement between the parties, **many courts will permit an award of a reasonable royalty only if the evidence provides a sufficiently reliable basis on which to calculate a fair royalty**.") (emphasis added).

2) *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 U.S. Dist. LEXIS 30219, *9-11 (S.D.N.Y. May 19, 2006) ("**Use of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonably royalty**. 'When the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated.'") (emphasis added).

3) *Action Ink, Inc. v. Anheuser-Busch, Inc.*, 2012 U.S. Dist. LEXIS 180250, *3-4 (E.D.

**FRIEDLAND VINING, P.A.**
(305) 777-1725 • court@friedlandvining.com

La. Dec. 20, 2012) ("**Therefore, [*Sands*] does not support plaintiff's contention that defendants' prior licenses with other companies are necessarily relevant to the royalties for plaintiff's trademark, particularly given the case-by-case nature of a determination of relevance** . . . . the Court does not find the Magistrate Judge's Order denying inclusion of these topics to be clearly erroneous or contrary to law.") (emphasis added).

4)   *Buffalo Wild Wings, Inc. v Buffalo Wings & Rings*, 2011 U.S. Dist. LEXIS 112050, *8-11 (Sept. 29, 2011) ("Courts consistently conclude that, **where no prior licensing agreement existed between the parties in a trademark infringement suit, a royalty theory of recovery is inappropriately speculative**.") (emphasis added).

5)   *Document Sec. Sys. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 497-98 (W.D.N.Y. Oct. 28, 2014) (relying upon *Juicy Couture* in finding a demand for a reasonable royalty speculative: **"[u]se of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty**.") (emphasis added).

6)   *Fashion Exch. LLC v. Hybrid Promotions, LLC,* 2022 U.S. Dist. LEXIS 177866, *16-17 (S.D.N.Y. Sept. 29, 2022) (relying upon *Juicy Couture* in finding **no basis on which to calculate a reasonable royalty**, as there existed "no licensing agreement between [the parties] from which to calculate a reasonably royalty" and there was no "sufficiently reliable basis from which such an award could be calculated.") (emphasis added).

7)   *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 233 (S.D.N.Y. Dec. 22, 2022) ("[B]ecause [reasonable royalties] are inherently difficult to calculate in a vacuum, **courts often decline to award such damages unless the parties had a prior licensing agreement**.") (emphasis added).

8)   *Marketquest Group Inv. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (June 12, 2018) ("Reasonable royalty damages 'must be established with reasonable certainty' and thus **damages that are remote or speculative should be denied** . . . . 'Usually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on.' J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION §30:85 (5th ed. 2018.)") (emphasis added).

9)   *Grecia v. Discover Fin. Servs.*, 2018 U.S. Dist. LEXIS 240612, *2 (N.D. Ill. June 7, 2018 ("Though information about comparable licenses is relevant, *see e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012), **the simple fact that patents are related does not support the inference that the licenses pertaining to them are comparable**. Because relatedness is the

2

**FRIEDLAND VINING, P.A.**
(305) 777-1725 • court@friedlandvining.com

only basis that defendant offers for seeking licenses pertaining to other patents, its motion to compel production of these documents is denied.").

10) *Slep-Tone Entm't Corp. v. Harrison Bar & Grill*, 2013 U.S. Dist. LEXIS 205965, *3 (D. Ore. June 28, 2013) ("The motion is denied with respect to the other aspects of defendants' businesses unrelated to the use of plaintiff's trademark or trade dress").

11) *Peace United, Ltd. v. 1906 Collins, LLC*, 2022 U.S. Dist. LEXIS 112243, *4 (S.D. Fla. June 24, 2022) ("*Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*, … 2017 U.S. Dist. LEXIS 222711, at *11 (S.D. Ala. Aug. 18, 2017) (recognizing that the 'recovery of lost royalties by a victim of trademark infringement is the preferred award of damages').").

12) *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*, 2017 U.S. Dist. LEXIS 222711, *11-12 (S.D. Ala. Aug. 18, 2017) ("It appears that Defendants received all the benefits of an authorized franchise during the holdover period. **Had Defendants been properly authorized to operate a franchise during the holdover period, Plaintiff would have received the amount stipulated in the Agreement. Therefore, the Court finds that the proper award for Plaintiff under § 1117(a) is the royalties Plaintiff would have been due had the Agreement remained in force.**") (emphasis added).

13) *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990) ("The district court determined Howard Johnson's actual damages by **calculating the amount of royalty payments it would have received during the period that the defendants were diluting or using a colorable imitation of its trademark had the defendants been a genuine Howard Johnson's franchise.**") (emphasis added).

14) *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("Ramada Inns did not seek to recover profits it would have received had it sold the use of its trademark to Gadsden during the infringement period. **Rather, much of Ramada Inns' award represented franchise fees or 'royalties' lost during the infringement period.**") (emphasis added).

DATED:  December 11, 2023

Respectfully submitted,

s/David K. Friedland
By:  **David K. Friedland**
Florida Bar No. 833479
Email:  dkf@friedlandvining.com
**Jaime Rich Vining**

3

**FRIEDLAND VINING, P.A.**
(305) 777-1725 • court@friedlandvining.com

Florida Bar No. 030932
Email:  jrv@friedlandvining.com
**FRIEDLAND VINING, P.A.**
9100 S. Dadeland Blvd., Suite 1620
Miami, FL 33156
(305) 777-1721 – telephone
(305) 456-4922 – facsimile

***Counsel for Defendant/Counter-Plaintiff***

4

1.  J. THOMAS MCCARTHY,
    TRADEMARKS & UNFAIR
    COMPETITION §30:85 (5th ed. 2023)



**5 McCarthy on Trademarks and Unfair Competition § 30:85 (5th ed.)**

McCarthy on Trademarks and Unfair Competition, Fifth Edition  |  December 2023 Update
J. Thomas McCarthy

Chapter 30. Remedies for Trademark Infringement and Unfair Competition

III. Monetary Recovery

C. Recovery of Damages

# § **30:85**. Recovery of plaintiff's actual damages—Reasonable royalty as a measure of damages

References

***A Compulsory License is Improper.*** The imposition of a compulsory license, permitting the infringer to continue use of the mark by paying a court-determined royalty to the trademark owner is not a proper remedy for infringement. [1] The GATT-TRIPS Agreement forbids a trademark compulsory license. [2]

***Usually Used Only for Holdover Licensees.*** Usually, when the courts have awarded a reasonable royalty for past acts of infringement, it was for a period of continued use of a mark after a license ended. [2.50] In such a case, damages might be measured by the royalty rate the parties had agreed on during the term of the license. [3]

***The Trademark Owner Must Identify a Method of Calculating a Reasonable Royalty.*** In the absence of a prior licensing agreement between the parties, many courts will permit an award of a reasonable royalty only if the evidence provides a sufficiently reliable basis on which to calculate a fair royalty. [3.30] If a trademark owner claims entitlement to a reasonable royalty but fails in discovery to identify a method of calculating a royalty rate, on a motion for summary judgement the court may dismiss the claim for a recovery of damages measured by a reasonable royalty. [3.70]

***Using a Royalty Rate Which the Infringer Offered and Was Rejected***. In the *Boston Hockey* case, a court used a royalty basis for measuring damages where the infringer offered a royalty rate but the trademark owner refused to grant a license. A professional sports league proved trademark infringement by a defendant who made cloth emblems reproducing the insignia of league teams. Defendant had made an offer to obtain a license which the trademark owner rejected. The court held that damages could be measured by the license fees plaintiff would have received, determining the amount by the fee that defendant offered to pay. [4] The unfairness with this way of measuring an award is that the court in effect forces the trademark owner to license the infringer for the period of infringement at a rate the trademark owner was offered and rejected. [5] The Federal Circuit said that the *Boston Hockey* decision does not stand for an unqualified rule that royalties are a standard measure of damages in a trademark infringement case. [6]

***The GATORADE Decision***. The largest award of a reasonable royalty as damages for trademark infringement occurred in the GATORADE case. Plaintiff, a small company who owned the THIRST-AID mark for beverages and food, won an infringement suit against Quaker for Quaker's use of the slogan "GATORADE IS THIRST-AID." In a case of reverse confusion, after two appeals, the Seventh Circuit affirmed a base award of almost $10.5 million. [7] This award was computed as a reasonable royalty rate of 1% of Quaker's sales of the infringing product the first year and 0.5% thereafter. The court rejected Quaker's proposal of a flat $100,000 paid-up royalty. But the district court's doubling of the award to provide for deterrence and to account for the uncertainty of calculation was remanded for the district court to "state with more clarity the reasons for the enhancement" of the award. [8] The Seventh Circuit said that, for two reasons, judicial enhancement of a reasonable royalty award is a permissible way to ensure that the infringer will bear any burden of uncertainty in compensation: (1) to ensure deterrence so that payment of a royalty does not simply become a cost of doing business as an infringer; and (2) the difficulty of computing a royalty for a hypothetical transaction. [9]

***Reasonable Royalty Must Bear a Reasonable Relationship to the Impact of the Infringement.*** The Fifth Circuit said that: "A royalty-based damages award must be rationally related to the scope of the defendant's infringement." The court reversed a jury award of a 1.5% royalty ($230,000.) where the jury had also expressly found that plaintiff was not entitled to any profits of the infringement because profits from infringing sales were "zero." [10]

Westlaw. © 2023 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

1.     A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208, 49 U.S.P.Q.2d 1481 (3d Cir. 1999) ("The objections to the royalty award are well taken. … The court's award of a royalty for future sales put the court in the position of imposing a license neither party had requested or negotiated.").

2.     Under Article 21 of the 1993 GATT TRIPS international trade agreement, the United States is no longer permitted to impose compulsory licensing of trademarks. See §§ 30:2, 31:107.

2.50     See Firebirds International, LLC v. Firebird Restaurant Group, LLC, 397 F. Supp. 3d 847, 872 (N.D. Tex. 2019) (In the Fifth Circuit, a prior licensing agreement between the parties is not a prerequisite to a claim for reasonable royalty damages.).

3.     See § 30:86.

3.30     Marketquest Group, Inc. v. BIC Corporation, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018) (There was no evidence to establish a reasonable royalty "and any attempt to discern one is completely speculative." Summary judgement that no reasonable royalty could be recovered.).

3.70     JL Beverage Company, LLC v. Beam, Inc., 124 U.S.P.Q.2d 1349, 2017 WL 3666302 (D. Nev. 2017) ("JL never identified a means of calculating a reasonable royalty or produced evidence upon which a fact finder could determine such a royalty.").

4.     Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 597 F.2d 71, 76, 202 U.S.P.Q. 536 (5th Cir. 1979) (Defendant had offered $15,000 for a three-year nonexclusive license and this was prorated to produce a recovery of $20,000 for four years of infringement. "[D]efendant offered to pay $15,000 for a three-year nonexclusive license to manufacture and sell the emblems through retail outlets.

This was the right wrongfully taken by Dallas Cap, and the value it placed on that right was a proper measure of damages caused by the usurpation.").

5    See § 30:87.

6    Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 920, 223 U.S.P.Q. 982, 995 (Fed. Cir. 1984) (The *Boston Hockey* decision "certainly did not 'rule' in any unqualified sense that 'royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks.'" A royalty measure of damages was inappropriate where an independent dealer used advertising creating the false impression that it was a franchisee. An award of the royalty rate which an authorized franchisee pays was held not proper, because the infringer did not use everything for which a true franchisee paid. Vacating the district court's award of over $36,000.).

7    Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 32 U.S.P.Q.2d 1065, 1068 (7th Cir. 1994), on reh'g in part, 44 F.3d 579, 33 U.S.P.Q.2d 1543 (7th Cir. 1995) (prejudgment interest of $5.5 million and attorney's fees of $400,000 were also awarded and affirmed).

8    34 F.3d at 1353. On remand, Judge Marshall said that his doubling of the award was "not a penalty. It reflects the inadequacy of the base royalty award in light of the circumstances of this case, the extraordinary profits defendant realized as a consequence of its deliberate infringement." Sands, Taylor & Wood Co. v. Quaker Oats Co., 1995 WL 221871 (N.D. Ill. 1995).

9    34 F.3d at 1351. ("All of these ambiguities require that, in fashioning relief based on royalty payments, a court take special care to ensure that the royalty payment has not undercompensated the victim. Enhancement of the damages attributable to a lost royalty in order to ensure that the malefactor, and not the victim, bears the burden of any uncertainty in its calculation is a permissible way of achieving that goal.").

10   Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc., 851 F.3d 440, 461 (5th Cir. 2017) ("[T]he royalty award does not bear a rational relationship to [defendant's] infringing use.").

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*2.  Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 U.S. Dist. LEXIS 30219, * 9-11 (S.D.N.Y. May 19, 2006)

⚠️ Caution
As of: December 9, 2023 11:51 AM Z

## *Juicy Couture, Inc. v. L'Oreal USA, Inc.*

United States District Court for the Southern District of New York

May 18, 2006, Decided ; May 19, 2006, Filed

04 CIV. 7203 (DLC)

**Reporter**
2006 U.S. Dist. LEXIS 30219 *; 2006 WL 1359955

JUICY COUTURE, INC. and L.C. LICENSING, INC., Plaintiffs, -v- L'OREAL USA, INC. and LUXURY PRODUCTS, LLC, Defendants.

**Subsequent History:** Costs and fees proceeding at, Motion granted by, in part *Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 U.S. Dist. LEXIS 64393 (S.D.N.Y., Sept. 11, 2006)*

**Prior History:** *Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 U.S. Dist. LEXIS 20787 (S.D.N.Y., Apr. 19, 2006)*

## Core Terms

advertising, corrective, *royalty*, damages, *infringement*, licensing, *trademark*, calculation, cosmetics, profits, hypothetical, negotiation, products

## Case Summary

**Procedural Posture**
Plaintiffs, a manufacturer and a licensing company, sued defendant manufacturer for *trademark infringement*. Defendant moved in limine to exclude the direct testimony of an expert presented by plaintiffs. The motion was granted in part prior to a nonjury trial wherein plaintiffs' claims were denied on the merits. The court issued a decision setting forth the reasons for its ruling.

**Overview**
Plaintiffs sought to prove that the registered *trademarks* of "Juicy," "Juicy Couture," and "Choose Juicy" for women's clothing were infringed when defendant adopted the product name "Juicy Wear" for a lipstick. Plaintiffs aspired to enter the cosmetics market, but had not yet done so. Defendant challenged the damage calculations of plaintiffs' expert. The court granted defendant's motion in part. As there was no competing product, the court found that an award of prospective

corrective advertising damages was not sufficiently tied to compensation for past *infringement* to be a reliable measure of damages. Thus, the court granted the motion as to the expert's testimony on this matter because corrective advertising damages would be nothing more than a windfall for plaintiffs. The court also granted defendant's motion as to the testimony of plaintiffs' expert regarding damages based on a constructive *royalty*. The parties did not have a previous licensing arrangement on which to base an award for *royalty* payments. Further, plaintiffs did not have any licensing agreement with any cosmetics manufacturer. Thus, the court concluded that such calculations were speculative.

**Outcome**
The court granted defendant's motion as to testimony by plaintiffs' damages expert regarding corrective advertising and *royalty* measures for damages, but the court denied the motion as to testimony regarding defendant's profits.

## LexisNexis® Headnotes

*Trademark* Law > ... > Damages > Types of Damages > Corrective Advertising Costs

*HN1*[⬇️] **Types of Damages, Corrective Advertising Costs**

Corrective advertising is a remedy that seeks to counteract public confusion resulting from *trademark infringement*. In contrast to a claim for damages that seeks reimbursement for a plaintiff's past expenditures in conducting such advertising that was concurrent with the wrong, an award for corrective advertising to be run in the future has been described as an extraordinary

remedy reserved for cases in which a plaintiff lacked financial ability to pay for reparative ads.

***Trademark*** Law > ... > Damages > Types of Damages > Corrective Advertising Costs

**HN2[⬇]** **Types of Damages, Corrective Advertising Costs**

Prospective corrective advertising damages have been awarded without evidence of a plaintiff's economic hardship by a few courts. Each of these cases has involved a situation where plaintiffs sought corrective advertising to rehabilitate ***trademarks*** that protected existing products.

***Trademark***
Law > ... > Remedies > Damages > General Overview

**HN3[⬇]** **Remedies, Damages**

Courts have used an infringer's advertising budget as a guide to determine an appropriate damages award.

***Trademark*** Law > ... > Damages > Types of Damages > Corrective Advertising Costs

**HN4[⬇]** **Types of Damages, Corrective Advertising Costs**

When corrective advertising is awarded based on competing products, there is some reason to believe that an infringer's advertising expenditures will reflect the harm that has been done to a plaintiff's mark and thus may relate to the cost of the advertising necessary to repair the confusion caused by the ***infringement***. Where there is no competing product, however, an award of prospective corrective advertising is not sufficiently tied to compensation for past ***infringement*** to be a reliable measure of damages.

***Trademark*** Law > ... > ***Infringement***
Actions > Remedies > General Overview

**HN5[⬇]** ***Infringement*** **Actions, Remedies**

A ***royalty*** is a measure of compensation for past ***infringement*** based on the ***reasonable*** value of a license to use the ***trademark*** that an infringing defendant should have paid. Use of a ***royalty*** theory of recovery is generally limited to situations where the parties have had a ***trademark*** licensing relationship that facilitates computation of the ***reasonable royalty***. When courts have awarded a ***royalty*** for past ***trademark infringement***, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated.

**Counsel:** **[*1]** For Plaintiffs Juicy Couture, Inc. and L.C. Licensing, Inc.: William Spatz, Keith Walter, Erica Klein, Kramer Levin Naftalis & Frankel LLP, New York, NY.

For Defendants L'Oreal USA, Inc. and Luxury Products, LLC: Robert Sherman, Danielle White, Eric Bensen, Paul, Hastings, Janofsky & Walker LLP, New York, NY.

**Judges:** DENISE COTE, United States District Judge.

**Opinion by:** DENISE COTE

# Opinion

DENISE COTE, District Judge:

L'Oreal USA, Inc. and Luxury Products, LLC ("Lancome") moved *in limine* to exclude the direct testimony of James Malackowski ("Malackowski"), an expert for plaintiffs Juicy Couture, Inc. and L.C. Licensing, Inc. ("Couture") in this ***trademark infringement*** action. The motion was granted in part prior to the non-jury trial held from April 4 to 12, 2006. Couture's claims at trial were denied on the merits through an Opinion issued on April 19, and it was therefore unnecessary at trial to calculate damages. See *Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 U.S. Dist. LEXIS 20787, 04 Civ. 7203 (DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)*. This Opinion sets forth the reasons for the ruling on the Malackowski motion.

At trial, Couture sought to prove that Couture's ***trademarks*** JUICY, **[*2]** JUICY COUTURE and CHOOSE JUICY, registered for women's clothing, were infringed when Lancome adopted the product name Juicy Wear for a long-lasting lipstick. Couture aspires to enter the cosmetic market someday, but has not yet

done so. Malackowski's damage calculation was based on four distinct theories of damages: the cost of future corrective advertising necessary to address consumer misimpressions created by Lancome's product; the value of hypothetical *royalty* payments from Lancome to Couture for the use of its marks; Lancome's profits on Juicy Wear; and actual harm to Couture in the form of lost profits.

Lancome argued that Couture cannot recover damages for corrective advertising or through a construction of *reasonable royalties*. Lancome also challenged Malackowski's calculations for damages based on Lancome's profits. Couture abandoned Malackowski's fourth theory of damages: profits lost by Couture. Lancome's motion was granted as to the corrective advertising and *royalty* measures for damages; it was denied as to Lancome's profits on Juicy Wear.

*Corrective Advertising*

*HN1*[↑] Corrective advertising is a remedy that seeks to counteract public confusion resulting from *trademark* [*3] *infringement*. *Lurzer GMBH v. American Showcase, Inc., 75 F. Supp. 2d 98, 101 (S.D.N.Y. 1998)*. In contrast to a claim for damages that seeks reimbursement for a plaintiff's past expenditures in conducting such advertising that was concurrent with the wrong, an award for corrective advertising to be run in the future has been described as "an extraordinary remedy reserved for cases in which a plaintiff lacked financial ability to pay for reparative ads." *Id.*; *see also MasterCard International, Inc. v. Arbel Corp.*, 13 U.S.P.Q.2d (BNA) 1958, 1989 U.S. Dist. LEXIS 12433, No. 86 Civ. 6801 (SWK), 1989 WL 125781, *8 (S.D.N.Y. Oct. 18, 1989).

The Tenth Circuit first articulated the "financial ability" limitation on prospective corrective advertising in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977)*. In *Big O*, the Tenth Circuit allowed an award for prospective corrective advertising where it was clear that the plaintiff had lacked the financial wherewithal to conduct adequate corrective advertising before trial. *Id. at 1375*.

The use of prospective corrective advertising has been criticized as arbitrary and inefficient. *See* J. [*4] Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30: 84 (4th ed. 2006) ("*McCarthy on Trademarks*"). The Seventh Circuit has opined that an award of corrective advertising should be limited to

cases where the plaintiff shows not only that the confusion injured the plaintiff, but also that the "'repair' of the old *trademark*, rather than adoption of a new one, is the least expensive way to proceed." *Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 506 (7th Cir. 1992)*. It reasoned that, where a plaintiff could afford corrective advertising, but did not conduct such a campaign, this is significant proof that either it was not injured or that it is cheaper to use a new name than to correct any confusion. *Id. at 507*. *See also Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003)*.

*HN2*[↑] Prospective corrective advertising damages have been awarded without evidence of a plaintiff's economic hardship by a few courts. *See Zelinski, 335 F.3d at 640*; *Adray v. Adry-Mart, Inc., 76 F.3d 984 (9th Cir. 1995)*; *Novell, Inc. v. Network Trade Ctr., Inc., 25 F. Supp. 2d. 1233 (D. Utah 1998)*. [*5] Each of these cases has involved a situation -- unlike that presented here -- where the plaintiffs sought corrective advertising to rehabilitate *trademarks* that protected existing products. *See Adray, 76 F.3d at 988-89*; *Novell, 25 F. Supp. 2d at 1244*. For example, an award of prospective corrective advertising was approved in *Zelinski* without consideration of the plaintiff's financial ability because other circumstances explained why the plaintiff had not done any concurrent corrective advertising: the plaintiff's business had been dormant during the *infringement*. *Id. at 637*. The award was an effort to compensate the plaintiff for the extra expenditures that would be necessary as he revived his business. *Id. at 640*.

Malackowski recognizes that Couture does not sell any cosmetics and does not spend any money on advertising, [1] but nonetheless proposes an award of at least $ 1.4 million to $ 5.6 million for corrective advertising, based on 25% or 100% of what he calculates Lancome spent to advertise its lipstick product Juicy Wear in 2004 through September 2005. Malackowski states that the corrective advertising would "remediate confusion [*6] and negative product perceptions" but does not specify whether the damages attempt to rehabilitate Couture's current products or prepare Couture for a move into the cosmetics market. *HN3*[↑] Courts have, as Malackowski suggests here, used the infringer's advertising budget as a guide to determine an appropriate damages award. *See Big O*,

---

[1] Couture does not engage in traditional advertising, but seeks to place its clothing with *celebrities* so that it is worn on television programs or in movies, or so that *celebrities* are photographed wearing the clothing in daily life.

2006 U.S. Dist. LEXIS 30219, *6

_561 F.2d at 1375_. Couture fails to explain, however, the relationship between Lancome's advertising expenses and plaintiff's corrective advertising costs. Couture has not lost profits, lost sales or suffered any damage to its reputation through Lancome's marketing of Juicy Wear. There is nothing for corrective advertising to correct.

In their brief, plaintiffs essentially admit that corrective advertising is inapplicable in this case **[*7]** because the companies did not and do not compete. Plaintiffs concede that if Couture "had undertaken corrective measures, the advertising likely would only serve to draw more attention to Lancome's infringing products and, as a result, exacerbate the problem and further damage the Juicy mark for cosmetics. Under such circumstances, it simply made no sense for Juicy to conduct corrective advertising."

_HN4_[⬆] When corrective advertising is awarded based on competing products, there is some reason to believe that the infringer's advertising expenditures will reflect the harm that has been done to the plaintiff's mark and thus may relate to the cost of the advertising necessary to repair the confusion caused by the _**infringement**_. Where there is no competing product, however, an award of prospective corrective advertising is not sufficiently tied to compensation for past _**infringement**_ to be a reliable measure of damages. Therefore, even if the Court were inclined to ignore the fact that Couture does not engage in advertising, and that is was financially capable of engaging in corrective advertising in 2004 and 2005 if it believed that Lancome's introduction of Juicy Wear into the cosmetics market **[*8]** warranted the adoption of an advertising program, Couture has not shown that it is entitled to such damages when it does not even have products that compete with Lancome's cosmetics. An award in these circumstances would be nothing more than a windfall. Lancome's motion to strike the demand for corrective advertising damages was therefore granted.

### _Reasonable Royalty_

Malackowski also contends that an award of damages based on a constructive _**royalty**_ is warranted. Malackowski's starting point for determining the _**royalty**_ rate is a "hypothetical negotiation between a willing licensee and a willing licensor at the time of the hypothetical negotiation of a _**royalty**_ and the likely outcome of such negotiation given their positions." He recognizes that plaintiff L.C. Licensing had approached five cosmetics and fragrance companies and that none

of them agreed to a licensing arrangement with Couture. Nonetheless, he concludes that an 8% _**royalty**_ is _**reasonable**_, resulting in a damages award of $ 1.3 million. In reaching this conclusion he also acknowledges that the industry range of _**royalty**_ rates are .5% to 7%, but rejects those in favor of his hypothetical rate.

The date Malackowski chooses **[*9]** for the hypothetical negotiation is January 2000, immediately before the launch of Lancome's lip product JUICY TUBES, but over four years before the sale of Juicy Wear, the product which Couture contends infringes its marks and the sale of which is the basis for its damage claim. As of 2000, as he notes, Couture had not taken any affirmative action to license its marks, and was a young, but growing company. Malackowski looks to several sources to help generate a _**reasonable royalty**_ rate and then applies a qualitative analysis used in patent law to arrive at his 8% figure.

_HN5_[⬆] A _**royalty**_ is a measure of compensation for past _**infringement**_ based on the _**reasonable**_ value of a license to use the _**trademark**_ that the infringing defendant should have paid. _See McCarthy on Trademarks_ § 30: 85. Use of a _**royalty**_ theory of recovery is generally limited to situations where the parties have had a _**trademark**_ licensing relationship that facilitates computation of the _**reasonable royalty**_. "When the courts have awarded a _**royalty**_ for past _**trademark infringement**_, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated. **[*10]** " _A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208-09 (3d Cir. 1999)_. The only case identified by the plaintiff that has allowed the use of a _**royalty**_ calculation outside of the context of a previous licensing agreement involved an extraordinary situation. In _Sands, Taylor & Wood v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992)_, the Seventh Circuit suggested a _**royalty**_ calculation as a starting point in order to limit an earlier award of damages based on profits that it viewed as "a windfall to the plaintiff." _Id. at 963_ & n.19.

Couture and Lancome do not have a previous licensing arrangement on which to base an award for _**royalty**_ payments. Nor does Couture have any licensing agreement with any cosmetics manufacturer. While Malackowski has endeavored to compute a _**royalty**_ rate, the speculative nature of his calculations underscores the wisdom of limiting _**royalty**_ damages to existing or negotiated licensing arrangements.

2006 U.S. Dist. LEXIS 30219, *10

Malackowski's analysis also suffers from a significant factual deficiency: the calculations are based on a hypothetical negotiation of a license beginning in January 2000. By trial, Couture **[*11]** had limited its damage claims to Juicy Wear, which was not launched until July 2004. For these reasons, the defendant's motion to preclude Malackowski's testimony as it relates to a calculation of a **_reasonable_ _royalty_** was granted.

SO ORDERED:

Dated: New York, New York

May 18, 2006

DENISE COTE

United States District Judge

---

**End of Document**

*3.   Action Ink, Inc. v. Anheuser-Busch, Inc.,* 2012 U.S. Dist. LEXIS 180250, *3-4 (E.D. La. Dec. 20, 2012)

 Caution
As of: December 7, 2023 7:25 PM Z

## *Action Ink, Inc.  v. Anheuser-Busch, Inc.*

United States District Court for the Eastern District of Louisiana

December 20, 2012, Decided; December 20, 2012, Filed

CIVIL ACTION NO: 12-141 SECTION: R

**Reporter**

2012 U.S. Dist. LEXIS 180250 *; 2012 WL 6673125

ACTION INK, INC. versus ANHEUSER-BUSCH, INC.

**Subsequent History:** Related proceeding at *Action Ink, Inc. v. New York Jets, LLC, 2013 U.S. Dist. LEXIS 119926 (E.D. La., June 20, 2013)*

Summary judgment granted by, Costs and fees proceeding at, Request denied by *Action Ink, Inc. v. Anheuser-Busch, Inc., 959 F. Supp. 2d 934, 2013 U.S. Dist. LEXIS 99800 (E.D. La., July 17, 2013)*

**Prior History:** *Action Ink v. Anheuser-Busch, Inc., 2012 U.S. Dist. LEXIS 200688 (E.D. La., Nov. 9, 2012)*

## Core Terms

trademark, magistrate judge, licenses, deposition, motion to compel, clearly erroneous, contrary to law, royalty

**Counsel:** **[*1]** For Action Ink, Inc., Plaintiff, Counter Defendant: .Mary Ellen Roy, LEAD ATTORNEY, Dan Brian Zimmerman, Phelps Dunbar, LLP (New Orleans), New Orleans, LA; Michael L. Eckstein, Eckstein Law Firm, APC, New Orleans, LA.

For Anheuser-Busch Inc., Defendant, Counter Claimant: Phillip A. Wittmann, LEAD ATTORNEY, Lesli D. Harris, Michael Q. Walshe, Jr., Stone, Pigman, Walther, Wittmann, LLC (New Orleans), New Orleans, LA; John P. Halski, PRO HAC VICE, Cadwalader, Wickersham & Taft, New York, NY; Peter E. Moll, PRO HAC VICE, Cadwalader, Wickersham & Taft LLP (Washington), Washington, DC.

**Judges:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SARAH S. VANCE

## Opinion

### ORDER AND REASONS

Before the Court is plaintiff Action Ink, Inc.'s motion to review the order issued by Magistrate Judge Wilkinson on October 31, 2012. [1] The Order granted in part and denied in part plaintiff's motion to compel the *Rule 30(b)(6)* deposition of defendant, Anheuser-Busch, Inc. [2] Because the Court finds that the Magistrate Judge's Order was neither clearly erroneous nor contrary to law, the Court DENIES plaintiff's motion.

### I. BACKGROUND

This suit arises out of defendant Anheuser-Busch's alleged infringement of plaintiff **[*2]** Action Ink's trademark "The Ultimate Fan." After defendant failed to designate *Rule 30(b)(6)* representatives to testify on a number of topics identified by plaintiff, plaintiff filed a motion to compel the *30(b)(6)* depositions. Magistrate Judge Wilkinson denied plaintiff's motion on several of the topics, finding them to be so broadly worded that they included information irrelevant to plaintiff's claim concerning its trademark. [3] Magistrate Judge Wilkinson granted in part and denied in part plaintiff's motion as to other topics, permitting the subjects but narrowing their scope. Plaintiff now seeks review of the Magistrate Judge's denial or denial in part of eight topics, in addition to the denial of an award of attorneys' fees or costs incurred in connection with the motion to compel. [4]

---

[1] R. Doc. 59.

[2] R. Doc. 41.

[3] R. Doc. 59.

[4] *Id.*

2012 U.S. Dist. LEXIS 180250, *2

## II. STANDARD

Federal law affords a magistrate judge broad discretion in the resolution of non-dispositive discovery disputes. *See Fed. R. Civ. P. 72(a)*; *28 U.S.C. § 636(b)(1)(A)*. If a party is dissatisfied with a magistrate judge's ruling, it may appeal to the district judge, who may reconsider the ruling and reverse it "where it has been shown that the magistrate judge's order is clearly **[*3]** erroneous or contrary to law." *Id.*; *Fed. R. Civ. P. 72(a)*; *see also Castillo v. Frank, 70 F.3d 382, 385 (5th Cir. 1995)*. A finding is clearly erroneous when a reviewing court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Stevens, 487 F.3d 232, 240 (5th Cir. 2007)* (quoting *United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)*).

## III. DISCUSSION

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Fed. R. Civ. P. 26(b)(1)*. Plaintiff first challenges the Magistrate Judge's determination that the topics of trademark licenses between defendant and third parties, royalty revenues received from those licenses, and other trademark infringement claims against defendant are overly broad and include information that is not relevant to plaintiff's claim.

Plaintiff asserts that to prove the value of a trademark license for "The Ultimate Fan," it would be helpful to review defendant's licenses with third parties not involved in the suit. Plaintiff cites a case in which the calculation of a reasonable royalty rate involved a comparison **[*4]** of the proposed rate and the rates of other licenses. *See Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 1343 (7th Cir. 1994)*. But, in *Sands*, the Seventh Circuit Court of Appeals had previously determined that the trial court calculated incorrectly the plaintiff's monetary award, and thus it required the trial court to establish a baseline reasonable royalty to determine the appropriate award. *Id.* Further, the trial court then estimated a royalty rate based on the *plaintiff's* prior licenses and policies, since the defendant refused to disclose its prior licenses. *Id. at 1343-44*. Therefore, the case does not support plaintiff's contention that defendant's prior licenses with other companies are necessarily relevant to the royalties for plaintiff's trademark, particularly given the case-by-case

nature of a determination of relevance. Plaintiff's desire to address unrelated trademark infringement claims against defendant is another exceptionally broad request for information that appears to have minimal relevance to the dispute here. In light of the extent to which these topics would expand the scope of the *30(b)(6)* depositions, the Court does not find the Magistrate Judge's Order **[*5]** denying inclusion of these topics to be clearly erroneous or contrary to law.

The Court also finds that plaintiff has not demonstrated that reversal of the Magistrate Order is warranted on the topic of defendant's defenses. Magistrate Judge Wilkinson held that plaintiff's request for "facts" related to certain legal defenses asserted by defendant fails to "describe with reasonable particularity the matters for examination". [5] *See Fed. R. Civ. P. 30(b)(6)*. Plaintiff is entitled to inquire about the defenses asserted by defendant, namely laches, acquiescence, estoppel, abandonment, fraud, unclean hands, and trademark misuse. But, given that plaintiff vaguely requests "facts" related to these defenses, the Court does not find that Magistrate Judge Wilkinson was mistaken in his determination that plaintiff's request lacks particularity.

Plaintiff also seeks reversal of the Order's partial denial of four other topics identified by plaintiff. Magistrate Judge Wilkinson granted plaintiff's motion to compel deposition testimony on the topics but limited the scope of the subject matter to the trademark at issue. Thus, the Order stated that the topic of defendant's "negotiation of **[*6]** the license agreement with the NFL . . . particularly any indemnification for trademark infringement claims and oversight of marketing campaigns that would include 'The Ultimate Fan' promotions," was overly broad. [6] Magistrate Judge Wilkinson allowed the topic but limited it to negotiations concerning the use of "The Ultimate Fan." [7] Similarly, Magistrate Judge Wilkinson narrowed plaintiff's request for testimony on defendant's marketing plans from 2006-2012 to marketing on the "The Ultimate Fan" trademark specifically. [8] Magistrate Judge Wilkinson also limited the motion to compel related to defendant's beer sales to beer sales and profits for defendant's products "as to

---

[5] R. Doc. 59.

[6] R. Doc. 59.

[7] *Id.*

[8] *Id.*

2012 U.S. Dist. LEXIS 180250, *6

which the Ultimate Fan promotion was run." [9] Lastly, Magistrate Judge Wilkinson denied plaintiff's request for information on defendant's communications with advertising agencies about "The Ultimate Fan" promotions but granted the motion to compel deposition testimony on communications concerning "plaintiff's assertion of trademark rights in 'The Ultimate Fan'". [10]

The Court does not find that the Magistrate Judge's partial denial of plaintiff's motion to compel and narrowing of **[*7]** the proposed topics are clearly erroneous or contrary to law. Within the topics proposed, Magistrate Judge Wilkinson allowed plaintiff to seek information concerning its specific trademark, thereby ensuring that the _Rule 30(b)(6)_ depositions would address the topics that plaintiff found relevant without including overly broad information of questionable relevance. Plaintiff's requests would expand the scope of the deposition topics to a potentially unmanageable degree, and plaintiff has not demonstrated the relevance of such broad topics other than to contend that the information would be helpful for comparison purposes.

Therefore, the Court finds that the Order's denial of plaintiff's motion to compel deposition testimony on defendant's overall business, rather than its actions related to "The Ultimate Fan" trademark does not merit reversal. Further, given Magistrate Judge Wilkinson's partial grant and partial denial of plaintiff's motion, the Court finds that his determination that each party should bear its own attorneys' fees and expenses is neither clearly erroneous nor contrary to law.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's motion to reverse the Magistrate **[*8]** Judge's Order issued on October 31, 2012.

New Orleans, Louisiana, this 20th day of December, 2012.

/s/ Sarah S. Vance

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[9] R. Doc. 59.

[10] _Id._

*4.  Buffalo Wild Wings, Inc. v Buffalo Wings & Rings*, 2011 U.S. Dist. LEXIS 112050, *8-11 (Sept. 29, 2011)

 Neutral

As of: December 9, 2023 12:02 PM Z

## *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*

United States District Court for the District of Minnesota

September 29, 2011, Decided; September 29, 2011, Filed

Civil No. 09-1426 (JRT/SER)

### Reporter

2011 U.S. Dist. LEXIS 112050 *; 2011 WL 4537970

BUFFALO WILD WINGS, INC., a Minnesota corporation, Plaintiff/Counter Defendant, v. BUFFALO WINGS & RINGS, also known as Buffalo Wings & Rings, LLC, Defendant/Counter Claimant.

**Prior History:** *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings, 2011 U.S. Dist. LEXIS 61238 (D. Minn., June 8, 2011)*

## Core Terms

damages, royalty, infringement, profits, logos, parties, winged, licensing, buffalo, trademark infringement, black and white, actual damage, hypothetical, trademark, license agreement, royalty rate, settlement, marks, motion in limine, trade dress, calculations, franchisees, negotiated, circle, moot, intellectual property, summary judgment, pre-suit, argues, red

## Case Summary

### Overview

Trademark owner's expert's damages calculation based on a reasonable royalty calculation was inadmissible because the expert's methodology was based on the misappropriation of all of the owner's intellectual property, and due to a summary judgment order, only infringement by certain black and white logos remained in the case. The alleged infringer's expert's opinions reflecting legal conclusions and referencing the parties' settlement discussions were also excluded.

### Outcome

The court granted in part and denied in part each party's motion.

## LexisNexis® Headnotes

Evidence > Admissibility > Expert Witnesses > Daubert Standard

**HN1[ ]** **Expert Witnesses, Daubert Standard**

*Fed. R. Evid. 702* upon a trial court a basic gatekeeping obligation to ensure the relevance and reliability of expert testimony based on both scientific and other specialized or technical knowledge.

Evidence > Admissibility > Expert Witnesses

**HN2[ ]** **Admissibility, Expert Witnesses**

Expert testimony is admissible under *Fed. R. Evid. 702* if it meets three prerequisites: First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Evidence > Admissibility > Expert Witnesses

Evidence > Burdens of Proof > Preponderance of Evidence

**HN3[ ]** **Admissibility, Expert Witnesses**

The proponent of the expert testimony has the burden of establishing the admissibility of such testimony by a preponderance of the evidence. Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility. However, when the

2011 U.S. Dist. LEXIS 112050, *112050

analytical gap between the data and proffered opinion is too great, the opinion must be excluded.

Trademark Law > ... > Damages > Types of Damages > Compensatory Damages

Trademark Law > ... > Damages > Types of Damages > Litigation Costs

Trademark Law > ... > Damages > Types of Damages > Profits

*HN4*[ ] **Types of Damages, Compensatory Damages**

See *15 U.S.C.S. § 1117(a)*.

Trademark Law > ... > Infringement Actions > Remedies > General Overview

*HN5*[ ] **Infringement Actions, Remedies**

*15 U.S.C.S. § 1117(a)* accords the court considerable discretion in fashioning an appropriate remedy for infringement.

Patent Law > ... > Damages > Patentholder Losses > Reasonable Royalties

Trademark Law > ... > Damages > Types of Damages > Compensatory Damages

*HN6*[ ] **Patentholder Losses, Reasonable Royalties**

The Patent Act expressly permits a reasonable royalty theory of recovery for infringement. *35 U.S.C.S. § 284*. The Lanham Act does not. *15 U.S.C.S. § 1117(a)*.

Evidence > Admissibility > Expert Witnesses

*HN7*[ ] **Admissibility, Expert Witnesses**

The factual basis of an expert's opinion generally goes to the credibility, not the admissibility, of the testimony. The testimony may be excluded only if it is so fundamentally unsupported that it can offer no assistance to the jury and must be excluded.

Business & Corporate Compliance > ... > Causes of Action Involving Trademarks > Infringement Actions > Contributory Infringement

*HN8*[ ] **Infringement Actions, Contributory Infringement**

One who intentionally induces another to infringe a trademark, or continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement is contributorially responsible for any harm done as a result of the deceit.

Trademark Law > ... > Damages > Types of Damages > Profits

*HN9*[ ] **Types of Damages, Profits**

If a party proves trademark infringement, it is permitted to recover, subject to the principles of equity, defendant's profits. *15 U.S.C.S. § 1117(a)*.

Evidence > Burdens of Proof > Allocation

Trademark Law > ... > Damages > Types of Damages > Compensatory Damages

Trademark Law > ... > Damages > Types of Damages > Profits

*HN10*[ ] **Burdens of Proof, Allocation**

While it is a trademark owner's burden in an infringement action to limit its damages analysis to the only trademark giving rise to a claim for damages, it is the defendant's burden to prove all elements of cost or deduction claimed with regard to the remedy of profits.

Evidence > Admissibility > Expert Witnesses

*HN11*[ ] **Admissibility, Expert Witnesses**

Experts may not invade the court's province by testifying on issues of law.

Trademark Law > ... > Damages > Types of

2011 U.S. Dist. LEXIS 112050, *112050

Damages > Compensatory Damages

*HN12*[↓]   **Types of Damages, Compensatory Damages**

There is no per se bar against employing a reasonable royalty theory to assess damages in a trademark infringement case even when no prior licensing agreement between the parties exists.

Evidence > Admissibility > Statements as
Evidence > Compromise & Settlement Negotiations

*HN13*[↓]   **Statements as Evidence, Compromise & Settlement Negotiations**

Settlement negotiations are inadmissible when offered to prove liability for, invalidity of, or amount of a claim. *Fed. R. Evid. 408(a)*.

**Counsel:** **[*1]** Lora Mitchell Friedemann, Laura L. Myers, and Ted C. Koshiol, FREDRIKSON & BYRON, PA, Minneapolis, MN, for plaintiff/counter defendant.

Jonathan C. Marquet, Kevin P. Hickey, and Nicole A. Delaney, BASSFORD REMELE, PA, Minneapolis, MN, for defendant/counter claimant.

**Judges:** JOHN R. TUNHEIM, United States District Judge.

**Opinion by:** JOHN R. TUNHEIM

# Opinion

### ORDER

Plaintiff/counter-defendant Buffalo Wild Wings, Inc. ("BWW") filed this trademark infringement action against defendant/counter-claimant Buffalo Wings & Rings, LLC ("BWR"). The parties operate competing national restaurant chains which feature buffalo-style chicken wings. On June 8, 2011, the Court issued an order granting in part and denying in part the parties' cross-motions for summary judgment. (Docket No. 251 ("June 8 Order").) The June 8 Order rendered several pending motions in limine moot. Remaining are the parties' opposing motions in limine regarding BWW's damages expert and BWR's rebuttal damages expert. The Court will grant in part each party's motion in limine, as

discussed below.

### BACKGROUND[1]

BWW's complaint alleges infringement of its trademarks and trade dress in violation **[*2]** of the Lanham Act, false marking, violations of the Minnesota Deceptive Trade Practices Act ("DTPA"), *Minn. Stat. § 325D.44*, and unfair competition. (Second A. Compl., Docket No. 142.) It accuses BWR of infringing on its restaurant trade dress, its registered name — "Buffalo Wild Wings" — and its "winged buffalo" design mark, which features a sideways facing black buffalo with white wings inside a yellow circle outlined in black. According to BWW, in 2007 BWR made a series of changes to its logos, signage, restaurant décor, and marketing materials intended to move closer to BWW's themes in an attempt to take advantage of BWW's marketplace recognition. BWW's allegations focus on four particular aspects of BWR's design: (1) its restaurants' interior décor, (2) its unregistered name "Buffalo Wings & Rings," (3) BWR's pending trademark applications for three "black and white logos" incorporating its new aesthetic, and (4) an approved amendment to its previously registered design mark featuring a forward looking buffalo head inside a circle ("the red circle logo"). The red circle logo is a colored version of one of the three black and white logos, the patent applications of which remain **[*3]** pending. Because BWR submitted its applications for the black and white logo designs to the United States Patent and Trademark Office ("USPTO") in black and white, if the applications are granted, BWR could employ any color combination, including a yellow background, when utilizing the design marks.

The June 8 Order disposed of several motions for summary judgment. Specifically, the Court concluded that that BWW does not have a protectable trade dress claim separate from its word and design marks claims, and granted summary judgment to BWR on BWW's claim of trade dress infringement. (June 8 Order at 12-14.) The Court also granted summary judgment to BWR on BWW's claims challenging its use of the phrase "Buffalo Wings & Rings" and the red circle logo. (*Id.* at 17-28.) However, the Court found a genuine issue of material fact with regard to whether BWR's proposed black and white logos are likely to be confused with BWW's registered winged buffalo logo, particularly if their coloring mimics BWW's yellow, black, and white

---

[1] A detailed factual background is available in the Court's June 8 Order.

scheme. Accordingly, the Court denied BWR summary judgment with regard to BWW's claims relating to the black and white logos. (*Id.*) The Court disposed of numerous other **[*4]** related claims, affirmative defenses, and a bifurcation request. (*Id.* at 28-41.) Remaining after the June 8 Order are BWR's trademark infringement and DTPA claims against BWR with regard to the black and white logos (Counts 1 and 7), and its demand to refuse registration of the design mark applications for the black and white logos (Count 5).

BWR has moved to exclude the proposed testimony of BWW's damages expert Carol Ludington, and BWW has moved to exclude some of the proposed testimony of BWR's expert Craig Siiro. (Docket Nos. 192, 199.) The June 8 Order rendered moot several other motions in limine. (Docket Nos. 188, 196.) Despite BWR's protestations that the June 8 Order also rendered the instant motions moot, and although the June 8 Order altered the contours of the case, the Court concludes that these motions remain relevant. The Court will grant in part and deny in part each party's motion.

## ANALYSIS

### I. STANDARD OF REVIEW

*HN1*[⬆] *Rule 702 of the Federal Rules of Evidence* imposes upon the Court a "basic gatekeeping obligation" to ensure the relevance and reliability of expert testimony based on both scientific and, as here, other specialized or technical knowledge. *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).* **[*5]** *HN2*[⬆] Expert testimony is admissible under *Rule 702* if it meets three prerequisites:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001)* (internal citations and quotation marks omitted); *Fed. R. Evid. 702*. *HN3*[⬆] The proponent of the expert testimony has the burden of establishing the

admissibility of such testimony by a preponderance of the evidence. *Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757-58 (8th Cir. 2006)*. "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id. at 758*. However, "[w]hen the analytical gap between the data and proffered opinion is too great, the opinion must be excluded." *Id.*

## II. MOTION TO EXCLUDE CAROL A. LUDINGTON

The Lanham Act provides for equitable **[*6]** recovery once a plaintiff establishes infringement:

> *HN4*[⬆] When a violation . . . shall have been established . . . , the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

*15 U.S.C. § 1117(a)*. *HN5*[⬆] This provision accords the Court "considerable latitude in fashioning an appropriate remedy for infringement." *Taco Cabana Intern., Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1127 (5th Cir. 1991)*; **[*7]** *see also Metric & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 715 (8th Cir. 1980)*. BWR moves to exclude Ludington's expert opinion regarding BWW's damages because it is based on a legal theory that BWR argues is unavailable in the circumstances presented by this case, and because it is highly speculative, particularly in light of the Court's June 8 Order.

To estimate BWW's damages, the second listed form of relief provided by the Lanham Act, Ludington employs a "reasonable royalty" theory of recovery. This theory is based upon a hypothetical license agreement between the licensee, BWW, and the licensor, BWR, and a

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 73 of 255

Page 5 of 8
2011 U.S. Dist. LEXIS 112050, *7

hypothetical licensing fee. As Ludington explains, her analysis assumes that BWW and BWR would have agreed to a license with regard to BWW's brand — including its trademarks, service marks, name, trade dress — as the result of a hypothetical negotiation between the parties. (Decl. of Lora M. Friedemann, Jan. 18, 2011, Ex. A ("Ludington Report") at 13, Docket No. 222.) In reaching her conclusion of a reasonable royalty rate of 5-10% of franchisee revenues, or royalties of $6.5 million to $13 million, Ludington considers several factors articulated in a patent **[*8]** case, *Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970)*. Specifically, Ludington weighs considerations including BWW's willingness to enter into a license agreement with BWR and its existing licensing policy; the royalties and fees the parties charge their franchisees; the nature and scope of the hypothetical license; the commercial relationship between the parties; the effect of the intellectual property on sales; the effect of BWW's intellectual property on its sales; the parties' comparative profitability and commercial success; and the extent to which BWR has made use of BWW's intellectual property. (Ludington Report at 14-23.)

BWR argues that the *Georgia-Pacific* reasonable royalty theory is inappropriate as a matter of law in trademark cases where, as here, the parties did not have any prior licensing relationship. **HN6**[↑] The Patent Act, which the *Georgia-Pacific* court applied, expressly permits a "reasonable royalty" theory of recovery for infringement. *35 U.S.C. § 284*. The Lanham Act, on which BWW's claims are based, does not. *15 U.S.C. § 1117(a)*. Courts consistently conclude that, where no prior licensing agreement existed between the parties in a trademark **[*9]** infringement suit, a royalty theory of recovery is inappropriately speculative. *See, e.g., A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208-09 (3d Cir. 1999)* ("[W]hen the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated."); *Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 CIV. 7203, 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006)* ("[T]he speculative nature of [the expert's] calculations underscores the wisdom of limiting royalty damages to existing or negotiated licensing arrangements."); *Nat'l Fire Prot. Ass'n, v. Int'l Code Council, No. Civ.A.03-10848, 2006 U.S. Dist. LEXIS 14360, 2006 WL 839501, at *29 (D. Mass. Mar. 29, 2006)* (finding that an "award of reasonable royalties has no basis in reality, much less any basis in fact"

where it is based on a hypothetical licensing agreement between parties who would never have consented to such an agreement) (internal quotation marks omitted); *M2 Software, Inc. v. Madacy Entm't, No. CV 00-2853 AHM, 2003 WL 25667610, at *1 (C.D. Cal. Jan. 23, 2003)* (prohibiting evidence of damages based **[*10]** on a reasonable royalty theory as "impermissibly speculative"). As Ludington acknowledged, "BWW would not willingly enter into a license with BWR . . . . [A] license is inconsistent with BWW's business model." (Ludington Report at 20.) Ludington's testimony thus measures "actual damages" based on an arrangement that the parties never contemplated and would never have consummated. [2]

BWW, however, cites other decisions permitting the use of a hypothetical reasonable royalty as a measure of profits in the **[*11]** context of trademark infringement despite the absence of a prior licensing agreement, most notably *Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340 (7th Cir. 1994)*. *Sands* has been characterized as an outlier. *See Juicy Couture, Inc., 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955, at *4* (noting that *Sands* involved "an extraordinary situation . . . [in which] the Seventh Circuit suggested a royalty calculation as a starting point in order to limit an earlier award of damages based on profits that it viewed as a windfall to the plaintiff" (internal quotation marks omitted)); *Nat'l Fire Prot. Ass'n Inc., 2006 U.S. Dist. LEXIS 14360, 2006 WL 839501, at *29* ("Of the courts that have allowed an award of reasonable royalties in trademark infringement cases, only the Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties had not shown a willingness to license the mark."). Nonetheless, permitting a reasonable royalty rate in the absence of a previous licensing agreement between parties is not without precedent in Lanham Act cases. *See, e.g., Coryn Group II v. O.C. Seacrets, No. WDQ—08-2764,*

---

[2] In *A & L Laboratories, Inc. v. Bou-Matic, LLC, No. Civ.02-4862, 2004 U.S. Dist. LEXIS 15062, 2004 WL 1745865, at *2 (D. Minn. Aug. 2, 2004)*, cited by BWR, the district court concluded that "[g]enerally, reasonable royalties are awarded as a measure of damages for infringement of a patent or trademark." In that case, however, the court was able to utilize previously existing licensing agreements between the parties and their predecessors to arrive at an appropriate reasonable royalty rate. *See 2004 U.S. Dist. LEXIS 15062, [WL] at *5*. In those circumstances, the reasonable royalty rate was based upon actual negotiations between the parties. This case, where defendant readily agrees that no licensing agreement was contemplated, is distinguishable.

2010 U.S. Dist. LEXIS 30719, 2010 WL 1375301, at *8 (D. Md. Mar. 30, 2010) (denying motion to exclude testimony regarding the **[*12]** use of a hypothetical royalty "as **an alternative measure** of [the] defendant's **profits**" (emphasis added)); *Adidas Am., Inc. v. Payless Shoesource, Inc., No. CV 01-1655—KI, 2008 U.S. Dist. LEXIS 69260, 2008 WL 4279812, at *12 (D. Or. Sept. 12, 2008)* (citing *Sands* with approval and concluding that "[a] reasonable royalty based on a hypothetical negotiation can be a measure of actual damages in a trademark infringement case"). As one court has observed, "[n]o court has announced a *per se* bar against the presentation or consideration of such evidence." *Coryn, 2010 U.S. Dist. LEXIS 30719, 2010 WL 1375301, at *8*.

**HN7**[⬆] The factual basis of an expert's opinion generally goes to the credibility, not the admissibility, of the testimony. *Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002)*. The testimony may be excluded only if it is "so fundamentally unsupported that it can offer no assistance to the jury" and must be excluded. *Id.* Accordingly, if not for the June 8 Order, the Court might be inclined to agree with the *Coryn* court's assessment that criticisms of Ludington's method "may be adequately addressed through cross-examination and the presentation of contrary evidence." *2010 U.S. Dist. LEXIS 30719, 2010 WL 1375301, at *8*. [3]

However, in *Sands* and other Lanham Act cases permitting a reasonable royalty theory despite the parties' lack of interest in entering into a licensing agreement, the rate was based on the licensing of the specific trademark or trade dress at issue. *See, e.g., Coryn, 2010 U.S. Dist. LEXIS 30719, 2010 WL 1375301, at *7-8* (expert report addresses the only trademark challenged); *Adidas Am., Inc., 2008 U.S. Dist. LEXIS 69260, 2008 WL 4279812, at *12* ("The

royalty figure awarded by the jury is consistent with royalties between **[*14]** adidas or Payless with third parties and also with royalties between third parties."); *see also Sands, 34 F.3d at 1350* (a reasonable royalty rate can only be characterized as measuring actual damages "**if** ascertained with reasonable certainty" (emphasis original)). Ludington's methodology and conclusions, by contrast, are based on BWR's alleged misappropriation of **all** of BWW's intellectual property described in its complaint including its trade dress, name, and logos; she conducts no independent analysis of any particular aesthetic aspect. Ludington provides no opinions relating to actual damages based on BWR's infringement of BWW's winged buffalo trademark through its usage of the black and white logos. [4] To the contrary, BWW asserts that the amount of franchise fees, royalties and advertising fees the parties charge their franchises — for the **entire package** of branded material — "factored strongly" in Ludington's analysis. (Buffalo Wild Wings' Mem. in Opp'n at 11, Docket No. 219.) Infringement by the black and white logos (excluding the red circle logo version) on the winged buffalo mark, however, is the only remaining basis for an award of damages in light of the June 8 Order.

Accordingly, regardless of whether the reasonable royalty theory is available as a matter of law, the Court concludes that Ludington's reasonable royalty calculation is inadmissible as applied to this case in light of the Court's June 8 Order. *See Cole v. Homier Distrib. Co., 599 F.3d 856, 865 (8th Cir. 2010)* (an opinion based on "incorrect factual premises" is properly excluded). BWW argues that the winged buffalo mark is severable from the other aspects of Ludington's reasonable royalty measurement because she conducted mathematical calculations to enable the jury to match a drop in the reasonable royalty rate with a corresponding reduced monetary quantity. These calculations do nothing to cure the underlying deficiency: the rate range is still based on a hypothetical licensing fee agreement for an **integrated** collection of intellectual property, most of which is no longer at issue in this case. BWW also offers to omit reference **[*16]** to the $6.5 million to $13 million range, but it has not stated how Ludington will calculate an appropriate reasonable royalty rate and range based on the winged

---

[3] The Court does not find merit in BWR's argument **[*13]** that Ludington's reasonable royalty rate testimony is speculative because it calculates a range of potential damages and relies upon the revenues of BWR's franchisees rather than BWR itself. BWR has cited no caselaw to support the proposition that a damages range is inherently speculative, and if it proves infringement BWW is entitled to recover damages for infringing sales by BWR's franchisees. *See Inwood Labs., v. Ives Labs., 456 U.S. 844, 854, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982)* **HN8**[⬆] ("[One who] intentionally induces another to infringe a trademark, or . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, . . . is contributorially responsible for any harm done as a result of the deceit.").

---

[4] Because **[*15]** she did not consider an independent licensing fee for the black and white logos, Ludington also offers no opinion on how to further limit such a hypothetical licensing fee to exclude BWR's red circle logo, a colored version of one of the black and white logos.

buffalo mark alone, excluding BWR's use of the red circle logo. Accordingly, the Court grants BWR's motion in limine in part, and will prohibit Ludington from testifying about a reasonable royalty rate.

The June 8 Order does not, as BWR argues, render the entire Ludington Report irrelevant and unreliable. The Ludington Report also provides an assessment of the profits BWR allegedly obtained unfairly. Specifically, Ludington discusses BWR's franchisor revenue, increase in value during the period of alleged infringement, advertising expenditures, and brand development costs; she explains how BWR was unjustly enriched through its infringement. (Ludington Report at 25-27, Docket No. 222.) *HN9*[↑] If BWW proves infringement on its winged buffalo mark, it is permitted to recover, "subject to the principles of equity, . . . defendant's profits . . . ." *15 U.S.C. § 1117(a)*. *HN10*[↑] While it is BWW's burden to limit its damages analysis to the only trademark giving rise to a claim for damages, "**defendant** must prove all elements of cost or deduction **[*17]** claimed" with regard to the remedy of profits. *Id.* (emphasis added). Ludington's testimony regarding profits remains relevant and will not be excluded.

## III. MOTION TO EXCLUDE CRAIG SIIRO

BWW moves for the exclusion of certain portions of the expert opinion of BWR's rebuttal damages expert Craig Siiro. (Decl. of Lora M. Friedemann, Nov. 1, 2010, Ex. C ("Siiro Report"), Docket No. 201.) BWR asserts that if the Court determines that Ludington's opinions are not relevant or admissible under *Rule 702*, then Siiro's rebuttal opinions are unnecessary, rendering BWW's motion in limine moot.[5] Because the Court will permit Ludington to testify regarding BWR's profits, Siiro's testimony criticizing Ludington's assessment of BWR's profits remains relevant and is admissible. (*Id.* at 13-20.) The Court's June 8 Order and exclusion of Ludington's current reasonable royalty testimony does, however, seem to moot several of BWW's objections to his testimony. The Court will consider each objection in turn.

BWW first argues that Siiro's "legal opinions" **[*18]** are inadmissible. It is well established that *HN11*[↑] "experts may not invade the court's province by testifying on issues of law." *Holman Enters. v. Fid. and*

*Guar. Ins. Co., 563 F. Supp. 2d 467, 472 (D.N.J. 2008)* (internal quotation marks omitted). BWW specifically objects to Siiro's opinions that (1) BWW suffered no "actual damages," (2) royalties are not an available measure of damages in a trademark infringement case, and (3) BWW cannot recover damages for infringement by BWR franchisees.

BWW's objection regarding "actual damages" takes aim at Siiro's characterization of what the Ludington Report does **not** include and what BWW has **not** produced, namely "any documentation of lost profits or other actual damages resulting from the alleged infringing activity." (Siiro Report at 4, Docket No. 201.) Siiro is certainly entitled to observe the dearth of evidence of lost profits, and BWW does not contend otherwise. Moreover, since the Court has excluded Ludington's testimony regarding damages, Siiro is certainly allowed to note that all that remains of her testimony is a consideration of BWR's profits, rather than its damages. *See 15 U.S.C. § 1117(a)* (listing defendant's profits and plaintiff's damages **[*19]** as two independent methods of recovery). Accordingly, the Court denies this aspect of BWW's motion in limine.

As to Siiro's opinions that royalties are not an available measure of damages in this case and that BWW cannot recover damages for infringement by BWR franchisees, the exclusion of Ludington's testimony regarding a reasonable royalty rate makes it unlikely that Siiro will offer these opinions. However, the Court agrees that these are inappropriate legal opinions. They are also incorrect. As discussed above, *HN12*[↑] there is no per se bar against employing a reasonable royalty theory to assess damages in a trademark infringement case even when no prior licensing agreement between the parties exists. *Sands, 34 F.3d at 1350*; *Coryn, 2010 U.S. Dist. LEXIS 30719, 2010 WL 1375301, at *8*. Moreover, BWW **is** contributorily responsible for infringement by BWR franchisees. *See Inwood Labs., 456 U.S. 844 at 854*. As a precautionary measure, the Court will grant BWW's motion in limine in this regard and prohibit Siiro from offering these two opinions.

In addition, BWW objects to Siiro's reliance on the parties' pre-suit settlement negotiations. Specifically, Siiro states that "it is my understanding BWW and BWR had settlement **[*20]** discussions and in the process a draft settlement agreement was negotiated in January 2009. This draft settlement agreement did not call for any damages to BWW from BWR." (Siiro Report at 5, Docket No. 201.) Siiro relies on this information to support his opinion that the Ludington Report does not

---

[5] BWW's motion in limine also seeks the exclusion of two other proposed experts. The parties agree that the June 8 Order renders moot these aspects of the motion.

2011 U.S. Dist. LEXIS 112050, *20

calculate any actual damages to BWW. *HN13*[↑] Settlement negotiations are inadmissible when "offered to prove liability for, invalidity of, or amount of a claim." *Fed. R. Evid. 408(a)*. Accordingly, the Court grants this part of BWW's motion and will prohibit Siiro from testifying about the parties' pre-suit settlement discussions to support his observation about the dearth of evidence regarding damages. BWW also objects to Siiro's reference to the parties' pre-suit discussions in the context of identifying 2008 as the starting point for the alleged infringement. BWW agrees that this particular objection is moot; after the Court's June 8 Order, 2008 **is** the appropriate starting point.

In sum, the Court grants BWW's motion in limine with regard to Siiro in part. The Court prohibits Siiro from opining that royalties are not an available measure of damages in a trademark infringement case and that BWW cannot **[*21]** recover damages for infringement by BWR franchisees. The Court further prohibits Siiro from relying on the parties' pre-suit settlement discussions. All other aspects of Siiro's expert report are admissible to the extent that they remain relevant.


**ORDER**

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Buffalo Wings & Rings, LLC's Motion to Exclude Plaintiff's Damages Expert [Docket No. 192] is **GRANTED in part** and **DENIED in part**.

    a. The motion is **GRANTED** insofar as Ludington may not offer testimony about a reasonable royalty rate.

    b. The motion is **DENIED** in all other regards.

2. Buffalo Wild Wings, Inc.'s Motion to Exclude Testimony of John Campbell, Joan Dillon and Craig Siiro [Docket No. 199] is **GRANTED in part** and **DENIED in part**.

    a. The motion is **GRANTED** insofar as Siiro shall be prohibited from opining that royalties are not an available measure of damages in a trademark infringement case and that BWW cannot recover damages for infringement by BWR franchisees. The Court further prohibits Siiro from relying on the parties' pre-suit settlement discussions.

    b. The motion is **DENIED** in all other regards.

DATED: September 29, 2011

at Minneapolis,  **[*22]** Minnesota.

/s/ John R. Tunheim

JOHN R. TUNHEIM

United States District Judge

---

**End of Document**

5.  *Document Sec. Sys. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 497-98 (W.D.N.Y. Oct. 28, 2014)

✚ Positive
As of: December 9, 2023 12:15 PM Z

## *Document Sec. Sys. v. Coupons.com, Inc.*

United States District Court for the Western District of New York

October 27, 2014, Decided; October 28, 2014, Filed

11-CV-6528 CJS

**Reporter**
55 F. Supp. 3d 485 *; 2014 U.S. Dist. LEXIS 152802 **

DOCUMENT SECURITY SYSTEMS, INC., Plaintiff, -v-COUPONS.COM, INC., Defendant.

**Prior History:** *Document Sec. Sys. v. Coupons.Com, Inc., 2012 U.S. Dist. LEXIS 117249 (W.D.N.Y., Aug. 20, 2012)*

## Core Terms

technology, royalty, damages, licensing, coupons, contends, parties, negotiated, summary judgment, lost profits, copying, anti-copying, consists, customer, printed, confidential information, speculative, volume, license agreement, five-ring, licensee, confidentiality agreement, public domain, non-moving, indicates, quotation, secret, marks, breach of contract, royalty rate

## Case Summary

### Overview
HOLDINGS: [1]-Plaintiff's claim for breach of contract failed because, even assuming that defendant breached the nondisclosure agreement, plaintiff did not suffer any expectation damages thereby, and any payment that it received would have placed it in a better position than if the contract had been performed; [2]-Even if the court found that what plaintiff was really seeking was reasonable royalties, plaintiff was not entitled to damages because New York law did not permit the recovery of reasonable royalty damages for a breach of contract, where the agreement itself did not provide for royalties; [3]-Even assuming that reasonable royalties were available under New York law for breach of a confidentiality agreement, defendant would have still been entitled to summary judgment because the lost profits/royalties that plaintiff was seeking were speculative.

### Outcome
Motion granted. Action dismissed.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

### *HN1*[⬇] Summary Judgment, Entitlement as Matter of Law

Summary judgment may not be granted unless the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. Summary judgment is appropriate only where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### *HN2*[⬇] Burdens of Proof, Nonmovant Persuasion & Proof

On a motion for summary judgment, a party cannot demonstrate a triable issue of fact based on mere speculation or conjecture.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 79 of
255

Page 2 of 12

55 F. Supp. 3d 485, *485; 2014 U.S. Dist. LEXIS 152802, **152802

*HN3*[⤓] **Burdens of Proof, Nonmovant Persuasion & Proof**

In order to defeat a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN4*[⤓] **Burdens of Proof, Nonmovant Persuasion & Proof**

On a motion for summary judgment, the non-moving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. In determining whether a genuine issue of material fact exists for trial, a court is obliged carefully to distinguish between evidence that allows for a reasonable inference and evidence that gives rise to mere speculation and conjecture.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Absence of Essential Element
>
> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof
>
> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof
>
> Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

*HN5*[⤓] **Burdens of Proof, Absence of Essential Element**

On a motion for summary judgment, the moving party bears the initial burden of showing that there is no genuine dispute as to a material fact. However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.

> Business & Corporate Compliance > ... > Contracts Law > Breach > Breach of Contract Actions
>
> Contracts Law > ... > Damages > Types of Damages > Compensatory Damages

*HN6*[⤓] **Breach, Breach of Contract Actions**

The general legal principles concerning contract damages under New York law are well settled: It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach. In order to impose on the defaulting party a further liability than for damages which naturally and directly flow from the breach, i.e., in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting. In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made. Another way of phrasing breach of contract damages is that, under New York law, plaintiffs are entitled to compensatory damages necessary to put the plaintiff in the same economic position the plaintiff would have occupied had the breaching party performed the contract.

> Business & Corporate Compliance > ... > Contracts Law > Breach > Breach of Contract Actions
>
> Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN7*[⤓] **Breach, Breach of Contract Actions**

General or expectation damages for breach of contract may often include lost profits. Because the goal of protecting the plaintiff's expectation interest is to place

55 F. Supp. 3d 485, *485; 2014 U.S. Dist. LEXIS 152802, **152802

the promisee in the same position as performance would have done, it follows that an award of damages will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because only by awarding lost profits will the plaintiff be made fully whole. More specifically, under New York law, consequential damages for lost profits are recoverable if a plaintiff can demonstrate with reasonable certainty that: (1) the lost profits were caused by the breach; (2) what the amount of the lost profits were; and (3) the liability for the lost profits were fairly within the contemplation of the parties at the time the agreement was formed.

Business & Corporate Compliance > ... > Contracts Law > Breach > Breach of Contract Actions

Contracts Law > ... > Damages > Types of Damages > Compensatory Damages

*HN8*[⬇] **Breach, Breach of Contract Actions**

A non-breaching party may recover expectation damages and any other losses foreseeably flowing from the breach of contract. However, the non-breaching party may not be placed in a better position because of the breach than he would have been in had the contract been performed.

Business & Corporate Compliance > ... > Contracts Law > Breach > Breach of Contract Actions

Contracts Law > Remedies > Damages > Types of Damages

Patent Law > ... > Damages > Patentholder Losses > Reasonable Royalties

Trade Secrets Law > ... > Remedies > Damages > Royalties

*HN9*[⬇] **Breach, Breach of Contract Actions**

Reasonable royalty damages are frequently awarded in patent and trade secret cases. However, New York law does not permit the recovery of such damages for a breach of contract, where the agreement itself did not provide for royalties.

**Counsel:** **[\*\*1]** For Plaintiff: Paul F. Keneally, Esq.,

Underberg & Kessler, LLP, Rochester, New York; Timothy J. Haller, Esq., Christopher J. Lee, Esq., David J. Mahalek, Esq., Robert A. Conley, Esq., Joseph A. Culig, Esq., Niro, Haller & Niro, Chicago, Illinois.

For Defendants: Neil A. Goteiner, Esq., Jessica Nall, Esq., Farella, Braun and Martel LLP, San Francisco, California.

**Judges:** CHARLES J. SIRAGUSA, United States District Judge.

**Opinion by:** CHARLES J. SIRAGUSA

## Opinion

**[\*486]** DECISION AND ORDER

INTRODUCTION

This is an action asserting a claim for breach of contract, relating to a commercial non-disclosure agreement. Now before the Court is Defendant's motion (Docket No. [#89]) for summary judgment. Defendant's application is granted and this action is dismissed.

BACKGROUND

Plaintiff is a corporation that provides "anti-counterfeiting, authentication and massserialization technologies" to other businesses. Amended Complaint [#14-3] ¶ 6. Defendant produces digital and printed store coupons. Between 2003 and 2008, Plaintiff provided Defendant with "safety paper" for printing coupons. However, Plaintiff was also interested in selling Defendant certain anti-counterfeiting technology.

In connection with this ongoing business arrangement, the **[\*\*2]** parties signed two nondisclosure agreements ("NDAs"), one in 2003, and one in 2005. *Id.*, Exs. A & B. The pertinent 2005 NDA ("the "NDA" or "the agreement"), which Plaintiff drafted, indicated that Plaintiff was disclosing confidential information to Defendant for the following purpose: "To evaluate a potential **[\*487]** business relationship regarding . . . technology and trade secrets of [Plaintiff] related to document printing security features." *Id.*, Ex. B. The NDA stated that Defendant could only use disclosed "Confidential Information" for that purpose.

The NDA indicated, however, that such "Confidential Information" did not include the following types of information:

55 F. Supp. 3d 485, *487; 2014 U.S. Dist. LEXIS 152802, **2

a) [information that] was known by the Recipient prior to disclosure, as evidenced by its business records; b) [information that is] lawfully received free of restriction from another source having the right to so furnish such confidential information; c) [information that is] independently developed by or for the Recipient without reference to or use of Confidential Information; d) [information that is] lawfully in the public domain other than through a breach of th[e] Agreement; e) [information that] Discloser agrees in writing [**3] is free of such restrictions; f) [information that] is disclosed by the Discloser to a third party without a duty of confidentiality on such third party; or g) [information that] is required or compelled by law to be disclosed, provided that the Recipient gives all reasonable prior notice to the Discloser to allow it to seek protective or other court orders.

Nall Declaration [#90], Ex. 6.

The agreement is strictly a non-disclosure agreement, not a license, and it specifically indicates that "[n]o license is either granted or implied by the conveying of Confidential Information to the Recipient." Moreover, as already discussed, the agreement did not envision that Defendant would use the disclosed information for any purpose other than considering whether to purchase Plaintiff's products. Consequently, the parties never negotiated royalties concerning the commercial use of Plaintiff's technology, and the agreement does not expressly provide for the payment or calculation of royalties in the event of a breach of the agreement. Rather, in terms of potential remedies, the agreement indicates only that

> any violation or threat of violation [of the agreement] will result in irreparable harm to Discloser [**4] for which damages would be an inadequate remedy and therefore in addition to its rights and remedies otherwise available at law, Discloser may seek equitable and administrative relief . . . to prevent any unauthorized use or disclosure.

*Id.*

At some time prior to 2006, Plaintiff developed the specific anti-copying technology that is the basis of this lawsuit. The technology, known as "Block-Out," is an image that is placed on a printed or digital document, and is designed to prevent photocopying of the document. Plaintiff developed the Block-Out anti-copying mechanism from a design that is widely used on currencies, including U.S. currency, and is commonly referred to as the "EURion pattern." The EURion pattern consists of a pattern of five rings. The anti-copying effect of the pattern is due to the fact that certain commercial-grade photocopiers contain a mechanism, called an "Omron chip," that recognizes the EURion five-ring pattern, and prevents copying of documents containing the pattern. However, many copiers, including the Court's color copier/fax/scanner,[1] and most if not all home printers and scanners, do not contain such a mechanism. Nor, in almost all cases, does the EURion pattern [**5] prevent the copying of black-and-white documents, and almost all, if not all, retailers accept black-and-white [*488] printed coupons. Consequently, the EURion pattern, and the Block-Out technology derived from that pattern, have limited utility for preventing the counterfeiting of coupons.[2]

The parties dispute exactly what constitutes the Block-Out technology and how it differs from the EURion pattern used on currencies. For example, Defendant essentially maintains that Block-Out consists of a five-ring image, which can readily be observed as being just a slightly-enlarged version of the EURion pattern. Plaintiff acknowledges that the anti-copying aspect of the Block-Out image is essentially the same as the EURion pattern, though optimized, by having slightly enlarged rings, so as to ensure that the image triggers copiers' anti-copying mechanism regardless of the type of printing method. In that regard, Plaintiff maintains that certain copying procedures may cause the rings to appear slightly smaller, which can affect whether [**6] a copier's Omron chip is activated. However, Plaintiff maintains that its Block-Out technology consists of more than just the five-ring image, and that Defendant "is conflating the printed Block-Out *pattern* [with] *the underlying electronic Block-Out file*,"[3] which, Plaintiff maintains, consists of "thirteen (13) separate items of Confidential Information."[4] Such items of information

---

[1] HP Color LaserJet CM3530 MFP

[2] Indeed, Plaintiff's CEO, Patrick White, admitted that "Block-Out alone is somewhat lame since it only prevents color copies." (DSS005189).

[3] Pl. Response to Defendant's Statement of Facts, ¶ 6 (emphasis added).

[4] Pl. Memo of Law [#99] at p. 4. The particular elements that Plaintiff contends comprise the Block-Out technology is set forth in Plaintiff's Statement of Additional Facts [#99-1] at pp. 19-22.

55 F. Supp. 3d 485, *488; 2014 U.S. Dist. LEXIS 152802, **6

pertain to things such as the ideal location for placement of the anti-copying pattern on a coupon and the color of ink to be used.

The parties also dispute whether the Block-Out technology is covered by the NDA. On this point, Defendant maintains that the Block-Out technology is not covered by the NDA, since it is nothing more than the EURion pattern which is in the public domain, and therefore is not novel. Alternatively, Defendant contends that even if the Block-Out technology is not the same as the EURion pattern, it was nevertheless in the public [**7] domain since Plaintiff used the Block-Out image on publicly-available printed materials such as coupons. Defendant maintains, in that regard, that the image could be easily copied by anyone wishing to do so. Plaintiff, though, disputes that the image is easily copied, and reiterates that Block-Out consists of the image along with the underlying electronic information about how to make the image, which is novel and not publicly-available, and which is therefore covered by the NDA.

In any event, Plaintiff maintains that in or about late July, 2006, it provided Defendant with a disc containing Block-Out technology, as well as the instructions for how to use the technology. Plaintiff further maintains that it offered to license the information to Defendant.[5] Such "offer" apparently consisted of Plaintiff providing Defendant with a sample of the technology to try out. However, the parties never actually discussed or negotiated possible royalties for the technology,[6] because Defendant informed Plaintiff that it was not interested in using the technology.

However, within a few months thereafter, Defendant began utilizing an anti-copying [**8] image, on its coupons, that also [*489] essentially consists of the EURion five-ring pattern. In that regard, Plaintiff maintains that it merely copied the EURion five-ring pattern from U.S. currency, which is admittedly in the public domain, and used the image to create its own anti-copying image. In fact, Defendant maintains that it created its anti-copying image before Plaintiff ever provided the disc containing the Block-Out image.

Plaintiff counters that Defendant blatantly stole its Block-Out technology, and has used it since that time without paying Plaintiff anything. Plaintiff believes that

Defendant copied the Block-Out technology based, in part, on its expert's opinion that Defendant's five-ring pattern more closely resembles Plaintiff's enlarged /optimized EURion pattern than it does the basic EURion pattern found on currency. However, Defendant's expert contends just the opposite, and maintains that Plaintiff's expert's opinion is based on flawed and subjective methods.

Nevertheless, relatively soon after Defendant began using its EURion-type anti-copying technology, the exact date of which is disputed,[7] Plaintiff at least had a strong suspicion that Defendant was using the Block-Out [**9] technology without paying for it. Plaintiff contends, though, that since it was not absolutely sure that Defendant was using Block-Out, and since it had more pressing business matters to address, it did not in any way notify Defendant about its suspicions. According to Plaintiff, it was not until several years later, in approximately 2010, that it became convinced that Defendant was improperly using Block-Out.

On October 24, 2011, Plaintiff commenced this action. At present, the only remaining cause of action is Plaintiff's claim that Defendant breached the NDA by using the Block-Out technology. The Court has already determined that the law of New York State applies to this breach of contract claim.[8]

Plaintiff argues that it is entitled to damages consisting

---

[5] See, Wicker Deposition at p. 508.

[6] Boal Deposition at p. 529.

---

[7] Plaintiff's Rule 30(b)(6) witness testified that the company was aware of Defendant's unauthorized use of Block-Out as early as May 2007, though Plaintiff now attempts to dispute that. Defendant contends that Plaintiff cannot use statements from other witnesses to contradict its own 30(b)(6) witness in opposition to a summary judgment motion. However, as Plaintiff's counsel indicated during oral argument, there is case authority for the view that a 30(b)(6) witness's testimony is not a judicial admission that is binding on the corporation, and may be contradicted by other witnesses, the same as any other witness's testimony. See, *Great Am. Ins. Co. v. Summit Exterior Works, LLC, No. 3:10 CV 1669(JGM), 2012 U.S. Dist. LEXIS 17548, 2012 WL 459885 at *3-4 (S.D.N.Y. Feb. 13, 2012)* (noting differing views among courts); *A&E Products Group, L.P. v. Mainetti USA Inc., No. 01 Civ. 10820(RPP), 2004 U.S. Dist. LEXIS 2904, 2004 WL 345841 at *6-7 (S.D.N.Y. Feb. 25, 2004)* [**10] ("[W]hile Rule 30(b)(6) testimony is binding, some authority holds that it does not constitute a judicial admission that ultimately decides on issues and cannot be contradicted or used for impeachment purposes.") (collecting cases).

[8] See, Decision and Order [#28] at pp. 6-9.

55 F. Supp. 3d 485, *489; 2014 U.S. Dist. LEXIS 152802, **10

of "lost profits." Plaintiff further argues that such lost profits consist solely of an amount of money that Defendant should have paid to Plaintiff as a reasonably royalty for the use of the Block-Out technology.[9] As already mentioned, the parties never actually negotiated any type of royalty. Nevertheless, Plaintiff contends that such lost-profit-royalty damages amount to approximately $6.7 million. Plaintiff maintains that it arrives at this figure by extrapolating from what other clients were willing to pay to license similar technology. However, Plaintiff has licensed its [**11] security technology [*490] to only a small handful of clients.[10] More specifically, Plaintiff has only licensed Block-Out to five clients.[11] Furthermore, of those, Plaintiff's own expert contends that only two clients are proper comparators for determining what a reasonable royalty would have been for Defendant: Arc Worldwide ("ARC") and RR Donnelley and Sons ("RRD"). Of those two, Plaintiff contends that its license agreement with Arc "was very comparable to what a license with Coupons.com would have looked like."[12]

However, Defendant maintains that "reasonable royalty" damages are not recoverable for a breach of contract under New York law, and that in any event, neither the ARC agreement nor the RRD agreement is helpful in determining a reasonable royalty as to Defendant. At the outset, in that regard, Defendant notes that the parties' NDA was executed in 2005, while Plaintiff never actually licensed Block-Out to anyone in the coupon industry until 2010.[13] Consequently, Defendant contends, an agreement between Defendant and Plaintiff would [**12] have been negotiated amidst very different market conditions. Furthermore, Defendant argues, ARC cancelled its license agreement within a few months, after paying Plaintiff only approximately three thousand dollars, because it found that Block-Out was neither effective nor worth the cost, given that it did not work with the vast majority of home printers and scanners.[14] Defendant further contends that ARC's

licensing agreement is a poor comparator for the following reasons: 1) it contemplated ARC issuing a much smaller volume of digital coupons than Defendant issues, resulting in a monthly licensing fee of only approximately $1,500 per month, whereas Defendant would have presumably paid a smaller license fee per-transaction due to its substantially higher volume;[15] 2) it envisioned that ARC would use Block-Out on coupons for a narrow category of products, namely, Marlboro tobacco products, while Defendant issues coupons for a wide variety of products; and 3) it required Plaintiff to provide ARC with additional services that were never provided to, or required by, Defendant.[16] Defendant similarly contends that the licensing arrangement between Plaintiff and RRD is a poor comparator, since [**13] their negotiations were likely affected by the fact that there was an existing business relationship between them, akin to that of the relationship between a contractor and subcontractor, that did not exist between Plaintiff and Defendant.[17] Additionally, Defendant maintains that there is no evidence that RRD ever actually used Block-Out.

With regard to licenses and royalties, Plaintiff indicates that it "generally" charges royalties "either on a percentage [*491] of revenues or a per unit basis."[18] Plaintiff further states that there is "a range" of royalty that it charges. Plaintiff indicates that when a customer uses the technology for printing documents, the royalty [**14] ranges between 2%-2.5% "for one technology through — upwards of 5 percent revenue."[19] Plaintiff states that the royalty rate is higher for "digital renditions of our technologies."[20] Plaintiff also set a higher price for licensees outside the U.S.[21] Plaintiff further states that the royalty rate is increased when the customer uses "multiple technologies."[22]

---

[9] See, e.g., Gleason Deposition at pp. 116-117.

[10] See, e.g., Philip Jones Deposition at pp. 56-59.

[11] Philip Jones Deposition at p. 19.

[12] Philip Jones Deposition at p. 188.

[13] Halm Expert Report at p. 32, n. 87.

[14] RRD also questioned the value of Block-Out in light of the public availability of the EURion technology. See, Halm Expert Report at p. 29 (referencing November 2010 email from RRD).

[15] See, ARC License Agreement, Schedule 1 at DSS009702-DSS009703. Meanwhile, Plaintiff maintains that Defendant has used Block-Out on "over a billion coupons across a wide range of industries." See, Plaintiff's Statement of Additional Facts [#99-1] at ¶ 12.

[16] Halm Expert Report at pp. 36-43.

[17] Halm Expert Report at p.p. 46-47.

[18] Philip Jones Deposition at p. 21.

[19] Id. at p. 22.

[20] Id.

[21] Philip Jones Deposition at p. 147.

[22] Id.

55 F. Supp. 3d 485, *491; 2014 U.S. Dist. LEXIS 152802, **14

Significantly, though, Plaintiff indicates that the actual royalty rate is negotiated differently with each customer:

> Q. Okay. So how is it determined where in the range between 2 percent . . . and five percent — or upwards of 5 percent, you were saying, how is that determined for each licensee where in the range the price would be set?
>
> A. It's negotiated. It becomes a business decision primarily depending on the customer and our confidence in the customer's ability to, you know, deliver the revenue that we expect we can get from the project.
>
> ***
>
> [We use] value based pricing [which] is based on the concept that the — that our technology significantly enhances the end product and therefore we want to capture that increasing value to the end product.
>
> Q. All right. And how **[**15]** do you determine — how [does] DSS determine to what extent [its] technology enhances the value of the end product?
>
> A. I think it's a negotiated process.[23]
>
> ***
>
> Q. ... [T]here's no standard way in which the customer is charged for use of the DSS technology; do I have that right?
>
> A. Yes, I think there's variation in pricing, yes.
>
> Q. And that variation is part — part of that is caused by DSS shaping their price in order to fit the needs of the licensee; is that right?
>
> A. I think pricing is, you know, mutually negotiated. Certainly we try to obtain the best — you know, the pricing that we're looking for, and that's negotiated with the customer.
>
> Q. Is one of the considerations for negotiating that price term the anticipated volume that a licensee is going to be using the DSS technology with respect to?
>
> A. Yes, volume is often considered, yes.
>
> Q. So if a — if a licensee is anticipated to be using DSS technology on a very high volume of products, what would generally be the impact on the price that DSS would offer; would it be higher or lower?
>
> A. It would be negotiated. For some customers, we wouldn't provide any delineations; others, you know, we would consider it.
>
> Q. So there's no standard — there's no standard **[**16]** that would be applied to the price term that's being offered based on whether it was

> — whether the licensee was anticipated to have high volume or low volume; is that right?
>
> **[*492]** A. Yes, I would agree with that.[24]

Consequently, it is clear that Plaintiff negotiated licenses with customers on a case-by-case basis, with no standard royalty rate.[25]

Furthermore, Plaintiff did not view Block-Out as a "stand alone" product. Instead, Plaintiff viewed Block-Out as an "add-on technology," to be "added-on" for an additional fee when customers were licensing other technologies, such as "Pantograph and Prism."[26] In that regard, Plaintiff admits that Block-Out by itself is "somewhat lame," and that it needs to be "layered" with other technologies.[27] More specifically, Plaintiff indicates that Block-Out's value comes from preventing color copying, and from impressing prospective clients who may have an emotional response to seeing a demonstration where Block-Out prevents a color copy from **[**17]** being made.[28] Despite all of that, Plaintiff contends that, assuming Defendant stole the Block-Out technology, it must have significant value since Defendant continues to use it.[29]

However, Defendant contends that the Block-Out technology has "no stand-alone commercial value" as a means of preventing the counterfeiting of coupons.[30] Defendant maintains that the technology has no value since, for example, it does, as indicated above, not prevent the copying of black-and-white coupons, and all retailers accept black-and-white coupons. Consequently, Defendant argues, the technology has, at best, "a possible, albeit speculative immaterial benefit of perhaps discouraging an uninformed, irresolute, and

---

[23] Philip Jones Dep. at pp. 23-24, 39.

[24] Philip Jones Dep. at pp. 157-159.

[25] See, Deposition of Plaintiff's CEO, Patrick White at p. 143 ("I would have to work with the client and get all the other factors. It has to be a negotiation.").

[26] Patrick White Deposition at p. 74.

[27] Patrick White Deposition at p. 83.

[28] Patrick White Deposition at p. 74. At another point in his deposition, White indicated that despite its limited utility, Block-Out had "sizzle," because it impressed potential clients during sales presentations; see also, id. at p. 305 ("[I]t's a wow factor.") (Speculating that Defendant may find value in using the anti-copying technology to impress potential clients).

[29] Patrick White Deposition at p. 305.

[30] Halm Expert Report at p. 3.

55 F. Supp. 3d 485, *492; 2014 U.S. Dist. LEXIS 152802, **17

languid counterfeiter." In fact,[31] Defendant maintains, [**18] its competitors in the coupon industry do not even bother using such technology.[32] Instead, they, and Defendant, rely primarily on other technology, that prevents consumers from being able to print multiple copies of on-line coupons from their home printers.[33] Finally, Defendant maintains that the lack of value attributable to Block-Out is evident from the fact that Plaintiff waited several years before confronting Defendant about the alleged misappropriation of the technology. If the technology was actually worth anything, Defendant contends, Plaintiff would have acted sooner.

On March 5, 2014, Defendant filed the subject motion for summary judgment. Defendant essentially maintains that it is entitled to summary judgment for two reasons: First, it did not breach the NDA, since the NDA does not cover the subject technology; and second, even if it did breach the NDA, Plaintiff cannot recover any damages. As to the first of these points, Defendant contends, as already mentioned, that Block-Out is not Confidential [*493] Information, because it is non-novel and was in the public domain [**19] before Plaintiff provided it to Defendant. As for the second point, Defendant maintains that the only damages that Plaintiff is seeking are "reasonable royalties," which are prohibited by the NDA, and which under New York law cannot be recovered for a breach of contract.

Plaintiff disputes both of those arguments. As already discussed, Plaintiff maintains that Block-Out is covered by the NDA, and that Defendant is attempting to define the technology in an overly-restrictive manner. Again, on this issue, Plaintiff insists that Block-Out consists of the optimized five-ring image along with the underlying electronic information about how to make the image, all of which is covered by the NDA's definition of "Confidential Information." Plaintiff contends that such information was not in the public domain and was novel, or at least novel as to Defendant. As for damages, Plaintiff contends that it is actually seeking lost profits, which are recoverable as contract damages under New York law. Plaintiff admits, though, that the only profit that it lost is the amount of royalties that Defendant should have paid for using the Block-Out technology.

On or about April 24, 2014, Defendant filed its [**20]

---

[31] Halm Expert Report at p. 12.

[32] Halm Expert Report at p. 20.

[33] Halm Expert Report at pp. 21-24.

reply papers, consisting of a ten-page memorandum of law, containing lengthy singled-spaced footnotes, and 265 pages of additional material, consisting primarily of responses to Plaintiff's statement of additional facts submitted in opposition to the summary judgment motion, and supporting exhibits.

On June 6, 2014, Plaintiff filed a motion [#118] to strike Defendant's reply papers. In that regard, Plaintiff contends that Defendant's memo of law violates the ten-page limit on reply papers contained in Rules 7(a)(2)(C) and 10(a)(3) of the Local Rules of Civil Procedure, by including additional argument in overly-lengthy footnotes. Plaintiff further contends that Defendant's reply to Plaintiff's factual assertions is not allowed by the local rules, and should be stricken.

On July 10, 2014, counsel for the parties appeared before the undersigned for oral argument.

DISCUSSION

*Plaintiff's Motion to Strike Defendant's Reply*

As the Court indicated during oral argument, it is denying Plaintiff's motion to strike. While it is true that Defendant may have pushed the boundaries of the Local Rule's page limitations by using lengthy footnotes, the Court almost routinely grants extensions of those limits upon request. Moreover, [**21] the Court generally applies such page limits to memorandums of law, not accompanying exhibits. Finally, it does not appear that Plaintiff was prejudiced, or that the manner of Defendant's submission has any effect on the outcome of the Court's decision below. Accordingly, Plaintiff's application [#118] is denied.

*Rule 56*

HN1[↑] Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could [*494] find in favor of the non-moving party." *Leon v. Murphy, 988 F.2d 303, 308*

55 F. Supp. 3d 485, *494; 2014 U.S. Dist. LEXIS 152802, **21

*(2d Cir.1993).*

**HN2**[⬆] A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir. 1982)* (**HN3**[⬆]) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings, nor by surmise [**22] or conjecture on the part of the litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)* (**HN4**[⬆]) "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005)* ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . . and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

**HN5**[⬆] "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact. However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013)* (citations and internal quotation marks omitted).

Having considered [**23] the foregoing legal principles, and the record viewed in the light most-favorable to Plaintiff, the Court finds that even assuming *arguendo* that Plaintiff has demonstrated triable issues of fact as to whether Defendant breached the NDA, that Defendant is nevertheless entitled to summary judgment since Plaintiff has not suffered any compensable damages.

*The Applicable New York Law on Damages*

Defendant maintains that New York law does not permit recovery of "reasonable royalties damages" in breach of contract actions generally, and that Plaintiff's alleged damages are speculative in any event. Plaintiff responds that it is seeking lost profits, not reasonable royalties, and that its damages can be ascertained based on evidence of royalty agreements between Plaintiff and other companies. The Court agrees with Defendant and disagrees with Plaintiff.

**HN6**[⬆] The general legal principles concerning contract damages under New York law are well settled:

It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach. In order to impose on the defaulting party a further liability than for damages [**24] which naturally and directly flow from the breach, *i.e.*, in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.

[*495] In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

*Kenford Co., Inc. v. County of Erie, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (N.Y.1989)* (citations and internal quotation marks omitted). "Another way of phrasing breach of contract damages is that, under New York law, plaintiffs are entitled to compensatory damages necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract." *Premier Florida Auto Sales and Leasing, LLC v. Mercedes-Benz of Massapequa, LLC, No. 10 CV 4428(DRH)(WDW), 2013 U.S. Dist. LEXIS 71227, 2013 WL 2177785 at *4 (E.D.N.Y. May 20, 2013)* (citations and internal quotation marks omitted).

**HN7**[⬆] General or expectation damages for breach of contract may often include [**25] lost profits. *See*, 24 WILLISTON ON CONTRACTS § 64:2 (4th ed.) ("Because the goal of protecting the plaintiff's expectation interest is to place the promisee in the same position as performance would have done, it follows that an award of damages will often include an amount representing the profits that

55 F. Supp. 3d 485, *495; 2014 U.S. Dist. LEXIS 152802, **25

were lost as a result of the defendant's breach of contract, because only by awarding lost profits will the plaintiff be made fully whole."). More specifically,

[u]nder New York law, consequential damages for lost profits are recoverable if a plaintiff can demonstrate with *reasonable certainty* that: (1) the lost profits were caused by the breach; (2) what the amount of the lost profits were; (3) the liability for the lost profits were "fairly within the contemplation of the parties" at the time the agreement was formed.

*Saenger v. Presbyterian Church of Mount Kisco, No. 96 CIV. 7684(JFK), 1997 U.S. Dist. LEXIS 19108, 1997 WL 742531 at *2 (S.D.N.Y. Dec. 1, 1997)* (emphasis added) (*citing Kenford Co., Inc. v. County of Erie, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132*).

Here, Plaintiff does not maintain that it lost the opportunity to do business with any other entity as a result of Defendant's breach. Instead, Plaintiff reasons that if Defendant had complied with the NDA, it would not have used the Block-Out technology, and that since Defendant used the technology, Defendant should have to pay for it, **[**26]** otherwise it would result in Defendant being able to use the technology for free without any consequences. In that regard, Plaintiff insists that it is not seeking "reasonable royalties," but is seeking "lost profits," that were fairly within the parties' contemplation at the time the NDA was executed.

In *Vojdani v. Pharmsan Labs, Inc., 741 F.3d 777 (7th Cir. 2014)*, the Seventh Circuit Court of Appeals considered a breach of contract claim that is substantially similar to the instant case. Although the case did not involve New York law, the general principles of contract law discussed therein are applicable here. In *Vojdani*, the parties had a confidentiality agreement concerning medical testing procedures that the plaintiff disclosed to the defendant as part of their joint business venture. After the parties terminated their business relationship, however, the defendant continued to use the plaintiff's testing procedures, in violation of the confidentiality agreement, which caused the plaintiff to sue to recover damages. Specifically, the plaintiff maintained that he was seeking the expectation damages that he would have received if the **[*496]** defendant had paid him for the use of the testing technology. However, the Circuit Court determined that the **[**27]** plaintiff did not sustain any money damages as a result of the breach, since he would not have been entitled to any payment at all if the

defendant had not breached the confidentiality agreement:

Vojdani challenges the district court's grant of NeuroScience's renewed motion for judgment as a matter of law, which vacated the verdict of nearly $1.2 million for breach of the confidentiality agreement. Vojdani argues that the money would merely compensate him for the "actual loss" he suffered from the breach. NeuroScience responds that Vojdani did not and cannot prove any damages because he was not made worse off by the confidentiality agreement's violation.
***

*HN8*[⬆️] The non-breaching party may recover expectation damages and any other losses foreseeably flowing from the breach. [However,] the non-breaching party may not be placed in a better position because of the breach than he would have been in had the contract been performed.
***

If [Defendant] had complied with the confidentiality agreement's requirement that the company not use Vojdani's proprietary information outside of their collaboration, Vojdani would have gained nothing. His methods simply would not have been used after the collaboration **[**28]** ended.

*Vojdani, 741 F.3d at 785-786* (citations omitted).[34] Likewise, in the instant case, if Defendant had complied with the NDA and not used the Block-Out technology, Plaintiff would not have been entitled to any payment. Consequently, even assuming that Defendant breached the agreement, Plaintiff did not suffer any expectation damages thereby, and any payment that it now receives would place it in a better position than if the contract had been performed.

Moreover, even assuming that the Court disregarded Plaintiff's protestations to the contrary, and found that what Plaintiff is really seeking is "reasonable royalties," the Court would still need to conclude that Plaintiff is not entitled to damages. In that regard, *HN9*[⬆️] "reasonable royalty" damages are frequently awarded in patent and

---

[34] As in this case, the defendant insisted that the plaintiff was actually attempting to recover reasonable royalties, but the plaintiff denied that he was, and contended that he was seeking lost profits. Unlike this case, however, the plaintiff in *Vojdani* apparently could have recovered reasonable royalties under the applicable law. Again, though, Plaintiff here denies that it is seeking reasonable royalties.

55 F. Supp. 3d 485, *496; 2014 U.S. Dist. LEXIS 152802, **28

trade secret cases. *See, e.g., Member Services, Inc. v. Security Mutual Life Ins. Co. of New York, No. 3:06-cv-1164 (TJM/DEP), 2010 U.S. Dist. LEXIS 103776, 2010 WL 3907489 at *27-28 (N.D.N.Y. Sep. 30, 2010)* **[\*\*29]** (discussing availability of reasonable royalty damages in those types of actions). However, New York law does not permit the recovery of such damages for a breach of contract, where the agreement itself did not provide for royalties.[35] *See, Jill Stuart* **[\*497]** *(Asia) LLC v. Sanei International Co., LTD., No. 12 Civ. 3699(KBF), 2013 U.S. Dist. LEXIS 89046, 2013 WL 3203893 at *5 (S.D.N.Y. Jun. 17, 2013)* ("The only breach of contract case [Plaintiffs] cite involved the breach of an express royalty provision - and no such provision exists here or in the parties' other agreements. The reasonable royalty theory of damages cannot apply.") (citing *Jim Beam Brands Co. v. Tequila Cuervo La Rojena S.A. de C.V.*, No. 600122/2008 (Sup. Ct. N.Y. Co. July 12, 2011)[36]), *aff'd 566 Fed.Appx. 29 (2d Cir. May 14, 2014)* (affirmed on other grounds); *see also, Rodgard Corp. v. Miner Enterprises, Inc., No. 84-CV-0397E(M), 1998 U.S. Dist. LEXIS 19403, 1998 WL 864943 at *5 (W.D.N.Y. Dec. 8, 1998)* (Plaintiff not entitled to reasonable royalties, even though Defendant breached confidentiality agreement and utilized Plaintiff's technology).

Furthermore, even assuming that reasonable royalties were available under New York law for breach of a confidentiality agreement, Defendant would still be entitled to summary judgment since the "lost profits"/royalties that Plaintiff is seeking are speculative. As to reasonable royalty damages in general, the Second Circuit has stated:

---

[35] *Compare, Inside Out Productions, Inc. v. Scholastic, Inc., 90 Civ. 7233 (JSM), 1995 U.S. Dist. LEXIS 8623, 1995 WL 375927 (S.D.N.Y. Jun. 23, 1995)* (allowing recovery of reasonable royalties, where the agreement that was breached specifically provided for the payment of royalties). Some other states allow a party to recover reasonable royalties **[\*\*30]** as damages for the breach of a non-disclosure agreement. *See, e.g., Veritas Operating Corp. v. Microsoft Corp., No. C06-0703-JCC, 2008 U.S. Dist. LEXIS 112135, 2008 WL 7404617 at *3-4 (W.D.Wash. Feb. 26, 2008)* (applying law of the State of Washington).

[36] In the *Jim Beam* case, the Court wrote: "Jim Beam has not provided any precedent to support an award of reasonable royalty damages in a breach of contract case. . . . Neither damages theory [reasonable royalties and disgorgement] proffered by Plaintiff's expert is available as a measure of contract damages under New York law." Decision and Order dated July 12, 2011, at pp. 7, 10.

A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff. By means of a "suppositious meeting" between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation **[\*\*31]** occurred.

In fashioning a reasonable royalty, most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation. To approximate the parties' agreement, had they bargained in good faith at the time of the misappropriation, the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes.

*Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151-152 (2d Cir. 1996)* (citations and internal quotation marks omitted). A reasonable royalty *cannot* be calculated based merely upon what the Plaintiff claims that it "would have charged" the defendant. *Id. at 152*.

The Second Circuit has held that, even **[\*\*32]** assuming *arguendo* that reasonable royalties could be recovered for a breach of contract under New York law, such damages would be speculative where there is no evidence of sufficiently-similar royalty agreements with third parties upon which to base an award:

Jill Stuart's 'reasonable royalty' theory also fails because, even assuming that a hypothetical reasonable royalty amount could support a nonspeculative consequential **[\*498]** damages determination under New York law, Jill Stuart failed to show sufficiently similar royalty contracts on which to base such a determination.

*Jill Stuart (Asia) LLC v. Sanei International Co., LTD, 566 Fed.Appx. at 32*. Other courts in this Circuit have similarly found demands for reasonable royalties to be

55 F. Supp. 3d 485, *498; 2014 U.S. Dist. LEXIS 152802, **32

speculative where there were neither sufficiently-similar royalty agreements with third parties nor a history of a prior licensing agreement between the parties upon which to base an award. *See, Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 CIV. 7203 (DLC), 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955 at *4 (S.D.N.Y. May 18, 2006)* ("Use of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty."); *but see, On Site Energy Co. v. MTU Onsite Energy Corp., No. 10-CV-1671 (JS)(WDW), 2012 U.S. Dist. LEXIS 100690, 2012 WL 2952424 at *2 (E.D.N.Y. Jul. 19, 2012)* ("Although reasonable royalties are a 'seldom-used' measure of damages, largely **[**33]** because they are difficult to quantify, there is no *per se* rule against reasonable royalties in cases with no evidence of licensing history.") (citations omitted).

Here, there is only scant evidence of licensing agreements between Plaintiff and third parties. Specifically, as Plaintiff's damages expert opines, there are only two such agreements that are even arguably comparable. However, for the reasons urged by Defendant, the Court does not believe that they are sufficiently comparable to use as a basis for calculating a reasonable royalty as to Defendant. For example, there is no evidence of any licensing agreement involving just the Block-Out technology, which is the only technology that Defendant allegedly used, and which was admittedly Plaintiff's least-effective "stand alone" product.[37] Instead, those agreements involved the licensing of multiple "layered" technologies, which would have affected the price. Moreover, ARC canceled its agreement almost immediately, due to its perception that Block-Out's limited utility in blocking color copies was not worth the licensing fee. Similarly, RRD's agreement is not a good comparator, both because RRD had a pre-existing business relationship **[**34]** with Plaintiff and because there is no indication that RRD actually used Block-Out. In short, Plaintiff has not shown that Defendant was similarly situated with ARC or RRD.

Moreover, it is clear that Plaintiff had no standard licensing arrangement, but rather, it negotiated each licensing agreement separately based on various factors that differ from client to client. In that regard, the Court finds it significant that Plaintiff refused to say that any particular factor, such as volume of coupons issued, would necessarily, or even generally, cause the licensing rate to be higher or lower.[38] Instead, Plaintiff reiterated that such factors had to be negotiated in each case, because each client was unique. *See*, White Dep. at p. 142 ("Every **[**35]** client's unique. Every use is unique."). Therefore, even viewing the disputed facts in the light most-favorable to Plaintiff, any attempt by Plaintiff to establish a reasonable royalty rate here would be unduly speculative. **[*499]** Accordingly, Defendant is entitled to summary judgment.

CONCLUSION

Defendant's motion [#89] for summary judgment is granted, and this action is dismissed. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated: October 27, 2014

Rochester, New York

/s/ Charles J. Siragusa

CHARLES J. SIRAGUSA

United States District Judge

---

**End of Document**

---

[37] *See, e.g.*, email of Patrick White describing Block-Out by itself as being "somewhat lame." (DSS004549); *see also*, White Deposition at pp. 53-54, 66-73, 84 (Indicating that Block-Out's primary value to Plaintiff was as a sales tool to impress clients, and that as far as Block-Out's utility, it only prevented color copies, and Plaintiff therefore considered it to be an "add on" technology to be layered with more powerful technologies such as Pantograph.)

[38] See, Philip Jones Dep. at pp. 156-159.

6. *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2022 U.S. Dist. LEXIS 177866, * 16-17 (S.D.N.Y. Sept. 29, 2022)

 Neutral

As of: December 9, 2023 11:57 AM Z

## *Fashion Exch. LLC v. Hybrid Promotions, LLC*

United States District Court for the Southern District of New York

September 29, 2022, Decided; September 29, 2022, Filed

14-Cv-1254 (SHS)

**Reporter**

2022 U.S. Dist. LEXIS 177866 *; 2022 WL 4554480

THE FASHION EXCHANGE LLC, Plaintiff, v. HYBRID PROMOTIONS, LLC, ET AL., Defendants.

**Subsequent History:** Reconsideration denied by *Fashion Exch. v. Hybrid Promotions, 2023 U.S. Dist. LEXIS 12239 (S.D.N.Y., Jan. 24, 2023)*

**Prior History:** *Fashion Exch. LLC v. Hybrid Promotions, LLC, 2017 U.S. Dist. LEXIS 138981 (S.D.N.Y., Aug. 28, 2017)*

## Core Terms

Marks, trademark, Retailer, summary judgment, defendants', profits, royalty, damages, buyer, unfair competition, discovery, consumer, parties, bad faith, infringement, depositions, substantiate, calculate, apparel, deceive, emails, sales

**Counsel: [*1]** For The Fashion Exchange LLC, Plaintiff: Scott Ross Zarin, Zarin & Associates, P.C., New York, NY.

For Hybrid Promotions, LLC, Jarrod Dogan, Gavin Dogan, National Stores, Inc., Hot Topic, Inc., Ross Stores, Inc., Tween Brands, Inc., The TJX Companies, Inc., Spencer Gifts LLC, Old Navy, LLC, Rue 21, Inc., J.C. Penney Corporation, Inc., BJ'S Wholesale Club, Inc., Boscov's Department Store, LLC, Wal-Mart Stores, Inc., Kohls Department Stores, Inc., Macy's Merchandising Group, Inc., Shopko Stores Operating Co., LLC, Family Dollar Services, Inc., The Cato Corporation, Belk Stores Services, Inc., Dillard International, Inc., Sports Holdings, Inc., Nordstrom, Inc., BDSRCO, Inc., Sears Brands, LLC, Marshalls of MA, Inc., Bob's Stores, LLC, Dollar General Corporation, Target Corporate Services, Inc., Urban Outfitters, Inc., Macy's Retail Holdings, Inc., Macys.com, Inc., Belk, Inc., Beall's Department Stores, Inc., Jeff Caldwell, Defendants: Mark Jon Rosenberg, LEAD ATTORNEY, Alan Tenenbaum, Christopher Michael Tumulty, Debra Bodian Bernstein, Joel Howard Rosner, Tarter Krinsky & Drogin LLP, New York, NY.

For Hybrid Promotions, LLC, Counter Claimant: Mark Jon Rosenberg, LEAD ATTORNEY, Alan Tenenbaum, **[*2]** Christopher Michael Tumulty, Debra Bodian Bernstein, Joel Howard Rosner, Tarter Krinsky & Drogin LLP, New York, NY.

For The Fashion Exchange LLC, Counter Defendant: Scott Ross Zarin, Zarin & Associates, P.C., New York, NY.

For Hybrid Promotions, LLC, Counter Claimant: Mark Jon Rosenberg, LEAD ATTORNEY, Alan Tenenbaum, Christopher Michael Tumulty, Debra Bodian Bernstein, Joel Howard Rosner, Tarter Krinsky & Drogin LLP, New York, NY.

For Jeff Caldwell, Jarrod Dogan, Gavin Dogan, Counter Claimant: Alan Tenenbaum, Christopher Michael Tumulty, Mark Jon Rosenberg, Tarter Krinsky & Drogin LLP, New York, NY.

For The Fashion Exchange LLC, Counter Defendant: Scott Ross Zarin, Zarin & Associates, P.C., New York, NY.

**Judges:** Sidney H. Stein, United States District Judge.

**Opinion by:** Sidney H. Stein

## Opinion

### OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Defendants Hybrid Promotions, Jarrod Dogan, Gavin Dogan, Jeff Caldwell, (collectively, the "Hybrid defendants"), and defendant retailers ("Retailer Defendants") have moved for summary judgment

against plaintiff The Fashion Exchange with respect to its claims for monetary relief and common law unfair competition. That motion is granted.

## I. Statement of Facts

Plaintiff The Fashion **[*3]** Exchange ("TFE") is a New York company founded by its former principal Jack Saadia. It asserts common law rights in the marks HYBRID and HYBRID & COMPANY (the "Asserted Marks") through a series of New York companies owned, operated, and managed by Saadia and his brothers: Young Girl Inc., YG Designs, and USA Design.

Young Girl, YG Designs, and USA Design each allegedly sold apparel under the Asserted Marks prior to the founding of TFE in 2006. (Plaintiff's Local Civil Rule 56.1 Statement ("Pl. 56.1") ¶¶4-5, ECF No. 160.) By 2008, TFE had issued an exclusive license to Fame Fashion House, Inc. ("Fame Fashion") to manufacture, market, and sell apparel under the Asserted Marks. (*Id.* ¶ 7.) At that point, TFE ceased selling apparel. (Plaintiff's Memorandum in Opposition ("Pl. Mem."), ECF No. 381 at 1.) It is undisputed that TFE and Fame Fashion have been commonly owned by Saadia family members and that the two entities share a computer network. (Defendants' Local Civil Rule 56.1 Statement ("Defs. 56.1") ¶ 3, ECF No. 379; see Plaintiff's Counter Statement to Defs. 56.1 ("Pl. 56.1 Counter Stmt.") ¶ 3, ECF No. 381.)

In 2009, the U.S. Patent and Trademark Office ("USPTO") granted TFE's application to trademark "HYBRID & COMPANY." (Declaration **[*4]** of Jack Saadia dated Oct. 27, 2015, "Saadia Decl.", ECF No. 172 Ex. Y.) TFE now owns U.S. Trademark Reg. No. 3,723,220, which states that "the mark consists of the word 'HYBRID' with decorative elements consisting of features and fanciful scrolls together with '& COMPANY' in smaller and less prominent stylization." (Declaration of Scott Zarin dated Sept. 28, 2015, ECF No. 160 Ex. N.) Neither TFE nor any of its predecessors policed use of the HYBRID and HYBRID & COMPANY trademarks. (Dep. of Jack Saadia dated May 12, 2015 at 46:23-47, 54:19-23, 60:2-5, 66:5-13, 76:7-77:4, Ex. 1 to Decl. of Mark Rosenberg dated Sept. 28, 2015 "Rosenberg Decl.", ECF No. 156; Dep. of Mark Hanono dated May 13, 2015 at 48:17-21, 48:25-49:5, Ex. 2 to Rosenberg Decl.)

Defendant Jarrod Dogan founded Hybrid Promotions ("Hybrid") in 1998 and began doing business under the mark HYBRID PROMOTIONS. (Defs. 56.1 ¶ 4.) In 1999,

Hybrid began placing the HYBRID mark on the neck labels of its apparel, and has also used the marks HYBRID PROMOTIONS, HYBRID TEES, HYBRID APPAREL, AND HYBRID JEM. (*Id.* ¶ 8.) Despite engaging in the practice of so-called "comp shopping" in order to discover competitors, Hybrid did not become aware of TFE or its registered trademark **[*5]** in HYBRID & COMPANY until 2011, when, while applying to register its HYBRID mark, it received an office action from the USPTO concerning TFE's trademark. (*Id.* ¶¶ 15-16.)

The USPTO ultimately denied Hybrid's trademark application on the ground that there was a likelihood of confusion with plaintiff's "HYBRID & COMPANY" mark. (Pl. 56.1 ¶ 49.) Plaintiff first learned of defendants' use of its Asserted Marks in November 2011 after Hybrid filed a petition with the USPTO to cancel plaintiff's registered trademark. (Saadia Decl. ¶¶ 92-94.) Hybrid's Petition for Cancellation alleged that plaintiff began using its HYBRID mark after Hybrid's use of the mark; in response, plaintiff asserted that "[Hybrid] has no right to the generic descriptive term Hybrid" and that, due to the word's genericity, "[TFE] cannot be considered to have committed anything other than 'nominal fair use' of the word Hybrid which has been in the public domain for years." (Defs. 56.1 ¶¶ 28-29.)

## II. Procedural Posture

Plaintiff brought this action in 2014 seeking judgment against Hybrid declaring that plaintiff has common law rights in the trademarks HYBRID and HYBRID & COMPANY and that its trademark registration for HYBRID **[*6]** & COMPANY is valid and enforceable. (Second Amended Complaint ("SAC") at ¶ 74, ECF No. 134.) The complaint further alleges against the Hybrid defendants and more than two dozen Retailer Defendants claims of trademark infringement in violation of the *Lanham Act, 15 U.S.C. § 1114(1)*, and unfair competition in violation of both the *Lanham Act, 15 U.S.C. § 1125(a)* and New York common law. (SAC ¶¶ 78-98.) TFE seeks declaratory and injunctive relief, as well as monetary relief including its own damages and defendants' profits. (*Id.* at 22-24.) In response Hybrid asserted the affirmative defense of laches as well as five counterclaims, including for a declaratory judgment as to the superiority of its rights in the Asserted Marks, for unfair competition pursuant to the *Lanham Act* and New York law, and for cancellation of TFE's HYBRID & COMPANY trademark registration. (Answer, ECF No. 135.)

2022 U.S. Dist. LEXIS 177866, *6

The Court later stayed all discovery against the Retailer Defendants except on the issue of confusion. (ECF No. 90.) The Court subsequently enlarged that stay to cover essentially all discovery against the Retailer Defendants. (See ECF Nos. 95-99, 110.) The Court also limited summary judgment motions to the issues of ownership of rights and laches - threshold issues whose **[*7]** resolution, if in defendants' favor, would remove any need for further discovery. (ECF No. 110.) TFE and the Hybrid defendants filed cross-motions for summary judgment in September of 2015. (ECF Nos. 153, 158.)

This Court subsequently denied defendants' motion for summary judgment and denied in part plaintiff's cross motion for partial summary judgment. (ECF No. 200; Transcript at ECF No. 202-1.) The Court also denied defendants' motion for reconsideration of that decision and directed the parties to submit "an agreed-upon schedule for the remainder of this litigation." (ECF No. 205 at 3.) The parties failed to reach agreement and submitted separate proposals, followed by a flurry of letters disputing various aspects of the record in this case. (ECF No. 208, 209, 211, 212, 213.) In November of 2017, the Court directed the Hybrid defendants to respond to plaintiff's discovery requests as to actual confusion and sales relating to the Retailer Defendants, and allowed limited discovery as to the remaining issues against eight Retailer Defendants chosen by the parties. (Order, ECF No. 215.) The Court later referred this action to Magistrate Judge Ona T. Wang for general pretrial purposes, **[*8]** including discovery. (ECF No. 229.) Pursuant to that referral, Judge Wang directed on August 2, 2018 that all fact discovery shall be completed by November 1, 2018. (Order, ECF No. 248.)

Following her August 2 order, Judge Wang handled additional contentious discovery disputes between the parties. She denied TFE's motion to compel depositions of Jarrod Dogan, Gavin Dogan, and Hybrid's former CFO Brad Shapiro, finding that plaintiff lacked any justification for 1) demanding additional 30(b)(6) depositions when it had already taken two; 2) having failed to depose Shapiro and Gavin Dogan before the close of fact discovery; or 3) deposing Jarrod Dogan a second time. (Order, ECF No. 305.) Later, TFE sought to compel the depositions of certain Retailer Defendants, (see ECF No. 290), but withdrew that motion after a pretrial conference in which Judge Wang made clear her doubts as to the Retailer Defendants' willfulness and her subsequent unwillingness to allow discovery as to those defendants on that issue. (Tr. at 32, ECF No. 374; Letter of Scott Zarin, Esq., dated

February 21, 2020, ECF No. 371.) Ultimately, Judge Wang issued two separate orders imposing sanctions on TFE for obstructing **[*9]** defendants' deposition of Jack Saadia and for the spoliation of documents that allegedly would have substantiated plaintiff's damages claims. (ECF Nos. 333, 348; see also this Court's Opinion & Order, ECF No. 408.)

Specifically, TFE was sanctioned for failing to preserve records to substantiate its claims for monetary relief. (See ECF No. 348 at 2-5.) Despite a court order, TFE had failed totally to produce financial documents relating to royalties received from its licensee Fame Fashion; instead, it produced only a single quarter-page summary of its royalty income, which provided conclusory figures with no indication as to how they were calculated or their source. (See id. at 2-3.) As an alternative to trying to determine what royalties, if any, were received by TFE, defendants sought production of TFE's tax returns, which Judge Wang granted. (Tr. at 8:17-25, 26:17-21, ECF No. 264.) Plaintiff produced unsigned tax returns with no indication that they were ever filed. (ECF No. 304 at 13.) Moreover, TFE's alleged royalty figures represented in the summary sheet and the income figures listed on TFE's unsigned tax returns were not the same. (ECF No. 270.) The only reason TFE gave for the **[*10]** loss of its financial documents was that the hard drive and server TFE and Fame Fashion shared were "fried" in some unknown fashion. (Deposition of Mark Hanono dated January 29, 2019, Tr. 11:2-12:6, ECF No. 345-1.)

In March of 2020, the Hybrid defendants and Retailer Defendants moved for partial summary judgment as to plaintiff's claims for damages and defendants' profits and as to its claim of unfair competition.

### III. Applicable Law

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant *is* entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"When considering a motion for summary judgment, a court must construe the evidence in the light most

2022 U.S. Dist. LEXIS 177866, *10

favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of N.Y., 426 F.3d 549,553 (2d Cir. 2005)*; *see also M.T. v. City of N.Y., 325 F. Supp. 3d 487,494 (S.D.N.Y. 2018)*. To defeat a motion for summary judgment, the non-movant "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support **[*11]** of its factual assertions. *D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998)*; *Sussman v. Rabobank Int'l, 739 F. Supp. 2d 624, 627 (S.D.N.Y. 2010)*. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson, 477 U.S. at 252*.

## IV. Discussion

### A. *Plaintiff's Damages*

The *Lanham Act* permits a successful plaintiff to recover "subject to the principles of equity,... (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *15 U.S.C. § 1117(a)*. The plaintiff's own damages "may include compensation for (1) lost sales or revenue; (2) sales at lower prices; (3) harm to market reputation; or (4) expenditures to prevent, correct, or mitigate consumer confusion." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996)*, *abrogated on other grounds by Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 1497, 206 L. Ed. 2d 672 (2020)*.

### i. *Actual Confusion*

"[I]t is well settled that in order for a *Lanham Act* plaintiff to receive an award of *damages* the plaintiff must prove either actual consumer confusion or deception resulting from the violation,... or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992)*, *abrogated on other grounds by Romag Fasteners, 140 S. Ct. at 1497* (internal quotation marks and citations omitted). "This requirement must be distinguished from cases brought under the *Lanham Act* in which **[*12]** only injunctive relief is sought; in those cases the plaintiff need only prove a likelihood of confusion among consumers." *Res. Dev., Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 139 (2d Cir. 1991)*.

"Actual confusion" for purpose of the *Lanham Act* is "consumer confusion that enables a seller to pass off his

goods as the goods of another." *The Sports Auth. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996)* (internal citations omitted). TFE must show that Hybrid's use of its marks "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.* "In many cases, confusion may be demonstrated by statistical survey evidence showing that actual consumers were confused by the entrance of defendant's mark in the marketplace. While such evidence is not absolutely required,... '[t]he lack of survey evidence counts against finding actual confusion.'" *O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 523 (S.D.N.Y. 2008)* (quoting *Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994)*). "[T]he relevant confusion is that which affects the purchasing and selling of the goods or services in question." *W.W.W. Pharm. Co., Inc. v. Gillette Co., 984 F.2d 567, 574 (2d Cir. 1993)* *(W.W.W.)* (internal quotation marks and citations omitted). In other words, proof of actual confusion should demonstrate a "potential or actual effect on consumers' purchasing decisions." *Lang v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991)*.

Here, TFE has blatantly misread circuit precedent to argue that actual confusion is not a necessary prerequisite **[*13]** to a damages award under the *Lanham Act*. (See Pl. Mem. at 6-7.) In 4 *Pillar Dynasty LLC v. New York & Co., Inc.*, upon which TFE relies to make this specious argument, the United States Court of Appeals for the Second Circuit rejected defendants' argument that actual confusion was required proof for an award of *profits*. *See 933 F.3d 202, 211-12 (2d Cir. 2019)*. In relying on 4 *Pillar*, plaintiff has conflated the standards for awarding the plaintiff its own damages and for the disgorgement of the infringer's profits. 4 *Pillar* did not discuss, and does not disturb, the "well settled" law that an award of damages requires proof of actual confusion. *See George Basch, 968 F.2d at 1537*.

Nonetheless, TFE claims that it has produced evidence of actual confusion between Hybrid's marks and the Asserted Marks. (Defs. 56.1 ¶ 86; Pl. 56.1 ¶ 86.) As proof of actual confusion, it cites to 1) a few emails showing alleged retailer-buyers mistaking TFE for Hybrid and 2) the testimony of Jack Saadia and TFE shareholder Mark Hanono that they believed there was confusion. (Declaration of Scott Zarin dated April 13, 2020, "Zarin Decl.", ECF No. 382 Exs. 4, 5, 7, 8, 28.) The evidence TFE puts forth as to actual confusion is largely inadmissible hearsay, such as Hanono's testimony **[*14]** that, during a phone call with a buyer from TJ Maxx, the buyer had expressed that she had

"worked with the Hybrid in California," presumably referring to defendant Hybrid. (Zarin Decl. Ex. 4 at 53). None of TFE's buyers testified, rendering Saadia's and Hanono's deposition testimony about those buyers' alleged confusion inadmissible hearsay.

Another buyer sent an email to a Hybrid employee and apparently inadvertently copied a Fame Fashion employee; this simply does not demonstrate a mistaken purchase of Hybrid goods by an intended Fame Fashion buyer. (Zarin Decl. Ex. 28 at FE46508.) In a separate email thread, a different buyer expresses confusion at the fact that Fame Fashion refers to itself as Hybrid. (*Id.* at FE46498-FE46500.) Taken in the light most favorable to plaintiff, these emails show at the very most some general confusion as to the distinction between TFE and Hybrid, but certainly are not indicative that the buyers were actually confused in regard to "the purchasing ... of the goods ... in question." *W.W.W., 984 F.2d at 574*.

The small number of buyers reflected in the emails and the fact that those buyers did not testify as to whether they were confused militate against a finding of actual confusion. **[*15]** In *Trustees of Columbia University v. Columbia/HCA Healthcare Corporation*, several of the plaintiff's employees testified that third parties thought that defendant's advertisements were connected to the plaintiff. *964 F. Supp. 733, 746-47 (S.D.N.Y. 1997)*. The district court held that that evidence was de minimis, finding "a difference between isolated expressions of momentary confusion," on one hand, and "confusion that leads to actual purchasing decisions" on the other. *Id. at 747*. Here too, TFE's evidence is de minimis, and does not rise to the level of actual confusion needed to merit a damages award.

Even if plaintiff were able to put forth more examples of general confusion among its buyers, it would likely nevertheless fail to meet the threshold of actual confusion. In *Lang*, plaintiff received approximately four hundred calls and many letters from persons attempting to contact defendant's magazine. *949 F.3d at 582*. There, the Second Circuit found that such evidence "obviously reflect[ed] some sort of confusion," *id.*, but nevertheless had "no reason to believe that confusion ... could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id. at 583*. There, as here, plaintiff's evidence **[*16]** "fail[s] to demonstrate a genuine issue as to any material actual confusion." *Id.*

ii. *Intent to Deceive*

Although TFE has not demonstrated actual confusion, it may nevertheless be entitled to a rebuttable presumption of confusion if it can show that Hybrid had an intent to deceive. Actual confusion can be inferred if a plaintiff sufficiently shows "that a defendant has intentionally set out to deceive the public." *Res. Dev., 926 F.2d at 140*. The Second Circuit explained the rationale for the rule as follows: "[g]iven the 'egregious nature' of deliberate conduct, 'we see no need to require [plaintiff] to provide consumer surveys or reaction tests in order to prove entitlement to damages.'" *Id.* (quoting *PPX Ent., Inc. v. Audiofidelity Ent., Inc., 818 F.2d 266, 272 (2d Cir. 1987)*).

Here, TFE has not offered a *scintilla* of evidence that Hybrid intended to deceive consumers through the use of the Asserted Marks. Accordingly, it is not entitled to a presumption that actual confusion occurred.

iii. *Reasonable Royalty*

"A plaintiff in a trademark action may recover a 'reasonable royalty' under the heading of actual damages," and here, defendants seek to preclude TFE from doing so. *Gucci Am., Inc. v. Guess?, Inc., 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012)*. "Use of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing **[*17]** relationship that facilitates computation of the reasonable royalty." *Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04-cv-7203, 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006)*. However, courts may grant reasonable royalty damages even in the absence of a licensing agreement between the parties "if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., 858 F. Supp. 2d at 253*. Here, there is no basis whatsoever on which to calculate a reasonable royalty.

First, there is no licensing agreement between TFE and Hybrid from which to calculate a reasonable royalty. Nor is there a "sufficiently reliable basis" from which such an award could be calculated. As set forth above, the sole evidence TFE provides to substantiate its damages claim is a vague, unsupported, bare bones summary of what it claims as royalties and unsigned tax returns. TFE's grossly negligent failure to preserve any documents to substantiate its damages claim along with the speculative nature as to the tax returns' filing status do not suggest reliability in the slightest. Accordingly, summary judgment is granted in favor of Hybrid on the issue of reasonable royalty.

iv. *As applied to the Retailer Defendants*

2022 U.S. Dist. LEXIS 177866, *17

The sheer lack of evidence to substantiate an actual damages claim against Hybrid applies with equal force to the **[*18]** Retailer Defendants, whose connection to the alleged infringement here is even more attenuated than that of Hybrid. Accordingly, summary judgment is also granted in favor of the Retailer Defendants as to plaintiff's claim for damages.

B. *Defendants' Profits*

Other than a damages award, a plaintiff whose marks have been infringed may be awarded the defendant's profits as a remedy. *15 U.S.C. § 1117(a)*. The cornerstone of a profits award is the infringing defendant's mental state. *George Basch Co., 968 F.2d at 1540*. While willfulness is no longer a prerequisite to an award of the defendant's profits for violations of *15 U.S.C. § 1125(a)*, "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 1497, 206 L. Ed. 2d 672 (2020)*. Plaintiff has set forth no evidence, as to defendants' mental state or as to other equitable factors,[1] upon which this Court could justify an award of profits.

TFE has patently failed to demonstrate that Hybrid or the Retailer Defendants acted willfully. A finding of willfulness requires plaintiff to show either "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result **[*19]**

---

[1] Following *Romag Fasteners'* dispensation with the requirement of willfulness for recovery of profits on *§ 1125(a)* claims, on remand the district court applied a series of "principles of equity" factors enumerated in *4 Pillar, 933 F.3d at 214*, and reiterated that "defendant's mental state must be considered in this analysis." *See Romag Fasteners, Inc. v. Fossil, Inc., No. 3:10CV1827 (JBA), 2021 U.S. Dist. LEXIS 81803, 2021 WL 1700695, at *2 (D. Conn. Apr. 29, 2021)*. Other district courts have since followed suit. *See Experience Hendrix, L.L.C. v. Pitsicalis, No. 17 CIV 1927, 2020 U.S. Dist. LEXIS 115075, 2020 WL 3564485, at *5-6 (S.D.N.Y. July 1, 2020), report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix, No. 17 CIV 1927, 2020 U.S. Dist. LEXIS 131030, 2020 WL 4261818 (S.D.N.Y. July 24, 2020); Chanel, Inc. v. WGACA, LLC, et al., No. 18-cv-2253, 2022 U.S. Dist. LEXIS 55880, 2022 WL 902931, at *13 (S.D.N.Y. March 28, 2022)*. Although defendants did not discuss the application of these factors in their briefing, this Court has duly considered them and finds that their application, in light of the lack of evidence submitted by plaintiff, presents no issues of material fact as to whether an award of defendants' profits to plaintiff is justified.

---

of reckless disregard ... or willful blindness." *4 Pillar, 933 F.3d at 210-11* (quoting *Island Software & Comput. Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005)*). Plaintiff's sole assertions that Hybrid acted willfully are as follows: 1) in 1999, when Hybrid first began to use the Asserted Marks, it failed to investigate whether the HYBRID mark and its variations were already in use; and 2) upon the USPTO's rejection of Hybrid's trademark applications, it failed to investigate and continued to use the Asserted Marks and a third party's mark. (Pl. Mem. at 17-18.) To start, the "failure to perform an official trade mark search does not, standing alone, prove that [Hybrid] acted in bad faith." *Savin Corp. v. Savin Corp., 391 F.3d 439, 460 (2d Cir. 2004)* (internal citations and quotation marks omitted). "Nor is prior knowledge of a senior user's trade mark inconsistent with good faith." *Id.* None of the allegations support the notion that Hybrid or the Retailers acted in bad faith. In fact, TFE admits that the only evidence that Hybrid attempted to deceive consumers is the fact that Hybrid uses the HYBRID Mark. (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.) Given the lack of evidence supporting a profits award, summary judgment is granted in favor of defendants on the issue of profits disgorgement.[2]

C. *Unfair Competition*

A claim of unfair competition under New **[*20]** York common law "requires a showing of bad faith or intent." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 598 (S.D.N.Y. 2010), amended on reconsideration* (Mar. 23, 2010); *Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997)* ("Genesee's state law claim of unfair competition is not viable without a showing of bad faith.") (emphasis removed). Use of a counterfeit mark creates a presumption of bad faith only when the defendant is aware of the counterfeiting. *BBK Tobacco & Foods, LLP v. Galaxy VI Corp., 408 F. Supp. 3d 508, 523 (S.D.N.Y. 2019)*. Because the Court has found that TFE has failed to show bad faith on the part of defendants here, its unfair competition claim must fail. Accordingly, summary judgment is granted in favor of Hybrid and the Retailer Defendants as to plaintiff's unfair competition claim.

---

[2] While conceding that fact discovery has long closed, TFE urges the Court to defer deciding whether it is entitled to a profits award until the close of expert discovery. (Pl. Mem. at 12.) What plaintiff does not recognize, however, is that there was never a basis for expert discovery on this issue: there is essentially no evidence that defendants acted willfully, or more broadly, to substantiate an award of their profits at all.

2022 U.S. Dist. LEXIS 177866, *20

**V. Conclusion**

For the foregoing reasons, defendants' motion for partial summary judgment on TFE's claims for monetary relief and unfair competition is GRANTED.

Dated: New York, New York

September 29, 2022

SO ORDERED:

/s/ Sidney H. Stein

Sidney H. Stein, U.S.D.J.

---

**End of Document**

7.  *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 233 (S.D.N.Y. Dec. 22, 2022)

⚠️ Caution
As of: December 9, 2023 11:55 AM Z

## *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*

United States District Court for the Southern District of New York

December 22, 2022, Decided; December 22, 2022, Filed

15 Civ. 10154 (PAE)

**Reporter**
647 F. Supp. 3d 145 *; 2022 U.S. Dist. LEXIS 230852 **

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SURE FIT HOME PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS CORP., and SF HOME DÉCOR, LLC, Plaintiffs, -v- KARTRI SALES CO., INC., and MARQUIS MILLS INTERNATIONAL, INC., Defendants.

**Subsequent History:** Appeal filed, 02/01/2023

**Prior History:** *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., 2018 U.S. Dist. LEXIS 134661, 2018 WL 3773986 (S.D.N.Y., Aug. 9, 2018)*

## Core Terms

infringement, products, patent, trade dress, HOOKLESS, shower curtain, curtain, sales, plaintiffs', royalty, trademark, Hang, rings, hospitality, Licensed, defendants', customers, damages, marks, lost profits, factors, license agreement, parties, disgorgement, secondary meaning, consumer, registered, calculate, intellectual property, manufacturing

**Counsel:** [**1] For Focus Products Group International, LLC, Zahner Design Group, Ltd., Hookless Systems of North America, Inc., Plaintiffs: Lee A. Goldberg, Limor Wigder, Morris E. Cohen, Goldberg Cohen LLP, New York, NY.

For Sure Fit Home Products, LLC, Sure Fit Home Decor Holdings Corp., SF Home Decor, LLC, Plaintiffs: Lee A. Goldberg, Morris E. Cohen, Goldberg Cohen LLP, New York, NY.

For Kartri Sales Company, Inc., Defendant: Bernhard Percival Molldrem, Jr., Law Office of Bernhard Molldrem, Syracuse, NY.

For Marquis Mills, International, Inc., Defendant: Donald J. Cox, Jr., LEAD ATTORNEY, PRO HAC VICE, Law Offices of Donald Cox LLC, Princeton, NJ.

For Kartri Sales Company, Inc, Kartri Sales Company, Inc., ThirdParty Plaintiffs: Bernhard Percival Molldrem, Jr., Law Office of Bernhard Molldrem, Syracuse, NY.

For Kartri Sales Company, Inc., Counter Claimant: Bernhard Percival Molldrem, Jr., Law Office of Bernhard Molldrem, Syracuse, NY.

For Focus Products Group International, LLC, Hookless Systems of North America, Inc., Zahner Design Group, Ltd., Focus Products Group International, LLC, Hookless Systems of North America, Inc., Zahner Design Group, Ltd., SF Home Decor, LLC, Sure Fit Home Decor Holdings [**2] Corp., Sure Fit Home Products, LLC, SF Home Decor, LLC, Sure Fit Home Decor Holdings Corp., Sure Fit Home Products, LLC, Counter Defendants: Morris E. Cohen, Goldberg Cohen LLP, New York, NY.

For Marquis Mills, International, Inc., Marquis Mills, International, Inc., Counter Claimants: Donald J. Cox, Jr., LEAD ATTORNEY, PRO HAC VICE, Law Offices of Donald Cox LLC, Princeton, NJ.

For Kartri Sales Company, Inc., Counter Defendant: Angela Foster, Law Office of Angela Foster, N. Brunswick, NJ; Bernhard Percival Molldrem, Jr., Law Office of Bernhard Molldrem, Syracuse, NY.

For Focus Products Group International, LLC, Hookless Systems of North America, Inc., Zahner Design Group, Ltd., Focus Products Group International, LLC, Hookless Systems of North America, Inc., Zahner Design Group, Ltd., Counter Defendants: Limor Wigder, Morris E. Cohen, Morris E. Cohen, Goldberg Cohen LLP, New York, NY.

**Judges:** PAUL A. ENGELMAYER, United States District Judge.

**Opinion by:** PAUL A. ENGELMAYER

## Opinion

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 100 of 255

Page 2 of 82

647 F. Supp. 3d 145, *145; 2022 U.S. Dist. LEXIS 230852, **2

**[\*168]**

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision sets out the Court's findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52* following a six-day bench trial in this case.

Plaintiffs manufacture, sell, and distribute shower curtains **[\*\*3]** with hookless rings that are coplanar with the curtain. These products have obtained considerable acclaim and commercial traction within the hospitality industry, insofar as they enable shower curtains to be put up more quickly and easily than conventional shower curtains that attach by means of hooks. Plaintiffs claim that defendants have manufactured, sold, and distributed confusingly similar shower curtains, and thus have infringed plaintiffs' utility and design patents, infringed plaintiffs' trademarks and trade dress, and engaged in unfair competition under the Lanham Act and New York law. Plaintiffs further claim that defendants' infringements were willful, warranting enhanced damages. Defendants deny these claims and advance a host of affirmative defenses.

During lengthy pretrial litigation, the Court conducted a *Markman* hearing, resolved many pretrial motions, and entered summary judgment for plaintiffs on their utility patent infringement claims. Trial was held on June 27-29 and July 26-28, 2022. The Court received testimony from 14 witnesses. As to six, called by plaintiffs,[1] the Court received direct testimony by affidavit, followed by live cross and redirect examination.[2] As to nine, **[\*\*4]** the Court heard testimony in wholly live form.[3] The

Court also received testimony, in the form of deposition excerpts, from five witnesses,[4] **[\*169]** and received hundreds of exhibits.[5]

The findings of fact that follow are based on the Court's review of the entire trial record. Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility determinations based on the Court's assessment of, *inter alia*, the relevant witness or witnesses' experience, knowledge, and demeanor.

For the reasons that follow, the Court finds for plaintiffs on all claims tried;[6] dismisses defendants' counterclaims and affirmative defenses; awards plaintiffs lost profits and reasonable royalty damages of $2,938,337, which reflects the trebling of certain damages; and commissions briefing on pre- and post-judgment interest and attorneys' fees.

## I. Findings of Fact

### A. The Parties and Other Relevant Entities

Plaintiff Focus Products Group International, LLC ("Focus Products") was a limited liability company organized under the laws of, and with its principal place of business in, Illinois. Kreilein Aff. ¶ 3; PTX 88. On March 6, 2017, Focus changed its name to Sure Fit Home Décor, **[\*\*5]** LLC ("Sure Fit Home Décor"), also a plaintiff here. Kreilein Aff. ¶ 6; PTX 88 at 3. Plaintiff Sure Fit Décor Holdings Corp. ("SFD Holdings") is a

---

[1] The Court here lists witnesses by the party who presented their direct testimony. A number of witnesses appeared on both sides' witness lists but, at the Court's direction for economy's sake, testified on only one party's case, with unrestricted cross-examination.

[2] These were: Stacy Dubinski, Ryan Erickson, David Kreilein, Charles Kuehne, David Zahner, and Adrian Whipple. Their affidavits are filed at Dkts. 455-2 ("Dubinski Aff."); 455-1 ("Erickson Aff."); 455-3 ("Kreilein Aff."); 454-4 ("Kuehne Aff."); 473-1 ("Zahner Aff."); and 473-2 ("Whipple Aff.").

[3] These were: Robert Burbank, Sandra Kemp, and John Elmore, called by plaintiffs; and Samantha Dolph, Karen Goskowski, Patricia Kubus, David Middleberg, Joseph Ranieri, and Graham Rogers, called by defendants.

[4] For plaintiffs, these were Goskowski, *see* Dkt. 455-6 ("Goskowski Dep. Tr."); Kubus, *see* Dkt. 455-7 ("Kubus Dep. Tr."); Lawrence Mayer, *see* Dkt. 455-5 ("Mayer Dep. Tr."); Middleberg, *see* Dkt. 455-8 ("Middleberg Dep. Tr."); and Ranieri, *see* Dkt. 455-9 ("Ranieri Dep. Tr."). For defendants, this was Mayer.

[5] Citations herein to "PTX" refer to a plaintiff exhibit; "DTX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep," to deposition designations of the person indicated. The Court has reviewed the parties' most recent proposed findings of fact and conclusions of law, *see* Dkts. 494, 500; exhibits; and pertinent letters, *see* Dkts. 454, 475, 480, 481. Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

[6] Plaintiffs' design patent infringement claim was not tried. As explained below, the parties agreed to stay litigation on that claim pending the outcome of a reexamination of that patent's validity by the United States Patent and Trademark Office ("PTO").

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 101 of 255

Page 3 of 82

647 F. Supp. 3d 145, *169; 2022 U.S. Dist. LEXIS 230852, **5

Delaware corporation with a principal place of business in New York City. Kreilein Aff. ¶ 10. Plaintiff SF Home Décor LLC ("SF Home Decor") is a subsidiary of SFD Holdings and a Delaware limited liability company with its principal place of business in Pennsylvania. *Id.* ¶ 9. Plaintiff Sure Fit Home Products, LLC ("SF Home Products") is a subsidiary of SF Home Décor and a Delaware limited liability company with a principal place of business in Pennsylvania. *See* PTX 416. Non-party Hollander Sleep Products acquired the Sure Fit entities in 2021. *See* Dkt. 494 at 3. However, the Sure Fit entities continue to exist. *Id.*

Plaintiffs Zahner Design Group, Ltd. ("ZDG") and Hookless Systems of North America ("HSNA") are affiliated New York corporations each with a principal place of business in New York. Dkt. 323 ("JPTO") at 12. Non-party David Zahner, who invented the hookless shower rings forming the basis of this intellectual property dispute, wholly owns ZDG and HSNA.[7] *Id.*

Non-party Arcs and Angles, Inc. ("A&A Inc.") was a corporation registered and **[**6]** with its principal place of business in New **[*170]** York.[8] Non-party Arcs & Angles, LLC ("A&A LLC") was a limited liability company. On July 9, 2004, HSNA exclusively licensed its rights in the hookless shower ring patents to A&A Inc. PTX 387 at 1-14. On December 22, 2010, A&A Inc. assigned those rights to A&A LLC. *Id.* at 23-24. On October 10, 2012, Focus acquired A&A LLC and its intellectual property rights. *Id.* at 28-29; *see also* Dkt. 297 at 3 ("SJ Op.").

Defendant Kartri Sales Company, Inc. ("Kartri") is a Pennsylvania corporation with its principal place of business in Forest City, Pennsylvania. JPTO at 12; Tr. at 626.

Defendant Marquis Mills International, Inc. ("Marquis") was a New Jersey corporation with its principal place of business in New Jersey that went out of business in 2020. JPTO at 12; Tr. at 576. Marquis manufactured and sold the accused shower curtains to Kartri, which sold these to resellers, mostly in the hospitality market. Middleberg Dep. Tr. at 96; Kubus Dep. Tr. at 14-15.

Non-party Carnation Home Fashions, Inc. ("Carnation") once owned the EZ-ON Mark pertinent to the trademark infringement claims here.

Non-party Star Linen, Inc. ("Star Linen") is a company that resells **[**7]** Kartri's products to the hospitality and healthcare industries. Tr. at 549. Middleberg worked in acquisitions for both Marquis and Star Linen. *Id.*

Non-party Ramtex is a manufacturer of hospitality products based in Shaoxing, China. It assisted Marquis in manufacturing the accused shower curtains. Middleberg Dep. Tr. at 46-47. Non-party Pong Hsu ("Pong") is an individual employed by Ramtex in 2012 and 2013. *Id.* at 58. Pong had formerly worked for Waytex, a manufacturer that supplied the HOOKLESS® product to Focus and its predecessor A&A LLC. Pong had been a "part of [Focus's] product development team and .. . manufacturing team." Tr. at 554.

## B. Witnesses

Plaintiffs' witnesses were Burbank, Sure Fit's CEO; Dubinski, who from 2018 to May 2022 held leadership roles in marketing and branding for Sure Fit Home Décor and Hollander Sleep; Erickson, Sure Fit's vice president of mass-market retail sales; Kemp, Focus's former senior vice president of hospitality; Kreilein, Focus's former executive vice president; Kuehne, Focus's former CFO; Whipple, Sure Fit's CFO; Zahner; and Elmore, a damages expert.

Defendants' witnesses were Dolph, Kartri's sales operations manager; Goskowski, Kartri's co-owner **[**8]** and president; Kubus, Kartri's co-owner and president of sales and marketing; Mayer, Carnation's former owner; Middleberg, Marquis's director of global operations and president of Star Linen; Ranieri, Marquis's owner; and Rogers, a damages expert.[9]

---

[7] The Court will refer to all plaintiffs collectively as "plaintiffs," to Focus Products and all its successor entities by the shorthand "Focus," and to all the Sure Fit entities as "Sure Fit."

[8] *See Arcs & Angles, Inc. v. Carnation Home Fashions, Inc.,* No. 09 Civ. 1467 (JPO) (FM) (S.D.N.Y. Feb. 18, 2009), Dkt. 1 ¶ 1.

[9] The Court found plaintiffs' witnesses consistently credible and relevant. The Court found the testimony of Kemp, who between 2008 and 2020 occupied a series of positions germane to this controversy, particularly illuminating and has drawn on it heavily. In 2008, Kemp was Focus's director of operations, overseeing the retail and hospitality distribution channels, and a member of the team that acquired Arcs & Angles Inc., which then held the intellectual property at issue. Tr. at 212-14, In late 2010 or January 2011, Kemp took charge of Focus's hospitality business. *Id.* at 214. From then until her 2020 retirement, Kemp served, sequentially, as vice president, senior vice president, and general manager of Focus and its successor entities.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 102 of 255

Page 4 of 82

647 F. Supp. 3d 145, *170; 2022 U.S. Dist. LEXIS 230852, **8

**[*171]  C. The Intellectual Property in Dispute**

**1. The Patents**

ZDG owns the four patents at issue—one design patent and three utility patents. Zahner Aff. ¶¶ 2-3.

The first is Design Patent No. D746,078, entitled "Shower Curtain" (the "'078 Patent" or "Design Patent"). It covers the design of the shower curtain ring that is worked into the shower curtain at the curtain's upper edge. It looks like this:



**FIG. 1**

The second patent is Utility Patent No. 6,494,248, entitled "Suspended Materials Having External Slits," (the "'248 Patent"). PTX 3 at 1. The '248 Patent's abstract describes it as "openings each having a slit therein for attachment to a fixed rod,... reinforced with rings having projecting flanges .. . [which] make[] it easier to open up the ring" and thus "facilitate the placement of [a shower] curtain upon the fixed rod." *Id.* It looks like this:

(anh)

*See id.* at 5.

The third and fourth patents are Utility Patent Nos. 7,296,609, entitled "Hanging Products" (the "'609 Patent"), PTX 4 at 1, and 8,235,088, entitled "Hanging Products," **[**9]** (the "'088 Patent"), PTX 5 at 1. The abstracts for these patents describe them as "[h]anging products" with "an opening for suspending the item from a rod," where each opening is strengthened "with a ring having a gap," and the ring contains "a movable member for opening and closing the gap." PTX 4 at 1; PTX 5 at 1.

Relevant here, the '248 Patent claimed an "approximately horizontal component," that is, a slit, when the shower curtain "is **[*172]** hanging from the rod," Dkt 148-2 at 13; the '609 Patent claimed a ring that included "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of the shower curtain ring, and that "projecting edge . .. [is]

provided next to said slit," Dkt. 148-3 at 15; and the '088 Patent similarly claimed "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of the shower curtain ring, Dkt. 148-4 at 15. ZDG has exclusively licensed each of these patents to Focus Products and Sure Fit through its affiliate HSNA. *See* PTX 89; Kreilein Aff. ¶ 4. Sure Fit sells shower curtains incorporating the patented inventions in the hospitality industry throughout the United States.

In its summary judgment decision on April 16, 2020, the **[**10]** Court held that defendants had infringed plaintiffs' three utility patents. *See* SJ Op.

**2. The EZ-ON Trademark and HOOKLESS® Trademark**

The design patent and utility patents are incorporated into shower curtains and sold under the HOOKLESS® Trademark ("Hookless Mark") and the EZ-ON Trademark ("EZ-ON Mark") (collectively, the "Marks"). The HOOKLESS® Mark is registered with the PTO. It was registered to its inventor Zahner's company ZDG, initially under U.S. Trademark Registration number 2,355,554 (Principal Register), and then under the numbers 2,381,995 (Supplemental Register) and 4,127,283 (Principal Register). *See* PTXs 84, 86, 520. The EZ-ON Mark was not registered with the PTO as of the date this suit was filed. On September 26, 2017—within defendants' challenged conduct—it was registered to ZDG on the Principal Register under U.S, Trademark Registration number 5,296,144.[10] PTX 113.

Plaintiffs' HOOKLESS® product, as sold in curtains, looks like this:

**[*173]**



The '248 Patent

**FIG. 20**

Plaintiffs' EZ-ON product, sold by Carnation pursuant to

---

[10] The Court will refer to the EZ-ON Mark as "EZ-ON," not "EZ-ON®."

647 F. Supp. 3d 145, *173; 2022 U.S. Dist. LEXIS 230852, **10

a sublicensing agreement with Focus, looks like this:

 

PTX 270 excerpt (EZ-ON shower curtain product, as sold by Carnation).

### 3. Plaintiffs' Trade Dress

Plaintiffs claim that they have trade [**11] dress rights in the overall appearance of shower curtains sold under the HOOKLESS® and EZ-ON brands (the "Trade Dress"). Plaintiffs circumscribe the scope of their claimed trade dress by four factors:

(1) a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

(2) and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially coplanar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

(3) wherein each ring includes a slit or gap in the ring;

(4) and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

Dkt. 148 ¶¶ 104-105; *see also* Erickson Aff. ¶ 28 (quoting same).

[*174] The claimed Trade Dress, plaintiffs [**12] clarified at trial, does not reach all shower curtains that do not contain hooks above their upper edge. It does not, for example, reach the Zenna Home Quik Hang Peva shower curtain, which contains rings partially embedded in the curtain's upper edge and partially jutting out above the edge, Erickson Aff. ¶ 31, and looks like this:



Partial screenshot of Dkt. 303-7. The protruding rings, plaintiffs explain, put the Zenna design outside of the first element of plaintiffs' Trade Dress—"lack[ing] any hooks protruding above the upper edge of the curtain." Erickson Aff. ¶ 34.

Similarly, plaintiffs disavow that their claimed Trade Dress covers products by Croydex, which include hooks preinstalled on the shower curtain to facilitate the installation of the shower curtain. *Id.* ¶ 36, Also outside the parameters of the claimed Trade Dress is a shower curtain named "InterDesign" that, lacking hooks, is affixed to the shower rod by buckles that hang from the rod and snap onto the shower curtain below. *See* PTX 132; *see also* PTX 131 (Brown design, similar). So, too, are a Pierce product that uses clips that protrude above the curtain's upper edge, *see* PTX 133; a Fields design that functions like a [**13] pull-down window shade and does not rely on hooks or rings, *see* PTX 129; and a Giumarra hookless spiral-notebook-like design in which rings, perpendicular to the curtain's surface and protruding above its edge, are threaded onto the rod, *see* PTX 130, Plaintiffs state that their Trade Dress does not constrain those non-hooked shower curtain designs, which have been sold commercially by Focus's competitors.[11]

As Erickson testified, plaintiffs' claimed Trade Dress leaves room for various forms of shower curtain designs that enable easier installation than installing hooks. Tr. at 176 ("Croydex and Zenna have pre-installed rings, . . . or a mechanism to suspend or hang or put that shower curtain on the shower curtain rod.").[12]

---

[11] The Zenna design has been commercialized by Maytex Mills, Erickson Aff. ¶ 33. The Croydex design has been commercialized by QK Supplies in the United Kingdom, *id.* ¶ 37.

[12] Some of Zahner's own designs fall outside Focus's claimed Trade Dress. For example, Figures 15, 16, and 17 of the '248 Patent protrude above the curtain's upper edge. *See* PTX 134.

647 F. Supp. 3d 145, *174; 2022 U.S. Dist. LEXIS 230852, **13

**[\*175]  4. Defendants' Accused Ezy Hang Product**

The product accused of infringement here is the shower curtain ring and corresponding curtains defendants have manufactured and sold under the unregistered "Ezy Hang" mark. Marquis manufactures and sells the accused curtain to Kartri. Kartri brands the accused curtains as "Ezy Hang" and resells them to distributors and end users in the hospitality market. The accused products look like this:



PTX 26, Kartri's Accused Product No. **[\*\*14]** I (excerpt of image).



PTX 27 Karti's Accused Product No. 2 (excerpt of image).

**D. Kartri's and Marquis's Businesses and Relationship**

Kartri was founded in 1975 and incorporated in 1979. Tr. at 626-28. It is operated by—and its name is derived from the first names of—Karen Goskowski and Patricia ("Trish") Kubus, sisters who in 2005 took over Kartri from their father. *Id.* at 630,633-34. Kartri manufactures the Ezy Hang product in its facility in Forest City, Pennsylvania, and through a contractor in Mexico and stores that supply in an Arizona warehouse. *Id.* at 656-57.

Marquis is an importer and supplies to Kartri. PTX 297 ("Elmore Rep.") ¶ 31. The two entities had a longstanding business relationship predating the challenged conduct. *See* Tr. at 551. Marquis sources its products, *inter alia*, from Ramtex in China. *Id.* at 589. Marquis provided fully finished curtains to Kartri. *Id.* at

712. Kartri would manufacture more individualized headers—the top part of the curtain containing the rings. *See id.* at 642-43. Until the challenged conduct began, Marquis and Kartri manufactured and sold traditional, hooked shower curtains. They then sought to compete with Focus's HOOKLESS® product in the hospitality **[\*\*15]** market, which had significantly shifted the hospitality market "in the direction of hook-free curtains," *id.* at 660, and in which Focus had established a dominant market share, **[\*176]** *see, e.g., id.* at 472,511,743. This set the stage for the parties' commercial—and now legal—battle.

**E. Plaintiffs' Claims, Defendants' Counterclaims, and Rulings Narrowing the Issues to Be Tried**

Plaintiffs' claims are in five categories: (1) against both defendants, for infringement of plaintiffs' utility and design patents under *35 U.S.C. §§ 101 et seq.*; (2) against both defendants, for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under *15 U.S.C. § 1125(a)*; (3) against Kafiri, for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under *15 U.S.C. § 1125(a)*; (4) against both defendants, for unfair competition with plaintiffs' EZ-ON Mark and Trade Dress under New York law; and (5) against Kartri, for unfair competition with plaintiffs' HOOKLESS® Mark under New York law. Plaintiffs seek damages on the patent infringement claims and all infringement and unfair competition claims as they relate to the EZ-ON Mark and the Trade Dress, but not on the infringement claims relating to the HOOKLESS® Mark. Plaintiffs seek **[\*\*16]** injunctive relief on their Lanham Act and unfair competition claims, attorneys' fees, and pre- and post-judgment interest.

Defendants have raised affirmative defenses of lack of statutory standing, failure to join an indispensable party, non-infringement of plaintiffs' EZ-ON Mark, invalidity of plaintiffs' EZ-ON Mark, non-infringement of plaintiffs' trade dress, and invalidity of plaintiffs' trade dress.

Rulings on summary judgment and on motions *in limine* pruned the issues to be tried:

• In an April 16, 2020 decision, the Court granted summary judgment to plaintiffs on the claim that defendants infringed the utility patents ('248, '609, and '088), leaving unresolved whether the infringements were willful. *See* Dkts. 297 at 31;

312.[13]

• The parties later agreed to stay plaintiffs' claim
that defendants infringed the fourth, design patent
('078)—and with it, Marquis's first counterclaim
alleging non-infringement of that patent, and
seventh counterclaim alleging the '078 patent's
invalidity—in light of reexamination proceedings
initiated by Kartri at the PTO as to that patent. See
PF at 4, 7-8.

• In a January 4, 2021 decision, the Court ruled that
plaintiffs' trade dress is non functional, see Dkt. 312
at 7-8, thereby **[\*\*17]** establishing that element of
plaintiffs' trade dress infringement claim.[14]

**[\*177]** Accordingly, the following claims were left for
resolution at trial:

• On plaintiffs' claims that both defendants infringed
the EZ-ON Trademark under the Lanham Act and
engaged in unfair competition with that Mark under
the Lanham Act and New York state law, the issues
of liability, damages, and injunctive relief;

• On plaintiffs' claim that Kartri infringed the
HOOKLESS® Mark under the Lanham Act and
engaged in unfair competition with that Mark under
the Lanham Act and New York state law, the issues

of liability and injunctive relief;

• On plaintiffs' claim that defendants infringed
plaintiffs' trade dress under the Lanham Act and
engaged in unfair competition under the Lanham
Act and New York state law, the issues of liability,
damages, and injunctive relief;

• On defendants' infringement of the '248, '609, and
'088 patents, the issue whether defendants'
infringement was willful, and the tabulation of
damages; and

• On all claims, the issue of reasonable attorneys'
fees, to be briefed and decided in post-trial
proceedings.

The following defenses and counterclaims were also left
for resolution at trial:

• The defense that plaintiffs lack standing to bring
its **[\*\*18]** claim that defendants infringed the EZ-
ON Mark, in light of non-party Carnation's alleged
ownership of the intellectual property at issue here,
and the related defense that plaintiffs failed to join
Carnation as an indispensable party;

• Marquis's ninth counterclaim alleging invalidity of
the EZ-ON Mark;

• Marquis's second counterclaim alleging non-
infringement of the EZ-ON Mark;

• Marquis's eleventh counterclaim alleging invalidity
of plaintiffs' Trade Dress; and

• Marquis's second counterclaim alleging non-
infringement of plaintiffs' Trade Dress.

## F. History, Ownership, and Licensing of the Intellectual Property at Issue

### 1. 1992-1997: Zahner's Invention, the '232 Patent, Early Commercialization Efforts, and "Game-Changtingl" Success

In or about 1992, Zahner conceived of inventing a
hookless shower curtain ring. Zahner Aff. ¶¶ 5-6, 68;
see also id. ¶ 69 ("I began experimenting with various
shower curtain designs. My goal was to create a design
that was both easy to install and aesthetically
attractive."). Developing the invention involved manual
labor, experimentation with rudimentary materials, and
refinements by trial and error. Id. ¶¶ 70-72. On May 18,
1992, Zahner filed an application to patent **[\*\*19]** his
invention with the PTO. PTX 303. On February 16,
1993, the PTO granted the application, under the
original '232 Patent. Id.

---

[13] The Court also granted summary judgment for plaintiffs on
(1) Kartri's first counterclaim alleging tortious interference and
monopolization; (2) Marquis's first counterclaim alleging non-
infringement of the utility patents; (3) Marquis's fourth
counterclaim alleging invalidity of the '248 patent; (4)
Marquis's fifth counterclaim alleging invalidity of the '609
patent; (5) Marquis's sixth counterclaim alleging invalidity of
the '088 patent; (6) Marquis's eighth counterclaim alleging
patent misuse; and (7) Marquis's tenth counterclaim alleging
the invalidity of the HOOKLESS® trademark. See Dkt. 297 at
32.

[14] On May 14, 2021, the Court dismissed defendants'
affirmative defense that plaintiffs lack patent standing. Dkt.
365. And on August 5 and November 23, 2021, in bench
rulings resolving motions in limine, the Court precluded as
abandoned or forfeited, these affirmative defenses: (1)
nominative fair use and descriptive fair use of plaintiffs'
trademarks; (2) equitable estoppel and unclean hands; and (3)
all other affirmative defenses not timely raised. See Dkts. 412,
436. The parties have dismissed, on consent, Marquis's third
counterclaim alleging patent invalidity for alleged lack of
inventorship, and its second counterclaim alleging the non-
infringement of the HOOKLESS® trademark. See Dkt. 297 at
31; PF at 7; Dkt. 412 (bench ruling resolving plaintiffs' motions
in limine); 436 (bench ruling resolving defendants' motions in
limine).

647 F. Supp. 3d 145, *177; 2022 U.S. Dist. LEXIS 230852, **19

For three or four years, Zahner attempted to commercialize his invention by meeting with investors and manufacturers. Those efforts failed. Zahner Aff. ¶¶ 77-82. In June 1996, Zahner joined forces with John Benis and Teddy Marcus to form **[*178]** HSNA. *Id.* ¶¶ 83-84. Benis supplied capital; Marcus was HSNA's marketing and sales expert. *Id.* ¶ 85. As of that time, Zahner testified, the idea of a curtain that attached without hooks was novel: "[N]o one had ever seen anything like that before. . . It [had been] just, you know, shower curtains with hooks." Tr. at 121. By 1997, that three-person team, operating as HSNA, was seeking to market Zahner's hookless shower curtain technology. Zahner Aff. ¶¶ 86-89.

At some time between 1997 and 1999, Marcus pitched Zahner's technology to Kartri. *Id.* ¶ 89; Tr. at 724-25. Then a small company, Kartri declined. Zahner Aff. ¶ 91; Tr. at 725-26. After approximately a year of refining and pitching the product, and having spent $250,000 in research and development, Zahner Aff. ¶¶ 94, 99, HSNA made its first sale to Gracious Home, a retail store in New **[**20]** York City, *id.* ¶ 103.

Zahner's product soon swept the hospitality market, until then dominated by traditional hooked curtains. Focus's Dubinski termed it "revolutionary" and "a game changer." Dubinski Aff. ¶ 12. The design was "innovative," neat, and "unique," *id.* ¶¶ 12, 20; it saved hospitality providers installation time and reduced workers' compensation claims from injuries sustained installing hooked curtains, which required effort and balance. Kartri's Kubus acknowledged that HOOKLESS® was "known in the industry . . . [I]t saves the housekeeper time and money to put this product up. It's just known. [Zahner has] done really well in that marketing direction." Kubus Dep. Tr. at 52-53.

The Court found illuminating two videos of live demonstrations of the HOOKLESS® products' ease of installation. These showed ZDG's Marcus installing the HOOKLESS® curtain on the telemarketing channel QVC. In each, Marcus snaps into place, with ease and in about 10 seconds, a HOOKLESS® curtain on a rod. *See* PTXs 471, 472 (video exhibits). The symmetric placement of the curtain's slits—connecting pairs of adjacent rings—ensured that the curtain billowed uniformly across the curtain rod. As installed, the **[**21]** curtain had a "neat" appearance consistent with plaintiffs' claimed trade dress. The video demonstrations made apparent the efficacy of the HOOKLESS® product relative to conventional shower curtains, and its appeal to hotel and motel chains that must install and remove

shower curtains in bulk daily.

## 2. The HSNA-A&A License Agreement and Its Chain of Transfers

On March 2, 1999, ZDG licensed all of its patent, trademark, and trade dress rights (the "Intellectual Property Rights") to HSNA. DTX 89.

On June 6, 2000, ZDG registered the Hookless Mark with the PTO, turning HSNA's common law rights in the previously unregistered Hooldess Mark into the rights under the Lanham Act accorded to a registered trademark. PTX 84. On May 31, 2004, HSNA licensed its intellectual property rights to Arcs and Angles, Inc. PTX 387 ("HSNA-A&A License Agreement") at 1; Zahner Aff. ¶ 337. On May 16, 2008, Arcs & Angles, Inc. was acquired by Arcs & Angles Holdings, LLC, which owned Focus. PTX 268; Zahner Aff. ¶¶ 345-346, Tr. at 214. Kemp, Focus's then-director of operations, *id.* at 212-13, testified that Arcs & Angles Holding, LLC acquired "all the assets, the inventory, open receivable records, everything," *id.* at 214. **[**22]** Focus thus controlled Arcs & Angles Holdings, LLC, Arcs & Angles, Inc., and the Intellectual Property Rights associated with Zahner's invention.

On December 14, 2010, Focus transferred the Intellectual Property Rights to **[*179]** Arcs & Angles, LLC. PTX 387 at 23-24. Zahner executed the amendment to the HSNA-A&A License Agreement on HSNA's behalf. *Id.*; Zahner Aff. ¶¶ 347-348. On October 10, 2012, Focus transferred the Intellectual Property rights to itself, that is, Focus Products Group International LLC. PTX 387 at 28-29; Zahner Aff. ¶¶ 350-351. This amendment to the HSNA-A&A License Agreement was executed by Zahner. PTX 387 at 29; Zahner Aff. ¶ 352; Kreilein Aff. ¶ 4.

On March 6, 2017, Focus was renamed Sure Fit Home Decor LLC. PTX 88 at 3; Kreilein Aff. ¶¶ 5-6. On July 13, 2017, Sure Fit Home Decor sold its license in the Intellectual Property Rights to SF Home Decor LLC. PTX 89; Kreilein Aff. ¶¶ 8-9. There were no further transfers of the Hookless Trademark and the Trade Dress or relevant licensing agreements.[15]

---

[15] ZDG has entered into license agreements with other companies that are not at issue here. *See, e.g.,* Tr. at 124 (Zahner, testifying about license agreement with On The Right Track).

647 F. Supp. 3d 145, *179; 2022 U.S. Dist. LEXIS 230852, **22

### 3. The EZ-ON Trademark, Plaintiffs' Dispute with Carnation, and the Carnation Licensing Agreement

The parties dispute whether the unregistered EZ-ON Mark was among the Intellectual **[\*\*23]** Property Rights subject to the series of transfers above. The history of that mark is complicated, on the one hand, by a course of dealings between ZDG and A&A, and on the other, third party Carnation, which had originally owned and used that then-unregistered mark. The Court here sets out the facts bearing on the ownership of the EZ-ON Mark. These are context for the Court's finding, *infra*, that, by the time Kartri's sales of the accused products began in 2013, plaintiffs, not Carnation, owned the EZ-ON Mark.

The EZ-ON Mark was undisputedly originally used and commercialized by Carnation. Until 2008, ZDG and A&A had produced hookless shower curtains under their FLEX-ON Trademark, registered with the PTO under the number 2,948,547 (the "FLEX-ON Mark"). *See* PTX 532. Carnation's owner and president, Lawrence Mayer, testified that Carnation had sold hookless shower curtain products under the unregistered EZ-ON Mark since 2009. Mayer Dep. Tr. at 15, 33. In fact, a letter adduced in discovery establishes that Carnation's use of this mark dated back to at least 2008. *See* PTX 360. The letter, dated December 16, 2008, is from counsel for ZDG and A&A to Carnation. It challenges Carnation's **[\*\*24]** use of the EZ-ON Mark. *See id.* ZDG and A&A there claimed that Carnation's sale of shower curtains under the EZ-ON Mark imitated their FLEX-ON Mark, was likely to cause consumer confusion between the two, and likely infringed ZDG's three utility patents. *Id.* The letter directed Carnation to cease the alleged infringement. *Id.* Carnation refused.

On February 18, 2009, ZDG and A&A filed suit against Carnation in this District for patent infringement and unfair competition. *See Arcs & Angles, Inc,* No. 09 Civ. 1467. On February 1, 2012, the parties resolved that lawsuit via a settlement agreement, PTX 390, and a separate licensing agreement, PTX 370 ("Carnation Licensing Agreement").

Salient here, the Carnation Licensing Agreement in § 4.1 granted Carnation a license to sell the shower curtains that had given rise to the dispute; in § 4.2 granted A&A a "sublicense" to Carnation to use intellectual property associated with these products, including the EZ-ON Trademark; and in § 5.3 required Carnation to assign any newly conceived, commercialized, or registered intellectual property not **[\*180]** explicitly covered in §§ 1.6-1.9 to ZDG and HSNA. More fully, the Carnation Licensing Agreement contained these provisions, among others:

> **Section 1.6 (definition [\*\*25] of "Licensed Products")**: The 'Licensed Products' shall be defined herein as shower curtains having integrated rings of the form depicted in Appendix A. The term Licensed Products shall also include any rings having a substantially similar appearance to that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +/- 15 degrees from that shown in Appendix A.

Appendix A looks like this:

### Appendix A



PTX 370 at 13.

> **Section 1.7 (definition of "Licensed Patents")**: The 'Licensed Patents' shall be defined herein as all patents and patent applications licensed by [Arcs & Angles, LLC] from HSNA pertaining to the Licensed Products that are issued, pending or filed in the future [worldwide]. The Licensed Patents include, but are not limited to, [patents '248, '609, and '402]; any divisions, reissues, reexaminations, continuations, continuations-in-part, extensions thereof, and all foreign counterparts thereto.

> **Section 1.8 [\*\*26] (definition of "Licensed Trademarks")**: The "Licensed Trademarks" shall include U.S. Trademark Registration No. 2,381,995 for HOOKLESS®; U.S. Trademark Application No. 77/878,05 for HOOKLESS, and CTM Trademark Registration No. 847,355 for HOOKLESS®.

> **Section 1.9 (definition of "Intellectual Property")**: The "Intellectual Property" shall be

defined herein defined as the Licensed Patents and the Licensed Trademarks.

**[*181]** *Section 4.1 (non-exclusive sublicense to Carnation)*: [Arcs & Angles, LLC] hereby grants Carnation, upon and subject to all the terms and conditions of this Agreement, a sub-license under the Intellectual Property to make, have made on its behalf, use, import, offer for sale, have offered for sale on its behalf, sell, have sold on its behalf, and export, the Licensed Products [worldwide] for the Term of this Agreement. Such sublicense to Carnation is non-exclusive with respect to ZDG's current licensees, namely, HSNA [and A&A LLC].

*Section 4.2 (rights sublicensed to Carnation)*: As part of said sublicense, [A&A LLC] hereby grants sub-licensee the right to use the following trademark on the Licensed Products: 'EZ ON Shower Curtain'; and also may use the phrase 'with patented HOOKLESS® **[**27]** technology' in small print . . . However, sub-licensee shall not use the trademark HOOKLESS® as a brand name for the Licensed Products.

*Section 4.3*: Carnation shall provide an example of a pre-production proof or sample of any Licensed Products, packaging, advertising, or other marketing or promotional material to A&A [LLC] before commercialization[.]

*Section 4.4*: This section restricts Carnation's sublicense to sell to retailers.

*Section 4.5*: This section prohibits Carnation from sublicensing, transferring, or assigning its rights under the Carnation License Agreement to another party.

*Section 5.3 (assignment of newly registered intellectual property to ZDG)*: In the event that any intellectual property falling within the scope of Licensed Patents, Licensed Trademarks, or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by sublicensee during the term of this agreement, such additional intellectual property shall be assigned to ZDG and deemed included within the scope of the present agreement.

PTX 370. By the time the Carnation Licensing Agreement was executed on February 7, 2012, A&A Inc. had assigned its intellectual property **[**28]** rights to A&A LLC. On October 10, 2012, Focus acquired A&A

LLC and, with it, A&A LLC's intellectual property rights under the Carnation Licensing Agreement. *See* PTX 387 at 28-29.

The parties dispute whether, upon execution of the Carnation License Agreement in February 2012, A&A (and soon thereafter Focus) or Carnation owned the EZ-ON Trademark. Plaintiffs advance two arguments as to why ownership rights in the EZ-ON Mark vested in them from the moment the agreement was executed. First, § 4.2's provision that Arcs & Angles, LLC "grant[ed] sub-licensee [*i.e.*, Carnation] the right to use" the Mark "EZ ON Shower Curtain" and the phrase "with patented HOOKLESS® technology" on the packaging of the EZ-ON curtain supports the inference that Arcs & Angles owned the EZ-ON Mark. That is because plaintiffs could not grant a sublicense to Carnation in a mark that plaintiffs did not own. Second, § 5.3 created an obligation for Carnation to assign to ZDG any "intellectual property" not captured by §§ 1.7 and 1.8 that was "conceived, reduced to practice, or developed, or [on which] a patent or trademark application is filed for by [Carnation] during the term of [the Carnation Licensing Agreement]." **[**29]** Insofar as the EZ-ON Mark, which was not registered until Carnation received a registration from the PTO on September 26, 2017, PTX 113, fell outside the "Intellectual Property" defined in the agreement as later registered, this was covered by § 5.3 and was **[*182]** assigned to ZDG pursuant to that provision.

Defendants counter with three arguments. First, they note that Carnation—specifically its CEO Mayer—subjectively continued to believe, after the agreement, that it owned the EZ-ON Mark, both before and after its registration in September 2017. Defendants ask that Carnation's understanding be credited. Second, they argue that § 4.2 should be read not as a licensing by plaintiffs to Carnation of the right to use the EZ-ON mark, but as vesting ownership of those rights in Carnation. And third, they assert, § 5.3 does not change this result, because it does not include the EZ-ON Mark. The Court resolves this dispute *infra*, in plaintiffs' favor, in the course of rejecting Marquis's affirmative defense that plaintiffs lack standing under the Lanham Act to pursue the EZ-ON trademark infringement claim because they purportedly did not own the EZON Mark.

In the years after the agreement, a disagreement arose **[**30]** between Focus and Carnation as to who owned the EZ-ON Mark. Focus, understanding the agreement to vest ownership of the mark in A&A, upon its acquisition by A&A began to sell shower curtains

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 109 of 255
Page 11 of 82

647 F. Supp. 3d 145, *182; 2022 U.S. Dist. LEXIS 230852, **30

using the EZ-ON Mark. Kreilein Aff. ¶ 14; Erickson Aff. ¶ 14. Zahner, who signed the agreement, Tr. at 131, testified at trial that he understood "that once this agreement was executed, [ZDG] would own the rights to the EZ ON shower curtain trademarks . . . and [ZDG] would license it [to HSNA] Systems, and [HSNA] would license it back to Carnation," *id.* at 126. Carnation, however, took a different view, and on March 3, 2017, issued a cease-and-desist letter to Focus objecting to Focus's usage of the EZ-ON Mark. DTX 127 (Carnation letter); Kreilein Aff. ¶ 15. Carnation proposed to consent to Focus's usage if Focus made payments to it. DTX 127; Kreilein Aff. ¶ 15. In this litigation, Carnation's president and owner, Mayer, gave deposition testimony in November 2018, in which he admitted he was "not sure" which entity owned the EZ-ON Mark following execution of the Carnation Licensing Agreement, Mayer Dep. Tr. at 31-32, but refused to concede that plaintiffs owned it, *see, e.g., id.* at 111. From his **[**31]** perspective, the Carnation Licensing Agreement had allowed Carnation "to get out of the [protracted] lawsuit," while "creat[ing] a little space that would permit [Carnation] to sell the [EZ-ON] product." *Id.* at 31.

On September 29, 2021, Carnation and Focus's successor, Sure Fit, resolved their dispute over who owned the EZ-ON Mark, executing an amendment to the Carnation Licensing Agreement that assigned all rights to the EZ-ON Mark to ZDG. On October 1, 2021, plaintiffs filed a letter attaching that amendment, *see* Dkt. 414-1 at 14-15; *see also* PTX 113 (registration of EZ-ON Trademark under number 5,296,144 with PTO to ZDG), and Carnation recorded that assignment with the PTO. Dkt. 414-2. This Court held that it would not consider the September 2021 amendment as evidence as to who had owned the EZ-ON Mark at the time of the Carnation License Agreement, as the agreement was entered into after discovery had closed. Tr. at 6-7.

## G. Advertising, Promotion, and Recognition of Plaintiffs' Products

In 1997, HSNA began promoting Zahner's shower curtain products. On March 30, 1998, shortly after HSNA began selling these through the retail store Gracious Home, *New York Magazine* featured the products **[**32]** in its "Best Bets" column. PTX 543 at 2. Zahner's hookless products gained national exposure on QVC, in a segment for new products called "The Big **[*183]** Time." Zahner Aff. ¶¶ 109-110. In it, Zahner's products competed with other new products—and won. *Id.* ¶ 112. HSNA received positive feedback from those

appearances and presented its Hookless products several more times on the QVC segment "Today's Special Value." *Id.* ¶¶ 115-118. In 2000, HSNA entered into a sales licensing agreement with the home furnishing company CHF Industries, Inc. PTX 368.

HSNA's successors-in-interest A&A Inc., A&A LLC, Focus Products, and Sure Fit, widely advertised their shower curtains through various channels. From 2008 on, Focus "did television ads, print ad[]s, trade shows, catalogs, websites, distributor buying guides, et cetera," Tr. at 217 (Kemp), plus physical flyers and website banners, *id.* at 237; *see also id.* at 227.

Focus and its predecessors have also heavily advertised their shower curtain products on TV. Between 1997 and 2005, HSNA promoted plaintiffs' shower curtain products on QVC. Between 2005 and 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC. *See* Tr. at 227; PTX 521 **[**33]** at 117 (listing TV appearances). Sales followed: Kemp testified that the Hooklesse product "broke records. . . . They ran through the stock. . . . In fact, QVC continuously asked to air it because the product did so well for them." Tr. at 229. Focus's television marketing included the videos in which Marcus quickly installed the product onto a shower curtain rod, *see* Tr. at 228-30 (video demonstrated); PTXs 471,472 (video exhibits), and advertisements that began to appear around 2011, Tr. at 230; PTX 470. Plaintiffs today continue to promote the products on QVC, Tr. at 227 (Kemp); *see also* PTX 469,470 (video exhibits), exposing the products to millions of viewers. Zahner Aff. ¶ 155.

In the retail market, A&A LLC promoted the HOOKLESS® shower curtains for their "ease of installation"; "ten second[]" installation time, PTX 547; the absence of missing or broken rings, "draping perfectly [and] sliding effortlessly," PTXs 547, 552, 560; the reduced "hassle" of changing shower curtains, PTX 548; "install[ation] like magic in just seconds" with "no need to remove the rod," PTX 552; and lower maintenance costs and increased safety, satisfaction, and morale among hospitality and housekeeping **[**34]** staff, PTX 550, 559. *See also* PTX 554 (reduced labor costs due to reduced installation time), 561 (same), 562 (same), 549, 553, 555, 558. Focus, after acquiring A&A LLC's intellectual property rights, similarly touted the products as [s]imple and dependable, . . . install[ing] in seconds, eliminat[ing] snags, and draw[ing] perfect folds in the curtain." PTX 121. By 2013, Focus asserted, its HOOKLESS® shower curtain had been "a fixture in

647 F. Supp. 3d 145, *183; 2022 U.S. Dist. LEXIS 230852, **34

retail for a decade." *Id.*

On the hospitality side of its business, Focus advertised its shower curtains in annual catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015); *see also* PTXs 474, 476, 480, 481, 545, 564. HOOKLESS® products have been prominently displayed in advertising catalogs by the American Hotel Register Company ("AHR"). Dubinski Aff. ¶ 17. That catalog distributed between 200,000 and 250,000 copies a year to hotel chains nationwide. *Id.* ¶¶ 17, 19. AHR was Focus's second-largest customer. Tr. at 237 (Kemp). Its catalog ads were often financed with so-called rebates, in which Focus subsidized a distributor's advertising by paying a lump sum or a share of sales toward the advertising cost. *Id.* at 140-41 (Dubinski). **[**35]** Percentages of sales could range between 1% (for example, at Bed Bath & Beyond) to 10% (for example, at Amazon). Tr. at 240 (Kemp). In 2013, such rebates amounted to a total of approximately **[*184]** $250,000 on the hospitality business side, and approximately $200,000 on the retail business side. *Id.* at 241. Between 2009 and 2013, Focus spent approximately $1.2 million in rebates, covering both the hospitality and retail arms of its business. *Id.*

*in* 2013, Focus's total advertising budget for its hospitality business exceeded $500,000. *Id.* at 246. Focus also promoted its products via approximately "150 field reps" who were trained at distributor trade shows. *Id.* at 248. In its retail business, Focus also drew customers who had been exposed to its HOOKLESS® products during their stays at hotels. *Id.*

In 2013, HOOKLESS® curtains were hung in approximately 2.5 million hotel rooms. *Id.* at 251. At an average occupancy rate of 76% per hotel, and an average length of stay of 2.5 to three days, that meant "over 100 million individual exposures" per year. *Id.* (Kemp). This had "enormous value" in increasing brand awareness. *Id.* Focus received so many individual consumer inquiries from hotel guests about **[**36]** its curtains that it prepared a dialogue script for its customer service team specific to such inquiries. *Id.* at 252.

Plaintiffs also promoted their products at trade shows. Between 2005 and 2009, Arcs & Angles made 34 trade show appearances. *See* PTX 521 at 117-18 (listing appearances). These continued after Focus acquired Arcs & Angles in 2009. *See* Tr. at 242-43, 245 (Kemp). The trade shows promoted the products to retailers,

hospitality chains, and other distributors. *Id.* at 242.[16] Before trade shows, Focus conducted short training sessions with some vendors. *Id.* A&A LLC and Focus also pitched their HOOKLESS® products at AHR's sales expos and gave rebates and advertising allowances to customers who agreed to promote the product. Dubinski Aff. Tiff 15-16, 32. HOOKLES SO products dominated attention at many trade shows, Tr. at 243; between 2008 and 2013, Focus promoted its HOOKLESS® products in at least 15-20 trade shows per year, and thus in 60-100 during a five-year period. *Id.* at 243-44 (Kemp). In 2013, Focus had an approximately $250,000 budget for trade shows in the hospitality business and a separate budget for retail-oriented trade shows, both of which increased over time. *Id.* **[**37]** at 245-46.

Arcs & Angles and Focus also advertised their shower curtain products on their websites. *See* PTXs 461, 566. Plaintiffs' distributors such as Guest Supply and True North—have also advertised plaintiffs' products. *See* PTXs 462, 521 and 82.

Plaintiffs' products have received favorable, unsolicited media coverage. As mentioned, in 1998, *New York Magazine* featured HSNA's HOOKLESS® curtain in its "Best Bets" section, calling the curtain "cutting-edge" in sparing customers the effort of "contorting to attach ugly hooks." PTX 543 at 2. In September 2001, the American Society of interior Designers' magazine, *Icon*, featured the "ingenious" HOOKLESS® curtain in an editorial. *See* PTX 429. In 2009, *Woman's Day* magazine featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. In 1997, after a multi-week competition, QVC named plaintiffs' shower curtain the "Best New Product." Zahner Aff. ¶ 183.

**[*185]** Plaintiffs also introduced evidence of the shower curtains' favorable recognition in the hospitality industry, *see, e.g.,* Dubinski Aff. ¶¶ 9, 12, 20, 28, unsolicited customer testimonials for Hookless curtains, *see, e.g.,* PTXs 438, 457 at 2, 467, and customers' brand **[**38]** loyalty, *see* Dubinski Aff. ¶ 55; Erickson Aff. ¶ 25. Kartri's Kubus acknowledged that plaintiffs' HOOKLESS® shower curtains "gained a lot of

---

[16] *See also* Tr. at 244 (Kemp) ("[I]f it's a retail industry show, it's going to be the retail buyers that are coming in, maybe some designers. If it's a hospitality industry show, it could be designers, independents, boutiques, chains, hotel owners, decision makers, basically, as well as like, I said the chain designers. And if it's a chain show, it's going to be the individual brand hotels, the owners of the hotels and decision makers coming.").

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 111 of 255

Page 13 of 82

647 F. Supp. 3d 145, *185; 2022 U.S. Dist. LEXIS 230852, **38

momentum" in the hospitality market. Kubus Dep. Tr. at 26.

## H. Plaintiffs' Market Share and Revenues

By the time defendants were developing their accused product in 2012, plaintiffs were the leading seller of shower curtains in the hospitality market. *See* Tr. at 661 (Goskowski, conceding that Focus, by late 2012, had established dominant market share). Throughout defendants' accused conduct—October 2013 to November 2018—plaintiffs' market share was approximately 50%. Elmore Rep. ¶ 80; Tr. at 512 (Elmore).

By 2005, plaintiffs' curtains were used by more than 25 hotel and motel chains, and in more than one million hotel or motel rooms across the United States. PTX 551; Zahner Aff. ¶ 186. In 2007, these had grown to 39 hotel and motel chains and more than two million rooms. These chains included Hilton, Holiday Inn, Motel 6, and Red Roof. PTX 563; Tr. at 521.

Between 2005 and September 2013, Focus sold more than $150 million of Hookless shower curtains, with about 65% of these revenues coming from hospitality customers and the balance from retail customers. **[**39]** Tr. at 252-53 (Kemp).[17]

Between 2013 and August 2017, Focus's revenues for its HOOKLESS® shower curtains in the hospitality market: $14.7 million in 2013; $16.5 million in 2014; $21.2 million in 2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518; Elmore Rep. ¶ 98. These reflected sales of approximately 5.76 million shower curtains. PTX 515. During the same period, revenues for the HOOKLESS® shower curtains in the retail market exceeded $54 million: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million in 2016; and $8.9 million in January through August 29, 2017. These reflected sales of approximately 4.57 million shower curtains. PTX 514.

---

[17] Additional evidence of plaintiffs' sales during that early period comes from Arcs & Angles's reported sales figures. Between 2005 and 2010, Arcs & Angles reported that sales for products under the HOOKLESS® brand had reached a volume of $88 million. PTX 521 at 116; Zahner Aff. ¶ 189. Carnation independently reported more modest sales figures. Between 2009 and January 2013, Carnation has had a total sales volume of $225,710. PTX 591.

## I. Plaintiffs' Actions Against Alleged Infringers

Plaintiffs have taken various legal actions to defend the intellectual property at issue here.

On September 25, 2007, Arcs & Angles filed a complaint against Royal Pacific Corporation, claiming infringement of its HOOKLESS® Mark and '248 patent. *See* PTX 99. On December 6, 2007, that litigation ended in settlement and Royal Pacific's agreement to desist from its challenged conduct. PTX 537. Plaintiffs brought similar such challenges, **[**40]** with similar outcomes, against Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (settlement and agreement to desist executed April 1, 2008); DFW Motel Supply & Textiles, Inc., *see* PTXs 102 **[*186]** (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); Neilmax Industries, Inc., *see* PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); and Trend Supply, Inc., *see* PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010). Plaintiffs also sent cease-and-desist letters to alleged infringers, which ended in agreements to desist. Recipients included: Courtesy Products, Inc., *see* PTX 381 (November 27, 2007 letter); Linens4Less Inc., *see* PTXs 589 (June 16, 2009 letter), 590 (email noticing desistance sent June 16, 2009); and Champion Supply Co., Inc., *see* PTXs 585 (January 6, 2009 letter), 586 (letter noticing desistance; undated, but fax watermark indicating receipt on January 8, 2009).

Through such measures, the Court finds, plaintiffs maintained exclusive control over its hookless shower curtains in the hospitality market between 1997, when the trade dress was introduced, **[**41]** and 2013, when defendants' alleged infringement began. The above entities either ceased the challenged conduct, or entered into license agreements with plaintiffs.

## J. Defendants' Challenged Conduct

### 1. Late 2012—Early 2013: Pong Pitches Samples to Marquis

Middleberg testified as follows. In late 2012 or early 2013, he traveled to China to meet Pong Hsu of the Chinese textile manufacturing company Ramtex. Tr. at 549-50. Pong and Middleberg had known each other through business dealings for more than 20 years. *Id.* at

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 112 of 255

Page 14 of 82

647 F. Supp. 3d 145, *186; 2022 U.S. Dist. LEXIS 230852, **41

548. Middleberg usually purchased products from Ramtex either on behalf of Star Linen, or on behalf of Marquis, to resell those products in the United States. *Id.* at 549, 551.[18]

At this meeting, Yong showed Middleberg a sample of a hook-free shower curtain with a "D-shaped grommet." *Id.* at 550. Pong represented that he had developed the idea himself, that he had obtained a Chinese patent for it, and that he was in the process of applying for a United States patent. *Id.* at 553-54. Pong showed Middleberg a document with Chinese characters, representing it to be a Chinese patent. Middleberg, who does not read Chinese, relied on Pong's representation. *Id.* at 602. The samples provided [**42] by Pong and the accused products at issue in this lawsuit were "[e]ssentially" the same. Middleberg Dep. Tr. at 94-95. Pong proposed that Marquis acquire the product design to sell it to a U.S.-based manufacturer. *Id.* at 59-60.

Middleberg and Pong knew of Focus Products and the HOOKLESS® product. The two had spoken about Focus "many times." Tr. at 554. And Pong had formerly worked for Waytex, a manufacturer that had supplied the HOOKLESS® product to Focus and its predecessor A&A LLC, and was "part of [Focus's] product development team and . . . manufacturing team. *Id.* Pong stated that his product competed with Focus's HOOKLESS® product, but claimed his design was "original" and "unique." Middleberg Dep. Tr. at 61-62. Pong also represented that he had consulted with his attorney and understood that Focus's patents in the HOOKLESS® technology had expired or were due to expire soon, and that Pong would soon secure his own patent on the sampled shower curtain ring. *See* Tr. at 555 (Middleberg testifying **[*187]** that "[Pong] mentioned to me that it had become a public domain kind of product; that the patent had run out or was about to run out"). Middleberg concluded that, if Marquis and its U.S. customers [**43] "could come into the market with this new idea, we might be able to carve out a niche for ourselves." *Id.* Pong connected Middleberg to Pong's lawyer, Tommy Wang, who stated "that [Pong's] patent was pending and . . . felt confident that it would be issued. *Id.* at 554; *see also id.* at 582.

Despite knowing of Focus's HOOKLESS® product, Middleberg did not investigate whether Marquis's plan to roll out Pong's proposed product was limited by any valid United States patent—including as owned by

Focus or its affiliates. *Id.* at 554. No Marquis official, employee, or attorney investigated whether A&A LLC or Focus held valid intellectual property rights in the HOOKLESS® technology, or whether Pong's proposed design might infringe those. Middleberg "rel[ied] on what Pong told [him]" in forming his belief that there was no legal impediment to Marquis's ability to sell the accused product. Middleberg Dep. Tr. at 72-75.

Kartri's Goskowski similarly testified that, despite knowing of Focus's existing patents in the HOOKLESS® technology, she was not concerned that Kartri's Ezy Hang products might infringe Focus's rights. Goskowski Dep. Tr. at 41-43. Goskowski did not seek advice from counsel. *Id.* at [**44] 43; *see also* Tr. at 643 (Kubus, testifying that "[Middleberg and Marquis] came with the name EZY-Hang and moved forward with the design, listening to Mr. Middleberg and Marquis that there was a patent, that everything was clear and safe, as I use the word 'safe.' It may not be the right word, but that's the way we approached it").

## 2. Late 2012—August 2013: Marquis Presents the Design Samples to Kartri; Kartri Purchases Test Orders; Defendants Profess Ignorance of Legal Restrictions on Their Sales of the Accused Products

In late 2012 or early 2013, during a sales meeting between Star Linen and Kartri, Middleberg, acting as Marquis's representative, presented Pong's pitched ring to Dolph—and possibly Kubus—of Kartri. Tr. at 549, 553, 641; Middleberg Dep. Tr. at 58-59, 83-84. Kartri's representatives "expressed some interest and took the samples back to their offices," Middleberg Dep. Tr. at 81. By this time, as Goskowski admitted, "the hospitality market had . . . gone in the direction of hook-free curtains," and Focus had established a dominant market share, to the detriment of sellers of hooked shower curtains, Tr. at 660-61. Kartri felt market pressure from its customers to pivot toward [**45] vendors of non-hooked shower curtains. *Id.* at 663-64 (Goskowski). Thus, "in an effort to keep up with , . . . the changing business in the hospitality area, [Kartri] decided to purchase [the proposed curtain design] from Marquis." *Id.* at 661.

Marquis and Kartri, assisted by Pang, experimented with refinements to Pong's sample, including because, in the initial product, "the fabric tended to pull away from the grommet." Tr. at 553, 556; Middleberg Dep. Tr. at 84,89. Although the D-shaped ring's initial design included a straight slit with no angles, Marquis and

---

[18] Star Linen and Marquis are owned and run by the same person—Joseph Ranieri. Tr. at 550.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 113 of 255

Page 15 of 82

647 F. Supp. 3d 145, *187; 2022 U.S. Dist. LEXIS 230852, **45

Kartri ultimately settled on a D-shaped ring with a slit in the shape of a "lightning bolt"—the angled slit visible in the accused product. Tr. at 557,593 (Middleberg). This design choice was advantageous because such rings could be snapped onto the shower curtain rod with one hand—allowing hospitality staff installing such curtains to secure themselves with their free hand. *Id.* at 558 (Middleberg).[19]

**[\*188]** In or about August 2013, Kartri began purchasing small "test orders" of the accused product. Middleberg Dep. Tr. at 95-96,124-25. Kartri sold those to other resellers. *Id.* Those products were met with "positive reception," and Kartri, **[\*\*46]** through Kubus, began to place larger orders. Middleberg Dep. Tr. at 97-98. Although Marquis and Kartri knew they were competing with Focus's HOOKLES SO products on price and design, Middleberg testified that he and other executives believed Pong's representation—that Focus's patents were "running out"—until the point that Focus accused Marquis of infringement, Middleberg Dep. Tr. at 99-100,108-09. He also testified that he believed—until the Court's 2018 ruling following the *Markman* hearing in this case—that Focus's patents did not cover the particular design of the Ezy Hang curtain ring. *See* Tr. at 587-88 ("The way it was described to me was that . . . it was like a whole pizza and that prior to the *Markman* hearing, that the [USPTO] had ruled that each slice of the pizza with its own toppings . . . had to be patented itself. After the *Markman* hearing, the Mudge said no, that's too restrictive and you can patent the whole pizza, and that was the way I understood it."). Middleberg did not have any training or expertise in patent law. *Id.* at 595, 665.

### 3. August 2013-February 2015: Communications Within Defendants Admitting the Similarity Between the Accused Products

Kartri marketed its **[\*\*47]** accused product under the brand "Ezy Hang." *See, e.g.,* Kubus Dep. Tr. at 18-20. When customers inquired whether Kartri sold hookless products, Kartri personnel were directed to respond that Kartri could not sell that exact product, but that its competing Ezy Hang products were an adequate substitute. *Id.* at 18-23. If a client was interested in Ezy

Hang, Kartri would "take it from there." *Id.* at 24. Kartri adopted this approach because it was "just trying] to do business. . . . [F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless. I could never supply anything." *Id* at 24.

The following communications of or with Kartri employees and executives, plaintiffs argue, reflect Kartri's appreciation—even before February 2015, when Focus sent a cease-and-desist letter to Kartri—of the strong similarity between plaintiffs' and defendants' products:

> \* On August 30, 2013, Middleberg emailed Kubus, stating, "if I understand correctly [Fairfield Inn] want[s] the same product that [A&A LLC] is using. What was your understanding?" Kubus responded by proposing to fill an order of the accused product "thinking we might get lucky." Middleberg Dep. Tr. at 127, 128, **[\*\*48]** 130.
> \* On December 18, 2013, Dolph, Kartri's sales operations manager, sent an email with the subject line "HOOKLESS" to Kimberly Ihsen, product manager at Best Western International. The email stated that Kartri has "a version of hookless called EZY Hang, [and] we would like to know how we can go about getting this product considered as an offering on Best [W]estern supply." PTX 230 at 2.

> **[\*189]** \* On April 24, 2014, in an email exchange among Pam Cales of GMK Associates and, *inter alia*, Sarah Woody, a Kartri sales director, Cales requested a price quote for "Hookless shower curtain[s]." Woody, without correcting Cales's misperception, provided the requested quote. PTX 231.
> \* Between December 8 and 16, 2014, in an email exchange initiated by retail customer Rick Roberts, Roberts requested a price quote for "Hookless Shower Curtains," Dolph quoted a price for a "Hookless Double H Chevron pattern" curtain. PTX 232.

Kartri also frequently received phone calls from consumers attempting to order Focus's products. Kubus testified that consumers often called Kartri demanding "Hookless" products, and "they either have a picture attached from Focus's website. . . . And it's just known in the industry. **[\*\*49]** I mean, they've bombarded the industry with that particular product because it saves the housekeeper time and money to put this product up. It's just known. [Zahner has] done really well in that marketing direction." Kubus Dep. Tr. at 52-53. She

---

[19] At trial, Middleberg sought to demonstrate this by having an assistant hold up a shower rod and Middleberg execute a one-handed installation. The demonstration went less than smoothly; as Middleberg "very much used two hands throughout the entire process." Tr. at 567-71.

647 F. Supp. 3d 145, *189; 2022 U.S. Dist. LEXIS 230852, **49

estimated that 50% of buyers inquiring about hookless shower curtains asked Kartri for Focus's products. *Id.* at 53.

In early 2014, Middleberg heard "from fabric suppliers, weavers, jobbers, people with whom we've had years of relationships that the suppliers weren't getting paid; that Focus was in financial trouble; that it was—that there was an opportunity in the market for us to get aggressive and get out there and sell because they had been cut off by their suppliers." Tr. at 573.

### 4. February 27, 2015-2017: Focus Issues a Cease-and-Desist Letter and Sues Kartri; Defendants Continue to Sell the Accused Products

On February 27, 2015, Focus, through counsel, sent a letter to Marquis stating that its manufacture and sale of the accused products infringed Focus's intellectual property rights, and demanding Marquis cease and desist. PTX 152 at 1.[20] That day, Woody, Kartri's general office sales director, forwarded the letter to Kartri's owners Goskowski **[\*\*50]** and Kubus, who brought the letter to Middleberg's attention. PTX 166. The same day, Middleberg replied: "Don't worry about this [Pong and I] will submit our pa[t]ent number. There is nothing they can do." PTX 166 at 1; Tr. at 608. Middleberg did not confer with counsel before so responding, and "did nothing in response to this letter." Tr. at 608. Kubus did not ask Middleberg whether he had conferred with counsel in reaching this conclusion. *Id.* at 773. At some point in this period, Goskowski conferred with Kartri's counsel, Bernhard Molldrem, and "came away with the understanding that [she was] complying with the law." *Id.* at 648-49.

Marquis and Kartri thereafter "continued to market the product," Middleberg Dep. Tr. at 113, 121, for another three-and-a-half years, until November 12, 2018, three months after this Court issued its *Markman* ruling on August 9, 2018. Tr. at 587, 615, 654. Communications during this period, including the following, bear on defendants' contention that until then, they did not appreciate that their Ezy Hang **[\*190]** product might be

infringing Focus's patents or marks.

***Reliance on purported Chinese patent***: On March 3, 2015, days after receiving the cease-and-desist **[\*\*51]** letter, Goskowski emailed Middleberg and Kubus, asking, "David, how do we get away with a China patent? How does that cover us in the U.S.?" *See* Goskowski Dep. Tr. at 99 (quoting email in PTX 167). Goskowski nevertheless testified that, upon seeing Pong's purported patents, she believed despite these being in Chinese and untranslated—that these covered Kartri's Ezy Hang products. *Id.* at 99-100.[21] Goskowski never sought a translation of the Chinese-language patent. Tr. at 668. Although she attested that she had received the Chinese-language patents in 2013, these bear the date March 19, 2014. *See* PTX 28-1 at 12. Goskowski testified that she had relied on Middleberg's claim to have found reliable Pong's claim to own a Chinese patent that would protect the Ezy Hang design in the United States, and believed Kartri's products were covered by that patent. Tr. at 674. Goskowski never contacted her attorney, Molldrem, about the purported Chinese patents. *Id.* at 675.[22]

***Filing of Focus's first lawsuit***: On June 30, 2015, Focus filed the first of two lawsuits today consolidated in this action. Its Complaint alleged that Kartri had infringed design patent '232 and the utility patents '248, '609, and '088. *Focus **[\*\*52]** Prods. Grp. Int'l, LLC et al. v. Kartri Sales Co.*, No. 15 Civ. 5108 (PAE) (S.D.N.Y.), Dkt. 1. The lawsuit was served on Kartri on September 11, 2015. *See id.*, Did, 8.

***Discovery of Carnation's EZ-ON product***: In summer 2015, Kartri discovered Carnation's nearly identical EZ-ON product. Tr. at 676 (Goskowski). The packaging of Carnation's product, Goskowski admitted, displayed on the front the language "using patented hookless technology," and listed the applicable U.S. patents—the

---

[20] Before receiving the cease-and-desist letter, Kubus knew that Focus manufactured and distributed hook-free shower curtains for hotels, but had not inquired into Focus's patents. Tr. at 645 (Kubus). At an unspecified date before receiving the letter, Goskowski received a phone call from Bucklew, Focus's then-president. In that call, Goskowski told Bucklew that in her view, Kartri was not infringing. Tr. at 648-49 (Goskowsld).

[21] *See* PTX 28-1 (declaration by Goskowski, stating that 2013, Mr. David Middleberg, contacted us to introduce a new style shower curtain that had an embedded buckle incorporated in its top margin," that "Mr. Middleberg had his supplier in China send [Kartri] patents that the supplier had obtained for the shower curtain embedded buckle," and that one such patent was "Chinese Utility Model patent CN 203852180 U (in English translation)," and another was "Chinese Design Patent CN 302766325 S (no translation available).").

[22] Middleberg later abandoned his view that Kartri's sales were lawful after Pong admitted to him that he did not in fact own a valid Chinese patent. Tr. at 603. The record does not reflect whether or when Middleberg communicated this to Kartri.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 115 of 255

Page 17 of 82

647 F. Supp. 3d 145, *190; 2022 U.S. Dist. LEXIS 230852, **52

design and utility patents at issue in this suit on the back. Tr. at 678; *see* PTX 28 (Goskowski declaration) at 1 ("During the summer of 2015, we discovered [a] shower curtain, sold by Carnation . . . which had embedded flat-top rings that have an overall shape similar to the buckles in Kartri's Ezy-Hang curtains.")

***Decision not to conduct an infringement analysis***: On September 21, 2015, Pong, prompted by Middleberg, emailed his lawyer Wang, asking for his view whether the Ezy Hang product likely infringed the Focus patents, whether Pong's patent was valid, and whether Wang would be prepared to defend Pong in a lawsuit. PTX 258 at 2. On September 22, 2015, Wang responded, offering to conduct an infringement analysis **[**53]** and draft an infringement report for $3,500. *Id.* Marquis did not commission this analysis, despite Middleberg's awareness that Focus had claimed infringement of its design (`232) and two utility (`248 and `609) patents. Tr. at 599, 601 (Middleberg). Middleberg testified that, "in retrospect," Marquis "probably shouldn't have" continued to manufacture **[*191]** the accused Ezy Hang product, "but at the time we thought we were right and we continued to move forward." Tr. at 600.

***Filing of Focus's second lawsuit***: On December 30, 2015, Focus filed the instant action against Kartri. *Focus Prods. Grp. Int?, LLC et al. v. Kartri Sales Co., Inc.*, No. 15 Civ. 10154 (PAE) (S.D.N.Y.), Dkt. 1. On February 4, 2016, Kartri brought Marquis into this action by initially filing a third-party complaint against it. *Id.* Dkt. 11; *see also id.* Dkt. 19 (Marquis waiver of service executed February 10, 2016).

***Pong's statements to Middleberg about a pending U.S. patent***: After litigation began, Pong claimed to Middleberg that he had a pending United States patent on the Ezy Hang product. On February 2, 2016, Middleberg emailed Pong: "When we last spoke in China you mentioned that the US Patent on the shower curtain buckle **[*54]** would be given to you in February [of 2016]. Can you please update me on perhaps a more specific date on which you expect to receive the patent?" PTX 183 at 2. Pong responded that patent approval would take "another 6— 8 months." *Id.* at 1. Marquis's president, Ranieri, interjected that "6-8 months could prove to be a problem." *Id.* Marquis nonetheless continued to sell the accused products to Kartri, for resale to hospitality or retail customers, believing that "Focus [was] in deep financial trouble," and that it and Kartri could "take advantage of that vulnerability." Tr. at 610-11 (Middleberg).

***Hartri's wariness of Pong***: On January 19, 2016, Goskowski emailed Kartri, expressing frustration that he had asked Kartri to accept payments directly from Pang, of whom her counsel had urged Kartri to steer clear. PTX 182.[23]

***Continued sales to customers of "Hookless" curtains***: After litigation began, Kartri continued in internal and customer communications to hold out Ezy Hang as equivalent to the HOOKLES SS product. On July 1, 2015, Woody, in an email to Kubus, referred to a certain Ezy Hang product as "our equivalent of the Hookless Double H pattern." PTX 217. In an email exchange **[*55]** between May 11 and 23, 2016, Kubus and Cheryl Hicks, a Kartri customer support representative, discussed a price quote for a hospitality customer seeking a "sub[stitute] or similar item" for an out-of-stock Focus product. PTX 609. In an email exchange in June 2016, retail customer Karen Teska of Standard Textile requested a quote for "Hookless shower curtains using our matrix fabric." Dolph quoted a price for Ezy Hang. PTX 246.

## K. Procedural History of This Litigation

### 1. December 30, 2015—December 21, 2017: The Prior Related Action

On June 30, 2015, ZDG, HSNA, and Focus (the "original plaintiffs") sued Kartri, alleging willful infringement of the utility patents '248, '609, and '088 and of the EZ-ON Trademark, and unfair competition under the Lanham Act and New York law. *Focus Prods.*, 15 Civ. 5108, Dkt. 1. On October 1, 2015, Kartri answered and filed counterclaims. Dkt. 9. On October 26, 2015, the original plaintiffs answered. Dkt. 16. On February 8, 2016, Kartri filed a third-party complaint alleging that Marquis was the liable party. Dkt. 22.

### [*192] 2. December 30, 2015-December 21, 2017: Initial Stages

On December 30, 2015, the original plaintiffs filed the initial complaint in this litigation against Kartri, alleging

---

[23] *See also* PTX 182 at 1 (Kartri email to Middleberg, stating "now you want me to take a check from [Pang] and put it thr[ough] my company and send something back to you, NOT GOING TO happen, I am not going to take the chance of an audit by them and have them see a check from Pong").

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 116 of 255

Page 18 of 82

647 F. Supp. 3d 145, *192; 2022 U.S. Dist. LEXIS 230852, **55

willful infringement of [**56] the design patent '078. Dkt. 1; *see also* Dkt. 7 (refiling). On February 4, 2016, Kartri filed a third-party complaint against Marquis, alleging that Marquis was the liable party. Dkt. 11; *see also* Dkt. 13 (refiling). On February 9, 2016, Kartri moved to dismiss. Dkt. 16. On March 1, 2016, the original plaintiffs filed the first amended complaint against defendants, now alleging willful infringement of the design patent and the utility patents, and willful infringement of, and unfair competition with, the EZ-ON and Hookless Trademarks and the original plaintiffs' trade dress, and adding Marquis as a third-party defendant. Dkt. 20. On March 22, 2016, Kartri filed, and on March 24, 2016, refiled, a partial motion to dismiss and strike certain allegations from the amended complaint, a memorandum of law, supporting exhibits, and a declaration in support. Dkts. 26-29. On April 11, 2016, the original plaintiffs opposed the motion. Dkts. 33-34. On April 12, 2016, the original plaintiffs voluntarily dismissed the related action at 15 Civ. 5108 and converted Kartri from a third-party defendant into a defendant. Dkts. 28, 32, 36. On April 18 and 19, 2016, Kartri filed a reply in support of its motion to [**57] dismiss. Dkts. 39-41. On May 5, 2016, the original plaintiffs filed the second amended complaint, amending claims and adding factual allegations. Dkt. 47. On May 26, 2016, Marquis filed a partial motion to dismiss. Dkt. 55. On June 17, 2016, the original plaintiffs opposed the motion, Dkt. 58, and, on June 24, 2016, replied, Dkt. 59.

On July 14, 2016, the Court denied both motions to dismiss in their entirety. *See* Dkts. 63, 77 (bench ruling transcript). On July 25, 2016, the Court approved a case management plan and consolidated this case with 15 Civ. 5108. Dkts. 65, 67. On July 26, 2016, the original plaintiffs filed a third amended complaint consolidating all allegations from the two actions. Dkt. 68. On July 27, 2016, the Court dismissed 15 Civ. 5108 with prejudice. *See* 15 Civ. 5108, Dkt. 30. On July 28, 2016, both defendants answered and filed counterclaims. 15 Civ. 10154, Dkts. 69, 70. On August 17, 2016, the original plaintiffs answered defendants' counterclaims. Dkts. 75, 76.

Over the next 13 months, discovery proceeded, contentiously. *See, e.g.,* Dkts. 106, 112, 125. On September 19, 2017, the Court ordered the filing of a Fourth Amended Complaint. Dkts. 145, 158. On September 29, 2017, that complaint-now [**58] entailing all plaintiffs in the action-was filed. Dkt. 148 ("FAC"). On October 12, 2017, Kartri filed a motion to dismiss or transfer for improper venue. Dkt. 149. On October 13, 2017, both defendants answered the FAC

and filed counterclaims. Dkts. 150, 151. On October 27, 2017, plaintiffs opposed Kartri's motion and filed supporting declarations and exhibits. Dkts. 153-154.

On December 21, 2017, the Court denied Kartri's motion in a bench ruling. Dkt. 171.

### 3. July 7, 2017-August 9, 2018: The *Markman* Hearing and Ruling

On July 7, 2017, the parties filed their original joint claims chart, Dkt. 124, and, on November 22, 2017, an amended such chart. Dkt. 162.[24] On July 26, 2018, the [*193] Court held a *Markman* hearing. *See* Dkt. 193 (transcript). On August 9, 2018, the Court issued its *Markman* ruling, construing 16 disputed terms relevant to the utility patents. Dkt. 198.[25]

---

[24] On December 22, 2017, plaintiffs filed an opening *Markman* brief. Dkt. 169. On January 22, 2018, defendants filed *Markman* briefs and supporting exhibits. Dkts. 173, 174. On February 5, 2018, plaintiffs filed reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis sought leave to file, and submitted, a sur-reply. Dkt. 181. On February 14, 2018, plaintiffs consented to Marquis's filing of the sur-reply, on the condition that the Court also consider plaintiffs' responsive letter brief. Dkt. 182.

[25] The Court construed the utility patents' terms as follows. For the '248 patent, the term "item" as "curtain," Dkt. 198 at 6; for all three utility patents, the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening," *id.* at 7; for all three utility patents, the term "inner circumference" as "inner edge that is curved, at least in part," *id.* at 13; for all three utility patents, the term "outer circumference" as "outer edge that is curved, at least in part," *id.*; for the '248 patent, the term "comprising a top" as "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point," *id.* at 15; for the '248 patent, the term "approximately horizontal component"—which referred to the slit in the ring—as "a component that is either level or nearly so," *id.* at 20; for the '248 patent, the term "said slit exits said ring at said upper edge of said curtain" as "the slit exits the ring at or near the upper edge of the curtain," *id.* at 22; for the '248 patent, the term "closed ring" as "a slit where the ring is 'closed'—that is, the two radial edges adjacent to the slit are pressed together," *id.* at 23; for the '609 and '088 patents, the term "projecting edge" as "an edge that projects from the outer circumference of the ring," *id.* at 25; for the '609 patent, the term "next to said slit" as "adjacent to the slit," *id.*; for the '609 patent, the term "extends towards the ceiling" as "points upward (would hit the ceiling if extended)," *id.* at 26; for the '248 and '609 patents, the term "offset said top" as "to a side

**4. March 5, 2019—January 4, 2021: The Summary Judgment Decisions**

On March 5, 2019, the Court held a pre-motion conference. *See* Dkts. 230, 241 (transcript). On March 26, 2019, plaintiffs filed a summary judgment motion and supporting materials on their claims of design patent and **[**59]** trade dress infringement and on damages theories. *See* Dkts. 243, 244. They also moved to preclude defendants from offering revenue and cost data—and expert testimony based on it—that they had not produced in fact discovery. Dkt. 246.

On April 17, 2019, defendants filed a cross-motion and supporting materials on their counterclaims that plaintiffs' Hookless Trademark is invalid, that defendants had not infringed the EZ-ON Trademark, and that plaintiffs lacked standing to allege infringement of the EZ-ON Trademark. Dkts. 253, 255. They also opposed plaintiffs' motion to preclude. Dkt. 254. On May 7, 2019, plaintiffs filed an opposition to defendants' cross-motion and reply, a reply in support of their motion to preclude, and supporting materials. Dkts. 272-275. On May 21, 2019, defendants filed their reply and supporting materials. Dkt. 288.

On April 16, 2020, the Court resolved the cross-motions for summary judgment, and held the motion to preclude in abeyance. Dkt. 297. On May 14, 2020, plaintiffs moved for limited reconsideration of the Court's holding that plaintiffs' trade dress was generic and a memorandum and exhibits in support. Dkt. 303. On May 27, 2020, defendants filed a memorandum **[**60]** in opposition. Dkt. 305. On June 5, 2020, plaintiffs replied. Dkt. 308. On June 30 and July 1, 2020, plaintiffs supplemented their briefing. Dkts. 309, 310.

 **[*194]** On January 4, 2021, the Court granted plaintiffs' motion for reconsideration, reversing its holding that their trade dress was generic and reserving that issue for trial. Dkt. 312.

**5. April 15, 2021-June 24, 2022: Final Pretrial Matters**

---

of the top," *id.* at 27; for the '609 patent, the term "slit extends through" as "slit passes through," *id.* at 28; for the '609 and '088 patents, the term "o'clock position" as "corresponding to the position on a standard 12-hour clock face"; and for the '609 patent, the term "approximately the 1 o'clock or 2 o'clock position on said ring" as "the area between and around the 1 o'clock and 2 o'clock positions on a standard 12-hour clock face," *id.* at 33.

On April 15 and 16, 2021, the parties filed their joint pretrial order and proposed *voir dire* and jury instructions. Dkts. 323, 329, 345, 346. On April 15, the parties filed motions *in limine*—five by plaintiffs, Dkts. 324-328, three by Marquis, Dkts. 338, 340, 342, and 12 by Kartri, Dkts. 330-337, 339, 341, 343, 344. On May 21, 2021, the parties filed oppositions. Dkts. 366-381. On May 28, 2021, the parties filed replies. Dkts. 383-387. On August 5, 2021, the Court resolved plaintiffs' motions *in limine* in a bench ruling. Dkts. 393, 412 (transcript). On November 23, 2021, the Court resolved defendants' motions *in limine* in a bench ruling. Dkts. 425, 433 (order), 436 (transcript).

On April 13, 2022, the parties consented to a bench trial. Dkt. 443. On April 25, 2022, the Court scheduled trial for June **[**61]** 15-17 and June 27-29, 2022. Dkt. 444. On May 14, 2022, defendants filed proposed findings of fact, conclusions of law, and a supporting exhibit. Dkt. 453. On May 20, 2022, defendants filed excerpts of supporting deposition testimony. Dkt. 454. That same day, plaintiffs filed their proposed findings of fact, conclusions of law, and supporting exhibits and deposition testimony excerpts. Dkt. 455. On June 3, 2022, defendants filed objections to plaintiffs' witness declarations. Dkt. 463. On June 7, 2022, the Court adjourned the June 15-17 trial dates, kept the June 27-29 trial dates, and scheduled new trial dates for July 26-28, 2022. Dkt. 468. On June 10, 2022, plaintiffs responded to defendants' objections. Dkt. 471. On June 21, 2022, the Court overruled these objections. Dkt. 474. On June 24, 2022, defendants submitted further objections to plaintiffs' witness declarations. Dkt. 478.

On June 27-29 and July 26-28, 2022, the Court held a bench trial. On August 11, 2022, plaintiffs filed updated proposed findings of fact and conclusions of law. Dkt. 494. On August 25, 2022, defendants did the same. Dkt. 500.

**II. Conclusions of Law as to Liability on the Claims Before the Court**

**A. Jurisdiction [**62]**

The FAC brings claims of patent infringement under *35 U.S.C. §§ 101 et seq.* (Count I), and of trademark infringement and unfair competition under *15 U.S.C. § 1125(a)* (Count II). The Court has subject matter jurisdiction over these claims under *28 U.S.C. § 1331*. *See Smith v. Harris, No. 21 Civ. 571 (PAE), 2021 U.S.*

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 118 of 255

Page 20 of 82

647 F. Supp. 3d 145, *194; 2022 U.S. Dist. LEXIS 230852, **62

Dist. LEXIS 193428, 2021 WL 4655943, at *2 (S.D.N.Y. Oct. 6, 2021) (citing Bay Shore Union Free Such. Dist. v. Rain, 485 F.3d 730, 734-35 (2d Cir. 2007)).

Count III brings a New York common law claim of unfair competition with plaintiffs' Trade Dress. The Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1367, as it arises from a common nucleus of fact as the federal claims, in that all turn on the same allegedly infringing conduct. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

**B. Standing Under the Lanham Act**

At the threshold, the Court must determine whether any plaintiff has standing under the Lanham Act to bring claims of infringement and unfair competition for the Hookless Mark, the EZ-ON Mark, and the Trade Dress. This turns on whether any plaintiff owns the two marks and Trade Dress. The parties particularly contest ownership of the EZ-ON Mark.

**[*195]  1. Applicable Legal Framework**

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliations, connection, or association of such person with another person, or as to the origin, sponsorship, or approval [**63] of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act "provides separate causes of action for, among other things, infringement of registered and unregistered trademarks." Fed. Treasury Ent. Sojuzplodoimport v. SPI Spirits Ltd, 726 F.3d 62, 72 (2d Cir, 2013); see 15 U.S.C. § 1114 (registered trademark); id. § 1125 (unregistered trademark or trade dress). An infringement action under § 1114 for registered trademarks—such as the HOOKLESS® Mark—is available only "to 'registrant[s]' of the trademarks at issue, which the Act defines to embrace the actual registrant's 'legal representatives, predecessors, successors and assigns.'" SPI Spirits, 726 F.3d at 72 (quoting 15 U.S.C. § 1127). By contrast, § 1125(a) allows "any person who believes that he or she is or is likely to be damaged" by a defendant's actions to bring an infringement action for an unregistered trademark or a trade dress. 15 U.S.C. § 1125(a). A plaintiff must also show that the trademark or

trade dress is valid, See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016), aff'd, 720 F. App'x 24 (2d Cir. 2017).

**2. Ownership and Validity of the HOOKLESS® Mark**

"A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." Capri Sun GmbH v. Am. Beverage Corp., 414 F. Supp. 3d 414, 433 (S.D.N.Y. 2019) (quoting Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 217 n.10 (2d Cir. 2012)) (alteration in Capri Sun). "As such, when a plaintiff [**64] sues for infringement of its registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership." C=Holdings B. V. v. Asiarim Corp., 992 F. Supp. 2d 223, 239 (S.D.N.Y. 2013) (citing, inter alia, Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 14 (2d Cir. 1976)).

Plaintiffs have produced certificates of registration that meet their prima facie burden. These show that, on June 6, 2000, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 2,355,554, PTX 84, and on August 29, 2000, ZDG registered the Hookless Mark on the PTO's Supplemental Register, PTX 85. On a date the record does not specify, the PTO refused to continue the Hookless Mark's registration, on the grounds that it was merely descriptive of the shower curtain product. See PTX 87. On November 23, 2009, ZDG filed a response opposing that determination. Id. On August 3, 2010, ZDG registered the Hookless Mark on the PTO's Supplemental Register under registration number 3,829,837. PTX 86. On April 17, 2012, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 4,127,283. PTX 520.

Defendants have not adduced evidence of the Hookless Mark's invalidity. As the Court explained in its summary judgment decision on April 21, 2020, plaintiffs have accused [**65] only Kartri of infringing the Hookless Mark. Marquis thus lacked standing to challenge the mark's validity. [*196] Dkt 297 at 20. And, the Court held, Kartri had failed to timely assert the defense and thereby waived it. See id. ("Failure to plead an affirmative defense ordinarily results in forfeiture of that defense." (quoting Foster v. Lee, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015))).

The Court accordingly finds the Hookless Mark valid and that plaintiffs own that mark. Plaintiffs have standing to bring their Lanham Act claims pertaining to the HOOKLESS Mark.

### 3. Ownership and Validity of the EZ-ON Mark

*a. Ownership*

To establish ownership over an unregistered trademark, a plaintiff must show "prior use of the trademark." *Dual Groupe, LLC v. Gans-Mex LLC, 932 F. Supp. 2d 569, 573 (S.D.N.Y. 2013)*. "[A] plaintiff can demonstrate prior use through licensing the trademark to a licensee." *Id. at 574* (citing *Haw.-Pac. Apparel Grp. Inc. v. Cleveland Browns Football Co. LLC, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006)*). This is so even where the "first and only use of the mark was made ... by the licensee," so long as the licensor "exercise[s] some control over the licensee's use of the mark." *Id.* (citing *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 277 F.3d 253, 259 (2d Cir. 2002)*).

Plaintiffs argue that the February 1, 2012 Carnation License Agreement, PTX 370, unambiguously conferred ownership of the EZ-ON Mark on plaintiffs' predecessor A&A LLC, and thus gave plaintiffs standing to bring infringement and unfair competition claims **[**66]** as to that Mark. The Court must therefore interpret that Agreement to determine whether this is so.

"Under New York law, the interpretation of a contract 'is a matter of law for the court to decide.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 650 F. App'x 70, 71 (2d Cir. 2016)* (summary order) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)*). "If the Court finds contract provisions to be unambiguous, then it must interpret those provisions in light of 'their plain and ordinary meaning.'" *Id.* (quoting *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011)*). "However, if the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 111 (2d Cir. 2006)*. "In interpreting an ambiguous contract provision, the factfinder 'should, when possible, apply the same measure as the parties have applied in performing their obligations.'" *Id. at 112* (citations omitted).

The Carnation License Agreement unambiguously gave A&A LLC, Focus's predecessor, control over Carnation's use of the intellectual property that is the subject of that agreement. Section 4.1 states that the "sublicense to Carnation is non-exclusive with respect to ZDG's current licensees, namely HSNA, A&A [LLC and others]." Section 4.2 states that, "[a]s part of said sublicense, [A&A LLC] hereby grants [Carnation] the right to use **[**67]** the following trademark on the Licensed Products: 'EZ ON Shower Curtain[.]'" And § 5.3 requires that Carnation assign, *inter alia*, "any intellectual property falling within the scope of Licensed Patents, Licensed Trademarks, or Licensed Products . . . or a patent or trademark application is filed for by sublicensee during the term of this agreement."

The only point of contention between the parties is whether the EZ-ON Mark falls within the scope of the Carnation License Agreement, that is, whether the agreement required Carnation to assign the EZ-ON **[*197]** Trademark when it applied for its registration with the PTO.

For three independent reasons, the Court finds that, by its unambiguous terms, the Carnation Licensing Agreement bound Carnation to assign its rights in the EZ-ON Trademark to ZDG.

First, § 1.6 defines the "Licensed Products" as "shower curtains having integrated rings of the form depicted in Appendix A" and "any rings having a substantially similar appearance to that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the **[**68]** slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +1-15 degrees from that shown in Appendix A." Comparing the images of Appendix A to the Carnation License Agreement and the EZ-ON Mark as Carnation used it at the time makes clear the two are "substantially similar."

**[*198]  Appendix A**

647 F. Supp. 3d 145, *198; 2022 U.S. Dist. LEXIS 230852, **68



Fig. 1



Second, under § 4.2, A&A LLC "grants" Carnation the right to use the mark "EZ ON Shower Curtain"—at the time unregistered—on its licensed products. The restrictions that the Carnation License Agreement imposes on these products thus restrict the use of the EZ-ON Mark on those products. It would not have made sense for licensor A&A LLC to grant Carnation the right to *use* the EZ-ON Mark on its shower curtain products if Carnation *owned* the Mark.

Defendants argue that Carnation has professed a contrary subject understanding of § 4.2, and that Carnation's understanding should control. That contention does not fairly reflect the record. Mayer, Carnation's CEO, testified that he viewed § 4.2 to mean merely that A&A LLC and ZDG consented to Carnation's **[*199]** usage of the Mark, not that A&A LLC or ZDG owned it. Mayer Dep. Tr. at 121 ("A: **[**69]** I took it to mean that it was [a] recognition that we were already doing this, so, I wasn't aware that [ZDG and A&A LLC] were granting a right that [they] possessed."). But he did not dispute that, under § 4.2, plaintiffs had granted Carnation the right to use the EZ-ON Mark. *Id.* Pressed, Mayer acknowledged that "what [§ 4.2] says" was that

had granted Carnation a sublicense in the EZ-[ON Mark]. *Id.* And when questioned whether "someone [could sub]license rights if they don't own those rights," [Mayer con]ceded, "I would think not." Mayer Dep. Tr. at [129. I]n any event, the plain language of the [contract] controls, not one party's claimed [understand]ing. *Lantheus Med. Imaging, 650 F. App'x at [XX].* [In light] of the plain language of § 4.2, Carnation was [thus] required to assign the unregistered EZ-ON [Mark and i]ts trademark application to ZDG.[26]

[Section 5].3 independently establishes that plaintiffs [own the] EZ-ON Mark. It states: "In the event that any [intellectual] property falling within the scope of Licensed [Patents, Li]censed Trademarks, or Licensed Products is [hereafter] reduced to practice, or developed, or a [new] trademark application is filed for by [Licensee] during the term of this agreement, such **[**70]** intellectual property shall be assigned [to Licensor a]nd deemed included within the scope of the [License A]greement." PTX 370 at 5. The phrases ["intellectual] property" and "additional intellectual [property"] are not capitalized in this provision; they are [used] in the vernacular, not in the defined sense [§ 1.9] uses the capitalized term "Intellectual [Property."] And reading "intellectual property" in § 5.3 to [mirror "]Intellectual Property" in § 1.9 would create [cons]istency, as "Licensed Patents, Licensed Trademarks, or Licensed Products" encompass the definition of "Intellectual Property" of § 1.9. It is also clear that the EZ-ON Mark is intellectual property that "falls within the scope" of the Intellectual Property defined in §§ 1.6-1.9, as the Court has found, *supra*, that the D-shaped ring under the EZ-ON Mark is "substantially similar" to the ring depicted in Appendix A. Further, the unregistered EZ-ON Mark was, between 2012 and the start of this suit in December 2015, "reduced to practice," and a trademark application as to it was filed only later. *See* Mayer Dep. Tr. at 33, 129 (conceding that Carnation, "at a subsequent date[,] . . . applied for and received [a] trademark for **[**71]** [the EZ-ON Mark]"). The unregistered EZ-ON Mark and its trademark application thus are "additional intellectual property" that Carnation was required to assign to ZDG.[27]

_____

[26] It is undisputed that Carnation filed a trademark application with the PTO for the EZ-ON Mark during the ter n of the Carnation License Agreement. Mayer Dep. Tr. at 134.

[27] Defendants' counterargument, as articulated by Mayer, fails. He contended that "EZ On [does not] fall[] within any of those categories [in § 5.3] to any rights that Focus [held]." Mayer

647 F. Supp. 3d 145, *199; 2022 U.S. Dist. LEXIS 230852, **71

**[\*200]** In contesting plaintiffs' ownership of the EZ-ON Mark, defendants also point to Carnation's March 3, 2017 cease-and-desist letter to Focus. DTX 127. That letter is not cognizable, because the Court finds the Carnation License Agreement textually unambiguous. *See Lantheus Med. Imaging, 650 F. App'x at 71*. But even if considered, the letter would not guide the meaning of the Agreement. It would merely reflect a post-agreement dispute as to its terms, which the Court finds unambiguous. And, although disputing that § 5.3 covered and made assignable to ZDG newly developed intellectual property, Mayer conceded facts making the EZ-ON Mark such property, in that the Mark appeared on the packaging of a Licensed Product and that he had filed a trademark application for the Mark within the term of the Carnation License Agreement. Mayer Dep. Tr. at 129, 134, 179; *see* PTX 113 at 1 (Carnation application to register EZ-ON Trademark with PTO, filed March 3, 2017, granted September 26, 2017); *see also* Tr. at 131-32 (Zahner, testifying that PTX 270 contained a true **[\*\*72]** and correct image of a packaged EZ-ON curtain product that Carnation used in selling the EZ-ON product).

The Court accordingly finds that plaintiffs own the EZ-

_____

Dep. Tr. at 125. He based this reading on a conflation of § 5.3's term "intellectual property" with § 1.9's term "Intellectual Property"—specifically defined as the "Licensed Patents" as defined in § 1.7 and the "Licensed Trademarks" as defined in § 1.8, but not covering the "Licensed Products" of § 1.6. *Id.* at 126. But § 5.3 in its entirety refers to lower-case "intellectual property falling within the scope of the Licensed Patents, Licensed Trademarks, or Licensed Products" as each term is defined in §§ 1.6-1.8. As noted, Mayer's construction would make the argument internally contradictory. At trial, the Court questioned Zahner as to his understanding why "Intellectual Property" in § 5.2 was capitalized, but not capitalized in § 5.3, and whether it meant that § 5.2 referred to the Intellectual Property extant at the time of the formation of the Carnation License Agreement, whereas § 5.3 referred to intellectual property to be generated. Tr. at 127 28. Non-lawyer Zahner initially could not explain the differing capitalization in the sections. *Id.* at 128. But, when later questioned as to his understanding as to who held proprietary rights under the Carnation Agreement, Zahner testified that it covered "anything that's developed by Carnation during this time that relates to the intellectual property that we're licensing them, whether it be a trademark, trade dress, or manufacturing method, a patent, an extension, an improvement, all those things would be assigned to [ZDG] and licensed to [HSNA] and [then] licensed to the appropriate person [at Carnation]." *Id.* at 130.

ON Mark.[28] They thus have standing under the Lanham Act to bring their claims that defendants infringed and unfairly competed with that Mark. Defendants' affirmative defense that plaintiffs lack standing as to this claim is dismissed.

**[\*201]** *b. Validity of the EZ-ON Mark, and Marquis's Counterclaim of Invalidity*

Marquis's only argument that the EZ-ON Mark is invalid is that, as of the alleged infringement in August 2013, not enough time had passed for Focus to acquire the consumer goodwill associated with the EZ-ON Mark. But a licensee's use of a trademark—such as Carnation, the seller of the EZ-ON product—"inures to the benefit of the licensor," *E. G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc., 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000)*; *see also 15 U.S.C. § 1055*; *Twentieth Century Fox Film Corp. v. Marvel Enters., 155 F. Supp. 2d 1, 20-21*

_____

[28] In so finding, the Court does not rely on evidence plaintiffs adduced of a new agreement entered into deep in this litigation. On October 1, 2021, three years after the close of fact discovery, plaintiffs filed a letter and supporting exhibits representing that, on September 29, 2021, plaintiffs ZDG, HSNA, SF Home Decor, and Sure Fit Home Products, and non-party Carnation had executed an agreement, Dkt. 414-1 (the "("AA"), that amended and clarified their existing Licensing Agreement of February 1, 2012. Dkt. 414. The AA specified, in effect, that the intellectual property rights in the EZ ON Trademark and trade dress were owned by ZDG, and had been since the time of the License Agreement's execution. The AA stated that: (1) "[p]ursuant to the [Licensing] Agreement, all intellectual property rights to the Ring and to the Shower Curtains incorporating that Ring . . . were owned and to be owned by ZDG," AA § 1(d); (2) "Carnation hereby irrevocably assigns to ZDG all rights, title, and interest that Carnation has or may have in the intellectual property associated with the Ring and Shower Curtain . . . including all rights in the EZ ON Trademark and EZ ON Trademark Registration and all good will associated therewith," *id.* § 2(a); (3) Carnation would not contest ZDG's ownership in the intellectual property rights in the HOOKLESS® Mark from February 1, 2012, *id.* § 3(a); and (4) Carnation would not contest ZDG's ownership in the intellectual property rights in the EZ ON mark from February 1, 2012, *id.* § 3(b). On October 1, 2021, Carnation registered the AA with the PTO. Dkt. 414-2. Plaintiffs contended that this letter confirms that they have owned the EZ ON Trademark and trade dress since at least February 1, 2012. Although the Court does not rely on this letter as proof of ownership, the Court denies defendants' post-trial request, at Dkt. 480, to strike the letter or plaintiffs' counsel's references to it.

647 F. Supp. 3d 145, *201; 2022 U.S. Dist. LEXIS 230852, **72

*(S.D.N.Y. 2001)*, *aff'd in relevant part and remanded*, *277 F.3d 253 (2d Cir. 2002)*. Marquis does not adduce authority that is contrary to this proposition. The Court thus finds the EZ-ON Mark valid and denies Marquis's counterclaim that it is invalid.

## C. Failure to Join an Indispensable Party

Marquis asserted as its 11th affirmative defense that plaintiffs had failed to join an indispensable party (Carnation) that had an ownership **[**73]** interest in, *inter alia*, the common law trademark of EZ-ON, and the trade dress at issue here.[29] Dkt. 151 at 21.

A party may seek dismissal under *Rule 12(b)(7)* at any stage of a proceeding before or during trial, for failure to join a necessary party under *Rule 19*. *Rule 12(b)(7)* requires a district court to "dismiss an action where a party was not joined only **if: (1)** an absent party is required, (2) it is not feasible to join the absent party, and (3) it is determined 'in equity and good conscience' that the action should not proceed among the existing parties." *In re Great Atl. & Pac. Tea Co., Inc., 467 B.R. 44, 58 n.9 (S.D.N.Y. 2012)* (quoting *Republic of Phil. v. Pimentel, 553 U.S. 851, 862-63, 128 S. Ct. 2180, 171 L. Ed. 2d 131 (2008)*, *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co., 508 F. App'x 63 (2d Cir. 2013)* (summary order)).

Under *Rule 19(a)(1)*, a person must be joined as a necessary party, if feasible, if:
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Fed. R. Civ. P. 19(a)(1)*. The second prong of *Rule 19(a)* requires that "there must be more than **[**74]** an

unsupported assertion that [the non-joined party] has a claim to that interest." *Jonesfilm v. Lion Gate Int'l, 299 F.3d 134, 140 (2d Cir. 2002)* (citing *Rule 19(a)(2)*).

"Where a court makes a threshold determination that a party is necessary under *Rule 19(a)* and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is 'indispensable' under *Rule 19(b)*." *Dunn v. Std. [*202] Bank London Ltd., No. 05 Civ. 2749 (DLC), 2006 U.S. Dist. LEXIS 3115, 2006 WL 217799, at *2 (S.D.N.Y. Jan. 30, 2006)* (citing *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co., 312 F.3d 82, 87 (2d Cir. 2002)*).

Carnation was not a necessary party to this suit. The Court therefore need not determine whether it was indispensable. Marquis's defense turns on its claim that Carnation, not plaintiffs, own the EZ-ON Mark. And while it is "obvious [that] trademark owners are treated as necessary parties to a trademark infringement action[,] . [a] party that has assigned its entire interest in United States trademark rights is generally not treated as a necessary party." *Alcon Vision, LLC v. Lens.com, Inc., No. 18 Civ. 407 (NG) (RLM), 2022 U.S. Dist. LEXIS 94031, 2022 WL 1665453, at *9 (E.D.N.Y. May 25, 2022)* (citing *Escamilla v. M2 Tech., Inc., 536 F. App'x 417, 420-21 (5th Cir. 2013)* (summary order); *Shima Am. Corp. v. S.M. Arnold, Inc., No. 88 Civ. 10064, 1989 U.S. Dist. LEXIS 6732, 1989 WL 65014, at *2 (N.D. Ill. June 7, 1989)*). Here, the Court has held that, under the 2012 License Agreement between plaintiffs and Carnation that settled the lawsuit between them, plaintiffs have owned the EZ-ON Mark. This alone supports denial of Marquis's *Rule 19* defense, *See De Beers LV Trademark Ltd v. DeBeers Diamond Syndicate, Inc., No. 04 Civ. 4099 (DLC), 2005 U.S. Dist. LEXIS 9307, 2005 WL 1164073, at *11 (S.D.N.Y. May 18, 2005)* (denying 19(a) motion where non-party had assigned its trademark rights to a party); *Shima Am. Corp., 1989 U.S. Dist. LEXIS 6732, 1989 WL 65014, at *2* ("By the October 1988 agreement, Kanebo has **[**75]** assigned all rights and duties to Shima and cannot be considered a necessary party to this action.").

Nor is there a threat of duplicative future litigation. In an amendment to the 2012 License Agreement executed on September 29, 2021, Carnation explicitly contracted not to challenge plaintiffs' ownership of the EZ-ON Mark and trade dress. *See* Dkt. 414-2 at 2[30], *see also De*

---

[29] The defense also asserted the indispensable party's ownership and interest in the design and utility patents. As to the design patent, that issue is not before the Court, with the proceedings as to that patent presently stayed. As to the utility patents, the Court found on summary judgment that defendants have infringed the utility patents; this defense is therefore meritless.

[30] On the first day of trial, the Court notified counsel that it would not consider the amendment as evidence of ownership,

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 123 of 255

Page 25 of 82

647 F. Supp. 3d 145, *202; 2022 U.S. Dist. LEXIS 230852, **75

*Beers LV, 2005 U.S. Dist. LEXIS 9307, 2005 WL 1164073, at *10, *12* (rejecting concern about future litigation where non-party had assigned trademark rights to a party).

The Court accordingly denies Marquis's affirmative defense under *Rule 19(a)*.

Having resolved all threshold issues and finding plaintiffs to have standing to bring all claims in this action, the Court proceeds to the merits.

### D. Infringement of Plaintiffs' Patents

There are no live issues at liability for patent infringement. The Court ruled, on summary judgment, that defendants have infringed plaintiffs' utility patents '248, '609, and '088. *See* Dkt. 297. And, as noted, plaintiff's patent infringement claim as to the design patent '078 has been stayed on consent pending a decision by the PTO as to its validity. JPTO at 4.

### E. Infringement of the HOOKLESS® Trademark, EZ-ON Trademark, and Trade Dress Under Lanham Act Claims

*Section 43(a) of the Lanham Act* protects registered and unregistered **[**76]** marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." **[*203]** *15 U.S.C. § 1125(a)(1)(A)*. To prevail on a trademark infringement, false designation of origin, or unfair competition claim, a plaintiff must show, first, that it owns a valid mark entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See, e.g., Louboutin, 696 F.3d at 224*; *Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003)*; *Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001)*.

*Section 43(a)* protects "not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress'—a category that originally

included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000)*; *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 28, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001)*.

### 1. Entitlement to Protection

Having found the EZ-ON and HOOKLESS® Marks valid and owned by Focus, the Court turns to whether Focus's Marks and Trade Dress are protectable.

#### a. Applicable Legal Framework

For a mark to be "protectable," **[**77]** it must be "distinctive." *Louboutin, 696 F.3d at 216*. A mark is "inherently distinctive" if its "intrinsic nature serves to identify a particular source." *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)*; *see also Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 162-63, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995)* (inherently distinctive marks "almost *automatically* tell a customer that they refer to a brand" (citation omitted) (emphasis in original)). Inherently distinctive marks are classified as either "suggestive" or "arbitrary or fanciful." *Morgans Grp. LLC v. John Doe Co., No. 10 Civ. 5225 (KMW) (HBP), 2012 U.S. Dist. LEXIS 46525, 2012 WL 1098276, at *4* (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1039 (2d Cir. 1992)*). Even if a mark is not inherently distinctive, it may "acquire" distinctiveness by achieving "secondary meaning" in the relevant consumer market. *Two Pesos, 505 U.S. at 769*. A mark has acquired "secondary meaning" when, "'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *Id. at 766 n.4* (quoting *Inwood Labs. Inc. v. Ives Labs. Inc., 456 U.S. 844, 851, 102 S. Ct. 2182, 72 L. Ed. 2d 606 n.11 (1982)*). Such marks are termed "descriptive." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 313-14 (S.D.N.Y. 2012)*, *as amended* (Sept. 19, 2012).

On the other hand, "generic marks . . . are deemed not to be distinctive and are not afforded . . . protection, because they merely identify the class of goods or services offered, rather than a particular characteristic of those goods." *Id.* "[T]he initial classification of a mark to determine its eligibility for protection is a question of fact

---

but reserved doing so for other purposes, Tr. at 6-7, such as that here.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 124 of 255

Page 26 of 82

647 F. Supp. 3d 145, *203; 2022 U.S. Dist. LEXIS 230852, **77

left to the determination of the district [**78] court." *Bristol-Myers Squibb, 973 F.2d at 1039-40*; *see also Rockland, 894 F. Supp. 2d at 314*.

A plaintiff asserting rights in a trade dress for product design must "surmount additional hurdles." *Yurman Design, 262 F.3d at 115*. The Supreme Court and Second Circuit have instructed that courts must exercise "particular 'caution,' when extending protection to product designs." *Id. at 114* (quoting *Landscape Forms, Inc. v. Colum. Cascade Co., 113 F.3d 373, 380 (2d Cir. 1997)*); *see also Wal-Mart, [*204] 529 U.S. at 215*. That is because, unlike word marks and product packaging, whose "predominant function [is often] source identification," *Wal-Mart, 529 U.S. at 212*, product design "almost invariably" serves another purpose: "to render the product itself more useful or more appealing," *Yurman Design, 262 F.3d at 114-15* (quoting *Wal-Mart, 529 U.S. at 213*).[31] Accordingly, trade dress protection for product design "entails a greater risk of impinging on ideas," *id. at 116*, and "hamper[ing] efforts to market competitive goods," *Landscape Forms, 113 F.3d at 380*.[32]

Relevant here, in *Wal-Mart*, the Supreme Court held that product design can never be inherently distinctive, and thus always requires secondary meaning to be protected. *529 U.S. at 216*. Thus, whereas word marks and product packaging can be held distinctive by virtue of *either* inherent distinctiveness or secondary meaning, "[t]he product design plaintiff . . . must always make the second, more difficult showing." *Yurman Design, 262 F.3d at 115* (citing *Wal-Mart, 529 U.S. at 213-14*).[33]

---

[31] *See also Restatement (Third) Unfair Competition § 16 cmt.b* (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.").

[32] *See also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1001 (2d Cir. 1997)* ("[O]ver-inclusive protection of the product design risks conferring benefits beyond the intended scope of the Lanham Act and entering what is properly the realm of patent law."); *Landscape Forms, 113 F.3d at 380* ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

[33] An additional "doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is 'not functional.'" *Yurman Design, 262 F.3d at 116* (quoting *15 U.S.C. § 1125(a)(3)*). A design feature is functional, and thus not protectable, if it is "essential to the use or purpose of the article, . . . affects the cost or quality of the

Finally, the claimed product design cannot be "generic," that is, [**79] so broad that it refers only "to the genus of which the particular product is a species." *Id.* (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32-33 (2d Cir. 1995)* (internal quotation marks omitted)).

The Court considers the distinctiveness of, in turn, the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress. *b. Protectability of the HOOKLESS® Mark*

The HOOKLESS® Trademark has been a federally registered trademark on the Principal Register since August 3, 2010. *See* PTX 86 (PTO Trademark Reg. No. 3,829,837). Such registration "creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999)*; *see also 15 U.S.C. § 1115(a)*. Where a defendant does not rebut that presumption, a plaintiff need not make a showing of secondary meaning to establish that a mark is protectable. *Id.* Neither Marquis nor Kartri has adduced evidence to rebut that presumption. The Court accordingly finds the HOOKLESS® Mark inherently distinctive—and entitled to Lanham Act protection.

*c. Protectability of the EZ-ON Mark*

The EZ-ON Mark was not registered with the PTO until September 26, 2017-21 months after this suit was commenced [*205] and some four years after defendants' challenged conduct began. *See* PTX 113 (PTO Trademark Reg. No. 5,296,144).[34] The infringing [**80] conduct lasted from August 2013 until approximately November 12, 2018, when the Court issued its *Markman* ruling. Dkt. 198; *see* Tr. at 587 (Middleberg testifying that sales of infringing products stopped on November 12, 2018), 613 (same on cross). For the period of infringement before September 26, 2017, the Court therefore must assess the strength of the EZ-ON Mark by determining its category of distinctiveness.

---

article," or, in cases involving an aesthetic feature, if its protection "would put competitors at a significant non-reputation-related disadvantage." *Id. at 116* (quoting *TrafFix, 532 U.S. at 32-33*) (internal quotation marks omitted).

[34] For this registration, too, defendants have not adduced evidence rebutting the presumption of the EZ-ON Mark's inherent distinctiveness.

647 F. Supp. 3d 145, *205; 2022 U.S. Dist. LEXIS 230852, **80

The Court finds that the EZ-ON Mark is suggestive—and thus inherently distinctive.

"Marks are classified, in ascending order of strength, as '(1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful.'" *Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384-85 (2d Cir. 2005)* (alteration in original) (citation omitted). "Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *RiseandShine Corp. v. PepsiCo, Inc., 41 F.4th 112, 121 (2d Cir. 2022)*. "A suggestive mark 'employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought[,] and perception to reach a conclusion as to the nature of the goods.'" *Kadant, Inc. v. Seeley Mach., Inc., 244 F. Supp. 2d 19, 28 (N.D.N.Y. 2003)* (quoting *Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997)*). "A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities[,] or characteristics **[**81]** of the goods." *Stix Prods., Inc. v. United Merchants & Mfrs, Inc., 295 F. Supp. 479, 488 (S.D.N.Y. 1968)* (footnote omitted). Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus., 412 F.3d at 385*. "Qualitatively, the distinction [between suggestive and descriptive marks] may be illustrated by the difference in the creativity which must be summoned to devise, as well as the sequential thought necessary to catch the linkage [between the product's mark and its source]." *BigStar Ent., Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185, 197 (S.D.N.Y. 2000)*.

"EZ-ON" is a suggestive mark because it does not merely describe what the product is—a shower curtain that incorporates rings into its fabric just beneath the upper edge—but invites the mind to draw an inference as to the characteristics that make the product preferable to hooked shower curtains—namely, that it "easily" snaps "onto" the shower rod. "EZ-ON" is not a descriptive mark because, on its own, it does not convey that it is a shower curtain. Nor does the mark neutrally describe the features of its underlying product. The EZ-ON Mark, in other words, *suggests* a reason it is superior to competing products, leaving it for the customer to associate this attribute with the product upon engaging with it. Finding this mark suggestive aligns with caselaw. *See Big Star Ent., 105 F. Supp. 2d at 197* (contrasting suggestive **[**82]** name "PASSION" for a fragrance for which "creativity . . . must be summoned to devise, as well as the sequential thought necessary to catch the linkage" between the mark and

the source with the descriptive name "LITTLE TAVERN" for a restaurant, in which no such creative effort was necessary (citing *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238 (S.D.N.Y. 1987)*; and *Little Tavern Shops [*206] v. Davis, 116 F.2d 903 (4th Cir. 1941)*); *Gross v. Bare Escentuals Beauty, Inc., 632 F. Supp. 2d 283,289-90 (S.D.N.Y. 2008)* (finding mark "Alpha Beta Peel" for a skincare product descriptive where the word mark referred to alpha and beta hydroxy acids contained in the product, not a purported "alpha step" and "beta step" in the product's application); *RiseandShine, 41 F.4th at 121-22* (affirming finding that "Rise" mark for coffee product was suggestive because "the word 'Rise' evokes images of morning, which suggests a quality or qualities of the product through the use of imagination, thought, and perception" (cleaned up)); *Easy Spirit, LLC v. Skechers U.S.A., Inc., 515 F. Supp. 3d 47,72 (S.D.N.Y. 2021)* (finding shoe trademark "Traveltime" suggestive, and thus inherently distinctive, because "'Traveltime' connotes that it is time to engage in movement, and movement often requires putting on a pair of shoes"); *Playtex Prods., Inc. v. Ga-Pac. Corp., 390 F.3d 158, 164-65 (2d Cir. 2004)* (upholding finding that "Wet Ones" is a suggestive mark for pre-moistened towelettes); *Two Hands IP LLC v. Two Hands Am., Inc., 563 F. Supp. 3d 290,302-03 (S.D.N.Y. 2021)* (finding mark "Two Hands" for sit-down cafés serving food and coffee suggestive, and thus inherently distinctive, **[**83]** because the tel "evoke[d] images of restaurants and eating food" but "require[d] some degree of imagination . . . to invest the mark with its intended mental association" (citations and internal quotation marks omitted)).

The EZ-ON Mark is suggestive—and, the Court finds, inherently distinctive.

### d. Protectability of the Trade Dress

#### i. The Trade Dress is not functional

To establish the protectability of a trade dress, a plaintiff must establish that it is not functional. This requires a showing that a trade dress is not "essential to the use or purpose of the article." *Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 620 (2d Cir. 2008)* (summary order) (quoting *Yurman Design, 262 F.3d at 116*). The Court has held, on reconsideration of its summary judgment decision, that the Trade Dress is not functional. Dkt. 312 at 7-8. There is no occasion to revisit this decision here.

647 F. Supp. 3d 145, *206; 2022 U.S. Dist. LEXIS 230852, **83

ii. The Trade Dress is not generic

The parties disagree whether the Trade Dress is generic (and thus unprotectable) or descriptive (and thus protectable on a showing of secondary meaning). On summary judgment, this Court initially held that it was generic, Dkt. 297 at 26, but was persuaded on reconsideration to leave the question open for trial, Dkt. 312 at 14-16.

In determining the distinctiveness of a trade dress, courts [**84]  must ultimately "look[] at all its elements and consider[] the total impression the trade dress gives to the observer." *Fun-Damental Too, 111 F.3d at 1001*. That determination must be made as of the date of the alleged infringement. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 744-45 (2d Cir. 1998)*. Courts do not protect "an idea or concept" if it "is too broad or too general to warrant protection." *Landscape Forms, 113 F.3d at 380*. Two factors guide this inquiry. "[F]irst, overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." *Id.* The Second Circuit has therefore required "a precise expression of the character and scope of the claimed trade dress," to enable courts "to evaluate how unique and unexpected the design elements are in the relevant market." *Id. at 381*. "Second, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a **[*207]** concept, or a generalized type of appearance." *Id.* (quotations marks and citation omitted). However, "trade dress may protect the 'overall look' of a product. [And] although each element of a trade dress individually may not be inherently distinctive, . . . the combination of elements may be indicative of source." *Id.; see **[**85]** also Steven Madden, Ltd. v. Yves Saint Laurent, No. 18 Civ. 7592 (VEC), 2019 U.S. Dist. LEXIS 77863, 2019 WL 2023766, at *8 (S.D.N.Y. May 8, 2019)*.[35]

"Courts in this Circuit—or applying this circuit's law—have found an entire product line's trade dress to be distinctive . . . both when the trade dress is virtually identical across the product line and when certain strong features marking the trade dress are found throughout the product line." *Kompcm A.S. v. Park Structures, Inc., 890 F. Supp. 1167, 1174 (N.D.N.Y. 1995)* (citing, *inter alia, Imagineering, Inc. v. Van Klassens, Inc., 53 F.3d 1260, 1264 (Fed. Cir. 1995)* (furniture) (applying Second Circuit law); *Life Indus. Corp. v. Star Brite Distrib., Inc., 31 F.3d 42, 45-46 (2d Cir. 1994)* (boat caulking products); and *Saban Ent., Inc. v. 222 World Corp., 865 F. Supp. 1047, 1055 (S.D.N.Y. 1994)* (copyright, characters in children's television program)).

Unless otherwise noted, the following analysis covers the Trade Dress as manifested by both the HOOKLESS® product and the EZ-ON product, which were co-branded. *See* PTXs 123, 194 (images of bagged EZ-ON curtains in which the packaging displayed).[36]

The Court finds that plaintiffs' Trade Dress is not generic—and that plaintiffs thus may attempt to establish secondary meaning and hence protectability—for three related reasons. First, plaintiffs describe their Trade Dress with sufficient specificity. Second, the Trade Dress is narrow enough to permit competing commercial products and not confer a monopoly on plaintiffs. And third, the Court's ruling that the Trade Dress is non-functional bolsters the finding of secondary meaning. **[**86]** The bases for these conclusions are as follows.

As noted, plaintiffs circumscribe their claimed Trade Dress as outlined below:

[1] a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

[2] and wherein the shower curtain has a row of

---

[35] In deciding "whether a mark is descriptive or suggestive . . .[,] it is necessary to surmise the mental processes of those in the marketplace at whom the mark is directed." *Thompson Med, 753 F.2d at 213*. Significantly, "the relevant purchasing public is not the population at large, but prospective purchasers of the product." *Lane Cap. Mgmt, 192 F.3d at 344* (citations omitted). This is a heavily factual question. *Id.* The party asserting genericism must prove such assertions for each market in which it competes. *See Landscape Forms, 113 F.3d at 379* ("[A]nalysis will always require a look at the product and the market in which it competes."). Here, the relevant market is the hospitality market.

[36] The use of the trademark and trade dress rights of the products sold by plaintiffs' licensees—such as Carnation, the vendor of the EZ-ON product—also "inure[d] to the benefit of [plaintiffs]." *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc., 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000)*; *see also 15 U.S.C. § 1055; Twentieth Century Fox Film Corp., 155 F. Supp. 2d at 20-21*. The rights arising from license Carnation's sales of the EZ-ON products accordingly accrue to plaintiffs, the licensors of the EZ-ON Mark effective 2009.

647 F. Supp. 3d 145, *207; 2022 U.S. Dist. LEXIS 230852, **86

rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar **[*208]** with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

[3] wherein each ring includes a slit or gap in the ring;

[4] and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

FAC ¶¶ 104-105; *see also* Erickson Aff. ¶ 28 (quoting same).

Plaintiffs' Trade Dress is drawn in clear and specific detail. It specifies that the affixture of the shower **[**87]** curtain to the rod is to be by rings, not hooks (or buckles, clasps, or any other means of affixing). Those rings are to be integrated into the shower curtain so as to be co-planar with it (not perpendicular or at any other angle relative to the fabric). The rings are not to protrude above the curtain's upper edge. The rings are to contain slits that are fixed in place that allow the user to snap the curtain onto the rod—either ring by ring where the slit connects to the curtain's upper edge, or in pairs of rings where the slit horizontally connects two rings and travels through the curtain's fabric. The resulting appearance of the curtain's surface billowing back and forth across the curtain rod makes the appearance "neat and orderly."

This level of specificity goes well beyond proposed trade dress descriptions that have been held unprotectible and generic—for example, "the 'theme' of skeletons engaging in sexual activities . . . used in [a] t-shirt design," *Jeffrey Milstein, 58 F.3d at 32* (citation omitted), a "'generalized concept' of grotesque figures in toys," *id.*, or a combination of the words "sports" and "traveler" in a certain spatial arrangement, in a certain font, and enhanced by a model, *Sports Traveler, Inc. v. Advance Mag. Pub's, Inc., 25 F. Supp. 2d 154, 162-63 (S.D.N.Y. 1998)*; *see also Laurel Rd. Bank v. CommonBond, Inc., No. 18 Civ. 7797 (ER), 2019 U.S. Dist. LEXIS 35092, 2019 WL 1034188, at *5 (S.D.N.Y. Mar. 5, 2019)* (trade **[**88]** dress for advertisements generic where trade dress was described as "[1] a color palette with a dark background; [2] a statement in large, light-colored, sans serif font at the top of the advertisement; [3] a 'hierarchal' typography with smaller, sans serif font

under the large typeface sentences; [4] center or left-side alignment; and [5] a colored line under a subset of words in the large typeface sentences" (brackets in original) (footnotes omitted)); *ID7D Co. v. Sears Holding Corp., No. 11 Civ. 1054 (VLB), 2012 U.S. Dist. LEXIS 52320, 2012 WL 1247329, at *10 (D. Conn. Apr. 13, 2012)* (trade dress for portable grill generic where plaintiff described it as "shiny exterior comprised of a rounded trapezoidal shaped lid on top, with a plastic handle and a rounded trapezoidal base pan at the bottom[, with t]he entire grilling unit [being] secured on top of four wire chrome legs with curved feet"). Plaintiffs' Trade Dress also does not capture a mere idea, but a concrete expression of it. *Cf., e.g., Roulo v. Russ Berrie & Co., 886 F.2d 931, 935 (7th Cir. 1989)* (trade dress protectable where it consisted of "beige, single-face (no fold) cards containing sentimental verses and frequently using ellipses written in Roulo's handwriting with brown ink"; "[f]lanking the messages on the left and right borders [were] a series of four stripes, two silver-foil stripes, enveloping one brown **[**89]** and one colored stripe in the middle"), *cert. denied*, 493 U.S. 1075, 110 S. Ct. 1124, 107 L. Ed. 2d 1030 (1990).

Second, plaintiffs' Trade Dress leaves ample room for competing hook-free products. As reviewed above, these include the Brown design, featuring a curtain without hooks whose rings protruded above the **[*209]** upper edge and are perpendicular to, not coplanar with, the curtain, Zahner Aff. ¶¶ 287-290; the Zenna design, sold by Maytex, which contains rings worked into the shower curtain's fabric but protruding above its upper edge, Erickson Aff. ¶ 34; the Croydex design, sold by QK Supplies, which includes hooks pre-attached to the shower curtain, *id.* ¶ 36; and the Pierce design, which relies on clips instead of sated rings, PTX 133; Zahner Aff. ¶¶ 292-293. Kartri's patented design using gliders is also not outside plaintiffs' Trade Dress. *See* PTX 110; Zahner Aff. ¶¶ 304-307.

Finally, that a trade dress is not functional bespeaks a lessened threat to competition. Trade dress is functional "when it is 'essential to the use or purpose of the article.'" *Cartier, 294 F. App'x at 620* (quoting *Yurman Design, 262 F.3d at 116*). But where a design "operate[s] to perform a function, the trade dress is not 'functional' [if] there are many alternative designs that could perform the same function," because enforcing **[**90]** a plaintiff's rights in its design "will not inhibit its competitors from being able to compete effectively in the market." *Id. at 621*. Before trial, the Court held plaintiffs' Trade Dress not functional. *See* Dkt. 312 at 7-8. Trial reinforced that finding, insofar as

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 128 of 255

Page 30 of 82

647 F. Supp. 3d 145, *209; 2022 U.S. Dist. LEXIS 230852, **90

the evidence revealed various alternative designs to plaintiffs', including the Pierce, PTX 133; Fields, PTX 129; and Giumarra, PTX 130 at 4, designs.

Plaintiffs Trade Dress is thus not generic. Plaintiffs may establish its protectability by showing secondary meaning. That showing is commonly made under the first factor of the second element of the infringement analysis: likelihood of confusion.

## 2. Likelihood of Confusion

### a. Applicable Legal Framework: The Polaroid Test

To show a likelihood of confusion, a plaintiff need not show "actual or potential confusion *at the time of purchase*"; "initial-interest confusion" and "post-sale confusion" may alternatively be shown. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872-73 (2d Cir. 1986)* (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons, 523 F.2d 1331, 1342 (2d Cir. 1975)* (emphasis in *Grotrian*)). But the plaintiff must demonstrate "'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" *Star Indus., 412 F.3d at 383* (quoting *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993)* (internal quotation marks omitted).

Courts in this Circuit assessing the likelihood of confusion **[**91]** consider the "*Polaroid* factors," famously articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961). Star Indus., 412 F.3d at 384.* Those are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of plaintiff's customers. *Time, Inc. v. Petersen Publ. Co. L.L. C., 173 F.3d 113, 117 (2d Cir. 1999); see also Polaroid, 287 F.2d at 495.* In applying the *Polaroid* test, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W. W. W. Pharm., 984 F.2d at 572* (citing *Lois Sportswear, 799 F.2d at 873*). "The evaluation of the *Polaroid* factors is not a **[*210]** mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a

court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 85 (2d Cir. 2020)* (citations and internal quotation marks omitted).

### b. Strength of the HOOKLESSO Mark and EZ-ON Mark

"The first *Polaroid* factor 'focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source." **[**92]** *LVL XIII Brands, 209 F. Supp. 3d at 667* (quoting *Lang v. Ret. Living Pub. Co., 949 F.2d 576, 581 (2d Cir. 1991)*). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace," that is, secondary meaning. *Id. at 667-68* (quoting *Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir. 1998)*).

The Court has found the HOOKLESS(R) and EZ-ON Marks inherently distinctive. This obviates the need to analyze their strength under *Polaroid*. *See Big Star Ent., 105 F. Supp. 2d at 197* ("The suggestive name does not depend upon a showing of secondary meaning to entitle it to trademark registration." (citing *Abercrombie & Fitch Co., 537 F.2d at 8*)); *Easy Spirit, 515 F. Supp. 3d at 72* ("The Traveltime trademark is therefore suggestive and inherently distinctive."). The Court thus finds the two Marks strong.

### c. Strength of the Trade Dress (Secondary Meaning)

"[A] trade dress based on the design of a product can never be inherently distinctive." *Malaco Leaf AB v. Promotion In Motion, Inc., 287 F. Supp. 2d 355, 363 (S.D.N.Y. 2003).* The Court must instead analyze the Trade Dress's strength—its secondary meaning. A trade dress has secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Louboutin, 696 F.3d at 216* (quoting *Inwood Labs., 456 U.S. at 851 n.11*). "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source," *id. at 226* (citation omitted), **[**93]** that is, whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark," *Naked Cowboy v. CBS, 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012)* (quotation marks and citation omitted). This question "requires a fact intensive examination of 'the probable

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 129 of 255

Page 31 of 82

647 F. Supp. 3d 145, *210; 2022 U.S. Dist. LEXIS 230852, **93

reactions of prospective purchasers of the parties' goods.'" *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC, 364 F. Supp. 3d 291, 309 (S.D.N.Y. 2019)* (quoting *Pirone v. MacMillan, Inc., 894 F.2d 579, 584 (2d Cir. 1990)*).

The Second Circuit has identified six non-exclusive factors that bear on this inquiry: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Id.* (internal quotation marks and citation omitted). "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985)* (internal quotation marks and citation omitted). "A plaintiff **[*211]** bears the burden of proving that his mark acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands, 209 F. Supp. 3d at 654* (citing *Thompson Med. Co., 753 F.2d at 217*).

*(i) Advertising expenditures*: Such expenditures are regarded as **[**94]** "indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product." *Id. at 654-55* (citing *Ergotron, Inc. v. Hergo Ergonomic Support Sys., No. 94 Civ. 2732 (SAS), 1996 U.S. Dist. LEXIS 3822, 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996)*. "Targeted, albeit low-cost advertising, may establish the advertising factor." *Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 425 (S.D.N.Y. 2012)*. But "[m]erely showing that a certain amount was spent on advertising provides little support for secondary meaning. It must be shown that there was promotion of the mark as an identifier for the product." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007)* (alteration in original) (citation omitted).

Here, plaintiffs have adduced ample, uncontroverted evidence of extensive expenditures on advertising promoting their Trade Dress. Focus "did television ads, print ad[]s, trade shows, catalogs, websites, [and] distributor buying guides," physical flyers and website banners, and rebates to distributors. Tr. at 217, 237 (Kemp). In 2013, Focus's ad budget for its hospitality business exceeded $500,000. *Id.* at 246.[37] It spent most

such dollars on distributor rebates. In 2013, these totaled approximately $250,000 for hospitality customers and $200,000 for retail customers, *id.* at 241 (Kemp); between 2009 and 2013, Focus spent approximately $1.2 million in rebates, *id.* The balance was spent on television ads, print ads, **[**95]** trade shows, catalogs, websites, and distributor buying guides, all exclusively or prominently featuring the HOOKLESS(R) product and trade dress. *See id.* at 217-51. From 2005 to 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC, on which Focus continues today to advertise. *See id.* at 227 (Kemp); PTX 521 at 117 (listing TV appearances).

In addition, approximately 150 field representatives promoted Focus's products with its distributor customers. Tr. at 248 (Kemp). Focus's products also gained attention among retail customers from the fact that, by 2013, its curtains were hung in approximately 2.5 million hotel and motel rooms. *Id.* at 248-51. At an average hotel occupancy rate of 76% and an average stay of 2.5 to 3 days, this equated to "over 100 million individual exposures," and greater brand awareness. *Id.* at 251. To address the resulting volume of customer inquiries about its curtains, Focus prepared a script for its customer service team. *Id.* at 252.

That plaintiffs' advertising efforts were focused on promotion of its Trade Dress is reflected in TV and print ads for the HOOKLESS(R) product line. In these, Focus touted the "ease of installation," the "ten second[]" installation **[**96]** time, PTX 547; the enhanced experience of a curtain that lacks missing or broken rings and "drap[es] perfectly [and] slid[es] effortlessly," PTX 547, 560; the reduced "hassle" of changing shower curtains, PTX 548; and "install[ation] like magic in just seconds" with "no need to remove the rod," PTX 552. The evidence at trial was persuasive that these ads succeeded. Kemp testified **[*212]** that the HOOKLESS(R) product "broke records. . . . They ran through the stock. . . In fact, QVC continuously asked to air it because the product did so well for them." Tr. at 229 (Kemp).[38] To hospitality customers, Focus's ads also touted the benefits including lower maintenance costs and increased safety, satisfaction, and morale among hospitality and housekeeping staff, PTX 550, 559; *see also* PTXs 554 (reduced labor costs due to

surpassed $100,000 per year ever since").

---

[37] *See RVC Floor Decor, 527 F. Supp. 3d at 319* (ad spend favored secondary meaning where ad "budget started at $10,000 in 1975, grew to $100,000 per year by 1981, and

[38] *See Lopez, 883 F. Supp. 2d at 425* ("[T]o support a finding of secondary meaning, such advertising must have reached the targeted audience.").

647 F. Supp. 3d 145, *212; 2022 U.S. Dist. LEXIS 230852, **96

reduced installation time), 561 (same), 562 (same), 553, 555, 558. Focus also promoted its shower curtains in its AHR catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015). Between 2006 and 2012, Focus annually distributed between 200,000 and 250,000 catalogs to nationwide hotel chains. These prominently displayed the HOOKLESS(R) products. Dubinski Aff. **[\*97]**  ¶¶ 17, 19.[39] These effective efforts and expenditures easily satisfy this factor.

*(ii) Consumer studies linking the Trade Dress to Focus*: "[C]onsumer surveys are the most persuasive evidence of secondary meaning," as the determination whether a mark or trade dress has acquired secondary meaning is "an 'empirical question of consumer association.'" *LVL XIII Brands, 209 F. Supp. 3d at 638-39* (quoting *Two Pesos, 505 U.S. at 770-71*).[40] Plaintiffs have not come forward with such a survey. *See* Dkt. 494 at 38-39. But that is not dispositive as to secondary meaning. *Shen Mfg. Co. v. Suncrest Mills, Inc., 673 F. Supp. 1199, 1204 (S.D.N.Y. 1987)* (internal quotations and citations omitted).[41]

---

[39] *See Gucci Am., Inc. v. Guess?, Inc., 868 F. Supp. 2d 207, 218 (S.D.N.Y. 2012)* ("GRG Stripe" mark appeared on 20% of all Gucci accessories, making it an effective identifier).

[40] *See also, e.g., Sports Traveler, Inc. v. Advance Mag. Publishers, Inc., 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998)* ("[C]onsumer surveys have become the usual way of demonstrating secondary meaning."); *Ergotron, Inc., 1996 U.S. Dist. LEXIS 3822, 1996 WL 143903, at \*8* ("A consumer survey is the most persuasive element in demonstrating secondary meaning, because such a survey provides direct evidence." (citations omitted)).

[41] *See also Rubik's Brand v. Flambeau, Inc., No. 17 Civ. 6559 (PGG) (KHP), 2021 U.S. Dist. LEXIS 20031, 2021 WL 363704, at \*17 (S.D.N.Y. Jan. 31, 2021)* ("[T]he extensive evidence of secondary meaning . . . could support a finding, even without survey evidence, that consumers identify the Rubik's Cube and its 3x3 Cube Design as source identifiers."); *GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002)* ("[A]lthough plaintiffs have failed to present consumer survey evidence of secondary meaning, 'every element need not be proved' for a determination of secondary meaning to be made"); *PAF S.r.l. v. Lisa Lighting Co., 712 F. Supp. 394, 406 (S.D.N.Y. 1989)* (where plaintiffs did not come forward with a survey, granting permanent injunction based on other evidence of secondary meaning); *Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc., 648 F. Supp. 1026, 1035 (S.D.N.Y. 1986)* ("[T]he "absence of [a consumer survey] here is damaging to plaintiff [where it] has

Cognizable alternative proof of consumer recognition of a trade dress's **[\*213]** source may include direct testimony of customers as evidence of secondary meaning. *27-24 Tavern Corp. v. Dutch Kills Centraal, No. 14 Civ. 1625 (FB) (RER), 2015 U.S. Dist. LEXIS 132049, 2015 WL 5772158, at \*9 (E.D.N.Y. Sept. 29, 2015)* (citing *Rockland, 894 F. Supp. 2d at 320*). Plaintiffs did not call customers on this point, but they elicited probative admissions from Kartri owner Kubus. She testified that customers frequently called Kartri demanding "Hookless" products, or "either have a picture attached from Focus's website"; she estimated that 50% of buyers inquiring about hookless shower curtains asked Kartri for *Focus*'s products. Kubus Dep. Tr. at 52-53 Such unprompted inquiries strongly indicate secondary meaning. **[\*\*98]**  In a survey context, a 19.4% rate of unaided brand awareness has been held indicative of secondary meaning. *See Stix Prods., 295 F. Supp. at 491 n.43*. The high rate of unsolicited calls to Kartri evincing confusion between the parties' products—and the mistaken belief that Kartri was the source of Focus's products—is indicative of secondary meaning.

The second factor, too, weighs, albeit to just a slight degree because of the lack of a data set prepared with rigor, in favor of finding secondary meaning.

*(iii) Unsolicited media coverage of the Trade Dress:* "[E]xtensive, unsolicited media coverage of a product is a strong indication that a [trade dress] has obtained secondary meaning." *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021)* (collecting cases) (emphasis in original). In contrast, "isolated incidents of . . . unsolicited media coverage in several industry-specific publications are insufficient to show secondary meaning." *Denimafia Inc. v. New Balance Athletic Shoe, Inc., No. 12 Civ. 4112 (MP), 2014 U.S. Dist. LEXIS*

---

offered nothing but its own conclusion[s]."), *aff'd*, **810 F.2d 1160 (2d Cir. 1986)**; *Yamaha Intl Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1582 (Fed. Cir. 1988)* (The "absence of consumer surveys need not preclude a finding of acquired distinctiveness."); *E.T. Browne Drug Co. v. Cococare Prods., 538 F.3d 185, 201 (3d Cir. 2008)* ("We never have held, and do not hold today, that a party seeking to establish secondary meaning must submit a survey on that point."). *Cf. Brown v. Quiniou, 744 F. Supp. 463, 470 (S.D.N.Y. 1990)* ("[A]lthough failure to undertake a consumer survey concerning recognition of [its] mark is not by itself fatal to [a] plaintiff['s] assertion of secondary meaning, where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiff['s] position.").

647 F. Supp. 3d 145, *213; 2022 U.S. Dist. LEXIS 230852, **98

27541, 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014), *appeal dismissed*, No. 14-1156, 2014 U.S. Dist. LEXIS 27541.

Plaintiffs have adduced modest evidence on this point. In 1997, QVC named their shower curtain the "Best New Product." Zahner Aff. ¶ 183. In 1998, *New York Magazine* featured the HOOKLESS® product in its "Best Bets" section, calling the curtain "cutting-edge" in sparing customers the effort of "contorting to attach ugly hooks." **[**99]** PTX 543 at 2. In September 2001, the American Society of Interior Designers' magazine, *Icon*, featured the "ingenious" HOOKLESS® curtain in an editorial. PTX 429. In 2009, *Woman's Day* magazine featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. Although these four affirmations over a 12-year period benefit plaintiffs, they are not, measured by the case law, strong enough to assign this factor heavy weight for plaintiffs.[42] *See Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004)* ("dozen or so unsolicited articles that praise[d plaintiffs' product]" not probative of secondary meaning).

*(iv) Sales success:* A product's sales success may indicate whether a substantial portion of the purchasing public associates the trade dress with the product's source. *RVC Floor Decor, 527 F. Supp. 3d at 320*. In assessing sales success, courts have considered sales volume, *Easy Spirit, 515 F. Stipp. 3d at 64-65*; market share, *Conn. Cmty. Bank v. The Bank of Greenwich, 578 F. Supp. 2d 405, 414-15 (D. Conn. 2008)*; whether sales grew over time, *RVC Floor Decor, 527 F. Supp. 3d at [*214] 320*; whether sales data was broken down by year, *Rockland, 894 F. Supp. 2d at 321* (citing cases); and whether sales data was convincingly linked to the mark-bearing product, *Therapy Prods., Inc. v. Bissoon, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009), aff'd in relevant part sub nom. Erchonia Corp. v. Bissoon, 410 F. App'x 416 (2d Cir. 2011)* (summary order).

This factor strongly favors plaintiffs, given Focus's substantial sales figures, both in the hospitality industry and among retail customers. Focus adduced convincing **[**100]** documentary evidence and testimony, largely via Kemp, on this point. Revenues for

HOOKLESS® brand products between 2005 and September 2013 exceeded $150 million, with revenues from hospitality market sales being $14.7 million in 2013; $16.5 million in 2014; $21.2 million in 2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518. Spread across roughly 250 distributors, these reflected sales of some 5.76 million shower curtains in that market. PTX 515. This data corroborated Kemp's and Elmore's testimony that, as of October 2013, HOOKLESS® was "the number one shower curtain in [the] hospitality [sector]," Tr. at 253 (Kemp), in which Focus (with a more than 50% market share) was the dominant player, with Karti second, *id.* at 512 (Elmore).

In the retail market, Focus's sales revenues for its HOOKLESS® shower curtains were also formidable: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million in 2016; and $8.9 million between January 2017 and August 29, 2017. These reflected retail sales during these years of approximately 4.57 million shower curtains. PTX 514. Sales by plaintiffs' licensee Carnation of EZ-ON products are properly included **[**101]** in the analysis of the retail sales success of products bearing plaintiffs' Trade Dress, Between 2009 and January 2013, Carnation had sales volume of $225,710. PTX 591.

The sales success factor thus strongly favors plaintiffs. *See, e.g., R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009)* ($4 million sales indicative of secondary meaning); *Metrokane, Inc. v. The Wine Enthusiast, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001)* ($3 million revenues held "indisputable sales success"); *Easy Spirit, 515 F. Supp. 3d at 65* (finding sales success where plaintiff's data "reflect[ed] millions-of-dollars in sales revenue"); *Conn. Cmty. Bank, 578 F. Supp. 2d at 414-15* finding sales success to favor plaintiff whose market share was 3.95% in a competitive market).

*(v) Attempts to plagiarize the Trade Dress:* "Evidence that a [trade dress] has been widely copied is persuasive evidence of secondary meaning because it demonstrates that it [the dress] has become a 'strong source identifier in the eyes of the purchasing public.'" *Lopez, 883 F. Supp. 2d at 428* (quoting *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993)); *accord, Centaur Commc'ns, 652 F. Supp. at 1109.* "Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwartz, 184 F.*

---

[42] Plaintiffs note that their products were distributed through third-party websites, such as kaboodle.com, QVC.com, SignatureHardware.com and thefind.com. PTX 521 at 90-100. But distribution through these channels does not speak to the extent of media coverage.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 132 of 255

Page 34 of 82

647 F. Supp. 3d 145, *214; 2022 U.S. Dist. LEXIS 230852, **101

*Supp. 2d 311, 319 (S.D.N.Y. 2001)* (footnote omitted) (citing *Bristol-Myers Squibb, 973 F.2d at 1042*). The key question is "whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will." *Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004)*.

Here, plaintiffs have introduced extensive evidence that third parties—not **[\*215]** only Kartri **[\*\*102]** and Marquis—have attempted to copy and commercially exploit Focus's intellectual property by marketing products with its Trade Dress. Each time, Focus responded by sending the malefactor a cease-and-desist letter—which resulted in agreements to desist—or by filing complaints, which resulted in similar agreements.[43] Competitors' efforts to parrot the Trade Dress reinforce that it has acquired secondary meaning in the hospitality market. *See Edible Arrangements, LLC v. Provide Com., Inc., No. 14 Civ. 250 (VLB), 2016 U.S. Dist. LEXIS 99291, 2016 WL 4074121, at \*7 (D. Conn. July 29, 2016)* ("numerous attempts to plagiarize the mark" probative of secondary meaning where plaintiff had sent "dozens of cease and desist letters" to "large and small businesses"). *But cf. MZ Wallace Inc. v. Fuller, No. 18 Civ. 2265 (DLC), 2018 U.S. Dist. LEXIS 214754, 2018 WL 6715489, at \*10 (S.D.N.Y. Dec. 20, 2018)* (few letters not probative of attempts to plagiarize where trade dress described in the letters "is inconsistent and often contains significant variations from that" in the case).

The attempts by Kartri and Marquis to capitalize on Focus's Trade Dress also strongly indicate intentional plagiarism. Before developing their Ezy Hang product, Kartri and Marquis demonstrably were aware of Focus's HOOKLES SO product and its success in the hospitality market. Tr. at 743 (Kubus). Kartri, in fact, had declined to commercialize the Hookless patent when HSNA's Marcus had pitched **[\*\*103]** it to Kartri's president in the

late 1990s. Tr. at 724-25, 727-28, 772; Zabner Aff. ¶ 387.

As to Marquis, the facts overwhelmingly reflect that it willfully closed its eyes to the high probability that the Ezy Hang design it was obtaining in China and furnishing to Kartri to sell in the -U.S. was infringing Focus's intellectual property rights. Middleberg and Fong had spoken about Focus "many times" when Pong—whom Middleberg knew had worked for a manufacturer of Focus's in China—pitched the D-shaped shower ring. Tr. at 554, 593-94. Middleberg accepted, uncritically, Pong's unsubstantiated representations that Focus's utility patents "had become a public domain kind of product" and/or were "about to run out." *Id.* at 555. Marquis did not investigate whether the product they proceeded to market was covered by a valid patent—whether owned by Focus, an affiliate, or anyone else—in the United States. *Id.* at 554, 596-97. And when Pong's patent attorney offered to conduct a patent analysis for $3,500, PTX 258 at 2, Middleberg spurned the offer, Tr. at 599. Instead, he chose to credit Pong's dubious claims—based on an untranslated Chinese language document—to own a Chinese patent on the D-shaped ring. *Id.* at 554. Middleberg also **[\*\*104]** put weight on Pong's statement that Focus was "in deep financial trouble," *id.* at 611 (quoting PTX 159 at 1). But while that statement appears to have emboldened Middleberg to conclude that Focus would be too weak to fight, it said nothing about Focus's intellectual property rights. Notably, Marquis **[\*216]** continued to develop the accused products even after Focus's 2015 cease-and-desist letter to Kartri, which was forwarded to Marquis. Its sales to Kartri of EZY-Hang curtains for sales in the United States persisted until November 2018, nearly three years after Focus brought this lawsuit.

Kartri, too, ignored the obvious. Kubus admitted deferring to Marquis's representations that, in light of Pong's purported patent, "everything was clear and safe." *Id.* at 643. Kartri did not investigate whether Focus (or others) had intellectual property rights to the shower curtains, despite her familiarity with Focus's products and her admission that Focus's hookless curtains had upended shower curtains sales in the hospitality market in which the parties competed. And Kartri openly described its Ezy Hang product as a "version of HOOKLESS®," despite knowing that Focus's product was widely referred to by that name.[44]

---

[43] Most apposite here, given these competitors' similar designs to Focus's, are the copying efforts by (1) Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (agreement to desist executed April 1, 2008); (2) DFW Motel Supply & Textiles, Inc., *see* PTXs 102 (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); (3) Neilmax Industries, Inc., PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); (4) Trend Supply, Inc., PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010); and (5) Royal Pacific, *see* PTXs 99 (cease-and-desist letter sent September 25, 2007, 537 (agreement to desist reached December 6, 2007).

---

[44] *See, e.g.* **[\*\*105]** , PTXs 230 (December 18, 2013 email

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 133 of 255

Page 35 of 82

647 F. Supp. 3d 145, *216; 2022 U.S. Dist. LEXIS 230852, **105

This factor strongly favors a finding that the Trade Dress had secondary meaning at the time of defendants' accused conduct.

*(vi) Length and exclusivity of the Trade Dress's use:* "[T]tle longer and more exclusive the trade use, the more likely it is that a [trade dress] has acquired secondary meaning." *BigStar Ent., 105 F. Supp. 2d at 203*. In contrast, "[t]he use of part or all of the mark by third parties" cuts against exclusivity of use and thus "weakens its overall strength." *Time, Inc., 173 F.3d at 118* (citing *Streetwise Maps, 159 F.3d at 744*); *see also KIND, LLC v. Clif Bar & Co., No. 14 Civ. 770 (KMW) (RLE), 2014 U.S. Dist. LEXIS 81097, 2014 WL 2619817, at *6 (S.D.N.Y. June 12, 2014)* (same). Although "no absolute time span can be posited as a yardstick, courts have indicated that continuous exclusive usage of a trade dress over a five-year period may support—but does not necessitate—a finding of secondary meaning." *Easy Spirit, 515 F. Supp. 3d at 67*.

That standard and benchmark are easily met here. Zahner invented his Hookless product around 1992, and obtained his first patent—the '232 Patent—on February 16,1993. PTX 303. In 1997, Zahner, through Hookless Systems of North America, introduced the invention to the market, where such Trade Dress was new. *See* Zahner Aff. ¶¶ 83-84; Tr. at 121 ("[N]o one had ever seen anything like that before." (Zahner)). Kubus agreed that the HOOKLESS® product was an innovative new design. Tr. at 772. Defendants first **[**106]** began to sell the accused product in 2013. Thus, for 16 years, between 1997 and 2013, plaintiffs had exclusivity over their product. And plaintiffs vigorously defended that exclusivity via cease-and-desist letters or lawsuits. This factor strongly favors plaintiffs. *See Landscape Forms, 117 F. Supp. 2d at 366-67* ("[P]laintiff's five year period of continuous use of the Petoskey trade dress provides additional evidence of the secondary meaning that these products had obtained."); *Jewish Sephardic Yellow Pages, 478 F. Supp. 2d at 375* ("[G]iven the well-defined nature of plaintiff's market . . . three to four years of exclusive use is somewhat significant.").

*(vii) Weighing the subfactors:* Four of the six relevant

factors—advertising spend, sales success, attempts to plagiarize **[*217]** the Trade Dress, and length and exclusivity of use—strongly favor plaintiffs. The second—consumer confusion studies—is not required, and plaintiffs have adduced other proof to the same effect. The third—unsolicited media coverage—lightly aids plaintiffs' claim. Weighing these factors, the Court finds plaintiffs' Trade Dress strong. The first *Polaroid* factor as to the Trade Dress infringement claim weighs heavily in plaintiffs' favor.

*d. Polaroid Factors (2) Through (8) for the HOOKLESS® Mark, the EZ-ON Mark, and the **[**107]** Trade Dress*

Having found the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress all strong, the Court now considers the remaining *Polaroid* factors. In conducting this analysis, the Court notes that while plaintiffs' Lanham Act claims of infringement of the EZ-ON Mark and Trade Dress are pursued against both defendants, their claim of infringement of the HOOKLESS® Mark is brought against Kartri only. Thus, although analyses of the three sets of infringement claims overlap—including because plaintiff's Trade Dress embraces curtains containing the EZ-ON Mark rings and curtains containing HOOKLESS® Mark rings—the Court has considered as bearing on Marquis only that evidence relevant to EZ-ON and Trade Dress claims.

*(2) Similarity*: "[C]ourts look to the overall impression created by the [marks and] trade dress and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers," *Gruner + Jahr, 991 F.2d at 1078*. "[T]he test . . . is whether confusion is probable among numerous customers who are ordinarily prudent." *AM Gen. LLC v. Activision Blizzard, Inc., 450 F. Supp. 3d 467, 480-81 (S.D.N.Y. 2020)* (quoting *Estee Lauder Inc. v. The Gap, 108 F.3d 1503, 1511 (2d Cir. 1997)*); *Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 133 (2d Cir. 2004)*. Courts compare the marks "in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly **[**108]** similar,'" *Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000)*, *aff'd, 234 F.3d 1262 (2d Cir. 2000)* (quoting *Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 117 (2d Cir. 1984)*), and "look[] at the visual and aural similarity of the marks, in addition to how they are presented in the marketplace," *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V., 201 F. Supp.*

---

exchange between Dolph and Best Western representative, subject line "HOOKLESS," and discussing Ezy Hang as "a version of hookless"), 231 (April 14, 2014 email exchange between Kartri and GMK Cales Associates discussing price quote for "Hookiess shower curtain[s]"), 232 (December 8-16, 2014 email exchange discussing price quote for "Hookless Shower Curtains").

647 F. Supp. 3d 145, *217; 2022 U.S. Dist. LEXIS 230852, **108

*3d 428, 447 (S.D.N.Y. 2016)* (internal citations omitted).

*Visual similarity between the Trade Dress as manifested by the EZ-ON Mark and the Ezy Hang curtain:* Focus's Trade Dress is manifested in both the HOOKLESS® Mark and the EZ-ON Mark. A side-by-side comparison of each with the accused Ezy Hang product shows that the Ezy Hang product is exceptionally similar to the trade dress manifested by EZ-ON Mark, and quite similar to the Trade Dress manifested by the HOOKLESS® Mark.

As to EZ-ON, the juxtaposition looks like this:
 **[*218]**



*Ezy Hang product, regular finish, ring slits facing in the same direction.* See *PTX 26.*



*Ezy Hang product, chrome finish, ring slits facing each other.* See *PTX 27.*



*EZ-ON product, as sold by Carnation.* See *DTX90.*

The dresses are nearly identical. Both rings are integrated into the curtain's fabric, are D-shaped, have their flat edge align with the curtain's upper edge, and display an upward-pointing slit that reaches the ring's upper edge near one of its corners. The only nominal difference—and it is nominal, indeed—is that Carnation's ring has a straight **[**109]** slit, while the Ezy Hang ring has an angle in its slit. *See* Tr. at 557 (Middleberg referring to angle as a "lightning bolt"). That angle does not change the big picture: that the two marks are overwhelmingly similar. Were it not for the lightning bolt angle, the Court might have found the two marks effectively identical.

*Visual similarity between the Trade Dress as manifested by the HOOKLESS® Mark and the Ezy Hang curtain*: A side-by-side comparison of the Ezy Hang product with

the Trade Dress as manifested by the HOOKLESS® product looks like this:
 **[*219]**



*Side-by-side comparison of the HOOKLESS® and Ezy Hang curtain rings*

The strong similarity between these products is apparent. Although the slit of the HOOKLESS® product protrudes horizontally and into the curtain's fabric to connect with an adjacent ring, the overall appearance is of a ring with a slit designed to accommodate a curtain rod. In both, the ring portion of the curtain occupies a small percentage of the overall curtain and its appearance. The "neat and orderly appearance" of the evenly billowing curtain that results from its affixture by rings that are coplanar with its fabric is a prominent feature of the Trade Dress. Its appearance **[**110]** does not depend on the placement or angulation of the slits, but on the curtain's arrangement on the rod that rings using such technology make possible.

*Aural similarity between EZ-ON Mark and Ezy Hang mark*: The names "EZ-ON" and "Ezy Hang" are confusingly similar'. The first half of each name is pronounced "easy."[45] "Easy" modifies the second half in each mark—"on" and "hang." Both words evoke the act of (easily) affixing the curtain on the rod. Although phonetically different, the respective second halves are semantically similar because the curtain is intended to facilitate the easy *hanging on* of the rod. *See Heartland. Trademarks, Ltd. v. Dr. Flax LLC, No. 17 Civ. 795 (MAD) (ATB), 2017 U.S. Dist. LEXIS 120440, 2017 WL 3278905, at *4 (N.D.N.Y. Aug. 1, 2017)* (finding "obvious similarity between the FLAX mark and the different variations of Dr. Flax, which simply add the title 'doctor' before the word 'flax'" and that, "[d]espite the addition of the title 'doctor,' the dominant word remains 'flax'"); *Classic Liquor Importers, 201 F. Supp. 3d at 447* ("[T]he ELITE and ELIT components of the marks are functionally equivalent in meaning and commercial

---

[45] The Court found highly unpersuasive Goskowski's claim that EZ-ON could be pronounced "ezzon." Tr. at 688. Throughout trial, all parties otherwise pronounced the mark "Easy On."

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 135 of 255

Page 37 of 82

647 F. Supp. 3d 145, *219; 2022 U.S. Dist. LEXIS 230852, **110

impression",'" and "there is no genuine dispute that ELITE and ELIT are intended to be pronounced identically"). The marks are used in the same context: the packaging and sale of shower curtains to customers in the hospitality market. **[**111]** [46]

 **[*220]** The Court accordingly finds that the Ezy Hang mark is so strongly similar in look and sound to the EZ-ON Mark as to be nearly identical. *See, e.g., Juicy Couture, Inc. v. Bella Int'l Ltd., 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013)* (finding defendant's marks "similar in both name and design to a number of Plaintiff's marks,"[47] and noting that the branded products "appear[ed] in similar contexts as both are used in the sale, packaging and promotion of women's apparel and accessories"). The Court finds that the Ezy Hang mark is strongly similar to the HOOKLESS® Mark, albeit in look only, not sound.

These findings compel a similar outcome as to the Trade Dress. Regardless whether the Court considers the HOOKLESS® manifestation of the Dress or the EZ-ON manifestation, the similarity of the Ezy Hang curtain's overall look and appearance is clear.

*(3) Competitive proximity of the products'.* "The 'competitive proximity' factor concerns whether and to what extent products bearing the two parties' marks compete with each other." *Goat Fashion Ltd. v. 1661, Inc., No. 19 Civ. 11045 (PAE), 2020 U.S. Dist. LEXIS 178636, 2020 WL 5758917, at *12 (S.D.N.Y. Sept. 28, 2020)*; *see also Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996)*. Courts consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." *La Cibeles, Inc. v. Adipar, Ltd., No. 99 Civ. 4129 (AGS), 2000 U.S. Dist. LEXIS 12676, 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000)* (internal quotation marks and citation omitted); *see also Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 517 (S.D.N.Y. 1993)* ("Factors to consider in **[**112]** determining the competitive proximity of the products include appearance, style,

function, fashion appeal, advertising orientation and price." (citing *McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (2d Cir. 1979)*, superseded on other grounds by *Fed. R. Civ. P. 52(a)* as stated in *RiseandShine, 41 F.4th at 120*)). Where the products "serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang, 949 F.2d at 582*.

*Ezy Hang's proximity to HOOKLESS® products*: The parties' products are exceedingly proximate. Both sell shower curtains without hooks, compete for the same consumers in the hospitality market, and extol the same product virtues. Those are—as reflected in the products' names and advertisements—the ease and speed of installation, which, of importance to the hospitality market, are associated with **[*221]** lower maintenance and labor costs. *Compare* PTXs 547 (Focus ad touting HOOKLESS's "ease of installation," its "ten second[]" installation time), 548 (Focus ad promoting reduced "hassle" of changing shower curtains), 552 (same, praising "install[ation] like magic in just seconds" with "no need to remove the rod"), 121 (same), 554 (Focus ad breaking down reduced labor costs due to reduced installation time), 561 (same), 562 (same), **[**113]** *-with* Tr. at 558 (Middleberg testifying that design choice of D-shaped ring for Ezy Hang was advantageous because such rings could be easily snapped onto the shower curtain rod, allowing hospitality staff installing such curtains to secure themselves with their free hand).

*Ezy Hang's proximity to EZ-On products*: The products' markets are adjacent. Focus's licensee, Carnation, sells the EZ-ON curtain in the retail market, while Kartri is active in the hospitality market. These markets are proximate and interrelated. The evidence reflected that individual consumers often develop interest in buying a hook-free shower curtain product based on exposure to it during a hotel stay. Accordingly, as "these products 'serve the same purpose [and] fall within the same general class,' they have market proximity and thus are 'likely to cause confusion.'" *RVC Floor Decor, 527 F. Supp. 3d at 325* (alteration in original) (citation omitted).

The proximity factor weighs overwhelmingly in plaintiffs' favor as to the HOOKLESS® Mark; very strongly in plaintiffs' favor as to the EZ-ON Mark; and overwhelmingly in plaintiffs' favor as to the Trade Dress, which is embodied by both products, and thus even more likely to be confused with the Ezy Hang **[**114]** curtain than either of plaintiffs' Marks in isolation.

---

[46] There is no aural similarity between the word marks "HOOKLESS®" and "Ezy Hang."

[47] The marks at issue that were found similar looked like this:

  

*Juicy Couture, 930 F. Supp. 2d at 500*.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 136 of 255

Page 38 of 82

647 F. Supp. 3d 145, *221; 2022 U.S. Dist. LEXIS 230852, **114

**(4)  Bridging the gap**: This factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., 412 F.3d at 387* (citation omitted). This factor "protects the plaintiff's interest in being able to enter a related field at some future time." *Cartier, 294 F. App'x at 619* (citing *Savin Corp., 391 F.3d at 459-60*). Where the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant the *Polaroid* analysis." *Star Indus., 412 F.3d at 387* (treating factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009)* (same, where both parties used marks in connection with sale of coffee products); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015)* (same, where both parties' marks appeared on sunglasses).

*Gap between Ezy Hang and the HOOKLESS® product*: As to the HOOKLESS® product, as explained, there is no gap to bridge. Both the HOOKLESS® curtain and defendants' Ezy Hang curtain are sold in the hospitality market.

*Gap between Ezy Hang and the EZ-ON product*: Kartri argues that the products are not proximate because Carnation sold its licensed EZ-ON curtains in the retail market, while Kartri served the hospitality market. That **[**115]** does not preclude finding proximity. As the Second Circuit has emphasized: "[T]he assumptions of the typical consumer . . . must be taken into account." *Cadbury, 73 F.3d at 482* ("Because it is surely plausible that a manufacturer of branded products such as Cadbury would enter the private-label market, it is also plausible that a wholesale purchasing agent would conclude that Cadbury **[*222]** *had already done so—i.e.*, that Cadbury had already bridged the gap."). That principle applies with force here. Focus's HOOKLESS® product had been a fixture in the hospitality market for over a decade by the time defendants' accused conduct began. Having a dominant foothold in that market with HOOKLESS® would have enabled Focus, through Carnation, to handily introduce the EZ-ON product in the hospitality market. Indeed, under Focus's licensing agreement with Carnation, the EZ-ON products were co-branded with the HOOKLESS® Mark on its packaging. PTXs 123 (images of packaging showing cobranding), 194 (same), 370 § 4.2 (licensing agreement so agreeing).

Moreover, the retail and hospitality markets are closely

linked because hotel guests are exposed to the curtains at issue during their stay and often then seek to buy one for at-home **[**116]** use. *See* Dubinski Aff. ¶¶ 53-54. Kemp testified that, as a result of its curtains' presence in more than 2.5 million U.S. hotel and motel rooms, Focus received so many retail customer inquiries that it developed a script for its service team to use in processing those inquiries. Tr. at 251-52.

The Court accordingly finds the following. For the infringement claim as to the HOOKLESS® Mark, the bridging-the-gap factor is neutral, as the Ezy Hang and HOOKLESS® already compete in the hospitality market. For the infringement claim as to the EZ-ON Mark, this factor strongly favors plaintiffs, as the retail and hospitality markets are closely related, and it would have been easy for plaintiff to introduce the EZ-On product into that market. As to the Trade Dress infringement claim, the factor moderately favors plaintiffs, as 65% of plaintiffs' sales volume occurred in the hospitality market (to which the bridging-the-gap factor is not germane), and 35% occurred in the retail market (to which this factor is germane).

**(5)  Actual confusion**: Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear, 799 F.2d at 875*, "[t]here can be no more positive or substantial proof of the likelihood of confusion," **[**117]** *Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368, 385 (S.D.N.Y. 2008)* (quoting *Savin Corp., 391 F.3d at 459*) (alteration in *Dooney Bourke)*. Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport, 86 F. Supp. 2d at 319* (collecting cases). But "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion." *Lois Sportswear, 799 F.2d at 875* (citation omitted).

"Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport, 86 F. Supp. 2d at 319*. To be germane under the Lanham Act, the confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang, 949 F.2d at 583*; *see also Trs. of Colum. Univ. v. Colum./HCA Healthcare Corp., 964 F. Supp. 733, 747 (S.D.N.Y. 1997)* ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

*Confusion of the HOOKLESS® Mark and Trade Dress*

647 F. Supp. 3d 145, *222; 2022 U.S. Dist. LEXIS 230852, **117

with the *Ezy Hang curtain*: Plaintiffs have adduced significant anecdotal evidence of actual consumer confusion. Burbank testified that Focus had received Kartri products in its warehouse from customers attempting to return it to seller. Tr. at 40. Although Burbank did not **[*223]** know the identity of the customers who did so—"could be distributor, **[**118]** could be a franchisee," *id.*—such events bespeak *some* consumers' misapprehension that the source of the Ezy Hang product was Focus. Kemp similarly recounted calls Focus's customer service department received from confused customers. These typically came from a hotel's head of housekeeping or general manager, lodging a quality complaint. Tr. at 267. In these calls, in which the Focus representative would "run through a series of questions about the product to verify a production date," it would become apparent that the caller was complaining about an Ezy Hang product, usually because, as described by the customer, the tag was a Kartri tag. *Id.* at 267,269-70. Kemp testified that customers were mystified how they ended up with a Kartri product—notwithstanding the nominal difference in appearance.[48] Distributors also mistakenly lodged complaints with Focus about Kartri curtains. *Id.* at 273. These reached Focus about "three to four times a month." *Id.* at 268 (Kemp).

This anecdotal evidence is compelling. That hotel chains would realize their confusion only *after* they had purchased and used the Ezy Hang product and called Focus powerfully establishes that this confusion "inflict[ed] commercial injury [on Focus] **[**119]** in the form of . . . a diversion of sales." *Lang, 949 F.2d at 583*. It also bespeaks likely harm to Focus's goodwill and reputation, *id.*, insofar as the calls concerned the malfunctioning or poor performance of a purported Focus product.[49] *See Mejia & Assocs., Inc. v. Intl Bus.*

_____

[48] *See* Tr. at 267 ("A lot of times—some of the time the . . . hotel manager would respond, what do you mean? This is Hookless. And we'd say, that's not made by Focus Hookless. And they'd say, I thought I was buying Hookless, you know, how did I get this product?"); *id.* at 269 ("Q: So as far as you understand, there was actually confusion between your horizontal slit product and the Kartri product? A: That's correct. It has the same design look to a hotel property or a general manager. They don't always notice where the slit location is.").

[49] A member of Kartri's own executive staff was also demonstrably confused by the parties' products. Dolph, a 30-year employee and Kartri's sales operations manager from 2013 on, was shown a Kartri shower curtain during her deposition. *See* PTX 642 at 15-18. She mistakenly identified it

*Machines Corp., 920 F. Supp. 540, 550 (S.D.N.Y. 1996)* (actual confusion factor moderately favored plaintiff where plaintiff documented 27 incidents of potential customers mistaking plaintiff for a company that already serviced them); *De Venustas v. Venustas Int'l, LLC., No. 07 Civ. 4530 (LTS) (THK), 2007 U.S. Dist. LEXIS 66586, 2007 WL 2597122, at *6 (S.D.N.Y. Sept. 11, 2007)* (actual confusion factor weighed in plaintiff's favor where confused callers "were fashion and beauty field insiders, and thus are important potential sources of referrals for its consulting work"); *Goat Fashion Ltd. v. 1661, Inc., No. 19 Civ. 11045 (PAE), 2020 U.S. Dist. LEXIS 178636, 2020 WL 5758917, at *13 (S.D.N.Y. Sept. 28, 2020)* (actual confusion factor weighed in plaintiffs favor where, "[t]ellingly, [defendant's] consumers are contacting Goat Fashion and searching for [defendant]'s items on [plaintiff]'s website").

*Confusion of the HOOKLESS® Mark and Trade Dress with the Ezy Hang curtain*: As to the confusion between the Ezy Hang curtain and the EZ-ON curtain sold by Carnation, plaintiffs have not adduced evidence of actual consumer confusion.

**[*224]** In sum, the actual confusion factor weighs in Focus's favor as to the infringement claim of the HOOKLESS® Mark and, by virtue of the HOOKLESS® Mark's embodiment of the Trade **[**120]** Dress, as to the infringement claim of the Trade Dress. However, as to the infringement claim of the EZ-On Mark, the actual confusion factor weighs against Focus.

**(6) Bad faith**: This inquiry "'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006)* (quoting *Savin Corp., 391 F.3d at 460*). "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol-Myers Squibb, 973 F.2d at 1044* (citation omitted). Where the junior user's mark is not fully identical to the senior mark, the Second Circuit has upheld findings of bad faith where the junior user knew of the prior mark and the junior mark showed "similarities so strong that it seems plain that deliberate copying has occurred," *Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 587 (2d Cir. 1993)* (citation omitted). But "[t]here is a considerable

_____

as a Focus curtain, before looking at the tag and correcting herself. *Id.* at 22-23.

difference between an intent to copy and an intent to deceive." *Starbucks Corp., 588 F.3d at 117* (citations omitted). "The intent to compete by imitating the successful features of anther's product is vastly different from the product." *Streetwise Maps, 159 F.3d at 745*. Where the junior user "prominently displays" its own **[\*\*121]** mark and "uses a trade dress dissimilar to" the senior user's, such efforts "negate[] an inference of intent to deceive consumers as to the source of the product." *Kind LLC, 2014 U.S. Dist. LEXIS 81097, 2014 WL 2619817, at \*11* (citation omitted).

Here, for the reasons reviewed in connection with defendants' attempts to plagiarize Focus's Trade Dress, the evidence is compelling that defendants, aware of the inroads Focus's innovation had made in the shower curtain market, intentionally sought to mimic Focus's Trade Dress to deceive customers to purchase Ezy Hang and thereby to capitalize on Focus's goodwill. The close similarity—in both looks and sound—between Kartri's Ezy Hang product and Focus's EZ-ON product reinforces this conclusion. These similarities are "so strong that it seems plain that deliberate copying has occurred," *Paddington Corp., 996 F.2d at 587*. Defendants did not offer a benign justification for these similarities—especially not for the strong similarities in look *and* sound between the Ezy Hang product and EZ-ON product. It is unavoidably clear that defendants intentionally, and in bad faith, sought to all-but-replicate the EZ-ON Mark so as to capitalize on competitor Focus's intellectual property and good will. *See, e.g.,* *Playboy Enters. Inc. v. Chuckleberry Pub'g, Inc., 687 F.2d 563, 565 (2d Cir. 1982)* (affirming finding of bad faith where **[\*\*122]** defendant offered no credible explanation for the similarity to the senior user's product).

The Court accordingly finds that the bad faith factor, too, favors Focus. Although the proof of bad faith is especially obvious in connection with the Ezy Hang product, the Court finds that the factor of bad faith cannot be logically cabined to the EZ-ON Mark. Defendants' strategy of deliberate infringement, the Court finds, was holistic.

*(7) Quality of product*: This factor "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013)*. "On the one **[\*225]** hand, the court must determine 'whether defendant's products or services are, inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.' On the other

hand, if the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality' may tend to create confusion as to source by bringing the products into even closer proximity," *Id.* (quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d 133, 142 (2d Cir. 1999)*). *But see* *Virgin Enters. Ltd. v Nawab, 335 F.3d 141, 152 (2d Cir. 2003)* ("[T]he quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."); *Pfizer Inc. v. Sachs, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009)* (sue):.

Here, defendants' inferior products, coupled with the **[\*\*123]** source confusion that consumers demonstrably expressed, tended to tarnish Focus's reputation. This factor favors plaintiffs, as to ail three infringement claims. And the evidence strongly showed that the Ezy Hang product was inferior to Focus's. Kemp testified that, in 2015, Focus sent several Ezy Hang product specs to its China-based factory for quality testing of individual components. Tr. at 264. This resulted in a finding that "compared to the Focus Hookles? product, [each tested product] was . . . inferior." *Id.* The overall fabric of the Ezy Hang curtain was of lower quality, the fabric window was lower weight, and the "snaps on the snap-in liner were thinner, flimsier material." *Id.*

Kemp also persuasively testified that, based on her observations, the Ezy Hang product was of lower quality. During a meeting with its customer HD Supply, which resells Focus's products, HD Supply's senior buyer Greg Syrek confronted Kemp with Kartri's proposal that HD Supply replace Focus's snap-in liners with Kartri's. *Id.* at 265. Syrek pulled a sample Kartri curtain from a rack, "[a]nd when he pulled it out, two or three of the snaps broke on the floor as he was pulling them." *Id.* at 266. In light of the quality concern, **[\*\*124]** Syrek lost interest in switching HD Supply's account to Kartri. *See id.* Where the junior product consists of lower-quality materials than the senior product, the quality factor favors plaintiff. *See* *Coty Inc. v. Excell Brands, LLC, 277 F. Supp. 3d 425, 455 (S.D.N.Y. 2017)* (quality factor favored plaintiff where junior fragrance product "use[d] less expensive, synthetic oils, rather than the natural oils used in [plaintiff's] fragrances, and it employ[ed] less expensive packaging components").

Other evidence is in accord. Focus's Dubinski testified that she had heard of consumer complaints that the Ezy Hang product did not slide on the curtain rod as easily as Focus's. Tr. at 148-49. Defense witnesses gave

testimony to similar effect. Middleberg testified that, at least initially, the fabric was coming off the grasp of the Ezy Hang ring, *id.* at 590-91; he did not testify whether quality issues were remedied. Kubus testified that, during Ezy Hang's initial commercialization in 2013 and 2014, "[w]e had a lot of issues getting it resolved with quality," *id.* at 766; *see also id.* at 767. Kartri encountered problems of curtains that were "falling apart"; it replaced these curtains for its customers. *Id.; see also Tiffany & Co.*, 127 F. Supp, 3d at 253 (finding disparity in quality between engagement rings where, unlike the senior **[\*\*125]** user, junior user faced issues with diamond falling out of its ring, did not use quality control standards, and did not use highest quality diamonds), *grant of summary judgment vacated and remanded for reconsideration of other* Polaroid *factors*, *971 F.3d 74 (2d Cir. 2020)*.

**[\*226]** The assembled evidence persuasively establishes that the Ezy Hang curtain suffered from quality issues. And defendants have not adduced evidence of deficiencies with Focus's curtain. Thus, "the junior user's product [was] of inferior quality," creating a risk that "the senior user's reputation could be jeopardized." *The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 965 (2d Ch. 1996)* (internal quotations and citation omitted); *see also Sunny Merch. Corp., 97 F. Supp. 3d at 498* (factor favored plaintiff where "[t]here [was] no dispute that [defendant's] products are of an inferior quality to [plaintiff's]").

The quality factor accordingly weighs in plaintiff's favor as to the HOOKLESS®, EZ-ON, and Trade Dress infringement claims.

*(8) Consumer sophistication*: The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., 412 F.3d at 390* (internal quotation marks and citation omitted) **[\*\*126]** (alteration in original). "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prods. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011)*. Confusion is thus more likely "where the goods are cheap and bought casually." *Dooney & Bourke, 561 F. Supp. 2d at 389* (quoting MCCARTHY ON TRADEMARKS § 23:96) (internal quotation marks omitted). And where "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied onto prevent confusion." *Morningside,*

*182 F.3d at 143*.

With the Court's having found that the Ezy Hang product is nearly identical to the EZ-ON product and strikingly similar to the HOOKLESS® product, there is a presumption that the likely customers of Focus's and Kartri's products would be confused among them, unless they are exceedingly sophisticated. *See id.* The evidence does not establish such sophistication. To the extent defendants operated through distributors, as was often the case for Focus's HOOKLESS® product, Kemp testified that such distributors usually buy hundreds, even thousands, of different products pertaining to bedding, bath, and related categories. Tr. at 274-75. Given the breadth of this suite of products, she testified, distributors "will never be experts [in non-hooked **[\*\*127]** shower curtain products], no matter how hard we train them." *Id.* at 275. Where a distributor relies on a field team, expertise may be particularly unlikely. *Id.* at 273 (Kemp). As to the parties' ultimate purchasers, these are, on the whole, of either medium sophistication (particularly as to hospitality-market purchasers) or low sophistication (retail-market purchasers). In the hospitality market, to the extent the purchasing decision is made by a higher-up executive, these are unlikely to be expert in particular shower curtain products. Erickson Aff. ¶ 13. In the retail market, individual customers may purchase a HOOKLESS® or Ezy Hang products based on encountering it at a hotel, not on comparison shopping or research. Such consumers are unlikely to be savvy to the differences between the parties' products. *See id.*

The inexpensive cost of a shower curtain is also consistent with lower sophistication. The shower curtains at issue in this litigation typically range in price between $12-31 for a Focus curtain, and $12-28 (in some instances $45) for a Kartri curtain. Elmore Rep. ¶ 91. They thus fall within the "inexpensive [product category that] does not require any sophistication on the **[\*227]** part of the buyer." **[\*\*128]** *Snuggly Plushez, 809 F. Supp. 2d at 156*; *see also Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011)* ("[p]urchasing fashionable yet affordable ladieswear" did not require any heightened degree of sophistication (internal quotation marks omitted)); *see Capri Sun GmbH v. Am. Bev. Corp., No. 19 Civ. 1422 (PAE) (DCF), 595 F. Supp. 3d 83, 2022 WL 976270, at \*56 (S.D.N.Y. Mar. 31, 2022)* (juice pouches, sold in cartons priced between $2 and $20, did not require consumer sophistication), *motion to certify interlocutory appeal denied, 2022 U.S. Dist. LEXIS 139816, 2022 WL 3137131 (S.D.N.Y. Aug. 5,*

647 F. Supp. 3d 145, *227; 2022 U.S. Dist. LEXIS 230852, **128

*2022)*; *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC, 7 F. Supp. 3d 385, 398-99 (S.D.N.Y. 2014)* (similar).

Kartri responds that some customers knew they had bought Kartri's products and proceeded anyway. That does not refute confusion. "[T]o be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *PAF S.r.l. v. Lisa Lighting Co., 712 F. Supp. 394, 411 (S.D.N.Y. 1989)* (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd., 604 F.2d 200, 204-05 (2d Cir. 1979)*). Kartri has not adduced evidence that its customers knew what they were purchasing was unconnected to—and not sponsored or endorsed by—Focus. On the contrary, Kartri blurred the distinction between the two products by, for example, referring to the Ezy Hang curtain as "a version of hookless" to inquiring customers. PTX 230; *see also* PTXs 231 (similar), 232 (similar). And Kartri's attempt to bring in customers seeking a "version of hookless" stood to mislead customers, **[**129]** from the outset, that they were buying a product allied with the HOOKLESS® product. Where a customer is

> [m]isled into an initial interest, a potential . . . buyer may satisfy himself that the less expensive [product] is at least as good, if not better, than [the senior product]. Deception and confusion thus work to appropriate [plaintiff]'s good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company.

*Grotrian, 523 F.2d at 1341* (internal quotation marks and citation omitted).

The final *Polaroid* factor thus also favors plaintiffs as to all three infringement claims.

**Weighing the** Polaroid *Factors*: "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co., 971 F.3d at 85*. "The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class." *24 Hour Fitness USA, inc. v. 24/7 Tribeca Fitness, LLC,*

*277 F. Supp. 2d 356, 366 (S.D.N.Y. 2003)*. "[The Second Circuit has explained that strength, **[**130]** similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works, 7 F. Supp. 3d at 399* (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987)*).

The Court finds, on balance, that the *Polaroid* factors establish a likelihood of confusion as to the HOOKLESS® Mark infringement claim as to Kartri, and the EZ-ON Mark and Trade Dress infringement claims as to both defendants. The assessments differ slightly by issue,

**[*228]** *HOOKLESS® Mark*: The Court found the HOOKLESS® Mark inherently distinctive due to its suggestiveness. That established the Mark's strength without the need of a showing that it had acquired secondary meaning over time. There is also a strong similarity between the marks (and between the curtains bearing the HOOKLESS® Mark and the Ezy Hang curtains). And plaintiffs' and defendants' marks compete in the same market. The first three factors of *Polaroid*— which the Second Circuit has recognized as the most important—decisively favor plaintiffs. The balance of the factors—bridging the gap, actual confusion, bad faith, quality, and consumer sophistication—also handily favors plaintiffs. Although bridging the gap is neutral here because the parties operate in the same market, the remaining factors—anecdotal evidence of actual confusion, the clear record of defendants' **[**131]** bad faith in imitating plaintiffs' design, the lower quality of defendants' Ezy Hang curtain, and the low-to-medium sophistication of purchasers and end users—all strongly favor a finding of likelihood of consumer confusion.

*EZ-ON Mark*: As to the EZ-ON Mark, the Court found it, too, inherently distinctive, but weaker than the HOOKLESS® Mark. That is of no moment, however, because the second factor—similarity—almost single-handedly establishes a finding of likelihood of confusion. That is because the similarity between the EZ-ON and the Ezy Hang Marks is extreme; the two are so alike as to be almost identical. And the markets in which the two products are sold—EZ-ON in retail, Ezy Hang in hospitality—are proximate. The first three *Polaroid* factor& carried decisively by the second—thus strongly favor a finding of likelihood of confusion. Of the remaining factors, only the absence of evidence of actual confusion weighs in defendants' favor. But the others—bridging the gap between the adjacent markets, quality issues, and consumer sophistication—favor plaintiffs. Most important, the Court has found

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 141 of 255

Page 43 of 82

647 F. Supp. 3d 145, *228; 2022 U.S. Dist. LEXIS 230852, **131

overwhelmingly that defendants acted in bad faith in attempting to imitate the EZ-ON Mark.

*Trade Dress [**132]* : The Trade Dress is embodied by curtains under the HOOKLESS® Mark and the EZ-ON Mark. The finding of a likelihood of confusion as to the two Marks compels a similar finding of likelihood of confusion as to the Trade Dress.

Having found that both Marks and the Trade Dress are entitled to protection, and that plaintiffs have shown the requisite likelihood of confusion as to each, the Court finds that Kartri infringed the HOOKLESS® Mark, and that both defendants infringed the EZ-ON Mark and the Trade Dress.

### 3. Marquis's Counterclaim of Non-Infringement as to the EZ-ON Mark

Marquis has counterclaimed that it did not infringe the EZ-ON Mark. In light of the above analysis and findings, that counterclaim is denied.

### F. Unfair Competition with Focus's EZ-ON Mark, Hookless Mark, and Trade Dress

The elements of an unfair competition claim under New York common law "mirror" those of Lanham Act claims for trademark or trade dress infringement. *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018)* (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)*). But the proponent of such a claim "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant]'s bad faith." *LVL XIII Brands, 209 F. Supp. 3d at 678* **[*229]** (citing *Info. Superhighway, Inc. v. Talk Am., Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005)* (alteration in *LVL XIII Brands)); see also Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000)*. A plaintiff "must prove: (1) actual confusion [**133]** or a likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands, 209 F. Supp. 3d at 678* (citing *Sly Magazine, LLC v. Weider Publs. L.L.C., 346 F. App'x 721, 723 (2d Cir. 2009)* (summary order)).

The findings above resolve this claim. The Court has found a likelihood of confusion based on the *Polaroid* factors' application to both Marks and the Trade Dress, and that, with respect to these, defendants acted in bad

faith. The Court thus finds that Kartri engaged, under New York common law, in unfair competition with the HOOKLESS® Mark, and that both defendants engaged in unfair competition with the EZ-ON Mark and the Trade Dress.

### III. Findings of Fact and Conclusions of Law as to Damages

Plaintiffs pursue three types of damages. First, they request disgorgement of defendants' profits arising from their infringement of plaintiffs' EZ-ON Mark and Trade Dress.[50] *See* PTX 637 at 10. Second, as an alternative, they seek their own lost profits arising from defendants' infringement of the utility patents and Trade Dress, that is, from defendants' sales of the infringing products. To the extent that a lost-profits award does not assume that defendants' sales would have gone to plaintiffs but for the infringement, they ask to receive a reasonable royalty award keyed to such sales, and for the infringement of **[**134]** the EZ-ON Mark. *See id.* Third, if a lost-profit award is not ordered, plaintiffs request the royalty awards from all of Kartri's sales infringing plaintiffs' patents or Trade Dress, and from the infringement of the EZ-ON mark. *See id.* Plaintiffs measure each proposed award for two possible periods of infringement, each beginning October 16, 2016: one would end July 31, 2018, the other November 15, 2018. The Court thus must choose the proper measure of damages and the proper period of infringement. The damages that plaintiffs calculate on each theory are as follows:

 **[*230]**

🗔 Go to table1

Under each theory, plaintiffs also seek enhanced—trebled—damages for defendants' allegedly willful conduct.

Plaintiffs base their damages calculations on the report of expert John Elmore. PTXs 297 ("Elmore Rep."), 297-1. Defendants rebut with a report by expert Graham Rogers. DTX 47 ("Rogers Rep."). The Court first reviews the governing legal framework and then applies these

---

[50] Plaintiffs do not seek monetary damages for the infringement of the HOOKLESS® Mark. And disgorgement for patent infringement is not available. *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 580 U.S. 328, 137 S. Ct. 954, 964, 197 L. Ed. 2d 292 & n.6 (2017)*.

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 142 of 255

Page 44 of 82

647 F. Supp. 3d 145, *230; 2022 U.S. Dist. LEXIS 230852, **134

principles to the facts.

## B. Applicable Legal Frameworks

### 1. Disgorgement of Defendants' Profits

Plaintiffs first seek to disgorge defendants' profits as a remedy for their infringement of the Trade Dress and the EZ-ON Mark. "Under the Lanham Act, [a plaintiff] is entitled to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.'" *Brooks v. Dash, 454 F. Supp. 3d 331, 341 (S.D.N.Y. 2020)* (quoting *15 U.S.C. § 1117(a)*), *gird, 852 F. App'x 40 (2d Cir. 2021)* (summary order). In tabulating such profits, it is plaintiff's burden "to prove defendant's sales"; it is defendant's burden "to prove all elements of cost or deduction claimed." *15 U.S.C. § 1117(a); see Hilton v. UK Fragrances, Inc., No. 12 Civ. 6346 (JFB) (AKT), 2014 U.S. Dist. LEXIS 25192, 2014 WL 794304, at *6 (E.D.N.Y. Feb. 25, 2014)*. "[D]isgorgement is an inherently equitable remedy." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH, No. 14 Civ. 585 (AJN), 2018 U.S. Dist. LEXIS 151961, 2018 WL 4253181, at *16 (S.D.N.Y. Sept. 5, 2018)*. Under principles of equity, "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate"—albeit not an "inflexible **[**136]** precondition." *Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 1497, **[*231]** 206 L. Ed. 2d 672 (2020).*[53] "The Second Circuit recognizes three theories under which a court may order disgorgement of defendant's profits: unjust enrichment, compensation, and deterrence," *River Light V, L.P. v. Lin & J Int'l, Inc., No. 13 Civ. 3669 (DLC), 2015 U.S. Dist. LEXIS 82940, 2015 WL 3916271 (June 25, 2015), at *5* (citing *Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 262 (2d Cir. 2014)*).

### 2. Plaintiffs' Lost Profits

Plaintiffs also seek lost profits for the patent and Trade

Dress infringement that resulted from the sales of the Ezy-Hang product. *See* PTX 637 at 2. Because the sales underlying both infringements are the same, plaintiffs have elected to request a lost profits award as calculated based on a showing of liability patent infringement. *See* Elmore Rep. ¶ 63; PTX 637 at 3-6. The Court accordingly sets forth that framework only,

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *35 U.S.C. § 284*. "Lost-profits damages are appropriate whenever there is a reasonable probability that, 'but for' the infringement, the patentee would have made the sales that were made by the infringer." *Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1263 (Fed. Cir. 2013)* (cleaned up). "In *Panduit Corp. v. Stahlin Bro[ther]s Fibre Works[, Inc., 575 F.2d 1152 (6th Cir. 1978)]*, the Sixth Circuit set forth the widely used four-factor test to determine **[**137]** when lost profits damages are available." *Town & Country Linen Corp. v. Ingenious Designs LLC, No. 18 Civ. 5075 (LJL), 2022 U.S. Dist. LEXIS 125154, 2022 WL 2757643, at *26 (S.D.N.Y. July 14, 2022); see also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995)* (en banc); *Grp. One Ltd. v. GTE Gmbh, No. 20 Civ. 2205 (MKB) (JRC), 2022 U.S. Dist. LEXIS 159179, 2022 WL 4010850, at *25 (E.D.N.Y. Sept. 2, 2022)*. The factors governing a showing of but-for causation under *Panduit* include: "(1) demand for the patented product, (2) absence of acceptable noninfringing alternatives, (3) [capacity] to exploit the demand, and (4) the amount of profit [the patentee] would have made." *Am. Tech. Ceramics Corp. v. Presidio Components, Inc., 490 F. Supp. 3d 593, 630 (E.D.N.Y. 2020)* (quoting *Panduit, 575 F.2d at 1156*) (alterations in *Presidio*). Under "the second prong, the patent owner may rely on proof of its established market share rather than proof of an acceptable noninfringing substitute." *Bic Corp. v. First Prominence Co., No. 00 Civ. 7155 (SHS) (RLE), 2001 U.S. Dist. LEXIS 20734, 2001 WL 1597983, at *2 (S.D.N.Y. Dec. 10, 2001)* (citing *State Indus. v. Mor-Flo Indus., 883 F.2d 1573, 1578 (Fed. Cir. 1989)*). The burden of making this showing is on the patentee. *FCX Solar, LLC v. FTC Solar, Inc., No. 21 Civ. 3556 (RA) (VF), 2022 U.S. Dist. LEXIS 150531, 2022 WL 3584946, at *2 (S.D.N.Y. Aug. 22, 2022)* (citing *Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370, 1381 (Fed. Cir. 2003)*). And "where lost profits are the best measure of damages in the but-for world where the defendant had not infringed, they are available to fully compensate the

---

[53] This holding abrogates the holding of *George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992)*, that willfulness is a prerequisite for a profits award under *15 U.S.C. § 1125(a)*. *See Experience Hendrix, 2020 U.S. Dist. LEXIS 115075, 2020 WL 3564485, at *6 n.4* (clarifying that equitable principles historically used in deciding whether to award profits "continue to be applicable").

647 F. Supp. 3d 145, *231; 2022 U.S. Dist. LEXIS 230852, **137

patent holder for the infringement." *Town & Country Linen Corp., 2022 U.S. Dist. LEXIS 125154, 2022 WL 2757643, at *26* (citation omitted).

**[*232] 3. Reasonable Royalties**

Plaintiffs also seek two types of reasonable royalties. The first is for the infringement of the utility patents and Trade Dress, which resulted from the same sales of the Ezy-Hang product. Plaintiffs propose varying awards, based on whether such an award is made in addition to a lost profits award, or stands alone. The second is for Kartri's unlawful branding of its **[**138]** Ezy-Hang products with the EZ-ON Mark. Here, plaintiffs propose a fixed award regardless of whether the Court awards lost profits.

*a. Reasonable Royalties for Patent and Trade Dress Infringement*

"For sales in which the patentee cannot prove the elements necessary to establish entitlement to lost profits, [*35 U.S.C. § 284*] guarantees the patentee a reasonable royalty for those sales." *Grp. One Ltd., 2022 U.S. Dist. LEXIS 159179, 2022 WL 4010850, at *26* (quoting *Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1286 (Fed. Cir. 2017)*). A "common approach used to calculate a reasonable royalty is the 'hypothetical negotiation,' which 'attempts to ascertain the royalty upon which the parties would have agreed *[ex ante]* had they successfully negotiated an agreement just before infringement began.' *FCX Solar, 2022 U.S. Dist. LEXIS 150531, 2022 WL 3584946, at *3* (quoting *Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009)*). "In calculating a reasonable royalty under this approach, courts rely on the . . . fifteen factors detailed in *Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)*." *ResQNet.com, Inc. v. Lansa, Inc., 828 F. Supp. 2d 688, 692 (S.D.N.Y. 2011)*; *see also i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 853 & n.3 (Fed. Cir. 2010), aff'd, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011)*.

The *Georgia-Pacific* factors are:
[1] the past and present royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;
[2] the rates paid by the licensee for the use of other patents comparable to the patents in suit;
[3] the nature and scope of the license, as exclusive

or non-exclusive; or as restricted or non-restricted;
[4] the licensor's policies and **[**139]** practices regarding the grant of licenses to its technology;
[5] the commercial relationship between the licensor and the licensee;
[6] the effect of selling the patented specialty in promoting sales of other products of the license, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative convoyed sales;
[7] the duration of the patent and teiut of the license;
[8] the established profitability of the product made under the patent; its commercial success; and its current popularity;
[9] the utility and advantage of the patent property over the old modes or devices, if any that has been used for working out similar results;
[10] the nature of the patented invention as well as its commercial embodiments and benefits;
[11] the extent the infringer used invention and evidence of the value of that use;
[12] the customary profit for use of the invention or analogous inventions;
[13] the portion of the infringer's profit that should be credited to the invention;
[14] the opinion of qualified experts; [and]

**[*233]** [15] the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying **[**140]** to reach an agreement.

*See ResQNet.com, Inc.,, 828 F. Supp. 2d at 692 93* (citing *Ga.-Pac., 318 F. Supp. at 1120*).

*b. Reasonable Royalties for EZ-ON Mark Infringement*

Unlike the *Patent Act*, the Lanham Act does not expressly provide for a reasonable royalty remedy, *15 U.S.C. § 1117(a)*. Instead, "[a] plaintiff in a trademark action may recover a 'reasonable royalty' under the [Lanham Act's] heading of actual damages." *Gucci Am., Inc. v. Guess? Inc., 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012)*. "However, because they are inherently difficult to calculate in a vacuum, courts often decline to award such damages unless the parties had a prior licensing agreement." *Id.; see also Juicy Couture, Inc. v. L 'Great USA, Inc., No. 04 Civ. 7203 (DLC), 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006)* (in trademark context, reasonable

647 F. Supp. 3d 145, *233; 2022 U.S. Dist. LEXIS 230852, **140

royalties "generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty"); *The Apollo Theater Found., Inc. v. W. Int'l Syndication, 02 Civ. 10037 (DLC), 2005 U.S. Dist. LEXIS 7955, 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005)* (royalty award a "seldom-used method for computing trademark damages"). Absent a prior licensing agreement, "courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., Inc., 858 F. Supp. 2d at 254,* In such instances, the *Georgia-Pacific* factors serve as a guiding framework.

## C. Plaintiffs' Damages Report

### 1. The Elmore Report and Its Relation to Plaintiffs Damages Requests at Trial

In his report, plaintiffs' expert Elmore provides the calculations and data [**141] underpinning plaintiffs' three damages theories: (1) disgorgement of profits, (2) plaintiffs' lost profits, complemented by reasonable royalties for defendants' (i) infringement of the utility patents and infringement of and unfair competition with the Trade Dress and (ii) infringement of and unfair competition with the EZ-ON Mark, and (3) a larger, standalone reasonable royalties award for defendants' (i) infringement of the utility patents and infringement of and unfair competition with the Trade Dress and (ii) infringement of and unfair competition with the EZ-ON Mark.[54] *See* Elmore Rep.; PTXs 297-1 (appendices); 637 at 2 (damages requests).[55]

The Court will supplement its summary with expansions and clarifications that Elmore supplied in his trial testimony. Elmore's report covers an infringement period from October 16, 2013 to July 31, 2018. But, at

---

[54] For infringement of the HOOKLESS® Mark, plaintiffs seek only injunctive relief because, unlike with the EZ-ON Mark "readily associated" with plaintiffs' products, it was not possible to reliably quantify the damages for infringement of that mark. Tr. at 405-06 (Elmore).

[55] Elmore's report was issued January 14, 2019. The cover page of the original report gave a date of January 14, 2018, notwithstanding setting out damages calculations for a period ending July 31, 2018. Elmore's updated report at trial repeated this date. *See* PTX 637 at 2 *et seq.;* Tr. at 505-06. The 2018 date was a typographical error. Tr. at 503-10.

trial, plaintiffs urged an extended infringement period for which to calculate damages: from October 16, 2013 to November 15, 2018. *See* PTX 637. That was to correct a lapse by the defense, which produced defendants' sales data only through [*234] July 31, 2018, whereas the infringement extended until November 15, 2018. *See* Tr. at 401-04; [**142] *id.* at 545, Elmore tabulated damages for the added period between August 1, 2018 and November 15, 2018 by extrapolating each defendant's revenues from its respective monthly average revenue between January 2017 and July 2018 and applying that average to August-October and November (prorated) 2018. *Id.* at 519-20; *see also id.* at 402 ("Same methodology just extending the date range." (Elmore)), 404-05, 520, 532.

### 2. Qualification of Elmore as an Expert Witness

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*; *Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004)*. "Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." *LVL XIII Brands, 209 F. Supp. 3d at 636*. Under *Rule 702*, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* (quoting *Fed. R. Evid. 702*). "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II), 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018)* (quoting *United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004)*), *aff'd, 982 F.3d 113 (2d Cir. 2020)*. These words must "be read in light of the liberalizing purpose of' *Rule 702*. *United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985)*, *cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986).*

Elmore is qualified [**143] to opine on the computation of damages on plaintiffs' claims. On November 23, 2021, the Court rejected defendants' motion *in limine* to exclude Elmore's report, finding Elmore amply qualified under *Rule 702* and *Daubert. See* Dkt. 436. Elmore holds a bachelor's degree in economics, a Master of Business Administration, and a Juris Doctor, and is a Certified Public Accountant, "accredited in business valuations, certified in financial forensics, and holds a

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 145 of 255

Page 47 of 82

647 F. Supp. 3d 145, *234; 2022 U.S. Dist. LEXIS 230852, **143

designation as a Master of Financial Forensics." *Id.* at 35. In 2017, Elmore joined the financial advisory firm Ernst & Young LLP as a manager in its valuation and business modeling, and before then led the intellectual property valuation services practice at a different business valuation firm. *Id.* Elmore had done valuation and damages analyses on more than 200 matters, many involving patent and trademark issues, across numerous industries. *Id.* at 35-36; *see also* Elmore Rep. ¶¶ 10-15 (qualifications). Elmore's qualifications were not objected to at trial. *See* Tr. 398-400.

### 3. Admissibility of Elmore's Report

Under *Rule 702*, after the witness is qualified as an expert, the party seeking to admit expert testimony must show that "(1) 'the testimony is based **[**144]** on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *United States v. Pryor, 474 F. App'x 831, 834 (2d Cir. 2012)* (summary order) (quoting *Fed. R. Evid. 702*). The proponent must further show that (4) "the testimony is relevant and will assist the [trier of fact]," *In re Mirena, 341 F. Supp. 3d at 240*, and "has the burden of establishing by a preponderance of the evidence that the admissibility requirements of *Rule 702* are satisfied," *United [*235] States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)*.

The Court again affirms its ruling, denying defendants' motion *in limine* to exclude Elmore's report. *See* Dkt. 436 at 36-38. The Court there rejected defendants' arguments that Elmore relied on unreliable data by (1) partially relying on data that a third-party analyst had synthesized from data that defendants provided in discovery; (2) failing to update the sales data through December 2018; and (3) introducing inconsistencies suggesting his report had been prepared in 2017. *See id.* The Court also rejected arguments by the defense questioning the persuasiveness of the Elmore Report. *See id.*

### 4. The Elmore Report's Damages Calculations56[56]

*a. Disgorgement of defendants 'profits*

---

[56] Where relevant, the Court supplements the report's figures with the updated figures to which Elmore testified at trial, capturing the infringement period ending November 15, 2018.

***Defendants' revenues'.*** Elmore presents data of each defendant's **[**145]** relevant sales:


Go to table2

Elmore Rep. ¶ 185; *id.* Att. 4.0.

Marquis's and Kartri's figures are based on records that each produced in discovery. Elmore Rep. ¶185. Marquis's data captures its sales of accused Ezy Hang curtains to Kartri. *Id.* Kartri's data captures its sales to its customers. *Id.*[57]

At trial, Elmore offered updated sales figures covering the period through November 15, 2018, based on extrapolations from the initial infringement period:

 **[*236]**


Go to table3

PTX 637 at 4.

***Estimates of defendants' profits'.*** Elmore next estimates each defendant's profits, notwithstanding the fact that defendants bear the burden of "proving appropriate costs and deductions." *15 U.S.C. § 1117(a)*; Elmore Rep. ¶ 187.

*Marquis's profits:* For Marquis, Elmore does not rely on Marquis's cost data. That is because Marquis, in discovery, **[**146]** did not break out the fixed costs independent of Marquis's sales volume. Elmore Rep. ¶ 188; *see* Tr. at 421 ("[Marquis's cost data] reflected some other measure of cost, and it's not certain as to whether that cost—what Marquis included in computing that level of cost."). Elmore uses "incremental profits" in calculating profits, which entails applying the variable

---

[57] The data and computations underlying Marquis's sales figures are set out in Attachments 7.0 and 7.1. Attachment 7.1 lists all Marquis invoices from November 27, 2013, through May 4, 2017. Marquis provided this data to Elmore in the form of a generated accounting. Tr. at 494. He did not receive the underlying invoices themselves. *Id.* Each line specifies the date, invoice, number, item number, item description, the quantity ordered, the dollar cost per unit, the dollar sales price per unit, the total cost incurred for the order, and the total revenue Marquis gathered from the order. Each line further included a gross margin percentage, which Elmore calculated by dividing the total cost by the total revenue, and subtracting that percentage from 100%. Some such profit margins show a negative percentage. Elmore explained that such figures, based on Marquis's own disclosures, resulted from its selling to Kartri at a loss. Tr. at 490-93.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 146 of 255

Page 48 of 82

647 F. Supp. 3d 145, *236; 2022 U.S. Dist. LEXIS 230852, **146

costs associated with the products sold against those products' revenues. Elmore Rep ¶¶ 188-189.

Accordingly, Elmore calculates Marquis's gross profits and profit margins for each year by looking at the revenues and costs associated with the Ezy Hang curtain. Those figures are:[58]

🔲 Go to table4

*Id.*, Att. 7.0; *see also id.* ¶ 189-190. Marquis's minimum profit for disgorgement is thus $256,809. This figure, Elmore states, may understate Marquis's profits, in that the variable cost figures that Marquis provided may include fixed costs that he would have excluded. *Id.* 190.[59]

*Kartri's profits'* **[**147**]** . As to Kartri, the data and computations underlying its sales figures are contained in Attachments 6.0, 6.1, and 6.2.[60] Elmore testified that, in compiling **[237]** his report, he observed that Marquis's reported number of curtains sold to Kartri was significantly higher than the number of curtains Kartri sold in the hospitality market. This suggested that Kartri may have underreported its sales figures. Tr. at 421-22. Kartri's data, as noted, lacks cost figures, despite cost being a defendant's burden to prove. *Id.* ¶ 191.[61] Elmore nonetheless calculates gross margins as best he can—by matching a product's identification number

---

[58] PTX 637 did not provide updated figures as to this chart.

[59] Attachment 7.1 does not provide sales data beyond May 4, 2017. But Attachment 7.0, whose only identified source is Attachment 7.1, provides sales, profit, and gross margin figures through July 31, 2018. This was not explained at trial.

[60] Attachments 6.1 and 6.2 list all invoices Kartri provided from November 27, 2013, through May 4, 2017. For the period January 1, 2017 through July 31, 2018, Kartri provided total sales figures to plaintiffs' counsel in a letter dated September 4, 2018 (the "September 2018 Letter"). *See* Att. 6.0 n.2. That total figure was $657,565. *Id.* Attachment 6.1 covers sales from Ezy Hang curtains that Kartri purchased from Marquis. Each line specifies the order's date, a "detail" number, order ID, invoice number, unit price, quantity, total revenue for the order, and a product identification number. Attachment 6.2 covers sales from Ezy Hang curtains that Kartri made itself by, for example, filling orders made to certain specifications. *See* Tr. at 513-14.

[61] As noted, on August 5, 2021, the Court excluded the cost data Kartri provided its rebuttal damages expert Graham Rogers, on account of defendant's discovery violation. Dkt. 412.

to an entry in Marquis's data, where possible. Where such a match exists, Elmore uses Marquis's sales price to Kartri as reflecting Kartri's cost for that item, and calculates the corresponding gross margin. Tr. at 523-24.

Elmore's tabulation of Kartri's total revenue was as follows:

🔲 Go to table5

Elmore Rep., Att. 6.0.

To calculate Kartri's disgorgeable profits, Elmore does not rely on the spotty gross margin data he was able to derive from matching Kartri's data to Marquis's. Instead, he takes as a proxy *Focus's* profit margins in the hospitality industry. *Id.* ¶ 192. That margin, across the board, is 50%. *Id.* ¶ 194.[63] Kartri's profits subject to disgorgement thus amount to:

🔲 Go to table6

*Id.* Applying this profit margin, Kartri's total profit to be disgorged, for the infringement period ending on July 31, 2018, is $1,096,839.

At trial, plaintiffs argued that because defendants had not met their burden to reliably prove their costs, defendants' entire revenue should be disgorged. *See* PTX **[238]** 637 at 9. For the infringement periods ending on July 31, 2018 and November 15, 2018, these revenues are, respectively:

🔲 Go to table7

**b. Lost profits**

Lost profits are available under the Patent Act and the Lanham Act. Because defendants' infringement of the utility patents and Trade Dress arose from the same accused sales, Elmore tabulated lost profits by applying the four *Panduit* factors, which guide the determination of lost profits for patent infringement. Elmore's report analyzed whether (1) demand for the patented product exists; (2) there were no acceptable non-infringing substitute products to satisfy that demand; (3) the owner

---

[63] Elmore arrived at this figure by reducing Focus's 54.1% profit margin to account for distribution costs of 2% of sales, sales commissions of 0.6% of sales, and other contingent factors. *See* Elmore Rep. 106, 108-109, 193.

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 147 of 255

Page 49 of 82

647 F. Supp. 3d 145, *238; 2022 U.S. Dist. LEXIS 230852, **147

of the patent possessed the manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profits can be quantified. Elmore Rep. ¶¶ 65-66.

*Yanduit factor 1 (consumer demand)*: According to Elmore, demand for the patented products exists because both plaintiffs and defendants have generated substantial revenues and profits from selling their respective products. Focus, between 2013 and August 2017 alone, sold HOOKLESS® curtains for total revenues of $81.4 million in the hospitality market and $54.4 million in the retail market. *Id.* ¶ 74. Its hospitality market profit margins were, on average, 54.1% each year, and 33.5% in [**150] the retail market. *Id.*; *see also id.* Att 8.1, Att. 8.2.[64]

Marquis's total sales for the Ezy Hang product were $1,889,582 between October 16, 2013 and July 31, 2018. ¶ 75; Art. 7.0.[65] Through November 15, 2018, those sales were $2,072,407. PTX 637 at 7, 16. Kartri's estimated net sales revenue for the Ezy Hang product for the period through May 31, 2018 was $2,193,677. *See* Elmore Rep. ¶ 75; Art. 6.0. Through November 15, 2018, those were $2,395,861. PTX 637 at 7, 9.

This, Elmore opines, establishes the existence of demand for the patented products in-suit. Elmore Rep. ¶76.

*Panduit factor 2 (no non-infringing products to satisfy demand, market share approach)*: To establish that no non-infringing alternatives to Focus's hook-free products were available to customers, Elmore first opines that the hook-free shower curtain market essentially consisted of two players—Focus and Kartri.[66] *Id.* ¶ 94. **[*239]** The only other player to sell hook-free curtain products in the hospitality market was Carnation, a licensee of Focus's. *Id.* ¶ 81.[67] Even though consumers in the hospitality market have the choice of buying "traditional hook-based" shower curtains, such have essentially been displaced by hook-free shower curtains. **[**151]** *Id.* ¶ 79. Elmore's report, and testimony, are that, with defendants' infringing products on the market, Focus captured a share of roughly 50%, with the rest allocated to Kartri due to its infringing sales. *Id.* ¶ 80. Kartri's products directly competed with Focus's. *Id.* ¶ 89.

Elmore next opines that, but for defendants' infringement, Kartri's customers would have purchased their curtains from Focus. Elmore establishes this in two ways. First, he relies on deposition testimony by Kartri's Kubus and Goskowsld that customers came to Kartri looking for a HOOKLESS® product and were persuaded to buy a Kartri product instead, *id.* ¶¶ 83-84, 86; on email records and testimony to the effect that Kartri sometimes exploited the confusing similarity between its products and Focus's, *id.* ¶¶ 87-89; on testimony that Focus and Kartri charged almost the same prices for their products, *id.* ¶ 91 ($12-31 for a Focus curtain and $12-28, and in some instances $45, for a Kartri curtain, according to Kubus); and on evidence that Focus and Kartri often sold to the same distributors, *id.* ¶ 92. He concludes that, but for Kartri's infringing conduct, there would not have been a non-infringing alternative **[**152]** to Focus's patented products that Kartri's customers could have purchased—and thus that, but for the infringing conduct, Focus would have captured Kartri's sales. *Id.* ¶ 95, Second, because Focus and Kartri operate in a two-player market, the sales captured by Kartri's similar, directly competing product would have likely gone to Focus. *Id.* ¶¶ 94-95.

*Panduit factor 3 (manufacturing and marketing capability)*: To show that Focus had the manufacturing capacity to meet the demand Kartri and Marquis served with their infringing products, Elmore takes the parties' sales figures as proxies for their ability to meet demand. He compares Focus's sales figures in the hospitality and

---

[64] Plaintiffs did not include their own sales data beyond August 2017—more than 14 months before the last date of the infringement period—or update those figures at trial. Although in theory Focus's profitability might have changed between August 2017 and November 15, 2018, defendants did not argue at trial that Focus's dataset was unrepresentative or inadequate.

[65] Elmore's report erroneously states an amount of $1.9 million and refers to Attachment 7.0. Elmore Rep. ¶ 75. But that amount and attachment refer to Marquis's revenues, whereas the revenues in question are those of Kartri, the party selling the Ezy Hang product to end consumers in the hospitality market. Elmore clarified at trial that this was a transposition error. *See* Tr. at 501. The Court has used the correct figures here.

---

[66] Although Elmore does not so state explicitly, the analysis for lost profits damages is necessarily restricted to the hospitality market, as Kartri sold its products—and deprived plaintiffs of profits—only in that market.

[67] A company offering a third hook-free curtain product in the *retail* market—Hospi-Tel Manufacturing Company—failed and went out of business in 2016. Elmore Rep. ¶ 81.

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 148 of 255

Page 50 of 82

647 F. Supp. 3d 145, *239; 2022 U.S. Dist. LEXIS 230852, **152

retail markets for the period between November 2013 and August 2017 to Kartri's accused sales for that period. Those figures are:

Go to table8

Elmore Rep. ¶ 98.

Elmore calculates that Kartri's sales volume constitutes 1.1% of Focus's sales. *Id.* This, he opines, **[**153]** establishes that Focus would have needed only to modestly expand its manufacturing capacity to meet the additional demand associated with a 1.1% increase of its sales. *Id.* ¶ 99.

**[*240]** As to marketing capabilities, Elmore reasons that, based on plaintiffs' 20-year presence in the market, the scale of HOOKLESS® curtain sales, its broad brand recognition, and its established distribution network, Focus would have easily been able to do the marketing necessary for the additional output it would have had but for the infringement. *Id.* ¶¶ 100-101.

***Panduit factor 4 (lost profits can be quantified)***: Elmore quantifies Focus's lost profits as follows. He assumes a two-player hospitality market, divided between Focus and Kartri, *id.* ¶ 103, and that Kartri's infringing sales would have gone to Focus absent Kartri's infringement. *Id.*; *see also id.* ¶¶ 104 (noting that Focus's pricing is comparable to Kartri's), 107 (reasoning, based on Kubus's testimony that approximately 90% of Kartri's sales are in the hospitality business, that most of Kartri's sales would have gone to Focus and at Focus's profit margin).

To calculate the sales Focus lost, Elmore starts with Kartri's accused sales—$2,193,677 for the period ending **[**154]** My 31, 2018, *id.* ¶ 110,[68] and $2,395,861 for the full infringement period ending November 15, 2018, PTX 637 at 9. And, "to account for any contingencies such as small marketplace participants or other factors that impact [p]laintiffs['] ability to capture all of the accused sales," Elmore reduced these sales figures by 10 percent.[69] Elmore

_____

[68] This figure corrects the confusion of Marquis's and Kartri's sales figures in the Report. *See* Elmore Rep. ¶ 110; *see also supra* note 65; PTX 637 (showing corrected figure).

[69] The Elmore Report states that a 10% reduction of Kartri's accused sales figure corresponds to a 10% reduction of Focus's market share. *See* Elmore Rep. ¶ 103 ("I have included a 10 percent reduction to Plaintiffs' but-for market

Rep. ¶¶ 103, 110. The resulting figures are $1,974,309 and $2,156,275, respectively for the partial and full infringement periods. *Id.* ¶ 110; PTX 637 at 9.

Elmore then derives Focus's profit. He tabulated a 50% profit margin, which, as noted, *see* note 63, *supra*, reflected deductions totaling 4.1% Focus's profit margin of 54.1%, which in turn was determined by taking the average (weighted by sales volume) of Focus's reported yearly margins in the hospitality sector between 2013 and August 2017. *See id.* ¶¶ 106, 108—109.

Elmore's full lost profits calculation for both infringement periods, with corrections for erroneous figures, thus amounts to:

Go to table9

*Id* ¶ 110 (corrected); *id.*, Att. 2.0; PTX 637 at 7.

**[*241]** *c. Reasonable Royalties*

Elmore calculates two reasonable royalties. The first is for defendants' infringement of the utility patents and Trade Dress, He urges that this award should be added to any lost profits award, but be calculated to apply only to the market share unaddressed by the lost profits award, such that, the smaller the market share used to calculate a lost profits award, the proportionately larger the reasonable royalty award for defendants' patent and Trade Dress infringement should be.[70] The second royalty is for infringement of the EZ-ON Trademark, *See*

_____

share. Accordingly, for purposes of my analysis, I have used a 90 percent market share to allocate the accused sales to Plaintiffs."). That is incorrect, in that, assuming a 50% market share for Focus, Kartri's gross accused sales reflect the remaining 50% of the market, and reducing *Kartri's sales* by 10% would leave it with 45% of the total market. Allocating that share to Focus would in turn leave it with 95% of the total market.

[70] *See* Tr. at 475 ("THE COURT:... If one were to use the lost profits approach, from your perspective, if that approach is applied to anything less than 100 percent of the sales, the remaining percentage method logically needs to be captured by a reasonable royalty calculation. That's the bottom line? THE WITNESS: Yes ..."). On this reasoning, were lost profits awarded based on the assumption that (but for the infringement) plaintiffs would have captured 90% of the market in the two-player market, it would calculate a reasonable royalties award for the remaining 10% of uncaptured infringing sales. *See* PTX 637 at 14.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 149 of 255

Page 51 of 82

647 F. Supp. 3d 145, *241; 2022 U.S. Dist. LEXIS 230852, **154

PTX 637 at 10.[71]

Elmore measures such damages for both the period ending July 31, 2018, and the full infringement period from October 16, 2013 to November 15, 2018:

⊞ *Go to table10*

Elmore's reasoning in support of each award was as follows.

*i. Reasonable royalty for the patent and Trade Dress infringement*

Elmore gives varying weight to the 15 *Georgia-Pacific* factors. Elmore Rep. ¶ 118. The weightiest is the 15th, *id.* ¶ 115—the reasonable royalty that would be "'willingly negotiated' by both parties in a hypothetical negotiation [at] or around the time of the first infringement," *id.* ¶ 114. He posits such a negotiation as the start of defendants' infringement "during or around October 2013." *Id.* ¶ 119. He assumes that the parties came to the negotiation with the following knowledge. Plaintiffs (1) own several utility and design **[*242]** patents protecting their hook-free shower curtains; (2) have a track record of commercializing their patented technology by manufacturing and selling their products through licensees; (3) recognize that defendants are direct competitors; and (4) recognize that a license to defendants would **[**157]** likely harm plaintiffs' profitability. *Id.* ¶ 120. Defendants recognize (1) the advantages and utility of the patented shower curtain technology and that such drives customer demand of the accused Ezy-Hang product; (2) that for over 20 years, plaintiffs have taken on risks and expenditures to research, develop, and market their patented product; and (3) that no acceptable non-infringing shower curtain ring design was available to them. *Id.* All parties would thus appreciate, he posits, that plaintiffs' bargaining position is strong. *Id.* ¶ 121. That understanding informed Elmore's analysis under the remaining *Georgia-Pacific* factors. *Id.* ¶ 115.

---

[71] Elmore argued that the two royalty calculations should be cumulative because the infringing sale of the patented products and Trade Dress was a distinct wrong from the infringing promotional use of the EZ-ON Mark. Tr. at 477-78. *But see id.* 446-47, 478 (noting that as an alternative, the royalty remedy from the EZ-ON infringement could be treated as subsumed into royalty damages for the patent and Trade Dress infringement).

Of these, Elmore first finds six factors (1-4, 7, and 12) inconclusive.

***Factor 1***: Elmore parses five agreements—some amended over time—in which Focus or its predecessors (Arcs & Angles and HSNA) licensed the utility and design patents to its hook-free shower curtain technology to licensees at royalty rates. These are:

• HSNA Agreement: In March 1999, ZDG entered into a license agreement with plaintiff HSNA. *Id.* ¶ 125. Elmore discounts this agreement as not probative of an established royalty rate because Zahner owned both ZDG and HSNA, such that there was not an **[**158]** arms-length negotiation between the parties. *Id.*

• CHF Agreement: On July 9, 1999, HSNA entered into a joint venture agreement with CHF Industries ("CHF"). *Id.* ¶ 126. It granted CHF a worldwide, exclusive license to the '232 Patent—the original design patent that Zahner registered in 1993 which is not in suit here—and proprietary business and intellectual property not pertinent to this royalty determination. *Id.* CHF was to pay HSNA an annual royalty of 10% of gross sales or $300,000, whichever was greater. *Id.*

• Arcs & Angles Agreement: On May 31, 2004, HSNA entered into a joint venture agreement with Arcs & Angles. *Id.* ¶ 127. It granted Arcs & Angles a worldwide, exclusive license to the Design Patent and the three Utility Patents in this suit, trademarks including the HOOKLESS® Mark, and other proprietary information. *Id.* Arcs & Angles was to pay HSNA an annual royalty of 3.25% of gross sales or $130,000, whichever was greater. *Id.* On July 1, 2007, HSNA and Arcs & Angles amended the agreement to increase the annual royalty 4.5% of gross sales (excepting sales to its customer Wal-Mart). *Id.* ¶ 128.

• OTRT Agreement: On May 28, 2007, HSNA entered into a joint venture agreement with On The Right Track **[**159]** Systems ("OTRT"). *Id.* ¶ 129. Under it, OTRT was to pay HSNA an annual royalty of 3.25% of gross sales or certain minimum amounts not specified in the Elmore Report, whichever was greater. *Id.*

• A&A Holdings Agreement: On October 24, 2014, HSNA and Focus, which inherited the intellectual property rights and obligations set out in the Arcs & Angles Agreement, *id.* ¶¶ 131-133, amended that

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 150 of 255

Page 52 of 82
647 F. Supp. 3d 145, *242; 2022 U.S. Dist. LEXIS 230852, **159

agreement, to define four tiers of Focus customers, and four corresponding royalty rates. The rates were 2%, 2.5%, 3%, and 4.5%, respectively, and **[*243]** applied to Focus's gross sales to each tier of customers. *Id.* ¶ 134.

Elmore opines that these agreements are non-probative of an established royalty rate because they involved related parties, contemplated joint venture transactions, and/or were entered in non-comparable circumstances. *Id.* ¶ 136. Accordingly, "there is no established royalty." *Id.*

**Factors 2-4, 7, and 12**: As to factor 2—past royalties paid by the licensee—Elmore is unaware of any relevant patent royalties paid by defendants. *Id.* ¶ 143. As to factor 3, Elmore states that licenses tend to command higher royalties if they are exclusive, geographically broad, and expansive in the know-how and commercialization **[**160]** they permit. *Id.* ¶ 140. He observes that the hypothetical negotiations between the parties would have resulted in a non-exclusive, U.S.-based, "minimal license," *id.* ¶ 142, but concludes that this would not have a downward effect on the royalty rate. As to factor 4, Elmore is not aware of a formal licensing policy of plaintiffs. *Id.* ¶ 138. As to factor 7, Elmore states that royalty rates increase where the remaining term of the underlying patent is short. *Id.* ¶ 141. Because the utility patents were due to expire in 2019, Elmore concludes that this fact would have had an upward effect on the royalty rate agreed upon by the parties. *Id.* ¶ 142. And as to factor 12—customary or standard royalty rates in the field—Elmore's research did not find usable benchmarks. *Id.* ¶¶ 144-146.

**Factors 9-11**: These are (9) the utility and advantages of the patented invention over the old modes or devices; (10) the nature, commercial embodiment, and benefits of the patented invention; and (11) the extent to which the infringer used the invention. *Id.* ¶ 147. As to these, Elmore canvasses testimony by Goskowski admitting that the advantages of Focus's patented shower curtain rings include quicker and safer installation, **[**161]** corresponding reduced costs, and a lower number of parts to be assembled compared to a hooked curtain. *Id.* ¶ 148. He notes, too, Kubus's concession that the advantages of Focus's patented products made it the leading shower curtain in the hospitality industry. *Id.* ¶ 149.

**Factors 5, 6, 8, and 13**: These are (5) the commercial relationship between the licensor and the licensee; (6) the extent to which the sales of other products by the licensee benefit from the promotional effect of selling the licensed patented products; (8) the profitability of the patented licensed product; and (13) the portion of the infringer's profit that should be ascribed to the patented invention. *Id.* ¶ 154. The commercial relationship between the parties, according to Elmore, is one of direct competitors, which "has an upward impact on the royalty." *Id.* *-155. He opines that he cannot identify any collateral commercial benefits that defendants derived from their sale of the infringing curtains. *Id.* ¶ 156. As to the profitability of the patented products, Elmore points to Focus's own gross margins on hook-free shower curtains of 50%, and to Table 5.4 of the January 2019 *Global Shower Curtains Industry Market Research* **[**162]** *Report* by the HeyReport Market Data Survey Center (the "Curtain Industry Report"), according to which the typical gross margin for *traditional* shower curtains is around 25%. *Id.* ¶ 160 & n.173. From the disparity in profitability between hook-free and hooked shower curtains, Elmore concludes that "the patented technology contributes substantially to the commercial success and profitability of the hook-free shower curtain products." *Id.* ¶ 160.

Finally, Elmore calculates the proposed reasonable royalty rate attributable to defendants' infringement of plaintiffs' utility **[*244]** patents and Trade Dress. Given the absence of non-infringing alternatives and the parties' direct competition in a two-player market, he opines that plaintiffs were in a strong bargaining position in the hypothetical royalty negotiation, *id.* ¶¶ 161-164. He selects—as the base against which the royalty amount is to apply—the sales of the accused products by Kartri, the defendant that sold the infringing products to the end-customers in the hospitality market. *Id.* ¶¶ 165-166. He then calculates the royalty rate to be applied to that base. He reasons that a reasonable royalty is the difference between the profit margin typically **[**163]** earned on sales of the accused products and the profit margin typically earned on sales of traditional hooked shower curtains. *Id.* ¶ 167. As evidence for Kartri's margin for hook-free curtains, Elmore, in his report, relies on Kubus's testimony—estimating that margin to be 50%—and Elmore's calculation estimating Kartri's average gross margin, based on Kartri's sale price and per-unit costs paid to Marquis, as approximately 52%. *Id.* ¶ 169; *id.*, Att. 3.0; *id.*, Att. 6.0. He chooses the lower, 50% figure. As to the profit margin in the sale of traditional hook-based curtains, Elmore relies on the 25% figure of the Curtain Industry Report. *Id.* ¶ 170.

The resulting royalty rate is 25%: 50% (the margin for

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 151 of 255

Page 53 of 82

647 F. Supp. 3d 145, *244; 2022 U.S. Dist. LEXIS 230852, **163

hook-free curtains) minus 25% (the margin for hooked curtains). Elmore applies this rate to the revenue Kartri derived from its sales of the accused products. He arrives at the following royalty figures:

⊞ *Go to table11*

*Id.* Att. 3.0.

The total figure of $548,419 covers the period through July 31, 2018. *See id.* **[**164]** , At trial, Elmore extended his analysis to Kartri's infringing sales of $2,395,861 over the full infringement period ending November 15, 2018. There, he arrived at aroyalty award of $598,965. *See* PTX 637 at 14.

#### ii. Reasonable royalty for the EZ-ON Mark infringement

In assessing a reasonable royalty for Kartri's infringement of the EZ-ON Mark, Elmore uses the same *Georgia-Pacific* framework, albeit in abbreviated fashion. *See* Elmore Rep. ¶ 197. As in its reasonable royalty analysis pertaining to Kartri's patent/Trade Dress infringement, he finds factor 15—the hypothetical reasonable royalty negotiation between the parties—the weightiest, and decisive, factor. *Id.* ¶¶ 198-199. The hypothetical negotiation is assumed to occur at the start of the infringement (October 2013), *id.* ¶ 200, and to concern only Kartri's hospitality market sales, which make up 90% or more of Kartri's business. *Id.* ¶ 201.

**Factors 14, 7, and 12**: As to factor 1, he finds non-probative the licensing agreements entered into by Focus and its predecessors. **[*245]** *Id.* ¶¶ 202-204. As to factor 2, he is not aware of any past royalties that the defendants paid for licenses to similar trademark rights. *Id.* **[**165]** ¶¶ 211-212. As to factor 3, he opines that the hypothetical license would likely be a non-exclusive license to sell plaintiffs' EZ-ON-marked products in the hospitality and retail industries that lasted from October 2013 until the date of trial. *Id.* ¶ 210. As to factor 4, he observes that plaintiffs have actively licensed their trademarks to joint venture partners to promote their hook-free shower curtain products and distinguish them from competitors. *Id.* ¶ 206. As to factor 7, no predetermined end term exists for trademarks—rather, they exist for as long as its owner is willing and able to maintain and protect it. *Id.* ¶ 208. And as for factor 12, he finds two data points useful in assessing customary royalties for comparable trademark licenses in the shower curtain industry. One was obtained from

Markables, an online database on trademark data licenses. *Id.* ¶ 215. It estimates an implied royalty of between 3.5% and 5.15% of net sales. *Id.* ¶ 216. The other is from the 2013 guidebook *Licensing Royalty Rates*, which, based on proprietary data accumulated since 1996, estimates royalty rates for trademarks associated with curtains as generally between 3% and 6.5%. *Id.* ¶ 217.

**Factor 5**: As to the parties' commercial relationship, Elmore again notes that they are direct competitors, which tends to drive up the royalty. *Id.* ¶¶ 219-220. The advantages of the EZ-ON Mark (factor 6) and the product's profitability and popularity (factor 8) are the same as with respect to the patent/Trade Dress infringement royalties, he opines. *Id.* ¶¶ 221-222.

Synthesizing these assessments, Elmore concludes that the parties would reasonably have agreed on a royalty rate of 4% of gross sales for the EZ-ON mark. *Id.* ¶ 228. That rate is based on the ranges found in the Markables database (3.5% to 5.1% with a mean of 4.3%) and the *Licensing Royalty Rates* guidebook (3% to 6.5% with a mean of 4.75%). *Id.* ¶ 227. He lowers these means to 4% to allow for downside contingencies during the negotiation. *Id.*

Applying this 4% rate to the revenue Kartri derived from its sales of the Accused Products, the **[**166]** Elmore Report arrives at the following royalty:

⊞ *Go to table12*

*Id.* Att. 5.0.

The total figure of $87,747 covered the period through July 31, 2018. *See id.* Applying the 4% reasonable royalty rate to Kartri's revenue of $2,395,861 through November 15, 2018 from the sales of the accused products yields an award of $95,834. *See* PTX 637 at 10.

#### [*246] D. Defendants' Rebuttal Report to Elmore's Damages Report

#### 1. Overview of Rogers's Report

Rogers's report seeks to rebut Elmore's calculations of disgorgeable profits,[74] lost profits damages, and

---

[74] Rogers's report also addresses damages for design patent

647 F. Supp. 3d 145, *246; 2022 U.S. Dist. LEXIS 230852, **166

reasonable royalty damages. Rogers Rep. 34. Like Elmore, Rogers opines that a damages award must avoid "double compensat[ion]." *Id.* 49.

## 2. Qualification of Rogers as an Expert

As the Court found at trial, Rogers is qualified to opine as to damages. *See* Tr. at 833. He has extensive experience testifying on damages in intellectual property disputes. *See* Rogers Rep., Ex. A at 45-47. He has authored dozens of expert reports on damages—for plaintiffs and defendants. *Id.* He has taught on valuation **[**167]** issues relating to intellectual property. *Id.* at 43. He has done damages assessments at accounting firms, including, today, his own. *Id.* at 38. He has pertinent certifications and degrees. *Id.* at 44; *see generally* Tr. at 831- 32.

## 3. Admissibility of Rogers's Report

"The 'task of a rebuttal expert is different from that of an affirmative expert. A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis.'" *In re Aluminum Warehousing Antitrust Litig., 336 F.R.D. 5, 29 (S.D.N.Y. 2020)* (citation omitted). Rebuttal experts thus "have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiff['s] expert[]." *In re Digit. Music Antitrust Litig., 321 F.R.D. 64, 78 (S.D.N.Y. 2017)* (internal quotation marks omitted) (second alteration in original). "[H]owever, rebuttal experts must [still] meet *Daubert's* threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016)* (collecting cases). Important here, under *Federal Rule of Civil Procedure 26,* the rebuttal expert's opinion must also rely on data disclosed to opposing counsel during discovery.[75]

---

infringement. Rogers Rep. ¶¶ 29-30. Because that claim has been stayed, the Court does not address that aspect of the report.

[75] *See* **Fed. R. Civ. P. 26(a)** (requiring party to turn over either a "copy—or a description by category and location—of all documents . . . the disclosing party has in its possession, custody, or control and may use to support its claims or defenses"); **Fed. R. Civ. P. 26(e)** (requiring disclosing party to supplement its disclosures "in a timely manner if the party

In light of a flagrant breach of *Rule 26* by defendants that led to **[**168]** an August 5, 2021 bench ruling excluding Kartri's cost data, the Court received a heavily redacted version of Rogers's report. Redacted—and not considered by the Court—were Rogers's calculations and opinions based on the excluded cost data. *See* Dkts. 324 (plaintiffs' motion *in limine* to exclude cost data for Kartri's failure to produce it in fact discovery), 412 (bench ruling transcript), 246 (original motion *in limine,* filed March 26, 2019).[76] The Court, however, **[*247]** permitted Rogers to rely upon Marquis's cost data, as to which there had not been a discovery breach.

## 4. Rogers's Rebuttals

### a. Disgorgement

---

learns that in some material respect the disclosure or response is incomplete or incorrect").

[76] The Court found that Kartri had knowingly failed to produce this data in discovery, in violation of **Rules 26(a)** and **(e)**. The Court accordingly precluded Rogers "from referring to or relying on such materials in trial testimony." Dkt. 412 at 7, 11-12, 17. As the Court's bench ruling recited, on July 29, 2016, Focus had served discovery requests. These sought financial information as to defendants' "revenue, expenses, and profits derived, from Defendants' sale of said Accused Products, from inception of sales through the present," and "all manufacturing costs per unit on an itemized basis, [the] selling costs per unit, the amount of gross profit and net profit realized per unit, [and] other expenses which in any way include or relate to the sale of the Accused Products." Dkt. 246 at 5; *id.,* Ex. 6 at 2. On September 27, 2016, Focus served defendants with interrogatories. These sought, for each product, total sales revenues by year "from inception of sales through to the present," *id.,* Ex. 7 at 2, 6 (Interrogatory No. 7), and "all relevant data pertaining to those profits . . . [and] alleged costs," *id.* (Interrogatory No. 9). Although defendants produced some summary sales figures, they failed to provide full sales information, such as cost and product descriptions. To address the noncompliance, Magistrate Judge Ellis held a telephonic conference on May 17, 2017 with counsel, Dkt. 235, and, on June 14, 2017, ordered defendants to supplement their discovery, including with "any documents that need to be produced in response to the interrogatories," Dkt. 114. Defendants did not do so, although they furnished such data to Rogers on January 26-27, 2019, for use in his rebuttal report. Dkt. 246, Ex. 30 at 24, 52. Focus discovered that this evidence existed and had been shared with Rogers during its deposition of Rogers on February 21, 2019. Dkt. 274 at 6.

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 153 of 255

Page 55 of 82

647 F. Supp. 3d 145, *247; 2022 U.S. Dist. LEXIS 230852, **168

Rogers agrees with Elmore that, in calculating disgorgeable profits for trademark or trade dress infringement, the plaintiff has the burden to adduce evidence of defendant's revenues, and the defendant has the burden as to applicable costs and deductions. Rogers Rep. ¶ 44.

**Marquis's disgorgeable profits**: Rogers's revenue and cost data differ from Elmore's. Rogers admits that this was because defendants produced "more complete and more current information" to him than to plaintiffs. *Id.* ¶ 104. Whereas the Court excluded Kartri's cost data as a result of this discovery violation, plaintiffs **[**169]** did not move for such relief as to Marquis, as the data Rogers presented proved *more* favorable to plaintiffs than that available to Elmore. For 2013 through 2017, the sales data Rogers presents are identical to Elmore's and the cost data are only negligibly different. But as to 2018, Rogers's report shows far higher sales—$918,653, compared to Elmore's $365,650—and far higher costs—$800,402, compared to Elmore's $305,165. *Id.* ¶¶ 104-105. Marquis's gross profit, according to Rogers, is $314,414, as compared to Elmore's tabulation of $256,809. *Id.* ¶ 106. Marquis's sales, costs, and profits, according to Rogers, were as follows:

⊞ Go to table13

*Id.*

**Kartri's disgorgeable profits**: As to Kartri, in light of the preclusion of the late-produced data, Rogers's report had no non-redacted data to add to that considered by Elmore. *See id.* ¶¶ 110, 113-114.

*b. Lost Profits*

Rogers's report takes issue with Elmore's reasoning as to the second, third, and **[**170]** fourth *Panduit* factors. *See* Tr. at 848 (not disputing Elmore's analysis of factor 1).

**[*248] Panduit factor 2 (absence of non-infringing alternatives)**: Rogers concedes that "[f]or the most part," Elmore's analysis of this factor "is correct." *Id.* ¶ 54. But Rogers makes two objections. First, "more than 50 percent of Kartri's sales of their alleged infringing product are custom made products." *Id.* ¶ 55. These fall into two categories: in one, the curtain is made of "specific fabric identified by a customer or even provided by a customer"; in the other, the curtain is made at

"custom length or width." *Id.* Focus generally did not fill such custom orders, but sought to persuade customers to buy an existing product. *Id.* Rogers does not address how similar or different the custom products were to Focus's, but suggests that these products do not compete in the hospitality market with Focus's. *Id.* ¶ 57. Had Focus accepted custom orders, it might have required "up to four months" to obtain materials from their manufacturers. *Id.* ¶ 56. This, he opines, also undermines Elmore's premise of direct competition. *Id.* ¶ 58.[77]

**Panduit factor 3 (manufacturing and marketing capabilities)**: Rogers offers two rebuttals to Elmore's analysis. **[**171]** First, as to plaintiffs' marketing capabilities, Elmore should have focused on the capacities of only ZDG and HSNA, the owners of the infringed patents and Trade Dress, and disregarded those of Focus and its Sure Fit successors, which were sublicensees of ZDG and HSNA. *Id.* ¶ 61. Because parent companies do not market the products sold by their sublicensees, they would not have had the marketing capability necessary to advertise the volume of Kartri's sales. *Id.* Second, as to manufacturing capability, Rogers again notes that most of Kartri's orders were low-quantity custom orders, whereas plaintiffs' manufacturing capacities were geared towards uniform orders of larger quantities. *Id.* ¶ 63. Elmore, he urges, did not fully analyze Focus's ability to handle such orders. *Id.*

**Panduit factor 4 (quantification of plaintiffs' profits)**: Rogers has three objections as to this factor.[78] The first two reprise objections above: that Elmore conflated sublicensee Focus's lost profits with those of right-owners HSNA and ZDG, *id.* ¶ 65, and that Elmore does not show a precise match between Focus's infringed products and defendants' infringing products, *id.* Third, he opines that Elmore's reduction of Focus's market **[**172]** share, but for Kartri's infringement, to

---

[77] At trial, Rogers briefly appeared to fault Elmore for, purportedly, failing to compare Focus's products to the infringing products. Tr. at 849-50. That is wrong. Elmore's report explained his bases for finding no non-infringing alternatives to plaintiffs' products. These include the parties' products' similar pricing, the confusing similarity between the HOOKLESS® and the Ezy Hang products, and Kartri's having attempted to persuade customers looking for HOOKLES® curtains to purchase Ezy Hang curtains. *See* Elmore Rep. ¶¶ 82-93.

[78] A fourth objection was redacted, pursuant to the Court's preclusion of Kartri's cost data.

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 154 of 255

Page 56 of 82

647 F. Supp. 3d 145, *248; 2022 U.S. Dist. LEXIS 230852, **172

90%, is "arbitrary," making his lost profit estimate short of "reasonably certain." *Id.* ¶ 70.


### c. Reasonable Royalties

**Patent and Trade Dress claims**: Rogers objects on four grounds to Elmore's reasonable royalty analysis, each keyed to a *Georgia-Pacific* factor.

**Factor 15**: Rogers argues that Elmore wrongly included Focus, alongside ZDG and HSNA, as a party on plaintiffs' side in the hypothetical reasonable-royalty negotiation, on the grounds that Focus did not own the patent rights at issue. *Id.* ¶ 76. Were Focus not at the table, Rogers opines, plaintiffs' bargaining position would have been different, in that (1) the patents are commercialized through royalty- **[*249]** generating sub-license agreements (not by manufacturing and selling patented products, as Focus did); (2) unlike Focus, ZDG and HSNA did not directly compete with defendants, but would have seen defendants as revenue-generating promoters of ZDG and HSNA's invention; and (3) any license with defendants would have likely increased ZDG and HSNA's royalty income (instead of decreasing its profits from direct competition). *Id.* ¶¶ 79-82. Rogers agrees, however, that ZDG and HSNA would still have a "relatively strong" **[**173]** bargaining position vis-à-vis defendants. *Id.* ¶ 83.

**Factor 1**: Rogers objects to Elmore's discounting of four prior license agreements: those between HSNA and CHF, HSNA and Arcs & Angles, HSNA and OTRT, and the A&A Holdings agreement acquiring Arcs & Angles and its intellectual property rights later assigned to Focus. These set out royalty rates between 2% and 10% of the licensee's gross sales. *Id.* ¶ 85. Rogers contends that these were probative of an established royalty rate. *Id.* ¶¶ 85-86. He finds that a reasonable royalty rate should be around 4.5% percent, on the lower end of the band of rates used in the four pertinent agreements. *Id.*

**Factor 12**: Rogers faults Elmore for discounting as insufficiently comparable 55 license agreements Elmore found on RoyaltySource.com. Elmore, he states, should have described these licenses in more detail. *Id.* ¶ 87. Elmore explains that none of the 55 licenses "were directed to a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145. Rogers does not state why more information was needed to support this conclusion, or identify any feature of any such

agreement that stood to undermine **[**174]** Elmore's conclusion.

**Factor 8**: Rogers objects to Elmore's calculation of the royalty rate based on Focus's profit margin of 50% in the hospitality market, and the usual 25% profit margin for hook-free shower curtains in that market. Rogers Rep. ¶ 89. This objection is based on Kartri's cost data, which was redacted from Rogers's Report.

In summary, Rogers advocates for a royalty rate of 4.5%. He notes that ZDG and HSNA had frequently sub-licensed their patents for 10 percent of gross sales or less. *Id.* ¶ 98.

**EZ-ON Mark claims:** Rogers's rebuttal consists effectively of a legal argument. He states that, in his experience, courts rarely award a reasonable royalty for trademark infringement under circumstances factually akin into these here, *Id.* ¶¶ 115-119. The Court disregards this opinion—essentially distinguishing past court decisions—as impermissible expert testimony.


## E. The Damages Award


### 1. Applicable Period of Infringement

The Court must first decide the end date of the infringement period—July 31, 2018 or November 15, 2018—for the purpose of calculating damages. Although the earlier date was used in Elmore's expert report, that was attributable to discovery violations by the defense, **[**175]** and the evidence at trial convincingly showed that the infringement extended until mid-November 2018. The Court accordingly uses the later date.

It is undisputed that defendants' sales continued until November 12, 2018, and that data as to those sales existed. Marquis's Middleberg admitted at trial that sales of the accused curtains continued until that date. Tr. at 587, 613. As Elmore testified, however, he had not received any data from the defense as to sales of the Ezy Hang curtain after July 31, 2018, Tr. at 401-04, 545, despite the fact that defendants **[*250]** provided such data to their rebuttal expert, Rogers, for use in his analysis. Dkt 246, Ex. 30 at 24, 52.

A court may draw an adverse inference where a party with control over evidence "had an obligation to timely produce it," failed to do so with a "culpable state of mind," and the missing evidence would "support [a]

claim or defense," *Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)*; *see also id.* ("purposeful sluggishness" may constitute a culpable state of mind). "[T]he party seeking the adverse inference must show both that its opponent defied a court order or an obligation under the Federal Rules of Civil Procedure, and that the evidence it has requested in fact exists." *Odyssey Marine Expl., Inc. v. Shipwrecked & Abandoned SS Mantola, 425 F. Supp. 3d 287, 293 (S.D.N.Y. 2019)* [**176] (citations omitted); *Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165, 172 (S.D.N.Y. 2006)* (in bench trial, court itself may draw adverse inference; court inferred that non-produced documents would have supported plaintiff disadvantaged by defendant's discovery breach).

Those standards are met here. As reflected in the August 5, 2021 bench ruling precluding late-produced data, *see* Dkt. 412, defendants admittedly possessed and had an obligation to produce in discovery records of infringing sales between August 1 and November 12, 2018; they did not do so in the face of unambiguous orders and despite producing these to their own expert. This gives rise to an inference of a culpable state of mind. Elmore was thereby forced to limit his report to the period ending July 31, 2018, despite the fact that data covering the ensuing 3.5 months was clearly germane to damages. With the Court's permission, Elmore at trial extrapolated as to what the missing underlying revenue data would show for the period of August 1 through November 15, 2018.[79] He did so by averaging Kartri's monthly revenue between January 1, 2017 and July 31, 2018, and applying that average to the 3.5-month period. Tr. at 519-20. This inference accords with record data and evidence. Accordingly, [**177] applying its "broad discretion" whether to grant an adverse inference, *Volenti v. Perm Mut. Life Ins., 850 F. Supp. 2d 445, 452 (S.D.N.Y. 2012)*, aff'd, *511 F. App'x 57 (2d Cir. 2013)* (summary order); *Glover v. Costco Wholesale Corp., 153 F. App'x 774, 776 (2d Cir. 2005)* (summary order), the Court finds October 16, 2013 through November 15, 2018 to be the appropriate infringement period for the purpose of calculating damages.

---

[79] Although the evidence at trial showed that the infringement continued until November 12, 2018, Elmore's extrapolation covered three additional days, till the mid-point of the month, presumably for convenience. Although using November 12, 2018 would have been more precise, the defense did not object to Elmore's use of November 15, 2018. The Court therefore will not recalculate Elmore's damages calculation to eliminate the three additional days.

## 2. Legal Framework for the Damages Award

### a. Damages available under the Lanham Act and Patent Act

The Lanham Act provides for money damages for trademark and trade dress infringement in the form of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," subject to "the principles of equity." *15 U.S.C. § 1117(a)*. Where a court finds an award "inadequate or excessive," it may, in its discretion, "enter judgment for such sum as the court shall find to be just, according to the circumstances of the **[*251]** case." *Id.* Courts have accordingly awarded disgorgement and lost profits under the act, but absent a prior licensing arrangement, generally have not awarded reasonable royalties. *See Apollo Theater Found., 2005 U.S. Dist. LEXIS 7955, 2005 WL 1041141, at \*13* (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208-09 (3d Cir. 1999)*); *Microban Prod. Co. v. Iskin Inc., No. 14 Civ. 5980 (RA) (DF), 2016 U.S. Dist. LEXIS 24119, 2016 WL 4411349, at \*8 (S.D.N.Y. Feb. 23, 2016)*, *report and recommendation adopted*, *No. 14 Civ. 5980 (RA), 2016 U.S. Dist. LEXIS 109900, 2016 WL 4411414 (S.D.N.Y. Aug. 18, 2016)*; *Gucci Am., Inc., 858 F. Supp. 2d at 254* (courts grant royalty awards only where "the evidence provides a sufficiently reliable basis from which to calculate [that award]" (collecting cases)).

The Patent Act, in turn, provides that a court should **[**178]** award a successful claimant damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *35 U.S.C. § 284*. Courts have recognized lost profits and reasonable royalty awards under this statute, but not "disgorgement of ill-gotten profits," which "Congress abolished in the patent context." *SCA Hygiene Prods. Aktiebolag, 137 S. Ct. at 964*.

### b. Choosing between a disgorgement and actual damages award

Courts applying the Lanham and Patent Acts "have often [held] that awarding the disgorgement of the defendant's profits and plaintiff's own lost profits based on the same sales would constitute 'an impermissible double recovery.'" *Church & Dwight Co., 2018 U.S. Dist.*

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 156 of 255

Page 58 of 82

647 F. Supp. 3d 145, *251; 2022 U.S. Dist. LEXIS 230852, **178

LEXIS 151961, 2018 WL 4253181, at *16 (quoting *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 264 (E.D.N.Y. 2008) (citation omitted)). Because "disgorgement is an inherently equitable remedy," a plaintiff may not elect disgorgement over an award of actual damages—such as an award of lost profits or based on a reasonable royalty—merely because a disgorgement award is "the greater of the two." *Id.* Rather, the Second Circuit has recognized three purposes for which it may be proper to order disgorgement of defendant's profits: "unjust enrichment, compensation, and deterrence." *River Light V, 2015 U.S. Dist. LEXIS 82940, 2015 WL 3916271, at *5* (citing *Merck Eprova, 760 F.3d at 262* [**179] ). In determining whether a disgorgement award is proper, a court must also balance equitable factors. These include "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar Dynasty LLC v. N.Y. & Co., 933 F.3d 202, 214 (2d Cir. 2019)* (citing *George Basch Co., 968 F.2d at 1540*). "[T]he statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief. Nevertheless, that discretion must operate within legally defined parameters." *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta, Inc., No. 09 Civ. 5517 (RMB) (AJP), 2009 U.S. Dist. LEXIS 111141, 2009 WL 4351962, at *2 (S.D.N.Y. Dec. 1, 2009)* (quoting *George Basch Co., 968 F.2d at 1537*), *report and recommendation adopted*, *No. 09 Civ. 5517 (RMB) (AJP), 2009 U.S. Dist. LEXIS 121325, 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009)*.

In contrast, in fixing an award of actual damages, the "quantum of damages," as opposed to the plaintiff's entitlement to damages, ordinarily "must be demonstrated with specificity," *Hilton v. UK Fragrances, Inc., No. 12 Civ. 6346 (JFB) (AKT), 2014 U.S. Dist. LEXIS 25192, 2014 WL 794304, at *7 (E.D.N. Y. Feb. 25, 2014)* (internal quotation [*252] marks and citations omitted). "[A]n award of actual damages under the Lanham Act must be based on an evidentiary showing, not sheer speculation that plaintiffs suffered a financial loss." *Solid 21, Inc. v. Jomashop Inc., No. 19 Civ. 1179 (MKB), 2020 U.S. Dist. LEXIS 255464, 2020 WL 9816843, at *10 (E.D.N.Y. Nov. 30, 2020)* (citation omitted) (alteration in original).

**3. Overview of the Court's Damages Analysis**

The Court awards plaintiffs actual damages for the full infringement period between October 16, 2013 and November 15, 2018, and declines to award disgorgement of defendants' profits. The Court first explains its analysis of the damages it awards: lost profits and reasonable royalties for the [**180] patent and Trade Dress infringement, and lost profits but no reasonable royalty for the EZ-ON Mark infringement, with both are trebled for the period between February 27, 2015 and November 15, 2018. The Court first addresses lost profits and then reasonable royalties. The Court then explains, in light of these awards, its decision not to award disgorgement of defendants' profits. The Court's approach tracks Judge Nathan's thoughtful analysis in *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH, No. 14 Civ. 585 (AJN), 2018 U.S. Dist. LEXIS 151961, 2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018)*, in which she granted a lost profits award under the Lanham Act (for false advertisement); assessed whether to treble that award; and then set out the reasons for not ordering disgorgement of the defendant's profits, *see 2018 U.S. Dist. LEXIS 151961, [WL] at *13-17*.

**4. The Lost Profits Award**

As to lost profits, the Court applies the four-factor Panduit framework.

***Panduit factor 1 (consumer demand)***: Focus's impressive sales figures easily establish that consumer demand existed; Kartri's sales figures independently support the point. By 2013, approximately 2.5 million HOOKLESS® curtains were hung in hotel and motel rooms nationwide. Tr. at 248-51. And Focus's HOOKLESS® sales in the hospitality market—the market in which it mostly competed with defendants—were $81.4 million between 2013 and August 2017 alone. Elmore Rep. ¶ 74. That [**181] figure represented sales of approximately 5.76 million shower curtains. PTX 515. Kartri's sales in the same market were also substantial, viz. $2.1 million. Elmore Rep. ¶ 75; id., Att. 6.0.

Defendants' expert Rogers conceded that such demand existed, Tr. at 848, and did not rebut Elmore's factor 1 analysis. Defendants' executives admitted the same. Kubus admitted that the product "took off," "exploded" onto the scene, and "started a whole marketing trend." Tr. at 730. The first *Panduit* factor is thus satisfied. *See Stryker Corp. v. Intermedics Orthopedics, Inc., 891 F. Supp. 751, 820 (E.D.N.Y. 1995)* (finding "overwhelming

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 157 of 255

Page 59 of 82

647 F. Supp. 3d 145, *252; 2022 U.S. Dist. LEXIS 230852, **181

evidence of demand for the patented product" in, inter alia, the "sales of the patent's commercial embodiment" and of the infringing product), *aff'd*, _96 F.3d 1409 (Fed. Cir. 1996)_.[80]

***Panduit factor 2 (no non-infringing alternatives to satisfy demand)***: Under this factor, "the patent owner may rely on proof of its established market share rather than proof of an acceptable noninfringing substitute." _Bic Corp., 2001 U.S. Dist. LEXIS 20734, 2001 WL 1597983, at *2_ (citing _Mor-Flo Indus., [*253] 883 F.2d at 1578_). Use of this approach is particularly sensible where the parties effectively operate in a two-player market. Such is so here, given the uniform testimony that hook-free shower curtains are a distinct market and that the only non-minor sellers of such curtains were Focus, its licensee [**182] Carnation, and Kartri. Elmore Rep. ¶¶ 81, 94. Defendants' expert Rogers acknowledged that it was appropriate to apply *Mor-Flo's* market share analysis. Tr. at 848-49; *see also* Rogers Rep. ¶ 54 (*Panduit* factor 2 analysis "[f]or the most part . . . correct"). Elmore also opined, without dispute, that Focus captured a market share of approximately 50%, and Kartri captured the rest. *Id.* ¶ 80 (citing Kubus and Goskowski deposition testimony). To account for contingencies, Elmore further reduced the market share Focus would have captured but for Kartri's infringing sales to 90%. Elmore Rep. ¶ 103; Tr, at 512. In such a two-player market, the Court finds that, but for Kartri's infringing sales, those sales would have gone to the plaintiff.

The evidence, in fact, establishes that Kartri knowingly exploited the similarity of the products. For example, in a July 1, 2015 email to Kubus, Kartri's sales director, termed the Ezy-Hang product as "our equivalent of the Hookless Double H pattern." PTX 217. And, between for a hospitality customer seeking a "sub[stitute] or similar item" for a Focus product that was out of stock. *See* PTX 609.

Defendants' expert resisted that the parties' products were interchangeable, [**183] on the ground that Kartri's sales purportedly consist of "custom-made" curtains. Rogers Rep. ¶ 55; *see* Tr. at 849-50. But the Ezy-Hang products, whether manufactured according to

custom orders or pre-fabricated specifications, were confusingly similar to plaintiffs' products and clearly infringing. And as Elmore demonstrated in his report, they sold for similar prices to plaintiffs' curtains. The label "custom made" does not alter the analysis as to this factor. And damages awards for lost profits have been upheld where the infringing product was deemed to have taken away market share not only from products protected by the patents-in-suit but also from related products. *See* _Rite-Hite Corp., 56 F.3d at 1547-48_. The second *Panduit* factor is met.

**Panduit factor *3 (manufacturing and marketing capability)***: Plaintiffs easily establish their manufacturing and marketing capability to fill the orders they would have received but for Kartri's infringing sales. As Elmore notes, Focus's total sales between 2013 and 2017 comprised $81.4 million in the hospitality market, and $54.4 million in the retail market. Elmore Rep. ¶ 98. In that same period, Kartri's accused sales were $1.5 million. Using Focus's sales figures as proxies for its [**184] capacity to manufacture HOOKLESS® curtains, Focus would have been able to meet the additional volume represented by Kartri's sales—a mere 1.1% increase.[81]

Defendants counter by asserting that Focus's practice was to refuse custom orders [*254] or orders for less than 200 curtains. Their expert, Rogers, testified that Focus was "stringent" about not accepting an order below 200. Tr. at 851. He opined that, had Focus accepted custom orders, it might have required "up to four months" to obtain the source products and materials from their manufacturers. Rogers Rep. ¶ 56. This, he opined, raised doubt about the extent to which Focus could have met the manufacturing demand of Kartri's infringing products. *Id.* ¶ 58.

This argument is unpersuasive. A product-by-product mapping is not required to demonstrate manufacturing capability. *See* _Rite-Hite Corp., 56 F.3d at 1547-48_.

---

[80] "This factor presupposes that the patented product and infringing product are sufficiently similar to compete in the same market for the same customers, and thus that demand for the infringer's and patent owner's products are interchangeable." _Stryker Corp., 891 F. Supp. at 819-20_ (citation omitted), Defendants do not dispute this.

[81] Kartri's modest sales figures relative to Focus's contrast with the approximate parity in market shares between the two. The Court cannot resolve this tension here, save to note that Kartri's sales and market-share calculations turn on information provided in discovery by Kartri, whose discovery compliance was shoddy and incomplete. As to market share, the testimony on this point of Kartri's leaders, Kubus and Goskowski, supplied Elmore's basis for his conclusion as to market share. *See* Elmore Rep. ¶ 80. In any event, the ultimate damages award turns on Kartri's sales—figures to which neither Kartri's counsel nor its rebuttal expert objected.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 158 of 255

Page 60 of 82

647 F. Supp. 3d 145, *254; 2022 U.S. Dist. LEXIS 230852, **184

Beyond that, the record refutes Rogers's claim that Focus would have been unable to fill custom orders specifying the curtain's fabric, length, or width. On the contrary, several plaintiffs' witnesses credibly testified that Focus's customers routinely specified characteristics such as fabric, dimensions, color, or ring shape, and that Focus met these specifications. **[**185]** Kemp, for example, testified that custom orders could be filled and turned around within approximately 30 days for the first such order, and one week for follow-on orders. Tr. at 276-77. Focus also routinely received "soft spec" orders which left room for variations. *Id* at 249-50 (Kemp). As to Rogers's basis to opine that Focus had a minimum quantity requirement of 200 curtains per order, he admitted at trial that he relied not on information from Focus, but on Middleberg's testimony. *Id.* at 851. Pressed, Rogers could not point to evidence of a single instance in which Focus rejected an order below 200 curtains. *Id.* at 853-55. He conceded that he was unaware of any evidence that, had Focus taken on the custom and other orders Kartri handled, Focus's "economics[,] profits[,] or costs would have been materially different." *Id.* at 903.

The evidence also established that Focus had the marketing and distribution capabilities to handle the additional orders. It established Focus's 20-year history of energetically marketing its curtains, and its regular sales channels, customer relations, and market presence. As to this, Rogers urged that Elmore should have disregarded the capacities of Focus and its successors and considered **[**186]** the marketing capacity only of the owners of the infringed patents—ZDG and HSNA. Rogers Rep. ¶ 61. But defendants did not cite any authority why the capacities of the owners' licensees, who handle the manufacturing and marketing of these goods, should be disregarded.

The third *Panduit* factor is therefore met.

**Panduit factor *4 (quantifying lost profits)***: In the main, the Court finds Elmore's tabulation of plaintiffs' lost profits persuasive. It is logical to conclude in a two-player hospitality market, shared by Focus and Kartri, with the competitors having similar price points—that, but for Kartri's infringement, its sales generally would have gone to Focus. Elmore Rep. ¶¶ 103-104. Elmore's conservative assumption that something short of 100% of Kartri's sales—he proposed 90% would have shifted to Focus "to account for any contingencies such as small marketplace participants or other factors," *id.* ¶¶ 103, 110, was well taken. Finally, the Court accepts as reasonable Elmore's proposed downward adjustment of

Focus's profit margin (54.1%) to 50%, *id.* ¶¶ 106, 108-109.

The Court makes a minor adjustment to Elmore's analysis: to the sales figure used as the baseline for calculating Focus's lost profits. **[**187]** At trial, Elmore used a sales figure of $2,395,861 for the full infringement period, ending November 15, 2018. PTX 637 at 13. But those sales cover both the hospitality and retail markets. Elmore's analysis, **[*255]** however, was restricted to the hospitality market, which Elmore opined accounts for 90% of Kartri's revenue from sales of the accused shower curtain. Elmore Rep. ¶ 107. Accordingly, the Court will treat the sales that Focus lost in the hospitality market due to Kartri's infringement as 90% of $2,395,861—.,that is, $2,156,275. With that one adjustment to Elmore's math, Focus's lost profits are as follows:

Go to table14

Rogers's rebuttal on this point is again unpersuasive. He found **[**188]** Elmore's 10% reduction of Focus's market share "arbitrary." *Id.* ¶ 70.[82] But Elmore's market share approach sensibly "allows the plaintiff to recover lost profits by establishing with reasonable probability sales it would have made 'but for' the infringement." *Bic Corp., 2001 U.S. Dist. LEXIS 20734, 2001 WL 1597983, at *2* (internal quotation marks omitted); *see also Church & Dwight Co., 2018 U.S. Dist. LEXIS 151961, 2018 WL 4253181, at *10* ("In the absence of complete infoiniation, courts have credited the application of a market share allocation methodology because it inherently accounts for a range of market factors."). And Elmore's 10% reduction of Focus's market share is prudent to account for contingencies that could "impact [p]laintiffs['] ability to capture all of the accused sales." Elmore Rep. ¶¶ 103, 110. At trial, Rogers retreated from this position, stating that he Ididln't necessarily disagree with" Elmore's assessment to impute a 90%, rather than 100%, market share to Focus. Tr. at 848.[83]

**[*256]** The Court accordingly tabulates a lost profits award of $970,324.

---

[82] Rogers also reprises his objections that Elmore should have examined only the lost profits of HSNA and ZDG, and did not precisely match Focus's infringed products to defendants' infringing products, Rogers Rep. ¶ 65. These objections fail for the reasons addressed above.

[83] Had the Court not reduced Focus's assumed market share, damages would have been higher.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 159 of 255

Page 61 of 82

647 F. Supp. 3d 145, *256; 2022 U.S. Dist. LEXIS 230852, **188

**5. Reasonable Royalties—Patent and Trade Dress Infringement**

"A patentee receives a reasonable royalty for any of the infringer's sales not included in the lost profit calculation." *Crystal Semiconductor Corp. v. TriTech Microelec's Int'l, Inc., 246 F.3d 1336, 1354 (Fed. Cir. 2001)* (citing *Minco, Inc. v. Combustion Eneg, Inc., 95 F.3d 1109, 1119 (Fed. Cir. 1996)*; and *Mor-Flo, 883 F.2d at 1577*). "Thus, a patentee may obtain lost profit damages for that portion **[\*\*189]** of the infringer's sales for which the patentee can demonstrate but for' causation and reasonable royalties for any remaining infringing." *Id* (citing *King Instruments Corp. v. Perego, 65 F.3d 941, 952-53 (Fed. Cir. 1995)*); *see also Mor-Flo, 883 F.2d at 1573* (affirming award of lost profits for 40% of market share, and reasonable royalty for the remainder of infringer's sales).

Here, plaintiffs have demonstrated in their *Panduit* analysis that, but for Kartri's infringement, 90% of its sales would have gone to Focus. The issue thus is the royalties attributable to the remaining 10% of Kartri's sales, which the Court has, conservatively, assumed would have gone elsewhere. As to these, the Court finds Elmore's reasonable royalty analysis, in which it applies the *Georgia-Pacific* factors to derive a 25% royalty rate, persuasive.

Elmore's starting assumption (factor 15) is correct that plaintiffs' bargaining position vis-à-vis Kartri would be strong, supporting a high royalty rate. Elmore Rep. ¶ 121. As he notes, plaintiffs own the utility patents, have widely and successfully commercialized those through joint venture and licensing agreements, including with Focus, and would directly compete with Kartri in a two-player market; to license their products to competitors in a market in which Focus is dominant **[\*\*190]** would likely harm the profitability of the patented products. *Id.* ¶ 120. And the licensees would appreciate that to offer a product that (like Ezy Hang) used plaintiffs' hook-free technology would infringe plaintiffs' patent rights, and that no non-infringing alternative was available to meet the demand for HOOKLESS® products in the market. *Id*[84]

Elmore also rightly excluded existing license agreements with affiliated entities as non-probative of an established royalty rate. Elmore Rep. ¶¶ 125-136. Those entailed rates between 2% and 10% of the licensee's gross sales. *See id.* Rogers objected that Elmore did not explain disregarding these agreements, Rogers Rep. ¶ 85, but Elmore did so, on the ground that they "involve[d] related parties or contemplate[d] joint venture transactions," Elmore, Rep. ¶ 136. By contrast, a licensee such as Kartri would enter the hospitality market as a direct competitor, to whom Focus would not rationally cede market share for less than a formidable royalty. *See Panduit, 575 F.2d at 1158* (in royalty analysis, the plaintiff and the infringer&quot;cannot be treated" as if engaged in "ordinary royalty negotiations among truly 'willing' patent owners and licensees," as "the infringer would **[\*\*191]** have nothing to lose and everything to gain if he could count on paying only the normal, routine royalty **[\*257]** non-infringers might have paid"). The Court rejects Rogers's proposed 4.5% royalty rate, which is at the lower end of ordinary such rates.

Also unpersuasive is Rogers's attack on Elmore's assessment (factor 12) that a search did not yield probative benchmarks of customary or standard royalty rates in the field, Elmore Rep. ¶¶ 144-146. Rogers faults Elmore for inadequately explaining why he put aside the 55 license agreements he found on RoyaltySource.com. Rogers Rep. ¶ 87. But Rogers does not identify from this dataset a single example undermining Elmore's explanation that none involved "a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145.

Elmore's basis for choosing a royalty rate of 25% (factor 8) is convincing. He explains that Kartri's alternatives to infringing would have been to continue to sell traditional, hooked shower curtains, or to obtain a license to sell the patented hookiess shower curtains. Hooked curtains had a hospitality-market profit margin of approximately 25%. Elmore Rep, ¶ 160 & n.173. **[\*\*192]** Hookless shower curtains had a margin of approximately 50%. *Id.* Because Kartri would not have rationally agreed to pay above the rate it otherwise could have garnered, Elmore inferred agreement on a 25% rate.[85] Although Rogers

---

[84] Rogers seeks to diminish plaintiffs' bargaining power by urging that only the owners of the patent-in-suit, and not licensee Focus, would not have been included among the parties in the hypothetical reasonable royalty negotiation. Rogers Rep. ¶¶ 79-83. That is unpersuasive. Had ZDG and HSNA negotiated without Focus, they would still have been

mindful that the license payments Focus paid them, tied to its sales, would have come under downward pressure had they allowed a competing licensee into the market.

[85] This rate gives Kartri the benefit of the doubt, in that such terms would have denied Focus the 50% rate it stood to gain

objected based on Kartri's own profit margins, Rogers Rep. ¶ 89, this was based on redacted data, and the Court disregards.[86]

The Court accordingly adopts Elmore's 25% royalty calculation and applies it to the 10% of Kartri's sales in the hospitality market that the Court has found would not have gone to Focus. This yields the following:

 **[*258]**

Go to table15

### 6. Reasonable Royalties—EZ ON Mark Infringement

The Court declines to award reasonable royalty damages **[**193]** for defendants' infringement of the EZ ON Mark. Courts have generally granted such an award where an infringer "continued [to] use ... a product beyond authorization" of a license agreement, "and damages were measured by the license the parties had or contemplated." *The Apollo Theater Found., 2005 U.S. Dist. LEXIS 7955, 2005 WL 1041141, at *13* (quoting *A & H Sportswear, Inc., 166 F.3d at 208-09*); *see also Microban Prods. Co., 2016 U.S. Dist. LEXIS 24119, 2016 WL 4411349, at *8*; *Koninkijke Philips Elecs. N. V. v. Hunt Control Sys., Inc., No. 11 Civ. 3684 (SRC) (CLW), 2016 U.S. Dist. LEXIS 84299, 2016 WL 3545529, at *29 (D.NJ. June 29, 2016)* ("'[T]he use of royalties in trademark is 'atypical.'" (quoting *A & H Sportswear, 166 F.3d at 208* (collecting cases))). Here, there was no license agreement, actual or contemplated, between the parties.

Otherwise, courts have granted royalty awards for trademark infringement only where "the evidence provides a sufficiently reliable basis from which to calculate [that award]." *Gucci Am., Inc., 858 F. Supp. 2d at 254* (collecting cases). There is none here. Focus's expert, Elmore, acknowledged that "[t]here is no established royalty rate for the trademark rights at issue." Elmore Rep. 1224. He noted that (1) the licensing agreements entered into by Focus **[*259]** and its predecessors did not help calculate a royalty for infringement of that mark, *id.* ¶¶ 203-204; (2) defendants had not paid royalties for a similar product, *id.* ¶¶ 211-212; and (3) although plaintiffs had actively licensed their trademarks to other licensees, *id.* ¶ 206, the terms

of those licenses varied by licensee **[**194]** and industry, *see id.* ¶ 209.

Elmore did recommend a royalty rate of 4% of gross sales, but his analysis on this point was threadbare, He did not address *Georgia-Pacific* factors 9-11 and 13, *see id.* ¶ 197, or identify apt licensing history between Focus and third parties. His sole basis for proposing this royalty was Markables, an online database on trademark licenses, *id.* ¶¶ 215-216, and the 2013 guidebook *Licensing Royalty Rates, id.* ¶ 217. These sources are unreliable for this purpose. The Markables estimate was for a trade name (not a trademark), and was "implied" from the terms of a larger acquisition of a company that sold, among other products, shower curtains. *Id.* ¶ 216. The *Licensing Royalty Rates* estimate was drawn from trademark licenses "associated with the promotion *of curtains" Id.* ¶ 217 (emphasis added). It does not identify the industry (for example, hospitality or retail) in which these were sold or limit its analysis to *shower* curtains. Elmore's royalty determination thus rests on just three *Georgia-Pacific* factors (12, 14, and 15). *See Lumber Liquidators, Inc. v. Stone Mt. Carpet Mills Inc., No. 08 Civ. 573, 2009 U.S. Dist. LEXIS 154667, 2009 WL 5876245, at *2-4 (E.D. Va. July 23, 2009)* (denying reasonable royalty on trademark claim where expert relied on scant evidence and applied only three factors). The Court cannot fashion a *reasonable* royalty **[**195]** on such tenuous evidence. *See Fashion Exch. LLC v. Hybrid Promotions, LLC, No. 14 Civ. 1254 (SHS), 2022 U.S. Dist. LEXIS 177866, 2022 WL 4554480, at *3 (S.D.N.Y. Sept. 29, 2022)* (denying royalties in trademark action where plaintiff had produced vague data on royalties received from third parties on the trademark at issue); *cf. QS Wholesale, Inc. v. World Mktg. Inc., No. 12 Civ. 451, 2013 U.S. Dist. LEXIS 67211, 2013 WL 1953719, at *5 (CD, Cal. May 9, 2013)* (royalty award available for trademark infringement where there was "a detailed record of business negotiations between [the parties] regarding the outright *purchase* of the mark" (emphasis in original)).

In sum, the Court awards, before trebling, the following damages amount to plaintiffs: lost profits in the amount of $970,324, and reasonable royalties in the amount of $53,907.

### 7. Treble Damages

Under the patent statute, a "court may increase the damages up to three times the amount found or

---

on such sales, had the customer come to Focus.

[86] Rogers does not find fault with Elmore's analyses of factors 2-7, 8-11, and 13-14, and the Court finds these analyses— some yielding inconclusive answers—persuasive.

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 161 of 255

Page 63 of 82

647 F. Supp. 3d 145, *259; 2022 U.S. Dist. LEXIS 230852, **195

assessed." *35 U.S.C. § 284*. Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," that is, behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93, 103-04, 136 S. Ct. 1923, 195 L. Ed. 2d 278 (2016)*. A plaintiff must establish such willfulness by a preponderance of the evidence. *Adrea, LLC v. Barnes & Noble, Inc., 227 F. Supp. 3d 303, 312 (S.D.N.Y. 2017)* (citing *Halo Elecs., 579 U.S. at 107*).

"[A]wards of enhanced damages are discretionary," *Georgetown Rail Equip. Co. v. Holland L.P., 867 F.3d 1229,1244 (Fed. Cir. 2017)* (citing *Halo Elecs., 579 U.S. at 106*), and "a finding of willful infringement does not command the enhancement of damages," *WCM Indus., Inc. v. IPS Corp., 721 F. App'x 959, 972 (Fed. Cir. 2018)* (summary **[**196]** order). Rather, on a finding of willfulness, a court should "take into account the particular **[*260]** circumstances of each case in deciding whether to award damages, and in what amount." *Kewazinga Corp. v. Microsoft Corp., 558 F. Supp. 3d 90,118 (S.D.N.Y. 2021)* (quoting *Halo Elecs., 579 U.S. at 104*), *reconsideration denied, No. 18 Civ. 4500 (GHW), 2022 U.S. Dist. LEXIS 166182, 2022 WL 4236301 (S.D.N.Y. Sept. 14, 2022)*. A court "must explain the basis for the [enhanced damages] award, particularly where the maximum amount is imposed." *Grp. One Ltd., 2022 U.S. Dist. LEXIS 159179, 2022 WL 4010850, at *27* (quoting *Polara Eng'g, Inc. v. Campbell Co., 894 F.3d 1339, 1355 (Fed. Cir. 2018)* (alteration in *Grp. One Ltd.*) (further citations omitted)). Analysis is typically guided by the non-exclusive factors set out in *Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992)*, *abrogated in part on other grounds by Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)*. *Georgetown Rail Equip. Co., 867 F.3d at 1244*. The *Read* factors are: "(1) 'whether the infringer deliberately copied the ideas of another'; (2) 'whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed'; (3) 'the infringer's behavior as a party to the litigation'; (4) the '[d]efendant's size and financial condition'; (5) the '[c]loseness of the case'; (6) the ' [d]uration of the defendant's misconduct'; (7) '[r]emedial action by the defendant'; (8) the '[d]efendant's motivation for harm'; and (9) '[w]hether the defendant attempted to conceal its misconduct.'" *Grp. One Ltd., 2022 U.S. Dist. LEXIS 159179, 2022 WL 4010850, at *26-27* (quoting *Georgetown Rail Equip. Co., 867 F.3d at 1245 n.6*).

For the reasons that follow, **[**197]** the Court finds that both Marquis and Kartri acted willfully from February 27, 2015, the day that Focus's counsel sent its cease-and-desist letter to Kartri, which was forwarded to Marquis's Middleberg on the same day. The Court thus holds that an enhancement of Focus's lost profits and reasonable royalty awards for patent infringement is warranted for the period between February 27, 2015 and November 15, 2018. And because the *Read* factors decisively favor plaintiffs, a trebling of such damages for that period in in order.

***Marquis's state of mind before the February 27, 2015 cease-and-desist letter***: In the period before it received Focus's February 27, 2015 cease-and-desist letter, Marquis, through its president Middleberg, was careless as to Focus's intellectual property rights. When Pong, whom Middleberg knew had been a manufacturer for Focus, presented his D-shaped ring design to Middleberg in late 2011 or early 2012, both were well aware of Focus's HOOKLESS® product. Tr. 548-50, 555. Middleberg, however, chose to believe Pong's claims that he owned a Chinese patent for the ring design, that he was in the process of obtaining a United States patent for it, and that Focus's patents relating **[**198]** to its HOOKLESS® products had expired or were due to expire soon. Middleberg did nothing to verify these self-serving claims, and instead accepted Pong's representation that a document comprised of Chinese characters was a Chinese patent on the ring design. Given its awareness that Focus then or recently had patent rights in the HOOKLESS® product, Marquis should have inquired into the state of Focus's rights, by, for example, consulting counsel. "Notice of [Focus's] patent to ... [Marquis] gave rise to an affirmative duty of care requiring [Marquis] to obtain competent legal advice before engaging (or continuing to engage) in conduct that might potentially infringe on [Focus's] patent." *WeddingChannel.Com, Inc. v. The Knot, Inc., No. 03 Civ. 7369 (RWS), 2004 U.S. Dist. LEXIS 25749, 2004 WL 2984305, at *3 (S.D.N.Y. [*261] Dec. 23, 2004)* (citing *Comark Communs., Inc. v. Harris Corp., 156 F.3d 1182, 1190 (Fed. Cir. 1998)*). Instead, Middleberg testified, he relied on the word of Pong's Chinese counsel, a Tommy Wang, who summarily stated "that [Pong's] patent was pending and [that Wang] felt confident that it would be issued." Tr. at 554.

Marquis's lax efforts fell short of its duty to ascertain that its D-shaped ring was not infringing any existing patents. The legal opinion sought by an infringer as to another's patent rights "must be 'competent' or it is of

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 162 of 255

Page 64 of 82

647 F. Supp. 3d 145, *261; 2022 U.S. Dist. LEXIS 230852, **198

little value in showing the good faith belief of **[\*\*199]** the infringer." *Comark Comm'ns, 156 F.3d at 1191*. Such an opinion "must be authoritative, not just conclusory, and objective," which ordinarily "include[s] a thorough review of the cited prior art and prosecution history." *Jurgens v. CBK, Ltd., 80 F.3d 1566,1572 (Fed. Cir. 1996)* (citations omitted). The summary statement of Wang—who represented the self-interested Pong—does not come close to satisfying this standard. *See also Berger & Gorin, Inc. v. Gary Plastic Packaging Corp., 691 F. Supp. 740, 752 (S.D.N.Y. 1988)* ("The law is not designed to permit patent counsel to market casually rendered opinions as immunizations against findings of willful infringement."),

However, although the question is close, the Court does not find, by a preponderance, *Adrea, LLC, 227 F. Supp. 3d at 312*, that Middleberg's actions were so flagrant and egregious as to support trebling. Instead, based on the facts and its assessment of Middleberg's demeanor, credibility, and limited sophistication, the Court finds that he acted negligently but not willfully in failing to seek out competent legal advice. *See Radware, Ltd. v. F5 Networks, Inc., No. 13 Civ. 2024 (RMW), 2016 U.S. Dist. LEXIS 112504, 2016 WL 4427490, at \*4 (N.D. Cal. Aug. 22, 2016)* (rejecting, in light of *Halo*, that "willfulness can be proven by negligence"). Marquis was surely opportunistic in moving to commercialize Pong's design—Middleberg admittedly sought to capitalize on an early 2014 rumor that "Focus was in financial trouble," perceiving "an opportunity in the market for us to get aggressive **[\*\*200]** and get out there and sell[.]" Tr. at 573. But Marquis's competitive motive, even coupled with its inattention to legality, does not establish "egregious infringement behavior" that was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs., 579 U.S. at 103-04*. The Court finds that, until February 27, 2015, Marquis, in selling Pong's infringing product, acted with naivete and negligence, but not willfulness.

***Marquis's state of mind after the February 27, 2015 cease-and-desist letter***: Marquis's claim of ignorance of infringement on Focus's rights, however, is unsustainable after February 27, 2015, the date it received Focus's cease-and-desist letter to Kartri. *See* Tr. at 606 (letter was forwarded to Middleberg). That letter documented that the manufacture and sale of the accused products infringed Focus's intellectual property rights, and demanded that Marquis cease and desist. *See* PTX 152. Almost unimaginably, Middleberg—notwithstanding the letter's clear articulation of the basis

of Focus's rights—disregarded the letter, in favor of his unfounded belief that Pong would soon obtain U.S. patents. He told Kartri's Goskowski and Kubus not **[\*\*201]** to "worry" and that "[t]here's nothing [Focus] can do." PTX 166 at 1. Marquis continued to sell the accused products to Kartri for it to resell. It still did not seek advice of counsel. Tr. at 608.

On September 11, 2015, Focus served Kartri with the Complaint in the related action to this, alleging, *inter alia*, infringement of the utility patents '248, '609, and '088. No. 15 Civ. 5108 (PAE) (S.D.N.Y.), **[\*262]** Dkt. 8. On September 21, 2015, Pong, at Middleberg's request, emailed his lawyer Wang, seeking an assessment whether, *inter alia*, Ezy Hang infringed Focus's patents. PTX 258 at 2. The next day, Wang offered, for $3,500, to conduct an infringement analysis and draft an infringement report. *Id.* Marquis still did not commission such an analysis. Tr. at 599, 601 (Middleberg). Nor did it do so when this action was filed against Kartri on December 30, 2015, or when Marquis was impleaded and executed a waiver of service on February 10, 2016. No. 15 Civ, 10154 (PAE) (S.D.N.Y., filed December 30, 2015), Dkts. 1, 11, 19. Instead, Marquis continued to sell infringing products to Kartri through November 12, 2018. *See* Tr. at 600.

Marquis's repeated failure to desist, investigate, or consult counsel, in the face of clear notice that its shower curtains infringed on the patents identified in Focus's **[\*\*202]** letter, was plainly willful. *See, e.g., Etna Prod. Co. v. Q Mktg. Grp., Ltd., No. 03 Civ. 3805 (SAS), 2004 U.S. Dist. LEXIS 15323, 2004 WL 1769794, at \*14 (S.D.N.Y. Aug. 6, 2004)* ("question of willfulness [was] not close" where defendant had "blatantly infringed [plaintiff]'s patent for over a year" and "[w]hen confronted with a cease and desist letter . . . did virtually nothing to remedy its infringement"); *Keystone Glob. LLC v. Auto Essentials Inc., No. 12 Civ. 9077 (DLC) (GWG), 2014 U.S. Dist. LEXIS 141044, 2014 WL 4897104, at \*5 (S.D.N.Y. Oct. 1, 2014)* (recommending finding willfulness where defendant "was notified of its infringing conduct [by cease-and-desist letters] on October 25, 2012, and again on November 7, 2012, but still continued to distribute the infringing product" (citations omitted)), *report and recommendation adopted, No. 12 Civ. 9077 (DLC), 2015 U.S. Dist. LEXIS 5612, 2015 WL 224359 (S.D.N.Y. Jan. 16, 2015)*; *Stryker Corp., 891 F. Supp. at 816* (patent infringement willful where infringer had actual notice of plaintiffs patent, "ignore[d] its own patent attorney's requests for a search of similar technology, [and] failed to seek competent legal advice and conduct a patent search

647 F. Supp. 3d 145, *262; 2022 U.S. Dist. LEXIS 230852, **202

until after [defendant received a] cease and desist letter"), *aff'd*, _96 F.3d 1409 (Fed. Cir. 1996)_. A defendant's continued sales of infringing products after a complaint has been filed against it can also, on its own, warrant a finding of willfulness. *See* _Apple Inc. v. Samsung Elecs. Co., 258 F. Supp. 3d 1013, 1027 (N.D. Cal. 2017)_ ("[P]ost-filing conduct alone can serve as the basis of a jury's willfulness finding and an award of enhanced damages."). Middleberg himself testified that, "in retrospect," **[**203]** Marquis "probably shouldn't have" continued to sell the accused products for as long as it did. Tr. at 600.

The Court accordingly finds that, between February 27, 2015 and November 15, 2018, Marquis infringing conduct was willful.

***Kartri's state of mind before the February 27, 2015 cease-and-desist letter***: As with Marquis, the evidence shows, throughout, a striking lack of concern about infringing on others' intellectual property rights on the part of Kartri owners Kubus and Goskowski. Through the cease-and-desist letter of February 27, 2015, this concern is properly found negligent, not willful.

Kartri had long been aware of the existence of Focus's HOOKLESS® products and their earlier iterations. In the late 1990s, HSNA's Marcus unsuccessfully pitched the invention to Kartri's then-president, who was Kubus and Goskowski's father. Tr. at 724-28. Kubus also was aware that plaintiffs had commercialized the hookless curtain and that it had been tremendously successful. *Id.* at 730-31 (Kubus). And, when Kartri began developing and rolling out the Ezy Hang product, she was aware of Focus's patent rights on **[*263]** the slit in the HOOKLESS(4) product and its trademark rights. But, she testified, she concluded that **[**204]** the Ezy Hang product was not infringing. *Id.* at 772-73. Her basis was Middleberg's assurance that the Ezy Hang product did not infringe. *Id.* at 773. Kubus testified that she relied on these representations despite knowing that non-lawyer Middleberg had no qualifications in patent law and that Middleberg was relying on Pong's self-serving statements. *Id.* at 773-74.

The state of mind of Kartri co-owner Goskowski before February 27,2015 was less clearly developed. In a declaration, she attested to having received two Chinese patents from Pong—one translated into English and one in Chinese. *Id.* at 667-68; PTX 28-1 at 2. She stated that, based on the Chinese patents, she had determined that Kartri was not infringing any of Focus's

U.S. patent rights. *See* Tr. at 668.[88] She also did not seek guidance from counsel before February 27, 2015, nor otherwise inquire whether Ezy Hang infringed on patent rights. *Id.* at 669. In this, she, too, relied on Middleberg's assurances. *Id.*

In sum, between early 2013 and February 27, 2015, there is substantial evidence that Kartri's owners had notice that the product with which they proposed to compete—Focus's HOOKLESS® curtains—was patented. Besides relying on their suppliers' conclusory, **[**205]** self-interested, and suspect remarks, they took no action to ascertain whether Ezy Hang infringed on others' patent rights. Kartri thus abandoned its duty to competently ascertain whether its product infringed existing patent rights. _WeddingChannel.com, 2004 U.S. Dist. LEXIS 25749, 2004 WL 2984305, at *3_.

Nonetheless, the Court, as with Marquis, cannot find that Kartri's pre-February 27, 2015 conduct crossed the line from negligent to "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." _Halo Elecs., 579 U.S. at 103-04_. Having carefully evaluated the testimony of Kubus and Goskowski, the Court finds that they acceded to the helm of a modest-sized family business without sophistication in intellectual property matters. Until Focus squarely put them on notice of Kartri's breaches, their failure to investigate is best ascribed to naiveté and ignorance of legal obligations, not willfulness.

***Kartri's state of mind after the February 27, 2015 cease-and-desist letter***: In contrast, Kartri's infringing conduct after receiving the cease-and-desist letter was clearly willful. There is no evidence that Goskowski received, let alone, reasonably relied upon, advice of counsel to the effect that it was lawful to market Ezy Hang.[89] Instead, **[**206]** on March 3, 2015, she emailed Middleberg, asking "David, how do we get away

---

[88] Goskowski's declaration stated that she had received copies of the two patents in 2013. The copies reflect issuance dates in 2014. Tr. at 670-71.

[89] At trial, Goskowski volunteered that, after receiving the letter, she had conferred with Kartri's counsel in this case, Bernhard Molldrem, Esq.., and "came away with the understanding that [she was] complying with the law." Tr. 648-49. Because Kartri did not advance an advice-of-counsel defense or waive attorney-client privilege, the content of any such communications were not developed. The Court considered this aspect of Goskowski's testimony solely as evidence of her asserted state of mind,

with a China patent? How does that cover us in the US?" PTX 167. And Kartri continued to sell the accused Ezy Hang product. Tr. at 587. It continued to do so after it was served, on September 11, 2015, with plaintiffs' initial complaint (in Dkt. 15 Civ. 5108) alleging **[*264]** infringement of the utility patents. *See* No. 15 Civ. 5108 (PAE), Dkt. 8. And it continued to do so, even after receiving notice of this action, filed December 30, 2015, Dkt. 1, and served on Kartri on February 9, 2016, *see* Dkt. 15. Kartri's sales continued until November 12, 2018, more than three months after the Court, on August 9, 2018, issued its *Markman ruling*. Dkt. 198. Kartri's flagrant and prolonged disregard of plaintiffs' intellectual property rights compels a finding that, like Marquis, Kartri, after February 27, 2015, acted willfully, deliberately, and in bad faith. *Halo Elecs., 579 U.S. at 103-04*.

The Court accordingly finds that, for both Marquis and Kartri, enhanced damages are warranted for the period between February 27, 2015 and November 15, 2018.

***Trebling Marquis's and Kartri's damages for February 27, 2015 to November 15, 2018***: The nine *Read* factors, in combination, **[**207]** strongly favor the maximum enhancement of treble damages.

First, defendants "deliberately copied [Focus's] ideas." *Grp. One Ltd., 2022 U.S. Dist. LEXIS 159179, 2022 WL 4010850, at *26*. They were well aware of Focus's innovative product and success. Middleberg and Pong discussed Focus's HOOKLESS® as early as the meeting in 2012 at which Pong pitched his D-shaped ring. Tr. at 548-50. Marquis, in 2014, saw a chance to break into Focus's market share, in light of Focus's rumored financial trouble. *Id.* at 573 (Middleberg) ("[T]here was an opportunity in the market for us to get aggressive and get out there and sell because they had been cut off by their suppliers."); Kubus Dep Tr. at 24 ("[F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless."). Defendants' introduction of their infringing product reflects deliberateness and opportunism. This factor strongly favors plaintiffs.

Second, Marquis, aware that Focus's HOOKLESS® technology was patent protected, did not investigate the scope of those patents. Middleberg declined the offer of Pong's lawyer to conduct an infringement analysis. Kartri's Kubus and Goskowski did not investigate either. This factor also strongly favors plaintiffs.

Third, in this litigation, both **[**208]** defendants repeatedly dallied. They reiterated arguments the Court had rejected. *See, e.g.*, Dkts. 297 at 20, 412 at 12, 436 at 23. They breached discovery obligations by withholding its cost data from plaintiffs in discovery while furnishing it to their expert. *See Apple Inc., 258 F. Supp. 3d at 1032* ("Typically, 'litigation misconduct' refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." (quoting *i4i Ltd., 598 F.3d at 859*)). This, too, favors plaintiffs.

Fourth, in contrast, defendants' relatively small size and financial condition, compared to Focus's, favors defendants. On Focus's estimation, Marquis's infringing sales in the hospitality market were $2,072,407 and Kartri's were $2,395,861, whereas Focus's were $81,351,591—all in the hospitality market alone. *Cf. Radware, 2016 U.S. Dist. LEXIS 112504, 2016 WL 4427490, at *8* (infringer's large size weighed in favor of enhanced damages).

Fifth, liability in this case is clear, The Court granted summary judgment for plaintiffs on the utility patent infringement claims. Dkts. 297, 312. And here, in resolving the trademark and Trade Dress infringement claims, the Court has found (1) ownership, validity, and protectability of the HOOKLESS® and EZ-ON Marks, **[**209]** (2) standing to sue for the infringement of the EZ ON Mark, (3) the strength of the Trade Dress given its acquired secondary meaning, and (4) that the *Polaroid* factors **[*265]** measuring the likelihood of confusion overwhelmingly favored Focus both as to the marks and the Trade Dress. The fifth *Read* factor strongly favors plaintiffs.

Sixth, "a long duration [of misconduct] tends to support enhanced damages more than a short duration." *Probatter Sports, LLC v. Sports Tutor, inc., 586 F. Supp. 3d 80, 118 (D. Conn. 2022)*. Defendants' misconduct lasted nearly three years before litigation commenced, and then persisted for nearly another three years. *See id.* (citing, *e.g., I-Flow Corp. v. Apex Med. Techs., Inc., No, 07 Civ. 1200, 2010 U.S. Dist. LEXIS 1021, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010)* (six years of misconduct "substantial," favoring enhancement)); *Broadcom Corp. v. Qualcomm Inc., No. 05 Civ. 467 (JVS), 2007 U.S. Dist. LEXIS 62764, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007)* (two years of infringement before lawsuit, and continued infringement thereafter, favored increased damages), *vacated on other grounds, 2007 U.S. Dist. LEXIS 86627, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007)*. The sixth *Read* factor favors plaintiffs.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 165 of 255
Page 67 of 82

647 F. Supp. 3d 145, *265; 2022 U.S. Dist. LEXIS 230852, **209

Seventh, the record does not reflect any remedial actions taken by defendants. On the contrary, they continued to infringe until after the Court's *Markman* ruling three years into this litigation. This factor, too, favors plaintiffs.

Eighth, as to motivation to harm, "[w]hen the infringer is a direct competitor, this factor generally weighs in favor of enhanced damages." *Probatter Sports, LLC, 586 F. Supp. 3d at 119* (citation omitted); *see [**210] also Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp., 593 F. Supp. 2d 1088, 1116-17 (N.D. Cal. 2009)* (where "the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages"). Kartri undisputedly is a direct competitor of Focus in the two-player hospitality market. And Marquis's economic incentives align with those of Kartri, its supplier; Middleberg pitched Pong's design to Kartri as a means to break into Focus's market. This factor favors plaintiffs.

The ninth factor does not favor plaintiffs, in that defendants did not conceal their conduct, but openly infringed. *See Probatter Sports, LLC, 586 F. Supp. 3d at 119* (factor did not favor of enhancement where infringer "put [its] product and the infringement in the open marketplace").

In sum, seven of the *Read* factors favor plaintiffs; only two favor defendants. Viewing the factors in totality, these do not mitigate the gravity of defendants' willful infringements.

The Court accordingly imposes the maximum enhancement and trebles defendants' damages to the extent incurred between February 27, 2015, and November 15, 2018.

Defendants' overall damages thus are as follows. For lost profits:
 **[*266]**

Go to table16

For the reasonable royalty award:
 **[*267]**

Go to table17

Adding those two awards yields a final award of $2,938,337. Plaintiffs are entitled **[**212]** to recover that sum from defendants.

## 8. Disgorgement Is Not Available

In light of the above analysis, a disgorgement remedy is not warranted here, In *Church & Dwight Co.*, Judge Nathan found disgorgement of profits unwarranted because the lost profits award adequately achieved compensation and deterrence. *2018 U.S. Dist. LEXIS 151961, 2018 WL 4253181, at *1, 17*; *see also 4 Pillar Dynasty, 933 F.3d at 214.* So too, here. The enhanced award above is sufficient to compensate Focus for its losses, divest defendants of any unjust enrichment, and deter similar misconduct by Kartri (Marquis went out of business in 2020, Tr. 576).

In so holding, the Court is mindful that the remaining four nonexclusive factors identified as considerations in whether to award disgorgement award do, or may, favor plaintiffs.[94] But on review, the Court finds that the award above, which reflects trebled **[*268]** damages for much of the infringement period, will in practice achieve the objectives served by disgorgement. The award here also has the virtue of being anchored in reliable data. A disgorgement award, in contrast, would be impossible to tabulate with anything close to precision, given defendants' lapses in producing evidence of their expenses. Although a court may resolve doubts against a defendant whose **[**213]** inadequate recordkeeping prevents precise tabulations, *Aris Isotoner Inc. v. Dong Jin Trading Co., No. 87 Civ. 890 (RO), 1989 U.S. Dist. LEXIS 18446, 1989 WL 236526, at *5 (S.D.N.Y. Sept. 14, 1989),* "some reasonable basis for computation has to be used," *Chloe v. Zarafshan, No. 06 Civ. 3140 (RJH) (MHD), 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009).* Here, plaintiffs pursue disgorgement of all of defendants' revenue. That request is plainly unreasonable, as plaintiffs' own damages expert has estimated that Marquis's yearly profit margin likely averaged around 13.6%, Elmore Rep., Att. 7.0, and there is no basis to assume that Kartri's costs were negligible so as to justify an assumed 100% profit margin. Plaintiffs' alternative proposal, which assumes profit margins for Marquis and Kartri of 75% and 44%, respectively, PF at 96-97, is based on isolated, anecdotal data taken from a stray facet of Kubus's testimony, which the Court is

---

[94] These are "the degree of certainty that the defendant benefited from the unlawful conduct," "the role of a particular defendant in effectuating the infringement," "any delay by plaintiff," and "plaintiff's clean (or unclean) hands." *4 Pillar Dynasty, 933 F.3d at 214.*

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 166 of 255

Page 68 of 82

647 F. Supp. 3d 145, *268; 2022 U.S. Dist. LEXIS 230852, **213

unprepared to credit as accurately capturing the company's revenues and costs. *See* Tr. at 763-64.

Accordingly, the Court declines to award disgorgement on top of, or as an alternative to, the lost profits and reasonable royalty awards set out above.

## 9. Reasonable Attorney's Fees

The Patent Act and the Lanham Act, in identical language, provide that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *35 U.S.C. § 285*; *15 U.S.C. § 11 17(a)*. "[A]yl 'exceptional' case . . . is simply one **[**214]** that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015)* (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014)* (applying *35 U.S.C. § 285* standard)); *see also Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530 (2d Cir. 2018)* (*Octane Fitness* standard applies to identically worded *15 U.S.C. § 1117(a)* provision). "The 'exceptional' standard 'demands a simple discretionary inquiry; it imposes no specific evidentiary burden.'" *Beijing Daddy's Choice Sci. & Tech. Co, v. Pinduoduo Inc., No. 18 Civ. 6504 (NRB), 2020 U.S. Dist. LEXIS 25382, 2020 WL 729518, at *2 (S.D.N.Y. Feb. 13, 2020)* (quoting *Octane Fitness, 572 U.S. at 557*). District courts are "given wide latitude" in the "case-by-case exercise of their discretion, considering the totality of the circumstances[,] . . . frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *4 Pillar Dynasty, 933 F.3d at 215*; *see also Blair v. Alstom Transport., Inc., No 16 Civ. 3391 (PAE), 2020 U.S. Dist. LEXIS 139841, 2020 W.L. 4504842, at *7 (S.D.N.Y. Aug. 5, 2020)*. And while "fraud, bad faith, or willful infringement are no longer required for a fee award," they remain "highly relevant" *post-Octane. Hello I Am Elliot, Inc. v. Sine, No, 19 Civ. 6905 (PAE), 2021 U.S. Dist. LEXIS 61261, 2021 WL 1191971, at *3 (S.D.N.Y. Mar, 30, 2021)* (internal quotation marks and citations omitted). Thus, "courts continue **[**215]** to hold claims of baselessness **[*269]**

to a high bar, [and] most *post-Octane* cases awarding fees continue to involve substantial litigation misconduct." *Id.* (internal quotation marks and citations omitted).

Neither party has briefed attorney's fees, properly treating it as reserved for after trial. *See* PF at 6; Elmore Rep. ¶ 230; Rogers Rep. ¶ 35, The Court orders plaintiffs, within four weeks of the date of this opinion and order, to file an opening brief as to such fees, with supporting documentation and calculations. Defendants' opposing brief is due four weeks later. Plaintiffs' reply is due two weeks after that.

## 10. Prejudgment and Postjudgment Interest

In a patent infringement case, "prejudgment interest should ordinarily be awarded," even though such an award is not "requir[ed] . . . whenever infringement is found." *Metso Mins., Inc. v. Powerscreen Distrib. Ltd., 833 F. Supp. 2d 333, 343 (E.D.N.Y. 2011)* (quoting *Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 655-57, 103 S. Ct. 2058, 76 L. Ed. 2d 211 (1983)*). Although "there is no mandatory interest rate and no standard rate for calculating an award of prejudgment interest," *TiVo, Inc. v. EchoStar Comm'ns Corp., No. 04 Civ. 1, 2006 U.S. Dist. LEXIS 64291, 2006 WL 6830818, at *5 (ED. Tex. Aug. 17, 2006)*, "[t]he Federal Circuit has given district courts great discretion when determining the applicable interest rate for an award of prejudgment interest," *Metso Mins., Inc., 833 F. Supp. 2d at 343* (citations omitted). "[M]ost often courts will award either the prime rate or the U.S. Treasury **[**216]** rate." *Id* (citation omitted). By contrast, the Lanham Act "does not provide for prejudgment interest." *Merck Eprova, 760 F.3d at 263* (citation omitted). But "such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Id. at 263-64* (citation omitted).

Post-judgment interest is available in Lanham Act actions and Patent Act actions pursuant to *28 U.S.C. § 1961(a). See Wowwee Grp. Ltd. v. Haoqin, No 17 Civ. 9893 (WHP), 2019 U.S. Dist. LEXIS 48408, 2019 WL 1316106, at *4 (S.D.N.Y. Mar. 22, 2019)* (Lanham Act); *Rentrop v. Spectranetics Corp., 514 F. Supp. 2d 497, 507 (S.D.N.Y. 2007)* (Patent Act), *aff'd, 550 F.3d 1112 (Fed. Cir. 2008)*. Consistent with *§ 1961(a)*, the rate of post-judgment interest is the weekly average one-year constant maturity Treasury yield for the week preceding entry of judgment. Post-judgment interest is compounded annually. *28 U.S.C. § 1961(b)*.

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 167 of 255

Page 69 of 82

647 F. Supp. 3d 145, *269; 2022 U.S. Dist. LEXIS 230852, **216

The Court orders the parties to address, in their briefs as to attorneys' fees, the issues of pre-and post-judgment interest.

## F. Injunctive Relief as to Both Defendants' Infringement of and Unfair Competition with the EZ-ON Mark and Trade Dress, and Kartri's Infringement of and Unfair Competition with the HOOKLESS® Mark

The Lanham Act "authorizes the Court to 'grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office[.]'" *Ideavillage Prods. Corp. v. Shenzhen City Poly Hui Foreign Trade Co., No. 17 Civ. 8704 (JGK) (BCM), 2019 U.S. Dist. LEXIS 215951, 2019 WL 12339638, at *7 (S.D.N.Y. Dec. 12, 2019)* (quoting *15 U.S.C. § 1116(a)*). To obtain a permanent injunction, a plaintiff that has **[**217]** established liability under the Lanham Act "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, **[*270]** a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*; *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011)* (eBay factors apply to trademark infringement action under Lanham Act), *aff'd, 511 F. App'x 81 (2d Cir. 2013)* (summary order).

*Irreparable harm*: This is established where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused." *Lobo Enters., Inc. v. Tunnel Inc., 822 F.2d 331, 333 (2d Cir. 1987).* The Court has found a likelihood of confusion among shower curtain purchasers. This satisfies the first *eBay* factor.

*No adequate remedies at law*: This "is satisfied where the record contains no assurance against defendant's continued violation of Plaintiffs trademark." *Ideavillage Prods. Corp., 2019 U.S. Dist. LEXIS 215951, 2019 WL 12339638, at *7* (citation omitted). There is none here. That defendants eventually ceased their infringing sales "[does] not prevent [a] court from considering [defendant's] previous infringing behavior as justification

for an injunction." *Register. corn, Inc. v. Verio, Inc., 356 F.3d 393, 405 (2d Cir. 2004)*; *accord Balady, Inc. v. Elhindi, No. 14 Civ. 855 (SJ) (RER), 2014 U.S. Dist. LEXIS 176845, 2014 WL 7342867, at *11 (E.D.N.Y. Dec. 23, 2014).* Here, **[**218]** defendants ceased infringing nearly three years into this litigation. Later, they sought to reprise their baseless claims that the HOOKLESS® Mark was generic, and thus invalid, *see* Dkt. 297 at 20, and Marquis continues to assert the invalidity of the EZ ON Mark and Trade Dress. A court is entitled to consider a defendant's cessation of infringing conduct skeptically where it "has already infringed, continues to contest the lawfulness of its actions, and ceased its infringing conduct only after the initiation of this lawsuit. If not enjoined, [the defendant] would have little incentive not to employ [plaintiffs] trademarks in advertising its product in the future." *Mattel, Inc. v. Robarb's, Inc., No. 00 Civ. 4866 (RWS), 2001 U.S. Dist. LEXIS 11742, 2001 WL 913894, at *3 (S.D.N.Y. Aug. 14, 2001)*; *see also Nat'l Geographic Soc'y v. Conde Nast Pubs. Inc., 687 F. Supp. 106 (S.D.N.Y. 1988)* (injunction issued where defendant agreed to cease trademark infringement only after lawsuit). The Court finds that a remedy at law for defendants' violations is inadequate. The second *eBay* factor is met.

*Balance of hardships*: This factor overwhelmingly favors plaintiffs, who may continue to suffer irreparable harm to their business, profits, goodwill, and reputation as a result of defendants' willful infringement of the trademarks and Trade Dress. *Kelly Toys Holdings, LLC v. Alialialill Store, No. 21 Civ. 8434 (AKH) (RWL), 2022 U.S. Dist. LEXIS 103587, 2022 WL 2072567, at *12 (S.D.N.Y. June 9, 2022).* Defendants, in contrast, have not identified any cognizable hardship **[**219]** they could experience from an injunction. *See Hounddog Prods., L.L.C. v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011).* Lost business attributable to unlawful infringement does not qualify as a hardship. *See Windsurfing Int'l Inc. v. AMF, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).* The third *eBay* factor is met.

*Public interest*: The public has an interest in not being deceived and "in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N. Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010)*; *accord ideavillage Prods. Corp., 2019 U.S. Dist. LEXIS 215951, 2019 WL 12339638, at *10.* Such is so here. A permanent injunction also favors the **[*271]** public interest, and the fourth *eBay* factor is met.

647 F. Supp. 3d 145, *271; 2022 U.S. Dist. LEXIS 230852, **219

The Court thus enjoins defendants from further infringement or unfair competition with the EZ-ON Mark and Trade Dress, and Kartri from further infringement or unfair competition with the HOOKLESS® Mark. Such conduct includes, but is not limited to, manufacturing, selling, advertising, or in any way commercializing the Ezy Hang product. Defendants are also enjoined from branding or advertising their products in any way that suggests an affiliation with the EZ-ON or HOOKLESS® Marks or Trade Dress.

**CONCLUSION**

For the reasons above:

1. The Court finds Marquis and Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under *15 U.S.C. § 1125(a)*; and for unfair competition with plaintiffs' **[**220]** EZ-ON Mark and Trade Dress under New York law.

2. The Court finds Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under *15 U.S.C. § 1125(a)*; and for unfair competition with plaintiffs' HOOKLESS® Mark under New York law.

3. The Court denies all of defendants' affirmative defenses, namely: lack of statutory standing, failure to join an indispensable party, non-infringement of the EZ-ON Mark, invalidity of the EZ-ON Mark, non-infringement of the Trade Dress, and invalidity of the Trade Dress.

4. The Court finds that defendants' infringement of the utility patents and Trade Dress was willful between February 27, 2015 and November 15, 2018.

5. The Court awards plaintiffs lost profits, in the amount of $970,324, for defendants' infringement of the utility patents and Trade Dress. That award covers the period from October 16, 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November 15, 2018. The final, enhanced lost profits award amounts to $2,783,687.

6. The Court awards plaintiffs a reasonable royalty of $53,907, for defendants' infringement of the utility patents and Trade Dress. That award covers the period from October 16, **[**221]** 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November 15, 2018. The final, enhanced reasonable

royalty award amounts to $154,649.

7. The Court enjoins both defendants from infringing or unfairly competing with the EZ-ON Mark and the Trade Dress under the Lanham Act, and from unfairly competing with the EZ-ON Mark and the Trade Dress under New York law. The Court further enjoins Kartri from infringing or unfairly competing with the HOOKLESS® Mark under the Lanham Act, and from unfairly competing with the HOOKLESS® Mark under New York law.

8. The Court denies plaintiffs' claim for a disgorgement of defendants' profits, and their claim for a reasonable royalty for defendants' infringement of the EZ-ON Mark.

9. The Court orders plaintiffs, within four weeks of the date of this opinion and order, to file their opening brief, with supporting documentation, on the issues of reasonable attorney's fees, prejudgment interest, and postjudgment interest. Defendants are ordered to file their opposing brief within four weeks of plaintiffs' due date. Plaintiffs are ordered to file their reply brief within 14 days thereafter.

SO ORDERED.

/s/ Paul A. Engelmayer

PAUL A. ENGELMAYER

United States **[**222]** District Judge

Dated: December 22, 2022

New            York,            New            York

8.  *Marketquest Group Inv. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (June 12, 2018)

 Caution
As of: December 9, 2023 12:05 PM Z

## *Marketquest Grp. Inc. v. BIC Corp.*

United States District Court for the Southern District of California

June 12, 2018, Decided; June 12, 2018, Filed

Case No. 11-cv-618-BAS-JLB

**Reporter**

316 F. Supp. 3d 1234 *; 2018 U.S. Dist. LEXIS 98674 **; 2018 WL 2933518

MARKETQUEST GROUP, INC., Plaintiff, v. BIC CORPORATION; BIC USA INC.; NORWOOD PROMOTIONAL PRODUCTS, LLC, Defendants.

**Prior History:** *Marketquest Group, Inc. v. BIC Corp., 862 F.3d 927, 2017 U.S. App. LEXIS 12165 (9th Cir. Cal., July 7, 2017)*

## Core Terms

registration, marks, Defendants', trademark, counterclaims, abandonment, summary judgment, commerce, infringement, affirmative defense, secondary meaning, fair use, products, damages, incontestable, registered, catalog, likelihood of confusion, advertising, parties, displays, trademark infringement, misuse, consumer, distributors, challenges, website, no evidence, Lanham Act, specimens

**Counsel:** [**1] For Marketquest Group, Inc., a California corporation doing business as, All-In-One, Plaintiff: Gregory Harris Guillot, LEAD ATTORNEY, PRO HAC VICE, Gregory H. Guillot, P.C., Dallas, TX; Guillermo Marrero, LEAD ATTORNEY, International Practice Group, P.C., San Diego, CA; Kent M. Walker, LEAD ATTORNEY, David Michael Kohn, Michael Thomas Lane, Lewis Kohn & Walker LLP, San Diego, CA.

For Bic Corporation, a Connecticut corporation, Bic USA, Inc., a Delaware corporation, Norwood Promotional Products, LLC, doing business as, Norwood Promotional Products, also known as, Norwood Operating Company, LLC, Defendants: Richard P Sybert, LEAD ATTORNEY, Gordon and Rees, San Diego, CA; Joan Borzcik Flaherty, Yuo-Fong C. Amato, Gordon & Rees LLP, San Diego, CA.

For Norwood Promotional Products, LLC, Bic Corporation, a Connecticut corporation, Bic USA, Inc., a Delaware corporation, Counter Claimants, Counter Defendants: Richard P Sybert, LEAD ATTORNEY,

Gordon and Rees, San Diego, CA; Yuo-Fong C. Amato, Gordon & Rees LLP, San Diego, CA.

**Judges:** Hon. Cynthia Bashant, United States District Judge.

**Opinion by:** Cynthia Bashant

## Opinion

[*1247] ORDER:

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF MARKETQUEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT [**2]**

[ECF No. 205];

**(2) DENYING DEFENDANT BIC CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

[ECF No. 216];

**AND**

**(3) GRANTING IN PART AND DENYING IN PART DEFENDANTS BIC USA AND NORWOOD'S MOTIONS FOR SUMMARY JUDGMENT AS TO DAMAGES**

[ECF Nos. 214, 215]

This case is on remand from the Ninth Circuit's reversal of this Court's previous order granting summary judgment to Defendants on their fair use defense and corresponding dismissal of Plaintiff Marketquest Group, Inc.'s ("Marketquest") claims that Defendants infringed its All in One and THE WRITE CHOICE marks. *See Marketquest Grp., Inc. v. BIC Corp., No. 11-cv-618-BAS-JLB, 2015 U.S. Dist. LEXIS 51037, 2015 WL 1757766 (S.D. Cal April 17, 2015)*, *rev'd by,*

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 171 of 255

Page 2 of 42

316 F. Supp. 3d 1234, *1247; 2018 U.S. Dist. LEXIS 98674, **2

*Marketquest Grp., Inc. v. BIC Corp., 862 F.3d 927 (9th Cir. 2017).* The Court has reinstated Marketquest and BIC Corp.'s cross-motions for summary judgment filed in **[*1248]** 2014, the merits of which the Court has not previously reached. Marketquest seeks partial summary judgment on all of Defendants' thirteen counterclaims and twelve of Defendants' twenty-two affirmative defenses. (ECF No. 205.) BIC Corp. has opposed the motion. (ECF No. 254.) BIC Corp. has cross-moved for partial summary judgment on five counterclaims, which Marketquest has opposed. (ECF Nos. 216-1, 259.) The Court has also reinstated Defendants BIC USA, Inc. ("BIC USA") and Norwood Promotional **[**3]** Products LLC's ("Norwood") motions for summary judgment as to Plaintiff's damages, which Marketquest has opposed. (ECF Nos. 214, 215, 258.) The reinstated motions and opposing papers, the record submitted, and the parties' evidentiary objections number several thousand pages.[1]

For the reasons herein, the Court: (1) grants in part and denies in part Marketquest's motion; (2) denies BIC Corp.'s motion in full; and (3) grants in part and denies in part BIC USA and Norwood's motions.

## I. BACKGROUND

### A. Factual Background

### 1. The Parties and the Promotional Products Industry

The acts of alleged trademark infringement in this case arise in the context of the promotional products industry. A promotional product is a product used by a company to brand itself with its customers. (ECF No. 205-8 Decl. of Harris Cohen ("Cohen Decl.") ¶16.) The industry supports the manufacture, imprinting, and distribution of promotional products to companies seeking to brand themselves. (*Id.*) In this context, a distributor approaches a supplier which either manufactures or imports a promotional product and then imprints the company's brand and messaging on the product. The end company then gives the product away **[**4]** as part of a promotion. (*Id.* ¶17, Ex. I.3.)

Marketquest, doing business as "All in One," is a San Diego, California-based local supplier of promotional products, including pens, writing instruments and magnets. (*Id.* ¶¶5-12.) At issue in this case are Plaintiff's federally registered All in One and THE WRITE CHOICE trademarks. Marketquest's All in One marks, primarily for "writing instruments, namely pens," include: (1) the word mark "ALL-IN-ONE," Registration No. 2,422,976 (Jan. 23, 2001) ('976 Registration); (2) the word mark "ALL-IN-ONE LINE," Registration No. 2,426,417 (Feb. 6, 2001) ('417 Registration); (3) the design mark "ALL IN ONE," Registration No. 3,153,089 (Oct. 10, 2006) ('089 Registration)[2] (a registration **[*1249]** which also covers services of "dissemination of advertising matter"); and (4) the design service mark "ALL IN ONE," Registration No. 3,718,333 (Dec. 1, 2009) ('333 Registration)[3], specifically for services including "customized printing of equipment, merchandise and accessories for business promotion." (ECF No. 205-2, Request for Judicial Notice ("RFJN") ¶¶1-3, 5, Exs. A-C, E.) Plaintiff also sues for alleged infringement of the word mark for goods "THE WRITE CHOICE," Registration No. 3,164,707 (Oct. 31, 2006) ('707 Registration). (*Id.* ¶4, Ex. D.)

According to Plaintiff, Defendant Norwood is one of **[**5]** the largest non-apparel promotional products suppliers in the industry. (ECF No. 205-22, Decl. of Michael Lane ("Lane Decl.") ¶¶12-13, Exs. J, K.) Plaintiff claims that Norwood has reached this size by acquiring and aggregating smaller suppliers, like Plaintiff, and retaining their trademarks. (*Id.* ¶¶14-15, Exs. F.2, I.2.) BIC Corp. and BIC USA acquired Norwood in 2009 at a bankruptcy auction. (ECF No. 214-2, Decl. of Lori Bauer ("Bauer Decl.") ¶3.)

---

[1] Throughout this litigation, each side has effectively sought to "memorize another Golgatha," W. Shakespeare, *Macbeth*, act I, scene 2, line 40 (1606). The extent of the counterclaims and affirmative defenses as well as the scope of the four motions for summary judgment reflect the contentious nature of the parties' dispute.

---

[2] The registered All in One '089 mark appears as (ECF No. 205-5 Ex. C):



[3] The registered All in One '333 mark appears as (ECF No. 205-7 Ex. E):



Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 172 of 255

Page 3 of 42

316 F. Supp. 3d 1234, *1249; 2018 U.S. Dist. LEXIS 98674, **5

### 2. Defendants' Alleged Infringement of the Marks

Plaintiff alleges Defendants used its "All in One" marks in their 2011 catalogue. (ECF No. 227-5, Lane Decl. ¶32, Exs. Y, Z.) Plaintiff claims Defendants placed the mark on the cover of the catalog in the same location where Norwood placed its "sub brands" on the cover of its 2010 catalog, which Plaintiff contends implied that Defendants had acquired Plaintiff. (Id. ¶¶20-23, Exs. S, N, O, P, Q.) Defendants contend that the phrase "All in One catalogue" signified that Defendants had merged multiple catalogues into one. (ECF No. 214-2, Bauer Decl. ¶6.) Defendants also distributed promotional materials that featured an image of this 2011 catalogue, and directed customers to look for products or **[**6]** information in the "2011 Norwood All in One catalogue." (ECF No. 227-5, Lane Decl. ¶¶34-38, Exs. X, Y, Y.2, AC, AD, AE, AF.) Plaintiff also alleges that Defendants distributed an on-line advertisement that said "Put Your Drinkware Needs . . . in a Norwood All in One basket," which included a photo of a basket containing several types of drinkware. (Lane Decl. ¶12, Ex. C.2.)[4]

Plaintiff further alleges Defendants used "the Write Pen Choice" to promote the **[*1250]** 30th anniversary of the BIC Round Stic pen. (First Amended Complaint ("FAC") ¶23; ECF No. 227-5, Lane Decl. ¶43, Ex. K.3.) Plaintiff claims that this infringed the "THE WRITE CHOICE" mark. (Id.)

_____

[4] There is no express reference to this factual allegation in the First Amended Complaint, nor in any of Plaintiff's summary judgment briefing. This Court was made aware of this allegation from the Ninth Circuit's opinion, which devoted a paragraph to the basket. See _Marketquest Grp., Inc., 862 F.3d at 935_. A review of Marketquest's briefing before the Ninth Circuit indicates that Marketquest expressly raised the issue of Norwood's basket in the Court of Appeals to show triable issues remain for trial, preventing summary judgment on the fair use defense for the All in One marks. See _Marketquest Grp., Inc. v. BIC Corp.,_ No. 15-55755, ECF No. 17-2 at 39, 83 (9th Cir. Nov. 16, 2015). The Court located the relevant exhibit after scouring the record submitted to the Ninth Circuit from the proceedings before this Court and its corresponding reference to the docket in this case. The Court should not have to "search for truffles" in the evidentiary record submitted with the parties' motions to discover the facts supporting Plaintiff's claims. See _All Cities Realty, Inc. v. CF Real Estate Loans, Inc., No. SA CV 05-615 AHS (MLGx), 2008 U.S. Dist. LEXIS 118803, 2008 WL 10594412, at *7 (C.D. Cal. Mar. 14, 2008)_ (quoting _Rogers v. Penland, 232 F.R.D. 581, 582 (E.D. Tex. 2005))_.

### B. Procedural Posture

### 1. Pre-Appeal

On March 28, 2011, Marketquest brought suit against BIC Corp., BIC USA, and Norwood, alleging that (1) Defendants infringed the All in One marks in violation of _15 U.S.C. §1114_; (2) Defendants' conduct with respect to the All in One marks constituted unfair competition in violation of _15 U.S.C. §1125(a)_; (3) Defendants infringed THE WRITE CHOICE mark in violation of _15 U.S.C. §1114_; (4) Defendants' conduct with respect to THE WRITE CHOICE mark constituted unfair **[**7]** competition in violation of _15 U.S.C. §1125(a)_; (5) Defendants' conduct violated the California Unfair Competition Law, _CAL. BUS. & PROF. CODE §17200, et seq._; and (6) Defendants were unjustly enriched. (ECF No. 1.) Plaintiff filed the FAC on May 5, 2011, alleging these same claims. (ECF No. 14.) On May 13, 2011, Defendants filed their Answer, raising thirteen counterclaims, broadly grouped into fraud, abandonment, and mere descriptiveness and ornamentality. (ECF No. 17.) Defendants also asserted some twenty-two affirmative defenses, including fair use, defenses related to the counterclaims, and multiple equitable defenses. (Id.)

In August 2011, Marketquest moved for a preliminary injunction to enjoin Defendants from continuing their alleged infringement of the marks. (ECF No. 27.) Judge Sammartino, then presiding over this case, denied Plaintiff's motion on November 7, 2011. (ECF No. 41.) Judge Sammartino determined that Plaintiff was likely to show it has valid, protectable All In One marks, and rejected Defendants' defenses of fraud and abandonment.[5] (Id. at 6-9.) Although Judge Sammartino determined that there was "some likelihood of confusion" based on the eight likelihood of confusion factors elaborated in _AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)_, she also determined that Defendants **[**8]** were likely to succeed on a fair use defense. (Id. at 9-23.) Marketquest did not appeal the denial of the preliminary injunction motion.

Roughly three years later, after numerous discovery

_____

[5] Judge Sammartino deemed waived Plaintiff's preliminary injunction request insofar as it concerned THE WRITE CHOICE mark because Plaintiff directed its preliminary injunction motion and supporting evidence solely to the All In One marks. (ECF No. 41 at 5 n.5.) The order focused solely on the All in One marks.

disputes among the parties requiring Court intervention on eighteen occasions (ECF No. 175), the case entered the summary judgment stage on October 27, 2014 when Marketquest filed its motion for partial summary judgment on Defendants' counterclaims and certain affirmative defenses. (ECF No. 205). BIC Corp. filed its motion for partial summary judgment on Defendants' fraud and abandonment counterclaims. (ECF No. 216-1.) BIC USA and Norwood each filed motions for summary judgment on the fair use defense and Marketquest's damages. (ECF Nos. 214, 215.) After submission of extensive briefing and a swelling record, the Court held oral argument on the parties' motions on February 9, 2015. (ECF No. 323, 324.)

On April 17, 2015, the Court granted Defendants Norwood and BIC USA's motions on fair use. (ECF No. 327.)[6] As a **[*1251]** result of that decision, the Court denied Defendant BIC Corp.'s cross-motion (ECF No. 216-1) and dismissed Defendants' counter-claims (ECF No. 17). The Court terminated as moot Plaintiff's motion for partial **[**9]** summary judgment (ECF No. 205), Defendants' motion for sanctions (ECF No. 289) and several motions seeking to exclude testimony of experts and certain witnesses. (ECF Nos. 199, 217, 218, 219). Judgment was entered in favor of Defendants and the FAC was dismissed. (ECF No. 328.)

## 2. Appeal and Post-Remand

Plaintiff appealed this Court's summary judgment decision in favor of Defendants on May 15, 2015. (ECF No. 339.) Over two years later, the Ninth Circuit issued its mandate (the "Mandate") reversing this Court's order. (ECF No. 377.) With respect to the All in One marks, the Ninth Circuit determined that genuine issues of fact exist as to all elements of the fair use defense. (*Id.* at 13-17.) The Ninth Circuit, however, left open to this Court to determine on remand the relevance of the degree of consumer confusion in this case. (*Id.* at 19.) As to THE WRITE CHOICE mark, the Ninth Circuit determined that this Court erred by applying the fair use analysis to Defendants' use when it had also found that "there was

no evidence of actual or potential confusion." (*Id.*) The Ninth Circuit observed that "'[t]he fair use defense only comes into play once the party alleging infringement has shown by a preponderance **[**10]** of the evidence that confusion is likely.'" (*Id.* quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 608-09 (9th Cir. 2005)*.) The Ninth Circuit remanded for this Court "to consider Marketquest's trademark infringement claim regarding Defendants' use of the 'The Write Choice.'" (*Id.* at 20.)[7]

In view of the Mandate and after requesting the parties' positions regarding how the case should proceed (ECF Nos. 383, 386, 388, 390, 391), the Court reinstated the FAC, Defendants' counterclaims, and the motions at issue in this Order. (ECF No. 400.)[8]

## 3. The Issues for Resolution Here

With the procedural posture of the case set, the Court briefly outlines the issues for resolution in this Order. Marketquest and BIC Corp. both seek partial summary judgment with respect to Defendants' (1) Affirmative Defense 15 and Counterclaims 4, 8, 10, and 12 regarding fraudulent procurement of the marks, and (2) Affirmative Defense 16 and Counterclaims 3, 7, 9, and 11 regarding abandonment of the marks. Marketquest further seeks partial summary **[*1252]** judgment on (1) Counts 1 and 3 (trademark infringement claims) of the FAC with respect to whether Marketquest has valid and protectable marks; (2) Affirmative Defense 21 and Counterclaims 1, 2, 5, 6 and 13 regarding mere descriptiveness **[**11]** and ornamentality of certain

---

[6] This Court's summary judgment order characterized a response from Defendants' counsel at the hearing to mean that if the Court ruled in Defendants' favor on the fair use defense, Defendants would concede their counterclaims. (ECF No. 327 at 11 & n.6.) The Court hereby clarifies that the particular response provided by counsel was that the Court would not have to reach the counterclaims, rather than an express concession to dismissal of the counterclaims. (*Id.*)

[7] Defendants filed a petition for writ of certiorari to seek Supreme Court review of the Ninth Circuit's decision, which the Supreme Court denied on May 14, 2018. *BIC Corp., et al. v. Marketquest Grp., Inc., No. 17-979, S.Ct. , 2018 U.S. LEXIS 2951, 2018 WL 2186233, at *1 (May 14, 2018).*

[8] The Court expressly overruled Plaintiff's objection (ECF No. 390) to reinstatement of Defendants' counterclaims and BIC Corp.'s cross-motion for partial summary judgment. (ECF No. 400.) It bears noting that Plaintiff contended that its motion for partial summary judgment would be properly before this Court on remand, but not BIC Corp.'s motion (ECF No. 390 at 1, 4), despite the fact that BIC Corp. cross-moved on the *same* issues as Plaintiff. Plaintiff also contended that this Court could not consider likelihood of confusion regarding THE WRITE CHOICE mark, despite the *express* language of the Mandate to do so to determine whether the fair use defense even applies to the alleged infringement of that mark. (*Id.* at 5-7.)

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 174 of 255

Page 5 of 42

316 F. Supp. 3d 1234, *1252; 2018 U.S. Dist. LEXIS 98674, **11

marks; and (3) Affirmative Defenses 2 (acquiescence), 6 (laches), 7 (waiver), 8 (estoppel), 9 (unclean hands), 10 (statute of limitations), 11 (general invalidity defense), 17 (trademark misuse), and 20 (nominative fair use). BIC USA and Norwood seek summary judgment on Plaintiff's damages.[9] In addition to these issues, the Court addresses the issue likelihood of confusion regarding THE WRITE CHOICE mark, as instructed by the Mandate.

## II. EVIDENTIARY ISSUES

### A. Plaintiff's Requests for Judicial Notice

Marketquest submits two requests for judicial notice. The first request seeks judicial notice of a certified copy of each mark's registration with the United States Patent and Trademark Office ("PTO"). (ECF No. 205-2 Exs. A-E.) The second request seeks judicial notice of a certified copy of each registration file wrapper for the marks, which includes information regarding the initial application for the marks, correspondence with the PTO, and related registration documents. (ECF No. 258-1 Exs. F-J.)

*Federal Rule of Evidence 201(b)* allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial [**12] jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b)*. Administrative agency records are subject to judicial notice. *Interstate Nat. Gas Co. v. S. Cal. Gas Co., 209 F.2d 380, 385 (9th Cir. 1953)*; *see also United States v. 14.02 Acres, 547 F.3d 943, 955 (9th Cir. 2008)*. Courts routinely take judicial notice of PTO records in trademark litigation. *See, e.g., Bennett v. Forbes, No. 17-cv-464-MMA-KSC, 2017 U.S. Dist. LEXIS 169149, 2017 WL 4557215, at *2 (S.D. Cal. Oct. 12, 2017)* (taking judicial notice of trademark application obtained from PTO electronic search system); *Clearly Food & Beverage Co. v. Top Shelf Bevs., Inc., 102 F. Supp. 3d 1154, 1161 (W.D. Wash. 2015)* (taking judicial

notice of trademark application, notice of publication of mark, registration certificate, combined declaration of use and/or excusable nonuse/application for renewal); *Dahon N. Am., Inc. v. Hon, No. 2:11-cv-05835-ODW (JCGx), 2012 U.S. Dist. LEXIS 57510, 2012 WL 1413681, at *8 n.4 (C.D. Cal. April 24, 2012)* (taking judicial notice of trademark assignment filed on PTO-published website). Accordingly, the Court grants Marketquest's requests.[10]

### [*1253]  B. Evidentiary Objections

Each party has lodged numerous evidentiary objections to many exhibits submitted in connection with the summary judgment briefing. These objections are largely unwarranted and the Court generally overrules them.

"[A] party does not necessarily have to produce evidence in a form that would be admissible at trial" to survive summary judgment. *Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001)*. Rather, [**13]  "*Rule 56[(c)]* requires only that evidence 'would be admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006)*. Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014)* (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 846 (9th Cir. 2004)*); *see also Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)* (same).

The vast majority of the objections offered by Marketquest (ECF Nos. 268, 282) are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013)* (quoting *Doe v. Starbucks, Inc., No. 08-0582, 2009 U.S. Dist. LEXIS 118878, 2009*

---

[9] As the Court has already noted, BIC USA and Norwood moved for summary judgment on the fair use defense in these motions. (ECF Nos. 214, 215.) The Court has not reinstated the motions as to that defense, which remains an issue for trial in light of the Mandate. The Court's analysis herein of the likelihood of confusion for THE WRITE CHOICE mark, however, draws from the parties' fair use defense briefing.

[10] In taking judicial notice of these documents, the Court overrules each of Marketquest's objections to documents submitted by Defendants. The documents submitted by Defendants are identical to those for which Plaintiff has sought judicial notice and would be independently subject to judicial notice under *Rule 201(b)*. *See, e.g., Peruta v. Cty. of San Diego, 678 F. Supp. 2d 1046, 1054 n.8 (S.D. Cal. 2010)* (courts may properly take judicial notice of documents appearing on governmental websites); *see also Bennett, 2017 U.S. Dist. LEXIS 169149, 2017 WL 4557215, at *2*.

316 F. Supp. 3d 1234, *1253; 2018 U.S. Dist. LEXIS 98674, **13

_WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009))_. As such, they do little to convince the Court that a meritorious objection hides among the haystack of evidentiary rules cited. While Defendants' objections appear tailored in form—adding analysis, rather than simply citing a slew of evidentiary rules—the consistency of the same objections raised to nearly every statement in Marketquest's declarations and the underlying exhibits evidences the boilerplate spirit that guides them. (ECF Nos. 291, 310-6.) As to all boilerplate objections from the parties regarding foundation, relevance, hearsay, the best evidence rule, and prejudice, "the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact." _Stonefire Grill, Inc., 987 F. Supp. 2d at 1033_. "To the extent that the Court relied on objected-to evidence, **[\*\*14]** it relied only on admissible evidence and, therefore, the objections are overruled." _Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010)_ (quotation omitted).

Both sides object to certain exhibits on the ground that they are irrelevant, speculative, and/or argumentative, or constitute an improper legal conclusion. These objections are unnecessary. The "parties should simply _argue_ that the facts are not material," rather than drown the Court in objections which "are all duplicative of the summary judgment standard itself." _Burch, 433 F. Supp. 2d at 1119_ (emphasis in original). Both sides also object to statements in the declarations submitted by the other's counsel as improperly characterizing the contents of documents, being argumentative, or making improper legal conclusions. These objections are "simply superfluous" in the summary judgment context because "statements in declarations or improper legal conclusions, or argumentative statements, are not fact and . . . will not be considered on a motion for summary judgment." _Id.; Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008)_ (declining to rule on objections to statements in declarations submitted with a summary judgment motion). The Court overrules all such objections.

Both sides lodge various authentication challenges to documents submitted by the other, even **[\*\*15]** when the document has been provided by the other side as well. To give a document foundation, the proponent need only make a showing of authenticity **[\*1254]** sufficient to allow a reasonable juror to find that the matter in question is what its proponent claims. _United States v. Tank, 200 F.3d 627, 630 (9th Cir. 2000)_ (citing _Fed. R. Evid. 901(a)_). The Court is generally satisfied

that the parties' exhibits meet this standard and overrules these objections.

Marketquest does offer a more particularized authentication challenge by objecting to various excerpts of deposition testimony submitted by Defendants, which generally lack a reporter's certification. A deposition or an extract therefrom is properly authenticated in a motion for summary judgment when it identifies the name of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. _See Fed. R. Evid. 901(b)_; _Fed. R. Civ. P. 56(e)_, _30(f)(1)_; _see also Orr v. Bank of Am., 285 F.3d 764, 774 (9th Cir. 2002)_. Although Defendant's excerpts do not satisfy this rule when taken alone, Marketquest has offered and properly authenticated excerpts from the depositions of the same individuals. As such, the excerpts on which Defendants rely from the same deponents are authenticated. _See Orr, 285 F.3d at 776_ ("[W]hen a document has been authenticated by a party, the requirement **[\*\*16]** of authenticity is satisfied as to that document with regards to all other parties . . ."); _Kesey, LLC v. Francis, CV-06-540-AC, 2009 U.S. Dist. LEXIS 28078, 2009 WL 909530, at *4 (D. Or. April 3, 2009)_ (finding that plaintiff's proper authentication of deposition excerpts from same deponent rendered admissible defendant's excerpts from same deponents). The Court thus overrules Marketquest's objections. With the parties' evidentiary objections addressed, the Court finally turns to the merits of the motions for summary judgment.

## III. LEGAL STANDARD

Summary judgment is proper on "each claim or defense" "or the part of each claim or defense" on which summary judgment is sought when "there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)_. A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled **[\*\*17]** to judgment as a

matter of law." *Fed. R. Civ. P. 56(c)*. "The district court may limit its review to documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001)*. The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)* (citing *Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995))*. When resolving a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The court does not make credibility determinations or weigh conflicting evidence. *See Anderson, 477 U.S. at 255*. The court's role at summary judgment "is **[*1255]** to isolate and dispose of factually unsupported claims" so that they are "prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)*.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp., 477 U.S. at 323*. The moving party can satisfy its burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving **[**18]** party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id. at 322-23*. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*.

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial. *Celotex Corp., 477 U.S. at 324*. The party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'" *Matsushita, 475 U.S. at 587*. A "scintilla of evidence" in support of the nonmoving party's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson, 477 U.S. at 252*; *Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995)* (same). Nor can "a party . . . manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc., 690 F.2d 1235, 1238 (9th Cir. 1982)* (citations omitted).

"[S]ummary judgment is generally disfavored in the trademark [**19]** arena" because of "the intensely factual nature of trademark disputes." *Marketquest Grp., Inc., 862 F.3d at 932* (citing *KP Permanent Make-Up, Inc., 408 F.3d at 602*); *Interstellar Starship Servs. Ltd. v. Epix, Inc., 184 F.3d 1107, 1109 (9th Cir. 1999)*. However, "this is not invariably so." *Sidco Indus. v. Wimar Tahoe Corp., 795 F. Supp. 343, 345 (D. Or. 1992)* (quoting *Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989))*.[11] Claims or affirmative defenses in a trademark infringement action that lack a sufficient evidentiary basis under the applicable standard of proof, or **[*1256]** for which there are only questions of law for the court to resolve, are appropriate for summary resolution. *See FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010)* ("In ruling on a motion for summary judgment, our inquiry 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.'") (quoting *Anderson, 477 U.S. at 252*); *Saul Zaentz Co. v. Wozniak Travel, Inc., 627 F. Supp. 2d 1096, 1108 (N.D. Cal. 2008)* ("[S]ummary judgment is still appropriate in trademark suits when no dispute

---

[11] While Marketquest relies on the general disfavor to summary judgment in the trademark arena to resist Defendants' motions for summary judgment, it does so only as a shield against those motions. (ECF No. 259 at 3.) Drawing on the exception as a sword, Marketquest "concedes" that summary judgment is proper so long as the Court rules in its favor on its motion. (*Id.* at 3 n.4.) Defendants in turn resist Marketquest's motion for summary judgment by contending that genuine issues of material fact remain, yet claim that no genuine issues of fact remain and the law clearly favors their position in their cross-motion. (ECF Nos. 216, 254.) The Court is left to question whether the parties' inflexible positions as to the propriety of summary judgment when it might be unfavorable to them are mere "sound and fury, signifying nothing." W. Shakespeare, *Macbeth*, act. V, scene 5 lines 27-28 (1606).

316 F. Supp. 3d 1234, *1256; 2018 U.S. Dist. LEXIS 98674, **19

remains as to genuine issues of material fact.") (citing *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n, 465 F.3d 1102 (9th Cir. 2006))*; *Lockheed Martin Corp. v. Network Solutions, Inc., 985 F. Supp. 949, 956 (C.D. Cal. 1997)*.

## IV. DISCUSSION

### A. Validity and Protectability of the Marks

Marketquest moves for summary judgment on two sets of issues that present the same question: whether the All in One and THE WRITE CHOICE marks are valid and protectable. Marketquest moves for partial summary judgment on its trademark infringement claims of the All in One marks (Count 1) and THE WRITE CHOICE mark (Count 3) on the ground that there are no triable issues regarding whether it has valid and protectable **[**20]** marks. (ECF No. 205-1 at 8-9.) Marketquest also moves for summary judgment on Defendants' Affirmative Defense 21 and Counterclaims 1, 2, 5, 6, and 13.[12] (*Id.* at 13-20.) Defendants assert that certain marks are invalid because they are "merely descriptive" and/or "merely ornamental." (ECF No. 17.) Defendants' counterclaims thus intersect with the fundamental question of the protectability of Marketquest's marks. Because the claims and counterclaims intersect in this manner, the Court will consider them together.

The fundamental starting point of whether Plaintiff has valid and protectable marks is the nature of a trademark. The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *15 U.S.C. §1127*. To claim infringement, a plaintiff must have a "valid, protectable trademark." *Brookfield Communs., Inc. v. West Coast Entertainment Corp., 174*

---

[12] The counterclaims as to particular registrations are: Counterclaim 1—mere descriptiveness (THE WRITE CHOICE mark '707 registration); Counterclaim 2—mere ornamentality (THE WRITE CHOICE mark '707 registration); Counterclaim 5—mere descriptiveness as to goods and services (All in One mark '089 registration); Counterclaim 6—mere ornamentality as to goods (All in One mark '089 registration); and Counterclaim 13—mere descriptiveness as to services (All in One mark '333 registration).

*F.3d 1036, 1046 (9th Cir. 1999)*. "The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness." *Calista Enters. v. Tenza Trading Ltd., 43 F. Supp. 3d 1099, 1115 (D. Or. 2014)* (citing *15 U.S.C. §1052*).

Courts have identified five categories of distinctiveness **[**21]** which impact whether a mark is protectable: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)*. Suggestive, arbitrary, and fanciful marks are deemed "inherently distinctive" and automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a **[*1257]** product." *Zobmondo Entm't, LLC, 602 F.3d at 1113*; *see also Two Pesos, Inc., 505 U.S. at 768-69*. "Generic" marks, or "common descriptive" names for what a product is, are the weakest category and receive no trademark protection. *Zobmondo Entm't, LLC, 602 F.3d at 1113*; *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc., 718 F.2d 327, 329 (9th Cir. 1983)*, *rev'd on other grounds by*, *469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)*. A "descriptive" mark may be entitled to protection *only* if it has acquired distinctiveness through secondary meaning. *Zobmondo Entm't, LLC, 602 F.3d at 1113*; *Two Pesos, 505 U.S. at 769*. Trademark validity and the category to which a mark belongs are deemed to be "an intensely factual issue" with "the plaintiff bear[ing] the ultimate burden of proof" to show that its trademark is valid and protectable. *Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010)*; *KP Permanent Make-Up, Inc., 408 F.3d at 605*.

As all of Marketquest's marks in this case are registered on the Principal Register of the PTO, the registrations are "prima facie evidence of the validity of the registered marks." *15 U.S.C. § 1057(b)*; *15 U.S.C. § 1115(a)*. "[F]ederal registration . . . entitles the plaintiff to a strong presumption that the mark is a protectable mark." *Zobmondo Entm't, LLC, 602 F.3d at 1113* (internal quotations omitted); **[**22]** *see also Brookfield Commc'ns., Inc., 174 F.3d at 1047*. If the plaintiff establishes that a mark has been properly registered, the burden shifts to the defendant to show by a preponderance of the evidence that the mark is not protectable. *Zobmondo Entm't, LLC, 602 F.3d at 1114*; *Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002)*; *Vuitton et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769, 775-76 (9th Cir. 1981)*. A defendant may rebut the presumption of validity when the federally registered trademark is contestable. *Vuitton et Fils S.A.,*

316 F. Supp. 3d 1234, *1257; 2018 U.S. Dist. LEXIS 98674, **22

*644 F.2d at 775*. Defendants' burden at trial with their counterclaims is thus to show that, notwithstanding the presumption of protectability arising from the marks' registrations, the marks are descriptive and lack secondary meaning. *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 928 (9th Cir. 2005), Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co., 601 F.2d 1011, 1014 (9th Cir. 1979)*. As the non-movants here, however, Defendants need only show that a triable issue of fact precludes summary judgment in Marketquest's favor.[13]

**1. The All in One Service Marks ('089 and '333 Registrations)**

The Court first considers Marketquest's motion as it applies to the All in One marks in the '089 and '333 registrations for services, both of which are contestable. The Court finds that genuine issues of material fact preclude summary judgment in Plaintiff's favor on both Count 1 of its trademark infringement claim and Counterclaims 5 and 13 of Defendants' mere descriptiveness counterclaims as to its contestable registrations for services.

**[*1258]  [**23] a. There Exists a Genuine Dispute About Whether the All in One Marks Are Descriptive of Services**

As an initial matter, the nature of the marks in the '089 and '333 registrations bears upon how the Court should assess the issues the parties raise. The PTO registered both marks without requiring proof of secondary meaning. When "the PTO issues a mark registration without requiring proof of secondary meaning, the registrant . . . enjoys 'a presumption that the purchasing public perceives the  . . .  mark to be inherently distinctive.'" *Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 760 (9th Cir. 2006)* (quoting *Lane Capital Mgmt.,*

*Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999))*; *see also Zobmondo Entm't, LLC, 602 F.3d at 1113-14*. Marketquest understandably grasps onto this presumption in its motion for summary judgment, requesting that the Court "decline Defendants' invitation" to find that the marks are not inherently distinctive. (ECF No. 205-1 at 15.) "However, 'while the registration adds something on the scales, we must come to grips with an assessment of the mark itself.'" *Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1149 (9th Cir. 2011)* (quoting *Zobmondo Entm't, LLC, 602 F.3d at 1115*). Thus, the fact that both the contestable '089 and '333 registrations did not require proof of secondary meaning does not foreclose this Court from determining that a genuine dispute of material fact exists as to whether the marks are descriptive without secondary meaning.[14]

"Deciding whether a mark is distinctive or merely descriptive 'is far from an exact science' and is 'a tricky business at best.'" *Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1197 (9th Cir. 2009)* (quoting *Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 489 (2d Cir. 1988))*. Suggestive marks require "a consumer [to] use imagination or any type of multistage reasoning to understand the mark's significance." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)* (providing as examples "Air Care" for a service that maintains medical equipment used for administering oxygen and "Anti-Washboard" for a soap that makes scrubbing unnecessary when washing clothes). Descriptive marks, however, "define qualities or characteristics of a product in a straightforward way." *Id.* (examples include "Honey Baked Ham" for a ham that has been baked with honey and "Honey Roast" for nuts that have been roasted with honey); *see also Park 'n Fly, Inc., 469 U.S. at 194, 105 S. Ct. 658, 83 L. Ed. 2d 582* (stating that a descriptive mark "describes the qualities or characteristics of a good or service"). "Whether a mark suggests or

---

[13] When a defendant affirmatively moves for summary judgment, "the burden on the defendant necessary to overcome that presumption [from the mark's registration] at summary judgment is a heavy one." *Zobmondo Entm't, LLC, 602 F.3d at 1113* (citing *Americana Trading, Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992)* (reversing a district court's grant of summary judgment because the district court "gave insufficient weight to the presumptive effect of [the plaintiff's] federal registration."). Here, as the parties opposing summary judgment on the particular claims, Defendants need only show that a triable issue of material fact exists.

[14] Marketquest suggests that a merely descriptive challenge is not available for the All in One marks in connection with services by pointing to the incontestable All in One mark registrations for goods. (ECF No. 205-1 at 15 & n. 13.) The Court rejects this suggestion without hesitation. Plaintiff cannot latch onto the incontestable registrations for goods to insulate the mark from review as applied to services. *[**24] See In re Merrill Lynch, Pierce, Fenner & Smith, Inc., 828 F.2d 1567, 1568 (Fed. Cir. 1987)* ("[t]he only thing that becomes incontestable is the right of the registrant to use the mark for the goods or services for which it is registered.").

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 179 of 255

Page 10 of 42

316 F. Supp. 3d 1234, *1258; 2018 U.S. Dist. LEXIS 98674, **24

describes the goods or services of the trademark holder depends, of course, upon what those goods or services are." *Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1142 (9th Cir. 2002)* (internal quotations and citations omitted). As noted, the question of which classification applies to a particular mark is a factual determination. *Lahoti, 586 F.3d at 1195*.

Two tests are used to differentiate descriptive marks requiring proof **[**25]** of **[*1259]** secondary meaning from suggestive marks that do not. The first and "primary criterion" is the "imagination test," which asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Rudolph Int'l, Inc. v. Realys, Inc., 482 F.3d 1195, 1198 (9th Cir. 2007)* (quotation marks omitted). A routinely used example of a mark that fails the imagination test is "ENTREPENEUR," which is descriptive as applied to a magazine because "an entirely unimaginative, literal-minded person would understand the significance of the reference." *Entrepreneur Media, Inc., 279 F.3d at 1142*. The second test is known as the "competitor needs" test, which "focuses on the extent to which a mark is actually needed by competitors to identify their goods or services." *Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1218 (9th Cir. 1987)*. The needs test asks whether "the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods." *Zobmondo Entm't, LLC, 602 F.3d at 1116* (quotations omitted). These two tests are complementary rather than independent inquiries as "the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." *Zobmondo Entm't, LLC, 602 F.3d at 1117* (quotations and citations omitted). **[**26]**

Marketquest argues that the issue of whether the All in One mark is descriptive or suggestive has already been decided, directing the Court to the preliminary injunction order. (ECF No. 205-1 at 15.) At the preliminary injunction stage, Judge Sammartino "agree[d] with Marketquest that ALL-IN-ONE is at least a suggestive mark because it requires a mental leap from the mark to the product, and as a registered trademark it is inherently distinctive." (ECF No. 41 at 11 (internal quotations omitted).) In reaching this conclusion, however, the decision first determined that the needs aspect was "plainly quite low" because the phrase is not needed to describe a company that sells customizable business promotion merchandise. (*Id.*) The decision

determined that "[c]orrespondingly, the mark's imagination aspect is high." (*Id.*) While recognizing that "the phrase 'all in one' comes closest to describing the 'one-stop source' aspect of Marketquest's service," the decision reasoned that "it does not explain how the phrase in any way describes customizable business promotion merchandise, which is in essence the heart of Marketquest's service." (*Id.* at 12.)

Marketquest contends that a different determination **[**27]** by this Court now would "reverse" the preliminary injunction ruling. (ECF No. 275 at 17.) The Court rejects Marketquest's argument for two postural reasons. First, a preliminary injunction ruling is premised on an inherently limited record. *See, e.g., FTC v. Affordable Media, LLC, 179 F.3d 1228, 1235 (9th Cir. 1999)*. A court's summary judgment analysis necessarily "may differ from its findings at the preliminary injunction stage" due to a fuller evidentiary record. *Zepeda v. INS, 753 F.2d 719, 723-24 (9th Cir. 1983)*. Defendants raise arguments and evidence here that were not presented during the preliminary injunction stage. Second, Marketquest's argument "misperceives the purpose of a preliminary injunction" assessment, which "is not a preliminary adjudication on the ultimate merits," but rather an assessment of whether the equities point toward "preserving rights pending final resolution of the dispute." *Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)*. Importantly, "decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits." **[*1260]** *Golden State Transit Corp. v. City of Los Angeles, 754 F.2d 830, 832 n.3 (9th Cir. 1985)* (internal quotation omitted); *Anaheim v. Duncan, 658 F.2d 1326, 1328 n.2 (9th Cir. 1981)*. Thus, the preliminary injunction order is not binding here.

In addition to these postural reasons, the Court respectfully departs from the reasoning in the preliminary injunction order because relevant distinctions have come into play **[**28]** at this stage of the proceedings in which the ultimate merits are very much at issue. The preliminary injunction order treated Marketquest's All in One marks for goods and services together, blurring the line between the specific products named in the All in One mark registrations for goods with those for services. But as the Court has noted, a mark is assessed with particular "reference to *the goods or services* that it identifies," *Entrepreneur Media, Inc., 279 F.3d at 1142* (emphasis added). A mark may be descriptive as to one but not as to the other, a point Marketquest expressly recognizes by arguing against descriptiveness of the All in One marks for goods

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 180 of 255

Page 11 of 42

316 F. Supp. 3d 1234, *1260; 2018 U.S. Dist. LEXIS 98674, **28

*separately* from that for services. (*Contrast* ECF No. 205-1 at 13-14 (goods) *with id.* 14-17 (services).) Whereas the Court agrees that the phrase "all in one" is not descriptive as applied to goods classes, the Court cannot say the same with respect to Marketquest's service marks.

Turning to the imagination test here, Defendants argue that the All in One mark merely describes an aspect of Marketquest's services. Defendants need only present sufficient evidence to show that there is a triable issue that the primary significance of the mark to the purchasing public is descriptive. **[**29]** *Quiksilver, Inc. 466 F.3d at 760-61* (quoting *Lane Capital Mgmt., Inc., 192 F.3d at 345*). Defendants provide a dictionary definition of "all in one." "A suitable starting place for attempting to draw the line between a suggestive and a descriptive mark is the dictionary." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1033 (9th Cir. 2010)* (internal quotations omitted); *see also Surgicenters of Am., Inc., 601 F.2d at 1015 n.11* ("While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public . . ."). The Oxford Dictionary definition proffered by Defendants defines "all in one" to mean "[c]ombining two or more items or functions in a single unit." (ECF No. 254-3 Ex. 19.) Defendants argue that one does not have to take a mental leap from the mark to Marketquest's services.

Given the absence of a comprehensive consumer survey in the record, the Court cannot say as a matter of law that the relevant purchasing public of Marketquest's services—distributors who engage on behalf of end companies—would or would not find that All in One "describes *some aspect* of the" service. *Fortune Dynamic, Inc., 618 F.3d at 1034* (emphasis added); *Zobmondo Entm't, LLC, 602 F.3d at 1116* (absence of survey precluded court from deciding how consumers would understand the mark "Would you rather . . .?"). In addition to enumerated goods classes, the '089 registration includes "dissemination of advertising **[**30]** matter," as a service for which the All in One mark is registered. (ECF No. 205-5 RFJN Ex. C.) The '333 registration applies to "customized imprinting of equipment, merchandise and accessories for business promotion." (205-7 RFJN Ex. E.) A reasonable jury focusing on the items aspect of the dictionary definition might conclude that Marketquest's services are descriptive because the services combine multiple items, such as pens, magnets, key chains, and the like.

In moving for summary judgment, Marketquest argues that the imagination **[*1261]** aspects are "high" because "nothing in the phrase ALL IN ONE immediately conveys knowledge to a consumer that [Marketquest] offers customized imprinting services on the business promotion products it sells to distributors." (ECF No. 205-1 at 16.) The Court cannot agree that the imagination test requires such a high level of specificity when a mark need only describe "some aspect" to be deemed descriptive. *See Fortune Dynamic, Inc., 618 F.3d at 1034; Zobmondo Entm't, LLC, 602 F.3d at 1116; see also Sunmark, Inc. v. Ocean Spray Cranberries, Inc., 64 F.3d 1055, 1059 (7th Cir. 1995)* ("For a word or mark to be considered descriptive it merely needs to refer to a characteristic of the product."); *Sec. Ctr., Ltd. v. First Nat'l. Sec. Ctrs., 750 F.2d 1295, 1299 (5th Cir. 1985)* ("To be descriptive, a term need only describe the essence of a business, rather than to spell out comprehensively all its **[**31]** adjunct services.") (holding that "Security Center" constituted a descriptive term when used by businesses "provid[ing] secured storage facilities"). A reasonable jury might focus on the function aspect of the dictionary definition. Doing so, a jury might determine that Marketquest's services have a singular function, *i.e.*, customizable business promotion, and do not combine multiple functions in one.

Defendants also submit evidence disputing competitor need to use the phrase "all in one." On this, Defendants submit evidence that the phrase "all in one" is the name of several businesses specifically in the promotional products field. (ECF No. 310 at 17; ECF No. 254-4 Ex. 24, 24a.) On this point, Defendants' expert, Wingfield Hughes, states that sales representatives in the promotional products industry use the phrase to describe the assortment of their products. (ECF No. 310-4 Ex. 23 at 4.) Another defense expert, Bruce Silverman opines that the phrase "all in one" is a very popular brand name for many businesses across industries. (ECF No. 310-4 Ex. 25 at 10.) Based on this evidence, a reasonable jury might conclude that all in one is descriptive based on third party use. *See Miss World (U.K.) Ltd. v. Mrs. Am. Pageants Inc., 856 F.2d 1445, 1449 (9th Cir. 1988)* ("[A] **[**32]** mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.' It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."); *cf. Halo Mgmt., LLC v. Interland, Inc., 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003)* (noting that the term "halo" is a popular one in "[i]n the trademark world," thus rendering marks incorporating the term

316 F. Supp. 3d 1234, *1261; 2018 U.S. Dist. LEXIS 98674, **32

"relatively weak").

Ever "mindful that summary judgment is generally disfavored in the trademark arena," *Marketquest Grp., Inc., 862 F.3d at 932*, the Court finds that Defendants have sufficiently raised a genuine dispute of material fact. *See, e.g., Fortune Dynamic, Inc., 618 F.3d at 1034* (determining that a genuine issue of material fact existed for whether the term "DELICIOUS" was descriptive as applied to footwear given several different dictionary meanings, any one of which a jury could rely on). Accordingly, the Court finds that summary judgment in Marketquest's favor is inappropriate both on Count 1 as to whether it has valid and protectable All in One marks for services and as to Defendants' descriptive counterclaims against the contestable '089 and '333 registrations as to services.

**b. A Dispute About Whether the Mark Has Secondary Meaning for Marketquest's [**33] Services Remains**

Assuming that the All in One marks are descriptive as to Marketquest's services, there is a genuine dispute about whether the marks in the '089 and '333 registrations for services have acquired **[*1262]** secondary meaning entitling them to trademark protection.

To determine whether a descriptive mark has acquired secondary meaning, courts consider: "'(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.'" *Yellow Cab Co. of Sacramento., 419 F.3d at 930* (quoting *Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985)* (en banc)). "The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source?" *Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 802 (9th Cir. 1970)* (internal quotation marks omitted). Generally, an expert survey of purchasers can provide the most persuasive evidence of secondary meaning. *Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989)*; *Levi Strauss & Co., 778 F.2d at 1358*.

Here, neither party has submitted survey evidence regarding secondary meaning. In the absence of such

evidence and assuming **[**34]** a jury concludes All in One is descriptive as to services, the competing evidence the parties present may permit a reasonable jury to find that the All in One mark does or does not have secondary meaning.[15]

Plaintiff has submitted testimony from a few distributor-customers, two trade organization executives, and Marketquest's president, Harris Cohen, to argue that All in One has acquired secondary meaning. (ECF No. 205-22 Lane Decl. Exs. A-I, I.4, N, O, AN.2, AR-AZ, BR.) At the summary judgment stage, declarations from associates of a company or its president are minimally persuasive in showing that consumers generally have formed a similar mental impression regarding the company's mark. *Japan Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.3d 866, 874 (9th Cir. 2002)*; *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1152 (9th Cir. 1999)* ("Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark."). In contrast, Defendants provide the deposition testimony of their expert, Wingfield Hughes, whose company was a customer of Marketquest but who could not recall Marketquest when referred to as "All in One." In his role as an expert, Hughes further opines that suppliers and distributors within the promotional products industry **[**35]** would think of "all in one" as a descriptive **[*1263]** expression. (ECF No. 310-4 Ex. 23 at 4.) This evidence thus controverts deposition

_____

[15] Some courts have stated that the evidentiary burden upon a smaller, senior user to establish the existence of secondary meaning is deemed to be "somewhat lower" in the context of a reverse confusion case. *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 444 (3d Cir. 2000)* (citing *Elizabeth Taylor Cosmetics Company, Inc. v. Annick Goutal, 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987)*). The notion underlying this lower burden is that otherwise, "a larger company could with impunity infringe the senior mark of a smaller one." *Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 491 (2d Cir. 1988)*. This Court finds such treatment, without limitation, unpersuasive. That a smaller, senior user claims reverse confusion should not, without more, countenance a relaxation of basic requirements to show that a mark is entitled to trademark protection. The Court finds a lower evidentiary burden would be more appropriate if there is direct or circumstantial evidence showing an intent by a junior, larger user to use the known mark of the smaller, senior user. Marketquest contends such is the case here. Should a jury agree, Marketquest may be entitled to a lower burden to show secondary meaning.

316 F. Supp. 3d 1234, *1263; 2018 U.S. Dist. LEXIS 98674, **35

testimony Marketquest offers from other distributor-customers. Drawing all inferences in favor of Defendants, the Court cannot say that a reasonable jury could not find for Defendants.

Plaintiff also argues that its "extensive and exclusive use" of the mark shows secondary meaning. (ECF No. 205-1 at 17.) Yet, "secondary meaning requires more than extensive use alone." *Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1146 (9th Cir. 2009)*. Even on this issue, Defendants' expert Silverman opines that the phrase "all in one" is used "so broadly and generically" that it is unlikely consumers will identify it with one company. (ECF No. 254-4 Ex. 25 at ¶25.) He opines that "too many other businesses use the phrase for it to qualify as a mark" and provides numerous examples. (*Id.* ¶¶25-26.) Defendants provide evidence of their own distributor-customers in the promotional products industry who use the phrase "all in one" in their company names and who order promotional products from Norwood or BIC USA. (ECF No. 254-4 Ex. 24 Bauer Decl. ¶14, Ex. 24a.) Such evidence thus controverts Marketquest's claim of exclusive use.

Lastly, Defendants **[**36]** also question Marketquest's advertising expenditures. A party asserting secondary meaning must demonstrate that its advertising "was 'of a nature and extent such as to create an association of the term with the user's goods.'" *Dep't of Parks & Recreation v. Bazaar del Mundo Inc., 448 F.3d 1118, 1128 (9th Cir. 2006)* (quoting *Malcolm Nicol & Co. v. Witco Corp., 881 F.2d 1063, 1065 (Fed. Cir. 1989)*). Silverman characterizes Marketquest's yearly advertising of some $340,000 as a "relative pittance" for a national advertiser. Although the Marketquest's expenditures may be explained because it is merely a local supplier, drawing all inferences in favor of Defendants, the Court cannot say that a reasonable jury would not think otherwise.

Accordingly, the Court finds that summary judgment in Marketquest's favor is inappropriate on Count 1 and Defendants' descriptive counterclaims (Counterclaims 5 and 13) against the '089 and '333 registrations for services. If a jury finds that the All in One marks for services are descriptive, the jury would need to resolve this additional genuine factual dispute regarding whether the mark has secondary meaning.

## 2. The All in One Marks for Goods

Although the Court has determined that genuine issues of fact remain regarding whether the All in One marks in the '089 and '333 registrations are protectable as to services, **[**37]** the Court finds that Marketquest is entitled to partial summary judgment on Count 1 insofar as it concerns the validity and protectability of the All in One marks for goods. These marks include the incontestable '967 and '417 registrations and the '089 registration, which the Court finds to be functionally incontestable solely as to goods classes. In addition, Marketquest is entitled to summary judgment on Counterclaims 5 and 6 regarding mere descriptiveness and ornamentality of the '089 registration with respect to goods classes.

### a. Incontestable '967 and '417 Registrations for Goods

It is undisputed that Marketquest's All in One mark '967 and '417 registrations for goods are incontestable. (ECF No. 205-1 at 2; ECF No. 254 at 11, 13; ECF No. 205-3 Ex. A ('417 registration); ECF No. 205-4 Ex. B ('967 registration).)

Under the Lanham Act, a mark may become incontestable if it is not challenged within five years of its registration. *See 15 U.S.C. § 1065(3)*. To become incontestable, *Section 1065(3)* requires that the registered **[*1264]** mark be continuously used in commerce for "five consecutive years" subsequent to the date of registration and still be in use in commerce. *Id.* The registration of an incontestable mark is "conclusive **[**38]** evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark." *15 U.S.C. § 1115(b)*. "Once incontestability is established, only [the] . . . defenses enumerated in *§ 1115(b)* can be interposed in an action for trademark infringement." *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady, 119 F.3d 1236, 1240 (6th Cir. 1997)*.

Incontestable registrations may not be challenged on the ground that they are merely descriptive. *See Park 'n Fly, Inc., 469 U.S. at 205* ("[T]he holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive."); *Clearly Food & Beverage Co., 102 F. Supp. 3d at 1173 n.7* (citing *Entrepreneur Media, Inc., 279 F.3d at 1142* & n.3); *see also 15 U.S.C. § 1115(b)* (omitting mere descriptiveness or mere ornamentality from list of

316 F. Supp. 3d 1234, *1264; 2018 U.S. Dist. LEXIS 98674, **38

permissible defenses to incontestable registrations). The absence of mere descriptive and ornamentality counterclaims to the All in One mark '967 and '417 registrations ostensibly reflects Defendants' awareness that they cannot challenge the registrations on those grounds. Defendants raise no other grounds for finding that these marks are invalid or not protectable.[16]

As a result of their incontestable nature here, the marks in the '967 and '417 registrations are "presumed to [**39] be at least descriptive with secondary meaning," regardless of whether the mark would otherwise be descriptive and regardless of its strength or weakness as a mark. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 939 (11th Cir. 2010)*; *see also KP Permanent Make-Up, Inc., 408 F.3d at 602* ("A descriptive mark that has become incontestable is conclusively presumed to have acquired secondary meaning") (citing *Entrepreneur Media, LLC, 279 F.3d at 1142 n.3*). Because no triable issues remain as to the '967 and '417 registrations for goods, the Court finds that Marketquest is entitled to partial summary judgment on Count 1 that it has valid and protectable marks with respect to these registrations.

**b. The '089 Registration's Goods Classes Are Functionally Incontestable**

Marketquest's All in One mark '089 registration is not itself incontestable. In Counterclaim 5, Defendants allege that the registration is invalid because it is merely descriptive, in part, as to goods, and in Counterclaim 6, Defendants allege it is merely ornamental as to goods. (ECF No. 17 at 15-16.) Marketquest moves for summary judgment on these counterclaims on the ground that the mark is "functionally incontestable" as to goods in view of the incontestable All in One '967 and '417 registrations for goods. (ECF No. 205-1 at 13-14 & n.12.) The Court agrees.

It is an "idle" act [**40] to cancel a contestable registration when the party holding it has an incontestable registration which protects "the most salient feature" of the contestable registration. *See*

---

[16] Although Defendants' expert, Silverman, characterizes "all in one" as used "generically" (ECF No. 254-4 Ex. 25 at ¶25), the Court will not rely on a comment in an expert report to find that a theory not pleaded anywhere in the counterclaims and not argued by Defendants provides a basis for withholding summary judgment on the incontestable registrations.

[*1265] *Park 'n Fly, Inc., 718 F.2d at 331 n.3* (rejecting argument that a contestable service mark registration should be cancelled because its most salient feature— the words "park 'n fly"—were protected in an incontestable service mark registered earlier). Courts have extended protection against descriptiveness challenges to a mark in an incontestable registration to a contestable registration if the marks are iterations of the same mark and for the same goods or services. *See, e.g., Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., 778 F. Supp. 2d 726, 744 n.21 (N.D. Tex. 2011)* (considering "marks that lack[ed] incontestable status as functionally incontestable" when the plaintiff had "obtained incontestable status for various iterations of the mark" "Cash Store"); *Serv. Merch. Co. v. Serv. Jewelry Stores, 737 F. Supp. 983, 999 (S.D. Tex. 1990)* (noting that "[i]t would be illogical to allow Defendants to claim that the phrase SERVICE MERCHANDISE is merely descriptive with respect to the non-incontestable marks while the law conclusively presumes that the same phrase is not merely descriptive with respect to the incontestable mark.") (citing *In re American Sail Training Ass'n, 230 U.S.P.Q. (BNA) 879 (T.T.A.B. 1986))*.

Defendants oppose treating the All in One design mark ('089 registration) as functionally [**41] incontestable. First, Defendants contend that such treatment is unavailable when the marks were never properly used in commerce. (ECF No. 254 at 13-14.) As set forth in the Court's analysis of Defendants' abandonment counterclaims herein, Defendants' argument that Marketquest has never properly used the marks in commerce fails as a matter of law. Thus, this reason carries no weight here.

Defendants further contend that the PTO does not permit an applicant to "bootstrap" incontestability from a prior registration when seeking an additional registration, pointing to a several regulations which they contend say nothing about "such bootstrapping." (*Id.* at 14.) In support of this argument, Defendants point to *In re Merrill Lynch, Pierce, Fenner & Smith, Inc., 828 F.2d 1567, 1568 (Fed. Cir. 1987)*, in which the Federal Circuit determined that a prior incontestable registration did not entitle a registrant to seek registration of the same mark for services broader than those covered by the incontestable registration. Defendants' argument confuses the issue here, which is not about what requirements a registrant must satisfy to register a given mark with the PTO, but about whether it makes any practical sense to challenge a mark on "merely descriptive" grounds when other iterations of [**42] the

316 F. Supp. 3d 1234, *1265; 2018 U.S. Dist. LEXIS 98674, **42

*same* salient feature of the marks for the *same* goods cannot be so challenged. Here, the Court finds that doing so would be nothing more than an "idle" act.

The most salient feature of the '967, '417, and '089 registrations is the "All in One" phrase. A review of the certificates for the All in One '967 and '417 registrations shows that these incontestable registrations cover the same goods set forth in the goods classes of the '089 registration. (ECF No. 205 RFJN Exs. A-C.) Accordingly, the Court grants summary judgment to Marketquest on Counterclaim 5 as it pertains to goods classes in the '089 registration and on Counterclaim 6 in full.[17] **[*1266]** Further, the Court grants partial summary judgment to Marketquest on Count 1 of the FAC as it pertains to the validity and protectability of the All in One mark '089 registration as to goods classes.

### 3. The Write Choice Mark ('707 Registration)

In Affirmative Defense 21 and Counterclaims 1 and 2, Defendants allege that THE WRITE CHOICE mark is merely descriptive with no secondary meaning and its use is merely ornamental. (ECF No. 17 at 10-11.) Marketquest moves for summary judgment on the ground that Defendants have no evidence that the mark is merely **[**43]** descriptive or merely ornamental and that it lacks secondary meaning. (ECF No. 205-1 at 17-18.) The Court finds that a triable issue remains regarding whether the mark has acquired secondary meaning.

THE WRITE CHOICE mark is subject to a particular type of presumption given that the PTO required Marketquest to show that it acquired distinctiveness. (ECF No. 258-5 Supp. RFJN Ex. I (file wrapper for '707 registration).) When the PTO determines that a mark is descriptive, *Section 1052(f)* of the Lanham Act permits a party to register the mark if it has acquired distinctiveness through five years of continuous and exclusive. *15 U.S.C. § 1052(f)*. When a mark is registered under this provision, there are two implications relevant to the Court's analysis here. First,

---

[17] Defendants state in their opposition to Plaintiff's motion for partial summary judgment that they have "withdrawn" Counterclaim 6. (ECF No. 254 at 17 n.7.) Because Defendants have never amended their counterclaims to remove this counterclaim, the Court construes Defendants' statement as a concession to summary judgment on this claim and an independent ground for granting summary judgment to Plaintiff on it.

such a registration "assumes that the mark has been shown or conceded to be merely descriptive." *Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1577 (Fed. Cir. 1988)*; *Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 393 (2d Cir. 1995)*. Second, such a registration creates a rebuttable presumption that the mark has secondary meaning. *See Zobmondo Entm't, LLC, 602 F.3d at 1114 n.7* (citing *PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 564 (2d Cir. 1990)*); *Arrow Fastener Co., Inc., 59 F.3d at 393*; *Church & Dwight Co. v. Mayer Laboratories Inc., No. C-10-4429 EMC, 2012 U.S. Dist. LEXIS 68681, 2012 WL 1745592, at *1 (N.D. Cal. May 16, 2012)*.

In view of the nature of this presumption, a party challenging the validity and protectability of a mark registered under *Section 1052(f)* must prove **[**44]** by a preponderance of the evidence that the mark has not acquired distinctiveness. *Cold War Museum, Inc. v. Cold War Air Museum, Inc., 586 F.3d 1352, 1358 (Fed. Cir. 2009)*. Here, Defendants need only show that a triable issue remains.

#### a. THE WRITE CHOICE Mark is Descriptive

Both parties opine on whether THE WRITE CHOICE is "merely laudatory" or something more. (ECF No. 205-1 at 18-19; ECF No. 254 at 23.) The PTO's registration of THE WRITE CHOICE mark based on proof of secondary meaning should have rendered a "nonissue" the question whether the mark is merely descriptive. *See Yamaha Int'l Corp., 840 F.2d at 1577*. The PTO's determination that a mark is descriptive, necessitating proof of secondary meaning to be protectable, is entitled to deference. *See Zobmondo Entm't, LLC, 602 F.3d at 1115* ("[T]he federal officials who register a mark are perceived to have some expertise in assessing if it is entitled to registration."); *Arrow Fastener Co., Inc., 59 F.3d at 392-93*. The Court acknowledges, however, that while the PTO's determination is entitled to some consideration, it is not binding on this Court. *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc., 57 F. Supp. 3d 1203, 1218-19 (C.D. Cal. 2014)* (citing *Lahoti v. Vericheck, 636 F.3d 501, 506 n.1 (9th Cir. 2011)*); *Calmese v. McNamer, No. 3:13-CV-01042-HU, 2014 U.S. Dist. LEXIS 62376, 2014 WL 1796680, at *2 n.3 (D. Or. May 6, 2014)* ("Generally, decisions of the PTO are not binding on **[*1267]** the Court, but are entitled to consideration by the Court.") (quotations and citation omitted). The Court may thus consider whether the mark is inherently distinctive.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 185 of 255

Page 16 of 42

316 F. Supp. 3d 1234, *1267; 2018 U.S. Dist. LEXIS 98674, **44

Marketquest contends [**45] that THE WRITE CHOICE is a "coined" phrase that should be treated as a fanciful mark, which would entitle it to greater trademark protection. (ECF No. 205-1 at 19.) The Court is not persuaded. "Fanciful marks consist of coined phrases that also have no commonly known connection with the product at hand." *See Surfivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 631-32 (9th Cir. 2005)*. Coined phrases may be considered a fanciful mark entitled to the highest degree of trademark protection, but "the mere fact that a mark consists of a coined term does not automatically render that mark fanciful." *Id. at 632*; *Interstellar Starship Servs. Ltd., 184 F.3d at 1111* (determining that the coined phrase "EPIX" for electronic pictures should not automatically be considered an arbitrary or fanciful mark). Here, even if the Court accepts that Marketquest coined "THE WRITE CHOICE," the Court finds that that Marketquest has not overcome the presumption that it is descriptive. Marketquest recognizes that the phrase has a "descriptive primary meaning." (ECF No. 205-1 at 19.) Indeed, the phrase, as it appears in written form, is descriptive in view of its association with "writing instruments, namely pens." (ECF No. 205-6 RFJN Ex. D.) The use of the word "write" is immediately descriptive of the mark's association with writing instruments. [**46]

In turn, Defendants' argument that the phrase is laudatory is persuasive when the phrase is taken in its auditory form. A self-laudatory term that "extol[s] some feature of attribute of the goods or services" "fall[s] into the descriptive category." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 11:17 (5th ed. 2018). Trademark law treats laudatory terms as descriptive because "they simply describe the characteristics or quality of the goods in a condensed form." *In re Nett Designs, Inc., 236 F.3d 1339, 1341 (Fed. Cir. 2001)*. Examples of laudatory terms include "such terms as SPEEDY, FRIENDLY, DEPENDABLE, PREFERRED, DELUXE, GOLD MEDAL, BLUE RIBBON, SUPER BUY and the like." *Rexel, Inc. v. Rexel Int'l Trading Corp., 540 F. Supp. 2d 1154, 1165 (C.D. Cal. 2007)* (citation omitted). Here, THE WRITE CHOICE sounds like "The Right Choice" in its auditory form. Evidence submitted by Plaintiff's deponents recognizes this "playoff" on the term "write." (ECF No. 205-27 Ex. C at 119:16-17.) Although Marketquest has altered how the mark appears in writing, its auditory meaning is necessarily of a laudatory nature.

That THE WRITE CHOICE is descriptive, however,

does not end the issue of whether it is protectable. Even if the mark is laudatory, "laudation does not *per se* prevent a mark from being registrable" and capable of trademark protection. *In re Boston Beer Co., 198 F.3d 1370, 1373 (Fed. Cir. 1999)* (citing *In re Bush Bros. & Co., 884 F.2d 569, 572 (Fed. Cir. 1989))*. A descriptive mark may acquire the [**47] secondary meaning necessary to render it protectable under trademark law, which the authorities on which Defendants rely make clear. *See, e.g., In re Boston Beer Co., 198 F.3d at 1373*; *Reed v. Amoco Oil Co., 611 F. Supp. 9, 13 (M.D. Tenn. 1984)* ("Being descriptive, the phrase must have developed a secondary meaning within the relevant market in order to be a protectable mark."). The Court turns to that issue.

**b. Whether the Mark Has Secondary Meaning Is An Issue For Trial**

Neither party has submitted survey evidence regarding secondary meaning of [*1268] THE WRITE CHOICE mark. In the absence of such evidence, the competing evidence the parties present may permit a reasonable jury to find that THE WRITE CHOICE mark does or does not have secondary meaning

Wisely not limiting their opposition to Marketquest's motion for partial summary judgment based on their contentions underlying their fraud counterclaim for THE WRITE CHOICE mark,[18] Defendants direct the Court to evidence regarding the mark's lack of secondary meaning.[19] Defendants' expert, Bruce Silverman,

---

[18] Defendants argue that they have rebutted the presumption that THE WRITE CHOICE mark possesses secondary meaning—or, at the very least, a triable issue of fact exists—based on the same assertions underlying their fraud counterclaim for mark's registration. (ECF No. 254 at 22.) The Court rejects this argument for the reasons set forth in the Court's conclusion herein that Marketquest is entitled to summary judgment on Defendants' fraudulent procurement counterclaim as to the '707 registration.

[19] Marketquest objects to the admissibility of two trademark search reports on which Defendants seek to rely to show third party use of THE WRITE CHOICE. (ECF No. 254-5 Exs. 28, 29 (reports).) "[I]t is well settled that a trademark search report does not constitute evidence of either the existence of the registration or the use of a mark." *See Icon Enters. Int'l v. Am. Prods. Co., CV 04-1240 SVW (PLAx), 2004 U.S. Dist. LEXIS 31080, 2004 WL 5644805, at *31 (C.D. Cal. Oct. 7, 2004)* (quoting 2 J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION § 11:88 (4th ed. 2001).) Accordingly,

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 186 of 255

Page 17 of 42

316 F. Supp. 3d 1234, *1268; 2018 U.S. Dist. LEXIS 98674, **47

opines that the phrase is not useful as a differentiator and may be easily forgotten by consumers. (ECF No. 254-4 Ex. 25 ¶¶47-49.) In contrast, Plaintiff submits testimony from Linda Neumann, Marvin Mittleman, and distributor-customers of Marketquest [**48] who testified that they associate the phrase "THE WRITE CHOICE" with Marketquest.[20] (ECF No. 205-23 Ex. A; ECF No. 205-27 Ex. C.) Marketquest also submits the testimony of Harris Cohen, but, as the Court has noted, such testimony is of little probative value at the summary judgment stage. *Japan Telecom, Inc., 287 F.3d at 874*; *Filipino Yellow Pages, Inc., 198 F.3d at 1152*.

On remand, Marketquest offers that "Plaintiff is . . . entitled to a jury determination on whether it has established secondary meaning" for THE WRITE CHOICE. (ECF No. 390 at 7 n.7.) Taking Marketquest's concession at face value along with the parties' competing evidence, the Court denies Plaintiff's motion for summary judgment as it pertains to (1) the issue of whether THE WRITE CHOICE is a valid and protectable mark in Count 3 of the FAC and (2) Affirmative Defense 21 and Counterclaims 1 and 2 concerning whether THE WRITE CHOICE is merely descriptive and/or merely ornamental without acquired distinctiveness.

**B. Likelihood of Confusion Regarding THE WRITE CHOICE**

The Ninth Circuit's Mandate calls on this Court to assess Marketquest's claim of trademark infringement and, consequently, whether a fair use defense is applicable in [*1269] this case. The decision expressly [**49] states that "we remand this case for the district court to consider Marketquest's trademark infringement claim regarding Defendants' use of 'The Write Choice.'" *Marketquest Grp., Inc., 862 F.3d at 939* (emphasis added). The Ninth Circuit determined that this Court erred by undertaking a fair use analysis after both finding that "no evidence of actual or potential confusion" existed regarding Defendants' use of THE WRITE CHOICE and failing to conduct a *Sleekcraft* likelihood of confusion assessment. The Ninth Circuit clarified that the fair use defense "only comes into play once the party alleging infringement has shown by a preponderance of the evidence that confusion is likely." *Id.*[21] "This is because if there is no likelihood of consumer confusion, then there is no trademark infringement, making an affirmative defense to trademark infringement irrelevant." *Id. at 937-38* (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 120, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004)*). Because this Court has never conducted a likelihood of confusion analysis regarding THE WRITE CHOICE, the Court conducts such an analysis now in view of the express language of the Mandate.

**1. Application of the *Sleekcraft* Factors**

In the Ninth Circuit, the test for likelihood of confusion turns on the eight *Sleekcraft* factors: (1) the strength of [**50] the mark; (2) the proximity or relatedness of the goods; (3) the similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion. *See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)*. The factors are not rigidly weighed, but rather guide the court in assessing likelihood of confusion. *Id.*; *E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290*

---

the Court agrees that the trademark search reports are inadmissible as evidence to show third party use and, therefore, does not consider them here. The Court overrules all other objections to the evidence here because Marketquest raises improper challenges to the weight of the evidence, not its admissibility. (ECF No. 258 at 24-25.)

[20] Marketquest also seeks to rely on the testimony of Karen Cohen and Stephanie Mills. (ECF No. 205-1 at 18; ECF No. 227-50 Ex. AU; ECF No. 227-51 Ex. AV; ECF No. 227-53 Ex. AU.) However, this testimony discusses the reputation of Marketquest in the industry as a general matter; it does not address THE WRITE CHOICE mark. In any event, it is of little probative value at the summary judgment stage given the relationship of these two individuals with Marketquest. *Japan Telecom, Inc., 287 F.3d at 874*; *Filipino Yellow Pages, Inc., 198 F.3d at 1152*.

[21] The language from this Court's fair use summary judgment order could be read narrowly to refer solely to one factor of the *Sleekcraft* analysis, *i.e.*, actual confusion, which the record supports. BIC USA moved for partial summary judgment as to that factor. (ECF No. 215 at 20 ("BIC requests partial summary judgment on the element of actual confusion of Marketquest's infringement and unfair competition claims.") Marketquest in turn "concede[d] that it has no documented evidence of distributors contacting [Marketquest] because of Defendants' use of THE WRITE CHOICE . . ." (ECF No. 258 at 35.) A broader reading of the Court's language, however, equates it with the overarching issue of likelihood of confusion at issue in every trademark infringement case. The Ninth Circuit appears to have adopted the broader reading in its Mandate and it is that reading which guides this Court on remand.

316 F. Supp. 3d 1234, *1269; 2018 U.S. Dist. LEXIS 98674, **50

*(1992)*. "[T]he presence or absence of a particular factor does not necessarily drive the determination of confusion." *E. & J. Gallo Winery, 967 F.2d at 1290*.

Neither party expressly briefed the issue of likelihood of confusion in the 2014 summary judgment briefing. However, certain arguments and evidence presented with the briefing permits the Court to undertake the *Sleekcraft* analysis now. The Court is additionally aided by certain analysis in the preliminary injunction order's *Sleekcraft* analysis of the All in One marks, which would apply equally to THE WRITE CHOICE mark. In addition, Marketquest has briefed the *Sleekcraft* factors in the joint status report submitted by the parties on remand. (ECF No. 388 at 6-7.) That briefing concedes that "the jury must decide whether a likelihood of confusion exists at to 'THE WRITE CHOICE.'" (*Id.* at 8.) With Marketquest's concession in mind, **[\*\*51]** the Court agrees that the *Sleekcraft* factors, when applied to the evidence in the record, show that there are triable factual issues regarding the likelihood **[\*1270]** of confusion concerning THE WRITE CHOICE mark. Because triable issues remain, Defendants are not precluded from raising the fair use defense.

**a. Strength of the Mark**

A mark's strength is a key factor in the likelihood of confusion analysis because it determines the scope of protection to which the mark is entitled. *See Stone Creek, Inc. v. Omnia Italian Design, Inc., 875 F.3d 426, 432 (9th Cir. 2017)*; *Entrepreneur Media, 279 F.3d at 1141*. Strength is evaluated in terms of its conceptual strength and commercial strength. *See Stone Creek, Inc., 875 F.3d at 432-33*; *GoTo.com, 202 F.3d at 1207*.

The conceptual strength analysis places the mark on the spectrum of distinctiveness, *i.e.* whether it is: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *See Entrepreneur Media, 279 F.3d at 1141*; *E. & J. Gallo, 967 F.2d at 1291* ("The strength of a mark is determined by its placement on a continuum of marks."). The strongest marks are those that are arbitrary or fanciful, whereas the weakest marks are generic. *See Entrepreneur Media, 279 F.3d at 1141*. As between suggestive and descriptive marks, suggestive marks have the greater strength. *Id.* "The more distinctive a mark, the greater its conceptual strength." *M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005)*. Here, the Court has already determined that THE WRITE CHOICE is descriptive, particularly **[\*\*52]** in light of the PTO's requirement that

Marketquest submit proof of secondary meaning and the Court's own analysis of the mark. The conceptual strength of THE WRITE CHOICE mark thus turns on whether it has attained secondary meaning. *See Kendall-Jackson Winery, Ltd., 150 F.3d at 1047*; *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc., No. CIV. S-01-1771 LKK/PAN, 2002 U.S. Dist. LEXIS 15734, 2002 WL 570681, at \*7 (E.D. Cal. Mar. 20, 2002)*. Because the Court has determined that triable issues of fact remain regarding whether THE WRITE CHOICE mark has acquired secondary meaning, there are in turn triable issues as to this *Sleekcraft* factor.[22]

**b. Proximity or Relatedness of the Goods**

"[T]he use of similar marks to offer similar products weighs heavily in favor of likelihood of confusion." *Brookfield Commc'ns, Inc., 174 F.3d at 1056*. When goods are related, "the danger present is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft, 599 F.2d at 350*. Here, the relevant goods for Marketquest's THE WRITE CHOICE mark are "writing instruments, namely pens." (ECF No. 205-6 RFJN Ex. D.) It is undisputed that Defendants' alleged infringing uses are associated with pens. (*See, e.g.*, ECF No. 216-4 Ex. 1; ECF No. 258 at 8-9.) Because the parties' goods are identical, this factor weighs in favor **[\*\*53]** of Marketquest.

**c. Similarity of Sight, Sound and Meaning**

The degree of the similarity of the marks is the "critical" question in the likelihood of confusion analysis. *See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000)*. "[T]he greater the similarity between the two **[\*1271]** marks at issue, the greater the likelihood of confusion." *Id. at 1206*. Marks must be considered in their entirety in terms of appearance, sound and meaning. *Id.*; *Entrepreneur Media, Inc., 279 F.3d at 1144*. It is "the 'combination of features as a

---

[22] As to commercial strength, commercial strength may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition. *M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1081 (9th Cir. 2005)*; *Adidas Am., Inc. v. Calmese, 662 F. Supp. 2d 1294, 1303 (D. Or. 2009)*. The Court declines to address this aspect of the strength inquiry given that triable issues remain as to the conceptual strength of THE WRITE CHOICE.

316 F. Supp. 3d 1234, *1271; 2018 U.S. Dist. LEXIS 98674, **53

whole rather than a difference in some of the details . . . [which] determine whether the competing product is likely to cause confusion in the minds of the public.'" *Perfect Fit Indus., Inc. v. Acme Quilting Co., 618 F.2d 950, 954 (2d Cir. 1980)* (citations omitted). "[S]imilarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features." *Exxon Corp. v. Texas Motor Exch., Inc., 628 F.2d 500, 505 (5th Cir. 1980)*; *Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1283 (W.D. Wash. 2003)*, aff'd by, *376 F.3d 894 (9th Cir. 2004)* (same). "Similarities weigh more heavily than differences." *See GoTo.com, Inc., 202 F.3d at 1206*. Yet, "[d]ifferent packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Glow Indus., Inc. v. Lopez, 252 F. Supp. 2d 962, 997 (C.D. Cal. 2002)*. The Court finds that triable issues of fact remain regarding this factor.

To frame the Court's analysis of this factor, examples of Marketquest's uses of THE WRITE CHOICE include:





**[*1272]** (ECF No. 205-14 Ex. C.4 (left); ECF No. 258-77 Ex. **[**54]** CV (right).)

The record reveals variations of the following use by Defendants (ECF No. 215-4 Ex. 1):



In its motion for summary judgment on the fair use defense, BIC USA highlights certain elements of its use, including that its advertisements featured the registered word mark "BIC," the BIC design mark, ROUND STIC®, and the "BIC boy" design along with the phrase. (ECF No. 215 at 9.) BIC USA also highlights the absence of a trademark designation near the "The Write Pen Choice" phrase. A likelihood of confusion may be mitigated when "the name of the company invariably accompanied the [trademarked] slogan." *Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002)* (quoting *Norm Thompson Outfitters, Inc. v. General Motors Corp., 448 F.2d 1293, 1298 (9th Cir. 1971))*. These several visual differences which BIC USA identifies may be ones on which a reasonable jury could rely to find that Defendants' use of the "The Write Pen Choice" is dissimilar from Marketquest's THE WRITE CHOICE. The weight to be accorded to these differences is best left to a jury. *See Americana Trading Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1288 (9th Cir. 1992)* (the role of prominence of house trademark in confusion determination is a jury question).

In contrast, Marketquest avers that Defendants' advertisements, despite some differences, highlight the most salient feature of THE WRITE CHOICE mark, thus making the uses confusingly similar. Marketquest **[**55]** points out that "The WRITE Pen Choice" appears near the top of the page and is sometimes larger and featured more prominently than "BIC." (ECF No. 258-1 at 8.) Marketquest underscores that the term "write" typically appears in all caps in the same font as "Round Stic" and the phrase "Write Pen Choice" is normally in bold "BIC yellow" font, with the phrase "for 30 years!" in a lighter or different color, thus emphasizing the beginning portion of the phrase. (*Id.*) Marketquest thus contends that "The WRITE Pen Choice" is the salient feature intended to draw the attention of the distributors to whom the promotions were directed. (*Id.* at 9.)

The lack of virtually identical uses does not preclude a

316 F. Supp. 3d 1234, *1272; 2018 U.S. Dist. LEXIS 98674, **55

finding of similarity and likelihood of confusion. *See, e.g., Adidas Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1053 (D. Or. 2008)* (alleged infringer of adidas mark could not avoid liability by adding or subtracting identical, paralegal strip to adidas' Three-Stripe mark); *Baker v. Master Printers Union, 34 F. Supp. 808, 811 (D.N.J. 1940)* (noting that "few would be stupid enough to make exact copies of another's mark or symbol."). The fact that Defendants used the phrase "The WRITE Pen Choice" rather than "THE WRITE CHOICE" would not itself preclude a finding of similarity. A transposition or reorganization of the elements of a mark **[*56]** does not create sufficient dissimilarity to preclude confusion. *See e.g., Perfumebay.com, Inc. v. eBay Inc., 506 F. 3d 1165, 1174 (9th Cir. 2007)* (finding "Perfumebay.com" and **[*1273]** "eBay.com" to be similar); *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc., 576 F.3d 221, 234 (5th Cir. 2009)* (finding a similarity between the marks EXTEND YOUR BEAUTY and XTENDED BEAUTY); *In Re Wine Soc'y of Am. Inc.*, 12 U.S.P.Q. 2d (BNA) 1139, 1989 TTAB LEXIS 29 (T.T.A.B. 1989) ("American Wine Society 1967" and "The Wine Society of America" confusingly similar). A reasonable jury could agree with Marketquest that despite the differences between Marketquest's and Defendants' uses, the overall impression created is confusingly similar. *See, e.g., GoTo.com, Inc., 202 F.3d at 1206* (finding actionable similarity despite use of different colors in logo); *Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (9th Cir. 1988)* (actionable similarity between "Century Investments & Realty" and "Century 21"); *Saks & Co. v. Hill, 843 F. Supp. 620, 622 (S.D. Cal. 1993)* ("Saks Thrift Avenue" likely to be confused with "Saks Fifth Avenue"); *Nabisco Brands, Inc. v. Kaye, 760 F. Supp. 25, 27 (D. Conn. 1991)* ("A2" steak sauce likely to be confused with "A1" steak sauce). Based on the foregoing, the Court concludes that a triable issue remains regarding the similarity of the marks factor.

### d. Evidence of Actual Confusion

While evidence of actual confusion provides strong support for a finding of a likelihood of confusion, actual confusion is not necessary to show a likelihood of confusion. *Am. Int'l Grp., Inc., v. Am. Int'l Bank, 926 F.2d 829, 832 (9th Cir. 1991)*; *Century 21 Real Estate Corp., 846 F.2d at 1178*; *Sleekcraft, 599 F.2d at 353*. Moreover, **[*57]** the lack of evidence of actual confusion "neither helps nor hurts" when the alleged infringer's product has been on the market for a relatively short time. *Hasbro Inc. v. Lanard Toys, Inc.,*

*858 F.2d 70, 78 (2d Cir. 1988)*. In its now reversed summary judgment order, the Court found that there is no evidence of actual confusion. *See Marketquest Grp., Inc., 2015 U.S. Dist. LEXIS 51037, 2015 WL 1757766, at *5*. Although the Court stands by that prior determination, it is not noteworthy in the analysis here. *See Calista Enters., 43 F. Supp. 3d at 1127* (stating that "[g]iven the difficulty in proving actual confusion, the absence of such evidence is not noteworthy"). Accordingly, the Court finds that this factor is neutral.

### e. Marketing Channels

"A consideration of how and to whom the respective goods of the parties are sold is relevant to the issue of likelihood of confusion. *Adidas Am., Inc., 546 F. Supp. 2d at 1055*. "Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1393 (9th Cir. 1993)*; *see also Network Automation, Inc., 638 F.3d at 1151*. However, "this factor becomes less important when the marketing channel is less obscure." *Network Automation, Inc., 638 F.3d at 1151*. For example, "the shared use of a ubiquitous marketing channel," such as the internet, "does not shed much light on the likelihood of consumer confusion." *Id.*; *Playboy Enters. v. Netscape Commc'ns. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004)* ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."). The preliminary **[*58]** injunction order found that this factor favors Marketquest because the parties utilize similar marketing channels, including the Internet, printed catalogs, and trade shows. (ECF No. 41 at 17.) The Court finds no reason to depart from that conclusion here, which is supported by the summary judgment record.

### f. Intent

A party claiming trademark infringement need not prove intent to deceive because intent is not a necessary element of trademark infringement. *Official Airline Guides, Inc., 6 F.3d at 1394* (citing *Rodeo Collection, Ltd., 812 F.2d at [*1274] 1219*). Accordingly, the Ninth Circuit has "emphasized the minimal importance of the intent factor" in the likelihood of confusion analysis. *GoTo.com, Inc., 202 F.3d at 1208* (declining to consider this factor). However, the intent factor may be "relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 190 of 255

Page 21 of 42

316 F. Supp. 3d 1234, *1274; 2018 U.S. Dist. LEXIS 98674, **58

as an equitable consideration)." *Brookfield Commc'ns, Inc., 174 F.3d at 1059* (citing *Sleekcraft, 599 F.2d at 348 n.10*). "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield Commc'ns, Inc., 174 F.3d at 1059*; *see also Stone Creek, Inc., 875 F.3d at 434* ("[C]hoosing a designation with knowledge that it is another's trademark permits a presumption of intent to deceive."); *Network Automation, Inc., 638 F.3d at 1153*.

Marketquest and Defendants **[**59]** dispute Defendants' intent to infringe THE WRITE CHOICE mark. Defendants assert that they had no intention to induce confusion by using the phrase "The WRITE Pen Choice for 30 years!" (ECF No. 215-2 ¶9.) Defendants contend that because BIC is one of most well-known suppliers in the promotional products industry, they had no need to associate themselves with Plaintiff. (*Id.*; *see also* ECF No. 215-6 Ex. 3 (showing Norwood as number 3 supplier in 2007 and 2008.) In contrast, Marketquest asserts that Defendants intended to adopt Marketquest's marks because they were aware of the mark's existence, yet still chose to use both marks at the same time. (ECF No. 258-1 at 3-4.) Marketquest has never pointed to any particularized evidence regarding Defendants' knowledge of THE WRITE CHOICE mark. Marketquest instead bootstraps its allegations regarding THE WRITE CHOICE mark based on its evidence concerning Defendants' purported knowledge of the All in One marks. (ECF No. 205-53 Ex. N; ECF No. 205-54 Ex. O; ECF No. 205-57 Ex. P; ECF No. 205-61 Ex. Q.)

The Court cannot agree that Marketquest may simply rely on evidence concerning knowledge of a different mark to show Defendants' knowledge of THE WRITE **[**60]** CHOICE. However, the Court finds instructive the Ninth Circuit's Mandate that the issue of intent is one best left to a jury. Although the Ninth Circuit acknowledged Marketquest's and Defendants' competing visions of what evidence is relevant to intent, it also stated that "no one type of evidence is required to establish intent," even in a reverse confusion case. *Marketquest Grp., Inc., 862 F.3d at 934-35*. Although the intent factor is of little importance in the *Sleekcraft* analysis when it does not bear upon likelihood of confusion, *see Brookfield Commc'ns, Inc., 174 F.3d at 1059*, the Court cannot say that no reasonable jury could find the competing evidence presented by the parties a relevant consideration in assessing Defendants' alleged conduct.

## g. Type of Goods and Purchaser Care

"Low consumer care . . . increases the likelihood of confusion." *Playboy Enters., 354 F.3d at 1028*. The degree of care likely to be exercised by purchasers of the products at issue is based on the standard of a "reasonably prudent consumer." *Brookfield Commc'ns, Inc., 174 F.3d at 1059* (citing *Dreamwerks Production Grp., 142 F.3d at 1129*). The degree of consumer care can be proven by survey evidence, expert testimony, or inference. *See, e.g., Star Indus., Inc. v. Bacardi & Co., Ltd., 412 F.3d 373, 387-88 (2d Cir. 2005)*.

Courts focus on the cost of the goods and the sophistication of the purchaser to determine degree of care, both of which may be related. "When the buyer has expertise **[**61]** in the field, a higher standard **[*1275]** is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Sleekcraft, 599 F.2d at 353* (citations omitted); *see also Official Airline Guides, Inc., 6 F.3d at 1393*; *Accuride Int'l Inc. v. Accuride Corp., 871 F.2d 1531, 1537 (9th Cir. 1989)*. In contrast, confusion is more likely when the goods at issue are relatively inexpensive products to which the consumer does not devote a great deal of care when purchasing. *See E.J. Gallo Winery v. Gallo Nero, 782 F. Supp. 457, 465 (N.D. Cal. 1991)*. Less sophisticated consumers are considered more likely to be confused by similarities among products, notwithstanding any differences among the products. *See Consolidated Cigar Corp. v. Monte Christi de Tabacos, 58 F. Supp. 2d 188, 199 (S.D.N.Y. 1999)*.

Here, while the relevant products appear to be inexpensive individually, the records shows that they are purchased in bulk. Plaintiff's retained expert, John Burnett, noted that the parties have "relatively inexpensive, non-technical products," (ECF No. 312-19 Ex. BV at 35.) Inexpensive products, even when purchased in bulk, may not call upon a consumer to exercise much care. *See ZW USA, Inc. v. PWD Sys., LLC, 889 F.3d 441, 448, 2018 U.S. App. LEXIS 10530 (8th Cir. 2018)*. This would point to a lower degree of care.

However, the record also reveals that the degree of sophistication of the relevant consumers, *i.e.* promotional products distributors, **[**62]** is an open issue. Based on evidence submitted by Defendants and without any evidence from Marketquest, the preliminary

316 F. Supp. 3d 1234, *1275; 2018 U.S. Dist. LEXIS 98674, **62

injunction order determined that "the average customer is highly sophisticated" and that the factor weighed "slightly in favor of BIC." (ECF No. 41 at 19.) With evidence from Marketquest, the summary judgment record now shows that the pool of distributors consists of some 75% to 80% of "mom-and-pop distributors," *i.e.* small entrepreneurs who own their companies and act as sales persons for their companies. (ECF No. 311-14 Ex. F.4 at 36:4-37:18.) The remainder consists of larger, institutional distributors. (*Id.*) Plaintiff's non-retained expert, Linda Neumann, testified that the majority of distributors in the promotional products industry are unsophisticated. (ECF No. 311-9 Ex. B.4 at 142:5-144:18.) Plaintiff's retained expert, John Burnett, opined that while the "degree of care may be quite uneven" amongst the pool of distributors, "the smaller the size of the distributor, the less care given when reviewing marketing materials and making a decision." (ECF No. 312-19 Ex. BV at 35.) While Plaintiff's evidence suggests that a segment of distributors exercise a lower **[**63]** degree of care, the evidence is not conclusive on this.

The Court finds that triable issues of fact remain regarding the degree of care exercised by distributors in light of the evidence regarding costs and purchaser sophistication. A reasonable factfinder might or might not find this factor weighs in favor of Marketquest.

**h. Likelihood of Expansion of Products**

While Defendants contend that BIC has steadily expanded over the years (ECF No. 215-2 Bauer Decl. ¶2), neither party offers clear evidence on this factor. This factor, however, is "irrelevant" when the parties' goods "are already related." *Playboy Enters., Inc., 354 F.3d at 1029*; *Brookfield Commc'ns, Inc., 174 F.3d at 1060*. Because that is the case here, the Court finds the factor to be neutral and affords it little weight.

**2. Result of *Sleekcraft* Analysis**

Based on the foregoing, the Court finds that triable issues remain as to the likelihood **[*1276]** of confusion resulting from Defendants' alleged use of THE WRITE CHOICE mark with respect to four *Sleekcraft* factors, including the two most critical factors of strength of THE WRITE CHOICE mark and the similarity of the uses. As such, Defendants are not precluded from raising the fair use defense at trial.

**C. Fraudulent Procurement of the Registrations for the Marks**

In Affirmative **[**64]** Defense 15 and Counterclaims 4, 8, 10, and 12[23] Defendants assert the registrations for Marketquest's marks are invalid based on fraudulent procurement. (ECF No. 17.) Marketquest seeks summary judgment on each of these and BIC Corp. seeks summary judgment on Counterclaim 4 as to fraud in procuring THE WRITE CHOICE registration. (ECF No. 205-1 at 9-11; ECF No. 216-1 at 22-24.) Although BIC Corp. does not separately move for summary judgment on Counterclaim 8, it also opposes Marketquest's motion for summary judgment with reference to it. (ECF No. 254 at 4-6.) The Court finds that Marketquest is entitled to summary judgment.

"A party may seek cancellation of a registered trademark on the basis of fraud under *15 U.S.C. §1064[3]* by proving a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages proximately resulting from the reliance." *Robi v. Five Platters, Inc., 918 F.2d 1439, 1444 (9th Cir. 1990)* (citing *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th Cir. 1988))*. The "burden of proving that a party fraudulently procured a trademark registration is heavy," and "must be shown by clear and convincing evidence."[24] *Robi, 918 F.2d at 1444*; *Spin Master, Ltd. v. Zobmondo Entm't, LLC, 778 F. Supp. 2d 1052, 1061 (C.D. Cal. 2011)*; see also *Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d 336, 340 (Fed. Cir.*

---

[23] The counterclaims pertain to the registrations as follows: Counterclaim 8 (THE WRITE CHOICE mark '707 registration); Counterclaim 8 (All in One mark '089 registration); Counterclaim 10 (All in One mark '967 registration); and Counterclaim 12 (All in One mark '417 registration).

[24] The heavy burden Defendants face on their fraud counterclaims stems in part from the fact that "a charge of fraud in the procurement of a trademark registration is a disfavored defense." *eCash Techs., Inc. v. Guagliardo, 210 F. Supp. 2d 1138, 1149 & n.12 (C.D. Cal. 2000)* (citing *Robi, 918 F.2d at 1444*; MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §31:68); see also *Aveda Corp. v. Evita Marketing, Inc., 706 F. Supp. 1419, 1425 (D. Minn. 1989)* ("The courts and the trademark board both view charges of fraud in the registration of a trademark as disfavored defense.").

Case 1:23-cv-21347-JEM  Document 24-4  Entered on FLSD Docket 12/11/2023  Page 192 of 255

Page 23 of 42

316 F. Supp. 3d 1234, *1276; 2018 U.S. Dist. LEXIS 98674, **64

*1997).* "There is no room for speculation, inference [**65] or surmise and, obviously, any doubt must be resolved *against the charging party*." *In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009)* (emphasis added). To preclude summary judgment, the nonmoving party "must raise a genuine issue of material fact as to each of the elements" of the claim. *Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001); Moroccanoil, Inc., 57 F. Supp. 3d at 1230.*

In assessing charges of fraud, courts must recognize that "[m]ost of a user's substantive trademark rights derive from the use of the mark, not registration of it. *Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc., No. 3:06-CV-232-ECR-RAM, 2009 U.S. Dist. LEXIS 116624, 2009 WL 5066908, at *14 (D. Nev. Dec. 14, 2009)* (citing *In re Bose Corp., 580 F.3d at 1247); see also Harod v. Sage Prods., 188 F. Supp. 2d 1369, 1375 (S.D. Ga. 2002)* (citing *Bauer Lamp Co. v. Shaffer, [*1277] 941 F.2d 1165, 1171 (11th Cir. 1991))* ("Registration does not actually confer ownership rights in the mark. Instead, trademark ownership accrues with use."). For this reason, "[t]here does not exist in trademark cases the fundamental reason for being on the alert to find fraud on the [PTO] which exists in patent cases" because "the right to exclude others from the use of a trademark results from the fact of use and the common law, independently of registration in the [PTO]." *Morehouse Mfg. Corp. v. J. Strickland & Co., 407 F.2d 881, 888, 56 C.C.P.A. 946 (C.C.P.A. 1969); see also Specialized Seating, Inc. v. Greenwich Indus., LP, 616 F.3d 722, 728 (7th Cir. 2010)* ("All a finding of fraud does is knock out the mark's 'incontestable' status, and its registration . . . .[i]t does not affect the mark's validity, because a mark need not be registered to be enforceable.").[25] Thus, "assertions [**66] of fraud should be dealt with realistically, comprehending . . . that trademark rights . . . continue notwithstanding cancellation" of a registration. *Morehouse Mfg. Corp., 407 F.2d at 888; Kerzner Int'l Ltd., 2009 U.S. Dist.*

---

[25] It is for this reason that the pursuit of a charge of fraudulent procurement may be one with little reward. *See eCash Techs., Inc. v. Guagliardo, 210 F. Supp. 2d 1138, 1148 n.11 (C.D. Cal. 2000);* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §31:60 (5th ed. 2018) ("It is difficult to understand why defendants in many trademark infringement suits expend so much time, effort and money in vigorously pursuing the claim that plaintiff's federal registration was obtained by fraud. It has been held several times that even if defendant succeeds in proving that the plaintiff's registration was fraudulently obtained, plaintiff's common law rights in the mark continue unabated . . .").

*LEXIS 116624, 2009 WL 5066908, at *14.* With these principles in mind, the Court turns to the counterclaims' merits.

## 1. THE WRITE CHOICE Mark ('707 Registration)

### a. Allegedly Knowingly False Representations

Defendants charge fraud in the procurement of THE WRITE CHOICE mark registration based on three allegedly false representations by Marketquest: (1) the submission of false specimens showing the mark placed on certain goods in its initial March 29, 2005 application; (2) Harris Cohen's declaration submitted with the initial application, which stated that the goods were first used in commerce as early as January 1, 2000; and (3) after the PTO's initial rejection of the mark as "merely ornamental" based on the specimens submitted, Cohen's supplemental declaration that the mark was distinctive based on substantially exclusive and continuous use, in BIC Corp.'s phrasing, "on the applicant's goods" in the five years preceding the application. (ECF No. 216-1 at 28-29.)

Defendants contend that the specimens, which were expressly referred to as "digitally photographed [**67] in the application submitted to the PTO, "are obviously not genuine to the naked eye." (ECF No. 216-1 at 23.) Defendants contend that the specimens and Cohen's declarations are false because Marketquest has never produced in discovery the goods depicted in the specimens. The problem with both assertions at the summary judgment stage is that it is *Defendants' burden* to provide evidence sufficient to show falsity by clear and convincing evidence, not that of Marketquest to disprove Defendants' allegations of fraud.[26] *See, e.g., Anhing Corp. v. Thuan Phong Co., 215 F. Supp. 3d 919, 938 (C.D. [*1278] Cal. 2015)* ("Although Defendant maintains that Plaintiff has not produced evidence to support or verify Mr. Ly's statements [to the PTO], this argument is unpersuasive, as it is Defendant's burden to produce clear and convincing evidence of fraud."); *Learning Internet v. Learn.com, Inc., No. CV 07-227-AC, 2009 U.S. Dist. LEXIS 126180, 2009 WL 6059550, at *6*

---

[26] Defendants also contend that the appearance of the mark without any stylization or particular font shows why it is false. However, the application itself expressly states that "the mark consists of standard characters, *without claim to any particular font, style, size, or color.*" (ECF No. 258-5 at 3, 4 (emphasis added).)

316 F. Supp. 3d 1234, *1278; 2018 U.S. Dist. LEXIS 98674, **67

*(D. Or. Nov. 25, 2009)* (party claiming falsity of acquired distinctiveness declaration must show that the mark had not been in continuous use for five years). At the summary judgment stage, Defendants cannot rest their charges of falsity on allegations in their Answer or assertions by counsel in legal memoranda and thus their claims of falsity falter. *See S. A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 690 F.2d at 1238* ("a party cannot manufacture a genuine issue **[**68]** of material fact merely by making assertions in its legal memoranda").

Defendants also point to the deposition testimony of Stephanie Mills, Marketquest's *Rule 30(b)(6)* deponent and Director of Operations who stated that "from the time I've been with the company, I wouldn't allow a sample to go out that only said 'The Write Choice' trademark." (ECF No. 310 at 3-4; ECF No. 310-1 Amato Decl. Ex. 4 at 244:19-248:12.) This testimony, however, has no connection to whether Harris Cohen knowingly made a false representation at the time of the application. "The question is not whether the statement is factually false, but whether *the applicant* subjectively believed it was false at the time he or she made the representation." *Ricks v. BMEzine.com, LLC, 727 F. Supp. 2d 936, 967 (D. Nev. 2010)* (citing *Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 874 (10th Cir. 1995))* (emphasis added). Accordingly, Defendants' counterclaim fails on the threshold element of false representations, and the related element of the applicant's knowledge or subjective belief of falsity.

### b. Intent to Deceive

Even if Defendants had provided sufficient evidence of knowingly false representations, they fail to produce evidence of intent to deceive or sufficient evidence from which such an intent may be inferred **[**69]** by a reasonable jury. "'[A]bsent the requisite intent to mislead the USPTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation.'" *Spin Master, Ltd., 778 F. Supp. 2d at 1061* (quoting *In re Bose Corp., 580 F.3d at 1244*). "[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence. But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *In re Bose Corp., 580 F.3d at 1245*; *Anhing Corp., 215 F. Supp. 3d 919, 936-37 (C.D. Cal. 2015).* "[W]hen drawing an inference of intent, 'the involved conduct, viewed in light of all the evidence . . .

must indicate sufficient culpability to require a finding of intent to deceive.'" *Spin Master, Ltd., 778 F. Supp. 2d at 1061.* "[D]eception must be willful," and any "[m]ere negligence is not sufficient to infer fraud or dishonesty." *In re Bose Corp., 580 F.3d at 1244*; *Spin Master, Ltd., 778 F. Supp. 2d at 1061.*

Defendants do not produce direct evidence of an intent to defraud the PTO with respect to either the specimens or Cohen's declarations. Defendants rely on Marketquest's alleged failure to produce the goods in the specimens to assert that Cohen knew that Marketquest did not distribute such goods, which purportedly gives rise to an inference of fraudulent intent. As the Court has already determined, Plaintiff's purported **[**70]** production failure does nothing to assist Defendants in meeting *their* clear and convincing burden. Moreover, because falsity is not the **[*1279]** same as fraudulent intent, Defendants cannot simply rely on a charge of falsity to prove intent by clear and convincing evidence. *See Spin Master, Ltd., 778 F. Supp. 2d at 1061*

Defendants fare no better with respect to Cohen's declarations. Because oaths and declarations submitted in connection with a trademark registration are "phrased in terms of a subjective belief," it is "extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief." *Woodstock's Enters., Inc. (Cal.) v. Woodstock's Enters., Inc. (Or.), 43 U.S.P.Q. 2d (BNA) 1440, 1444, 1997 TTAB LEXIS 21 (T.T.A.B. 1997).* Although Defendants point to Cohen's February 2012 deposition testimony that he could not recall submitting the declarations (ECF No. 310-1 Amato Decl. Ex. 3 at 149:17), this cannot create a triable issue of fact on whether he intended to defraud the PTO at the time he submitted the declarations in view of the clear and convincing evidentiary standard.

To the extent Defendants claim that fraudulent intent can be inferred simply because Cohen provided a declaration of acquired distinctiveness to the PTO, the Court rejects this notion as a matter of law. When an applicant makes a claim of acquired distinctiveness to the PTO, **[**71]** the PTO may accept "proof of substantially exclusive and continuous use" of the mark by the applicant "for the five years before the date on which the claim of distinctiveness is made . . . as prima facie evidence that the mark has become distinctive." *15 U.S.C. §1052(f)*; *Learning Internet, 2009 U.S. Dist. LEXIS 126180, 2009 WL 6059550, at *6.* Such distinctiveness must relate to the goods or services specified in the application. *Learning Internet, 2009 U.S.*

316 F. Supp. 3d 1234, *1279; 2018 U.S. Dist. LEXIS 98674, **71

*Dist. LEXIS 126180, 2009 WL 6059550, at *6* (citing Trademark Manual of Examining Procedure (hereinafter "T.M.E.P.") §1212.05(d)(6)). As Marketquest observes, its response to the PTO's initial rejection of the application for THE WRITE CHOICE was based on the very items the PTO expressly indicated could be used to make a showing sufficient for approval. (ECF No. 258-5 Ex. I at 19.) The Court will not infer fraudulent intent from a registrant's mere filing of a PTO-sanctioned declaration of acquired distinctiveness. Defendants provide no evidence showing, or from which a reasonable inference may be drawn, that Cohen's statements in the supplemental declaration was anything other than a proper response to the PTO's request.

Based on the factual record here, the Court finds that Defendants cannot carry their burden at trial to show by clear and convincing evidence that Marketquest fraudulently procured **[**72]** the '707 registration.[27] Marketquest is entitled to summary judgment on Counterclaim 4.

## 2. The All in One Design Mark ('089 Registration)

Referring to their charges of fraud for THE WRITE CHOICE registration, Defendants contend that "similar suspicious specimens were submitted with the registration application filed with the PTO [on] March 24, 2005" for the All in One design mark in the '089 registration (ECF No. 254 at 4-5.) As with the fraud charge against THE WRITE CHOICE registration, Defendants' assertions of falsity are unsupported and fail to show that a genuine dispute remains for trial.

First, Defendants' assertion in their opposing papers of falsity "obvious to the naked eye" of the specimens submitted **[*1280]** with the application is devoid of the evidentiary basis necessary to withstand summary judgment. *See S. A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 690 F.2d at 1238*. Even assuming that it is proper for the Court to undertake a "naked eye" test here, the specimens submitted with the

'089 registration bear no similarity to those in the '707 registration aside from the fact that they contain similar items (*e.g.*, magnets, key chains, *etc.*). Second, Stephanie Mills' testimony that samples leaving Marketquest at least contain an ASI number **[**73]** or part number cannot be used to show falsity of the specimens because several in fact contain an ASI number. (*Compare* ECF No. 310-1 Amato Decl. ¶6 Ex. 4 at 249:11-250:24 *with* ECF No. 254-1 Amato Decl. ¶6 Ex. 5 at 157-161 ('089 specimens).)

Even assuming Defendants could identify any false representations here, they fail to provide any evidence showing that the representations were intentionally made to deceive the PTO in connection with the All in One '089 registration, nor do they brief these issues. On the factual record here, the Court finds that Defendants cannot carry their burden at trial to show by clear and convincing evidence that Plaintiff fraudulently procured the '089 registration. Marketquest is entitled to summary judgment on Counterclaim 8.

## 3. Remaining Fraud Counterclaims and Affirmative Defense

Defendants' remaining fraudulent procurement counterclaims concern the All in One marks in the '967 and '417 registrations. Defendants fail to oppose Plaintiff's motion on these counterclaims. In the absence of any evidentiary basis beyond Defendants' bare allegations of fraud in the Answer and Defendants' apparent abandonment of such allegations here, Plaintiff's registered marks **[**74]** remain entitled to the presumption of the validity, insofar as the fraud charges are concerned. *15 U.S.C. §§1057(b); 1115(a)*. The Court grants summary judgment to Plaintiff on Counterclaims 10 and 12. Because Plaintiff is entitled to summary judgment on all of Defendants' fraud counterclaims, Plaintiff is entitled to summary judgment on Affirmative Defense 15.

## D. Abandonment of the Marks

In Affirmative Defense 16 and Counterclaims 3, 7, 9, and 11[28] , Defendants assert that Marketquest's mark

---

[27] The record also shows that on February 2011, Defendants' counsel filed a petition to cancel THE WRITE CHOICE mark based, *inter alia*, on fraud in the initial March 2005 application, with allegations that Marketquest had not used the mark for goods, but only as a promotional tool for services. (ECF No. 258-52 Ex. M.) Notwithstanding that petition, the PTO renewed the registration for the mark a year later. (ECF No. 258-4 Ex. H.)

[28] The counterclaims pertain to the registrations as follows: Counterclaim 3 (THE WRITE CHOICE mark '707 registration); Counterclaim 7 (All in One mark '089 registration); Counterclaim 9 (All in One mark '967 registration); and Counterclaim 11 (All in One mark '417 registration).

316 F. Supp. 3d 1234, *1280; 2018 U.S. Dist. LEXIS 98674, **74

registrations are invalid based on abandonment. Both parties seek summary judgment on abandonment and the bulk of the cross-motions are directed to this issue. (ECF No. 205-1 at 11-13; ECF No. 216-1 at 1-22.) BIC Corp. methodically argues that each of Marketquest's identifiable uses of the marks did not constitute use in commerce at the time the registrations were filed, nor for the three-year period preceding its cross-motion for summary judgment. Dressing its challenge in the label of abandonment, BIC Corp. also asserts that Marketquest's mark registrations for goods are void *ab initio* because the applications for the marks were not supported by specimens showing actual use of the goods in commerce. (ECF No. 216-1 **[\*\*75]** at 3, 7, 21-22.) Marketquest argues that each use identified by BIC Corp. constitutes a use in commerce under the law and, therefore, it did not abandon the marks and the corresponding registrations are not void *ab initio*. The Court finds that Marketquest is entitled to summary judgment.

 **[\*1281]** _Section 1127_ of the Lanham Act deems a mark to be abandoned when: (1) "its use has been discontinued with the intent not to resume such use" or (2) "any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services or in connection with which it is used to otherwise to lose its significance as a mark." _15 U.S.C. §1127_. Defendants assert abandonment by non-use. To prevail, Defendants must show (1) nonuse of the mark and (2) intent not to resume its use. _Sonista, Inc. v. Hsieh, 348 F. Supp. 2d 1089, 1095 (N.D. Cal. 2004)_.

Because abandonment of a trademark is "in the nature of forfeiture, [it] must be strictly proved." _FreecycleSunnyvale, 626 F.3d at 515_; _Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal., 694 F.2d 1150, 1156 (9th Cir. 1983)_. The Ninth Circuit has yet to determine whether the "strictly proved" standard means "clear and convincing evidence" or "preponderance of the evidence." _See FreecycleSunnyvale, 626 F.3d at 515_ (finding that abandonment theory would fail under either standard); *compare* _Grocery Outlet Inc. v. Albertson's Inc., 497 F.3d 949, 952 (9th Cir. 2007)_ (Wallace, J., concurring) ("In my view, meeting a strict **[\*\*76]** burden requires proof by clear and convincing evidence.") *with* _id. at 953-54_ (McKeown, J., concurring) ("In my view, the language of _15 U.S.C. §1127_ does not support an elevated standard of 'clear and convincing.' The statute does not impose a burden beyond the traditional preponderance of the evidence standard applicable in civil matters."). The Ninth Circuit

has avoided deciding the issue. *See* _FreecycleSunnyvale, 626 F.3d at 515_ (finding no need to decide which standard applies because even applying higher standard of proof, abandonment was shown); _Grocery Outlet, Inc., 497 F.3d at 951_ ("Although the parties disagree as to the standard of proof applicable to the defense of abandonment, Grocery waived its challenge on this point by adopting the clear and convincing standard in its briefing in the district court."); _Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d at 935 n.2, 936 (9th Cir. 2006)_ ("We do not need to flesh out the contours of the 'strict proof' standard because our resolution of this summary judgment appeal rests on the proper legal construction of _§1127_ and the determination that factual issues preclude summary judgment in favor of PPI.").

Here, the parties naturally adopt the evidentiary standard that is most favorable to their positions from a hypothetical perspective. Whereas Marketquest contends that the clear and convincing standard applies to **[\*\*77]** charges of abandonment (ECF No. 205-1 at 11; ECF No. 275 at 3), Defendants contend that the preponderance of the evidence standard applies (ECF No. 254 at 1). This Court need not decide which standard applies because Defendants fail under both based on the undisputed facts in the record. *See, e.g.,* _Grocery Outlet Inc. v. Albertsons, Inc., No. C 06-02173 JSW, 2008 U.S. Dist. LEXIS 101999, 2008 WL 5245962, at \*6 (N.D. Cal. Dec. 17, 2008)_ (not deciding issue because party's charge of abandonment failed under either standard).

Although the exact parameters of the "strictly proved" standard remain unsettled in the Ninth Circuit, "[i]t is *not* the law that 'the slightest cessation of use causes a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent.'" 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §17:14 (5th ed. 2018) (citing _Continental Distilling Corp. v. Old Charter Distillery Co., 188 F.2d 614, 619, 88 U.S. App. D.C. 73, 1951 Dec. Comm'r Pat. 20 (D.C. Cir. 1950))_ (emphasis in original). Rather, "[a]bandonment requires complete cessation or discontinuance of trademark use." _Electro Source, 458 F.3d at 938_. Generally,  **[\*1282]**  "[a] trademark owner's certificate of registration is prima facie evidence of the registration and continued use of the mark." _eMachines, Inc. v. Ready Access Memory, Inc., No. EDCV 00-00374-VAP (EEx), 2001 U.S. Dist. LEXIS 13904, 2001 WL 456404, at \*5 (C.D. Cal. Mar. 5, 2001)_ (citing _Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc., 892 F.2d 1021, 1025-26_

316 F. Supp. 3d 1234, *1282; 2018 U.S. Dist. LEXIS 98674, **77

*(Fed. Cir. 1989))*.

Notwithstanding a certificate of registration for a mark, non-use for three consecutive years constitutes *prima facie* evidence of **[**78]** abandonment under the *Lanham Act*. *See 15 U.S.C. §1127; Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1247-48 (9th Cir. 2013)*. When a *prima facie* case of non-use is shown, there is a rebuttable presumption that the trademark owner has abandoned the mark without intent to resume use. *On-Line Careline, Inc. v. Am. Online, Inc., 229 F.3d 1080, 1087 (9th Cir. 2000)*. Whether the presumption even comes into play is a key issue for even a "single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Carter-Wallace, Inc., 434 F.2d at 804*; *see also Cash Processing Servs. v. Ambient Entm't, Inc., 418 F. Supp. 2d 1227, 1232 (D. Nev. 2006)* ("When the alleged period of nonuse is less than three years, no presumption attaches . . .."). If a challenger successfully makes a *prima facie* case, the trademark owner must show valid reasons for non-use or a lack of intent to abandon. *Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 411 (9th Cir. 1996)*; *Clearly Food & Beverage Co., Inc., 102 F. Supp. 3d at 1162*. "The burden of persuasion . . . always remains with the petitioner to prove abandonment . . ." *On-Line Careline, Inc., 229 F.3d at 1087* (internal quotation and citations omitted); *Abdul-Jabbar, 85 F.3d at 411* (the burden of proof does not shift to the trademark owner simply because a *prima facie* case of non-use is made).

### 1. Abandonment for Lack of Use in Commerce

BIC Corp. contends that each of Marketquest's uses of the marks in the three years preceding its summary judgment papers does not constitute a "use in commerce" and, therefore, Plaintiff has abandoned the marks for goods. (ECF No. 254 at 6-10; ECF No. 216-1 at 7-22.) **[**79]** [29] The undisputed facts show that Marketquest has used the All in One marks and THE WRITE CHOICE marks on its website, in catalogs, and trade show booth displays. (ECF No. 205-8 Cohen Decl. Exs. C, C.2, C.4-C.6, C.8-C.9; ECF No. 216-21 Ex. 19.) The evidence also shows that Marketquest has used some of the All in One marks in its containers with samples and goods as well as on shipping labels and packing slips. (ECF No. 216-20 Ex. 18; ECF No. 226-26 Ex. 23.) Defendants concede these uses of the marks by Marketquest. Indeed, the entire premise of BIC Corp.'s cross-motion for summary judgment and Defendants' **[*1283]** opposition to Plaintiff's motion is to assert that these uses are insufficient use in commerce. Thus, the only issue confronting the Court is whether, as a matter of law, Marketquest's qualify as use in commerce for goods.[30]

"[T]he meaning of 'use' for the purposes of abandonment necessarily signifies 'use in commerce'" under the Lanham Act. *Electro Source, LLC, 458 F.3d at 936* (citing *Money Store v. Harriscorp Fin., Inc., 689 F.2d 666, 676 (7th Cir. 1982))*. The Ninth Circuit applies a "totality of the circumstances" test to determine if usage of a trademark qualifies as "use in the ordinary course of trade under *§1127*." *Electro Source, LLC, 458 F.3d at 940* (internal quotations omitted). A use must be "bona fide" and not made **[**80]** merely to reserve the

---

[29] BIC Corp.'s framing of the relevant period for the abandonment analysis raises concerns for the Court. While BIC Corp. argues about Marketquest's uses of the marks from 2011 through 2014, it is doubtful that the evidentiary record at the summary judgment stage was drawn from discovery that extended beyond 2012. Not a single exhibit the parties provided in their exhibit lists filed contemporaneously with the summary judgment motions, and which draw from the record submitted with those motions, is a document dated beyond 2012. (ECF Nos. 238; 242.) The summary judgment motions also do not refer to documents beyond 2012. (ECF Nos. 205;

216.) A party may not invoke the presumption of non-use, or strictly prove abandonment for that matter, by asserting non-use for years either not covered in discovery or for which the record submitted by the parties contains no evidence. Because the record here does not extend past 2012, the Court will not measure Marketquest's purported abandonment beyond that year.

[30] Defendants recognize that the PTO accepted as specimens of use each of these uses at issue here when it granted Marketquest's registrations for the marks. (ECF No. 216 at 11.) Yet Defendants cast doubt on the PTO's determinations by asserting that the PTO "is not required to scrutinize each application" as to all factual matters. (*Id.* quoting *Sandro Andy, S.A. v. Light Inc., No. 12 Civ. 2392 (HB), 2012 U.S. Dist. LEXIS 182401, 2012 WL 6709268, at *4 (S.D.N.Y. Dec. 27, 2012).*) Even accepting that proposition, it does not undermine the deference due to the PTO's actual decision to register or a renew a trademark based on the specimens provided. *See Zobmondo Entm't, LLC, 602 F.3d at 1115* ("[T]he federal officials who register a mark are perceived to have some expertise in assessing if it is entitled to registration . . ."); *Lahoti, 586 F.3d at 1199* (PTO determinations are entitled to deference). As "use in commerce" is a statutory requirement to register a mark, there is a presumption—absent a showing of fraud—that an application satisfied the use in commerce requirement.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 197 of 255

Page 28 of 42

316 F. Supp. 3d 1234, *1283; 2018 U.S. Dist. LEXIS 98674, **80

right in a mark. *Id.* Thus, "[t]he Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services." *Brookfield Commc'ns, Inc., 174 F.3d at 1051*. "[N]either promotional use of the mark on goods in a different course of trade nor mere token use constitute 'use' under the Lanham Act." *Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 536 (4th Cir. 2000)*; *Grocery Outlet Inc., v. Albertsons, Inc., No. CV 06-2173, 2008 U.S. Dist. LEXIS 101999, 2008 WL 5245962, at *7 (N.D. Cal. Dec. 7, 2008)* (signage erected solely on the advice of counsel for the purpose of maintaining an active registration in the mark was not active use in the ordinary course of trade). Evaluating whether a use is in "the ordinary course of trade" is "often an intensely factual undertaking." *Electro Source, LLC, 458 F.3d at 940*. With these principles in mind, the Court turns to Marketquest's various uses of the marks, any of which is sufficient to defeat Defendants' abandonment counterclaims.

### a. Sample Goods and Shipping/Packing Labels

The Court first turns to Marketquest's provision of sample goods to distributor-customers and shipping and packing labels associated with the transport of those goods. In challenging the sufficiency of these uses, Defendants burrow deep into their argument that a mark for goods must specifically **[**81]** appear on the goods Marketquest provides to distributor-customers in order to qualify as a use in commerce. (ECF No. 216-1 at 17.) The Court rejects Defendants' argument.

The Lanham Act's express terms resolve the sufficiency of Marketquest's provision of sample goods to its distributor-customers. Under the Lanham Act, a mark is used in commerce "when it is placed in any manner on . . . [the goods'] containers . . . or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their **[*1284]** sale." *See 15 U.S.C. §1127*. Under its plain meaning then, the Lanham Act does not require that a mark be affixed to or have a close physical association with the goods in order for the mark to be used in commerce. *See Lands' End, Inc. v. Manbeck, 797 F. Supp. 511, 513 (E.D. Va. 1992)*; *In re Marriott, 459 F.2d 525, 526, 59 C.C.P.A. 1055 (C.C.P.A. 1972)* ("The terms of the statute [ *15 U.S.C. §1127*] are met if the mark is placed 'in any manner' on the 'displays associated' with the goods."). The record shows that Marketquest's shipping

labels and packing slips contain its marks and that containers in which the goods, including samples, it ships display All in One marks. (ECF No. 216-20 Ex. 18 (shipping labels and packing slips); ECF No. 205-16 Ex. C.6 (photographs depicting '089 and '333 marks on containers shipped by Marketquest).) **[**82]** The alleged lack of imprinting Marketquest's marks on the samples or goods it provides to distributor-customers does not place Marketquest's uses outside the broad scope of the Lanham Act's use in commerce requirement. *See Elec. Commc'ns., Inc. v. Elec. Components for Indus. Co., 443 F.2d 487, 492 (8th Cir. 1971)* (rejecting defendants' argument that use of packing slips and labels on the outer of shipping containers did not constitute trademark use because it "flies in the teeth of the plain language of the statute"); *In re A. S. Beck Shoe Corp., 161 U.S.P.Q. (BNA) 168, 169, 1969 TTAB LEXIS 21 (T.T.A.B. 1969)* ("Since the specimens in question are in fact applied to the containers for applicant's goods and the goods are transported in commerce, the use thereof of applicant's mark is clearly a use such as would satisfy the requirements . . . for registration.").

Defendants further argue that the samples do not qualify as use in commerce because they are "mere advertising." (ECF No. 216-1 at 18-20.) Defendants' challenge is nominally premised on the notion that Marketquest's samples do not contain its own marks and are not resold by distributor-customers to end users. Defendants' own factual concessions, however, are at odds with their argument. As to Marketquest's purported failure to place its marks on samples, Defendants concede that Marketquest printed 51,330 promotional **[**83]** product samples in 2010, which in Defendants' words, "likely had some form of a Marketquest mark." (ECF No. 216-1 at 18; ECF No. 216-29 Ex. 26 (record of Marketquest's 2010 samples distribution).) The record corroborates this. (*See, e.g.*, ECF No. 227-58 Ex. BE.) This concession places Marketquest's samples directly in the scope of the Lanham Act's use in commerce requirement. *See 15 U.S.C. §1127* (a mark is used in commerce "when it is placed in any manner on the goods . . .").

Defendants' challenge regarding who sells the goods and to whom the goods are sold fares no better because it confuses the focus of the use in commerce analysis here, which is on Marketquest's uses, not those of its distributor-customers. Because Marketquest is a supplier, the relevant focus for the use in commerce requirement is on its sales to distributors, not end users who purchase from those distributors. Defendants treat

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 198 of 255

Page 29 of 42

316 F. Supp. 3d 1234, *1284; 2018 U.S. Dist. LEXIS 98674, **83

the number of samples distributed in 2010 as part of Marketquest's overall sales in 2010. (ECF No. 216-1 at 18-20.) Defendants further concede that "Marketquest sells these samples exclusively to distributors of promotional-products . . ." (ECF No. 216-1 at 18; ECF No. 216-24 Ex. 22 at 43:10-11 (Dep. of [**84] Harris Cohen).) The record also shows the provision of Marketquest's samples to its distributors. (ECF No. 226-28 Ex. 25.) These undisputed facts place Marketquest's uses directly in the scope of the Lanham Act's use in commerce requirement. *See* 15 U.S.C. §1127 (sale of goods with mark qualifies as use in commerce).

 **[*1285]** Even if Defendants had not made these concessions, the Lanham Act does not require the actual sale of goods for a mark to be used in commerce. *See* 15 U.S.C. §1127 (use in commerce also requires that the "the goods are sold *or transported in commerce*") (emphasis added). Thus, "[t]he statute is clear that the actual sale of goods is not required to satisfy §1127's 'use in commerce' requirement, provided that the goods are 'transported' in commerce." *Lens.com, Inc. v. 1-800 Contacts, Inc., 686 F.3d 1376, 1380 (Fed. Cir. 2012)*; *Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir. 2004)* ("[S]ales of goods within or from the United States are not necessary to establish trademark ownership; for purposes of the Lanham Act, transportation alone qualifies."). When a user seeks to establish use in commerce based on transportation, a requirement of "public awareness of the use" is imposed. *Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1195 (11th Cir. 2001)*; *Brookfield Commc'ns., Inc., 174 F.3d 1036, 1052 (9th Cir. 1999)*; *New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1200 (9th Cir. 1979)* (same). "Secret, undisclosed shipments are generally inadequate to support the denomination use." *Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975)*. As the Court has noted, Marketquest [**85] has produced evidence showing that it transports its samples and goods in boxes containing two of its All in One marks. (ECF No. 205-16 Ex. C.6 (photographs depicting '089 and '333 marks on containers shipped by Marketquest); ECF No. 258-7 Cohen Decl. ¶8.) Defendants provide no evidence disputing that such transportation is sufficiently public and the Court finds no basis to conclude otherwise. Given the undisputed facts and in view of the applicable standard, the Court finds that Marketquest's provision of samples and placement of samples in containers with its marks and similar packing and shipping labels are sufficient to defeat Defendants' abandonment counterclaims.

**b. Trade Show Displays**

Defendants concede that Marketquest has used the marks in trade show banners, yet they contend that those uses constitute "mere advertising" insufficient to show use of the marks in commerce for goods. (ECF No. 216-1 at 14-15.) Defendants contend that Marketquest's trade show book displays do not qualify as acceptable point-of-sale displays of the marks because Marketquest has produced no evidence that sales are actually made at the trade show booths. (ECF No. 216-1 at 15.) The Court rejects this challenge. [**86]

Under the Lanham Act, a mark for goods is used in commerce when "it is placed in any manner on the goods . . . *or the displays associated therewith* or on the tags or labels affixed thereto . . ." 15 U.S.C. §1127 (emphasis added). It is settled that mere advertising does not constitute use of a mark in commerce under the Lanham Act. *See* Lands' End Inc., 797 F. Supp. at 513 ("Specimens are invalid for registration purposes if they constitute mere advertising."); *In re Shipley Co., Inc., 230 U.S.P.Q. (BNA) 691, 694, 1986 TTAB LEXIS 74 (T.T.A.B. 1986)*; *Powermatics, Inc. v. Globe Roofing Products Co., 341 F.2d 127, 52 C.C.P.A. 950, 954 (C.C.P.A. 1965)* ("[I]t being well settled that mere advertising and documentary use of a notation apart from the goods do not constitute technical trademark use."). The principle underlying the exclusion of advertising is that "any material whose function is simply to tell a prospective purchaser about the goods or to promote the sale of the goods is unacceptable to support trademark use." *In re Mediashare Corp., 43 U.S.P.Q. 2d (BNA) 1304, 1307, 1997 TTAB LEXIS 18 (T.T.A.B. 1997)*; 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §16:29 (5th ed. 2018).

 **[*1286]** However, "a clear line of demarcation has been drawn between mere advertising materials . . . and point-of-purchase promotional materials . . ." *In re Anpath Grp., Inc., 95 U.S.P.Q. 2d (BNA) 1377, 1382, 2010 TTAB LEXIS 130 (T.T.A.B. 2010)*. A point-of-sale display associated with the goods is "more than mere advertising" if it is "calculated to consummate a sale." *In re Quantum Foods, Inc., 94 U.S.P.Q. 2d (BNA) at 1379, 2010 TTAB LEXIS 85*; *see also* In re Bright of America, Inc., 205 U.S.P.Q. (BNA) 63, 71, 1979 TTAB LEXIS 100 (T.T.A.B. 1979). The line between what constitutes mere [**87] advertising versus a display associated with the goods may be difficult to draw in particular

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 199 of 255

Page 30 of 42

316 F. Supp. 3d 1234, *1286; 2018 U.S. Dist. LEXIS 98674, **87

cases. But a display is more likely an advertisement when it does not: (1) offer a way to purchase the goods, (2) contain an offer to accept orders for the goods, or (3) provide instructions for placing orders for the goods. *In re Quantum Foods, Inc., 94 U.S.P.Q. 2d (BNA) at 1379*; *In re Osterberg*, 83 U.S.P.Q. 2d (BNA) 1220, 1224 (T.T.A.B. 2007). Trade show displays are sufficient to constitute a use in commerce when the mark is prominently displayed near the goods and orders for goods may be taken. *See In re Shipley, 230 U.S.P.Q. (BNA) at 693-94*. Even distribution of "an informational flyer or leaflet clearly depicting the mark and presented on the goods at trade show exhibits are sufficient . . ." *In re Ancha Elecs., Inc., 1 U.S.P.Q. 2d (BNA) 1318, 1320, 1986 TTAB LEXIS 36 (T.T.A.B. 1986)*

Defendants' challenge to Marketquest's trade show displays faces two pitfalls. First, Marketquest's declarations of use and/or excusable non-use of marks in commerce submitted to the PTO in connection with THE WRITE CHOICE and All in One marks show the marks associated with the goods for trade show booths as point-of-sale locations. (ECF No. 216-14 Ex. 12 ('089 registration), ECF No. 216-18 Ex. 16 ('707 registration), ECF No. 216-23 Ex. 21 ('707 registration substitute specimen.) Each application provides photographs of the booths and declares that the booths **[**88]** are point-of-sale presentations. (*Id.*) A registrant's application showing use of the specimens in a trade show booth and declaration explaining the circumstances of that use is sufficient to show that the "applicant's use is a 'display associated' with the goods." *In re Shipley Co., Inc.*, 230 U.S.P.Q. 2d (BNA) at 694. Defendants do not contend that these declarations were fraudulent and there is no basis for this Court to look beyond them now.

Second, Defendants' contention runs counter to their burden to "strictly prove" abandonment. It is not Marketquest's burden to disprove allegations of abandonment that lack an evidentiary basis. All Defendants provide this Court to meet their burden is speculation that "it is highly unlikely that any actual sales of products . . . were made from the booths." (ECF No. 216-1 at 15.) This speculative assertion, uncorroborated by evidence, cannot meet their burden now or at trial. In contrast, Marketquest has submitted evidence showing that its sales representatives attend the trade shows and Marketquest conducts sales transactions at the booths. (ECF No. 205-19 Ex. C.9 (photographs of trade show booths with samples of products for sale); ECF No. 258-7 Cohen Decl. ¶¶5, 7.) Based on the undisputed evidence, the **[**89]** Court

concludes that Marketquest's trade show booth displays, which associate the marks with the relevant goods, constitute point-of-sale displays that qualify as use in commerce.

### c. Catalog Uses

Defendants challenge Marketquest's use of the marks in its catalogs. Defendants concede that "[a]t various times Marketquest has displayed all five marks in its printed catalogs . . ." (ECF No. 216-1 at 12.) Yet Defendants contend these uses are insufficient because the catalogs lack direct order forms. (ECF No. **[*1287]** 279 at 7-8.) The Court rejects Defendants' challenge.

Catalog uses of a mark can qualify as use in commerce for goods if the catalog includes "a prominent display of the alleged mark with the product" and is "point of sale [in] nature." *Lands' End, Inc., 797 F. Supp. at 514*; *see also Menashe v. V Secret Catalogue, Inc., 409 F. Supp. 2d 412, 424 (S.D.N.Y. 2006)*. It is not necessary for the catalog to show the mark imprinted on the product. *See Lands' End Inc., 797 F. Supp. at 511* (the mark "KETCH" for purses was used in a catalog with a picture of the purses with the mark situated below). The PTO has taken the position that catalog use of a mark qualifies as a display associated with the goods so long as the catalog (1) includes a picture of the goods, (2) the trademark is sufficiently near the picture such that the mark is associated **[**90]** with the goods, and (3) information necessary to order the goods is provided. *See* T.M.E.P. §904.03(h) (2013); *see also In re Sones, 590 F.3d 1282, 1285-86 (Fed. Cir. 2009)* (recognizing PTO's elaboration of test for when a catalog constitutes a specimen showing use of a mark in commerce for goods). While the TEMP "is not established law," it is instructive. *See In re Sones, 590 F.3d at 1288* (citing *In re Pennington Seed, Inc., 466 F.3d 1053, 1059 (Fed Cir. 2006))*.

Here, Marketquest's catalog uses of the marks easily satisfy this standard. In particular, the record shows that All in One and THE WRITE CHOICE marks appear on the same page as the products with which they are associated in the mark registrations. (ECF No. 205-12 Ex. C.2; ECF No. 216-3 Ex. 1; ECF No 254 Ex. 27.) Contrary to Defendants' assertion that a catalog must provide a "direct order" format, all that is required is adequate information for placing orders for the goods. Adequacy is measured based on "whether the purported point-of-sale display provides the potential purchaser with the information normally associated with ordering

Case 1:23-cv-21347-JEM Document 24-4 Entered on FLSD Docket 12/11/2023 Page 200 of 255

Page 31 of 42

316 F. Supp. 3d 1234, *1287; 2018 U.S. Dist. LEXIS 98674, **90

products of that kind." *In re Anpath Grp., Inc., 95 U.S.P.Q. 2d (BNA) at 1381, 2010 TTAB LEXIS 130*. As Defendants recognize (ECF No. 216-1 at 13), the catalogs expressly direct consumers to "contact your distributor" to place an order. (ECF No. 216-3 Ex. 1, ECF No. 216-4 Ex. 2; *see also e.g.*, ECF No. 205-12 C.2 at MQ.02615, MQ.02714, **[\*\*91]** MQ.02814; ECF No 254 Ex. 27.) While Defendants fault Marketquest for the absence of an order form with the catalog, Marketquest provides uncontroverted evidence regarding how promotional products are ordered: the nature of the promotional products industry supply chain in which distributors order from suppliers, like Marketquest, and in turn sell to end purchasers. (ECF No. 258-7 P4; ECF No. 259 at 15 n.15.) Defendants' own expert, H. Wingfield Hughes, testified as to this relationship between suppliers, distributors, and end-consumers in the industry, expressly observing that "it is not the norm for a supplier to sell directly to an end user." (ECF No. 205-45 Ex. I.3 at 86:9-18; 89:16-17.) Given the undisputed facts and in view of the applicable standard, the Court finds that Marketquest's catalog uses are sufficient to defeat Defendants' abandonment counterclaims.

### d. Website Uses

Defendants concede that "Marketquest uses the 'All-in-One' and 'The Write Choice' marks on its website," but contends that these uses are insufficient because Marketquest "does not offer any 'All-in-One' or 'The Write Choice'-branded products carrying those marks." (ECF No. 216-1 at 11.) Defendants' challenge **[\*\*92]** to Marketquest's website uses is fundamentally at odds with the evolution of trademark law to embrace website uses of marks as acceptable displays associated with goods.

**[\*1288]** A website use of a mark constitutes a use in commerce for goods when the use "in some way evince[s] that the mark is '*associated*' with the goods and serves as an indicator of course." *In re Sones, 590 F.3d at 1288* (emphasis added); *In re Dell Inc., 71 U.S.P.Q. 2d (BNA) 1725, 1727, 2004 TTAB LEXIS 442 (T.T.A.B. 2004)* (recognizing that "[i]n today's commercial environment," "[w]eb pages which display goods and their trademarks and provide for the on-line ordering of such goods are, in fact, electronic displays which are associated with the goods."); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §16:32.70 (5th ed. 2018) (same). Although a website display showing a product branded with the mark is one form of showing association, so is a visual depiction of the mark near the goods. *In re Sones, 590 F.3d at 1288*; *Lands' End, Inc., 797 F. Supp. at 514*. But even on this point, there is no bright line rule that a website must contain a picture of the goods in order to satisfy the use in commerce requirement. *See In re Sones, 590 F.3d at 1288-89*. Here, Marketquest's website uses of the marks display the All in One marks and THE WRITE CHOICE prominently near the goods for which the marks are registered. (ECF No. 216-21 Ex. 19.) Thus, Marketquest's website uses of the marks satisfy **[\*\*93]** this requirement.

In addition to associating a mark with the goods, a website must provide information necessary to order the goods. *See In re Dell Inc.*, 71 U.S.P.Q. 2d (BNA) 1725, 1727 (T.T.A.B. 2004); T.M.E.P. §904.03(i). Defendants argue that Marketquest's website uses fail this requirement because there is no virtual cart to buy the goods offered, as with Amazon. (ECF No. 279 at 7.) But the requirement to provide information necessary to order the goods is not limited to the availability of a virtual shopping cart. The very provision of the T.M.E.P. on which Defendants rely indicates five means by which a website can provide ordering information any one of which may be sufficient to constitute use in commerce. These means include: "[1] a sales order form to place an order, an online process to accept an order, such as 'shopping cart' functionality, or special instructions on how to order; [2] information on minimum quantities; [3] indication of methods of payment; [4] information about shipment of the goods; *and/or* [5] means of contacting the applicant to place an order." T.M.E.P. §904.03(i)(C) (emphasis added); *see also In re Anpath Grp., 95 U.S.P.Q. 2d (BNA) 1377, 1381, 2010 TTAB LEXIS 130 (T.T.A.B. 2010)*; *In re Quantum Foods, Inc., 94 U.S.P.Q. 2d (BNA) at 1379, 2010 TTAB LEXIS 85*. As the very evidence submitted by the Defendants shows, Marketquest's website expressly provides detailed information regarding how to order **[\*\*94]** the goods associated with the marks. (ECF No. 216-21 Ex. 19.) Marketquest also presents evidence showing that its distributors—the immediate consumers of its promotional products—have a secure login necessary to purchase goods from its website. (ECF No. 258-7 Cohen Decl. ¶4.) Given the undisputed facts and in view of the applicable standard, the Court finds that Marketquest's website uses are sufficient to defeat Defendants' abandonment counterclaims

Based on the foregoing, the Court finds that Defendants have failed to raise any triable issues of fact regarding

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 201 of 255

Page 32 of 42

316 F. Supp. 3d 1234, *1288; 2018 U.S. Dist. LEXIS 98674, **94

whether Marketquest's provision of sample goods, trade show booth displays, catalog uses, and website uses constitute use in commerce under the Lanham Act.

## 2. Abandonment Challenges to Particular Registrations

In addition to their general abandonment challenges to Marketquest's uses of the marks, Defendants assert particularized abandonment challenges to the All in One marks in the '417 and '333 registrations. Both challenges lack merit.

### [*1289]  a. All in One Line '417 Registration

First, Defendants argue that All in One line mark '417 registration has been abandoned because discovery has produced no evidence of any type of use of the mark [**95] in the three years preceding their cross-motion. (ECF No. 216-1 at 4.) They argue that the mark has only been used in Marketquest's domain name, www.allinoneline.com, which does not qualify as trademark use. (ECF No. 216-1 at 4-6.) Plaintiff argues that to establish abandonment of the '417 registration, Defendants must show that Marketquest has abandoned each form of its All in One marks. (ECF No. 259 at 6.) Plaintiff's argument prevails as a matter of law.

It is true that "the use of a website address containing a trademark is not the same as use of the mark," particularly because it is generally used to identify the online location of a company's products or services. *Specht v. Google, 758 F. Supp. 2d 570, 591 (N.D. Ill. 2010)*; *In re Eilberg*, 49 U.S.P.Q. 2d (BNA) 1955, 1956 (T.T.A.B. 1998). But Marketquest does not contend that its website domain name qualifies as a use in commerce of the All in One line mark, nor does the '417 registration identify Marketquest's domain name. (ECF No. 205-3 RFJN Ex. A; ECF No. 259 at 11.) Defendants raise a point to an issue that simply does not exist here.

More fundamentally, Defendants' challenge to the '417 registration disregards Marketquest's continuous use of the most salient feature of the mark in every All in One mark at issue in this case. Defendants emphasize [**96] the word "line" in the '417 registration and assert that it creates a commercial impression different from the impressions created by the other All in One marks. (ECF No. 279 at 9.). The Court recognizes that "a change of format which alters the overall commercial impression of a mark" may provide the

basis for an abandonment challenge. *See Iowa Health Sys. v. Trinity Health Corp., 177 F. Supp. 2d 897, 923 (N.D. Iowa 2001)* ("'[I]mproper tacking' can be, but is not necessarily, a species of 'abandonment' that could result in cancellation of a [registration of a] mark . . . if the 'improper tacking' also is shown to satisfy the elements of 'abandonment'. . . "); 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition §17:26 (5th ed. 2018). The Court also recognizes that modifications to a mark are more likely to create a different commercial impression when the modification pertains to a *different* type of good or service. *See, e.g. Am. Paging, Inc. v. Am. Mobilephone, Inc.*, 13 U.S.P.Q. 2d (BNA) 2036, 1989 TTAB LEXIS 48 (T.T.A.B. 1989), *aff'd by, 17 U.S.P.Q. 2d (BNA) 1726 (Fed. Cir. 1990)* ("Customers who simply saw the mark AMERICAN MOBILPHONE and design and who simply utilized registrant's mobile phone services, would not know they were dealing with a company that also rendered paging services . . . [T]he mark AMERICAN MOBILPHONE PAGING and design conveys more information to potential customers than does [**97] the mark AMERICAN MOBILPHONE and design.").

But trademark law also recognizes that "[a] mark can be modified or changed without abandonment . . . if done in such a way that the continuing common element of the mark retains its impact and symbolizes a continuing commercial impression." *Id.* Courts do not construe a mark modified in such a manner to have been abandoned, particularly when it is applied to the *same* goods or services. *See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 955 (7th Cir. 1992)* (rejecting argument that plaintiff had abandoned right to use of "THIRST AID" by not using the full phrase originally registered because "the owner continue[d] use of the 'key element' of the registered mark"); *Puritan Sportswear Corp. v. [*1290] Shure, 307 F. Supp. 377 (W.D. Pa. 1969)* (change from PURITAN SPORTSWEAR, THE CHOICE OF ALL AMERICANS to PURITAN was not abandonment); *Am. Sec. Bank v. Am. Sec. & Tr. Co., 571 F.2d 564 (C.C.P.A. 1978)* (determining that when used for banking services, the marks AMERICAN SECURITY and AMERICAN SECURITY BANK are legal equivalents because "customers using the services would know they were dealing with a bank."). In determining whether there is a continuing commercial impression, a court may consider the design of the marks. *See Pro-Cuts v. Schilz-Price Enters., Inc.*, 27 U.S.P.Q. 2d (BNA) 1224, 1227 (T.T.A.B. 1993) (considering design features of "confusingly similar" marks to assess whether they were "legal equivalents").

316 F. Supp. 3d 1234, *1290; 2018 U.S. Dist. LEXIS 98674, **97

Here, the '417 **[\*\*98]** registration contains the same salient feature as the later in time '089 registrations, specifically the "All in One" phrase. The record shows that between 1999 and 2001 Marketquest used "All in One Line" with the stylization applicable to the mark appearing in the later '089 registration. The only difference is that the word "the" precedes "All in One" and the word "line" appears thereafter, both in smaller lettering and set off from "All in One." (*Compare* ECF No. 216-4 Ex. 2 at 1 (1999 catalog), *id.* at 4 (2000 catalog), *id.* at 6 (2001 catalog) *with* ECF No. 205-5 Ex. C ('089 registration certificate).) In 2002, Marketquest dropped "the" and "line," but retained the same stylization. The change appears as follows:



(ECF No. 216-4 Ex. 2 at 1 (excerpt from 1999 Catalog).)



(ECF No. 216-4 Ex. 2 at 8 (excerpt from 2002 Catalog).)

Nearly each iteration of the "All in One" mark on the front cover of the catalogs in 2002 and thereafter contains the salient feature of the '417 registration and its stylization. (*See generally* ECF No. 216-4 Ex. 2.) The record also shows that the goods classes in the '417 registration appear in the '089 registration, which was registered on October 10, 2006. (*Compare* ECF No. 205-3 RFJN Ex. A ('417 registration) **[\*\*99]** *with* ECF No. 205-5 RFJN Ex. C ('089 registration).) This confirms to the Court that, at a minimum, the '089 registration is a continuing commercial impression of the salient feature of the '417 registration, as applied to goods. Because Marketquest has continuously used the **[\*1291]** most salient feature of the '417 registration, the Court rejects Defendants' abandonment challenge to that registration.

### b. All in One '333 Registration

Defendants argue that the All in One mark '333 registration has been abandoned for lack of use in the three years preceding their motion by relying on (1) their rejected arguments regarding the sufficiency of

Marketquest's uses and (2) May 3, 2012 testimony from Marketquest's *Rule 30(b)(6)* deponent, Stephanie Mills, that Marketquest no longer intended to use the logo. (ECF No. 216-1 at 6; ECF No. 226-5 Ex. 3 at 188:18-189:17).) This argument has no merit now that the Court has rejected the first premise. As Defendants have failed to show non-use, Defendants' reliance on Mills' testimony as proof that Marketquest intended not to resume use of the '333 mark is irrelevant because intent never comes into play if non-use has not been shown. *See Electro Source, LLC, 458 F.3d at 937-38* ("[U]nless the trademark use is actually **[\*\*100]** terminated, the intent not to resume use prong of abandonment does not come into play."); *KeyCorp. v. Key Bank Tr., 99 F. Supp. 2d 814, 827 (N.D. Ohio 2000)* ("When an owner of a mark announces an intention to cease using the mark, but fails to actually do so, there is no abandonment . . ."). Accordingly, the Court rejects Defendants' particularized challenge to the '333 registration.

### 3. Void *Ab Initio* Challenges

Having determined that Defendants' abandonment counterclaims cannot survive summary judgment, the Court turns to Defendants' void *ab initio* challenge. This challenge is premised on the erroneous notion that Marketquest's uses of the marks, as shown in the specimens with the applications for registration and renewal of the marks, did not qualify as uses in commerce.

A court may cancel a registration under *Section 1119* of the Lanham Act as void *ab initio* and a third party may seek to cancel a registration on that basis under *Section 1064*. *15 U.S.C. §§1064*; *1119*. Such a challenge is based on the notion that the application for the registration of the mark did not comply with the statutory requirements to register a mark. *See Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350 (Fed. Cir. 2009)*. Among the requirements the Lanham Act imposes to register a mark are its "use in commerce." *15 U.S.C. §§1051* (trademark), 1053 (service mark).[31] Because use is a predicate to the **[\*\*101]** acquisition of trademark rights,

---

[31] Alternatively, an applicant may seek registration of a mark based on a "bona fide intention to use" the trademark. *See 15 U.S.C. §1051(b)*; *Aycock Eng'g, Inc., 560 F.3d at 1357-58*. None of Marketquest's marks were registered in that manner and Defendants do not challenge the registrations on this basis.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 203 of 255

Page 34 of 42

316 F. Supp. 3d 1234, *1291; 2018 U.S. Dist. LEXIS 98674, **101

"[t]he registration of a mark that does not meet the use requirement is void *ab initio*." *Aycock Eng'g, Inc., 560 F.3d at 1357*; *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *10*; *Adidas Am., Inc. v. Calmese, No. 08-CV-91-BR, 2010 U.S. Dist. LEXIS 123386, 2010 WL 4861444, at *2 (D. Or. Nov. 19, 2010)*. A void *ab initio* challenge functions as a means of cancelling a registration in whole or in part even when there has been no showing of fraudulent conduct. *See Quia Corp. v. Mattel, Inc., No. C 10-1902-JF-HRL, 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *10 (N.D. Cal Jul. 14, 2011)* (citing *Grand Canyon West Ranch LLC v. Hualapi Tribe*, 78 U.S.P.Q. 2d (BNA) 1696, 2006 TTAB LEXIS 82 (T.T.A.B. 1985)).

Marketquest contends that BIC Corp.'s abandonment challenges, which incorporate void *ab initio* challenges, are "novel"—perhaps suggesting that this purported novelty should deter the Court from entertaining the challenges. The Court acknowledges that the void *ab initio* challenges are uneasily stitched into the abandonment counterclaims given that **[*1292]** abandonment presupposes that a mark was valid at some prior point. Yet, the Court also recognizes that both sets of challenges, as presented by Defendants here, are based on the same thread of legal reasoning, *i.e.* a lack of "proper" use in commerce. Thus, setting aside the fact that Defendants failed to plead void *ab initio* grounds for cancellation of the registrations anywhere in the Answer, the Court will consider the challenges.

Defendants' void *ab initio* challenges necessarily fail given that the Court **[**102]** has rejected the severely restrictive view of use in commerce on which they are premised. Furthermore, Defendants' void *ab initio* challenges to the All in One '967 and '417 registrations fail for the independent reason that they are barred. Because these registrations are incontestable, they are statutorily subject to a limited set of challenges. *See 15 U.S.C. §§1065*; *1115(b)*. Void *ab initio* challenges are conspicuously absent from the list of statutory defenses to an incontestable registration under *Section 1115(b)*. They are also absent from *Section 1064*, which means courts lack jurisdiction to cancel a registration under *Section 1119* based on a void *ab initio* challenge. *See NetJets Inc. v. IntelliJet Grp., LLC, 678 Fed. App'x 343, 350 (6th Cir. 2017)* ("*Section 1064* bars [a defendant] from bringing a claim that [a plaintiff's] mark is void *ab initio*" for lack of use with respect to an incontestable registration). Thus, Defendants' void *ab initio* challenges to the All in One '967 and '417 registrations fail for this additional reason.

Based on the record, Marketquest has shown by a totality of the circumstances its use of the marks in commerce and Defendants cannot meet their burden at trial to strictly prove abandonment. Accordingly, the Court grants summary judgment to Plaintiff on all of Defendants' abandonment counterclaims **[**103]** and related affirmative defense.

## E. Statute of Limitations and Laches

Defendants' tenth affirmative defense contends that all of Plaintiff's claims are barred due to the statute of limitations. (ECF No. 17 at. 8.) Relatedly, Defendants' sixth affirmative defense contends that all of Plaintiff's claims are barred based on the doctrine of laches. (*Id.* at 7.) Marketquest moves for summary judgment against both defenses on the ground that it filed the instant action within the applicable statute of limitations. Because these two defenses are related, the Court addresses them together and agrees that Marketquest is entitled to summary judgment.

The Lanham Act contains no statute of limitations and so federal courts borrow statute of limitations from analogous state law. *See Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc., 603 F.3d 1133, 1140 (9th Cir. 2010)*; *Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 836 (9th Cir. 2002)*. The Ninth Circuit has applied California's three-year statute of limitations in *California Civil Procedure Code Section 338(d)* applicable to fraud claims or the four-year statute of limitations in *California Business and Professions Code Section 17208* applicable to state law trademark infringement actions. *See Derek & Constance Lee Corp. v. Kim Seng Co., 391 Fed. App'x 627, 628 n.1 (9th Cir. 2010)* (referring to both statutes of limitations as analogous); *Internet Specialties W., Inc. v. Milon-Digiorgio Enters., 559 F.3d 985, 990 & n.1 (9th Cir. 2009)* (agreeing the four-year limitations period from California trademark infringement law is appropriate); *DC Comics v. Towle, 989 F. Supp. 2d 948, 971-72 (C.D. Cal. 2013)* (applying four-year statute of limitations).

In this **[**104]** case, the Court finds that California's four-year statute of limitations for trademark infringement governs. Marketquest **[*1293]** timely filed suit within that period. Whereas Defendants' alleged infringement began to occur in December 2010, Plaintiff brought suit in March 2011. (*Compare* ECF No. 33-1 at 3, 33-3 *and* 33-4 *with* ECF No. 1.) Based on this undisputed evidence, the Court grants Plaintiff's motion for summary judgment on Defendants' affirmative

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 204 of 255

Page 35 of 42

316 F. Supp. 3d 1234, *1293; 2018 U.S. Dist. LEXIS 98674, **104

defense of statute of limitations.

Marketquest is similarly entitled to summary judgment on laches for this reason. "Laches is an equitable defense to Lanham Act claims," "which can defeat an otherwise valid claim under the Lanham Act." *Internet Specialties W., Inc., 559 F.3d at 989*; *Jarrow Formulas, Inc., 304 F.3d at 835*. The defense, however, is not a favored one in trademark cases because "the overriding interest at stake is that of avoiding public confusion." *E. & J. Gallo Winery v. Pasatiempos Gallo, S.A., 905 F. Supp. 1403, 1414 (E.D. Cal. 1994)*; *E. & J. Gallo Winery v. Gallo Cattle Co*, 12 U.S.P.Q. 2d (BNA) 1657, 1676 (E.D. Cal. 1989). The test for laches involves two factors: (1) whether the plaintiff unreasonably delayed in bringing suit and (2) whether the defendant was prejudiced by that delay. *Internet Specialties W., Inc., 559 F.3d at 990*. The relevant delay starts when the plaintiff knew or should have known of the alleged infringing conduct. *Danjaq LLC v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2001)*. In assessing delay, a court "must first decide whether [the plaintiff] filed suit within [**105] the applicable" statute of limitations period. *Internet Specialties W., Inc., 559 F.3d at 990* (citing *Tillamook Country Smoker, Inc., 465 F.3d at 1108*); *Jarrow Formulas, Inc., 304 F.3d at 838*. When a plaintiff has filed suit within that time period, "the strong presumption is that laches is inapplicable." *Au-Tomotive Gold Inc., 603 F.3d at 1140*; *Internet Specialties W., Inc., 559 F.3d at 990*; *Bauer Bros., LLC v. Nike, Inc., 159 F. Supp. 3d 1202, 1216 (S.D. Cal. 2016)*.

Here, because Marketquest filed its suit within the applicable statute of limitations, its suit against Defendants is not barred by laches. *Bauer Bros., LLC, 159 F. Supp. 3d at 1216-17* (granting summary judgment on laches defense when case was filed within applicable statute of limitations). Accordingly, the Court grants summary judgment to Plaintiff on Defendants' laches defense.

## F. Acquiescence

Defendants' second affirmative defense contends that all of Plaintiff's claims are barred based on the doctrine of acquiescence. (ECF No. 17 at 7.) Marketquest moves for summary judgment on the ground that Defendants have no evidence to support this defense. The Court agrees.

It is in the trial court's discretion to determine whether acquiescence applies in a given case. *Wallack v. IDEXX*

*Laboratories, Inc., No. 11-cv-2996-PC-KSC, 2015 U.S. Dist. LEXIS 139302, 2015 WL 5943844, at *14 (S.D. Cal. Oct. 13, 2015)* (citing *Seller Council, 621 F.3d at 986*). The elements of an acquiescence defense are that: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; [**106] and (3) the delay caused the defendant undue prejudice. *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 67 (2d Cir. 2002)*; *Eliminator Custom Boats v. Am. Marine Holdings, Inc., No. ED CV 06-15-VBP (Ex), 2007 U.S. Dist. LEXIS 96414, 2007 WL 4978243, at *6 (C.D. Cal. Nov. 5, 2007)*. Acquiescence is "closely related" to laches because "[f]indings of delay and prejudice are central to both . . ." *Profitness Physical Therapy Ctr., 314 F at 67*; *see also Seller Agency Council v. Kennedy Ctr. for Real Estate Educ., Inc., 621 F.3d 981, 988 (9th Cir. 2010)*. However, [*1294] "[t]he distinguishing feature of the acquiescence defense is the element of *active* or *explicit* consent to the use of an allegedly infringing mark." *SunAmerica Corp. v. Sun Life. Assurance Co., 77 F.3d 1325, 1344 (11th Cir. 1996)* (emphasis in original); *see also Seller Agency Council, 621 F.3d at 989* (same). Thus, the defense "may be employed 'only in those cases where the trademark owner, by affirmative word or deed' conveys its consent to another with respect to use of the trademark." *Express Diagnostics Int'l, Inc. v. Tydings, No. C 06-01346 JW, 2009 U.S. Dist. LEXIS 5754, 2009 WL 111736, at *6 (N.D. Cal. Jan. 15, 2009)* (quoting *Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002))*.

Marketquest asserts that Defendants' acquiescence defense fails to the same extent as the laches defense and because Defendants cannot show that Marketquest affirmatively acted to induce the belief that it had abandoned its infringement claims or consented to Defendants' uses of the marks. (ECF No. 205-1 at 24.) On this last point, Marketquest reiterates that because it brought suit "only a few months after [Defendants] first began using AIO's Marks to compete with AIO," Defendants can neither [**107] show affirmative conduct, nor reliance. (*Id.*) Defendants allege no basis for an acquiescence defense in their Answer, nor do they identify any affirmative conduct by Marketquest that could provide a foundation for an acquiescence defense. (ECF No. 254 at 24-25.) Moreover, to the extent acquiescence focuses on delay by the plaintiff, Defendants' failure on the laches defense dooms their acquiescence defense. *E. & J. Gallo Winery, 905 F. Supp. at 1414*. Marketquest is entitled to summary

316 F. Supp. 3d 1234, *1294; 2018 U.S. Dist. LEXIS 98674, **107

judgment.

## G. Waiver

Defendants' seventh affirmative defense contends that all of Plaintiff's claims are respectively barred by waiver. (ECF No. 17 at 7.) Marketquest moves for summary judgment on the ground that Defendants have **[*1295]** no evidence to support this defense. The Court agrees.

Waiver is a defense to trademark infringement, which "emphasizes the mental state of the actor." *See Yoshida v. Liberty Mut. Ins. Co., 240 F.2d 824, 829 (9th Cir. 1957); Kelley Blue Book v. Car-Smarts, Inc., 802 F. Supp. 278, 291 (C.D. Cal. 1992)*. It is the "intentional relinquishment of a known right with knowledge and the intent to relinquish it." *United States v. King Features Entm't, 843 F.2d 394 (9th Cir. 1988); Adidas Am., Inc., 546 F. Supp. 2d at 1074*. Waiver may be found when a party either expressly relinquishes the right or engages in "conduct inconsistent with an intent to enforce that right." *Saverslak v. Davis-Cleaver Produce, Co., 606 F.2d 208, 213 (7th Cir. 1979)*. To apply in a given case, "waiver must be manifested in an unequivocal manner." *Duncan v. Office Depot, 973 F. Supp. 1171, 1177 (D. Or. 1997); see also Groves v. Prickett, 420 F.2d 1119, 1125 (9th Cir. 1970)*. Here, Defendants **[**108]** have proffered no evidence of a "clear, decisive, and unequivocal" intent by Marketquest to relinquish its right to claim infringement of the All in One marks or THE WRITE CHOICE. Because Marketquest sought to enforce its rights shortly after Defendants began their alleged infringement, the Court finds that it is undisputed that Marketquest in fact did not waive its right to claim infringement. The Court grants summary judgment to Plaintiff on the waiver defense.

## H. Estoppel

Defendants' eighth affirmative defense contends that all of Plaintiff's claims are barred by estoppel. (ECF No. 17 at 7.) Marketquest moves for summary judgment on the ground that Defendants have no evidence to support this defense. The Court agrees.

"[E]stoppel is any conduct, express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law. It is grounded not on subjective intent but rather on the objective impression created by the actor's conduct." *Yoshida, 240 F.3d at 829; see also Adidas*

*Am., Inc., 546 F. Supp. 2d 1029 at 1075*. To prevail on a defense of estoppel, Defendants must show that: (1) Marketquest knew Defendants were potentially infringing the All in One and THE WRITE CHOICE marks; (2) **[**109]** Marketquest's actions or failure to act led Defendants to reasonably believe that Marketquest did not intend to enforce its trademark rights against Defendants; (3) Defendants did not know that Marketquest actually objected to its potential infringement of the marks; and (4) due to their reliance on the Marketquest's conduct, Defendants will be materially prejudiced if Marketquest is allowed to proceed with its claims. *See Lehman v. United States, 154 F.3d 1010, 1016 (9th Cir. 1998); see also 3M Co. v. Rollit, LLC, No. C 06-01225-JW, 2008 U.S. Dist. LEXIS 123592, 2008 WL 8820473, at *5 (N.D. Cal. May 14, 2008)*. "Where any one of the elements of equitable estoppel is absent, the claim must fail." *Am. Cas. Co. v. Baker, 22 F.3d 880, 892 (9th Cir. 1994)*.

Here, Defendants identify no conduct of Marketquest that could support an estoppel defense, nor can the Court identify any conduct in the record. At a minimum, the Court finds that the defense is defeated by the fact that Marketquest brought suit shortly after Defendants began the conduct allegedly infringing Marketquest's marks. The Court grants summary judgment to Plaintiff.

## I. Unclean Hands

Defendants' ninth affirmative defense asserts that all of Plaintiff's claims are barred based on the doctrine of unclean hands. (ECF No. 17 at 7.) Marketquest moves for summary judgment on the ground that Defendants have no evidence to support **[**110]** this defense. The Court agrees.

Unclean hands is an equitable doctrine that "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir. 1989)*. To prevail on a defense of unclean hands, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Brother Records, Inc. v. Jardine, 318 F.3d 900, 909 (9th Cir. 2003)*. "[C]ourts require clear, convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands." *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004); TrafficSchool.com, Inc. v. Edriver, Inc.,*

316 F. Supp. 3d 1234, *1295; 2018 U.S. Dist. LEXIS 98674, **110

653 F.3d 820, 833 (9th Cir. 2011) (approving of clear and convincing evidence standard). The defense is unavailable when the defendant has failed to identify any evidence showing inequitable conduct. Here, Defendants' unclean hands defense fails because the Court has granted summary judgment to Plaintiff on the only allegedly inequitable conduct identified by Defendants, *i.e.*, the alleged fraudulent procurement of certain registrations. Accordingly, the Court grants summary judgment to Plaintiff on this defense.

### J. Trademark Misuse

Defendants' seventeenth affirmative defense asserts that Plaintiff's claims are barred by trademark **[**111]** misuse. (ECF No. 17 **[*1296]** at 9.) Marketquest seeks summary judgment on the ground that trademark misuse is not a recognized legal basis for cancellation of registration. (ECF No. 205-1 at 20-21.) Defendants oppose summary judgment on the ground that trademark misuse is a recognized defense. (ECF No. 310 at 24.)

Marketquest's argument that trademark misuse is not a recognized legal basis for cancellation of a mark is premised on *eCash Techs., Inc. v. Guagliardo, 35 Fed. App'x 498 (9th Cir. 2002)*. In that case, the appellant challenged dismissal of his counterclaim for cancellation of the appellee's federal trademark registration on the ground that appellee had misused its trademark by seeking to enforce it beyond the scope of the rights granted. *Id. at 500*. The Ninth Circuit rejected this challenge on the ground that "[a]ppellant does not challenge the trademark's appropriateness for registration and does not provide any legal authority showing that its 'trademark misuse' theory is a recognized basis for trademark cancellation." A close reading of the case reveals that the Ninth Circuit did not foreclose trademark misuse as a *defense*, but rather challenged the particular assertion of trademark misuse raised in the case as an *affirmative claim* for relief. See **[**112]** *id.* (citing *Helene Curtis Indus., Inc. v. Milo Corp. & Micro Beauty Products Co., No. 84 C 5217, 1985 U.S. Dist. LEXIS 23870, 1985 WL 1282, at *3 (N.D. Ill. May 2, 1985)* (rejecting trademark misuse theory based on overextending trademark rights as a ground for trademark cancellation)).

Defendants observe that they raise a defense of trademark misuse, not an affirmative counterclaim. Trademark misuse can be a proper *defense* to trademark infringement claims. *See James R. Glidewell*

*Dental Ceramics v. Keating Dental Arts, Inc., No. SACV 11-1309-DOC(ANx), 2013 U.S. Dist. LEXIS 24824, 2013 WL 655314, at *11 (C.D. Cal. Feb. 21, 2013)*; *Dunn Computer Corp. v. Loudcloud, Inc., 133 F. Supp. 2d 823, 830, 259 B.R. 472 (E.D. Va. 2001)* ("Trademark misuse is not an independent cause of action, but is, instead, only an affirmative defense to a trademark infringement claim."); *Juno Online Servs. v. Juno Lighting, Inc., 979 F. Supp. 684, 687-88 (N.D. Ill. 1997)*; *see also* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §31:44 (5th ed. 2018) ("Unclean hands, or trademark misuse, is purely an affirmative defense and does not form the basis for an affirmative claim for recovery."). As a defense, courts have recognized trademark misuse in (1) situations in which the mark is being used to violate the antitrust laws and (2) as a variation of the unclean hands doctrine even when no antitrust violation has been alleged. *Juno Online Servs., 979 F. Supp. at 688*; *see also Adidas Am., Inc. 546 F. Supp. 2d at 1078-79*.

Although Defendants' trademark misuse defense is proper as a procedural matter, courts have found that a trademark misuse defense is superfluous when the defendant has asserted unclean **[**113]** hands. *See Desert European Motorcars, Ltd. v. Desert European Motorcars, Inc., EDCV 11-197 RSWL (DTBx), 2011 U.S. Dist. LEXIS 96154, 2011 WL 3809933, at *8 & n.1 (C.D. Cal. Aug. 25, 2011)* (striking trademark misuse as an affirmative defense when defendant had already pleaded unclean hands given that "trademark misuse concerns the alleged misconduct of the plaintiff with regard to its trademark, and as such, like the defense of unclean hands, this defense is based on Plaintiff's alleged past misconduct"); *1-800 Contacts, Inc. v. Mem'l Eye, P.A., No. 2:08-cv-983 TS, 2010 U.S. Dist. LEXIS 131790, 2010 WL 5149269, at *4 (D. Utah Dec. 13, 2010)* ("[T]rademark misuse is generally viewed as another term for uncle[a]n hands."); *cf. Nw. Corp. v. Gabriel Mfg. Co., No. 95 C 2004, 1998 U.S. Dist. LEXIS 12763, 1998 WL 525431, at *7 (N.D. Ill. Aug. 19, 1998)* (observing that "the trademark misuse defense will permit the court to exercise its equitable powers any deny **[*1297]** enforcement of [a] trademark"). Because the Court has granted summary judgment to Marketquest on Defendants' unclean hands defense and Defendants identify no other inequitable conduct related to the marks at issue in this case, Marketquest is entitled to summary judgment on this defense.

### K. Nominative Fair Use

316 F. Supp. 3d 1234, *1297; 2018 U.S. Dist. LEXIS 98674, **113

Defendants' twentieth affirmative defense asserts that Plaintiff's claim are barred because any use was a nominative fair use. (ECF No. 17 at 9.) **[\*\*114]** Marketquest moves for summary judgment on the ground that Defendants have no evidence they used Marketquest's marks for comparison purposes and Defendants' fair use defense is incompatible with nominative fair use. (ECF No. 205-1 at 20.) The Court finds that Marketquest is entitled to summary judgment.

To establish a nominative fair use defense, the defendant must prove three elements: (1) the [plaintiff's] product or service in question must be one not readily identifiable without use of the trademark; (2) only so much of the mark or marks may be used as is reasonably necessary to identify the [plaintiff's] product or service; and (3) the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. *New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992)).* In contrast to nominative fair use, the classic fair use defense applies when "a defendant has used the plaintiff's mark only to describe his own product, and not at all to describe the plaintiff's product." *Cairns v. Franklin Mint Co., 292 F.3d 1139, 1151 (9th Cir. 2002)* (emphasis omitted). Nominative fair use is different from classic fair use because "[a] court may find classic fair use despite 'proof of infringement,'" whereas "nominative fair use . . . represents a finding of no liability" **[\*\*115]** for trademark infringement. *Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1183 n.11 (9th Cir. 2010).* Whereas a classic fair use analysis complements the likelihood of customer confusion analysis set forth in *Sleekcraft*, a nominative fair use analysis replaces the *Sleekcraft* analysis entirely. *Cairns, 292 F.3d at 1150.*

Marketquest asserts that Defendants have no evidence that they used Marketquest's marks for the purposes of comparison under nominative fair use, but rather submit evidence to show classic fair use. Indeed, as part of the fair use defense, Defendants' employees have testified that they used the phrases, which Marketquest contends were its marks, to describe their own offerings. (ECF No. 205-22 Lane Decl. ¶¶89-91, Exs. P.4, BR.2, BS.) Moreover, the entire premise of two summary judgment motions filed by BIC USA and Norwood is that Defendants' uses were fair under the classic fair use doctrine, not that they were nominative uses. (ECF Nos. 214, 215.) At this stage of the proceedings, the Court finds that the normative fair use defense pleaded in the Answer is incompatible with the class fair use defense on which Defendants evidently intend to rely at trial and

for which they have amassed evidence. Accordingly, the Court grants summary judgment to Marketquest on this **[\*\*116]** defense.

## L. Damages

In the FAC, Marketquest generally seeks to recover all damages sustained based on Defendants' conduct and specifically seeks an accounting of Defendants' profits and recovery of profits under an unjust enrichment theory. (FAC at 10.) In opposing summary judgment on damages, Marketquest clarifies that it further seeks (1) a reasonable licensing or royalty fee, or (2) compensation for injury to its good will **[\*1298]** and reputation, including recovery of its lost profits from defendants' infringement along with corrective advertising. (ECF No. 258 at 31-34.)

Marketquest presents the evidence of its damages expert David Drews to support its request for damages.[32] (ECF No. 232-1.) Drews first calculates Defendants' profits obtained from using the marks during the alleged period of infringement. Specifically, Drews attempts to isolate Defendants' profits from any sales made from the 2011 All in One catalogue and any sales of the Bic Round Stic pen associated with its 30th anniversary. Next, Drews attempts to calculate Marketquest's lost profits caused by Defendants' infringement by comparing Marketquest's historical sales and profits before and after the period of infringement. Drews then **[\*\*117]** attempts to calculate reasonable royalties from a hypothetical negotiation between Marketquest and Defendants and tries to duplicate an arms' length agreement between a willing licensor and willing licensee. Drews is hampered in this effort by his admission that Marketquest does not have any outbound licensing program by which it licenses any of its marks to outside businesses. Nor does he find any evidence that indicates Defendants have ever licensed any marks for their corporate use. Finally, Drews determines the cost of corrective advertising to alleviate any market confusion caused by Defendants' use of the marks.

Defendants BIC USA and Norwood move for summary

---

[32] Drews' qualifications are detailed in greater length in this Court's order denying Defendants' *Daubert* motion to exclude Drews' opinions. *See Marketquest Grp., Inc. v. BIC Corp., No. 11-cv-618-BAS-JLB, 2018 U.S. Dist. LEXIS 62357, 2018 WL 1756117 (S.D. Cal. April 12, 2018).* Accordingly, the Court does not recount them here.

Case 1:23-cv-21347-JEM   Document 24-4   Entered on FLSD Docket 12/11/2023   Page 208 of 255

Page 39 of 42

316 F. Supp. 3d 1234, *1298; 2018 U.S. Dist. LEXIS 98674, **117

judgment on the issue of the damages for which Marketquest may seek recovery if Marketquest proves unlawful infringement of its mark. (ECF Nos. 214, 215.) These Defendants contend that Marketquest is not entitled to any form of damages sought in the FAC.

## 1. Accounting/ Unjust Enrichment

Under the Lanham Act, a plaintiff is "entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the [**118] action." *15 U.S.C. §1117(a)*. Under *Section 1117(a)*, a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages, or (2) on a theory of disgorgement of the defendant's unjustly obtained profits. *See Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993)*. A plaintiff must prove both the fact and the amount of damage. 2 J. Thomas McCarthy, Trademarks & Unfair Competition §30:27 (5th ed. 2018). An award of damages under *Section 1117* is subject to equitable limitations. *See 15 U.S.C. §1117(a)*; *Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir. 1968)*. Given that "[t]he goal of *Section 1117* is to achieve equity" between the parties, a "[d]efendant may not retain the fruits, if any, of unauthorized trademark use or continue that use; plaintiff is not, on the other hand, entitled to a windfall." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 918 (Fed. Cir. 1984)*.

An accounting of profits is the proper remedy to secure the return of profits when the parties are in direct competition and is justified in indirect competition cases to prevent unjust enrichment of the infringing party. *See Playboy Enters., Inc. v. Baccarat Clothing Co., 692 F.2d 1272, 1274 (9th Cir. 1982)*. "To establish damages under the lost profits method, a plaintiff must make a prima facie showing [*1299] of reasonably forecast profits." *Lindy Pen Co., 982 F.2d at 1408*. (quotation omitted). "Plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff [**119] demonstrates gross profits, they are presumed to be the result of the infringing activity." *Id.* (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206-07, 62 S. Ct. 1022, 86 L. Ed. 1381, 1942 Dec. Comm'r Pat. 767 (1942))*; *Spin Master, Ltd., 944 F. Supp. 2d at 839*. "The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and additionally any permissible deductions for overhead." *Lindy Pen Co.,*

*982 F.2d at 1408* (citing *15 U.S.C. §1117(a)*).

In view of the equitable considerations that guide an award of damages under *Section 1117(a)*, an accounting is appropriate when the trademark infringement is "'willfully calculated to exploit the advantage of an established mark.'" *Id.* (quoting *Playboy Enters, Inc., 692 F.2d at 1274*).[33] Generally, "a knowing use in the belief that there is no confusion is not bad faith." *Lindy Pen Co., 982 F.2d at 1405-06*; *see also Highway Cruisers of Cal, Inc. v. Sec. Indus., Inc., 374 F.2d 875 (9th Cir. 1967)* (where infringement was deliberate but not willful, in that defendant erroneously believed it had the right to use the name, an accounting was not appropriate. However, "in the context of reverse confusion, the junior user's knowledge of the senior user's mark at the time of infringement may establish willfulness." *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *8* (citing *Bellagio Jewelry, Inc. v. Croton Watch Co., Inc., No. cv 06-6672, 2008 U.S. Dist. LEXIS 130262 , 2008 WL 3905895, at *13 (C.D. Cal. Aug. 20, 2008))*. This is because "an infringer's intent to trade off the established goodwill of the smaller, less established plaintiff is necessarily absent." *Spin Master, Ltd., 944 F. Supp. 2d at 848* (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 961 (7th Cir. 1992)*; *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *8))*.

Here, [**120] Marketquest presents evidence that Defendants knew Marketquest owned federally registered trademarks for the All in One and THE WRITE CHOICE marks. (ECF No. 205-22 Lane Dec. ¶¶20-23, Exs. N, O, P, Q.) Furthermore, Plaintiff presents evidence that Norwood had acquired and aggregated smaller sellers like Plaintiff in the past. (*Id.* ¶¶ 14-15, Exs. F.2, I.2.) Plaintiff also shows that in the 2011 catalogue, Defendants placed the All in One mark on the cover of its catalog in the same location where Norwood placed its "sub brands" on the cover of its 2010 Catalogue (presumably implying it had acquired Plaintiff). (*Id.* ¶¶20-23, Exs. S, N, O, P, Q.) Finally, at the same time that Defendants were presenting All in One on its catalogue (and presumably in its drinkware advertisement), it used Plaintiff's second mark THE WRITE CHOICE to advertise its pens. (*Id.* ¶43, Ex. K.3.)

---

[33] The parties disagree as to whether the willfulness requirement in *Lindy Pen* has now been vitiated by Congress in a 1999 Amendment to the Lanham Act. The Court need not reach that issue at this stage because there are sufficient facts from which a jury could find Defendants' conduct was willful.

316 F. Supp. 3d 1234, *1299; 2018 U.S. Dist. LEXIS 98674, **120

A jury could find from these facts that Defendants were willfully using Plaintiff's marks to suggest that it had acquired Plaintiff and to cause confusion in the promotional products market. Although Defendants may certainly argue to the jury that this evidence does not support this conclusion, it is not appropriate for **[**121]** the Court to make a determination at the summary judgment stage regarding willfulness.

 **[*1300]** Defendants argue that there is no evidence they profited from the use of the marks since they never sold articles bearing the infringing mark. (ECF No. 214 at 22; ECF No. 215 at 18.) Furthermore, Defendants claim they sold many items from multiple sources and it is impossible to determine if a buyer bought an item specifically from the 2011 catalogue or from some other source that had the infringing mark. (ECF No. 214 at 22; ECF No. 215 at 18.) These are appropriate and valid arguments the Court expects Defendants to make to the jury. At trial, Defendants must bear the burden of showing which sales are not attributable to the infringing activity. At this stage, however, Defendants have failed to establish the absence of a genuine issue of material fact.

**2. Reasonable Licensing or Royalty Fee**

The Lanham Act permits the recovery of damages but, unlike patent law, it does not specify reasonable royalty damages. *Contrast 15 U.S.C. §1117(a) with 35 U.S.C. §284.* Reasonable royalties are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark and can be recovered as a measure **[**122]** of damages in trademark infringement cases. *See QS Wholesale, Inc. v. World Mktg., No. SA 12-cv-0451-RNBx, 2013 U.S. Dist. LEXIS 67211, 2013 WL 1953719, at *3 (C.D. Cal. May 9, 2013).*

Reasonable royalty damages "must be established with reasonable certainty" and thus damages that are remote or speculative should be denied. *Lindy Pen Co., 982 F.2d at 1407-08; QS Wholesale, Inc., 2013 U.S. Dist. LEXIS 67211, 2013 WL 1953719, at *4.* "Usually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on." 5 J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION §30:85 (5th ed. 2018); *see also A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197 (3d Cir. 1999)* ("Even when the courts have awarded a royalty

for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated."). A prior "trademark licensing relationship . . . facilitates computation of the reasonable royalty," and thus will satisfy this requirement. *Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 CIV. 7203(DLC), 2006 U.S. Dist. LEXIS 30219, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006); see also QS Wholesale, Inc., 2013 U.S. Dist. LEXIS 67211, 2013 WL 1953719, at *5* (negotiations to purchase mark can suffice).

In the absence of a prior licensing agreement between the parties, courts will permit reasonable royalty damages only if the evidence provides a sufficiently reliable basis to calculate such damages. *See Adidas Am., Inc. v. Skechers United States, No. 3:15-cv-1741-HZ, 2017 U.S. Dist. LEXIS 122459, 2017 WL 3319190, at *25 (D. Or. Aug. 3, 2017)* **[**123]**.* However, "[t]he mere possibility of a future license cannot create an issue of fact as to the availability of lost royalties, any more than speculation about the possibility of lost sales can create an issue of fact as to lost profits." *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *7; Trovan Ltd. v. Pfizer, Inc., No. cv 98-94 LGB (MCX), 2000 U.S. Dist. LEXIS 7522, 2000 WL 709149, at *16 (C.D. Cal. May 24, 2000)* (royalties generally require that the parties have shown a willingness to license the mark). "Where a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculative," and there is an insufficient basis on which to calculate reasonable royalty damages. *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *6; Trovan Ltd., 2000 U.S. Dist. LEXIS 7522, 2000 WL 709149, at *15-16.*

Here, Marketquest presents no evidence that it has ever licensed any of its **[*1301]** marks for use by third parties or intends to do so. Marketquest's own damages expert states that he is not aware of Marketquest doing so either. (ECF No. 232 Ex. A. at ¶63.) Nor is there evidence that Defendants have ever licensed their marks. Relatedly, there is no evidence sufficient to establish what a reasonable royalty rate would be, and any attempt to discern one is completely speculative.[34]

––––––––––––––––––––

[34] To argue that an assessment of a reasonable royalty is not speculative, Plaintiff presents cases concerning the calculation of reasonably royalties for infringement of patents even when the parties have not negotiated a royalty. The calculation of a reasonable royalty in patent litigation is typically measured

316 F. Supp. 3d 1234, *1301; 2018 U.S. Dist. LEXIS 98674, **123

Because no evidence supports this theory of damages, summary judgment in favor of Defendants **[**124]** is appropriate on this theory of damages.

### 3. Injury to Good Will and Reputation

"[B]ecause proof of actual damages often is difficult, a plaintiff may seek compensation based on other measures, such as the cost of advertising needed to correct public confusion caused by the infringement." *Quia Corp., 2011 U.S. Dist. LEXIS 76157, 2011 WL 2749576, at *5* (citing *Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1995)).* Such "compensatory damages are appropriate only where a plaintiff has shown that in fact it has been injured; it still must present non-speculative evidence that goodwill and reputation—that is, the value of its mark—was damaged in some way." *Id.; see also Trovan Ltd., 2000 U.S. Dist. LEXIS 7522, 2000 WL 709149, at *8* (although corrective advertising may be the proper basis for calculating a damages award, there must first be a preliminary showing that plaintiff was actually damaged by the infringement). Uncertainty about the amount of damages is not fatal, but a plaintiff must present evidence as to the fact that the mark lost value at all. *Id.*

Marketquest presents evidence of individuals who claim they were confused by Defendants' use of the marks. (ECF No. 205-22 Lane Dec. ¶¶44-50, Exs B.2, D.2, E.2, AM, AN, AO, AP.) Additionally, Drews compares Marketquest's historical sales and profits before and after the infringement **[**125]** and calculates lost profits that could be attributable to this confusion. (ECF No. 232-1, Ex. A.) Although certainly there could be other explanations for this loss, and Defendants are free to argue at trial that Marketquest's revenues were already trending downward, this is sufficient information to put the theory in front of the jury for determination.

### V. CONCLUSION & ORDER

---

based on the fifteen factors in *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).* Drews expressly relied on the *Georgia-Pacific* test to calculate a reasonable royalty here. (ECF No. 232 Ex. A. at ¶¶60-87.) While the *Georgia-Pacific* test may be appropriate in patent cases for statutorily-sanctioned reasonable royalty damages, the Court finds its application impermissibly speculative in this case given the absence of a prior licensing agreement, evidence of licensing negotiations between the parties, or evidence otherwise showing either side's intent to license.

For the foregoing reasons, the Court **HEREBY ORDERS** that:

1. Plaintiff Marketquest's motion for partial summary judgment (ECF No. 205) is **GRANTED IN PART** as to:

> a. Partially as to Count 1 of trademark infringement of the All in One marks, *only insofar* as it concerns whether Plaintiff has valid and protectable All in One trademarks *for goods classes* in the '967, '417, and '089 registrations;

> b. Partially as to Defendants' counterclaim that the All in One mark ('089 registration) is descriptive *as to goods classes* (Counterclaim 5)

> **[*1302]** c. Fully as to Defendants' counterclaim that the All in One mark ('089 registration) is merely ornamental as to goods classes (Counterclaim 6);
> d. Defendants' counterclaims for fraudulent procurement of the registrations for the marks (Counterclaims 4, 8, 10, and 12);

> e. Defendants' counterclaims **[**126]** for abandonment (Counterclaims 3, 7, 9, and 11); and
> f. Defendants' affirmative defenses of abandonment, acquiescence, estoppel, fraud, laches, nominative fair use, statute of limitations, trade mark misuse, unclean hands, and waiver (Affirmative Defenses 2, 6, 7, 8, 9, 10, 15, 16, 17, and 20).

2. Marketquest's motion for partial summary judgment (ECF No. 205) is **DENIED IN PART** as to:

> a. Partially as to Count 1 of trademark infringement of the All in One marks, *only insofar* as concerns whether Plaintiff has valid, protectable All in One mark registrations ('089 and '333 registrations) *for services*;

> b. Partially as to Defendants' counterclaim that the All in One mark ('089 registration) is descriptive *as to services classes* (Counterclaim 5);
> c. The issue of whether Plaintiff has a valid and protectable THE WRITE CHOICE mark ('707 registration) for Count 3 of the FAC;
> d. Defendants' counterclaims regarding whether THE WRITE CHOICE is merely descriptive and merely ornamental (Counterclaims 1 and 2);
> e. Defendants' affirmative defense that THE WRITE CHOICE lacks distinctiveness (Affirmative Defense 21); and

> f. Defendants' general affirmative defense of mark

316 F. Supp. 3d 1234, *1302; 2018 U.S. Dist. LEXIS 98674, **126

invalidity *only as to invalidity counterclaims* **[**127]** *for which summary judgment has been denied* (Affirmative Defense 11).

3. Defendant BIC Corp.'s motion for summary judgment (ECF No. 216) is **DENIED IN FULL**.

4. Defendants BIC USA and Norwood's motions for summary judgment (ECF Nos. 214, 215), as to the issue of damages, is:

    a. **GRANTED IN PART**, as to Plaintiff's request for recovery of reasonable royalties from Defendants' alleged infringement of the marks; and

    b. **DENIED IN PART**, as to Plaintiff's requested recovery of lost profits and unjust enrichment and/or the costs of corrective advertising.

5. Based on the foregoing, Defendants' counterclaims for fraud and abandonment are **DISMISSED WITH PREJUDICE**. Furthermore, Defendants' affirmative defenses of abandonment, acquiescence, estoppel, fraud, laches, nominative fair use, statute of limitations, trade mark misuse, unclean hands, and waiver are **STRICKEN** from the Answer. Defendants are barred from raising these affirmative defenses at trial. Further, Defendants are **BARRED** from raising at trial Affirmative Defense 11 (general invalidity) as to the '967, '417, and '089 registrations *as to goods classes*.

6. Based on the Court's likelihood of confusion analysis as to THE WRITE CHOICE mark, Defendants **[**128]** are **HEREBY PERMITTED** to raise the classic fair use defense (Affirmative Defense 19) at trial as to their alleged infringement of that mark.

7. The parties are **ORDERED** to appear in person before Magistrate Judge Burkhardt to set the remaining deadlines in this case. The parties shall coordinate **[*1303]** with Judge Burkhardt **no later than fourteen days from entry of this Order** to schedule the date of their appearance for such a hearing.

**IT IS SO ORDERED**.

**DATED: June 12, 2018**

/s/ Cynthia Bashant

**Hon. Cynthia Bashant**

**United States District Judge**

9. *Grecia v. Discover Fin. Servs.*, 2018 U.S. Dist. LEXIS 240612, *2 (N.D. Ill. June 7, 2018



Neutral
As of: December 11, 2023 3:15 PM Z

## *Grecia v. Discover Fin. Servs.*

United States District Court for the Northern District of Illinois, Eastern Division

June 7, 2018, Decided; June 7, 2018, Filed

No. 17 C 7300

**Reporter**
2018 U.S. Dist. LEXIS 240612 *; 2018 WL 11196598

WILLIAM GRECIA, Plaintiff, v. DISCOVER FINANCIAL SERVICES, INC., Defendant.

**Subsequent History:** Motion denied by *Grecia v. Discover Fin. Servs., 2018 U.S. Dist. LEXIS 240609, 2018 WL 11196597 (N.D. Ill., Sept. 24, 2018)*

## Core Terms

documents, patents, license, pertaining, practices, subpoena, discovery, requests, reasons, trademark, motion to quash, assertions, contends, download

**Counsel:** **[*1]** For William Grecia, Plaintiff: Matthew M. Wawrzyn, LEAD ATTORNEY, Wawrzyn & Jarvis LLC, Glenview, IL USA; Stephen C. Jarvis, Wawrzyn & Jarvis LLC, Glenview, IL USA.

For Discover Financial Services, Inc., Defendant: David Spencer Bloch, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA USA; Lowell Daniel Jacobson, Benesch, Friedlander, Coplan & Aronoff LLP, Chicago, IL USA; Saranya Raghavan, Winston & Strawn, Chicago, IL USA.

For Qondado Llc, Edward Robles, Movants: Matthew M. Wawrzyn, LEAD ATTORNEY, Wawrzyn & Jarvis LLC, Glenview, IL USA.

**Judges:** M. David Weisman, United States Magistrate Judge. Judge John Z. Lee.

**Opinion by:** M. David Weisman

## Opinion

### ORDER

This case is before the Court on defendant's motion to compel and third-party movants Qondado and Edward

Robles's motion to quash. For the reasons set forth below, the motions are [60, 62 & 65] granted in part and denied in part.

### Discussion

### Motion to Compel

In requests for production ("RFPs") 7-8, defendant seeks license agreements and documents identifying licensees of the "Asserted Patent and/or Related Patents." (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 25.) Plaintiff objected on relevance grounds solely to the portion of these requests pertaining to "Related **[*2]** Patents." (*Id.*, Ex. F, ECF 62-3 at 35-36.)[1] Defendant argues that "discovery can properly seek information about other patents in the same family, and even unrelated patents that may inform the damages aspect of the case." (Def.'s Mot. Compel, ECF 62 at 7.) Though information about comparable licenses is relevant, *see e.g., LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012)*, the simple fact that patents are related does not support the inference that the licenses pertaining to them are comparable. Because relatedness is the only basis that defendant offers for seeking licenses pertaining to other patents, its motion to compel production of these documents is denied.

RFPs 9-10 seek documents pertaining to assertions plaintiff made in another lawsuit that he practices his invention through a mobile payment product called Digital Debit® and that Digital Debit® competes with

_____

[1] Plaintiff argues in his response brief that information pertaining to the '308 license he gave Qondado, a company he co-owns, is also irrelevant because it was not made at arms-length. (See Pl.'s Resp. Opp'n Mot. Compel, ECF 71 at 2-3.) Plaintiff did not, however, make this objection in his responses to these RFPs. (*See* Mot. Compel. Ex. F, ECF 62-3 at 35-36.)

MasterCard and Samsung. (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 25.) Defendant argues that responsive documents are relevant to claim construction and its obviousness defense. Plaintiff says the documents are irrelevant because he is not relying in this suit on the assertion that Digital Debit® practices the '308 patent. (Id., Ex. F, ECF 62-3 at 36; see Mot Quash, Ex. 1, ECF [*3] 60-3, Pl.'s Initial Infringement Contentions ¶ 2(h).)

The Court agrees with plaintiff. Defendant's argument seems to be that plaintiff is bound in this lawsuit by assertions he made in a previous one. "But a statement made in one lawsuit cannot be a judicial admission in another." See Kohler v. Leslie Hindman, Inc., 80 F.3d 1181, 1185 (7th Cir. 1996). Moreover, plaintiff has said he will not rely on the commercial success of Digital Debit® to prove non-obviousness (Pl.'s Resp. Opp'n Mot. Compel, ECF 71 at 4), and even if Digital Debit® practices the '308 patent, any evidence of its lack of commercial success would not support an inference of obviousness. Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 960 (Fed. Cir. 1986) ("[T]he absence of . . . evidence [of commercial success] does not preclude a holding of nonobviousness . . . ."); Medtronic Inc. v. Intermedics, Inc., 799 F.2d 734, 739 n.13 (Fed. Cir. 1986) (stating that the absence of commercial success is a "neutral factor" in the obviousness analysis).

RFP 11 seeks "[a]ll documents concerning [plaintiff's] relationship with Qondado." (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 25.) Plaintiff objects on the grounds of overbreadth, burden, and relevance. (Id., Ex. F, ECF 62-3 at 36-37.) The Court agrees that the request, which has no subject or temporal bounds, is overbroad. Defendant's motion to compel compliance with this request is therefore denied. [*4]

In RFP 12, defendant seeks documents relating to whether and how Qondado, the entity that purportedly makes the '308 patent available for licensing through its Digital Debit Group, "practices the Asserted Patent and/or Related Patents." (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 25.) Plaintiff objected that Qondado, a non-party's, practice, if any, of any patent is irrelevant. (Id., Ex. F, ECF 62-3 at 37.) The fact that Qondado is not a party to this suit does not, however, make its information irrelevant. If plaintiff contends that Qondado practices the '308 patent, then how it does so could be extrinsic evidence relevant to claim construction. Documents pertaining to whether and how Qondado practices any other patent are irrelevant. Thus, only the former

documents must be produced.

RFPs 19-23[2] seek documents relating to allegedly incorrect assertions plaintiff made in various trademark applications. (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 26-27.) Though there is no trademark infringement claim in this suit, defendant contends that "[i]naccurate statements to the Patent & Trademark Office are always relevant [to an inequitable conduct defense], even if the representations were not made in connection with the [*5] '308 patent application itself." (Mot. Compel, ECF 62 at 11) (emphasis in original). However, the cases defendant cites do not stand for the proposition that inequitable conduct in prosecuting a trademark application is a basis for invalidating a patent, and the Court could not find one that does. Because that is the only relevance defendant articulates for these documents, its motion to compel their production is denied.

RFP 24 and 26, respectively, seek documents that show the functionality of the Digital Debit® application available for download on Google Play on or about September 21, 2016, and documents that show the differences between that version of Digital Debit® and the version available for download on Google Play at some point between November 30, 2017 and December 11, 2017. (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 27.) Responsive documents are relevant only if these versions of Digital Debit® practice the '308 patent. Because the requests are not limited to applications that practice the patent, the motion to compel compliance with them is denied.

RFP 25 seeks documents that identify "all transactions of, relating to, or utilizing the 'Digital Debit' application made available for download [*6] on Google Play on or about September 21, 2016." (Id.) Documents responsive to this request bear on commercial success, which for the reasons discussed above, are irrelevant.

RFP 27 seeks "[s]ource code sufficient to show how [plaintiff] contend[s] that the Digital Debit® application[s]" practice the '308 patent. (Def.'s Mot. Compel, Ex. E, ECF 62-3 at 28.) If plaintiff contends that any of the applications practice the '308 patent, how it does so could be extrinsic evidence relevant to claim construction. If that is the case, the code must be produced.

---

[2] Defendant's request for compliance with RFP 15 is moot because plaintiff did not object to that request. (See Def.'s Mot. Compel, Ex. F, ECF 62-3 at 38.)

2018 U.S. Dist. LEXIS 240612, *6

**Motion to Quash**

In relevant part, *Federal Rule of Civil Procedure 45* states: "On timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . subjects a person to undue burden." *Fed. R. Civ. P. 45(d)(3)(A)(iv)*. In this case, compliance is required in the District of Puerto Rico. (*See* Mot. Quash, Exs. 2 & 3, ECF 60-4 & 60-5.) Thus, the motion to quash should have been filed there. However, *Rule 45* also permits the court where the subpoena is to be enforced to transfer a motion quash to the court that issued the subpoena, "if the person subject to the subpoena consents." *Fed. R. Civ. P. 45(f)*. Given that movants filed the motion to quash here, they clearly would have consented to its transfer to this **[*7]** Court had they filed the motion in the District of Puerto Rico. Under the circumstances, the Court will address the motion to quash.

A subpoena should be quashed if it subjects the respondent to undue burden; that is, when "the burden of compl[ying] with [the subpoena] would exceed the benefit of production of the material sought by it." *Nw. Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 927 (7th Cir. 2004)*; *see Fed. R. Civ. P. 26(b)(2)(C)* (instructing Courts to limit the frequency or extent of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"). "When making the determination of whether a person will be subjected to undue burden, courts consider a number of factors, including the person's status as a non-party, the relevance of the discovery sought, the subpoenaing party's need for the discovery, and the breadth of the request." *Uppal v. Rosalind Franklin Univ. of Med. & Sci., 124 F. Supp. 3d 811, 813 (N.D. Ill. 2015)*. "The party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant." *Williams v. Blagojevich, No. 05 C 4673, 2008 U.S. Dist. LEXIS 643, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008)* (quotation omitted).

Robles and Qondado argue that the subpoenas should be quashed or limited because they are non-parties and defendant can obtain the information it seeks from plaintiff, who is privy **[*8]** to it by virtue of his board membership and equity stake in Qondado. (Mot. Quash, ECF 60 at 8.) As an initial matter, movants do not offer any evidence to support their assertions about plaintiff's board membership and ownership interest in Qondado.

Moreover, even if they had, the fact that plaintiff is a board member and part owner of Qondado would not support the inference that he possesses or controls the company and CEO's documents. Thus, the Court will not quash the subpoenas in their entirety. However, many of defendant's RFPs are overbroad or seek information of little or no relevance to this case. Accordingly, the Court modifies the subpoenas as follows:

**Requests to Qondado**

RFP 1 seeks "[a]ll" communications with plaintiff relating to any patent, Digital Debit Group Division, or Qondado's business. (Mot. Quash, Ex. 2, ECF 60-4.) RFP 2 seeks documents relating to the retention or elimination of the communications referenced in RFP 1. (*Id.*) Because the requests are overbroad both in time and scope, Qondado need not respond to them.

RFPs 3, 5, and 6 seek documents describing Qondado's relationship with plaintiff and Digital Debit Group Division, and documents that describe Qondado's **[*9]** corporate structure. (*Id.*) Because these documents have no relevance to this suit, Qondado does not have to produce them.

RFP 4 seeks documents relating to any valuation of the '308 patent and "Related Patents" including Qondado's license payment to plaintiff. (*Id.*) For the reasons discussed above, Qondado is only required to produce responsive documents pertaining to the '308 patent.

RFP 7 seeks documents showing the conception and reduction to practice of the Digital Debit® application. (*Id.*) Because this RFP is not limited to applications that practice the '308 patent, Qondado does not have to comply with it.

RFP 8 seeks documents relating to whether and how Qondado practices the '308 patent and related patents. (*Id.*) For the reasons discussed above, Qondado is only required to produce responsive documents pertaining to the '308 patent.

RFP 9 seeks documents showing marketing of the Digital Debit® application, and RFP 10 seeks all documents relating to the assertion that Digital Debit® competes with MasterCard and Samsung. (*Id.*) For the reasons discussed above, these documents are not relevant and need not be produced.

RFP 11 asks for "[a]ll documents concerning the Digital

2018 U.S. Dist. LEXIS 240612, *9

Debit Group Consortium IP Pool including the patents, trademarks, **[\*10]** and copyrights associated with the pool, the members of the pool, and [Qondado's] ability to grant any license relating to the Asserted Patent and/or Related Patents." (*Id.*) RFP 12 seeks documents that identify every person who can grant licenses for the '308 patent and related patents. (*Id.*) Documents pertaining to licenses that have been granted for the '308 patent are potentially relevant to determining a reasonable royalty. Documents relating to the Digital Debit Group Consortium IP Pool's intellectual property portfolio are not. Thus, Qondado must only produce documents pertaining to licensing of the '308 patent.

RFPs 13-15 seek documents pertaining to licensing of the '308 patent and related patents. (*Id.*) Only responsive documents pertaining to the '308 patent must be produced.

RFPs 16-18 seek documents relating to the Digital Debit® applications available for download on Google Play in 2016 and 2017. (*Id.*) As discussed above, the requested documents are relevant only if these versions of Digital Debit® practice the '308 patent. Because these requests are not limited to applications that do so, Qondado need not respond to them.

RFP 19 seeks source code that shows where the Digital Debit® application practices the '308 patent. (*Id.*) If plaintiff contends **[\*11]** that the Digital Debit® application practices the '308 patent, Qondado must produce documents responsive to this request.

RFPs 20-24 seek documents related to assertions made in trademark applications. (*Id.*) For the reasons discussed above, these documents are irrelevant and need not be produced.

### Requests to Robles

RFP 1 seeks all of Robles's communications with plaintiff relating to the '308 patent, related patents, Digital Debit Group Division, or Qondado. (Mot. Quash, Ex. 3, ECF 60-5.) RFP 2 seeks documents relating to the preservation or elimination of the communications set forth in RFP 1. (*Id.*) Robles need only produce responsive documents relating to the '308 patent.

RFPs 3 and 4 seek documents that describe Robles's relationship with plaintiff, Digital Debit Group Division, and Qondado, and Robles's reason for joining Qondado. (*Id.*) Because there is no relevance to these documents, Robles does not have to produce them.

RFP 5 seeks documents concerning Robles's conception and reduction to practice of the Digital Debit® application. (*Id.*) Because this RFP is not limited to applications that practice the '308 patent, Robles does not have to comply with it.

RFP 6 documents showing marketing of the Digital Debit® application. ( **[\*12]** *Id.*) As discussed above, these documents are irrelevant.

RFP 7 seeks documents that show Robles's right to license the '308 patent and related patents. (*Id.*) For the reasons set forth above, only responsive documents related to the '308 patent must be produced.

RFP 8 seeks documents relating to any valuation of the '308 patent and "Related Patents" including Qondado's license payment to plaintiff. (*Id.*) Robles is only required to produce documents related to the '308 patent.

RFP 9 seeks documents relating to the assertion that Digital Debit® competes with MasterCard and Samsung. (*Id.*) As discussed above, these documents are irrelevant and need not be produced.

RFP 10 seeks documents relating to whether and how Robles, plaintiff, Digital Debit Group, or Qondado practice the '308 patent and related patents. (*Id.*) Robles is only required to produce responsive documents pertaining to the '308 patent.

RFPs 11-13 seek documents relating to the Digital Debit® applications available for download on Google Play in 2016 and 2017. (*Id.*) As discussed above, the requested documents are relevant only if these versions of Digital Debit® practice the '308 patent. Because these requests are not limited to applications that do so, Robles need not respond to them.

RFP 14 seeks source **[\*13]** code that shows whether the Digital Debit® application practices the '308 patent. (*Id.*) Robles must produce these documents only if plaintiff contends that the Digital Debit® application practices the '308 patent.

**SO ORDERED**.

**ENTERED: June 7, 2018**

/s/ M. David Weisman

**M. David Weisman**

**United States Magistrate Judge**

2018 U.S. Dist. LEXIS 240612, *13

**End of Document**

10. *Slep-Tone Entm't Corp. v. Harrison Bar & Grill*, 2013 U.S. Dist. LEXIS 205965, *3 (D. Ore. June 28, 2013)

No *Shepard's* Signal™
As of: December 11, 2023 3:30 PM Z

# *Slep-Tone Entm't Corp. v. Harrison Bar & Grill*

United States District Court for the District of Oregon

June 28, 2013, Decided

No. 6:13-cv-281-TC; No. 6:13-cv-269-TC

**Reporter**
2013 U.S. Dist. LEXIS 205965 *

SLEP-TONE ENTERTAINMENT CORPORATION, Plaintiff, v. HARRISON BAR & GRILL and SKMJMM, LLC, Defendants.SLEP-TONE ENTERTAINMENT CORPORATION, Plaintiff, v. HARRISON BAR & GRILL and YEUNG'S INVESTMENT, INC., Defendants.

## Core Terms

documents, karaoke, motion to compel, interrogatories, licensing, time limit, defendants', evidencing, requests, media, song, royalties, trademark, software

**Counsel:** **[*1]** For Slep-Tone Entertainment Corporation, Plaintiff (6:13-cv-00269-TC): Carl D. Crowell, LEAD ATTORNEY, Crowell Law, Salem, OR; Franklin J. Seibert, F.J. Seibert, LLC, Salem, OR.

For Yeung's Investment Inc., Harrison Bar & Grill, Defendants (6:13-cv-00269-TC): Bradley J. Woodworth, LEAD ATTORNEY, Bradley J. Woodworth & Associates, PC, Portland, OR; Michael Dell Long, Long Law PC, Ste B, Portland, OR.

For Slep-Tone Entertainment Corporation, Plaintiff (6:13-cv-00281-TC): Carl D. Crowell, LEAD ATTORNEY, Crowell Law, Salem, OR; Franklin J. Seibert, LEAD ATTORNEY, F.J. Seibert, LLC, Salem, OR.

For Peacock Bar & Grill East, SKMJMM, LLC, Defendants (6:13-cv-00281-TC): Bradley J. Woodworth, LEAD ATTORNEY, Bradley J. Woodworth & Associates, PC, Portland, OR; Michael Dell Long, LEAD ATTORNEY, Long Law PC, Ste B, Portland, OR.

**Judges:** THOMAS M. COFFIN, United States Magistrate Judge.

**Opinion by:** THOMAS M. COFFIN

## Opinion

ORDER

COFFIN, Magistrate Judge:

In these cases, plaintiff asserts claims for trademark infringement and unfair competition. Specifically, plaintiff alleges that defendants possess or regularly utilize unauthorized media-shifted and format-shifted duplicates of karaoke accompaniment tracks which have been falsely **[*2]** marked with plaintiff's registered trademark or which carry plaintiff's distinctive trade dress or both. Plaintiff further alleges that defendants have benefitted, commercially, by providing karaoke entertainment services to their customers using the unauthorized tracks. Further, plaintiff asserts that while it pays royalties to the owners of the copyrighted musical works underlying the karaoke tracks it authorizes, defendants do not pay royalties in connection with their alleged use of unauthorized tracks.

Plaintiff now seeks responses to requests for production and to compel answers to interrogatories. It is unclear to what extent defendants have responded to the discovery requests to date. Defendants generally argue that the requests are too broad, vague, and unduly burdensome. In addition, defendants object to the unlimited time period of some of the requests and contend a protective order is necessary before a response can be made to certain requests. Finally, defendants argue that the number of interrogatories exceeds the limit of 25 established by the federal rules. Defendants do not address the requests specifically. To the extent any discovery compelled by the following order **[*3]** involves confidential information or trade secrets, etc., the parties are directed to provide a stipulated protective order prior to defendants' response.

A. Requests For Production

Plaintiff submitted 23 requests for production of documents. It appears that there is no longer a dispute

2013 U.S. Dist. LEXIS 205965, *3

as to requests 1-4 because plaintiff has agreed to limit the request to the last five years. The motion to compel responses to requests 1-4 is denied as moot.

> Request 5: All documents pertaining to efforts by defendants to ensure that KJs or others hired by defendants operate legally, including the use of OLCC licenses, Food Handler Permits and that they use properly licensed media including video and karaoke products compliant with trademark and licensing law.

To the extent plaintiff seeks documents related to whether karaoke jockey's operate legally, the motion is granted. The motion is denied with respect to the other aspects of defendants' businesses unrelated to the use of plaintiff's trademark or trade dress, such as OLCC licenses and food handler permits.

> Request 6: All documents concerning correspondence or communication between defendants and its owners, shareholders, officers or directors regarding [*4] karaoke events, services, or purchases for the last five (5) years.

It appears that defendant has or will provide documents responsive to this request. The motion to compel responses to request 6 is denied as moot.

> Request 7: All documents concerning the defendants' relationship to its members, officers, shareholders, licensees or other affiliates for the last five (5) years.

Plaintiff asserts it needs this information to establish: the extent and scope of ownership; identity of possible liable parties and whether infringement was solely under the named entity; and whether or not defendants are a legitimate business maintaining proper formalities. The motion to compel responses to this request is denied.

> Request 8: All documents related to any change in entity form or sale of business interest or asset which comprised at least 10% of the business value by any defendant in the last five (5) years.

It appears that defendants have agreed to provide documents responsive to this request and the motion to compel a response is denied as moot.

> Request 9: All documents on how to operate any karaoke machine or software used by the defendants or defendants' service providers, including KJs or employees [*5] .

The motion to compel this response is granted with a time limit of 5 years.

> Request 10: All documents concerning media-shifting of karaoke libraries, catalogues, software, or products.

The motion to compel this response is granted with a time limit of 5 years.

> Request 11: All documents evidencing or concerning any karaoke manuals, guides, instructions, goods, supplies, equipment or materials provided to or by the defendants.

The motion to compel this response is granted with a time limit of 5 years.

> Request 12: All documents relating to the design, purchase, and placement of advertisements about karaoke events and services hosted or provided by the defendants.

The motion to compel this response is granted with a time limit of 5 years.

> Request 13: All receipts and documents concerning the purchase of karaoke services, karaoke music, catalogs, and software, or other karaoke equipment and services by defendants.

The motion to compel this response is granted with a time limit of 5 years.

> Request 14: All documents evidencing any sales by or income to defendants during any time at which karaoke events were available at defendants' locations.

To the extent such documents exist, the motion to compel [*6] this response is granted with a time limit of 5 years. There is no request 15.

> Request 16: All records of any royalties, licensing fees paid, or services fees paid for media, products or services, including libraries, lottery games, audio playback, video, sports, movies, use of broadcast television, music catalogs, software, or equipment.

The motion is denied with respect to this request to the extent it does not relate to karaoke or plaintiff's trademark.

> Request 17: All documents evidencing any communications with any KJ's within the last five (5) years, including any contracts or documents

2013 U.S. Dist. LEXIS 205965, *6

evidencing compensation, promotion or earnings of KJ's.

The motion to compel this response is granted subject to an appropriate protective order.

> Request 18: Bank account records, deposits, sales receipts, tax returns, and evidences of defendants' income for the last five (5) years, including but not limited to a copy of any database or electronic record such as a QuickbooksTM database or the like.

The motion to compel this response is granted subject to an appropriate protective order.

> Request 19: All documents evidencing any contact or communication between defendants and Slep-Tone.

The motion to compel **[*7]** this response is granted.

> Request 20: All documents evidencing any conduct by defendants responsive to any demand letters from Slep-Tone or its agents.

The motion to compel this response is granted to the extent it does not involve attorney-client privileged documents.

> Request 21: All non-privileged communications which discuss or reference Slep-Tone.

The motion to compel this response is granted.

> Request 22: All non-privileged documents upon which defendant may rely in defending this matter or conducting further discovery.

This request is too vague and broad and the motion to compel a response is denied.

> Request 23: All documents evidencing communications with any sales agent or vendor of karaoke equipment of software.

The motion to compel this response is granted with a time limit of 5 years.

> Request 24: A complete copy of any insurance policies that may be available to pay any of the claims of Slep-Tone.

The motion to compel this response is denied.

B. Interrogatories

Plaintiff submitted four interrogatories to defendants and defendants object contending that the interrogatories, when considering the subparts, far exceed the limit of 25.

The interrogatories are:

Interrogatory 1:

Identify with **[*8]** specificity each and every KJ who operated karaoke equipment or played karaoke media at any location owned, managed by or affiliated with defendants within the last five (5) years. Include the full name of the KJ, relevant contact information, the specific location where and times and dates when the KJ operated karaoke equipment or played karaoke media, and the compensation if any.

Interrogatory 2:

Describe in detail all karaoke media which has been at any location owned, managed by or affiliated with defendants within the last five (5) years. Include the title of each song, how you came to be in possession or obtain use or benefit of each song, how much you paid for each song, to whom you paid any sums for each song, the current location of any and all original media from which each song was sourced, and a listing of all copies, translations or duplicates made of each song. For each song that has been deleted, also identify when the deletion occurred and how and who performed the deletion.

Interrogatory 3:

Describe in detail the economic benefit of karaoke to defendants over the past five (5) years.

Interrogatory 4:

Describe in detail any and all licensing or royalty fees paid by any defendants **[*9]** for the last five (5) years, including ASCAP and BMI licensing for play of music, any licensing or fees associated with any lottery or games, any licensing or royalties associating with the playback of any video programming, including sports or other video media. Include all sums paid, when payments are made and how negotiations for such payments occurred.

These are not improper compound interrogatories given the logical relation between the various requested information in each main question. Even if the interrogatories were improper compounds, the number of questions does not exceed 25. Accordingly, the

2013 U.S. Dist. LEXIS 205965, *9

motion to compel answers to the interrogatories is granted.

To the extent either party seeks an award of fees and costs incurred in filing or opposing the motions to compel, the court declines to award fees and costs.

<u>CONCLUSION</u>

For the reasons stated above, plaintiff's motions to compel (#21 in 13-281 and #19 in 13-269) are granted, and plaintiff's motions to compel (#17 in 13-281 and #15 in 13-269) are granted in part and denied in part.

DATED this 28 day of June, 2013.

/s/ Thomas M. Coffin

THOMAS M. COFFIN

United States Magistrate Judge

---

**End of Document**

*11. Peace United, Ltd. v. 1906 Collins, LLC*, 2022 U.S. Dist. LEXIS 112243, *4 (S.D. Fla. June 24, 2022)

 Neutral

As of: December 7, 2023 7:54 PM Z

## *Peace United, Ltd. v. 1906 Collins, LLC*

United States District Court for the Southern District of Florida, Miami Division

June 24, 2022, Decided; June 24, 2022, Entered on Docket

Case Number: 17-21881-CIV-MARTINEZ-BECERRA

**Reporter**

2022 U.S. Dist. LEXIS 112243 *; 2022 WL 2290528

PEACE UNITED, LTD., Plaintiff, vs. 1906 COLLINS, LLC and MATHIEU MASSA, Defendants,

**Prior History:** *Peace United, Ltd. v. 1906 Collins, LLC, 2022 U.S. Dist. LEXIS 87354, 2022 WL 1522213 (S.D. Fla., Apr. 29, 2022)*

## Core Terms

actual damage, **_royalties_**, jury trial, equitable, disgorgement, right to a jury trial, license agreement, legal remedy, common law, **_trademark_**, asserts, damages, profits, misuse, **_trademark infringement_**, equitable remedy, legal claim, courts, prong

**Counsel: [*1]** For Peace United Ltd., Plaintiff: Anthony Vicken Narula, LEAD ATTORNEY, AXS Law Group, PLLC, Wynwood, FL; Jeffrey W. Gutchess, LEAD ATTORNEY, Joanna Niworowski, AXS Law Group, Miami, FL; Joshua Shore, Rossana Arteaga-Gomez, LEAD ATTORNEYS, AXS Law Group, PLLC, Miami, FL.

For 1906 Collins LLC, Mathieu Massa, Defendants: Alan J. Perlman, LEAD ATTORNEY, Dickinson Wright PLLC, Ft Lauderdale, FL; Catherine Fran Hoffman, Dickinson Wright PLLC, Fort Lauderdale, FL; James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL; Vijay Gibran Brijbasi, Dickinson Wright PLLC, Las Olas Centre I, Ft. Lauderdale, FL.

For Mathieu Massa, Defendant: Catherine Fran Hoffman, Dickinson Wright PLLC, Fort Lauderdale, FL; James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL.

For 1906 Collins LLC, Counter Claimant, Counter Defendant: James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL.

For Mathieu Massa, Counter Defendant: James Alexander Stepan, Law Offices of James A. Stepan, P.A., Hollywood, FL.

**Judges:** JOSE E. MARTINEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOSE E. MARTINEZ

## Opinion

**ORDER ON MOTION TO STRIKE JURY DEMAND**

**THIS MATTER** comes before the Court on Defendants 1906 Collins, **[*2]** LLC and Mathieu Massa's Motion to Strike Jury Trial Demand. (ECF No. 278). Defendants argue Plaintiff Peace United Ltd. does not have the right to a jury trial because Peace is only entitled to equitable relief on its **_trademark infringement_** and unfair competition claims. (*Id.* at 2). In response, Peace asserts that it is entitled to recover both actual damages in the form of a **_reasonable royalty_** and the equitable disgorgement of profits. (ECF No. 297).

A plaintiff is entitled to a jury trial under the *Seventh Amendment of the U.S. Constitution* or pursuant to a federal statute. *See Fed. R. Civ. P. 38.* The *Seventh Amendment of the U.S. Constitution* provides for jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." *U.S. Const. amend. VII.* The Supreme Court has established a two-part test to determine whether a plaintiff is entitled to a jury trial: (1) whether the action "is 'analogous' to a claim that would have been brought in the English law courts at common law" or "if the claims sounded in equity or admiralty"; and (2) whether the remedy sought is legal or equitable in nature. *See Tull v. United States, 481 U.S. 412, 417-18, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987); Hard Candy, LLC v. Anastasia Beverly Hills, Inc., 921 F.3d 1343, 1352 (11th Cir. 2019).* To be entitled to a jury trial, the plaintiff must assert a common law claim and be entitled to a legal remedy. *See Hard Candy, 921 F.3d at 1352-53.* Applying the test here, the

2022 U.S. Dist. LEXIS 112243, *2

first prong is "indeterminate" **[*3]** "because when the *Seventh Amendment* was ratified **trademark** rights had 'been long recognized by the common law and the chancery courts of England.'" *Id. at 1355*. Thus, Peace's right to a jury trial turns on the second prong, the nature of the remedy, which is the "[m]ore important" consideration. *See Curtis v. Loether, 415 U.S. 189, 196, 94 S. Ct. 1005, 39 L. Ed. 2d 260 (1974)*.

Both equitable and legal remedies are available under the *Lanham Act*. *See 15 U.S.C. § 1117(a)*. Here, Peace asserts that it is entitled to both the disgorgement of profits from Defendants' alleged misuse of Peace's **trademarks** and actual damages in the form of **reasonable royalty** fees. (*See* Resp. at 5, ECF No. 297). Disgorgement of profits is an equitable remedy, *Waldrop v. S. Co. Servs., 24 F.3d 152, 157 (11th Cir. 1994)*, while actual damages are a legal remedy, *see Hard Candy, 921 F.3d at 1358*. To support its claim for actual damages, Peace points to the licensing agreement between its predecessor-in-interest and 1906 Collins, which Peace asserts entitles it to a **royalty** payment. (TAC ¶ 10, ECF No. 340). "The use of lost **royalties** to determine the actual damages incurred by a victim of **trademark** misuse is well established by this court." *Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1519-20 (11th Cir. 1990)*; *see also Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986)* ("**Royalties** normally received for the use of a mark are the proper measure of damages for misuse of those marks."). With these principles in mind, the Court finds that the licensing **[*4]** agreement provides adequate support for Peace's claim for actual damages and, corresponding, to Peace's right to a trial by jury.

Defendant argues that allowing Peace to recover for disgorgement and actual damages would amount to a double recovery. But "if a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, *including all issues common to both claims*, remain intact." *Curtis v. Loether, 415 U.S. 189, 196 n. 11, 94 S. Ct. 1005, 39 L. Ed. 2d 260 (1974)* (emphasis added); *see also Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477, 82 S. Ct. 894, 8 L. Ed. 2d 44 (1962)* ("The necessary prerequisite to maintain a suit for an equitable [remedy] . . . is . . . the absence of an adequate remedy at law."); *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II, No. 16-cv-452, 2017 U.S. Dist. LEXIS 222711, at *11 (S.D. Ala. Aug. 18, 2017)* (recognizing that the "recovery of lost **royalties** by a victim of **trademark infringement** is the preferred award of damages"). As to Defendants' argument that Peace has not presented evidence of actual damages, the **royalties** purportedly owed to

Peace under the licensing agreement can provide the jury with adequate information to calculate damages. *See N. Atl. Operating Co. v. Hammad Enters., No. 19-60200, 2020 U.S. Dist. LEXIS 50182, at *8 (S.D. Fla. Jan. 15, 2020)*; *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 8404330, at *7 (S.D. Fla. Nov. 20, 2017)*.

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Strike the Jury Demand, (ECF No. 278), is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of June, 2022.

/s/ Jose E. Martinez

JOSE E. MARTINEZ

UNITED STATES DISTRICT **[*5]** JUDGE

**End of Document**

*12. Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*, 2017 U.S. Dist. LEXIS 222711, * 11-12 (S.D. Ala. Aug. 18, 2017)

🅐 Neutral

As of: December 11, 2023 3:53 PM Z

## *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*

United States District Court for the Southern District of Alabama, Southern Division

August 18, 2017, Decided; August 18, 2017, Filed

CIVIL ACTION NO. 16-452-CG-B

**Reporter**

2017 U.S. Dist. LEXIS 222711 *; 2017 WL 6945340

CHOICE HOTELS INTERNATIONAL, INC., Plaintiff, vs. KEY HOTELS OF ATMORE II, LLC; ANAND PATEL; DIPAN PATEL; and SARJU PATEL, Defendants.

**Prior History:** *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II, LLC, 2016 U.S. Dist. LEXIS 155449 (S.D. Ala., Nov. 9, 2016)*

## Core Terms

infringement, damages, Defendants', profits, holdover, royalties, double recovery, marks, monthly, costs, franchise, trademark, unauthorized use, attorney's fees, Lanham Act, default, rental, estimated, disgorge, Hotels, treble, sales, treble damages, actual damage, cumulatively, preceding, awarding

**Counsel: [*1]** For Choice Hotels International, Inc., Plaintiff: Matthew Jacob Ladenheim, LEAD ATTORNEY, PRO HAC VICE, Trego, Hines & Ladenheim, PLLC, Charlotte, NC USA; Theodore Fuller Mitchell, PRO HAC VICE, Trego, Hines, Ladenheim, PLLC, Charlotte, NC USA.

**Judges:** Callie V. S. Granade, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** Callie V. S. Granade

## Opinion

### ORDER ON DAMAGES

This matter is before the Court on a motion for award of damages and memorandum in support filed by Plaintiff Choice Hotels International, Inc. ("Plaintiff"). (Doc. 34; Doc. 35). For the reasons stated below, the Court **GRANTS**, in part, and **DENIES**, in part, Plaintiff's motion.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Delaware corporation with its principal place of business in Maryland. (Doc. 1, ¶ 1). Plaintiff has been in the business of operating hotels and motels since the 1930s and has become one of the largest and most successful lodging franchisors in the world, which includes the QUALITY® family of marks.[1] (Doc. 1, ¶¶

---

[1] Plaintiff is the registrant of United States Trademark Registration No. 0,886,881 for the mark QUALITY; No. 1,050,372 for the mark QUALITY for use in connection with the provision of hotel, motel, and restaurant services; No. 1,183,294 for the mark QUALITY INN for use in connection with the provision of hotel, motel, and restaurant services; No. 1,534,820 for the mark QUALITY HOTEL for use in connection with the provision of hotel and restaurant services; No. 1,769,488 for the mark QUALITY RESORT for use in connection with the provision of hotel and motel services; No. 2,729,999 for the mark Q QUALITY INN + design for use in connection with the provision of hotel and motel services; No. 2,732,875 for the mark Q QUALITY SUITES + design for use in connection with the provision of hotel and motel services; No. 2,946,054 for the mark Q QUALITY + design for use in connection with the provision of hotel and motel services, hotel and motel reservation services for others, and online hotel and motel reservation services for others; No. 3,053,888 for the mark QUALITY SUITES for use in connection with the provision of hotel and motel services, hotel and motel reservation services for others, and online hotel and motel reservation services for others; No. 3,448,436 for the mark QUALITY INN & SUITES for use in connection with the provision of hotel and motel services, hotel and motel reservation services for others, and online hotel and motel reservation services for others; No. 3,448,437 for the mark Q QUALITY INN & SUITES + design for use in connection with the provision of hotel and motel services, hotel and motel reservation services for others, and online hotel and motel reservation services for others; No. 3,435,885 for the mark Q QUALITY + design for use in connection with the provision of hotel and motel services, and hotel and motel reservation services

13-17). Defendants Anand Patel, Dipan Patel, and Sarju Patel are natural persons residing in the Southern District of Alabama and are members of Key Hotels of Atmore II, LLC. (Doc. 1, ¶¶ 3-5). Defendant Key Hotels of Atmore **[*2]** II, LLC is a limited liability company organized under Alabama law regularly engaging in the provision of hotel-motel services at 1610 South Main Street, Atmore, Alabama 36502 ("the Subject Property"). (Doc. 1, ¶ 2).[2]

On September 30, 2011, Plaintiff and Defendants entered into a Franchise Agreement ("the Agreement"). The Agreement permitted Defendants to operate a QUALITY INN® franchise at the Subject Property and licensed the QUALITY® family of marks to Defendants for the duration of the Agreement. (Doc. 1, ¶¶ 53-54). The Agreement required Defendants make monthly franchise fee payments and pay service charges unto Plaintiff on an ongoing basis. (Doc. 1, ¶ 56). Defendants failed to satisfy these two obligations, and Plaintiff terminated the Agreement on August 29, 2013. (Doc. 1, ¶¶ 55, 58, 61).

After an arbitration action between the parties before the American Arbitration Association, Plaintiff received an award against Defendants. (Doc. 1, ¶ 70). Defendants continued to make unauthorized use of the QUALITY® family of marks during and after the arbitration action. (Doc. 1, ¶¶ 72-73). A site inspection on July 22, 2016, established that Defendants' unauthorized use of the QUALITY® family **[*3]** of marks continued. (Doc. 1, ¶ 73). Plaintiff initiated this action to halt Defendants' unauthorized use of the QUALITY® family of marks on August 26, 2016.

After Defendants failed to file an answer in this matter, Plaintiff moved for an entry of default (Doc. 16), which the Clerk of the Court granted (Doc. 17). Shortly

thereafter Plaintiff motioned the Court for default judgment against Defendants based on the claims asserted within the Complaint. (Doc. 18).

On November 9, 2016, the Court granted Plaintiff's default judgment motion as to all claims asserted within the Complaint. (Doc. 20). As part of the Order, the Court ruled as follows: (1) Defendants were permanently enjoined from further use of the QUALITY® family of marks; (2) Defendants were to surrender up all items bearing the QUALITY® family of marks still in their possession; and (3) Defendants were to provide an accounting for the term of infringement. (Doc. 20, pp. 15-17). Defendants failed to comply with the Order in any fashion.

Even after entry of the permanent injunction, Defendants continued to make unauthorized use of the QUALITY® family of marks at the Subject Property. *See* (Doc. 24). Given this, the Court entered a **[*4]** Show Cause Order directing Defendants to show cause why they should not be held in contempt of court for refusing to abide by the terms of the November 9, 2016 Order. (Doc. 25). Yet again, Defendants failed to comply and Plaintiff's onsite inspection of the Subject Property showed Defendants continued to make unauthorized use of the QUALITY® family of marks as of April 11, 2017. (Doc. 29). At this time the Court entered an order finding Defendants in civil contempt. (Doc. 32). The Order also directed the United States Marshal Service to aid in enforcing the Court's order by seizing and impounding any infringing material still located at the Subject Property as soon as practicable. (Doc. 32).

On May 19, 2017, the United States Marshal Service, under supervision of Plaintiff's counsel, executed the Seizure Order at the Subject Property. *See* (Doc. 35-1). During the execution of the Seizure Order, the Subject Property was "de-flagged" (signage removal) and any items bearing the QUALITY® family of marks were seized. As of that date, Defendants had made unauthorized use of the QUALITY® family of marks for approximately forty-five (45) months.

## II. ANALYSIS

### A. Trademark Infringement Damages [*5]

Plaintiff seeks three forms of infringement damages under *§ 32(a)* of the Lanham Act, *15 U.S.C. § 1117(a)* for Defendants' trademark infringement during the holdover period (*i.e.*, August 2013-May 2017). First,

---

for others, and online hotel and motel reservation services for others; No. 3,569,789 for the mark Q QUALITY HOTEL + design for use in connection with the provision of hotel and motel services, hotel and motel reservation services for others, and online hotel and motel reservation services for others; and No. 3,837,912 for the mark Q (stylized) for use in connection with hotel and motel services, hotel and motel reservation services for others, online hotel and motel reservation services for others, and providing a complimentary breakfast to hotel guests. (Doc. 1, ¶¶ 11-44; Doc. 1-2 to Doc. 1-14). Plaintiff contends that each registration is incontestable under *Section 15* of the Lanham Act, *15 U.S.C. § 1065*. (Doc. 1, ¶ 18).

[2] Defendants Key Hotels of Atmore II, LLC; Anand Patel, Dipan Patel, and Sarju Patel are hereafter collectively referred to as "Defendants."

Plaintiff seeks to disgorge Defendants of $1,644,177.60 in "reasonably" estimated gross room rental revenue for the term of Defendants' infringing holdover. (Doc. 35, p. 6). Second, Plaintiff seeks $139,066.67 from Defendants in royalty fees based on the "reasonably" estimated gross room rental revenue for the term of Defendants' infringing holdover. (Doc. 26, p. 8). Third, based on Defendants' conduct, or lack thereof, during this matter, Plaintiff "submits that the actual damage figure of $139,066.67 should be trebled and that damages be awarded in the amount of $417,200.01." (Doc. 35, p. 9).

*Section 1117(a)* states, in relevant part:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under *section 1125(a)* or *(d)* of this title, or a willful violation under *section 1125(c)* of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of *sections 1111* and *1114* of this title, and subject to the principles of equity, to recover **[*6]** (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The Court shall assess such profits and damages or cause the same to be assessed under its discretion. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

*15 U.S.C. § 1117(a)*.

As a basis for calculating profits and royalties for Defendants' holdover period of infringement, Plaintiff asks the Court to look to the monthly average gross room rental revenues for the eight months immediately preceding when Defendants stopped reporting revenues in August 2013 (*i.e.*, January 2013-August 2013). (Doc. 35, p. 6). August 2013 coincides with the termination of the Agreement and beginning of Defendants' infringement. Plaintiff explains that the average monthly room rental income for this period is $36,537.28. (Doc. 35, p. 6). Plaintiff contends that looking to the twelve months preceding Defendants' holdover is necessary because Defendants refused to participate in this litigation or provide an accounting for their holdover period of infringement as ordered. *Id.*

When an infringing defendant defaults and refuses to provide **[*7]** income data for the holdover period of infringement, a court may look to historical income data to estimate an average amount of gross sales to calculate an award under *§ 1117(a)*. *Choice Hotels Int'l v. Patel, 2013 U.S. Dist. LEXIS 194012, 2013 WL 12114787, at *3 (S.D. Cal. June 11, 2013)*. And "'when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales.'" *Tiramisu Int'l LLC v. Clever Imports LLC, 741 F. Supp. 2d 1279, 1290-91 (S.D. Fla. 2010)* (quoting *WMS Gaming Inc. v. WPC Prods. Ltd., 542 F.3d 601, 609 (7th Cir. 2008))*. This puts the burden of proving the net revenue squarely on the shoulders of the infringing party, which is where it belongs under *§ 1117(a)*.

Defendants failed to appear in this matter and provide any measure of accounting or deductions, even after being ordered by the Court to do so. Thus, the Court finds Plaintiff's proffered computation method and value for monthly income ($36,537.28) reasonable. The Court concludes that Defendants' refusal to offer any deductions means they do not contest that this amount is also the monthly profit amount by which to determine any award Plaintiff is due.

## 1. Double Recovery

Even though *§ 1117(a)* uses the conjunctive term *and* to enumerate a plaintiff's possible means of recovery, the Court is unconvinced that all three forms of relief **[*8]** are mandatory when *§ 1117(a)* clearly states that any means of recovery is subject to specifically enumerated sections of the Lanham Act and the principles of equity. To be sure, the Eleventh Circuit has used the permissive term "may" when describing *§ 1117* damages and left awarding such relief up to the wide discretion of a district court. *Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986)*.

One such circumstance when a plaintiff may not be due both an infringing defendant's profits and any damages suffered is when awarding both amounts to double recovery. *See, e.g., Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1010 (9th Cir. 1994)* ("[R]ecovery of both plaintiff's lost profits and disgorgement of defendant's profits is generally considered double recovery under the Lanham Act."); *Choice Hotels Int'l, 2013 U.S. Dist. LEXIS 194012, 2013 WL 12114787, at *3* (applying the principle from *Nintendo of America* and barring cumulative recovery of

both a defendant's profits and plaintiff's damages because such recovery amounted to double recovery); *Members 1st Fed. Credit Union v. Metro Bank, 2010 U.S. Dist. LEXIS 112781, 2010 WL 4318839, at *3 (M.D. Pa. Oct. 22, 2010)*, on reconsideration, *2011 U.S. Dist. LEXIS 6005, 2011 WL 208743 (M.D. Pa. Jan. 21, 2011)* (explaining that a defendant's profits and plaintiff's damages are not "mutually exclusive" and "a court may, mindful of equitable principles and the prohibition on double recovery, award only one type of relief, award both, or deny all monetary relief"); *Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc., 409 F. Supp. 2d 1131, 1136 (D. Minn. 2005)* (declining to cumulatively award a defendant's profits and plaintiff's damages **[*9]** when it amounted to double recovery) (citing *EFCO Corp. v. Symons Corp., 219 F.3d 734, 742 (8th Cir. 2000)*); *Polo Fashions, Inc. v. Extra Special Products, Inc., 1980 U.S. Dist. LEXIS 16290, 1980 WL 30287, at *8 (S.D. N.Y. Mar. 5, 1980)* (damages and profits may not be awarded together if based on the same sales); McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:73 ("damages and profits cannot be awarded simultaneously if it would result in over-compensation"). *See also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 208, 62 S. Ct. 1022, 86 L. Ed. 1381, 1942 Dec. Comm'r Pat. 767 (1942)* (vacating and remanding to the district court to determine if actual damages in addition to lost profits are warranted). *But see Hospitality Int'l v. Mahtani, 1998 U.S. Dist. LEXIS 16445, 1998 WL 35296447, at 30-31 (M.D. N.C. Aug. 3, 1998)* (cumulatively awarding a defendant's profits and plaintiff's damages under *§ 1117(a)*). A court may raise the issue of double recovery *sua sponte* in deciding what damages a plaintiff is due from a defaulting defendant's trademark infringement. *Choice Hotels Int'l, Inc., 2013 U.S. Dist. LEXIS 194012, 2013 WL 12114787, at *3*.

Although the undersigned is unable to ascertain whether the Eleventh Circuit has necessarily found double recovery under *§ 1117(a)* permissible, declining to cumulatively award both profits and damages under *§ 1117(a)* when they amount to double recovery generally aligns with the reasoning of the United States Supreme Court and the Eleventh Circuit. *See Gen. Tel. Co. v. EEOC, 446 U.S. 318, 333, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980)* (explaining that "the courts can and should preclude double recovery by an individual"); *White v. United States, 507 F.2d 1101, 1103 (5th Cir. 1975)* (explaining that "no duplicating recovery of damages for

the same injury may be had").[3]

A very real possibility of double **[*10]** recovery looms on the horizon when the Court looks to simultaneously disgorge Defendants' profits and award Plaintiff's royalties. To be sure, Plaintiff not only asks the Court to award it Defendants' estimated profits for Defendants' infringing holdover but to circle back around and use the profits they seek as a basis for royalty damages for Defendants' same infringing holdover. To do this would allow Plaintiff to double-down on Defendants' single act of infringement. Such an award would amount to double recovery.[4]

The Court is not to be understood as concluding that cumulative recovery is precluded in every instance. The outcome may have been different if Plaintiff had shown that the royalties due under the franchise agreement were not calculated using the same monthly income Plaintiff asks the Court to disgorge. Additionally, the outcome may have been different if the claim for relief was based on separate acts by Defendants or disparate harm. *See Ramada Inns, Inc., 804 F.2d at 1566* (finding that a franchisor could recover both a breach of a franchise agreement award and statutory award under the Lanham Act because the two claims were based on separate conduct and addressing disparate harm); **[*11]** *see also Microsoft Corp. v. Tierra Computer, Inc., 184 F. Supp. 2d 1329 (N.D. Ga. 2001)* (finding recovery under the Copyright Act and Lanham Act constitutes two separate wrongs, which did not amount to double recovery). Thus, the Court declines to exercise its discretion and award Plaintiff both disgorgement of Defendants' profits and damages because it would amount to double recovery in this

---

[3] Fifth Circuit decisions rendered on or before September 30, 1981, are binding precedent on this Court. *See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc).

[4] It bears noting that the Court's previous Order recognized that a court may cumulatively award damages and an infringer's profits. (Doc. 20, p. 14) (citing *Inmuno Vital, Inc. v. Golden Sun, Inc., 49 F. Supp. 2d 1344, 1362 (S.D. Fla. 1997)*). The present finding does not contradict the previous Order for two reasons. First, the Court noted it its previous order that cumulative recovery was discretionary, not mandatory. Second, the *Inmuno Vital* Court did not conclusively find that the plaintiff in that case was due cumulative relief and reserved ruling on damages for a later time. *49 F. Supp. 2d at 1362-63*. Moreover, the *Inmuno Vital* Court did not evaluate whether recovery of both profits and damages amounted to double recovery.

situation.

But even if recovery of both Defendants' profits and Plaintiff's damages did not amount to double recovery, the undersigned would still not exercise its discretion and find Plaintiff due both under *§ 1117(a)*. As this Court and the Eleventh Circuit have previously concluded, recovery of lost royalties by a victim of trademark infringement is the preferred award of damages. *See Howard Johnson Co., Inc. v. Khimani, 892 F.2d 1512, 1519-20 (11th Cir. 1990)* ("The use of lost royalties to determine the actual damages incurred by a victim of trademark misuse is well established in this court."); *Ramada Inns, Inc., 804 F.2d at 1565* ("Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks."); *Pearle Vision, Inc. v. Star Vision Centers, Inc., 2008 U.S. Dist. LEXIS 45253, 2008 WL 2329196, at *3 (S.D. Ala. June 3, 2008)* ("While PVI contends that they should be entitled to a judgment in the amount of defendants' estimated gross sales, the court believes the franchise fees PVI would be entitled to under its standard franchise agreement are a more appropriate measure [*12] of damages.") Plaintiff understands the preference of awarding royalties as it cites *Ramada Inns* for this same proposition. (Doc. 35, p. 7). It appears that Defendants received all the benefits of an authorized franchise during the holdover period. Had Defendants been properly authorized to operate a franchise during the holdover period, Plaintiff would have received the amount stipulated in the Agreement. Therefore, the Court finds that the proper award for Plaintiff under *§ 1117(a)* is the royalties Plaintiff would have been due had the Agreement remained in force.

## 2. Damages suffered by Choice Hotels

Having determined that the royalties due under the Agreement are the preferred and equitable means of Plaintiff's recovery, the question remains how much in royalty damages is Plaintiff due. It has already been established the Court may look to historical gross room rental income Defendants reported in order to determine the damages due. *See Choice Hotels Int'l, 2013 U.S. Dist. LEXIS 194012, 2013 WL 12114787, at *3*. Further, it has already been established that the average gross monthly room rental income figure is $36,537.28.

The Court notes that there is some question as to the state of the Subject Property based on the observations of a Deputy United States Marshal [*13] that executed the Seizure Order. (Doc. 35-1, p. 2). These observations

generally call into question the accuracy in using historical data to calculate damages in this matter. However, Defendants "may not complain of inexactness where [there] actions preclude precise computation of the extent of the injury." *Ramada Inns, Inc., 804 F.2d at 1565* (citation omitted). "[W]here the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may only be an approximation." *Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd., 543 F.2d 1107, 1110-11 (5th Cir. 1976)*.

Undisputed evidence shows that the Agreement between Plaintiff and Defendants contemplated Defendants would pay Plaintiff monthly "an amount equal to the sum of the Monthly Royalty Fee (4.65% of the preceding month's gross room revenues) plus the Monthly System Fee (3.85% of the preceding month's gross room revenues)." (Doc. 35-2, p. 4). Together, the Agreement contemplated Defendants would pay 8.5% of the preceding month's gross room revenues as royalties to Plaintiff. (Doc. 35-2, p. 4). Based on the estimated gross monthly room rental income ($36,537.28), the monthly royalty amount payable to Plaintiff [*14] is $3,105.67 ($36,537.28 times 8.5%). The holdover period of infringement was approximately 45 months. (Doc. 35-2, pp. 3-4). Multiplying the monthly royalty payment times the approximate holdover period, the Court finds the total measure of damages for the holdover period is $139,066.67.[5]

## 3. Treble Damages

Plaintiff asks the Court to treble its damages based on Defendants' intentional and deliberate infringement of the QUALITY® family of marks during the holdover period. (Doc. 35, p. 8).

*Section 1117(a)* provides, "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages not exceeding three

---

[5] This figure differs slightly from the figure proposed in Plaintiff's memorandum and accompanying affidavit. Upon evaluation, the Court finds the difference is based on the affidavit transposing numbers in the estimated average gross monthly room rental income. *See* (Doc. 35-2, ¶¶ 16, 17) (using $36,357.28 as the estimated monthly amount at one point and $36,375.28 at another instead of $36,537.28).

times such amount." *15 U.S.C. § 1117(a)*. A court's award of treble damages under *§ 1117(a)* is discretionary, "but it may not be punitive, and must be based on a showing of actual harm." *Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1183 (11th Cir. 1994)* (per curiam).

Here, Plaintiff makes no showing that it suffered actual harm as a result of Defendants' holdover infringement. The only damage that might exist must be implied based on a loss of goodwill and business reputation due to the state of disrepair at the Subject Property. But a loss of good will and business reputation do not justify trebling damages. *Tiramisu Int'l LLC v. Clever Imports LLC, 741 F. Supp. 2d 1279, 1291-92 (S.D. Fla. 2010)*.

Instead, **[*15]** Plaintiff's arguments for trebled damages focus on Defendants' willful, intentional, and less than commendable actions and the need for Defendants to answer for their behavior. *See* (Doc. 35, pp. 8-9). The present state of the law does not allow the Court to treble Plaintiff's damages in order to punish Defendants' actions. *See, e.g., Hospitality Int'l, Inc. v. Sitaram, Inc., 2013 U.S. Dist. LEXIS 179697, 2013 WL 6798927, at *6 (M.D. Fla. Dec. 23, 2013)* (finding treble damages based on a defendant motel owner's holdover infringement was unwarranted where no actual damage to trademark holder was shown, in spite of the defendant's default status and deliberate holdover infringement); *Tiramisu Int'l LLC, 741 F. Supp. 2d at 1294* (refusing to treble damages even though the infringing defendant's actions were willful and the defendant engaged in dilatory discovery tactics). Thus, the Court declines to treble Plaintiff's damages.

## B. Costs

Plaintiff also seeks to recover costs in this matter. (Doc. 35, p. 9). The Court determined in an earlier order that Plaintiff was due to recover costs but reserved final ruling for a time when Plaintiff found its total costs could be ascertained. (Doc. 20). Plaintiff explains that the time is now and seeks $861.71 in costs ($400.00 filing fee for the Complaint, $100.00 for attorney *pro hac vice* admission fees, $240.00 **[*16]** for service of process fees, and $121.71 for service fees from the United States Marshal Service). (Doc. 35-3, p. 1).

*Section 1117(a)* provides that a prevailing plaintiff may recover "the costs of the action." *15 U.S.C. § 1117(a)*. "The term 'costs of the action' is not defined by the Lanham Act. However, the term has been interpreted as

meaning the costs allowed under *28 U.S.C. § 1920*." *Hospitality Int'l, Inc., 2013 U.S. Dist. LEXIS 179697, 2013 WL 6798927, at *10* (citing *Rib City Group, Inc. v. RCC Restaurant Corp., 2010 U.S. Dist. LEXIS 125107, 2010 WL 4739493, at *2 (M.D. Fla. Nov. 16, 2010))*.

Under *§ 1920*, a prevailing party may recover: (1) fees of the clerk and marshal; (2) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under *28 U.S.C. § 1923*; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under *28 U.S.C. § 1828*. *28 U.S.C. § 1920*.

The Court finds the costs Plaintiff seeks to recover are permissible under *§ 1920*, save one. The cost to appear before a court *pro hac vice* are not properly taxable. *Thompson v. Equifax Credit Info. Servs., Inc., 2003 U.S. Dist. LEXIS 4243, 2003 WL 1579270, at *1 (M.D. Ala. Mar. 3, 2003)*; *Eagle Ins. Co. v. Johnson, 982 F. Supp. 1456, 1456-60 (M.D. Ala. 1997)*.[6] Given this, the Court reduces the amount Plaintiff requests and awards Plaintiff $761.71 in costs.

## C. Attorneys' Fees

The Lanham Act provides that a court may award attorney fees "in exceptional cases." *15 U.S.C. § 1117(a)*. "While Congress has not further defined 'exceptional,' the legislative history **[*17]** of the Act suggests that exceptional cases are those where the infringing party acts in a malicious, fraudulent, deliberate, or willful manner." *Burger King Corp. v. Pilgrim's Pride Corp., 15 F.3d 166, 168 (11th Cir. 1994)* (internal quotation marks omitted).

As the Court has already determined, Defendants made deliberate and unauthorized use of the QUALITY® family of marks after termination of the Agreement. (Doc. 20, p. 15). Defendants had ample opportunity to discontinue their use but insisted in their infringing actions. Based on this, the Court has already ruled that Plaintiff is due attorneys' fees. *Id.*

But even if the Court had not already ruled in such a

---

[6] This differs from a prevailing plaintiff seeking to recover the fee for original attorney admission under *§ 1920*. *Strawser v. Strange, 202 F. Supp. 3d 1318, 1321 (S.D. Ala. 2016)*.

way, Plaintiff would still be due attorneys' fees. After the Court entered a permanent injunction in this matter, Defendants continued their infringement. It took a Deputy United States Marshal visiting the Subject Property and collecting the infringing items for Defendants' serial behavior to be stopped. Therefore, the Court is reassured in its earlier decision that this is an exceptional case whereby Plaintiff is due attorneys' fees.

At the time the Court entered its default judgment, it was unknown the extent to which Plaintiff would incur additional attorneys' fees. Now that the Subject Property has **[*18]** been sterilized of any infringing mark, Plaintiff indicates that it is able to reasonably ascertain its attorneys' fees incurred in this matter. (Doc. 26, p. 9). Therefore, Plaintiff requests leave of the Court to "submit the appropriate lodestar petition." *Id.* Given the present state of this matter, the Court hereby **GRANTS** Plaintiff's request and **ORDERS** Plaintiff file with the Court a memorandum supporting the attorneys' fee request, not to exceed ten (10) pages, and any exhibits thereto no later than September 1, 2017.

## III. CONCLUSION

Based on the foregoing, the Court hereby **GRANTS**, in part, and **DENIES**, in part, Plaintiff's Motion for Entry of Damage Award (Doc. 34) as follows:

1. Plaintiff's request to disgorge Defendants' profits during the period of infringement is **DENIED**;

2. Plaintiff's request for damages for the period of infringement in the amount of $139,755.15 is **GRANTED**;

3. Plaintiff's request for treble damages for the period of infringement is **DENIED**;

4. Plaintiff is **AWARDED** costs in the amount of $761.71; and

5. Plaintiff is **ORDERED** to provide the Court with a memorandum supporting its attorneys' fee request and any exhibits thereto by September 1, 2017.

The Clerk is directed **[*19]** to mail two copies of this Order, one by certified mail, return receipt requested, and the other by first class mail, to Defendants at the address where each received service of process, to wit:
1. Key Hotels of Atmore II, LLC at 3960 Wimbledon Park, Mobile, AL 36608;

2. Anand Patel at 3960 Wimbledon Park, Mobile, AL 36608;
3. Dipan Patel at 6401 Canebrake Road, Mobile, Alabama 36695; and
4. Sarju Patel at 108 East Oak Ridge Place, Brewton, AL 36426.

**DONE** and **ORDERED** this 18th day of August, 2017.

/s/ Callie V. S. Granade

SENIOR UNITED STATES DISTRICT JUDGE

**End of Document**

13. *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1519 (11th Cir. 1990)

Q Questioned
As of: December 11, 2023 3:09 PM Z

## *Howard Johnson Co. v. Khimani*

United States Court of Appeals for the Eleventh Circuit

January 29, 1990

No. 87-3874

**Reporter**
892 F.2d 1512 *; 1990 U.S. App. LEXIS 995 **; 13 U.S.P.Q.2D (BNA) 1808 ***

HOWARD JOHNSON COMPANY, INC., Howard Johnson Franchise Systems, Inc., Howard Johnson Restaurant Franchise, Inc., Plaintiffs-Appellees v. Amir KHIMANI, Maralak, Ltd., Torbay Holding, Inc., Defendants-Appellants

**Subsequent History:** **[**1]** As Amended.

**Prior History:** Appeal from the United States District Court for the Middle District of Florida, No. 86-1079-CIV-T-17(C) Kovachevich, Judge.

## Core Terms

contempt, civil contempt, franchise, facilities, lodges, imitation, sanctions, defendants', district court, compensatory, infringement, colorable, trademark, Lanham Act, damages, preliminary injunction, compliance, royalties, profits, signs, trademark infringement, restaurants, injunction, service mark, reputation, violating, diluting, cases, hotel

## Case Summary

### Procedural Posture

Defendants, an independent hotel, its subsidiary and its principal shareholder, appealed an order of the United States District Court for the Middle District of Florida, which held them in contempt for violating a preliminary injunction in favor of plaintiffs, a hotel chain and its corporate affiliates, against the use of the hotel chain's trademark name.

### Overview

After plaintiffs prevailed in a trademark infringement suit against defendants, the district court preliminarily enjoined defendants from using plaintiffs' name or any colorable imitation. Defendants responded by renaming their hotel with plaintiffs' initials. The district court held defendants in contempt, and defendants appealed. On

appeal, the court affirmed, holding that (a) contempt order was appealable, as it was effective irrespective of which side ultimately prevailed; (b) the district court did not abuse its discretion in holding defendants in contempt, since the initials were sufficiently similar to plaintiffs' trademark name to cause consumer confusion (particularly as plaintiffs also used, within defendants' state, initials at some of its hotels and had also a trademark variant of its name using the initials - which defendants knew); and (c) the royalties award was not abusive, given that defendants likely profited from the use of a name similar to that of plaintiffs.

### Outcome

The court affirmed the district court's judgment of contempt. The contempt order was appealable as a final order, and there was no abuse of discretion since defendants' moniker was very similar to the trademarked name and the initials known by defendants to also have been trademarked by plaintiffs.

## LexisNexis® Headnotes

Civil Procedure > Sanctions > Contempt > Civil Contempt

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > Contempt > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

892 F.2d 1512, *1512; 1990 U.S. App. LEXIS 995, **1; 13 U.S.P.Q.2D (BNA) 1808, ***1808

*HN1*[⬇] **Contempt, Civil Contempt**

A finding of civil contempt is generally not reviewable on interlocutory appeal. However, there are several exceptions to this principle. There is a distinction between orders imposing a fine or penalty for contempt which may be avoided by the party purging himself of the contempt by complying with the order, and those in which a fine or penalty is imposed within a time certain that may not be avoided by some other form of compliance. The former is not appealable in an interlocutory action; the latter may be taken on appeal immediately. If the contempt penalties imposed are conditional or subject to modification, then they are not reviewable on appeal.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Contempt > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN2*[⬇] **Contempt, Civil Contempt**

A final judgment of civil contempt incorporating the previous orders for contempt, sanctions, and fees is a final, non-conditional judgment ripe for immediate appeal (so long as there is no contingency or condition which could permit the appellants to modify or purge themselves of the sanctions imposed by the judgment of contempt). Regardless of the outcome of the underlying case, the party held in contempt will be bound by the contempt judgment when this is the case. Because such an appeal is the only opportunity of the party held in contempt to alter their obligations under the judgment of contempt, it has the requisite finality for appellate review.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > Contempt > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Inferences & Presumptions > General Overview

Evidence > Burdens of Proof > Burdens of Production

*HN3*[⬇] **Contempt, Civil Contempt**

In a civil contempt proceeding, the petitioning party bears the burden of establishing by clear and convincing proof that the underlying order was violated. However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a present inability to comply that goes beyond a mere assertion of inability. Therefore, the focus of a reviewing court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue. Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > Sanctions > Contempt > General Overview

892 F.2d 1512, *1512; 1990 U.S. App. LEXIS 995, **1; 13 U.S.P.Q.2D (BNA) 1808, ***1808

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

## HN4[⬇] Contempt, Civil Contempt

A district court's judgment of civil contempt will be affirmed unless an appellate court finds that the district court abused its discretion. Thus, if the evidence is such that a reasonable person could find a clear and convincing violation of the preliminary injunction, the appellate court must affirm the contempt ruling of the district court.

Trademark Law > Special Marks > Service Marks > General Overview

Trademark Law > Causes of Action Involving Trademarks > Dilution of Famous Marks > General Overview

Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

Trademark Law > ... > Factors for Determining Confusion > Similarity of Marks > General Overview

Trademark Law > ... > Particular Subject Matter > Names > General Overview

## HN5[⬇] Special Marks, Service Marks

A district court's finding that a product name was a colorable imitation of or diluted trade and service marks is strengthened by the fact that the consuming public was likely to confuse the two marks because they created the same general impression and had been used in the same context.

Business & Corporate Compliance > ... > Causes of Action Involving Trademarks > Infringement Actions > Determinations

Civil Procedure > Remedies > Injunctions > Contempt

Trademark Law > ... > Remedies > Equitable Relief > Safe Distance Rule

Civil Procedure > Remedies > Injunctions > Preliminary

& Temporary Injunctions

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

Trademark Law > ... > Infringement Actions > Remedies > General Overview

Trademark Law > ... > Remedies > Equitable Relief > General Overview

## HN6[⬇] Infringement Actions, Determinations

Where a party has been found guilty of infringing the trademark rights of others, and has been enjoined from further violations, it should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction. It must do more than see how close it can come with safety to that which it is enjoined from doing. District courts in trademark cases possess substantial discretion to decide how close is too close, once an infringer has committed a contempt of the original injunction. It is well established that the protection of a trademark requires that a party once convicted of infringement should keep a safe distance from the margin line between compliance with the order and a violation.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Trademark Law > ... > Remedies > Equitable Relief > General Overview

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Contempt > General Overview

Torts > Remedies > Damages > General Overview

Torts > ... > Types of Damages > Costs & Attorney Fees > General Overview

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

892 F.2d 1512, *1512; 1990 U.S. App. LEXIS 995, **1; 13 U.S.P.Q.2D (BNA) 1808, ***1808

Trademark Law > ... > Infringement
Actions > Remedies > General Overview

Trademark Law > ... > Damages > Types of
Damages > Profits

## HN7[↓]  Contempt, Civil Contempt

District courts have broad discretion in fashioning civil
contempt sanctions. A district court may refer to the
remedies provided in § 35 of the Lanham Act, *15
U.S.C.S. § 1117*, as guidance for determining the
appropriate measure of damages for violating an
injunction in a trademark infringement case. Under the
Lanham Act, a plaintiff whose trademark rights have
been violated is entitled to recover the defendant's
profits, any damages sustained by the plaintiff, and the
costs of the action. The Lanham Act also gives a district
court the discretion to treble the actual damage award
and raise or lower the profit award as necessary to
compensate the plaintiff.

Civil Procedure > Sanctions > Contempt > Civil
Contempt

Torts > Remedies > Damages > General Overview

Trademark Law > ... > Equitable
Relief > Injunctions > Preliminary Injunctions

Civil
Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Contempt > General
Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Trademark Law > ... > Remedies > Equitable
Relief > General Overview

### HN8[↓]  Contempt, Civil Contempt

A federal district court's use of the Lanham Act to guide
its structuring of the civil contempt sanction in a
trademark infringement case is reasonable and within its
discretion. A court's use of the act to provide a
framework for determining the compensatory civil

contempt award was not an abuse of discretion.
Reference to the Lanham Act is reasonable given the
confluence of the trademark infringement subject matter
of the statute and this case. Additionally, both the
Lanham Act and the civil contempt sanction share a
common underlying compensatory goal.

Business & Corporate
Compliance > ... > Trademark
Law > Conveyances > Franchises

Civil
Procedure > Remedies > Injunctions > Contempt

Torts > ... > Types of Damages > Property
Damages > Loss of Use

Torts > Remedies > Damages > General Overview

### HN9[↓]  Conveyances, Franchises

The use of lost royalties to determine the actual
damages incurred by a victim of trademark misuse is
well established. Royalties normally received for the use
of a trademark may be an appropriate measure for
damages when they bear a rational relationship to the
rights appropriated.

Civil Procedure > Sanctions > Contempt > Civil
Contempt

Trademark
Law > ... > Remedies > Damages > General
Overview

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Contempt > General
Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Trademark Law > ... > Infringement
Actions > Remedies > General Overview

Trademark Law > ... > Damages > Types of
Damages > Profits

### HN10[↓]  Contempt, Civil Contempt

892 F.2d 1512, *1512; 1990 U.S. App. LEXIS 995, **1; 13 U.S.P.Q.2D (BNA) 1808, ***1808

In a trademark infringement case, profits may be included as part of compensatory relief despite the absence of a showing of pecuniary loss.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Torts > Remedies > Damages > General Overview

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

Civil Procedure > Remedies > Injunctions > Contempt

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Contempt > General Overview

Copyright Law > ... > Damages > Types of Damages > Infringement Profits

Trademark Law > ... > Damages > Types of Damages > Profits

**HN11**[🔖] **Contempt, Civil Contempt**

In the civil contempt context, a federal district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory. Even in trademark infringement cases, the factors warranting profit awards are stated in the disjunctive. Therefore, a federal district court can base a profit award upon a finding of any one of these factors.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Governments > Courts > Authority to Adjudicate

**HN12**[🔖] **Reviewability of Lower Court Decisions, Preservation for Review**

The failure of a party to raise a theory of relief before the trial court generally precludes that party from arguing the theory on appeal, and a federal appellate court may decline to exercise its discretion to consider an argument if its resolution would inappropriately require

the court to make factual findings.

**Counsel:** David L. Evans, Ava K. Doppelt, Herbert L. Allen, Neal J. Blaher, Orlando, Florida, for Defendants-Appellants.

Frank R. Jakes, Esquire, Tampa, Florida, for Plaintiffs-Appellees.

**Judges:** Kravitch, Circuit Judge, Henderson and Hill, Senior Circuit Judges. *

**Opinion by:** KRAVITCH

# Opinion

 [*1514]  KRAVITCH, Circuit Judge:

Defendants Torbay Holding, Inc. (Torbay), its wholly owned subsidiary Maralak, Ltd., and its principal shareholder Amir Khimani (referred to collectively as Maralak), appeal the district court's finding of civil contempt and imposition of sanctions in a trademark infringement action brought by plaintiffs Howard Johnson Co., Inc., Howard Johnson Franchise Systems, Inc., and Howard Johnson Restaurant Franchises, Inc. (referred to collectively as Howard Johnson). Because we conclude that the district court did not abuse its discretion in holding the defendants in civil contempt and imposing sanctions, we affirm.

FACTS

On February 6, 1984, Maralak [**2]  and Howard Johnson entered into a franchise agreement respecting the operation of three Howard Johnson motor lodges and restaurants in St. Petersburg, Cocoa, and Melbourne, Florida. After the expiration of the agreement on February 6, 1986, the defendants continued to hold out these properties as authorized Howard Johnson franchises. On July 25, 1986, Howard Johnson filed the present trademark infringement suit and sought a preliminary injunction to halt Maralak's conduct. On August 4, 1986, the court granted Howard Johnson's motion and enjoined the defendants from using the words "HOWARD JOHNSON" or "HOWARD JOHNSON'S" or the Howard Johnson quality stripe design service mark or the orange roof and blue cupola design service mark, or "any colorable imitations of

_____

* See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

these trade names and federally-registered servicemarks" in connection with the operation, promotion, and sale of services of defendants' St. Petersburg, Cocoa, and Melbourne, Florida motor [***1809] lodges and restaurants. Additionally, the defendants were prohibited from engaging in any advertising or sales practices that in any way diluted or disparaged these service marks and trade names. The district court's preliminary injunction [**3] was subsequently affirmed by this court. *Howard Johnson Co. v. Khimani, 819 F.2d 1148 (11th Cir.1987)* (mem.).

The defendants' efforts at compliance were dilatory and grudging. At least through August 17, 1986, the defendants' facilities continued to hold themselves out to the public as Howard Johnson franchises. All of the exterior signs identified the facilities as Howard Johnson motor lodges and restaurants and the buildings each had the distinctive Howard Johnson orange roof and blue cupola. The lobbies, restaurants, and guest rooms were all replete with articles bearing the Howard Johnson logo. Additionally, the personnel at these locations continued to refer to their facilities as Howard Johnson when speaking to patrons. Substantial compliance was not achieved until the eve of a September 5, 1986, contempt hearing.

Howard Johnson filed a second motion for contempt on November 6, 1986, after it discovered that the plastic coverings used by the defendants to block out the signs at the Melbourne and Cocoa locations had blown off and had not been replaced. The plaintiffs also noticed that two billboards advertising the Cocoa facility still retained the orange [**4] "roofline" logo of Howard Johnson. The trial court denied the plaintiffs' motion for contempt after the defendants removed the signs and obscured the "roofline" logo from the billboards three days prior to the second contempt hearing.

The third motion for contempt, which is the subject of this appeal, was filed by Howard Johnson on April 21, 1987, after discovering that the defendants had begun operating their Cocoa and Melbourne motor lodges and restaurants under the name "H.J. Inns." The trial court had testimony from Azim Visram, the general manager of the Cocoa and Melbourne facilities, concerning a November 1986 meeting between Visram, Khimani, and Khimani's son Ariff, who was president of defendant [*1515] Torbay Holding. [1] Visram testified that at this

meeting, "it was decided that we would get a name that would be close to Howard Johnson's name, yet it would not infringe on their name. . . ." Visram later affirmed that "the idea was to get as close to Howard Johnson as you could without infringing." Visram testified that during or shortly after this meeting, the Khimanis, with the final approval of defendant Amir Khimani, decided to rename the facilities "H.J. Inns. [**5] "

Pursuant to Amir Khimani's decision to rename the facilities, "H.J. Inns" was painted in white lettering against a dark blue background on the former Howard Johnson sign at the Cocoa lodge. Previously, the sign had displayed [**6] "HOWARD JOHNSON'S" in white letters on a light blue background. The name "H.J. Inns" was also placed with removable black plastic letters on the marquee sign at the Melbourne lodge. Additionally, the employees at both locations answered their phones and identified the facilities to the public as "H.J. Inns."

The trial court found that the defendants' operation of the Melbourne and Cocoa facilities under the name "H.J. Inns" and the "H.J. Inns" signs constituted a violation of the court's preliminary injunction. It therefore granted the plaintiffs' third motion for civil contempt and, in a subsequent hearing, imposed compensatory damages, costs, and attorneys' fees in the amount of $ 234,475.15. On appeal, the defendants challenge both the district court's finding of contempt and the amount of sanctions.

JURISDICTION

As a preliminary matter, the appellees assert that this court lacks jurisdiction to hear Maralak's appeal because it is allegedly based upon a non-final interlocutory order of civil contempt. Appellees rely on the Supreme Court's holding in *Fox v. Capital Co.*, "that except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt." *299 U.S. 105, 107, 57 S. Ct. 57, 58, 81 L. Ed. 67 (1936)*; [**7] *see Doyle v.*

---

[1] The defendants erroneously contend that this court cannot rely on the deposition testimony of Visram to support the district court's grant of civil contempt because that testimony

was not filed in the district court until October 20, 1987, several months after the May 14, 1987, civil contempt order. Defendants neglect to mention that this deposition was filed by plaintiffs in response to the defendants' motion to amend the court's civil contempt order. The court rejected the defendants' motion to strike the testimony as irrelevant and did not issue a final judgment of civil contempt until November 27, 1987 -- the same day it denied the defendants' motion for rehearing and reconsideration of the sanction order and over a month after the deposition had been filed in the district court.

892 F.2d 1512, *1515; 1990 U.S. App. LEXIS 995, **7; 13 U.S.P.Q.2D (BNA) 1808, ***1809

*London Guarantee & Accident Co., 204 U.S. 599, 27 S. Ct. 313, 314, 51 L. Ed. 641 [***1810] (1907)*; *Rosenfeldt v. Comprehensive Accounting Service Corp., 514 F.2d 607, 613 n. 9 (7th Cir. 1975)*.

Appellees are correct that *HN1*[↑] a finding of civil contempt is generally not reviewable on interlocutory appeal.  *Fox*, 299 U.S. at 107, 57 S. Ct. at 58; *Combs v. Ryan's Coal Co., 785 F.2d 970, 976* (11th Cir.), *cert. denied, 479 U.S. 853, 107 S. Ct. 187, 93 L. Ed. 2d 120 (1986)*. However, there are several exceptions to this principle. Most significant is the distinction this court has drawn

> between orders imposing a fine or penalty for contempt which may be avoided by the party purging himself of the contempt by complying with the order, and those in which a fine or penalty is imposed within a time certain that may not be avoided by some other form of compliance. The former is not appealable in an interlocutory action; the latter may be taken on appeal immediately.

*Combs, 785 F.2d at 976*; **[**8]** *Drummond Co. v. District 20, United Mine Workers of America, 598 F.2d 381, 384 (5th Cir.1979)*. [2] If the contempt penalties imposed are conditional or subject to modification, then they are not reviewable on appeal.  *Combs, 785 F.2d at 976*; **[*1516]** *Drummond, 598 F.2d at 384*.

*HN2*[↑] The final judgment of civil contempt entered by the district court on November 27, 1987, and incorporating the previous orders for contempt, sanctions, and fees is a final, non-conditional judgment ripe for immediate appeal. There is no contingency or condition which could permit the appellants to modify or purge themselves of the sanctions imposed by the judgment of contempt. **[**9]** Regardless of the outcome of the underlying trademark infringement case, the defendants will be bound by the contempt judgment. Because this appeal is the defendants' only opportunity to alter their obligations under the judgment of contempt, it has the requisite finality for appellate review.

FINDING OF CONTEMPT

---

[2] *See* *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent for this circuit).

*HN3*[↑] In a civil contempt proceeding, the petitioning party bears the burden of establishing by "clear and convincing" proof that the underlying order was violated.  *Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984)*; *Piambino v. Bestline Products, Inc., 645 F. Supp. 1210, 1213 (S.D.Fla. 1986)*. However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability. . . .'" *Combs, 785 F.2d at 984* (quoting *United States v. Hayes, 722 F.2d 723, 725 (11th Cir. 1984)*; *see United States v. McAnlis, 721 F.2d 334, 337 (11th Cir. 1983)*, **[**10]** *cert. denied*, 467 U.S. 1227, 104 S. Ct. 2681, 81 L. Ed. 2d 877 (1984). Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue.  *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America, 609 F.2d 165, 168 (5th Cir. 1980)*. Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance.  *Newman, 740 F.2d at 1524*.

*HN4*[↑] The district court's judgment of civil contempt will be affirmed unless we find that the court abused its discretion.  *Afro-American Patrolmen's League v. City of Atlanta, 817 F.2d 719, 723 (11th Cir.1987)*; *Sizzler Family Steak Houses v. Western Sizzlin' Steak House, Inc., 793 F.2d 1529, 1534 n. 4 (11th Cir.1986)*. Thus, if the evidence is such that a reasonable person could find a clear and convincing violation **[**11]** of the preliminary injunction, we must affirm the contempt ruling of the district court. *See* *Deitchman v. E.R. Squibb & Sons, 740 F.2d 556, 563-64 (7th Cir. 1984)*.

Maralak contends that the court abused its discretion in finding it in civil contempt for violating the preliminary injunction because the court lacked sufficient facts upon which to base a decision, the name "H.J. Inns" was not a colorable imitation of any Howard Johnson trade or service marks, and, in any event, it was not responsible for the violative behavior. The district court properly rejected these arguments.

The district court's preliminary injunction prohibited the defendants from using "any colorable imitation" or otherwise diluting the Howard Johnson trade name or service marks in connection with the operation of the St. Petersburg, Cocoa, and Melbourne, Florida facilities. The record before the court provided an ample basis for

892 F.2d 1512, *1516; 1990 U.S. App. LEXIS 995, **11; 13 U.S.P.Q.2D (BNA) 1808, ***1810

finding the defendants' conduct violative of the injunction by clear and convincing evidence. Specifically, the court had photographic evidence of the H.J. Inns signs at the Cocoa and Melbourne lodges and the old Howard Johnson signs that they replaced. The Cocoa [**12] H.J. [***1811] Inns sign was painted in the same color lettering against a similarly colored background on the same sign that had once said "Howard Johnson's." Although the Melbourne sign was not visually similar to the previous Howard Johnson sign, the name itself is similar enough to "Howard Johnson" that a reasonable person could find it to be a colorable imitation. *Cf. Holiday Inns v. Alberding, 683 F.2d 931, 932-33 & n.1 (5th [*1517] Cir. 1982)* (defendant's sign, retaining color and shape of former franchise sign, essentially identical to former sign despite name change from "Holiday Inn" to "Holiday Hotel"); *see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 842 (11th Cir. 1983)* (roller skating rink name "Lollipops visually similar to Jellibeans" because each is a similar sounding candy name used to designate a roller rink); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 994 (7th Cir. 1989)* (initials, in the trademark context, do not differ significantly from the words they represent). This interpretation is supported by evidence that Howard Johnson uses the "HJ" mark at several motor lodges [**13] in Florida and that it has a federally registered "HJH" service mark for hotel services.

*HN5*[↑] ] The court's finding that "H.J. Inns" was a colorable imitation of or diluted Howard Johnson trade and service marks is strengthened by the fact that the consuming public was likely to confuse the two marks because they created the same general impression and had been used in the same context. *See Jellibeans, 716 F.2d at 842; Holiday Inns, 683 F.2d at 933; Hart Schaffner & Marx v. Alexander's Department Stores, 341 F.2d 101, 102 (2d Cir. 1965)*. Aside from the intrinsic similarity of the names and design, the same facilities with the same signs had previously operated as Howard Johnson franchises, thereby greatly increasing the possibility that consumers would interpret "H.J. Inns" as designating a Howard Johnson establishment. *See, e.g., Holiday Inns v. Airport Holiday Corp., 493 F. Supp. 1025, 1028 (N.D.Tex. 1980), aff'd sub nom Holiday Inns, Inc. v. Alberding, 683 F.2d 931 (5th Cir. 1982)* (considering whether former [**14] franchise's imitation of hotel name misled and lured potential franchise patrons. [3] The danger of such confusion was

exacerbated by the existence during the period of contempt of a Howard Johnson advertising campaign having the theme "We're turning Howard Johnson upside down." Customers who were aware of these advertisements could perceive the slight alteration in name as consistent with the theme of making substantial changes in the operation of the franchise.

[**15] Furthermore, the legal posture of this case places a heavier burden upon the defendants of avoiding a colorable imitation of or diluting Howard Johnson trade and service marks than upon a party not already preliminarily enjoined from engaging in such activity. The former Fifth Circuit explained that

> *HN6*[↑] ] where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction. They must do more than see how close they can come with safety to that which they are enjoined from doing.

*Eskay Drugs v. Smith, Kline & French Laboratories, 188 F.2d 430, 432 (5th Cir. 1951); see Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1432 (7th Cir. 1985), cert. denied, 475 U.S. 1147, 106 S. Ct. 1801, 90 L. Ed. 2d 346, 229 U.S.P.Q. (BNA) 560 (1986)* (district courts in trademark cases "possess[] substantial discretion to decide how close is too close, once an infringer [**16] has committed a contempt of the original injunction"); *World's Finest Chocolate, Inc. v. World Candies, Inc., 409 F. Supp. 840, 844 (N.D.Ill. 1976), aff'd, 559 F.2d 1226 (7th Cir. 1977)* ("It is well established that the protection of a trademark requires that a party once convicted of infringement . . . should keep a safe distance from the margin line between compliance with the order and a violation.").

The court also did not abuse its discretion in rejecting the defendants' contention that, because they had made

---

[3] Similarly, in *Clayton v. Howard Johnson Franchise Systems, Inc.*, a district court found the use of "HJ" in the name of a

motor lodge to be "the colorable imitation of 'Howard Johnson's' and . . . likely to cause confusion." *730 F. Supp. 1553, 1558 (M.D.Fla. 1988)*. The court also found "HJ" confusingly similar to "HJH." *Id.* at 17; *see also Howard Johnson Co. v. Ho-Jo Campsites, Inc., 273 F. Supp. 447 (M.D.Fla. 1967)* (use of "Ho-Jo" likely to cause public to believe there is a connection between Howard Johnson and defendant's campsites).

a substantial [*1518] good faith effort at compliance with the court's order, a finding of contempt was inappropriate. To the contrary, the record indicates that the defendants engaged in the process of compliance slowly and grudgingly, prompting three motions for civil contempt from [***1812] Howard Johnson. This is not the case of a lodge or restaurant owner using his or her own initials to name an establishment, unaware that a similar trademarked name was being used by another facility. Rather, there was evidence before the court that the defendants deliberately sought a name that "would be close to Howard Johnson's name, yet . . . not [**17] infringe." The defendants also were aware that other Howard Johnson lodges used the initials "HJ" to identify themselves. In fact, Amir Khimani described the use of the initials "HJ" in franchise manuals as "Howard Johnson's in short form." The court's finding that the defendants' use of the H.J. Inns name violated the preliminary injunction is well supported by the evidence and does not approach an abuse of discretion.

The defendants seek to absolve themselves of responsibility for violating the court's injunction by attributing the name change decision to other corporate entities. The defendants note that while Maralak owned the facilities at issue, the Melbourne and Cocoa locations were subleased to and operated by Aly Investments, Inc. (Aly). The defendants urge that the adoption of the H.J. Inns appellation was attributable to Aly rather than themselves. The court below questioned the purported control of the facilities by Aly and found that the name change was made with Khimani's knowledge and agreement. We agree.

Closer scrutiny of the relationship between the defendants and Aly belies the assertion that the defendants lacked either control of the facilities or responsibility [**18] for violating the injunction. Cf. Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1553 (9th Cir. 1989) (finding "substantial and continuing connection" between infringing acts of parent and subsidiary). The evidence shows that Khimani's sons, who are corporate officers of defendant Torbay, are also officers and directors in Aly and own 66% of the company. Furthermore, the defendants concede that Khimani instructed Aly to chose a new name for the Cocoa and Melbourne lodges. Khimani subsequently examined the H.J. sign and testified that he was fully aware of the name change. In fact, Visram, the president of Aly testified that the decision to name the facilities H.J. Inns was made by Khimani and his son and that he subsequently changed the name at their direction.

Even accepting the defendants' contention that they lacked control over the facilities while they were subleased to Aly, the defendants concede that in January 1987, the properties were reconveyed to Maralak. Rather than using this opportunity to remedy any potential violation of the court's order, Maralak left the signs intact and conveyed the Cocoa property to a new sublessee along with [**19] an assignment of the non-exclusive right to use the name H.J. Inns. A month later, Maralak exhibited its control of the Melbourne property by having the H.J. Inns sign removed. [4] The district court had ample evidence to support its finding that the defendants were responsible for the violating the preliminary injunction.

SANCTIONS

The district court awarded Howard Johnson $ 218,555.48 in compensatory sanctions for the defendants' civil contempt. The award of compensatory sanctions was based on the amount of royalties Howard Johnson would have received during this period from the Melbourne and Cocoa lodges ($ 9,727.66) multiplied by a factor of 1.5 due to "the flagrant and deliberate nature of the defendants' continuing [**20] infringement," [*1519] for a total of $ 14,591.49. [5] In addition to the lost royalties, the award of compensatory sanctions included $ 203,963.99 in profits earned by the defendants during the period of contempt under a theory of unjust enrichment or, alternatively, an application of the Lanham Act. 15 U.S.C. § 1117(a) (1982 & Supp. 1989). The court also awarded the plaintiffs $ 15,919.67 for attorneys fees and costs incurred in connection with the contempt proceedings.

The defendants raise numerous objections to the district court's award of sanctions. First, they argue that the court lacked sufficient evidence of actual pecuniary loss suffered by Howard Johnson [**21] to support an award of compensatory damages based on franchise royalties. Essentially, defendants urge that the award of royalties

---

[4] Maralak took down the removable H.J. Inns lettering on the Melbourne marquee sign at the request of Howard Johnson, with whom it was conducting negotiations for a possible future franchise agreement. Maralak, by its own admission, did not remove the painted Cocoa sign because of the expense.

[5] Based on the terms of Howard Johnson franchise agreements, the royalty fees were calculated at a rate of 1.5% of gross restaurant sales and 5% of lodge gross revenues. The court declined to assess the 1% marketing contribution normally paid by Howard Johnson franchises because it did not constitute a royalty fee.

was improper because Maralak was not using any of the services and benefits provided by the franchise, including participation in the Howard Johnson national reservation network. **[\*\*\*1813]**

**HN7**[⬆] District courts have broad discretion in fashioning civil contempt sanctions. *United States v. United Mine Workers of America, 330 U.S. 258, 303-04, 67 S. Ct. 677, 701-02, 91 L. Ed. 884 (1947); Sizzler Family Steak Houses, 793 F.2d at 1536 n. 8.* Here, the trial court referred to the remedies provided in section 35 of the Lanham Act as guidance for determining the appropriate measure of damages for violating an injunction in a trademark infringement case. Under the Lanham Act, a plaintiff whose trademark rights have been violated is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *15 U.S.C. § 1117(a).* The Lanham Act also gives the court the discretion **[\*\*22]** to treble the actual damage award and raise or lower the profit award as necessary to compensate the plaintiff. *Id.*

**HN8**[⬆] The district court's use of the Lanham Act to guide its structuring of the civil contempt sanction was reasonable and within its discretion. *See, e.g., Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458-59 & n. 37 (11th Cir. 1984)* (suggesting that Lanham Act could be followed in determining contempt sanctions in trademark infringement case); *W.E. Bassett Co. v. Revlon, Inc., 305 F. Supp. 581, 594 (S.D.N.Y. 1969)* (following Lanham Act in imposing contempt sanction for violation of preliminary injunction), *aff'd in part, rev'd in part, 435 F.2d 656 (2d Cir. 1970)* (reversing only the district court's denial of profit damages). Although we do not hold that a district court should impose Lanham Act remedies in a civil contempt action involving trademark misuse, we find that the court's use of the act to provide a framework for determining the compensatory civil contempt award was not an abuse of discretion.

Reference **[\*\*23]** to the Lanham Act was reasonable given the confluence of the trademark infringement subject matter of the statute and this case. Additionally, both the Lanham Act and the civil contempt sanction share a common underlying compensatory goal. *Cf.* Lanham Act § 35, *15 U.S.C. § 1117* (award "shall constitute compensation and not a penalty"); *Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 719, 87 S. Ct. 1404, 1407-08, 18 L. Ed. 2d 475 (1967)* (referring to Lanham Act's provision for profit, damage, and cost awards as compensatory relief) *with Leman v. Krentler-Arnold Hinge Last Co., 284 U.S.*

*448, 452-53, 52 S. Ct. 238, 240, 76 L. Ed. 389 (1932)* (civil contempt awards must be compensatory, not punitive); *In re Smith*, 735 F.2d at 459 (same).

The district court determined Howard Johnson's actual damages by calculating the amount of royalty payments it would have received during the period that the defendants were diluting or using a colorable imitation of its trademark had the defendants been a genuine Howard Johnson franchise. **[\*\*24] HN9**[⬆] The use of lost royalties to determine the actual damages incurred by **[\*1520]** a victim of trademark misuse is well established in this court. *See Ramada Inns v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986); Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., 597 F.2d 71, 76 (5th Cir.1979); Holiday Inns, 493 F. Supp. at 1028; see also Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 920, 223 U.S.P.Q. (BNA) 982 (Fed.Cir. 1984)* (royalties normally received for the use of a trademark may be an appropriate measure for damages when they bear a rational relationship to the rights appropriated). In both *Ramada Inns* and *Holiday Inns*, hold-over licensees who continued to use the licensor's trademarks on their lodges after the termination of the licenses were assessed sanctions based on lost royalty payments. *See Ramada Inns, 804 F.2d at 1563; Holiday Inns, 683 F.2d at 932-33. Holiday Inns*, in particular, presents factual circumstances remarkably similar to the present case because it involved a motel that used a colorable imitation of its **[\*\*25]** former licensor's name, "Holiday Inns," by operating under the name "Holiday Hotel." *See Holiday Inns, 683 F.2d at 932-33.*

Maralak urges us to distinguish these cases because it did not enjoy all of the benefits of a Howard Johnson franchise, such as participation in the national reservation network and a listing in the Howard Johnson directory. This argument fails because neither of the defendants in *Ramada Inns* and *Holiday Inns* were shown to have received all of the benefits of an authorized franchisee. *See Ramada Inns, 804 F.2d at 1563* (decision based on infringer's use of signs and graphics); *Holiday Inns, 493 F. Supp. at 1027* (decision based on infringer's use of sign). [6] **[\*\*28]** Moreover, by

_____

[6] In fact, if these cases are to be distinguished at all it is because Maralak, unlike the defendants in *Ramada Inns* and *Holiday Inns*, was not merely a former lodge licensee who had been enjoined from violating a franchise trademark. Rather, Maralak took the additional step of violating a court injunction and further injured the plaintiffs' trademark. This conduct

imitating [***1814] Howard Johnson's name, the defendants took advantage of perhaps the most significant benefit of the Howard Johnson franchise. Customers selecting lodging in an unknown facility of a familiar franchise are likely to impute the characteristics of the franchise, including its general reputation, to the specific inn. When an unaffiliated lodge imitates a franchise name, it is exploiting the goodwill of that chain. See University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535, 1545 (11th Cir. 1985) [**26] (defendant imitated school bulldog mark to capitalize on popularity of football program); Jellibeans, 716 F.2d at 843 (affirming district court's finding that defendant chose similar roller rink name to confuse public and capitalize on plaintiff's reputation); John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 977 (11th Cir. 1983) (only plausible explanation for attempt to adopt a mark as close to plaintiff's as "legally" permissible is to "cash in" on plaintiff's goodwill); Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 704 (5th Cir. Unit A 1981) (same), cert. denied, 457 U.S. 1126, 102 S. Ct. 2947, 73 L. Ed. 2d 1342 (1982). Likewise, any unfavorable reaction of the imitator's patrons are likely to be attributed to the franchise as a whole and diminish its reputation. See Ramada Inns, 804 F.2d at 1564-66 (affirming damage award that compensated for Ramada Inns' lost reputation while hold-over franchisee was operating hotel poorly); Boston Professional Hockey Ass'n, 597 F.2d at 75 (affirming damage award that compensated in part for injury to [**27] plaintiff's reputation caused by poor imitation of product). It was, therefore, not an abuse of discretion for the district court to use lost royalty payments to replicate the actual damages suffered by Howard Johnson. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S. Ct. 248, 75 L. Ed. 544 (1931) (where plaintiff's injury "is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); Ramada Inns v. Gadsden Motel [*1521] Co., 804 F.2d 1562, 1565 (11th Cir. 1986) (same). [7]

---

likewise justifies the district court's finding that "the flagrant and deliberate nature of Defendants' continuing infringement" warrants the use of the 1.5 actual damage multiplier.

[7] Additionally, it seems reasonable to interpret the district court's refusal to include the 1% marketing contribution fee in the royalty damage award as a reflection of the fact that the defendants did not gain all of the advantages of the franchise. Arguably, even an award of such damages might have been

Maralak also objects to the district court's award of the profits generated by the Melbourne and Cocoa facilities during the period they were in contempt of the court's injunction. The defendants do not seriously challenge the discretion of a district court to award profits as part of a civil contempt sanction. Indeed, the Supreme Court has held that HN10[↑] profits may be included as part of compensatory relief despite the absence of a showing of pecuniary [**29] loss. Leman, 284 U.S. at 456-57, 52 S. Ct. at 241-42. [8] The Second Circuit has even reversed a district court's refusal to consider profits as part of a compensatory contempt sanction. See Oral-B Laboratories v. Mi-Lor Corp., 810 F.2d 20, 25-26 (2d Cir. 1987); W.E. Bassett Co., 435 F.2d at 664. Rather, the defendants contend that the court abused its discretion in awarding profits because such an award is only appropriate where the plaintiff sustains provable damage from the infringement, the defendant's conduct is a deliberate and willful violation, the infringer is unjustly enriched, and the sanction is necessary for future deterrence.

[**30] The defendants' proposition is erroneous. First, the cases relied upon by the defendants to derive a series of prerequisites for an award of profits are in the context of trademark infringement cases rather than civil contempt actions. HN11[↑] In the civil contempt context the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement [***1815] that they be compensatory. See Leman, 284 U.S. at 452-53, 52 S. Ct. at 240; Rickard, 735 F.2d at 459. Second, even in trademark

---

appropriate because the defendants' locations at former Howard Johnson franchises and use of a similar name are likely to have misled customers enticed by Howard Johnson advertising campaigns into staying at the unaffiliated imitating facilities.

[8] In Holiday Inns, the Fifth Circuit approved a district court's imposition of both profits and royalty damages in a trademark infringement case. 683 F.2d at 933-35, aff'g, 493 F. Supp. 1025 (N.D.Tex. 1980). Likewise, in Maltina Corp. v. Cawy Bottling Co., a district court awarded plaintiffs both the defendant's profits and damages to reputation and goodwill as part of a sanction for the defendant's violation of an injunction in a trademark infringement action. 613 F.2d 582, 583 (5th Cir. 1980). The old Fifth Circuit did not question the propriety of awarding both profits and damages, but reversed the award of damages because the record was "wholly devoid of support for [the $ 35,000 damage] figure." Id. at 585-87. In contrast the judge based the damage award on readily ascertainable royalty figures which were a reasonable reflection of the injury to reputation and goodwill suffered by Howard Johnson.

892 F.2d 1512, *1521; 1990 U.S. App. LEXIS 995, **30; 13 U.S.P.Q.2D (BNA) 1808, ***1815

infringement cases, the factors warranting profit awards are stated in the disjunctive. *Maltina*, 613 F.2d at 585; *W.E. Bassett Co.*, 435 F.2d at 664. Therefore, a court could base a profit award upon a finding of any one of these factors. Finally, to the extent that an examination of these factors may assist the determination of whether the district judge abused her discretion in incorporating profits as part of the civil contempt sanction, the evidence provides ample justification for the award. [9]

 **[**31] [*1522]**   Because the district court's finding of contempt and imposition of sanctions was within its discretion and the defendants' remaining arguments are meritless, [10] the district court's final judgment of civil contempt is AFFIRMED.

_____

[9] For instance, the district court was not clearly erroneous in finding the defendants' conduct flagrant and deliberate. Likewise, the conduct of the defendants in persisting in a violation of Howard Johnson's trademark after they were preliminarily enjoined from doing so adds a specific deterrent value to the sanction while also providing a general deterrent to conduct evincing trademark infringement. Most significantly, the court did not abuse its discretion in awarding profits under a theory of unjust enrichment based on the evidence before it. *See Manhattan Industries v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5-7 (2d Cir. 1989)*. During the period of contempt the defendants both injured Howard Johnson by imitating its trademark without compensation and enriched themselves by tapping the reputation and good will of Howard Johnson through this imitation. The district court's royalty award remedies the defendants' colorable imitation of the plaintiff's trademark without compensation while the profit award remedies the impermissible gains made by the defendants' exploitation of the Howard Johnson mark through its imitation.

[10] For the first time on appeal, defendants contend that the award of profits as to the Cocoa facilities was improper because those profits were purportedly realized by the defendants' sub-lessee rather than themselves. *HN12*[⬆] The failure of a party to raise a theory of relief before the trial court generally precludes that party from arguing the theory on appeal. *Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S. Ct. 2868, 2877-78, 49 L. Ed. 2d 826 (1976); Denis v. Liberty Mutual Insurance Co., 791 F.2d 846, 848-49 (11th Cir. 1986); Lumpkin v. Ricketts, 551 F.2d 680, 682 n. 3* (5th Cir.), *cert. denied,* **434 U.S. 957, 98 S. Ct. 485, 54 L. Ed. 2d 316 (1977)**. We decline to exercise our discretion to consider this argument because its resolution would inappropriately require this court to make factual findings. *See Denis, 791 F.2d at 849; see also Holiday Inns, 683 F.2d at 934-35* (rejecting argument that defendant airport never received profits from trademark infringing inn because "at no time before or during the trial on damages . . . did Airport claim that it had not received profits earned by the hotel that it admittedly owned").

 **[**32]**

_____

End of Document

*14. Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562 (11th Cir. 1986)

⚠️ Caution
As of: December 11, 2023 3:10 PM Z

# *Ramada Inns, Inc. v. Gadsden Motel Co.*

United States Court of Appeals for the Eleventh Circuit

December 3, 1986

No. 85-7774

## Reporter

804 F.2d 1562 *; 1986 U.S. App. LEXIS 34279 **; 1 U.S.P.Q.2D (BNA) 1011 ***

RAMADA INNS, INC., Plaintiff-Appellee, v. GADSDEN MOTEL COMPANY, a partnership; Conrad O. Moss; Thomas H. Heatherly and John T. Murray, Defendants-Appellants

**Subsequent History: [**1]** Rehearing En Banc Denied January 27, 1987.

**Prior History:** Appeal from the United States District Court for the Northern District of Alabama.

**Disposition:** Affirmed.

## Core Terms

damages, trademark infringement, district court, infringement, liquidated damages, motel, franchise agreement, franchise fee, contends, award damages, Lanham Act, calculated, awarding, franchisee, summary judgment, expenditures, partnership, speculative, termination, estimate, license

## Case Summary

### Procedural Posture

Defendants, a company and partners, appealed from a judgment of the United States District Court for the Northern District of Alabama, which awarded plaintiff corporation substantial damages on plaintiff's claims for trademark infringement under the Lanham Trademark Act of 1946, *15 U.S.C.S. § 1051 et seq.*, and breach of contract.

### Overview

After plaintiff terminated defendant's license agreement, defendants, the company and partners, continued using plaintiff's signage and graphics. Consequently, plaintiff sued defendants for trademark infringement under the Lanham Trademark Act of 1946, *15 U.S.C.S. § 1051 et seq.*, and for breach of franchise agreement. The district court found defendant partners liable on the trademark infringement claims, awarded damages, and held the liquidated damages clause of the franchise agreement void as a penalty. Defendants appealed the assessment of damages. Upon review, the court concluded the assessment of actual damages or harm suffered by plaintiff was not speculative. Although the trademark infringement damages were calculated in almost the same manner as the liquidated damages, liquidated damages were awarded because defendants breached the franchise agreement, while trademark infringement damages were awarded because they held over after the agreement was terminated. By committing two indiscretions, defendants became liable for two damage awards. Accordingly, the district court had not abused its discretion in assessing damages.

### Outcome

The court affirmed the judgment. Defendants were liable for the damage awards for each indiscretion they had committed.

## LexisNexis® Headnotes

Trademark Law > ... > Remedies > Damages > General Overview

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > General Overview

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

804 F.2d 1562, *1562; 1986 U.S. App. LEXIS 34279, **1; 1 U.S.P.Q.2D (BNA) 1011, ***1011

Trademark Law > ... > Infringement
Actions > Remedies > General Overview

Trademark Law > ... > Damages > Types of
Damages > Profits

**HN1**[⬇] **Remedies, Damages**

Under the Lanham Act, damages for trademark
infringement may include (1) the defendant's profits, (2)
any damages sustained by the plaintiff, and (3) the cost
of the action. *15 U.S.C.S. § 1117*.

Trademark
Law > ... > Remedies > Damages > General
Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Trademark Law > ... > Infringement
Actions > Remedies > General Overview

**HN2**[⬇] **Remedies, Damages**

A trademark infringement award must be based on
proof of actual damages, and some evidence of harm
arising from the violation must exist.

Civil Procedure > Preliminary
Considerations > Equity > General Overview

Trademark
Law > ... > Remedies > Damages > General
Overview

**HN3**[⬇] **Preliminary Considerations, Equity**

See *15 U.S.C.S. § 1117*.

Civil Procedure > Judicial
Officers > Judges > General Overview

Trademark
Law > ... > Remedies > Damages > General
Overview

Trademark Law > ... > Federal Unfair Competition

Law > Lanham Act > General Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Trademark Law > ... > Infringement
Actions > Standards of Review > General Overview

**HN4**[⬇] **Judicial Officers, Judges**

Great latitude is given the trial judge in awarding
damages, and his judgment will not be set aside unless
the award is clearly inadequate. This is especially true
of an award fashioned pursuant to the Lanham Act,
which expressly confers upon district judges wide
discretion in determining a just amount of recovery for
trademark infringement. *15 U.S.C.S. § 1117*.

Trademark
Law > ... > Remedies > Damages > General
Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

**HN5**[⬇] **Remedies, Damages**

In making a damage assessment, the district court may
allow recovery for all elements of injury to the business
of the trademark owner proximately resulting from the
infringer's wrongful acts.

Trademark
Law > ... > Remedies > Damages > General
Overview

Trademark Law > ... > Federal Unfair Competition
Law > Lanham Act > General Overview

**HN6**[⬇] **Remedies, Damages**

The Lanham Act, *15 U.S.C.S. § 1051 et seq.*, damages
may be awarded even when they are not susceptible to
precise calculations: where the wrong is of such a
nature as to preclude exact ascertainment of the
amount of damages, plaintiff may recover upon a
showing of the extent of damages as a matter of just
and reasonable inference, although the result may be

804 F.2d 1562, *1562; 1986 U.S. App. LEXIS 34279, **1; 1 U.S.P.Q.2D (BNA) 1011, ***1011

only an approximation.

Trademark
Law > ... > Remedies > Damages > General
Overview

**HN7**[⬇] **Remedies, Damages**

The wrongdoer may not complain of inexactness of damages where his actions preclude precise computation of the extent of the injury.

Business & Corporate
Compliance > ... > Trademark
Law > Conveyances > Franchises

Trademark
Law > ... > Remedies > Damages > General
Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Trademark Law > ... > Damages > Types of
Damages > Profits

**HN8**[⬇] **Conveyances, Franchises**

Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks.

Business & Corporate
Compliance > ... > Trademark
Law > Conveyances > Franchises

Business & Corporate Law > Distributorships &
Franchises > Remedies > General Overview

Trademark Law > Causes of Action Involving
Trademarks > Infringement Actions > General
Overview

Business & Corporate Law > Distributorships &
Franchises > Causes of Action > Breach of Contract

Business & Corporate Law > Distributorships &
Franchises > Franchise Relationships > Elements

Business & Corporate Law > Distributorships &
Franchises > Trademark Licensing

Trademark Law > Conveyances > General
Overview

Trademark Law > ... > Infringement
Actions > Remedies > General Overview

Trademark
Law > ... > Remedies > Damages > General
Overview

**HN9**[⬇] **Conveyances, Franchises**

When a trademark infringement action is established because a franchisee "holds over," and damages are based on the franchisor's losses, royalties normally received by the franchisor and expenditures necessary to establish a new franchisee will constitute substantial elements in the damage award.

**Counsel:** (The Partnership), Roy O. McCord, McCord and McCord, (Conrad O. Moss, Individually), F. Guthrie Castle, Jr., Borod & Huggins, for Appellant.

Joseph Barry Jones, Bradley, Arant, Rose & White, Linda Friedman, Thad G. Long, for Appellee.

**Judges:** Hill and Hatchett, Circuit Judges, and Thomas, [*] Senior District Judge.

**Opinion by:** HATCHETT

# Opinion

[***1011]  [*1563] HATCHETT, Circuit Judge:

This appeal arises out of an action filed by Ramada Inns, Inc. (Ramada Inns) against Gadsden Motel Company (Gadsden), a partnership, and partners, Thomas H. Heatherly, John T. Murray, and Conrad O. Moss (partners) for trademark infringement and breach of contract. The district court awarded Ramada Inns substantial damages on the claims. We affirm.

**Background**

In August, 1977, the partners purchased a motel in

---

[*] Hon. Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

Attalla, Alabama, and entered into a license agreement with Ramada Inns. In 1982, the motel began receiving poor **[\*\*2]** ratings from Ramada Inns inspectors, and Gadsden **[\*\*\*1012]** fell behind in its monthly franchise fee payments. Despite proddings from Ramada Inns, and the initiation of a refurbishing program to upgrade facilities by Gadsden, the motel never met Ramada Inns' operational standards again. On November 17, 1983, Ramada Inns terminated the license agreement citing quality dificiencies and Gadsden's failure to pay past due license fees. Ramada Inns' termination notice directed Gadsden to remove any materials or signs identifying the motel as a Ramada Inn. Inspections on January 6, 1984, and in March, 1984, revealed that Gadsden continued using Ramada Inns' signage and graphics inside and outside the motel.

On September 24, 1984, Ramada Inns brought this action for trademark infringement under the Lanham Trademark Act of 1946, *15 U.S.C. § 1051 et seq.* (Lanham Act) and for breach of the franchise agreement. The district court, acting on a motion for partial summary judgment, found Heatherly, Murray, and Moss liable on the trademark infringement claims awarded Ramada Inns $17,993.24 for past due license fees, and held the liquidated damages clause of the franchise agreement **[\*\*3]** void as a penalty. During the trial, however, the court stated that the liquidated damages issue was open to question.

On September 30, 1985, the district court entered a $255,936.08 judgment for Ramada Inns in addition to the previous award. This judgment included $94,441.08 in liquidated damages, $20,000 in attorney's fees, and trademark infringement damages trebled from $47,165 to $141,995. On October 10, 1985, Moss filed a motion to alter or amend the judgment contending, among other things, that he was not a partner in Gadsden Motel Company when the trademark infringement occurred. His motion was denied. Heatherly, Murray, and Moss all appeal asserting errors in the district court's assessment of damages.

### Discussion

The partners raise a host of issues on appeal, but only three merit discussion: (1) whether the trademark infringement damages were speculative; (2) whether the district court erred in awarding Ramada Inns trademark infringement damages in addition to the liquidated damages; and (3) whether Moss should have been spared trademark infringement liability because he withdrew from the partnership before the infringement

took place.

A. Whether the trademark **[\*\*4]** infringement damages were speculative.

The district court awarded Ramada Inns $47,165 in trademark infringement damages based on the testimony of Dr. Robert Robicheaux, then associate professor of marketing at the University of Alabama Graduate School of Business. Dr. Robicheaux arrived at his damage calculation **[\*1564]** by adding the following: (1) $23,610 in lost franchise fees for the six-month "hold over" period when Gadsden Motel Company continued to use Ramada Inns' marks; (2) $3,555 interest on the lost franchise fees; (3) $5,000 needed to develop a new franchise in the area; and (4) $15,000 for advertising to restore Ramada Inns' good reputation. The partners contend that the district court should have disregarded Dr. Robicheaux's estimates because they were too speculative. Damages were too uncertain to be awarded, in their view, because Dr. Robicheaux based his estimate of the amount of the lost franchise fees on 1983, instead of 1984. The amount was also uncertain, according to the partners, because Dr. Robicheaux's estimate that it would take $5,000 to attract a new franchise was based solely on a conversation he had with a Ramada Inns official, and because Dr. Robicheaux's **[\*\*5]** estimate that it would take $15,000 in order to restore Ramada Inns' image was based on figures for the entire southeastern area. In rebuttal, Ramada Inns contends that Dr. Robicheaux used 1983 figures because the computation of damages in the form of lost license fees is properly based on the revenues produced by a properly run motel, and that the partners' motel was run better in 1983 than in 1984. Ramada Inns further contends that the partners never objected to Dr. Robicheaux's reliance on his conversation with the Ramada Inns official to arrive at his conclusion that it would take $5,000 to get a new licensee in the area, and that Dr. Robicheaux used an estimate of the cost of remedial advertising based on the entire southeast because it was the "best information available."

*HN1*[↑] Under the Lanham Act, damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. *15 U.S.C. § 1117*. [1] The

_____

[1] The entire provision reads:

*HN3*[↑] When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office

Gadsden [***1013] Motel Company failed to realize a profit during the period of infringement; thus, [**6] the district court's damage award was based on damages sustained by Ramada Inns as a result of the infringement. The partners stress that HN2[↑] a trademark infringement award must be based on proof of actual damages and that some evidence of harm arising from the violation must exist. We agree, but the essence of the question presented remains the same. We must decide whether the district court's assessment of the actual damages or harm suffered by Ramada Inns was speculative. We conclude that it was not.

[**7] In arriving at our conclusion, we are guided by well established principles, the first and foremost being that the district court's damage assessment is entitled to deference:

> HN4[↑] 'Great latitude is given the trial judge in awarding damages, and his judgment will not be set aside unless the award is clearly inadequate.' *Drake v. E.I. DuPont de Nemours and Company, 432 F.2d 276, 279 (5th Cir.1970)*. This is especially true of an award fashioned pursuant to the Lanham Act which expressly confers upon district judges wide discretion in determining a just amount of [*1565] recovery for trademark infringement. *See 15 U.S.C. § 1117.*

*Holiday Inns, Inc. v. Alberding, 683 F.2d 931 (5th*

---

shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 111 and 114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney's fees to the prevailing party.

*Cir.1982)*. *See also Burger King v. Mason, 710 F.2d 1480, 1495 (11th Cir. 1983)* (*15 U.S.C. § 1117* "vests considerable discretion in the district court.") HN5[↑] In making a damage assessment, the district [**8] court may allow recovery for "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts." *Boston Professional Hockey v. Dallas Cap, 597 F.2d 71 (5th Cir.1979)* (quoting *Obear-Nester Glass Company v. United Drug Company, 149 F.2d 671* (8th Cir.), *cert. denied, 326 U.S. 761, 66 S. Ct. 141, 90 L. Ed. 458, 67 U.S.P.Q. (BNA) 360 (1945))*. Moreover, HN6[↑] Lanham Act damages may be awarded even when they are not susceptible to precise calculations:

> Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation. *Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 563, 51 S. Ct. 248, at 250, 75 L. Ed. 544 (1931)*. HN7[↑] The wrongdoer may not complain of inexactness where [**9] his actions preclude precise computation of the extent of the injury. *Eastman Kodak Company v. Southern Photo Company, 273 U.S. 359, 379, 47 S. Ct. 400* [405], *71 L. Ed. 684 (1927)*.

*Bangor Punta Operations v. Universal Marine Company, 543 F.2d 1107, 1110-11 (5th Cir.1976)*; *Borg-Warner Corporation v. York-Shipley, Inc., 293 F.2d 88, 95 (7th Cir.1961)* ("damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded.") Under these teachings, the district court's $47,165 damage award cannot be termed "speculative," especially considering that it was based on unrebutted expert testimony.

Moss further contends, however, that the award in this case "imposes a hypothetical franchise contract onto the facts and makes an award for breach thereof," and thus "runs afoul of the rule" established in *St. Charles Manufacturing Company v. Mercer, 737 F.2d 891 (11th Cir.1983)*. In *St. Charles*, defendants, developers of a townhome community in Palm Beach, Florida, represented that their homes would contain [**10] "St. Charles kitchens" without reaching an agreement with

804 F.2d 1562, *1565; 1986 U.S. App. LEXIS 34279, **10; 1 U.S.P.Q.2D (BNA) 1011, ***1013

the plaintiff, St. Charles, to do so. The plaintiff brought a trademark infringement action under the Lanham Act and sought to recover the profit they would have made on the sales to the defendants.

We found this an "inappropriate measure of damages under the Act" and affirmed the district court's denial of relief. *St. Charles* is clearly inapposite. Notwithstanding Moss's contention to the contrary, Ramada Inns did **[\*\*\*1014]** not seek to recover profits it would have received had it sold the use of its trademark to Gadsden during the infringement period. Rather, much of Ramada Inns' award represented franchise fees or "royalties" lost during the infringement period. This was entirely proper: *HN8* "Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks." *Holiday Inns v. Airport Holiday Corporation, 493 F. Supp. 1025, 1028 (N.D.Tex.1980)* (citing *Boston Professional Hockey Association v. Dallas Cap Manufacturing, 597 F.2d 71 (5th Cir.1979))*.

B. Whether the **[\*\*11]** district court erred in awarding Ramada Inns trademark infringement damages in addition to the liquidated damages.

The partners next contend that the district court erred in awarding Ramada Inns damages under both the liquidated damages clause of the franchise agreement and under the Lanham Act. The partners point out that the purpose of including the liquidated damages in the agreement was to compensate Ramada Inns for lost franchise fees and expenditures to attract a **[\*1566]** new franchisee for a period of two years after breach of the franchise agreement. Because some of the trademark infringement award was based upon the same items considered for liquidated damages, the partners claim that Ramada Inns received a "double recovery for a single injury."

In rebuttal, Ramada Inns contends that the partners' argument is meritless because the liquidated damages and trademark infringement damages related to an "entirely separate set of wrongs." In support of this contention, Ramada Inns points out that the liquidated damages were recoverable even in the absence of trademark infringement, and upon the partners' breach of the franchise agreement, they became, like any other infringers, **[\*\*12]** liable for trademark infringement damages. Ramada Inns further contends that it did not receive a double recovery for a single injury because the liquidated damages were only intended to provide compensation for two years of expenses and lost

franchise fees *after* the period of infringement ended.

This issue, one of first impression in our circuit, is problematic. We begin our analysis by examining the parties' contentions. After careful review of the record, we find it indisputable that the trademark infringement damages were *calculated* in almost the same manner as the liquidated damages. The district court reversed an earlier ruling that the liquidated damages clause of the franchise agreement was void in large part because James Wellbeloved, Ramada Inns' director of franchise administration, testified that the purpose of the liquidated damages clause was to compensate Ramada Inns for lost franchise fees and expenditures to establish a new franchisee upon premature termination of a franchise agreement. Likewise, the bulk of the trademark infringement damages were awarded based on Dr. Robicheaux's testimony that to be made whole for the infringement, Ramada Inns would need **[\*\*13]** a sum to compensate for lost franchise fees and expenditures needed to attract a new franchisee.

Our determination that these two elements -- loss of franchise fees and expenditures to establish a new franchisee -- were both taken into account in calculating each damage award does not end the analysis. The question next faced is: whether the fact that common elements were used to calculate the two damage awards resulted in Ramada Inns' receiving an impermissible "double recovery."

First, we note that Ramada Inns' observation that damages were awarded for two "set of wrongs" is as irrefutable as the partners' contention that the damage awards included common elements. Liquidated damages were awarded because the partners breached the franchise agreement; trademark infringement damages were awarded because they held over for six months *after* the agreement was terminated. The franchise agreement stated clearly that upon termination, Ramada Inns was entitled to liquidated damages. Under the Lanham Act, Ramada Inns was entitled to damages for the partners' impermissible "holding over." After all, "holding over" is no different than unlawfully using the Ramada Inns' marks from the **[\*\*14]** beginning of operations. By committing these two indiscretions, the partners became liable for two damage awards. Since damages are not always given to precise calculation, a possibility always exists that some overlap will occur when separate awards are made to compensate for separate wrongs.

Second, were we to hold that the district court erred in

804 F.2d 1562, *1566; 1986 U.S. App. LEXIS 34279, **14; 1 U.S.P.Q.2D (BNA) 1011, ***1014

awarding trademark infringement damages, we would undoubtedly subvert the purpose behind the Lanham Act. [2] [***1015] HN9[↑] When a trademark infringement action [*1567] is established because a franchisee "holds over" as here, and damages are based on the franchisor's losses, royalties normally received by the franchisor and expenditures necessary to establish a new franchisee will constitute substantial elements in the damage award. See *Boston Professional Hockey v. Dallas Cap, 597 F.2d 71, 75 (5th Cir.1979)*. Were we to hold that trademark infringement damages could not be recovered if the franchisor received like damages in a separate action for breach of the franchise agreement, we would provide an incentive for some infringers to "hold [**15] over." With the knowledge that they could only be answerable for contractual damages, unscrupulous infringers would "hold over" with impunity.

[**16] C. Whether Moss should have been spared trademark infringement liability because he withdrew from the partnership before the infringement occurred.

Moss contends that he is not liable for trademark infringement damages because he extricated himself from the partnership before the infringement period began. Moss points out that in his answer to Ramada Inns' complaint, he denied that he was a general partner of Gadsden Motel Company, and he further contends that no evidence was adduced at trial or for purposes of summary judgment which indicated that he participated in the trademark infringement. In response, Ramada

_____

[2] Title *15 U.S.C. § 1127* provides in pertinent part:

The intent of this chapter is to regulate commerce within the control of Congress by *making actionable* the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by state, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations. [Emphasis added.]

An action for trademark infringement is, of course, useless in many instances if damages for the infringement are not recoverable.

Inns contends that Moss's liability was determined under the district court's August 13, 1985, order granting partial summary judgment. Because Moss failed to appeal that order, Ramada Inns claims that this court has no jurisdiction to consider Moss's claim. Finally, Ramada Inns asserts that the "agreed summary" in the pretrial order stipulated that Moss was situated similarly to the other partners and that Moss failed to claim a different status at trial.

The district court denied Moss's post-trial motion to extricate himself from trademark infringement liability [**17] pursuant to *Rules 52(b)* and *59(e) of the Federal Rules of Civil Procedure*. The district court's order denying Moss's motion adequately disposes of his arguments on appeal. In disposing of the motion, the district court stated:

Until the final judgment was entered all defendants were represented only by one attorney. On May 30, 1985 *all* defendants admitted owing $17,994.24 to plaintiff. Moss made no attempt whatsoever to distinguish himself from the pack, and on August 13, 1985 the court entered partial summary judgment in favor of plaintiff and against *all* defendants in the sum of $17,994.24 and made the judgment appealable under *Rule 54(b) Federal Rule of Civil Procedure*. Moss did not take a timely appeal from that judgment and thus identified himself again with the other defendants. From the phrasing in Moss's post judgment motion he seems to claim that he should be relieved from any obligation even under the partial summary judgment of August 13, 1985. Obviously his request comes too late. If he does not now intend to extricate himself entirely, then his earlier failure to distinguish himself constituted a confession of a lack of distinction.

The district [**18] court went on to point out that the plural "defendants" appeared throughout the "agreed summary" of the July 3, 1985, pretrial order, and that Moss never attempted to distinguish himself or advance a defense separate from the other partners. We find Moss's contention that the pretrial order was ambiguous unpersuasive. If Moss withdrew from the partnership before the trademark infringement began, as he contends, he must now pay for his "want of caution in the proceedings [*1568] below." *Holiday Inns, Inc. v. Alberding, 683 F.2d 931, 934-35 (5th Cir.1982)*.

804 F.2d 1562, *1568; 1986 U.S. App. LEXIS 34279, **18; 1 U.S.P.Q.2D (BNA) 1011, ***1015

**Conclusion**

We have examined the partners' other contentions of error and find them meritless. We also conclude that the district court did not abuse its discretion in trebling the damages, awarding prelitigation interest, and awarding Ramada Inns $20,000 in attorney's fees. For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

**End of Document**